UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK 12 CIV 7372

---

FINANCIAL GUARANTY INSURANCE
COMPANY,

Plaintiff,

-against-

THE PUTNAM ADVISORY COMPANY,
LLC,

Defendant.

---

12 Civ. ____

**COMPLAINT**



Plaintiff Financial Guaranty Insurance Company ("FGIC" or "Plaintiff"), by its attorneys

Quinn Emanuel Urquhart & Sullivan, LLP, brings this Complaint against The Putnam Advisory

Company, LLC ("Putnam") and alleges as follows:

### Nature of the Case

1.      The success or failure of a Collateralized Debt Obligation ("CDO") is directly tied

to the credit quality of the assets selected for inclusion in the portfolio of assets securing the

payment obligations of the CDO.  That is because payments from the CDO are generated by

those assets.  Thus, there is nothing more important to investors in a CDO than the integrity and

business acumen of the organization that selects the assets.  This action arises out of Putnam's

fraudulent misrepresentations that it—and it alone—would select the collateral for a complex

collateralized  CDO called Pyxis ABS CDO 2006-1 ("Pyxis"), and that it would do so acting

independently and in good faith in the interests of long investors (i.e., investors who profit when

the investment performs as designed and succeeds).  Putnam made these written and oral

misrepresentations to induce FGIC to insure $900 million of credit protection on Pyxis, which in

turn ensured that Pyxis would close and that Putnam would earn millions of dollars in

management fees for its role as collateral manager. In fact, Putnam did not select the Pyxis collateral acting independently and in good faith. Rather, Putnam allowed the collateral selection process to be controlled by Magnetar Capital LLC ("Magnetar"), a hedge fund manager with a significant net short investment in Pyxis—*i.e.*, an investment that would pay off when Pyxis defaulted. Had FGIC known that Putnam was not selecting the Pyxis collateral independently, but was instead allowing the selection process to be controlled by a net short investor—whose economic interests directly conflicted with FGIC—FGIC would never have provided insurance on Pyxis, and FGIC would not have lost millions when Pyxis defaulted.

2.     In July 2006, Putnam, with Calyon Corporate and Investment Bank ("Calyon"), began marketing Pyxis. As with all CDOs, the financial success of Pyxis was totally dependent upon the performance of the underlying collateral. This collateral is the principal source of funds used to pay investors in the CDOs. The Pyxis CDO was collateralized by other securities (the "Pyxis Portfolio"), including residential mortgage-backed securities ("RMBS"), that were pooled and securitized so they could be marketed to investors. The higher the credit quality of the collateral, the lower the chances of default. Conversely, the lower the credit quality of the collateral, the greater the chances of default. Accordingly, for long investors, nothing was more important than the competence and independence of the collateral manager—in this case, Putnam.

3.     The relevant parts of the Pyxis offering documents were prepared by Putnam. They  stated clearly and unambiguously that the collateral for the Pyxis Portfolio was to be chosen by Putnam, which represented that it was an experienced, respected and putatively independent asset management firm. Putnam told FGIC, both orally and in writing, that it was

using its own market-tested, rigorous selection process in selecting collateral, which was consistent with the highest industry standards.

4.      However, unbeknownst to FGIC, Putnam did not select the securities for Pyxis. Rather, there is overwhelming evidence that the Pyxis collateral selection process was controlled and directed by Magnetar.  In fact, Putnam even allowed Magnetar to exercise veto rights over any investments that went into the Pyxis Portfolio.

5.      At the very same time, Magnetar was also "shorting" Pyxis by entering into credit default swaps ("CDS") with various entities.  Under these CDS, Magnetar paid premiums to a counterparty, and the counterparty in turn guaranteed payments to Magnetar in the event that Pyxis defaulted.  As a result of these multiple CDS, Magnetar stood to gain substantial profits if Pyxis defaulted.

6.      For its part, Putnam received millions in collateral management fees for cooperating with Magnetar's scheme.  Putnam had other economic incentives to cooperate. Pyxis was Putnam's first structured finance CDO since 2003, and its first ever CDO primarily backed by subprime RMBS.  Putnam saw Pyxis as a chance to establish a foothold in the market for managing such CDOs, taking advantage of its close relationship with the Magnetar executive responsible for Magnetar's CDOs (a former Putnam employee).  As a result of its cooperation with Magnetar on Pyxis, Putnam was selected by Magnetar as the collateral manager for a second Pyxis CDO, which also gained it millions in fees.  Putnam would not have received any of these substantial fees had it not allowed Magnetar to control the selection of assets that went into the Pyxis Portfolio.

7.      Magnetar's scheme, and Putnam's profits, were dependent upon Pyxis actually closing.  If Pyxis did not close, there would be no assets for Magnetar to short, no CDO for

Putnam to manage and no fees for Putnam to earn. The closing of the Pyxis CDO in turn depended largely on a party agreeing to provide insurance on the $900 million (60% of the aggregate initial value of the Pyxis Portfolio) "Super Senior" swap between Pyxis and Calyon, which was senior to other AAA-rated tranches and was itself AAA-rated.

8.      This insurance was provided by FGIC, via a financial guaranty insurance policy (the "Pyxis Guaranty") that insured payment of all obligations owed by FGIC's wholly-owned subsidiary, FGIC Credit Products LLC, under a CDS referencing Pyxis (the "Pyxis Swap"). Under the Pyxis Swap, in return for Calyon's payment of premiums, FGIC Credit Products LLC agreed that, if Pyxis defaulted, it would make all the payments owed by Calyon on its underlying swap with Pyxis. Without the Pyxis Guaranty to insure payment of all sums due under the Pyxis Swap, Pyxis would not have closed, and neither Magnetar nor Putnam would have obtained their hoped-for windfalls.

9.      FGIC agreed to enter into the Pyxis Guaranty based on Putnam's demonstrably false representations that it would independently select and manage the Pyxis Portfolio. Because FGIC's liability under the Pyxis Guaranty depended on the performance of Pyxis, which in turn depended on the performance of the Pyxis Portfolio, FGIC relied primarily on Putnam's represented financial acumen and independence in selecting the right assets in its decision to enter into the Pyxis Guaranty.

10.     Having created Pyxis, Putnam and Magnetar had exclusive knowledge of the facts rendering their representations false. Putnam knew, and affirmatively and actively concealed from FGIC, that it was not acting independently in selecting collateral for Pyxis and that Magnetar, in collusion with Putnam, had rigged the collateral selection process of the Pyxis

4

Portfolio so that it could select weaker assets whose performance it could bet against through the use of CDS.

11.     As Putnam was well aware, had FGIC known the truth about Pyxis—(a) that Putnam was *not* acting independently, (b) that Magnetar was involved in the process, and (c) that Magnetar was shorting the Pyxis notes (and therefore had economic interests that conflicted with those of FGIC)—it would never have agreed to enter into the Pyxis Guaranty.

12.     On April 30, 2008, only 18 months after Pyxis closed, Fitch Ratings Ltd. ("Fitch") downgraded the credit rating of the Pyxis Super Senior tranche from AAA to C. Ultimately, Pyxis defaulted and FGIC incurred potential liability of up to $900 million under the Pyxis Guaranty.  FGIC has thus suffered substantial losses as a result of Putnam's' fraud and misrepresentations.

13.     The evidence is clear that FGIC's loss was not the result of neutral market forces. It was instead the direct and intended result of Putnam's actions and those of Magnetar—actions which were substantively identical to those for which Goldman, Sachs & Co. recently agreed to pay $550 million to settle claims brought by the Securities and Exchange Commission ("SEC"). *See Securities and Exchange Commission v. Goldman, Sachs & Co.*, 790 F. Supp. 2d 147, 149-50 (S.D.N.Y. 2011).

14.     Moreover, it is now known that Pyxis was not the first transaction in which Magnetar colluded with a compliant collateral manager like Putnam.  In fact Pyxis was a part of a much larger scheme.  Pyxis was just one of numerous so-called "Constellation" CDOs in which Magnetar secretly controlled asset selection for the CDO and then bet that the CDO would lose money, making billions of dollars in profits at the expense of unsuspecting long investors.

15.    The full extent of the scheme is now becoming public.  J.P. Morgan recently paid $153.6 million to settle SEC charges that it participated with Magnetar in a similar scheme, and the SEC is currently investigating several other CDOs with which Magnetar was involved. Indeed, just four months ago, on information and belief, the SEC began an investigation of Magnetar itself, not merely of the banks and rating agencies who dealt with it.   In addition, the Securities Division of the Commonwealth of Massachusetts recently imposed a $5 million penalty on State Street Global Advisors for its failure to disclose Magnetar's involvement in a CDO for which it acted as the investment manager.  *See* Commonwealth of Massachusetts Securities Division Consent Order, *In the Matter of: State Street Global Advisors (Carina CDO, Ltd.)*, Docket No. 2011-0023 (February 28, 2012).

16.    It is also noteworthy that, after incriminating evidence came to light last year in a lawsuit brought against Putnam and Calyon *by investors in Pyxis*, the investors' claims were promptly settled for an undisclosed amount.  *See Loreley Fin. (Jersey) No. 7 Ltd. v. Credit Agricole Corporate & Inv. Bank*, No. 650673/2010 (Sup. Ct. N.Y. County June 18, 2010).

17.    In sum, FGIC reasonably relied on Putnam's written and oral misrepresentations concerning its independence and business acumen in entering into the Pyxis Guaranty.  FGIC would never have entered into the transaction had it known Putnam was not acting independently, because Putnam's independence was critical.  Furthermore, FGIC certainly would not have entered into the Pyxis Guaranty had it known an entity with conflicting economic interests to FGIC had rigged the asset selection process.  As a result of its misplaced reliance, FGIC lost millions.  FGIC therefore brings this action for fraud, negligent misrepresentation and negligence against Putnam.

## The Parties

### I.    The Plaintiff

18.    Plaintiff Financial Guaranty Insurance Company is a stock insurance company organized under the laws of New York, with its principal office located at 125 Park Avenue, New York, New York 10017.

### II.    The Defendant

19.    The Putnam Advisory Company, the Defendant, is a limited liability company organized and existing under the laws of Delaware.  Its principal executive office is located at 1 Post Office Square, Boston, Massachusetts 02109.  It is a registered investment advisor specializing in asset management, including CDOs.

## Jurisdiction and Venue

20.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1332, because the amount in controversy exceeds $75,000, exclusive of interest and costs, and because the plaintiff and defendant are citizens of different states.

21.    This Court has jurisdiction over Putnam under F.R.C.P. 4(k)(1)(A) and CPLR 301 and 302(a)(1) because, at all times relevant to the allegations of this Complaint, Putnam regularly transacted business in New York, committed tortious acts in New York, and committed tortious acts causing injury in New York.

22.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c).  The wrongful acts alleged herein occurred in this District.

## Factual Background

### I.    Collateralized Debt Obligations

23.    A CDO is a special purpose financial vehicle that purchases, or assumes the risk of, a portfolio of assets (the "portfolio")—such as bonds or loans—and issues securities which

then make payments to investors from the income generated by the assets in the portfolio. A CDO's portfolio can include a variety of assets, like commercial or residential mortgage-backed securities ("CMBS" and "RMBS," respectively), securities issued by other CDOs, or CDS referencing those types of obligations. When a CDO performs as designed, the assets that form the CDO portfolio generate a stream of cash flows (*e.g.*, from mortgage payments) that the CDO uses to pay its expenses and make interest and principal payments to the CDO's note holders. Any remaining cash flows go to the CDO's equity investors, if there are any. Whether a CDO's issued securities will be repaid in full depends primarily on the CDO's structure and the credit quality (and subsequent performance) of the portfolio of assets in the CDO. Thus, for a CDO comprised primarily of RMBS, CDO noteholders will be more likely to receive promised payments of interest and principal if the rate of collection on the underlying individual mortgages is high. Obviously, the higher the credit quality of the mortgages in the portfolio, the more likely that payments to the CDO noteholders will be made. Just as obviously, the converse is also true. So, from the investor's perspective nothing is more important than the skill and judgment of the entity selecting which assets to put into the CDO portfolio.

24.     To buy their portfolio of assets, CDOs raise money from investors by issuing multiple classes of notes and equity interests. A CDO's notes are not necessarily all subject to the same level of risk. Rather, CDO notes are issued in "tranches" representing different levels of risk (and therefore potential reward). This is achieved by creating a hierarchical structure of note holders in the CDO. The senior tranche of a CDO typically receives the highest "AAA" rating. "Super senior" CDO tranches, which are intended to be even more remote from loss, are senior to another tranche that is also rated AAA. Because the most senior tranches receive

proceeds from the CDO portfolio first, they bear the lowest risk of sustaining losses in the CDO structure.

25.     Correspondingly, CDO notes do not all offer the same level of anticipated return to their purchasers. The interest on CDO notes is set according to their expected level of risk. More junior tranches generally offer higher interest, but are exposed to a higher risk of shortfalls, because their position in the CDO structure exposes them to losses in the portfolio before the more senior notes. The more senior tranches, on the other hand, receive lower investment returns because they benefit from greater subordination and thus carry lower risk.

26.     Rating agencies typically assign ratings to the tranches of a CDO—except for the equity or income tranche (if any). The rating agencies also assign ratings to the underlying assets that are either held or referenced by the CDO. The risk of default on properly rated AAA tranches issued by a CDO should be remote if: (a) the portfolio includes only securities of credit quality commensurate with expected loss rates; and (b) the amount of subordination is set properly, according to the quality of the portfolio, to absorb potential losses so that the risk of default affecting the senior tranches is extremely remote. Therefore, one of the most critical determinants of a CDO's performance is the selection and management of its portfolio.

## II.     Managed CDOs: Why the Role Of The Collateral Manager Is Crucial to the Success of the CDO.

27.     Pyxis was designed to be a managed CDO. The assets selected for a managed CDO are selected by a collateral manager. The collateral manager is given significant discretion and is expected to use his best efforts in managing the CDO portfolio. For actively managed, cash-flow CDOs like Pyxis, the CDO's portfolio is supposed to be selected and managed by a collateral manager. Managing a CDO portfolio typically involves, among other things, selecting the assets for inclusion in the initial portfolio, monitoring the credit status of the individual

underlying assets, reinvesting payment proceeds from maturing underlying assets, and making substitutions in the portfolio of assets to the extent consistent with the CDO's operative agreements.  A collateral manager, therefore, can greatly impact a CDO's performance and either lower—or raise—its risk profile.  It almost goes without saying that the expertise of the collateral manager is critical.

28.     As explained by Ian Giddy, Professor of Finance at the Stern School of Business at New York University:

> [T]the manager's expertise with the assets and ability to manage within established constraints is *paramount* to the success of the CDOs. *Market consensus is that the manager is the most important factor in the performance of a CDO.*

"The CDO Product," by Ian Giddy, Professor of Finance at the Stern School of Business at New York University (emphasis added).  As Putnam itself stated in the Pyxis offering memorandum, "[b]ecause the composition of the [portfolio] will vary over time, *the performance of the [portfolio] depends heavily on the skills of the Collateral Manager* in analyzing, selecting, and managing the [portfolio]."  (Emphasis added.)

29.     Fundamental to the collateral manager's role is that it will act independently and will serve, first and foremost, the interests of the CDO's investors.  As explained by the former Co-Head of Global CDOs at Citigroup in testimony to the U.S. Financial Crisis Inquiry Commission ("FCIC") in April 2010: "The collateral manager's role was to . . . manage and trade the collateral pool for the benefit of the debt and equity issued by the CDO."

30.     Investors rely heavily on the collateral manager's professed sophistication in analyzing and selecting assets for the CDO's portfolio.  This is especially true for investments in other CDOs, whose complex portfolios are themselves comprised of other CDOs and RMBS,

which are in turn dependent on the performance of underlying loans. Evaluating such intricate, multilayered deals requires significant expertise. Most investors must rely heavily on the due diligence conducted by others, including the collateral manager.

31.     Collateral managers are paid a fee for their services, typically a percentage of the notional value of the transaction (*i.e.,* the total face amount of all securities issued by the CDO), the cost of which is ultimately paid by the CDO investors.

32.     Most of a CDO's initial portfolio of assets are selected by the collateral manager in the months before the CDO closing. Because the CDO has not yet raised any capital during that period (which, along with any post-closing period in which the CDO continues to acquire its portfolio, is known as the "ramp up period"), the pre-closing acquisition of assets is funded pursuant to a CDO "warehousing facility" between the collateral manager and the warehousing facility provider, which is usually the bank structuring the transaction (here, Calyon). If the CDO fails to close, the warehousing facility provider is usually at risk for assets that had already been acquired for the CDO's portfolio. Upon the CDO's closing, however, all of the assets that were acquired pursuant to the warehousing facility are transferred to the CDO (so long as they still qualify under the eligibility criteria that are established for such CDO), with the warehousing facility provider receiving reimbursement via the funds raised by the CDO through its issuance of notes and equity. After the CDO closes, the collateral manager typically continues to acquire assets for the CDO portfolio until it is fully "ramped up" (*i.e.,* complete). The collateral manager also manages the acquired underlying assets pursuant to the terms of the CDO's indenture and a collateral management agreement between the CDO and the collateral manager setting forth the collateral manager's responsibilities.

**III.     Credit Default Swaps: A Form of Credit Protection (Like Insurance).**

33.     Credit default swaps are commonly used forms of credit protection (similar to credit insurance) in which, in return for the payment of premiums by one party (the "buyer" of credit protection), the counterparty (the "seller" of credit protection) agrees to make payments upon the occurrence of one or more agreed-upon "Credit Events" (as defined in the CDS transaction documents), generally including, without limitation, a default by the issuer of a specified security to pay when due the principal of or interest on that security.  In general, the buyer of credit protection has a "short" position with respect to the specified security, since it will be entitled to a payment if the specified security defaults.  Conversely, the seller—and through the seller, the guarantor—of credit protection has a "long" position with respect to the specified security, since it bears the risk of default by the issuer on the specified security.

**IV.     Magnetar's CDO Shorting Scheme**

34.     Magnetar was founded in 2005 and grew rapidly.  Though not well known outside the structured credit market, it became a major participant in that market.  From its launch in 2005 through 2007, Magnetar grew 500% in terms of assets under management, from approximately $1.5 billion under management to approximately $9 billion.  That growth occurred largely because of profits from Magnetar's shorting scheme as applied to multiple CDO transactions.  Magnetar facilitated the creation of CDOs with portfolios of RMBS and CDO securities ultimately backed by RMBS.  Magnetar then shorted those very same CDOs, generally by means of credit default swaps, and netted substantial profits when they defaulted.

35.     In early 2006, as default rates on subprime mortgages in the United States began to rise, Magnetar began to bet heavily <u>against</u> securities backed by subprime mortgages.  It did so by shorting subprime RMBS and RMBS CDOs through the use of credit default swaps.  That is, Magnetar sought to buy credit protection through credit default swaps on RMBS and RMBS CDOs.  Under the credit default swaps Magnetar entered, if one or more Credit Events occurred

on any of the underlying RMBS and RMBS CDOs, Magnetar would receive payments under the credit default swaps.

36.    During this period, Magnetar found it increasingly difficult to buy large amounts of credit default swap protection on subprime RMBS CDO tranches, because there were not many investors willing to take the most risky, equity stakes in CDOs. To solve this problem, Magnetar worked secretly with a number of collateral managers, like Putnam, to launch a series of CDOs disguised as *bona fide* investments for the benefit of CDO note holders (*i.e.*, "long" investors). In reality, however, these were vehicles designed by Magnetar to allow it take short positions via credit default swaps on billions of dollars of subprime mortgage bonds at below-market costs. In these CDOs, Magnetar served as the equity investor, making it possible to procure investors (including insurers such as FGIC) willing to take long positions in the CDOs. The CDOs in turn gave Magnetar the opportunity (1) to make massive short bets against the assets being purchased by the CDOs by entering into CDS referencing either the synthetic assets of the CDO, or the securities issued by the CDO itself; and (2) to control the composition of those assets by secretly dictating—and having veto rights over—the asset selection for the CDOs. The more toxic assets Magnetar could direct the collateral manager to include in the CDO, the faster and larger the payout to Magnetar via the credit default swaps it purchased that were triggered by the default of the CDOs.

37.    Magnetar's shorting scheme has now been reported in multiple media sources. As recounted in a Pulitzer Prize-winning April 9, 2010 investigative report authored by ProPublica, "[u]sually, investment banks had to go out and find buyers of the equity. With Magnetar, the buyer came right to the bank's doorstep. Wall Street was overjoyed." Jesse Eisinger and Jake Bernstein, "The Magnetar Trade: How One Hedge Fund Helped Keep the

13

Bubble Going," PROPUBLICA, April 9, 2010.  A banker told ProPublica that Magnetar's purchase

of equity tranches "seemed like a miracle" because "no one" had been buying the equity.

38.       Unlike an ordinary investor, Magnetar bought the equity in its CDOs not because

it believed that the equity was a sound investment.  Rather, as Putnam knew, Magnetar was

positioned to benefit from the ultimate failure of the very CDOs that it had helped to create.

Magnetar used its equity tranches, and in particular the unusually early and substantial payouts

that it arranged for those tranches to receive (at the expense of more senior tranches), to fund its

short positions on the very same deals, during the (relatively) brief time between closing and the

deal's collapse.

39.       As described by one former Goldman Sachs banker:

> Magnetar owns the [CDO's] equity layer, which throws out a lot of
> cash for perhaps a year or two and then starts to decay quickly.  They
> bet against the better slices, *short the very same deals they created*[.]
>
> ***
>
> *It only works if the deal is so bad that the equity, plus the higher
> layers, are all toast*.  Magnetar would not make its target returns
> on the equity tranche alone.  *The deals had to fail for them to
> succeed*.  It was common for funds like Magnetar to let a trading
> desk know what parameters it wanted, and the traders would in
> turn line up suitable investments with the CDO manager.
> *Magnetar influenced the transaction by mandating a certain
> equity return, which meant the CDO would have to hold the
> 'spreadiest' (i.e., riskiest) crap*.

Yves Smith, ECONNED, at 258-59 (Palgrave MacMillan 2010).  (Emphasis added.)

40.       The ratio of Magnetar's short positions to its equity positions varied from deal to

deal, but it was often 6-to-1 or even higher, meaning that when a Magnetar CDO such as Pyxis

failed, the payoff on Magnetar's short positions was at least six times the amount of Magnetar's

original equity investment in that CDO.  It was like printing money.

## A.       Magnetar Directed Collateral Managers to Purchase "Crap" and Insisted on Veto Rights on Asset Purchases

14

41.     Magnetar acted as the equity sponsor for, and secretly influenced the portfolio selection of, at least 26 so-called "Constellation" CDOs—beginning with Orion 2006-1, which closed on May 26, 2006.  Orion was followed shortly thereafter by Pyxis and numerous other CDOs.  Magnetar secretly insisted on having a "veto" right over any asset that might become part of a CDO's reference portfolio.  Unbeknownst to FGIC and other prospective investors, Magnetar bought cooperation and acquiescence in this "veto" arrangement from putatively independent collateral managers like Putnam by promising larger fees and a substantial, steady flow of deals.  In a September 8, 2006 email to a prospective CDO manager, for example, Magnetar executive James Prusko (formerly of Putnam) stated:  "Our goal is to *partner* with managers and do a series of deals, there are two managers with whom we are already on our third deal . . . I think the cumulative business will be worthwhile even if you feel the first deal is too skinny."  Magnetar's Prusko wrote to the same collateral manager that made his intentions crystal clear—Magnetar was to control the selection of assets:  "I have attached the target portfolio that I would like for this deal with target spreads that I believe are very achievable in the current market."  When that collateral manager refused to assemble such a portfolio, Magnetar declined to work with the manager on any other CDOs.

V.     **The Pyxis CDO**

42.     Pyxis, for which Putnam was the "independent" collateral manager, was a so-called "hybrid" CDO, which means that its $1.5 billion portfolio included both "cash" and "synthetic" underlying assets.  Approximately 23% (or $350 million par value) of the Pyxis Portfolio was comprised of "cash" assets, that is, investments that Pyxis actually purchased.  The remaining 77% (or $1.15 billion par value) of the Pyxis Portfolio was comprised of "synthetic" assets, which are assets created through credit default swaps that referenced other asset-backed securities not actually owned by Pyxis.  In these credit default swaps, Pyxis sold credit protection

to counterparties (*i.e.,* agreed to make payments in the event of specified Credit Events, such as failure by the issuer of the referenced security to pay when due the interest or principal thereon) in exchange for premium payments. The performance of these securities—contractually mandated to be selected by Putnam—would thus determine the returns (or losses) to Pyxis under the credit default swaps. If the assets performed well, Pyxis would enjoy the premium payments without having to make any credit protection payments. However, if the assets performed badly, then Pyxis would have to make credit protection payments to the credit default swap counterparty, potentially up to the full notional amount of the referenced obligation. These potential payments could exceed by many multiples the premium payments to which Pyxis was entitled under the credit default swaps. Through such swaps, Pyxis was the "long" investor on the referenced securities making up the synthetic portion of its portfolio, while the credit default swap counterparties were "short" the same securities.

43.    Pyxis took the risk that the securities would not perform through selling protection to Calyon. Calyon performed the role of credit protection buyer, meaning that it paid the premiums to Pyxis under the credit default swap in exchange for protection payments in the event that one or more Credit Events occurred on any of the Portfolio assets. For most of the specified assets, Calyon represented that it acted only as an intermediary, meaning that the ultimate short positions were held by other market participants whose identity was never disclosed to FGIC. As explained in the offering materials, this was achieved through a series of "back to back hedging transactions" between Calyon and other counterparties, which referenced the same obligations as the credit default swap between Calyon, in its role as credit default swap Counterparty, and Pyxis. In this way, Calyon effectively acted as a conduit for parties willing to take a short position on particular assets, with Pyxis acting as the "long" investor. Payments

under the credit default swaps would flow between Pyxis and the ultimate short counterparty via
Calyon; if the referenced assets performed well, Pyxis would simply receive its premium, which
was paid by the short counterparty to Calyon and then passed from Calyon to Pyxis (with Calyon
keeping a portion of the premium for itself). But, if the referenced assets performed badly, Pyxis
would be obligated to make loss payments that would ultimately flow to the short party via
Calyon.

A. **The Quid Pro Quo for Allowing Magnetar to Control the Selection of the
Pyxis Collateral Were Large Management Fees and the Promise of
Additional Deal Volume**

44.     Putnam acted as the putative collateral manager on Pyxis. For its role as
collateral manager, Putnam was to receive a fixed (or "senior") fee of fifteen basis points, or
0.15% of the outstanding principal of the Pyxis CDO per year. Because of the size of Pyxis—
which, like all Constellation CDOs, was far larger than a typical CDO (with an initial deal
volume of $1.5 billion)—Putnam's fixed fee would be $2.25 million for the first year alone.
This was almost twice what the manager of a typical CDO (with an initial deal volume of $400
million) would earn. Indeed, Putnam's fixed management fee on Pyxis was high even by the
standards of Magnetar CDOs. On information and belief, Putnam's fixed fee of 15 basis points
was higher than the fixed fee paid to the collateral manager in all but three of Magnetar's 26
CDOs, and higher than the total fee—including both fixed and incentive fees—on all but six of
Magnetar's CDOs. In fact, the fixed fee paid to the collateral manager on the vast majority of
Magnetar's CDOs was only 10 basis points, and Putnam's fixed fee of 15 basis points was higher
than the fixed fee *and the incentive fee combined* on a number of other Magnetar CDOs. Thus,
Magnetar was willing to pay extra for Putnam's cooperation in the scheme.

45.     In addition to its fixed fee, Putnam was also to receive an additional "incentive"
(or "subordinated") fee of five basis points, amounting to $0.75 million for the first year.

Although this was described as an incentive fee, payment of this fee was dependent not on Pyxis performing well, but rather on Magnetar receiving its target return, which in turn was effectively guaranteed by certain provisions favoring the equity investors in the Pyxis governing documents (set forth in ¶ 50 below).   Thus, as Magnetar's co-equity sponsor on Pyxis, Deutsche Bank, stated, Putnam's fees were "virtually assured" by Magnetar's control over Pyxis.

46.     This is demonstrated by the fact that, according to the Pyxis Trustee Reports provided to Pyxis investors, Putnam continued to be paid both its fixed and subordinated fees long after Pyxis began to fail, as shown in the table below:

| Date | Event | Cumulative senior fees | Cumulative subordinated fees | Cumulative total fees |
|------|-------|------------------------|------------------------------|------------------------|
| Feb. 12, 2007 | First payment to Putnam | $807,407 | $269,136 | $1,076,543 |
| Aug. 10, 2007 | First Pyxis collateral quality test failures | $1,934,363 | $640,505 | $2,574,868 |
| Sept. 10, 2007 | First Pyxis ratings downgrades | $2,122,134 | $640,505 | $2,762,639 |
| Dec. 10, 2007 | Pyxis A-1 notes (referenced by Pyxis Swap) downgraded | $2,655,584 | $833,238 | $3,488,822 |
| Dec. 10, 2008 | Pyxis Event of Default | $4,092,742 | $1,331,647 | $5,424,389 |
| July 3, 2012 | Latest payment to Putnam | $4,413,579 | $1,331,647 | $5,745,226 |

47.     Thus, Putnam kept getting paid both its senior and subordinated fees until Pyxis suffered an Event of Default in December 2008—sixteen months after Pyxis suffered its first

collateral quality test failures—and it is *still* receiving part of its fixed fee from Pyxis. The latest such payment was made just over two months ago, in July 2012.

48.    To date, Putnam has been paid $5,745,226—including both fixed and subordinated fees—for acting as the putative independent collateral manager for Pyxis.

49.    Putnam was further motivated to cooperate with Magnetar on Pyxis because Pyxis was Putnam's first structured finance CDO since 2003, and its first ever CDO primarily backed by subprime RMBS. Putnam saw Magnetar as the key to its gaining a foothold in this highly lucrative market. The promise of additional, similarly lucrative deal volume from Magnetar was quickly realized when Putnam was selected to serve as collateral manager for a second Pyxis CDO, Pyxis ABS CDO 2007-1 ("Pyxis 2"), which closed just a few months after Pyxis.

### B.    The Selection of Assets for Pyxis Was Manipulated by Magnetar So it Would Profit at the Expense of Noteholders and FGIC

50.    The equity ("Preference Shares") and the lowest tranche of notes ("Class X Subordinated Notes") issued by Pyxis were held equally by Magnetar and Deutsche Bank. Although the Preference Shares had a nominal value of $82.5 million, Magnetar and Deutsche Bank bought them at a 75% discount, for a total payment of $20.625 million. In addition, Magnetar and Deutsche Bank paid a total of $61.875 million for their Class X Subordinated Notes, meaning that they each paid a total of $41.25 million for the shares and notes they held in Pyxis.

51.    The structure of Pyxis was unusual in another respect—once again designed for Magnetar to profit at the expense of other noteholders. In most CDOs, the more senior the note is, the more likely the note will be paid in the event the CDO does not receive enough cash flows from the CDO portfolio to make all payments to noteholders. Pyxis was different. Pyxis, like Magnetar's other CDOs, was structured in such a way that, as long as it avoided default, the

preference shares and Class X notes would receive much larger payments of principal and interest than the senior notes during the first five years of its existence, by which time they would both be fully paid out—and they would receive a large portion of their investment back within just over a year if Pyxis avoided default for that long, which it did.  To protect this windfall, this structure could only be altered with the consent of the preference shareholders—*i.e.*, Magnetar and Deutsche Bank.  It was described by Magnetar as "triggerless," because it effectively removed the typical CDO triggers which would have redirected funds away from the holdings of Magnetar and Deutsche Bank to senior noteholders in the event of certain events reflecting deterioration in the performance of the portfolio.  Thus, despite owning the equity and the *lowest* (usually most risky) tranche of notes in Pyxis, Magnetar's risk, and eventual losses, were in fact much lower than those of senior note holders.  Indeed, a review of the Pyxis monthly investor reports reveals that, pursuant to the "triggerless" structure, the preference shareholders and Class X note holders received payments of principal and interest of $36,364,897 before Pyxis' eventual default in December 2008 (including a payment of over $7 million within a few months of closing, and one payment even *after* Pyxis defaulted), while, during this same period, senior noteholders only received payments totaling $7,450,377.  Even when the Pyxis Portfolio began failing collateral quality tests as early as August 2007 and Notes started to be downgraded by the rating agencies as early as September 2007 (which in a typical CDO would have triggered redirection of funds from the equity holders and Class X note holders to senior note holders), principal distributions could not be reallocated to senior note holders without the consent of Magnetar (which was, not surprisingly, not forthcoming).

52.     In addition, as Magnetar itself stated in a letter to the Financial Crisis Inquiry Commission, Magnetar negotiated with each of its CDOs an upfront payment "as a rebate to the

purchase price of long positions taken by the Magnetar funds," amounting to 30 basis points (0.30%) of the notional amount of the CDO.  In Pyxis' case, this was $4.5 million.  Taking Magnetar's share of this upfront payment into account, along with Magnetar's share of the payments made by Pyxis to preference shareholders and Class X note holders ($18,182,448), Magnetar's long position on Pyxis by the time Pyxis defaulted was effectively only $21 million.

53.    However, once Pyxis defaulted, Magnetar reaped the full amount of the credit protection it had purchased on Pyxis, which—as Putnam was aware—far exceeded Magnetar's long position.  Magnetar achieved its huge net short position because, unbeknownst to FGIC, the ultimate short counterparty for many of the so-called "back-to-back hedging transactions" described in the Pyxis offering materials was in fact Magnetar.  This is demonstrated by documents that have come to light in the *Loreley* litigation brought by Pyxis investors against Putnam and Calyon, a litigation that settled shortly after these documents emerged.  In September 2006, for example, when a Calyon employee questioned whether a trade ticket showing Magnetar purchasing the short side of a CDS for the Pyxis Portfolio was correct (since he had understood it was supposed to be Citigroup), Putnam confirmed: "*It is definitely Magnetar.*"  (Emphasis added.)  Moreover, this trade was merely the tip of the iceberg.  In November 2006, when Calyon asked Jim Prusko of Magnetar whether he still wanted to "buy protection on PYXIS 06-1A C (A/A2/A)," Prusko responded that he was "*actually pretty full on Pyxis A unless super level, have room for AA or BBB.*"  (Emphasis added.)  In other words, Magnetar had already taken a substantial short position on Pyxis A notes, but still wanted to buy more protection on other classes of Pyxis notes.

54.    Indeed, according to Magnetar's own letter to investors in response to ProPublica's April 9, 2010 article discussing its CDO shorting strategy, Magnetar's short

positions on the CDOs in which it invested averaged approximately 7% of the aggregate assets

of those CDOs. Thus, even assuming the accuracy of that statement, if Pyxis was merely an

*average* Magnetar CDO, Magnetar's short positions on Pyxis—with Pyxis' aggregate assets of

$1.5 billion—would have totaled $105 million! This dwarfed Magnetar's $21 million long

position.

55.     Moreover, a review of the publicly available Intex files for the Constellation

CDOs alone reveals that Magnetar bought protection on Pyxis from dealers who offset their

exposure by buying protection from at least the following Magnetar CDOs: Draco ($10 million),

Cetus 2006-4 ($10 million), Octans 2006-2 ($10 million), Cetus 6-2 ($10 million), Volans

($6.888 million), and Delphinus ($13.3 million)—a total of more than $60 million. It is

reasonable to assume that these sales resulted from sales of protection by these dealers to

Magnetar, given that Magnetar used all of these dealers regularly and that, in its investor letter,

Magnetar conceded that it was plausible that "all of Magnetar's protection instruments became

assets of the various CDOs in which we held equity, to the extent that the assets in the CDOs'

warehouses corresponded to the protection instruments held by Magnetar."

56.     In addition, a review of Intex files for other non-Constellation CDOs indicates

that Magnetar bought protection on Pyxis from dealers who offset their exposure by buying

protection, possibly totaling far more than $60 million, from at least the following CDOs: 888

Tactical, Class V III, Grand Avenue II, GSC ABS 2006-3 G, Jupiter HG 6, Lexington Capital V,

Octonion, Plettenburg Square, Raffles, Tricadia 6-7, Tricadia 7-8, West Trade II, West Trade III,

Cookson 2007-36, Cookson 2007-37, and Ridgeway Court 1. Again, given that Magnetar

regularly used most of the underwriters of these CDOs and that most of the dealers also

underwrote Magnetar CDOs, it is reasonable to assume that many of the CDOs' sales of protection to these dealers resulted from sales of protection by the dealers to Magnetar.

57.     In May 2012, for example, details emerged of Magnetar's involvement in Class V Funding III CDO ("Class V III"), in claims brought by the SEC against Citigroup concerning their role in structuring and marketing Class V III.  The Citigroup claims were settled for *$285 million*—a settlement the Court rejected as *inadequate*.  *See SEC v. Citigroup Global Markets Inc.*, 827 F. Supp. 2d 328, 332 (S.D.N.Y. 2011).  Documents filed in support of the SEC's claims include a number of emails from September and October 2006—around the time Pyxis closed— in which Citigroup employees discussed a potential buyer of protection on various Magnetar deals—including Pyxis—which were being considered for inclusion in the Class V III portfolio. This buyer, who was also being considered as a potential equity investor in Class V III, turned out to be none other than Jim Prusko of Magnetar.  In September 2006, Prusko told Citigroup that buying protection on various CDOs in the Class V III portfolio "is a top priority for me!" Subsequently, he said he would like Class V III to sell him protection on various CDOs "*as well as any of my deals of course*." (Emphasis added.)  He then provided Citigroup with a full list of deals against which he wanted to buy protection, which again specifically included Pyxis.

58.     Taking all of this evidence into account, conservatively, Magnetar's short positions on Pyxis totaled more than $100 million, compared to its long positions of approximately $21 million.  In other words, Magnetar stood to gain huge profits from Pyxis' failure.  Putnam in turn stood to gain large fees with relatively little effort or risk, along with the promise of additional similarly lucrative and stable deal volume, for helping Magnetar in its secret shorting scheme.

**VI.    Putnam Helped Market The Pyxis Guaranty To FGIC on the Basis of Affirmative Material Misrepresentations And Critical Omissions**

    **A.    Putnam's Affirmative Misrepresentations To FGIC**

59.    In early July 2006, Calyon contacted FGIC to solicit credit protection for the Pyxis CDO. Calyon represented that the CDO would be managed by Putnam—who would select its portfolio acting independently and in good faith in the best interests of the investors.

60.    Under the deal Calyon presented to FGIC, FGIC was to insure all payments owed by its wholly-owned subsidiary FGIC Credit Products LLC under a credit default swap which would provide credit protection on the $900 million Super Senior Pyxis tranche.

61.    If FGIC or another investor could not be persuaded to provide this insurance, the Pyxis CDO would not close and neither Putnam nor Magnetar would obtain the substantial benefits they stood to gain from Pyxis.

62.    In order to induce FGIC to enter into the Pyxis Guaranty, Putnam represented to FGIC, both orally and in writing, that it was an experienced and reputable collateral manager and that it would select the assets for the Pyxis Portfolio, acting diligently and independently in the interests of long investors like FGIC. This was vitally important to FGIC because, as explained above, the most important determinant of a CDO's performance is the skill of the collateral manager in selecting and maintaining the credit quality of its underlying portfolio. From an investor's perspective there literally was nothing more important. Putnam represented that it was well qualified to value the Pyxis Portfolio down to the level of the underlying loans of each RMBS. Specifically, each RMBS contained typically 3,000 underlying loans from across the United States. Because there were approximately 180 RMBS in the Pyxis Portfolio—both directly and indirectly though Pyxis' exposure to CDOs that were themselves exposed to RMBS—there were over 500,000 loans on which the performance of Pyxis depended. As a

practical matter, it was important for FGIC to be able to rely on Putnam's experience,

independence and integrity in selecting the assets that went into the Pyxis Portfolio.

### 1.    Putnam's Misrepresentations in the Initial Marketing Materials

63.    The Pyxis launch email, dated July 14, 2006, presented Pyxis as a mezzanine

ABS CDO "managed by The Putnam Advisory Company, LLC." This launch email touted the

fact that Putnam was one of the largest U.S. mutual fund companies with nearly 70 years of asset

management experience, including CDO collateral management. This email also represented

that Putnam had "developed a multi-class CDO capability" and had investment personnel with

"an average of 13 years investment experience."

64.    This initial marketing email also stated that "the collateral manager [Putnam] is

able to cherry-pick the collateral for this portfolio via the CDS market with the ability to focus

on seasoned product." At that time, seasoned products were believed to be less risky than new

issues. Yet it was later discovered that over 60 percent of the Pyxis Portfolio was not

"seasoned," but rather consisted of new issuances.

65.    The  misrepresentations as to Putnam's collateral management role were

reinforced by a 52-page marketing book for Pyxis (the "Pitchbook"), which was provided to

FGIC along with the Pyxis launch email. The Pitchbook represented on its face that it was

prepared and presented by *both* Calyon and Putnam, and that large portions of it relating to the

collateral manager's role were specifically prepared by Putnam. *See, e.g.*, Pitchbook at 21 ("All

information in this section has been supplied herein by Putnam.").

66.    The cover page and Executive Summary of the Pitchbook highlighted the fact that

"The Putnam Advisory Company, LLC will serve as Collateral Manager." In the Pitchbook,

Putnam again represented itself as "a global leader in asset management," with over $11.4 billion

in ABS/MBS holdings, including management of more than $3.5 billion of CDOs across seven

different deals.  Putnam further represented that its "[i]investment [p]hilosophy" and "goal is to generate excellent *long term* investment results."  (Emphasis added.)  The Pitchbook included extensive representations as to Putnam's "deep, experienced management teams," promising that their "talent pool" included "[s]easoned leaders committed to investment excellence and high fiduciary standards," who would "[f]ocus on achieving client performance objectives."  The Pitchbook incorporated detailed biographies of Putman key personnel, including Carl Bell, the Managing Director and Team Leader for the CDO & Portfolio Credit Team with "15 years of investment experience", whose role was to "lead[] the portfolio construction effort in designing CDOs . . . for institutional investors."

67.     The Pitchbook also included approximately 20 pages that purported to describe, in detail, the rigorous selection process that Putnam, as collateral manager, would use to select the assets for the Pyxis Portfolio.  For example, Putnam represented that it analyzes "each transaction . . . to better understand its collateral composition" and conducts a "[s]tructural analysis [that] includes understanding rating levels."  The presentation stated that Putnam "develops multiple scenarios to test the structure's durability," which "involves running multiple stress scenarios by varying inputs such as default frequency vectors, loss severities, prepayments speeds and interest rates."  According to the Pitchbook , "[t]he results of [Putnam's] analysis, combined with the prudent application of judgment, allow Putnam to decide if to invest, what tranche to invest in, how much to invest and at what price in order to achieve acceptable risk-adjusted returns for its clients."  Indeed, Putnam represented that it offered "best in class CDO management capability."  The Pitchbook also pointed to the relatively low "lifetime impairment rates" for the type of portfolio in which Putnam was planning to invest, representing that these

assets had "exhibited greater rating stability and a higher percentage of upgrades" and had a higher "average recovery rate" than other types of similarly rated assets.

68.　　Putnam further represented in the Pitchbook that "Putnam should actively drive the product structure;" that "Putnam seeks to design and undertake transactions that have a high probability of success;" and that Putnam would undertake "rigorous portfolio construction" and "fundamental security selection."

### 2.　　Putnam's Misrepresentations Concerning the Collateral Mix

69.　　Putnam also falsely represented in the Pitchbook that the "target portfolio" for Pyxis, which set forth the ramped portfolio that had been purchased for the CDO to date and the type of assets that were expected to be added to the portfolio subsequently, would include at least $60 million of prime RMBS assets.  Prime RMBS assets are RMBS in which the underlying loans are made to "prime" borrowers, that is, those with high credit scores (typically, 675 or higher from Fair, Isaac & Company) and other characteristics indicating a high likelihood of repayment of the loan.  Mid-prime and subprime RMBS, by contrast, consist of loans made to higher risk borrowers.

### 3.　　FGIC's Due Diligence Focused on Confirming Putnam's Representations

70.　　In order to assess the validity of Putnam's representations and the merits of the Pyxis Swap and the Pyxis Guaranty, FGIC performed due diligence from July-August 2006, focusing on an analysis of the deal's structure, the skills and independence of the collateral manager, and the assets that would be included in the Pyxis Portfolio.  In particular, FGIC sought comfort about Putnam's experience and reputation, because it considered it essential that its investments be entrusted only to highly reputable firms, and also sought confirmation of Putnam's strategy for selecting and managing the Pyxis Portfolio.

71.     In the second half of July 2006, FGIC had email correspondence with Putnam through Calyon, in which Calyon forwarded FGIC's questions to Putnam and then forwarded Putnam's responses to these questions to FGIC.  In the course of this correspondence, Putnam repeated and reinforced its representations that it would control the selection and management of the Pyxis Portfolio.  Among other things, Putnam (1) described the elaborate procedure it used to obtain the best possible terms for Pyxis' RMBS and CDO investments, that involved Putnam sending out lists of 20-25 bonds with a size of $12 million per bond to around 12 dealers, and, if the winning bid was acceptable, instructing the dealer and Calyon to confirm the trade for the warehouse; (2) discussed the relative merits of synthetic versus cash investments; (3) discussed whether new issues it was considering for the Pyxis Portfolio were trading at premium or tighter spreads; (4) described the merits of a hybrid structure for Pyxis; (5) explained who within Putnam was responsible for selecting and managing the Pyxis Portfolio; and (6) explained which of the RMBS to be included in the portfolio were held on Putnam's books.

### 4.     Putnam's Further Misrepresentations Concerning the Collateral Mix

72.     In the course of this correspondence, on July 25, 2006, Putnam provided another "target portfolio" for Pyxis, which again showed that at least $60 million of the portfolio would consist of prime RMBS assets.  Ultimately, there were no prime assets in the portfolio.

### 5.     Putnam's Oral Misrepresentations at an August Face-to-Face Meeting at Putnam's Headquarters

73.     In July and August 2006, FGIC initiated and conducted further due diligence that included an onsite review of Putnam's operations at Putnam's offices in Boston.  Before this meeting, FGIC sent Putnam a comprehensive list of topics for discussion, including (1) Putnam's views as to the current market environment for RMBS and CDOs; (2) Putnam's investment

strategy for Pyxis; (3) Putnam's credit selection, approval and surveillance process; and (4) the performance of Putnam's existing structured finance CDOs.

74.      At this face-to-face meeting, which took place on August 3, 2006, and which was attended by four FGIC representatives and seven Putnam representatives, each of the topics raised by FGIC was addressed.  During this meeting, Putnam, led by Carl Bell, once again represented repeatedly and emphatically that Putnam, and Putnam alone, would select and manage the assets in the Pyxis Portfolio.  Bell described in detail Putnam's expertise and strategy for doing so.  Putnam represented, among other things, that: (1) its CDO group, managed by Carl Bell, had been managing Putnam's CDOs since 2001; (2) this group had considerable expertise in managing structures like Pyxis; (3) Putnam had a substantial franchise and reputation in the industry to protect; (4) Putnam had "tied out" cashflows for Pyxis as early as April/May 2006 (far earlier than most CDO collateral managers) to make sure that it fully understood the intricacies of the deal structure; (5) investing in other CDOs and RMBS through CDS, as Putnam did for Pyxis, enabled a more efficient and timely sourcing of assets than investments in cash assets; (6) for each potential investment, Putnam put out a bid list of 30 (not just 20-25) reference bonds to a dozen or so dealers, to obtain the best possible terms for the bond; (7) the Pyxis Portfolio would include only a limited amount of ABX Index securities (comprised of low-rated RMBS)—a limitation which was subsequently reflected in the Pyxis offering memorandum and indenture, which specified a strict concentration limit on Pyxis' ABX Index Securities bucket; (8) Pyxis' "triggerless" structure removed triggers that would distract Putnam from doing its job most effectively and that were used by some collateral managers to "game" the structure; (9) Putnam's compensation on Pyxis was not tied to short-term results or trading volume, but to Moody's deal score for Pyxis, which was debt-focused, and to equity distributions (which, as

Putnam failed to mention, would be disproportionately large in Pyxis' first few years, irrespective of performance, because of Pyxis' triggerless structure); and (10) Putnam had never shorted assets that were included in one of its CDO's portfolios.

### 6.     Putnam's Oral Misrepresentations on Follow-up Due Diligence Call

75.     After the Boston meeting, on August 7, 2006, FGIC had a follow-up due diligence call with Putnam to further explore Putnam's strategy for selecting and managing Pyxis' RMBS investments.  During this call, Putnam again made clear that it would select and manage the assets for Pyxis, and that it had considerable experience in the RMBS market, particularly in the market for subprime RMBS, of which the Pyxis Portfolio would primarily be composed.  Putnam represented that it performed extensive due diligence with respect to prospective RMBS investments, including conducting on-site visits to most of the servicers of the loans underlying these investments, and, more importantly, maintaining ongoing interactions with all servicers to keep tabs on their servicing strategy and performance.  Putnam also represented that it looked beyond standard metrics like simple combined loan to value ratios to assess the credit quality of underlying loans and applied a numeric weighting of various other factors relating to credit quality, which it described in some detail, and which allowed for more meaningful differentiation between loan pools.

### 7.     Putnam's Most Extreme Misrepresentations Concerning the Collateral Mix

76.     On August 9, 2006, Putnam provided an updated target portfolio that purported to show the final target portfolio for Pyxis for FGIC's review and analysis.  This target portfolio showed that at least $145 million of the Pyxis Portfolio would be prime RMBS assets—almost two and a half times the amount of such assets previously slated for the portfolio.  Again, as will

be discussed below, ultimately there were no prime RMBS assets in the Pyxis Portfolio—not a single one.

77.     FGIC's MBS team spent the next three weeks analyzing the ramped RMBS-backed portion of the Pyxis Portfolio (91% of the ramped portfolio), reviewing each individual bond for originator, issuer and servicer strength and adequacy of internal credit enhancement in comparison to the credit profile of the underlying loan pools.  This team then prepared an analysis of the ramped portfolio, which was included in a CDO credit application (the "Application") made to FGIC's Structured Finance Committee on August 31, 2006, and which noted that, pursuant to Putnam's final target portfolio, the final Pyxis Portfolio would include, among other things, approximately $145 million of prime RMBS assets.

78.     As it turned out, this in depth financial analysis was a waste of time because the final Pyxis Portfolio was vastly different than the one FGIC was given.

**B.     FGIC's Recommendation to the FGIC Structured Finance Committee Proves FGIC Relied on Putnam's Representations.**

79.     FGIC's Structured Finance Committee approved the Application for the Pyxis Guaranty on September 6, 2006.  The Application, and the Committee's approval, relied heavily on Putnam's representations that it would select and manage the Pyxis Portfolio, acting diligently and independently in the interests of long investors like FGIC.  Thus, the Application began with a Recommendation, which stated up front that "[t]his is an attractive opportunity for FGIC . . . with Putnam acting as collateral manager;" that the Pyxis assets were "to be selected by Putnam;" and that "[c]ombined with the strength of an experienced manager," Pyxis' synthetic structure could result in a superior portfolio to a cash-only structure.  The Recommendation went on to state:

> This deal allows FGIC to take exposure to the subprime RMBS sector, and have the benefit of an experienced CDO manager and MBS investor who is permitted to

defensively manage the deal through the CDO structure.  Putnam manages $64bln in fixed income assets/$3.5bln in CDOs.  Putnam's CDO platform benefits from the robust infrastructure that supports Putnam's Mutual Fund and institutional business: well trained professional/focused asset specialist credit teams/established processes and resources to facilitate investment decisions and monitoring efforts.  Key personnel are responsible for establishing Putnam's current CDO platform and the issuance of Putnam's CDOs since 2001.

80.     In the Transaction Summary, the Application noted as the primary "Strength" of

the transaction:

Putnam.  Experienced credit investor.  Strong institutional resources.  Disciplined credit processes tested through past credit cycles.  Strong back-office/access to reports/ability to monitor trustee error for failure to pay interest or principal events.  Experienced CDO manager/involved in deal structuring—Putnam performed cashflow tie-out of the Pyxis structure with Calyon several months prior to Calyon's marketing this deal to investors.

The Transaction Summary then set forth an extensive "Asset Manager Assessment" elaborating

on each of these points, and describing specifically how Putnam would use the Pyxis structure to

buy cash and CDS assets, and its elaborate credit assessment procedure for selecting such assets:

For CDS, Putnam selects single-name RMBS from a universe of credits it tracks (appx. 500 names).  Internal criteria are used to help the group further weed out certain bad characteristics, while leaving a sufficient pool size (e.g. 300 names) for Putnam to create bid lists, and recycle the bid list over a ramp up period.

81.     The Collateral Description/Assessment section of the Application then stated that

"[t]he asset manager will select the target portfolio subject to percentage limitations," and that

"[t]he percentage limitations and collateral quality measures are appropriate for an ABS CDO

and fits well within the asset manager's expertise."

82.     The Application went on to provide "Management Biographies" for all ten

Putnam representatives who would be involved in selecting and managing the Pyxis Portfolio,

including Carl Bell, and further provided a six page description of FGIC's "Putnam Investments

Manager Review," setting forth in detail the results of FGIC's August 3, 2006 due diligence

meeting with Putnam and its August 7, 2006 follow-up call.  This Manager Review concluded

that "Putnam Investments is a strong investment company with robust infrastructure and long
experience of various assets under management."

### C.   The Pyxis Offering Memorandum Reinforced Putnam's Affirmative Misrepresentations

83.   Putnam's representations that Putnam—and Putnam alone—would select and
manage the Pyxis  portfolio were further reinforced by the October 2, 2006 offering
memorandum for Pyxis.  A large portion of the memorandum was specifically stated to have
been prepared by and to be the sole responsibility of Putnam.  The offering memorandum
represented that the "Fixed Income Group" of Putnam "will select and manage the Collateral
[portfolio]" and "will manage the assets of the Issuer," and that "[d]ay-to-day portfolio
management" will "be the joint responsibility of [Putnam's] CDO & Portfolio Credit Team."
The offering memorandum further touted Putnam's vast experience in managing structured
assets.

84.   Most importantly, Putnam represented in the Offering Memorandum that,
pursuant to the Collateral Management Agreement, Putnam was required to "supervise and direct
the investment and reinvestment of the Collateral" and to "perform its obligations hereunder and
under the Indenture with reasonable care and in good faith using a degree of skill and attention
no less than that which the Collateral Manager exercises with respect to comparable assets that it
manages for others with similar objectives and policies, and to carry out its obligations hereunder
in a manner consistent with the practices and procedures followed by prudent institutional
managers of national standing," a representation that is reiterated in the Collateral Management
Agreement.

85.   On October 3, 2006, in reliance on Putnam's representations that it would select
the assets for the Pyxis Portfolio, acting independently and diligently in the interests of long

investors, FGIC entered into the Pyxis Guaranty with Calyon. Pursuant to the Pyxis Guaranty, FGIC agreed to provide credit protection on $900 million of Pyxis Super Senior Notes.

### D.    Putnam's Material Omissions and Concealments

86.    Putnam's representations were egregiously false. Putnam improperly concealed critical facts regarding Pyxis from FGIC. Most importantly, Putnam concealed the fact that the Pyxis Portfolio was not in fact selected by Putnam, acting independently. On the contrary, as set forth below, the selection of the assets for Pyxis was ultimately controlled by a net short investor with veto power over these assets—Magnetar.

87.    Magnetar selected collateral managers for its CDOs based on their willingness to cooperate with Magnetar. Magnetar had an especially close relationship with Putnam through Magnetar executive James Prusko, the former Putnam employee who had been Carl Bell's superior at Putnam. Bell was represented to be the Putnam representative responsible for selecting the Pyxis Portfolio and for marketing the Pyxis Guaranty to FGIC. Accordingly, while Putnam was the nominal collateral manager for Pyxis, in reality, Magnetar controlled this deal. Putnam's abdication of its duty to select assets independently and in good faith for the Pyxis CDO was, as Putnam knew, in blatant contravention of the representations it had made to FGIC of a careful, rigorous asset selection process. However, Putnam concealed this information from FGIC to ensure that the Pyxis Guaranty closed, which in turn ensured that Pyxis itself closed. As a result, Putnam obtained substantial fees for its putative management of Pyxis and secured additional deal volume from Magnetar, and Magnetar reaped substantial profits from its net short position on Pyxis.

1. **Documentary Evidence Confirms That Putnam Secretly Allowed Magnetar To Rig The Pyxis Asset Selection Process, Allowing Magnetar to Successfully Short The Pyxis Portfolio**

88.     A number of email communications between employees of Calyon, Putnam, Magnetar and Deutsche Bank (Magnetar's co-equity sponsor on Pyxis), relating specifically to Pyxis, became public last year in the *Loreley* litigation brought by Pyxis investors against Calyon and Putnam. These documents confirm the control which Magnetar exercised over the Pyxis asset selection process, at the same time that it was shorting those very assets (and Pyxis itself). They also confirm Putnam's awareness of and complicity in Magnetar's scheme. The authenticity of these documents is unquestioned.

89.     From the beginning, Magnetar—not Putnam—was actually in control of the collateral selection process of Pyxis, as these documents demonstrate. In May 2006, for example, in an exchange of emails between Carl Bell (Putnam), Alex Rekeda (Calyon), Jim Prusko (Magnetar) and Michael Henriques (Deutsche Bank), relating to the "cash flow" features of the Orion CDO, Rekeda noted that Putnam had discovered that the "the IRR is really in excess of 30%," which "shocks them a little bit," and raised the possibility of "another round of the fee negotiation [sic]" with respect to Putnam's fee for Pyxis. Prusko replied: "Fee not negotiable. *Take it or leave it, plenty of managers will do this deal. I want to do it with them for a variety of reasons, **but they have to play ball**.*" (Emphasis added.) Henriques responded: "I agree with jim [sic], but I don't think that is the issue with Putnam. . . . *In the end . . . I think they will likely be helpful . . . .*" (Emphasis added.)

90.     Magnetar and Deutsche Bank then made a "behind the scenes" arrangement with Calyon, of which Putnam was fully aware, that Calyon or Putnam would notify them of any proposed acquisition for the Pyxis Portfolio and that they would have the right to veto any such acquisition. In June 2006, for example, Benjamin Lee (Calyon), Alex Rekeda, Jim Prusko,

Michael Henriques and Kurt Palmer (Deutsche Bank) discussed via email an "Equity Purchase Letter . . . *between CALYON and DB & Magnetar only*" for Pyxis in order to keep their involvement secret from investors. (Emphasis added.) In this exchange, Lee asked Prusko if he "was proposing that we execute the 3 Putnam docs [for Pyxis] in exactly the same way that we did the Orion docs—that is, *DB is the only party in the docs, and any arrangement between DB and Magnetar is done behind the scenes and outside of the docs.*" Subsequently, Lee sent the same group an email attaching "the warehouse side letter **giving DB and Magnetar veto rights over any warehouse asset***." (Emphasis added.) The attached draft agreement between Calyon, Deutsche Bank and Magnetar provided: "CALYON hereby agrees that each of *Deutsche Bank and Magnetar* (for so long as the respective Equity Purchase Letter has not been terminated) *shall have the right to object to the proposed acquisition of any asset pursuant to the Warehouse Agreement within 24 hours after notification thereof has been sent to Deutsche Bank and Magnetar by CALYON or the Investment Adviser [Putnam] (provided, that one of Calyon or the Investment Adviser will promptly provide such notification) and CALYON as the warehouse provider shall not give its approval to acquire any such asset if it has been objected to by either Deutsche Bank or Magnetar.*" (Emphasis added.)

91.     Putnam was fully aware of this agreement, as the agreement required Putnam to provide notice of proposed Pyxis CDO investments to Magnetar. Moreover, Putnam did in fact allow Magnetar to exercise this secret control over the Pyxis Portfolio. In emails, Magnetar, both directly and through Calyon, provided Putnam with lists of assets acceptable to Magnetar, including Magnetar's own CDOs, and made clear to Putnam that Magnetar would directly source Pyxis' CDO exposure and that Putnam was not to purchase any such exposure itself unless Magnetar had closely vetted it beforehand. In August 2006, for example, in an exchange of

emails between Alex Rekeda, Benjamin Lee (Calyon), Carl Bell, John Van Tassel (Putnam), Jim Prusko, Michael Henriques and Kurt Palmer, among others, Lee asked Bell and Van Tassel to "give a brief description of your ramp up strategy and timing regarding the CDO assets," and also asked if "you have any interest on AA of Lincoln Ave *and 4mln of Orion [Magnetar deal] that Bill Budd showed?*" (Emphasis added.)  Bell responded by providing the group with a summary of the CDO assets Putnam had warehoused so far, to which Prusko replied: "*We [Magnetar] are going to source the CDO exposure synthetically.  **We will buy CDO CDS on names of your choosing** at mid-market, or bid list +3bp, whatever you prefer.  Any recent mezz abs deal is fine.  I can send you a list of what's in our other deals if it's helpful.*" (Emphasis added.)  Prusko then provided Bell with a list of "*[t]ypical names that we see in other deals a lot,*" including Orion and Cetus (both Magnetar deals).  (Emphasis added.)

92.     Subsequently, Prusko sent a private email to Alex Rekeda to confirm that Magnetar would maintain control over asset selection for Pyxis, which stated, "*Please stay on top of Putnam CDO situation*, get a little nervous when I hear about Bill Budd peddling desk axes to them, *although not too worried about Putnam doing anything rash. . . . If they add any CDO exposure that is not sourced by me, I want Michael [Henriques] and I to have a long look at it first.*" (Emphasis added.)  Rekeda responded: "*Sure—I will ask our trading to forward you any CDO requests.*" (Emphasis added.)  Prusko replied in turn, copying Michael Henriques: "*Don't like that they are buying CDO's without us knowing about it.  At least I don't think I knew about it.  I'll check in with Carl [Bell], just saw him, thought we were on the same page with us buying the cdo cds.*" (Emphasis added.)

93.     At the same time that Magnetar was controlling the selection of assets for the Pyxis Portfolio, it was shorting those very same assets and Putnam was aware of this.  For

example, in a September 2006 exchange of emails between Craig Weiner (Putnam), Alex Rekeda, Mauro Calderon (Calyon), and numerous other employees of Calyon and Putnam, Calderon questioned whether a trade ticket showing Magnetar purchasing *the short side* of a CDS for the Pyxis Portfolio was correct. Weiner confirmed: "*It is definitely Magnetar.*" (Emphasis added.)

94.     Moreover, this trade ticket provides further support for the inference that Putnam abdicated its portfolio selection responsibilities to Magnetar. Despite Putnam's confirmation that the trade should be booked to Magnetar, the CDS premium and amount of the trade do not correspond to any trade in the Pyxis Portfolio. They do, however, correspond to a trade in the portfolio of a separate Magnetar CDO, Octans III, which was managed by Harding Advisory and underwritten by Citigroup, and in which Putnam was not involved. Thus, it appears that Calyon executed a trade for Pyxis that Magnetar actually intended for Octans III. (Moreover, this particular trade was an unusual "offset trade" of the type common in several Magnetar CDOs with large ABX Index exposures.) The most plausible explanation for this is that Magnetar got the trading orders for two of its deals mixed up, that Putnam instructed Calyon to execute the trade for Pyxis at Magnetar's direction, and that Putnam then reversed the instruction when it discovered that Magnetar in fact wanted the trade to be made for Octans III. In other words, Putnam was following Magnetar's orders, not exercising its own independent judgment.

95.     Putnam's abdication of its collateral selection responsibilities to Magnetar is further confirmed by a remarkably brazen exchange of emails between Magnetar, Deutsche Bank and Calyon with respect to Orion 2006-2 Ltd. ("Orion 2"), the successor to Orion. In this exchange, Michael Henriques (Deutsche Bank) specifically contrasted Putnam's acquiescence on Pyxis with the recalcitrance of NIBC Credit Management, Inc. ("NIBC" or "NIB"), the collateral

manager slated for Orion 2.  When NIBC balked at Magnetar's and Deutsche Bank's insistence that they have the right to terminate NIBC without cause, Henriques asked if NIBC wanted to "*go back to the regular style CDOs with 400mm mezz deals, scrapping for cash bonds, spending 9 months on ramp-up and 3-months marketing, to get 40bps running on a 400mm balance*." (Emphasis added.)  Henriques pointed out that "*[i]n those deals there is no single party that can exercise significant control so that their smaller fee stream is virtually assured*," and that "*the velocity of deals is much lower and the effort to buy those 400mm of bonds will be higher than our 1.5bln.*"  (Emphasis added.)  Remarkably, he went so far as to say that "*[t]hese deals are not CDOs, but they are structured separate accounts.*"  (Emphasis added.)  Most significantly, for present purposes, he concluded: "*I think Putnam got it.  NIB doesn't.*"  (Emphasis added.)

96.     Later in the same exchange, Henriques reiterated that "I don't think [NIBC's responses] reflect a spirit of partnership that is appropriate for a *separate account mandate*," and complained that "we are being treated like a typical 3rd party cdo investor, but does nib have any asset management clients *who directly engaged them and pay $5.5mm/yr in fees*?"  (Emphasis added.)  Again, he drew a telling comparison to Putnam:  "*We have provided a precedent with respect to Putnam.*"  (Emphasis added.)  Thus, in seeking to convince NIBC to accede to Magnetar's and Deutsche Bank's demands to exercise control over the CDO, Henriques pointed to Putnam as an example or "precedent" of a firm willing to manage CDOs as structured accounts for the benefit of Magnetar and Deutsche Bank, understanding that they were far more than "typical 3d party cdo investor[s]."

97.     This email exchange confirms that Putnam had a clear and compelling motive for acquiescing in Magnetar's control over the selection of the Pyxis Portfolio:  to obtain large fees with relatively little effort, which would be "virtually assured" by Magnetar's equity stake in and

its "significant control" over the CDO.   Moreover, if, but only if, Putnam cooperated with

Magnetar on Pyxis, it stood to gain additional, similarly lucrative deal volume from Magnetar.

Thus, Putnam's subsequent selection to serve as collateral manager for another Pyxis CDO,

Pyxis ABS CDO 2007-1 ("Pyxis 2") provides yet further confirmation of Putnam's abdication of

its Pyxis Portfolio selection responsibilities.

98.     After much of the above information came to light in the *Loreley* case, the claims

of the Pyxis investors who filed suit in that case were promptly settled for an undisclosed

amount.

> **2.     Magnetar Directed Putnam to Invest in Other Magnetar CDOs for
> the Pyxis Portfolio To Further Guarantee the Demise of Pyxis and the
> Success of the Magnetar Shorting Scheme**

99.     As a further demonstration of Magnetar's influence over Pyxis Portfolio selection,

Pyxis invested heavily in other Magnetar CDOs—without informing FGIC—in an undisclosed

arrangement designed to fuel Magnetar's broader CDO shorting machine.  In fact, Putnam

ultimately invested *over half* of Pyxis' cash allocated to CDO investments in four other Magnetar

CDOs—even though there were *223* ABS CDOs issued in 2006 alone from which Putnam could

have made its selection.  These four Magnetar CDOs were in turn invested in yet more Magnetar

CDOs, meaning that Pyxis ultimately had exposure to at least fifteen Magnetar CDOs.  Not

surprisingly, all fifteen defaulted—and Magnetar profited from each such default.  FGIC was

kept completely in the dark and had no way to discover this, as Magnetar's shorting scheme was

a closely held secret.

100.    Further evidence of Magnetar's role is the fact that three of the Magnetar CDOs in

which Pyxis invested did not close until well **after** Pyxis closed, meaning that Putnam, at

Magnetar's behest, had allocated these other Magnetar CDOs to be added to Pyxis **before** the

CDOs were finalized.  Pyxis's investment in these three CDOs was also not disclosed to FGIC

on any target portfolio spreadsheets provided by Calyon and Putnam in July and August 2006. On information and belief, even on other Magnetar deals, no collateral manager added more Magnetar CDOs to a portfolio after the deal had closed than Putnam, and, after the first five Magnetar CDOs had closed, no collateral manager added *as many* such CDOs post-closing as Putnam. Moreover, also unbeknownst to FGIC, at least six other Magnetar CDOs owned securities issued by Pyxis.

101.   Pyxis was thus an integral part of Magnetar's complex cross-ownership scheme among the Constellation CDOs to create a market for these CDOs to build Magnetar's shorting positions. As part of this scheme, Magnetar caused Pyxis to invest heavily in numerous other Magnetar CDOs, most of which Magnetar was also shorting. These other CDOs were in turn, at Magnetar's direction, heavily invested in Pyxis and in the other CDOs in the group, creating an extensive web of deception and interrelationships, which is graphically illustrated below:

## Constellation CDO Investments in other Constellation CDOs

### Web of Deception



### 3. Further Proof of Control Was the Fact that There Was a High Correlation Between the Pyxis Portfolio And the Portfolios of Other Constellation CDOs

102.     As the chart above graphically demonstrates, this scheme did not happen

randomly.  It was carefully choreographed to bring about a desired result.  Magnetar had

identified a set of high-risk CDO and RMBS transactions, in addition to its own CDOs, which it

specifically targeted.  Magnetar either instructed or persuaded its collateral managers to include

in its CDOs (or reference in credit default swaps issued by its CDOs) securities issued by the

targeted high-risk RMBS and CDO's.  At Magnetar's behest, Putnam selected securities issued

by many of the targeted RMBS and CDOs for Pyxis.  This resulted in an undisclosed,

remarkably high correlation between the issuers whose securities were held or referenced by

Pyxis and the issuers whose securities were held or referenced by other Constellation CDOs.  For

instance, of the 163 unique CUSIPs in the Pyxis Portfolio, fully 90 CUSIPs (or 55%) referenced

RMBS or CDOs whose securities were included in at least five other Magnetar CDOs, while 45

CUSIPs (or 28%) referenced RMBS or CDOs whose securities were included in at least ten other

Magnetar CDOs.  There is no way this could have happened by chance—especially given that

there were well over *1,000* RMBS issued in 2005-2007 (more than half in 2006 alone) from

which the RMBS in the Pyxis Portfolio could have been selected, and there were more than *500*

ABS CDOs issued in the same period from which the CDOs in the Pyxis Portfolio could have

been selected.

### 4. The Statistical Probability of the Cross-Referencing and Portfolio Correlations Observed between All Constellation CDOs Occurring by Chance is <u>Less than One in a Billion</u>

103.     Given the substantial cross-referencing and portfolio correlation between all

Constellation CDOs, not merely Pyxis, FGIC retained a firm of economic consultants to perform

a statistical analysis to assess the likelihood of this correlation occurring by chance if all

Constellation CDO managers had been acting independently. This analysis concluded that:

- "Constellation CDOs have a high percentage of CUSIPs [designations used to identify securities] and issuers that repeat across the 23 CDOs. This may indicate that the portfolio selection by independent portfolio managers was influenced by an external factor."

- "Constellation CDOs also have a high percentage of references to other [C]onstellation CDOs."

- "This referencing is statistically greater than one would normally expect across independent portfolio managers. *The probability of this happening by chance across independent portfolio managers is less than 1 in a billion.* This probability is in line with the probabilities observed in the options backdating cases, which was reported in the WSJ and initiated numerous SEC investigations and class action lawsuits." (Emphasis added.)

### 5.    Putnam Circumvented Limits On The ABX Index

104.    Putnam also concealed the extent to which Pyxis sold protection on the ABX

Index of low-rated RMBS. The ABX Index is a benchmark created by an independent financial

information company called Markit. The Index is designed to measure the overall value of

mortgages made to borrowers with subprime or weak credit. If the Index increases, it means the

securities are less risky. If it decreases, the opposite is true. Magnetar pushed Putnam to

circumvent the represented limit on investment in the ABX Index by causing Pyxis to sell

protection against both the ABX Index itself and the individual constituent RMBS in the ABX

Index. In total, Pyxis sold protection on $240 million of RMBS comprising all 40 constituents

included in the ABX BBB- 06-1 and ABX BBB- 06-2 Indices—more than three times the

specified concentration limit. By dramatically increasing the risk profile of the Pyxis Portfolio,

this deception worked in favor of a net short investor like Magnetar, at the expense of long

investors like FGIC.

### 6.    Pyxis Included Offset Trades on ABX Index Components of a Type Unique to Magnetar CDOs

105.    Magnetar's control over the Pyxis Portfolio is further proven by the fact that, on at least three occasions, Pyxis purchased protection to offset previously acquired exposures to individual components of an ABX Index.  The February 6, 2007 Trustee Report for Pyxis shows three such offset securities referencing the following ABX Index components: Ace Securities 2005-HE7; BSABS 2005-HE11; and RASC 2005-KS11.  These trades represent a unique signature technique executed as part of a complex ABX Index arbitrage strategy used by Magnetar in many of its CDOs (including Norma, Draco, Octans, Auriga, Virgo, and Lacerta, among others), pursuant to which the CDO would buy protection (often from Magnetar) on an ABX Index component security to which the CDO had previously acquired a long exposure (by virtue of either an ABX Index trade which was part of a CDS referencing an ABX Index—as was the case in Pyxis—or by virtue of a disguised Index trade simultaneously referencing each individual Index component).  In many instances, these trades resulted in a cash loss to the CDO which accrued to the benefit of Magnetar.  Since this was a signature trading technique used only by Magnetar, it points to Magnetar's control over these trades.

106.    Two other features of these three offset trades also indicate Magnetar's control.  First, the BSABS 2005-HE11 trade is the same trade referenced in Paragraph 91 above, whose CDS terms do not correspond to this Pyxis 2006-1 trade but rather to an Octans III trade.  Second, it is noteworthy that the three Pyxis trades which were offset referenced 2005-vintage RMBS collateral.  This 2005-vintage collateral was generally viewed to be of higher quality than 2006-vintage collateral.  Thus the removal of these securities from the Pyxis Portfolio further weakened the credit quality of the Pyxis Portfolio and increased the chances of success of the Magnetar shorting strategy.

7.      **Notwithstanding Representations to the Contrary, the Final Pyxis Portfolio Did Not Contain Any Prime RMBS Assets**

107.    Mortgages given to "prime" customers, *i.e.*, those who have high credit ratings, are inherently less risky than those given to "subprime" customers.  That means that, statistically, they are much less likely to default.  Thus, from FGIC's perspective, the more prime mortgages there were in the Pyxis Portfolio, the lower the risk that Pyxis would default and, thus, the lower the risk that FGIC would have to make payments under the Pyxis Guaranty.

108.    The Pyxis "target portfolio" provided to FGIC by Calyon and Putnam initially included at least $60 million of prime RMBS assets.  This was later revised to include at least $145 million of such assets. In fact the final ramped portfolio did not contain a *single* prime RMBS asset.  Putnam acquiesced in Magnetar's control over the portfolio selection process and ultimately rejected these relatively risk remote investments in favor of investments in higher risk mid-prime or subprime assets, as well as tranches of high-risk Constellation deals, all of which defaulted.

8.      **Magnetar's Control Over Pyxis, and Putnam's Acquiescence in Its Control, Was Strikingly Similar to the Process by Which Magnetar's Other CDOs Were Structured**

109.    As more information has come to light about the "Magnetar Trade" and Magnetar's involvement in the CDO business generally, it has become apparent that Pyxis was only one of numerous CDOs over which Magnetar exercised tight control over asset selection in order to fuel its lucrative shorting scheme, securing the acquiescence of banks and collateral managers with the promise of large, easily realized fees and deal volume.  The striking similarity between Magnetar's conduct with respect to each of these other deals makes it highly implausible that Magnetar would have allowed Putnam to control the selection of the Pyxis Portfolio.  It provides still further confirmation that Magnetar in fact exercised close control over

this process, with the knowledge and acquiescence of Putnam, for Putnam's and Magnetar's benefit.

110. **Orion and Orion 2**    As they did with Pyxis, Magnetar and Deutsche Bank also exercised tight control over the collateral manager NIBC's selection of assets for the portfolios of the Orion and Orion 2 CDOs, working closely with NIBC to make sure that the assets included in the portfolio were assets Magnetar wanted to short. For example, in a July 2006 email to Alex Rekeda, Michael Henriques and Kurt Palmer relating to "Orion CDO Trades," Jim Prusko of Magnetar stated: "Arjun Kakar [NIBC] is going to send me a list of CDO's tomorrow. *We will buy protection from the deal on agreed upon names and that will fill the bucket.*" (Emphasis added.) Similarly, Magnetar and Deutsche Bank insisted on the right to terminate NIBC as the collateral manager for Orion 2 if it performed inadequately. When NIBC balked at this, Michael Henriques of Deutsche Bank threatened in a November 2006 email to make NIBC "*go back to the regular style CDOs [where] there is no single party that can exercise significant control so that their. . . fee stream is virtually assured.*" (Emphasis added.) Henriques further complained that NIBC's conduct did not "*reflect a spirit of partnership that is appropriate for a separate account mandate where the equity[investor] . . . directly engaged them and pay $5.5mm/yr in fees?*" (Emphasis added.) NIBC appears to have capitulated, given that it did ultimately act as the collateral manager for Orion 2 and that the Orion 2 portfolio was eventually stocked with the usual collection of cross-owned Magnetar and Magnetar-approved CDOs and other Magnetar-approved investments.

111. **Squared**    Magnetar also exercised tight control over another CDO, Squared CDO 2007-1 ("Squared"), which was structured and marketed by J.P. Morgan Securities LLC ("JP Morgan") and for which GSCP (NJ) L.P. ("GSC") acted as the collateral manager. As in its

other CDOs, Magnetar purchased the equity in Squared. However, as an internal Magnetar email from January 2007 confirms, Magnetar regarded its equity position as "basically nothing" and stated that it was "*just doing it [taking the equity position]. . . to buy some protection.*" (Emphasis added.) Indeed, by the time the deal closed in May 2007, Magnetar's $600 million short position completely dwarfed its $8.9 million long position.

112.    Magnetar played a significant role in selecting the collateral for Squared. For example, on February 8, 2007, Magnetar informed GSC via email that it would "like to do a list of names with [them] . . . if [they] have them ready." The next day, GSC gave Magnetar a list of 12 proposed CDO securities for the Squared portfolio, of which Magnetar agreed to short six. These six securities were subsequently included in the Squared portfolio, and both GSC and JP Morgan were aware that Magnetar was shorting them.

113.    Similarly, in early April 2007, JP Morgan sent Magnetar a list of 28 names for inclusion in the Squared portfolio, which included ten names on which Magnetar had previously decided it did not want to take a short position. A Magnetar employee forwarded this list to GSC and complained: "To be honest, I don't love it, some recent deals I'd like to get in there are missing. Also, think they're missing some of the trades to which we've already agreed. Lets discuss [sic]." In an internal email about the same time, Magnetar characterized JP Morgan's list as "stupid" and explained that it needed to "*use GSC to get some decent shorts off on the balance of the portfolio.*" (Emphasis added.) All ten securities to which Magnetar objected were excluded from the final portfolio.

114.    Also in early April 2007, GSC sent Magnetar a list of certain bonds they had discussed for possible inclusion in the Squared portfolio, and "*highlighted the names which [Magnetar] had interest in shorting into the deal.*" (Emphasis added.) A week later, JP Morgan

sent GSC a list of CDO securities, on twelve of which Magnetar had agreed to take a short

position, and asked GSC if all of these securities had been approved.  That same day, Magnetar

sent JP Morgan the CDO list and noted that it *"looks like we [Magnetar] are shorting in $168

million."*  (Emphasis added.)  Additional lists were exchanged between Magnetar and JP

Morgan, and the next day JP Morgan sent GSC an updated Squared portfolio stating:  *"These are

the names and levels agreed with Magnetar."*  (Emphasis added.)

115.    In June 2011, JP Morgan paid $153.6 million to settle charges brought against it

by the SEC for its role in structuring the Squared CDO.

116.    ***Norma***          Magnetar also exercised tight control over the selection of assets

for the portfolio of Norma CDO 1 Ltd ("Norma"), which was structured and marketed by Merrill

Lynch ("Merrill") and for which NIR Capital Management, LLC ("NIR") acted as the collateral

manager.  Magnetar provided the equity investment in Norma, but also took a much more

substantial short position in the very assets it was directing NIR to select for Norma's portfolio.

117.    Magnetar's control of the asset selection process for Norma is demonstrated by

various emails that became public in a suit brought against Merrill by an investor in Norma.  *See

Cooperative Centrale Raiffeisen-Boerenleenbank, B.A. ("Rabobank") v. Merrill Lynch & Co.,

Inc.*, Index No. 601832/09 (N.Y. Sup. Ct. N.Y. County Aug. 19, 2009).  In an August 2006

email, for example, Magnetar assumed NIR's role in directing Merrill on what purchases to

execute for Norma, stating:  "Here is the first batch of protection purchases I'm planning for

NIR."  A November 2006 email stated:  *"Apparently NIR allowed Magnetar to do some trading

for their [Norma] portfolio (in the area of 600MM).  This accounted for a large chunk of trading

that NIR originally didn't recognize."*  (Emphasis added.)  This prompted a Merrill corporate risk

manager to ask: *"Dumb question.  Is Magnetar allowed to trade for NIR?"*  (Emphasis added.)

118.    Even on trades that NIR did execute for Norma, Magnetar exercised veto rights over the selection of each asset.  One Magnetar email stated:  "*I definitely want to approve any CDO's that go in the deal.*"  (Emphasis added.)  Another email rejected a NIR request to include TABS 2006-6A cash bonds in the portfolio, stating: "Afraid so, tabs in particular *I don't want the cash in there.*"  (Emphasis added.)

119.    By January 2007, Magnetar had already shorted $600 million of synthetic assets which were contained in Norma's portfolio.  In an email, Merrill recognized that Magnetar's short positions were much more important to Magnetar than its long investments, noting that Magnetar "is less worried about [its] deal pricings and more worried about where [it] can short paper in the aftermarket."  Indeed, Magnetar's equity investment in Norma totaled less than $50 million after receiving undisclosed amounts funded through the loan from Rabobank.  This meant that Magnetar stood to make *ten times* more from its short position of $600 million if Norma defaulted than it had invested in Norma's equity.

120.    Rabobank's lawsuit against Merrill was also settled in 2010 for an undisclosed amount.

121.    ***Carina***        Magnetar also closely controlled the selection of assets for the portfolio of another CDO, Carina CDO, Ltd. ("Carina"), which was structured by Deutsche Bank and for which State Street Global Advisors ("State Street") acted as the collateral manager.  Once again, Magnetar provided the equity investment in Carina, at the same time as it was shorting the very assets it was directing State Street to include in Carina's portfolio.

122.    Magnetar's control of the selection of assets for the Carina portfolio is demonstrated by various emails which recently came to light in a consent order issued against State Street by the Commonwealth of Massachusetts.  In an email dated July 7, 2006, for

example, the Magnetar Head of Structured Products (the "Magnetar Head") asked the State Street Head of Structured Products (the "State Street Head"): "what's [the] plan of action looking like?" In response, the State Street Head provided Magnetar with an update on the ramping phase of Carina and told him, "I'll keep you posted on my progress." A week later, the Magnetar Head sent the State Street Head another email saying: "*I'd like to establish a bit more of a dialogue between us. Discuss ramping strategy, talk about each list as it goes out, plan for non-sub/mid-prime sectors, market conditions, that sort of thing. Just talk briefly a few times a week.*" The State Street Head responded, "*Absolutely.*" (Emphasis added.)

123.     A few weeks later, on August 3, 2006, the State Street Head emailed Deutsche Bank, copying Magnetar, to identify ten ABS CDO tranches on which State Street proposed to sell protection to establish a portion of Carina's synthetic exposure. The Magnetar Head replied: "*I will buy protection on the four 06 deals at best bid+50bp.*" (Emphasis added.) A few weeks later still, high level personnel of State Street, Deutsche Bank and Magnetar entered into discussions about a possible Carina II CDO transaction. In one email, the Magnetar Head stated: "*As we did last time, I would like to strategize and discuss names for the CDO bucket before we execute any trades. Thought that worked out well for Carina 1. I will be taking the other side of this first trade as approved such that I am effectively pairing off its risk . . . .*" The State Street Head responded: "*I'm happy to discuss the CDO bucket with you.*" (Emphasis added.)

124.     In February of this year, State Street agreed to pay the Commonwealth of Massachusetts a $5 million penalty for its conduct with respect to Carina.

125.     *Class V III*     Just last month, details of Magnetar's potential involvement in yet another CDO as an equity investor and its interest in shorting the same CDO's portfolio came to light, in a case brought by the SEC against Citigroup and one of its executives, Brian Stoker,

concerning their role in structuring and marketing the Class V Funding III CDO ("Class V III").
*See SEC v. Citigroup Global Markets Inc.*, 11-CV-7387 (S.D.N.Y. Oct. 19, 2011); *SEC v. Stoker*, 11-CV-7388 (S.D.N.Y. Oct. 19, 2011).  Documents filed last month in support of the SEC's claim include a number of emails from September-October 2006—around the time Pyxis closed—in which Citigroup employees discussed a potential buyer of protection on various Magnetar deals, including Pyxis, which were being considered for inclusion in the Class V III portfolio.  This buyer, who was also being considered as a potential equity investor in Class V III, turned out to be none other than Jim Prusko of Magnetar.  In a September 2006 exchange of emails between Prusko and various Citigroup employees, Prusko asked: "Pls have big DQ show them jackson, buchanan and baldwin [CDOs] in synthetic form *so I can buy protection.  This is a top priority for me!*"  (Emphasis added.)  Subsequent internal emails between Citigroup employees indicated that Prusko was also seeking shorts with respect to a Constellation CDO, Cetus 2, and stated "*we already created the short for him on Cetus 2.*"  (Emphasis added.)  The next day, Prusko told Citigroup again, "I would like them to sell me protection on Baldwin, Jackson and Buchanan if possible *as well as any of my deals of course.*"  (Emphasis added.)  Later that day, he provided a full list of deals against which he wanted to buy protection, again including Pyxis.

126.   In late October 2006, internal Citigroup emails focused on the possibility of finding an equity investor in Class V III who would also buy protection on the deal.  One email noted: "A lot of people are looking to do *this 'Prusko-like' trade , i.e. go long equity and short mezz in some form or other.*"  (Emphasis added.)  Two days later, an email from Brian Stoker stated: "*I'm torn on whether to include Prusko.  1) If he doesn't add assets to the deal, and he keeps the equity, he'll bug us about the assets we pick and our structuring fee.  2) If he adds*

*assets and keeps a proportional % of the equity and he agrees to the assets we put in, then I'd*

*include him b/c we get diversity benefit and get more structuring fees*." (Emphasis added.)

127.   The SEC submitted a Consent Judgment along with its Complaint against Citigroup, pursuant to which Citigroup agreed, among other things, to disgorge its $160 million in profits on Class V III, plus $30 million in interest thereon, and to pay a civil penalty of $95 million—a total settlement of $285 million.  This Court has refused to approve the Consent Judgment, on the basis that it is *inadequate.  SEC v. Citigroup Global Markets Inc.*, 827 F. Supp. 2d 328, 332 (S.D.N.Y. 2011).

## VII.   Putnam Benefited From Its Misconduct

128.   Putnam received substantial economic benefits from its fraudulent conduct. Putnam benefited by obtaining large fees—even by Magnetar deal standards—for serving as collateral manager for Pyxis.  Putnam obtained these fees with relatively little effort or risk, because they were effectively assured by Magnetar's control over Pyxis.  Putnam also benefited from further deal volume from Magnetar, when it was chosen to act as collateral manager for Pyxis 2.  Had it not cooperated with Magnetar's scheme, Putnam would not have been chosen as collateral manager for either Pyxis 1 or Pyxis 2.

## VIII.   The Pyxis Super Senior Notes Were Downgraded To Junk, And FGIC Lost Many Millions

129.   On April 30, 2008, only 18 months after Pyxis closed, Fitch Ratings Ltd. ("Fitch") downgraded the credit rating of the Super Senior Pyxis tranche from AAA to C. Ultimately, Pyxis defaulted and FGIC incurred potential liability of up to $900 million under the Pyxis Guaranty.  FGIC never would have entered into the Pyxis Guaranty had it known Putnam was not acting independently in the selection of assets for the Pyxis portfolio.  It most certainly would not have entered into the Pyxis Guaranty had it known Magnetar, whose economic

interests conflicted with FGIC's, had any role whatsoever in the selection of assets for the Pyxis

Portfolio.   FGIC was deceived and induced to enter into the Pyxis Guaranty.  FGIC has suffered

substantial losses as the direct result of Putnam's fraud.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION:
### FRAUD

#### (Against Putnam)

130.    FGIC repeats and realleges the allegations set forth above as though fully set forth

herein.

131.    This is a claim for fraud brought against Putnam relating to affirmative

misrepresentations and material omissions it made to induce FGIC to enter into the Pyxis

Guaranty.

132.    Putnam made material misrepresentations of fact in connection with FGIC's entry

into the Pyxis Guaranty.  Putnam represented, among other things, that it would select the assets

to be included in the Pyxis Portfolio, acting as a diligent and independent collateral manager in

the interests of long investors.  These representations were made, among other things, in the

Pitchbook, Offering Memorandum, Term Sheet, Collateral Management Agreement, and

numerous oral representations by Putnam to FGIC on August 3, 2006, August 7, 2006, and on

other occasions.

133.    Putnam also omitted to disclose material facts necessary to make the statements it

had made not materially misleading.  Among other things, Putnam knowingly or recklessly

failed to disclose that:

- The selection of assets for the Pyxis Portfolio was controlled by and
  designed for the benefit of a net short investor, namely Magnetar, who
  was betting against the interests of FGIC;

- Putnam did not select the assets for Pyxis acting diligently, independently and in good faith in the interests of long investors, but rather at the behest of and under the direction of Magnetar to whom it ceded veto rights over the selection of assets;

- The asset selection procedures for Pyxis were based on a process that emphasized weaker assets over stronger ones; and

- All these actions ensured that FGIC would have to make payments on the Pyxis Guaranty.

134.    All of this information was known to Putnam but not known or readily available to FGIC.  FGIC did not know, and could not have reasonably discovered, that the selection process had been rigged by Magnetar.  Putnam further knew that its statements were false and misleading, and made the statements with the intent and expectation that FGIC would rely on them in agreeing to provide protection on the notes.

135.    Putnam's misstatements and omissions were material to FGIC's decision to enter into the Pyxis Guaranty since they bore directly on the performance of the Pyxis Portfolio, the likelihood of a Credit Event occurring under the Pyxis Guaranty, and the possibility that the Pyxis notes would default, leaving FGIC to bear any losses.

136.    FGIC reasonably relied on Putnam's misstatements and omissions in entering into the Pyxis Guaranty.  Without these material misstatements and omissions, FGIC would not have entered into the Pyxis Guaranty.

137.    Putnam's conduct, as alleged herein, was willful, malicious, reckless, and without regard to FGIC's interests.  Specifically, Putnam engaged in this deceptive conduct in order to earn unusually large fees which were guaranteed by Magnetar's control over Pyxis, and which Putnam would not earn if the Pyxis Guaranty, and thus Pyxis itself, did not close.

138.    As a direct, proximate, and foreseeable result of Putnam's conduct, FGIC has suffered harm.  Accordingly, FGIC should be restored to the status quo ante and FGIC should be

awarded damages incurred as a result of its agreement to provide protection on the notes in an amount to be determined at trial.  As a result of Putnam's conduct, FGIC is also entitled to punitive damages.

139.     This Count is brought within the time permitted by law.

## SECOND CAUSE OF ACTION:
## NEGLIGENT MISREPRESENTATION

### (Against Putnam)

140.     FGIC repeats and realleges the allegations set forth above as though fully set forth herein.

141.     This is a claim for negligent misrepresentation brought against Putnam relating to affirmative misrepresentations and material omissions it made concerning Pyxis which caused FGIC to enter into the FGIC Guaranty.

142.     Given the complexity of the Pyxis Portfolio and the number of assets underlying it, Putnam necessarily had much more knowledge than FGIC about the value and credit quality of the Pyxis Portfolio.  As Putnam was well aware, as a practical matter, it was necessary for FGIC to rely on Putnam's experience, independence and integrity in selecting the assets that went into the Pyxis Portfolio.  This created a "special relationship" of trust and confidence between Putnam and FGIC.

143.     Putnam also had exclusive knowledge of the true facts concerning the selection of the Pyxis Portfolio.  Putnam knew that it was not acting independently in selecting collateral for Pyxis, and that Magnetar, in collusion with Putnam, had rigged the collateral selection process for the Pyxis Portfolio so that it could select toxic assets whose performance it could bet against. Putnam further knew that, as a result of its misrepresentations to FGIC, FGIC did not know about Magnetar's control over the selection process for the Pyxis Portfolio, and that in entering

into the Pyxis Guaranty FGIC was acting in the mistaken belief that Putnam was controlling this selection process.

144.    Putnam made material misrepresentations of fact to FGIC in connection with its decision to enter into the Pyxis Guaranty.  Putnam represented, among other things, that it would select the assets to be included in the Pyxis Portfolio, acting as a diligent and independent collateral manager in the interests of long investors.  These representations were made, among other things, in the Pitchbook, Offering Memorandum, Term Sheet, Collateral Management Agreement, and numerous oral representations by Putnam to FGIC on August 3, 2006, August 7, 2006, and on other occasions.

145.    Putnam also omitted to disclose material facts necessary to make the statements it had made not materially misleading.  Among other things, Putnam negligently failed to disclose that:

- The selection of assets for the Pyxis Portfolio was controlled by and designed for the benefit of a net short investor, namely Magnetar, who was betting against the interests of FGIC;

- Putnam did not select the assets for Pyxis acting diligently, independently and in good faith in the interests of long investors, but rather at the behest of and under the direction of Magnetar to whom it ceded veto rights over the selection of assets;

- The asset selection procedures for Pyxis were based on a process that emphasized weaker assets over stronger ones; and

- All these actions ensured that FGIC would have to make payments on the Pyxis Guaranty.

146.    Putnam knew or should reasonably have known that its statements and omissions were false and misleading, and either knew or should reasonably have foreseen that FGIC would rely on its statements and omissions in agreeing to provide protection on the notes, since they bore directly on the performance of the Pyxis Portfolio, the likelihood of a Credit Event

occurring under the Pyxis Swap, and the possibility that the Pyxis notes would default, leaving FGIC to bear any losses pursuant to the Pyxis Guaranty.  Putnam knew or should reasonably have FGIC would suffer harm if it entered into the Pyxis Guaranty.

147.    FGIC reasonably relied on Putnam's misstatements and omissions in entering into the Pyxis Guaranty.

148.    As a direct, proximate, and foreseeable result of Putnam's conduct, FGIC has suffered harm.  Accordingly, FGIC should be restored to the status quo ante and FGIC should be awarded damages incurred as a result of its agreement to provide protection on the notes in an amount to be determined at trial.

149.    This Count is brought within the time permitted by law.

**THIRD CAUSE OF ACTION:**
**NEGLIGENCE**

**(Against Putnam)**

150.    FGIC repeats and realleges the allegations set forth above as though fully set forth herein.

151.    This is a claim for negligence brought against Putnam relating to its negligent performance as the putative collateral manger of Pyxis.

152.    Putnam failed to select and manage the Pyxis Portfolio acting diligently, independently and in good faith in the interests of long investors like FGIC, and exercising the degree of care expected of an ordinary CDO collateral manager.  On the contrary, Putnam abdicated its collateral selection responsibilities to Magnetar, in return for large fees on Pyxis and the promise of further lucrative deal volume.  Putnam was aware, but FGIC was not, nor could it have been aware, that Magnetar was selecting weaker assets for the Pyxis Portfolio and was shorting Pyxis.

153.    In agreeing to enter into the Pyxis Guaranty, FGIC reasonably believed and relied on its understanding that Putnam would exercise the degree of care expected of an ordinary CDO collateral manager in selecting and managing the Pyxis Portfolio.  FGIC's understanding was material to its decision to enter into the Pyxis Guaranty, since it bore directly on the performance of the Pyxis Portfolio, the likelihood of a Credit Event occurring under the Pyxis Swap, and the possibility that the Pyxis notes would default, leaving FGIC to bear any losses under the Pyxis Guaranty.

154.    Putnam knew or should reasonably have known that, in deciding to enter into the Pyxis Guaranty, FGIC relied on it to exercise the degree of care expected of an ordinary CDO collateral manager in selecting and managing the Pyxis Portfolio.

155.    Putnam knew or should reasonably have known that its failure to exercise the degree of care expected of an ordinary CDO collateral manager with respect to the selection of the Pyxis Portfolio would cause FGIC to suffer harm.

156.    As a direct, proximate, and foreseeable result of Putnam's conduct, FGIC has suffered harm.  Accordingly, FGIC should be restored to the status quo ante and FGIC should be awarded damages incurred as a result of its agreement to provide protection on the notes in an amount to be determined at trial.

157.    This Count is brought within the time permitted by law.

### Prayer for Relief

WHEREFORE, FGIC requests the Court enter judgment:

(a)     awarding FGIC damages to restore it to the status quo ante;

(b)     awarding FGIC compensatory damages in amounts to be determined at trial, together with pre-judgment interest at the maximum rate allowable by law;

(c)     awarding FGIC punitive damages in an amount to be determined at trial;

(d)     awarding FGIC reasonable costs and expenses incurred in this action, including, to

the extent applicable, counsel fees; and

(e)     such other relief as the Court deems just and proper.

Dated: New York, New York
       October 1, 2012

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By:

A. William Urquhart
(billurquhart@quinnemanuel.com)
Sean Baldwin
(seanbaldwin@quinnemanuel.com)

51 Madison Avenue, 22nd Floor
New York, New York  10010
(212) 849-7000

*Attorneys for Plaintiff Financial Guaranty
Insurance Company*