UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FINANCIAL GUARANTY INSURANCE
COMPANY,

               Plaintiff,

    -against-

THE PUTNAM ADVISORY COMPANY,
LLC,

             Defendant.

No. 12-cv-7372 (RWS)

**ECF CASE**
**Electronically Filed**

---

## MEMORANDUM OF LAW IN SUPPORT OF PUTNAM ADVISORY COMPANY, LLC'S MOTION TO DISMISS THE AMENDED COMPLAINT

MILBANK, TWEED, HADLEY &
M<sup>c</sup>CLOY LLP
James N. Benedict
Sean M. Murphy
Thomas A. Arena
Robert C. Hora
William P. Gross
1 Chase Manhattan Plaza
New York, New York 10005
(212) 530-5000

*Attorneys for Defendant*
*Putnam Advisory Company, LLC*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ........................................................................................ ii

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND ........................................................................................................... 5

    A.    The Pyxis ABS CDO 2006-1 ........................................................................ 5

    B.    Putnam's Role as Collateral Manager for the Pyxis CDO .......................... 7

    C.    FGIC ................................................................................................................ 8

    D.    Magnetar's Equity Stake and First Risk .................................................... 9

    E.    The Amended Complaint Relies on General News Reports ...................... 9

    F.    FGIC's Reference to Regulatory Investigation and Complaints Involving Other CDOs and Collateral Managers ............................................... 11

    G.    The Massachusetts Securities Division's Administrative Complaint ................. 12

    H.    Justice Schweitzer Dismissed the Same Claims Against Putnam in Prior Litigation in New York Supreme Court; Putnam Did Not Settle ....................... 13

ARGUMENT .............................................................................................................. 14

I.    FGIC FAILS TO STATE A CLAIM FOR FRAUD ........................................ 14

    A.    FGIC Fails to Plead an Actionable Misrepresentation or Omission ................... 14

        1.    FGIC Fails to Allege Any Misrepresentations Regarding Putnam's Role ...................................................................................... 14

        2.    FGIC's Claim Based on the Composition of the Pyxis Portfolio is Without Merit ...................................................................... 17

        3.    FGIC Fails to Allege a Misrepresentation or Omission as to the Identity of Any Short Counterparty ....................................... 19

    B.    FGIC Fails to Allege That Putnam Acted With Scienter .................................... 20

        1.    FGIC Fails to Allege a Plausible Motive for Putnam's Participation in the Alleged Fraud ............................................................ 21

        2.    FGIC Fails to Allege Circumstantial Evidence of Conscious Misbehavior or Recklessness ................................................. 24

    C.    The Amended Complaint Does Not Adequately Plead Loss Causation ............. 30

II.    FGIC'S NEGLIGENT MISREPRESENTATION CLAIM SHOULD BE DISMISSED BECAUSE FGIC FAILS TO ALLEGE A SPECIAL RELATIONSHIP ....................................................................................... 32

III.    FGIC'S NEGLIGENCE CLAIM SHOULD BE DISMISSED BECAUSE FGIC FAILS TO ALLEGE THE EXISTENCE OF A DUTY OWED BY PUTNAM ........... 34

CONCLUSION ........................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Amusement Indus. v. Stern*,
  786 F. Supp. 2d 758 (S.D.N.Y. 2011).................................................................32

*Anschutz Corp. v. Merrill Lynch & Co.*,
  690 F.3d 98 (2d Cir. 2012)................................................................................32

*Art Capital Group, LLC v. Neuhaus*,
  70 A.D.3d 605 (1st Dep't 2010) ........................................................................20

*ATSI Commc'ns, Inc. v. Shaar Funds, Ltd.*,
  493 F.3d 87 (2d Cir. 2007).................................................................................14

*Bell v. Hubbert*,
  No. 95 Civ. 10456 (RWS), 2007 WL 60513 (S.D.N.Y. Jan. 8, 2007) ...................5

*Campo v. Sears Holdings Corp.*,
  371 F. App'x 212 (2d Cir. 2010) ........................................................................10

*Cohen v. Stevanovich*,
  722 F. Supp. 2d 416 (S.D.N.Y. 2010) (Sweet, J.)................................................23

*Dooner v. Keefe, Bruyette & Woods, Inc.*,
  No. 00 Civ. 572 (JGK), 2003 WL 135706 (S.D.N.Y. Jan. 17, 2003)....................24

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JPMorgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)...............................................................................17

*Epirus Capital Mgmt., LLC v. Citigroup, Inc.*,
  No. 09 Civ. 2594 (SHS), 2010 U.S. Dist. LEXIS 42200 (S.D.N.Y. Apr. 28, 2010)...............18

*First Nationwide Bank v. Gelt Funding Corp.*,
  27 F.3d 763 (2d Cir. 1994).................................................................................5

*Footbridge Ltd. v. Countrywide Home Loans, Inc.*,
  No. 09 Civ. 4050 (PKC), 2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010)........................14, 31

*G-I Holdings, Inc. v. Baron & Budd*,
  No. 01 Civ. 0216 (RWS), 2004 WL 1277870 (S.D.N.Y. June 10, 2004) (Sweet, J.) ............24

*Graham Packaging Co. v. Owens-Ill., Inc.*,
  67 A.D.3d 465 (1st Dep't 2009) ........................................................................18, 20

*Healthcare Fin. Grp., Inc. v. Bank Leumi USA*,
  669 F. Supp. 2d 344 (S.D.N.Y. 2009)..................................................................31

*HSH Nordbank AG v. UBS AG,*
    95 A.D.3d 185 (1st Dep't 2012) ........................................................18

*HSH Nordbank, AG v. UBS AG,*
    No. 600562/08, 2008 N.Y. Misc. LEXIS 10416 (Sup. Ct., N.Y. County Oct. 21,
    2008) ..................................................................................................33

*In re CRM Holdings, Ltd. Sec. Litig.,*
    No. 10 Civ. 975 (RPP), 2012 U.S. Dist. LEXIS 66034 (S.D.N.Y. May 10, 2012) ................12

*In re Flag Telecom Holdings, Ltd. Sec. Litig.,*
    308 F. Supp. 2d 249 (S.D.N.Y. 2004) ....................................................10

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,*
    218 F.R.D. 76 (S.D.N.Y. 2003) ............................................................12

*In re Merrill Lynch Auction Rate Sec. Litig.,*
    851 F. Supp. 2d 512 (S.D.N.Y. 2012) ....................................................18

*In re Wachovia Equity Sec. Litig.,*
    753 F. Supp. 2d 326 (S.D.N.Y. 2011) ....................................................24

*J.A.O. Acquisition Corp. v. Stavitsky,*
    8 N.Y.3d 144 (2007) ............................................................................32

*Janbay v. Canadian Solar, Inc.,*
    No. 10 Civ. 4430 (RWS), 2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ............................11

*Janus Capital Grp., Inc. v. First Derivative Traders,*
    131 S. Ct. 2296 (2011) ........................................................................18

*Landesbank Baden-Württemberg v. Goldman Sachs & Co.,*
    821 F. Supp. 2d 616 (S.D.N.Y. 2011) ..............................................32, 33

*Lattanzio v. Deloitte & Touche LLP,*
    476 F.3d 147 (2d Cir. 2007) ................................................................31

*Laub v. Faessel,*
    297 A.D.2d 28 (1st Dep't 2002) ......................................................30, 31

*Ledford v. Rapid-Am. Corp.,*
    No. 86 Civ. 9116 (JFK), 1988 U.S. Dist. LEXIS 79 (S.D.N.Y. Jan. 8, 1988) ......................12

*Lentell v. Merrill Lynch & Co.,*
    396 F.3d 161 (2d Cir. 2005) ................................................................31

*Lipsky v. Commonwealth United Corp.,*
    551 F.2d 887 (2d Cir. 1976) ................................................................12

*Loreley Financing (Jersey) No. 7 Ltd. v. Crédit Agricole Corporate & Investment Bank*,
   Index No. 650673/2010 (N.Y. Sup. Ct. June 9, 2011) (Schweitzer, J.) ........................ passim

*Luminent Mortg. Capital, Inc. v. Merrill Lynch & Co.*,
   652 F. Supp. 2d 576 (E.D. Pa. 2009) ...................................................................31

*M&T Bank Corp. v. Gemstone CDO VII, Ltd.*,
   68 A.D.3d 1747 (4th Dep't 2009) ........................................................................33

*Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.p.A.*,
   244 F.R.D. 204 (S.D.N.Y. 2007) ........................................................................34

*Marcus v. Frome*,
   275 F. Supp. 2d 496 (S.D.N.Y. 2003)...................................................................14

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*,
   87 A.D.3d 287 (1st Dep't 2011) ......................................................................32, 34

*Miller v. Lazard, Ltd.*,
   473 F. Supp. 2d 571 (S.D.N.Y. 2007)...................................................................11

*Naughright v. Weiss*,
   857 F. Supp. 2d 462 (S.D.N.Y. 2012)....................................................................5

*Pension Comm. of the Univ. of Montreal v. Bank of Am. Secs. LLC*,
   446 F. Supp. 2d 163 (S.D.N.Y. 2006)...................................................................34

*Permasteelisa, S.p.A. v. Lincolnshire Mgmt., Inc.*,
   16 A.D.3d 352 (1st Dep't 2005) .........................................................................20

*Primavera Familienstiftung v. Askin*,
   No. 95 Civ. 8905 (RWS), 1996 U.S. Dist. LEXIS 12683 (S.D.N.Y. Aug. 22, 1996)
   (Sweet, J.)...............................................................................................33

*Rich v. Maidstone Fin. Inc.*,
   No. 98 Civ. 2569 (DAB), 2002 WL 31867724 (S.D.N.Y. Dec. 20, 2002).............................14

*Saltz v. First Frontier, LP*,
   782 F. Supp. 2d 61 (S.D.N.Y. 2010)....................................................................14

*Sebastian Holdings, Inc. v. Deutsche Bank AG*,
   78 A.D.3d 446 (1st Dep't 2010) .........................................................................34

*Small v. Lorillard Tobacco Co.*,
   94 N.Y.2d 43 (1997) ....................................................................................14

*Stern v. Leucadia Nat'l Corp.*,
   844 F.2d 997 (2d Cir. 1988)............................................................................10

*Stewart v. Jackson & Nash*,
    976 F.2d 86 (2d Cir. 1992)..................................................................................32

*Travelers Cas. & Sur. Co. v. Dormitory Auth.*,
    734 F. Supp. 2d 368 (S.D.N.Y. 2010)..................................................................34

**STATUTES**

Section 10(b) of the Securities Exchange Act of 1939 ..................................................14

**RULES**

Rule 9(b) of the Federal Rules of Civil Procedure ........................................1, 5, 14, 24

Rule 12(b)(6) of the Federal Rules of Civil Procedure...................................................5

Rule 144A of the Securities Act of 1933 ......................................................................6

Putnam Advisory Company, LLC ("Putnam") respectfully submits this memorandum of law in support of its motion, pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the Amended Complaint (the "Amended Complaint") filed by Financial Guaranty Insurance Company ("Plaintiff" or "FGIC") with prejudice.

## PRELIMINARY STATEMENT

FGIC, a sophisticated financial institution, made a fully informed decision to guarantee its subsidiary's obligations under a credit default swap tied to a collateralized debt obligation called Pyxis ABS CDO 2006-1 ("Pyxis").  Having had to perform on its guaranty as a result of the industry-wide collapse of the subprime housing market in 2008, FGIC seeks to recoup unspecified losses by alleging a broad scheme to defraud involving the Pyxis CDO. FGIC's flawed claims are based, almost exclusively, on press reports and cases involving CDOs other than Pyxis, and on unproven allegations and emails cited in an administrative complaint against Putnam that actually contradict FGIC's claims.  FGIC alleges that Putnam, the collateral manager of the Pyxis CDO, intentionally selected "toxic assets" for inclusion in the CDO's portfolio for the express purpose of causing the $1.5 billion CDO to fail.  FGIC alleges that Putnam engaged in this conduct, not to enrich itself, but to enable a third party, Magnetar Capital LLC ("Magnetar"), a hedge fund manager, to reap hundreds of millions of dollars on short positions referencing such "toxic assets."  (Am. Compl. ¶¶ 36, 160.)

There are no well-pleaded allegations, however, supporting this sensational claim. The Amended Complaint does not allege that Putnam selected any assets that violated any of the "Eligibility Criteria" set forth in the confidential offering memorandum for the Pyxis CDO dated October 2, 2006 (the "Offering Memorandum"), or that any of the assets selected for the Pyxis portfolio had received lower credit ratings than required by these Eligibility Criteria.  Nor does the Amended Complaint adequately allege that Putnam made any false statements to investors

1

regarding its role, that Magnetar improperly influenced Putnam's selection of collateral assets or that Putnam had any motive whatsoever to engage in this conduct.

The New York Supreme Court previously rejected the same core allegations underlying the Amended Complaint.  In *Loreley Financing (Jersey) No. 7 Ltd. v. Crédit Agricole Corporate & Investment Bank*, Index No. 650673/2010 (N.Y. Sup. Ct. June 9, 2011) (Schweitzer, J.) ("*Loreley*"), the court dismissed fraud claims brought by a Pyxis noteholder against Putnam, holding that the same types of allegations asserted by FGIC here were not sufficient to plead with the requisite particularity that Putnam had abdicated its responsibility for selecting assets for the Pyxis portfolio or had otherwise engaged in fraudulent conduct.  After the New York court dismissed Loreley's claims against Putnam, Loreley agreed to enter a stipulation of discontinuance of the action, with prejudice.  There was no settlement agreement between Putnam and Loreley, and Putnam did not pay any sum whatsoever to Loreley.

Here, the Amended Complaint fails to state a claim against Putnam on numerous grounds.  <u>First</u>, the Amended Complaint fails to allege any actionable misrepresentations or omissions by Putnam.  Putnam was not responsible for the vast majority of the information in the Offering Memorandum or other materials distributed to investors.  Even if Putnam bore such responsibility, FGIC cannot point to anything in the offering materials that was inaccurate.  The Offering Memorandum described at great length the composition of the securities that would be collateralizing the CDO (the vast majority of which were subprime and mid-prime residential mortgage-backed securities ("RMBS")), the relatively low credit rating of those securities (many of which were rated "BBB"), and all structural features of the CDO.  In page after page of carefully drafted disclosures, the Offering Memorandum detailed the very risks relating to the assets FGIC claims were misrepresented.  FGIC does not identify any assets selected by Putnam

2

for the Pyxis portfolio that violated any of the detailed Eligibility Criteria set forth in the Offering Memorandum.

The Amended Complaint also alleges that Putnam should have disclosed that Magnetar, an equity investor in the CDO, was taking a short position against the Pyxis CDO. But there are no well-pleaded allegations that Putnam had any reason to believe that Magnetar's short positions were anything other than ordinary hedging activity, or that Putnam knew the overall size of these short positions. And the Offering Memorandum, which FGIC acknowledges it read and relied upon, fully disclosed that more than 75% of the portfolio—with a notional value well in excess of $1 billion—would consist of credit default swaps ("CDS") and that third parties would be taking the short position on those securities. Accordingly, a sophisticated investor like FGIC was fully aware that an enormous number of "short" bets were being made with respect to the Pyxis CDO, directly contrary to FGIC's long position. FGIC does not claim that any of these CDS failed to meet the terms of the CDO, or that it was denied an opportunity to inspect the Pyxis portfolio prior to issuing its guaranty.

Second, the Amended Complaint does not allege a theory of motive sufficient to support a plausible theory of scienter. FGIC alleges that Putnam, a large and respected financial institution, knowingly engaged in a billion-dollar fraud to earn purportedly "high" collateral manager fees. (Am. Compl. ¶ 44.) Yet Putnam's fee percentages were ***well below*** the normal rate for a CDO collateral manager. Further, a significant portion of Putnam's fee was subordinated to the payments owed by Pyxis to noteholders. And the remainder of Putnam's fee was to be calculated on the basis of a monthly portfolio asset amount that ***excluded*** defaulted securities. In other words, if the CDO failed in whole or even in part, Putnam would not receive its full fee. The Amended Complaint's allegations fall well short of establishing motive.

Nor does the Amended Complaint allege any conscious misbehavior sufficient to establish scienter.  The Amended Complaint relies upon a number of press reports and other sources to support its theory of fraud, but none of these sources makes any particularized allegations about the Pyxis CDO or about Putnam's purported selection of "toxic assets" in the Pyxis CDO.  The emails referenced in the Amended Complaint are also insufficient to establish any misconduct by Putnam.  These emails, many of which were also before Judge Schweitzer when he dismissed the *Loreley* claims against Putnam and the remainder of which have been blindly quoted from an administrative complaint not properly before this Court, do not evidence any abdication of responsibility by Putnam.  They do not show that Magnetar directed the selection of collateral assets or that Putnam allowed Magnetar or any other party to veto any assets Putnam had selected for the CDO.  Nor do these emails evidence that Putnam knew the size of Magnetar's short position or that Putnam had any reason to believe there was anything improper with an equity investor in a CDO seeking to hedge its long exposure with short positions.

Third, FGIC fails to articulate a viable theory of how Putnam's alleged abdication of its collateral selection responsibilities caused FGIC's losses.  Although FGIC alleges that it would not have suffered unspecified losses but for Putnam's purported abdication of its collateral selection responsibilities, it fails to make any allegation of loss causation.  Significantly, the Amended Complaint does not allege that any other portfolio of assets capable of meeting the Pyxis CDO's eligibility criteria would have performed any differently during the unprecedented market events of 2007 and 2008.  Ultimately, the Pyxis CDO failed because of its large, fully disclosed exposure to the subprime sector.

4

<u>Fourth</u>, Plaintiff's negligent misrepresentation and negligence claims should be dismissed with prejudice.  Not only does the Amended Complaint fail to adequately allege an actionable misrepresentation or omission, but the absence of any alleged facts reflecting a special or privity-like relationship between FGIC and Putnam is fatal to FGIC's claims.  The offering materials disclaimed that Putnam had assumed any fiduciary obligations to any noteholder or investor.  Putnam was not in privity with FGIC.  Putnam was not the counterparty on FGIC's guaranty of its subsidiary's swap obligation referencing Pyxis, or a counterparty on the underlying swap.  Putnam and FGIC did not have a pre-existing relationship of trust and confidence.  And the law is well-settled that, as a sophisticated financial institution, FGIC cannot allege reliance on Putnam's purportedly superior expertise when deciding to invest in Pyxis.

## BACKGROUND[1]

### A.    The Pyxis ABS CDO 2006-1

Pyxis was a "hybrid" CDO, meaning that its $1.5 billion collateral portfolio included both "cash" and "synthetic" assets.  (Am. Compl. ¶ 42.)  As fully disclosed in the Offering Memorandum, approximately 23% of the Pyxis portfolio was comprised of "cash" assets—that is, RMBS bonds, CDO notes, and other securities purchased by Pyxis.  (*Id.*)  The remaining roughly 77% (or $1.15 billion par value) of the portfolio was comprised of "synthetic" assets, created through CDS referencing RMBS bonds, CDO notes, and other securities not actually owned by Pyxis.  (*Id.*)

The securities issued by the Pyxis CDO consisted of several tranches of notes and one tranche of equity.  (*See* Pyxis Offering Mem., Hora Decl. Ex. 1 at i.)[2]  The various notes and

---

[1] Although the allegations of the Amended Complaint are, solely for the purposes of this motion, accepted as true, "'conclusions of law or unwarranted deductions of fact are not admitted.'"  *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994) (citations omitted).  "This principle applies with even greater force in a fraud case governed by the more stringent pleading requirements of Fed. R. Civ. P. 9(b)."  *Id.*; *see also Bell v. Hubbert*, No. 95 Civ. 10456 (RWS), 2007 WL 60513, at *2 (S.D.N.Y. Jan. 8, 2007).

the equity tranches were offered for sale in a private placement to "qualified institutional buyers" under Rule 144A of the Securities Act of 1933.  (*Id.*)  Accordingly, the purchasers were sophisticated institutional investors deemed capable of evaluating the transaction based on the disclosures in the offering documents.[3]

The Pyxis Offering Memorandum expressly warned these qualified institutional buyers that each investor must rely on its "own examination of the Co-Issuers and the terms of the offering, including the merits and risks involved."  (Hora Decl. Ex. 1 at iii.)  Moreover, the Offering Memorandum disclosed that Putnam was not responsible for any information contained therein, except for extremely limited information set forth in a brief 4-page section describing the Collateral Manager.  (*Id.* at ii.)

Pyxis was the protection seller or "long" counterparty for each of the CDS that comprised the overwhelming majority of the assets in the collateral portfolio; Pyxis received a premium from the "short" counterparties in exchange for the obligation "to make loss payments" to the short counterparties if the referenced assets performed poorly.  (Am. Compl. ¶¶ 42-43.) The Pyxis Offering Memorandum made clear that the CDO's arranger and underwriter, Calyon, which assumed these short positions in the first instance, would transfer some or all of the risk of these positions through back-to-back hedging arrangements with other market participants selected in its "sole discretion."  (Hora Decl. Ex. 1 at 48; *see also* Am. Compl. ¶ 43.)

---

[2] References to "Hora Decl. Ex. __" refer to the exhibits to the Declaration of Robert C. Hora in Support of The Putnam Advisory Company LLC's Motion to Dismiss the Complaint, dated December 21, 2012.  "When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of and relied on when bringing suit, or matters of which judicial notice may be taken." *Naughright v. Weiss*, 857 F. Supp. 2d 462, 469 (S.D.N.Y. 2012).

[3] "Qualified institutional buyers" are institutions registered under the Securities Exchange Act of 1934 that, because of their investment activity and sophistication, are deemed not to require the same level of disclosure as ordinary investors.  *See* Guy P. Lander, Resales of Restricted Securities Under SEC Rules 144 and 144A § A-47 (46-3d. Corporate Practice Series 2001) ("Rule 144A is based on the concept that certain institutions can fend for themselves . . . .").

Accordingly, FGIC and other participants in Pyxis were on notice that sophisticated, institutional investors whose identities they would not know were, in the aggregate, making enormous "short" bets that the collateral underlying the Pyxis CDO would perform poorly.

The sophisticated participants in the Pyxis CDO also knew, as FGIC admits in its Amended Complaint, that the Pyxis portfolio would be "primarily backed by subprime RMBS" (Am. Compl. ¶¶ 6, 49, 76)—loans made to borrowers with weaker credit histories and high debt-to-income ratios.  Indeed, the Offering Memorandum disclosed that *a minimum* of 80% of the RMBS in Pyxis 2006-1 would be collateralized by subprime and mid-prime mortgages.  (*See* Hora Decl. Ex. 1 at 31, 124, 139-40; *see also* Am. Compl. ¶ 80 ("This deal allows FGIC to take exposure to the *subprime RMBS sector* . . . .") (emphasis added).)

The Pyxis transaction closed on October 3, 2006.

**B.      Putnam's Role as Collateral Manager for the Pyxis CDO**

Putnam served as the collateral manager for the Pyxis CDO, a role defined by a Collateral Management Agreement between Putnam and Pyxis, dated October 3, 2006.  (*See* Am. Compl. ¶¶ 32, 42, 85.)  Pursuant to this agreement, Putnam agreed to "supervise and direct the investment and reinvestment of the Collateral" in accordance with the detailed Eligibility Criteria and Collateral Quality Tests prescribed in the CDO Indenture.  (Pyxis Collateral Management Agmt., Hora Decl. Ex. 2 at §§ 2(a)-(b); Pyxis Indenture, *id.* Ex. 3 at 237-52.)  The Amended Complaint does not allege that the collateral selected by Putnam did not meet any of these detailed criteria or tests, or that any of the collateral received lower credit ratings than required by the Indenture or other offering documents.

The Collateral Management Agreement specified the fees that Putnam was entitled to receive as compensation for managing the Pyxis portfolio.  Under the agreement, Pyxis agreed to pay Putnam a monthly senior collateral management fee in an amount equal to

0.15% *per annum* of the portfolio's Monthly Asset Amount on each Monthly Distribution Date,

and a quarterly subordinated incentive collateral management fee in an amount equal to 0.05%

*per annum* of the portfolio's Monthly Asset Amount on each Quarterly Distribution Date.  (Hora

Decl. Ex. 2 at §§ 8(a)-(b).)  Although FGIC calls the senior fee "fixed" (*see* Am. Compl. ¶ 44), it

was not.  The definition of "Monthly Asset Amount" expressly excluded any collateral assets

that had defaulted.  (*See* Hora Decl. Ex. 3 at 40, 43-44 ("Monthly Asset Amount" and "Net

Outstanding Portfolio Collateral Balance" definitions).)  Thus, any defaults would decrease the

Monthly Asset Amount and decrease the size of both the senior and subordinated fee.

   Significantly, Putnam's right to receive the subordinated collateral management

fee was also junior to the Pyxis noteholders' rights to receive interest payments on their

securities.  (*See* Hora Decl. Ex. 1 at 70-74.)  Thus, as stated in the Offering Memorandum,

Putnam would receive its incentive fee only ***after*** all six classes of noteholders (starting with

Class A-1 and ending with Class X) received the amount each such class was entitled to receive

per distribution date.  (*Id.* at 74.)

  **C.**  **FGIC**

   FGIC is a large and sophisticated monoline insurer that issued a number of

policies on CDOs, CDS, and other instruments tied to the housing market during the housing

bubble.[4]  FGIC was not an investor in Pyxis.  It did not purchase any notes or equity issued by

Pyxis, and it did not enter into any CDS that were to be included in the Pyxis portfolio.  Instead,

according to the Amended Complaint, FGIC "insured payment of all obligations owed by

FGIC's wholly-owned subsidiary, FGIC Credit Products LLC, under a CDS referencing Pyxis

. . . ."  (Am. Compl. ¶ 8.)  Under the CDS guaranteed by FGIC, "FGIC Credit Products LLC

---

[4] In June 2012, FGIC was placed in rehabilitation proceedings, the insurance equivalent of bankruptcy, by the Superintendent of Financial Services of the State of New York.  (Cover Page to FGIC Rehabilitation Proceeding Website, Hora Decl. Ex. 4 at 1.)

agreed that, if Pyxis defaulted, it would make all the payments owed by Calyon" on a $900 million CDS between Calyon and Pyxis, in which Calyon was the protection seller.  (*Id.*) According to FGIC, it entered into its guaranty "to take exposure to the subprime RMBS sector. . . ." (*Id.* ¶ 80.)  As alleged in the Amended Complaint, FGIC performed rigorous "due diligence" prior to issuing its guaranty, including "an analysis of the deal's structure . . . and the assets that would be included in the Pyxis Portfolio." (*Id.* ¶ 71.)

### D.    Magnetar's Equity Stake and First Risk

In Pyxis, as with CDOs generally, equity holders are the last in line to receive payments from the CDO.  (*See* Hora Decl. Ex. 1 at 70-79 (describing Pyxis Priority of Payments).)  If a default occurs, the equity holders suffer the first loss.  Thus, FGIC characterizes the equity position as the riskiest stake in the CDO.  (Am. Compl. ¶ 36; *cf. id.* ¶¶ 24-25.) According to FGIC, Magnetar and its co-equity sponsor Deutsche Bank ("DB") purchased the entire equity stake in Pyxis.  (*Id.* ¶ 51.)  Magnetar and DB also allegedly made a second long investment, purchasing the $61.875 million Class X Subordinate Notes that were just one rung above the equity and, after the equity, would suffer the next loss if the CDO defaulted.  (*Id.*; *see also* Hora Decl. Ex. 1 at i, 70-79.)[5]

### E.    The Amended Complaint Relies on General News Reports

Citing a scant number of emails and a handful of anonymous reports of Magnetar's alleged general CDO trading strategy, FGIC alleges that, in addition to purchasing the Pyxis CDO's equity tranche, Magnetar took short positions related to Pyxis, and speculates

---

[5] FGIC complains at length that the Pyxis CDO was "structured in such a way that, as long as it avoided default, the preference shares and Class X notes would receive much larger payments of principal and interest than the senior notes during the first five years of their existence" and  "would receive a large portion of their investment back within just over a year." (Am. Compl. ¶ 52 (referring to structure as "triggerless").)  The Complaint, however, contains no allegations that this structure was not fully disclosed to FGIC and other market participants in the offering materials, nor does FGIC's description of Pyxis' structure diminish that, in a default, the preference and Class X shares held by Magnetar and DB would suffer the first loss.

that Magnetar's short position must have been larger than its long position.  (*See, e.g.,* Am. Compl. ¶ 54.)  But FGIC offers no well-pleaded factual allegations as to the relative size of Magnetar's positions in Pyxis, instead asserting in a conclusory fashion that Magnetar's short positions "far exceeded" its long position.  (*Id.*)  Even if this speculative assertion were true, it would provide no factual support for the entirely separate claim, at the heart of the Amended Complaint, that Putnam simply selected the Pyxis CDO's collateral at Magnetar's bidding.

Lacking particularized facts to support its claims, FGIC relies heavily on news reports, which in turn rely on anonymous sources, to speculate about Magnetar's general trading strategy, none of which suggests that Putnam was involved in executing this alleged strategy in connection with Pyxis.  In April 2010, the website ProPublica, based on anonymous, unverifiable sources, reported that beginning in 2005 and continuing through 2007 Magnetar purchased substantial stakes in the equity tranches of various CDOs at the same time it took short positions against these CDOs.  (*See* ProPublica article, Hora Decl. Ex. 5.)  This article, however, acknowledges that "[n]obody but Magnetar knows" the specific CDOs Magnetar took short positions against, or the amount of these positions relative to its equity investments.  (*Id.* at 6.)  When asked to comment, Magnetar informed ProPublica that it was "net long" on the CDOs it invested in, meaning that it stood to lose money when they failed.  (*Id.*)

Speculation in the business press, however, is not sufficient to support a fraud claim*, see Campo v. Sears Holdings Corp.*, 371 F. App'x 212, 215 (2d Cir. 2010), and even if such speculation were true, it does not support the claim that Putnam "abdicated" its collateral selection responsibilities to Magnetar.[6]  Where news articles are cited in a complaint, they "still

---

[6] *See also Stern v. Leucadia Nat'l Corp.*, 844 F.2d 997, 1004 (2d Cir. 1988) ("It is not enough to quote press speculation about defendants' motives and press reports of other occasions . . . ."); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 262 (S.D.N.Y. 2004) (plaintiff's reliance on news articles discussing similar

10

must indicate particularized facts about Defendant['s] conduct in order to support the Plaintiff['s]

claims." *Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 586 (S.D.N.Y. 2007).  The ProPublica

article ***does not*** implicate Putnam in any way or even discuss the Pyxis CDO.  The only mention

of Putnam in the ProPublica article is a single reference to the employment history of the

Magnetar employee Jim Prusko, who is reported to have previously worked at Putnam.  (Hora

Decl. Ex. 5 at 7.)  Based solely on this innocuous fact, FGIC makes the speculative leap,

unadorned with any factual support, that "the Putnam representative putatively responsible for

selecting the Pyxis Portfolio" had an "especially close" relationship with Prusko, and that "in

reality, Magnetar controlled" the asset selection process for the Pyxis portfolio. (Am. Compl. ¶

88.)[7]

     **F.**     **FGIC's Reference to Regulatory Investigation and Complaints
Involving Other CDOs and Collateral Managers**

     In an effort to dress up its conclusory allegations by way of analogy, the

Amended Complaint includes scores of allegations detailing complaints against and regulatory

investigations of several other arrangers and collateral managers with respect to other CDO

transactions.  (*See* Am. Compl. ¶¶ 13, 15, 58, 126-44.)  Such allegations do not, however,

support FGIC's claims against Putnam:  Putnam is not alleged to have had any involvement in

the CDOs at issue.  *See Janbay v. Canadian Solar, Inc.*, No. 10 Civ. 4430 (RWS), 2012

WL 1080306, at *5 (S.D.N.Y. Mar. 30, 2012) ("Allegations contained in the complaint of an

---

transactions entered into by defendant's rivals to artificially inflate revenues amounted to "guilt by association" and "more is required to plead securities fraud").

[7] FGIC also cites a book titled *Econned* written by a financial journalist that discusses Magnetar's alleged role in certain CDOs, but fails to mention either Putnam or Pyxis.  (*See* Am. Compl. ¶ 39.)  Although the Complaint misleadingly refers to *Econned*'s author, Susan Webber (who uses the pen name Yves Smith), as a "former Goldman Sachs banker" (*id.*), the book makes clear that the author had not worked at Goldman Sachs for years and had no first-hand information relating to the structuring of CDOs in general, or the Pyxis CDO in particular.  Indeed, Ms. Webber's biography on the website of Aurora Advisors Inc., the management consulting firm she founded, reveals that she last worked at Goldman Sachs ***29 years ago*** as a corporate finance associate in 1983.  *See* http://www.auroraadvisors.com/resume_webber.html (last visited December 20, 2012).

unrelated matter . . . cannot establish the particularized facts necessary to support this securities fraud claim.").

###### G.     The Massachusetts Securities Division's Administrative Complaint

FGIC also adds several references in its Amended Complaint, for the first time, to an administrative complaint recently filed by the Massachusetts Securities Division (the "MSD") against Putnam relating to the Pyxis CDOs,[8] and to various documents referenced in that pleading.  But the administrative complaint's unproven allegations, much like the complaints and investigations of other collateral managers referenced by FGIC, cannot form the basis of a fraud claim against Putnam:  References to complaints in administrative proceedings that have not resulted in a decision on the merits are immaterial as a matter of law and should be stricken.  *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 218 F.R.D. 76, 78 (S.D.N.Y. 2003) (citing *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 892-94 (2d Cir. 1976)).[9]

Even if FGIC's references to the MSD's administrative complaint could properly be considered, the administrative complaint makes no allegations of scienter or loss causation, both essential elements of FGIC's fraud claim here.  And the emails it selectively quotes, far from showing that Magnetar controlled the selection of the Pyxis CDO's collateral, demonstrate that Magnetar did ***not*** have any ability to direct Putnam's asset selection.  *See* Section I(B)(2)(b), *infra*.

---

[8]  The "Pyxis CDOs" are Pyxis ABS CDO 2006-1 and a later CDO, Pyxis ABS CDO 2007-1.

[9]  *See also In re CRM Holdings, Ltd. Sec. Litig.*, No. 10 Civ. 975 (RPP), 2012 U.S. Dist. LEXIS 66034, at *77-78 (S.D.N.Y. May 10, 2012) (citing *In re Merrill Lynch* and rejecting plaintiffs' citations to "unproven allegations" made in earlier regulatory complaints); *Ledford v. Rapid-Am. Corp.*, No. 86 Civ. 9116 (JFK), 1988 U.S. Dist. LEXIS 79, at *3 (S.D.N.Y. Jan. 8, 1988) (citing *Lipsky* and rejecting plaintiff's reference to determination by New York State Division of Human Rights finding probable cause, noting that "references in a complaint to proceedings which do not adjudicate underlying issues may be stricken").

**H.      Justice Schweitzer Dismissed the Same Claims Against Putnam in
Prior Litigation in New York Supreme Court; Putnam Did Not Settle**

The allegations in FGIC's Amended Complaint, though defective, are not new.
In 2010, an investor in Pyxis sued Calyon and Putnam in New York Supreme Court.  There, as
here, the plaintiff's claim was that Putnam "abdicated its role as asset manager of Pyxis, as part
of an over-arching fraudulent scheme orchestrated by . . . an aggressive hedge fund, Magnetar. . .
." (*Loreley*, Hora Decl. Ex. 6 at 6.)  Indeed, the plaintiff not only relied heavily on the very same
ProPublica article and other media sources upon which FGIC relies, but also submitted to the
court many of the same Pyxis-related e-mails that FGIC quotes in the Amended Complaint.[10]

On June 9, 2011, Justice Schweitzer dismissed the complaint for failure to plead
fraud with particularity, noting that the plaintiffs had relied heavily on general allegations "based
on anecdotal print reports citing unidentified or confidential sources," and concluded that "[t]his
will not carry the day."  (Hora Decl. Ex. 6 at 9, 10.)  In an attempt to blunt the impact of Justice
Schweitzer's decision, FGIC repeatedly asserts that after allegedly "incriminating evidence came
to light" (the same Pyxis-related emails that FGIC quotes in its Amended Complaint), "the
investors' claims were promptly settled for an undisclosed amount." (*See* Am. Compl. ¶¶ 16,
114.)  This assertion is disingenuous.  FGIC fails to inform the Court that Justice Schweitzer
dismissed Putnam from the *Loreley* action *prior* to this alleged settlement by other parties, and
*after* the *Loreley* plaintiffs had invoked many of the same defective emails now raised in FGIC's
complaint.  (*See* Hora Decl. Ex. 6; *id.* Ex. 8 at 7-10.)[11]  Putnam did not enter into any settlement

---

[10]   *See* Affirm. of Stephen M. Plotnick in Opp'n to Defs.' Mots. to Dismiss, *Loreley Fin. (Jersey) No. 7 Ltd. v. Crédit Agricole Corp. & Inv. Bank*, No. 650673/2010 (Apr. 28, 2011) (without exhibits), Hora Decl. Ex. 7; Putnam's Reply Mem. of Law in Supp. of its Mot. to Dismiss, *Loreley Fin. (Jersey) No. 7 Ltd. v. Crédit Agricole Corp. & Inv. Bank*, No. 650673/2010 (June 8, 2011) (addressing emails), Hora Decl. Ex. 8.

[11]   In April 2011, Intesa, a swap counterparty of Calyon's that took both long and short positions on Pyxis notes, filed a similar complaint against Magnetar, Calyon, and Putnam in this Court, represented by the same counsel as FGIC.  Intesa's complaint is the subject of pending motions to dismiss.  *See Intesa SanPaolo, S.P.A. v. Credit Agricole Corporate and Inv. Bank*, No. 12-CV-2683 (S.D.N.Y.) (Sweet, J.).

agreement with the *Loreley* plaintiff, which simply filed a notice of discontinuance of the *Loreley* action after Justice Schweitzer granted Putnam's motion to dismiss.

## ARGUMENT

## I.   FGIC FAILS TO STATE A CLAIM FOR FRAUD

FGIC's common-law fraud claim is subject to the heightened pleading requirements of Rule 9(b), which is intended to "safeguard[] a defendant's reputation from 'improvident' charges and protect[] against strike suits."  *Footbridge Ltd. v. Countrywide Home Loans, Inc.*, No. 09 Civ. 4050 (PKC), 2010 WL 3790810, at *7 (S.D.N.Y. Sept.  28, 2010); *see also ATSI Commc'ns, Inc. v. Shaar Funds, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).  To state a claim for fraud under New York law, a complaint "must contain allegations of a representation of material fact, falsity, scienter, reliance and injury."  *Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43, 57 (1997).  These elements are "substantially identical to those governing § 10(b) [of the Securities Exchange Act of 1934]," and, as such, the "identical analysis applies."  *Rich v. Maidstone Fin. Inc.*, No. 98 Civ. 2569 (DAB), 2002 WL 31867724, at *13 (S.D.N.Y. Dec. 20, 2002) (internal quotation marks and citation omitted).[12]  Here, FGIC fails to plead facts making out the most basic elements of a fraud claim, let alone with the particularity required by Rule 9(b).

### A.   FGIC Fails to Plead an Actionable Misrepresentation or Omission

#### 1.   FGIC Fails to Allege Any Misrepresentations Regarding Putnam's Role

FGIC alleges that Putnam abdicated its collateral selection responsibilities to Magnetar so that Magnetar supposedly could "select weaker assets whose performance it could

---

[12] *See also Saltz v. First Frontier, LP*, 782 F. Supp. 2d 61, 73  (S.D.N.Y. 2010) (dismissing common law fraud claims where plaintiff failed to satisfy requirements of 10b-5 claim); *Marcus v. Frome*, 275 F. Supp. 2d 496, 503 (S.D.N.Y. 2003) (same).

bet against through the use of CDS." (Am. Compl. ¶ 10; *see also* Am. Compl. ¶¶ 150, 169.)

Thus, FGIC claims that Putnam's alleged representations that it would act "diligently and

independently in the interests of long investors" (Am. Compl. ¶¶ 63, 80, 85) and its alleged

representations regarding its processes and procedures for selecting collateral (*id.* ¶¶ 3, 72, 75-

76) were false because Magnetar, not Putnam, selected the CDO's collateral. Although the

Amended Complaint is heavy on speculation and conclusory allegations, it contains no well-

pleaded facts to support this sensational claim.

FGIC cites a draft agreement among Calyon, Deutsche Bank, and Magnetar, but

*not* Putnam, that included a term that would have given Magnetar purported "veto rights" over

assets selected for the Pyxis CDO's warehouse. (*See* Am. Compl. ¶ 93; Draft Warehouse Agmt.,

Hora Decl. Ex. 9.) But nowhere does the Amended Complaint allege well-pleaded facts showing

(i) an agreement including this draft term, which was expressly conditioned on Magnetar

maintaining its early commitment to purchase Pyxis' equity, was ever signed; (ii) that Putnam

knew about this arrangement;[13] (iii) that this proposed veto right was ever exercised; (iv) that

Putnam, Calyon, or any other party ever honored any request by Magnetar to remove or block

collateral from the Pyxis CDO warehouse, let alone to substitute "toxic" assets for "good" ones;

or (v) that FGIC did not have the ability to inspect the warehoused assets prior to issuing its

guaranty.

FGIC also claims that there was a "remarkably high correlation between the

issuers whose securities were held or referenced by Pyxis and the issuers whose securities were

held or referenced by" other CDOs sponsored by Magnetar, and speculates that Putnam therefore

---

[13]  FGIC speculates that Putnam was aware of the letter because the draft agreement required "Calyon or the Investment Adviser" to provide notification of asset purchases to Deutsche Bank and Magnetar. (Am. Compl. ¶ 93.) Putnam, however, could not possibly be bound to language in an agreement to which it was not a party, and there are no well-pled allegations that Putnam consented to or was ever informed of such an arrangement.

must have allowed Magnetar to select the portfolio.  (Am. Compl. ¶ 119.)  In an effort to cloak

this speculation with an air of authority, FGIC relies on an alleged "statistical analysis," which it

does not attach to the Amended Complaint, performed by an unidentified consultant concluding

that the alleged correlation across various Magnetar-sponsored CDOs "*may* indicate that the

portfolio selection by independent portfolio managers was influenced by an external factor."  (*Id.*

¶ 120) (emphasis added).  But there are no well-pleaded factual allegations that Putnam had any

involvement in these other Magnetar CDOs, knew the contents of their portfolios, or did not

perform a rigorous, independent analysis of any of the common collateral.[14]  This unidentified

consultant's untested opinions suffer from the same infirmities as the ProPublica article and the

Amended Complaint's myriad references to other parties and other CDO transactions—they do

not and cannot supply any particularized factual allegations about Putnam itself or the collateral

selection process for the Pyxis CDO.

    Unable to come up with any other support for its conclusory allegation that Pyxis

was built to fail or that Magnetar, not Putnam, selected Pyxis' collateral, FGIC resorts to

blatantly misrepresenting the contents of the same handful of emails that were submitted to

Justice Schweitzer before he dismissed virtually identical allegations brought against Putnam by

a Pyxis investor, and blindly copying mischaracterizations of other emails from the MSD's

administrative complaint.  For the reasons discussed at length in Section I(B)(2)(a) below, none

of these emails supports the allegation that Putnam acquiesced in the creation of a CDO built to

fail or abdicated its collateral selection responsibilities to Magnetar.[15]

---

[14] FGIC's assertion that Putnam "included offset trades on ABX index components of a type unique to" other CDOs in which Magnetar invested fails for the same reasons—there is no well-pleaded allegation (i) that Putnam knew the composition of these other CDOs, (ii) that these alleged "offset" trades violated any of the Eligibility Criteria, or (iii) that Putnam failed to perform an independent analysis of these trades.

[15] FGIC also repeatedly alleges that, when choosing to enter into its guaranty, it relied upon statements in the offering materials and in purported oral statements regarding Putnam's experience and capabilities.  (See Am. Compl. ¶¶ 3, 63, 75-76, 84.)  As a threshold matter, FGIC fails to allege any facts suggesting that Putnam lacked the

### 2.   FGIC's Claim Based on the Composition of the Pyxis Portfolio is Without Merit

FGIC's allegation that the amount of prime RMBS assets in the final Pyxis portfolio selected by Putnam differed from the amount of prime RMBS assets set forth in various "target" portfolios that FGIC purportedly received likewise fails to plead any actionable misrepresentation or omission on Putnam's part.  (*See* Am. Compl. ¶¶ 70, 73, 77-79.)

FGIC does not allege that a *single* asset in the $1.5 billion portfolio failed to comply with the CDO's detailed Eligibility Criteria.  (*See* Hora Decl. Ex. 1 at 115-55.)  This is fatal to FGIC's claim.  In a section entitled "Security for the Notes," the Offering Memorandum contained more than 40 pages of disclosures concerning the composition of the collateral assets and the Eligibility Criteria governing the selection of these assets.  (*Id.*)  Among other things, the Offering Memorandum disclosed that not less than 80% of the Pyxis portfolio's assets would consist of subprime and mid-prime RMBS assets.  (*Id.* at 31, 124, 139-40.)  There was no corresponding minimum concentration of prime RMBS assets—in other words, the Offering Memorandum disclosed and FGIC was on notice that the Pyxis portfolio could contain *no* prime RMBS assets.

Likewise, the "Pitchbook" upon which FGIC claims it relied for its purported understanding that the portfolio would contain a minimum amount of prime RMBS expressly stated that its pie chart setting forth a proposed "asset type distribution" was "indicative," and that "[a]ll information contained herein is preliminary and subject to change without further notice."  (Investor Presentation, Hora Decl. Ex. 10 at 14.)  Nothing in the Pitchbook purported to

---

experience and capabilities described in such statements.  In any event, such general statements regarding Putnam's business practices are "precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable."  *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JPMorgan Chase Co.*, 553 F.3d 187, 205 (2d Cir. 2009) (rejecting allegations of "numerous misrepresentations regarding [defendant's] 'highly disciplined' risk management and its standard-setting reputation for integrity").

"set forth the ramped portfolio that had been purchased for the CDO to date" (Am. Compl. ¶ 70),

as FGIC now claims, and no investor or other market participant reading the disclosures in the

offering documents could have been misled into believing that the portfolio would consist of any

minimum amount of "prime RMBS" assets.[16]  *See Epirus Capital Mgmt., LLC v. Citigroup, Inc.*,

No. 09 Civ. 2594 (SHS), 2010 U.S. Dist. LEXIS 42200, at *16 (S.D.N.Y. Apr. 28, 2010)

(holding that CDO investors failed to state securities fraud claim where the offering materials

explicitly disclosed the nature of the collateral being selected).

          Moreover, though FGIC complains that the final Pyxis portfolio differed from the

various "target" portfolios it received, conspicuously absent is any allegation that FGIC made

any effort to obtain either the portfolio as it existed at closing on October 3, 2006, or the final,

fully-ramped portfolio, which it easily could have compared with the "target" portfolio it alleges

it received on August 9, 2006.  As a sophisticated party, FGIC had "a duty to exercise ordinary

diligence and conduct an independent appraisal of the risk," *HSH Nordbank AG v. UBS AG*, 95

A.D.3d 185, 195 (1st Dep't 2012), and it plainly had the ability to do so.  (*See* Am. Compl. ¶ 71

(FGIC "performed due diligence . . . focusing on an analysis of . . . the assets that would be

included in the Pyxis portfolio"); *see also In re Merrill Lynch Auction Rate Sec.  Litig.*, 851 F.

Supp. 2d 512, 536-37 (S.D.N.Y. 2012); *Graham Packaging Co. v. Owens-Ill., Inc.*, 67

A.D.3d 465, 465 (1st Dep't 2009).[17]

---

[16] FGIC's assertion that an "initial launch email" stating that "the collateral manager [Putnam] is able to cherry-pick the collateral for this portfolio . . . with the ability to focus on seasoned product" was false because 60% of the Pyxis portfolio supposedly was not seasoned also states no claim against Putnam.  (Am. Compl. ¶ 65; *see also* Hora Decl. Ex. 11.)  There is no allegation that the CDO's terms required any specific amount of seasoned product.  Nor is there any well-pled allegation of what type of collateral security constituted "seasoned product," which was not a defined term in the Offering Memorandum or a component of any of the Eligibility Criteria governing the selection of collateral assets.  In any event, *Calyon*, not Putnam, made this statement.  Putnam cannot be held liable for it.  *See Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2303 (2011) ("[W]e will not expand liability beyond the person or entity that ultimately has authority over a false statement.").

[17] Also notably absent from the Complaint is any allegation that the Pyxis portfolio would have performed any differently and avoided an event of default if it had contained the up to $145 million of prime RMBS assets that

Finally, there is no well-pleaded factual allegation to support the contention that Putnam "concealed the extent to which Pyxis sold protection on the ABX Index of low-rated RMBS." (Am. Compl. ¶ 121.)  The Eligibility Criteria disclosed in the Offering Memorandum specified concentration limits on the ABX Index and the indices contained therein, not on the constituent RMBS.  (*See* Hora Decl. Ex. 1 at 118 (providing that the aggregate amount of CDS referencing any of the series of indices included in the ABX Index could not exceed 5% of the Pyxis portfolio, and that the aggregate amount of CDS referencing any one series included in the ABX Index could not exceed 2% of the Pyxis portfolio).)  FGIC's attempt to create new collateral selection criteria not set forth in the Offering Memorandum should be rejected.

### 3.     FGIC Fails to Allege a Misrepresentation or Omission as to the Identity of Any Short Counterparty

FGIC has no cause to complain that it was unaware that the Pyxis CDO's equity investor, Magnetar, allegedly took certain short positions on the CDO's assets.  (*See* Am. Compl. ¶ 54.)  There is no well-pleaded allegation in the Amended Complaint that Putnam believed Magnetar was engaged in anything other than ordinary hedging, or that Putnam knew the overall size of Magnetar's hedges.  And the Pyxis Offering Memorandum, which in any event was prepared almost entirely by Calyon, expressly disclosed to Pyxis's sophisticated investors that 77% of the Pyxis portfolio (or $1.15 billion of the total $1.5 billion par value portfolio) would be comprised of CDS in which the Pyxis CDO would act as the long counterparty.  (Hora Decl. Ex. 1 at 18, 34, 169.)  By definition, *someone* had to assume the "short" side of these CDS trades, and it would have been readily apparent to FGIC, a sophisticated monoline insurer, that the short

---

FGIC claims it should have pursuant to the last "target" portfolio it received.  This amount would have represented a mere 9.7% of the Pyxis CDO's total $1.5 billion portfolio—meaning that the overwhelming majority of the Pyxis portfolio (90.3% or $1.355 billion) *still* would have consisted of subprime and mid-prime RMBS assets.  There is no allegation in the Complaint that a portfolio that contained 90% subprime and mid-prime RMBS assets would have avoided default.

counterparties on these CDS would have economic interests diametrically opposed to those of FGIC.  (*See* Am. Compl. ¶¶ 42-43.)

The Pyxis Offering Memorandum also clearly disclosed that the CDO's arranger, Calyon, which assumed these short positions in the first instance, expected to enter into a series of "back-to-back hedging transactions" transferring some or all of the risk of these positions to other market participants selected by Calyon in its "sole discretion."  (Hora Decl. Ex. 1 at 48; *see also* Am. Compl. ¶ 43.)  This fundamental aspect of the Pyxis transaction was also depicted in a large diagram in the Investor Presentation on which FGIC claims it relied.  (See Hora Decl. Ex. 10 at 10 (illustrating CDS between short counterparties and Calyon, with Calyon acting as intermediary facing Issuer); Am. Compl. ¶ 65 (referencing Investor Presentation).)  The Pyxis offering documents thus made abundantly clear that participants would have no information as to the identities of the ultimate short counterparties on the CDS in the Pyxis portfolio.  (Hora Decl. Ex. 1 at 48; Am. Compl. ¶ 43.)  FGIC cannot plead fraud where it knew that it lacked information and proceeded anyway.  *Permasteelisa*, *S.p.A. v. Lincolnshire Mgmt.*, *Inc.*, 16 A.D.3d 352, 352 (1st Dep't 2005); *Graham Packaging Co., L.P.*, 67 A.D.3d at 465.

Finally, there is no allegation in the Amended Complaint that any of the collateral allegedly shorted by Magnetar failed to comply with the CDO's terms, or that FGIC did not have an opportunity to inspect the CDO's collateral portfolio prior to issuing its guaranty.

### B.    FGIC Fails to Allege That Putnam Acted With Scienter

The Amended Complaint also fails to plead any particularized facts showing that Putnam acted with scienter—that is, that it knew the alleged misstatements to be false and specifically intended to induce FGIC's reliance.  *See, e.g.*, *Art Capital Group, LLC* v. *Neuhaus*, 70 A.D.3d 605, 607 (1st Dep't 2010).

1.     **FGIC Fails to Allege a Plausible Motive for Putnam's
        Participation in the Alleged Fraud**

Try as it might, FGIC cannot articulate a plausible theory of motive to defraud on the part of Putnam.  According to FGIC, Putnam engaged in a billion-dollar fraud, risked its reputation and business, abdicated its duties as collateral manager, and intentionally assisted in the creation of a CDO designed to fail, all to put hundreds of millions of dollars in the pocket of another entity, and to earn collateral management fees that were dependent on the Pyxis CDO not failing, but instead performing well and meeting its payment obligations.

To begin with, FGIC attempts to gloss over the fact that a significant portion of Putnam's collateral management fee was junior to the interest payments to be made to Pyxis noteholders.  (*See* Hora Decl. Ex. 1 at 70-74.)  In other words, Putnam would receive the subordinated portion of its fee (0.05% of the Monthly Asset Amount) *only if* the Pyxis CDO performed well enough to first pay all six classes of noteholders the maximum amount they were entitled to receive on each applicable distribution date.  Further, under the terms of the Collateral Management Agreement, *both* the senior and subordinated portions of Putnam's collateral management fee were dependent on a calculation of the underlying collateral assets that specifically excluded defaulted securities.  *See supra* at 7-8.  Putnam simply had no incentive to design a CDO that would fail: any defaults would (and did) reduce the size of its fees.

In an effort to evade the implications of this fee structure, FGIC alleges that Putnam continued to be paid its subordinated fee until Pyxis defaulted in December 2008 (Am. Compl. ¶¶ 46-47), is "still receiving part of its fixed fee from Pyxis" (*id.* ¶ 47), and to date "has been paid $5,707,429" in its role as collateral manager (Am. Compl. ¶ 48).  None of this, however, helps FGIC.  That Putnam allegedly received its subordinated incentive fee until December 2008 cannot establish a motive on Putnam's part to abdicate its collateral selection

responsibilities or design a toxic CDO:  if Pyxis had *not* defaulted, Putnam would have continued to receive $750,000 per year in incentive payments, or $3,000,000 more over the last four years. Similarly, the fact that Putnam has received a small amount in senior fees (roughly $320,000 as alleged in the Amended Complaint) since Pyxis defaulted does not raise a plausible motive to defraud: if Pyxis had not defaulted, these fees would have amounted to $2.25 million per year, or *twenty-eight* times as much over the last four years.[18]  In fact, if Pyxis had not defaulted, Putnam would have received a total of $18 million in fees since 2006, far more than the $5.7 million the Amended Complaint alleges it actually received.

FGIC next attacks Putnam's subordinated incentive fee on the grounds that it was supposedly "not dependent on Pyxis performing well, but rather on Magnetar receiving its targeted return," which FGIC claims was "effectively guaranteed" by provisions in the Pyxis Indenture giving the equity and Class X noteholders larger payments of principal and interest than senior noteholders in the first five years of the CDO's existence so long as Pyxis avoided default.  (Am. Compl. ¶¶ 45, 52.)  But the Amended Complaint's allegations show unmistakably that the incentive fee *was* dependent on Pyxis performing well:  The Amended Complaint admits that Putnam received *no* subordinated fees after Pyxis defaulted in 2008.  (*Id.* ¶¶ 46-47.) Moreover, FGIC's contention is simply incorrect:  Under a plain reading of the Pyxis Indenture, Putnam's incentive fee was *not* dependent solely on Magnetar receiving principal and interest payments.  It was dependent on (i) Pyxis not defaulting, and (ii) *all* CDO investors, including the senior noteholders, *first* receiving the amounts they were entitled to on each quarterly distribution date.  (Hora Decl. Ex. 3 at 224.)  The incentive fee thus explicitly depended on the CDO performing well.

---

[18]  Under the terms of the Collateral Management Agreement, Putnam is entitled to continue to be paid for its management of performing, non-defaulted collateral assets.  (*See* Hora Decl. Ex. 2 § 8(a).)

FGIC's assertion that Putnam's subordinated fee was "virtually assured" by Magnetar's alleged "control" over the Pyxis portfolio (*see* Am. Compl. ¶¶ 45, 108) also has no basis. In support of this assertion, Plaintiff quotes a November 2006 email between DB and Calyon that includes no Putnam personnel, discusses an unrelated collateral manager (NIBC), concerns a different CDO in which Putnam is not alleged to have participated (Orion 2), mentions nothing about subordinated fees, and addresses the irrelevant issue of whether Orion 2's long (not short) investors should be given a right to terminate NIBC as collateral manager. (*See* Hora Decl. Ex. 12.) Nothing in this email even remotely supports FGIC's contention that Putnam's subordinated fee would be "virtually assured":  As the chart in FGIC's Amended Complaint shows, those fees were not "assured"—they ended once Pyxis defaulted. (*See* Am. Compl. ¶ 46.)

The Amended Complaint's allegation that Putnam's senior collateral management fees were purportedly higher than normal because of Pyxis' $1.5 billion size (*see id.* ¶ 44) likewise fails to adequately allege motive. A larger CDO necessarily involves more assets to select and manage, and the emails cited in the Amended Complaint show that Putnam's 0.15% senior and 0.05% subordinated fee rates were in fact much less than the 0.40% rate on smaller, so-called "regular style" $400 million CDOs. (*Id.* ¶ 108.) The desire to earn ordinary fees is not a permissible basis for inferring scienter or motive to defraud. *See, e.g., Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 429 (S.D.N.Y. 2010) (Sweet, J.) ("[T]he desire to earn management fees is a motive generally possessed by . . . managers, and as such, does not suffic[iently] allege a 'concrete and personal benefit' resulting from fraud."). This principle applies with even greater force to less than ordinary fees.[19]

---

[19] FGIC alleges, solely on information and belief, that Putnam's senior fee on the Pyxis CDO was higher (by apparently a mere five basis points) than the senior fee paid to the collateral manager in all but three Magnetar-

The bald allegation that Magnetar "promis[ed]" Putnam "additional, similarly lucrative deal volume," which was purportedly "realized when Putnam was selected to serve as collateral manager for a second Pyxis CDO" (Am. Compl. ¶¶ 49, 110), also does not suffice to allege motive.  There are no well-pleaded facts tying Putnam's selection as collateral manager for Pyxis ABS CDO 2007-1 to any fraudulent conduct with respect to the Pyxis CDO, and the Amended Complaint does not and cannot supply any particularized facts, as required by Rule 9(b), regarding who made the alleged "promise," when it was made, to whom it was made, or what was said.  Moreover, it lacks all plausibility to suggest that a large and respected financial institution would have a motive to commit a billion-dollar fraud to benefit another entity, design a toxic CDO, and damage its reputation as a collateral manager, all to guarantee a role in future CDOs also allegedly designed to spectacularly fail.  *See Dooner v. Keefe, Bruyette & Woods, Inc.*, No. 00 Civ. 572 (JGK), 2003 WL 135706, at *3 (S.D.N.Y. Jan. 17, 2003) (rejecting theory of motive that was "clearly self-defeating, if not irrational").[20]

2.     **FGIC Fails to Allege Circumstantial Evidence of Conscious Misbehavior or Recklessness**

Having failed to allege a plausible motive for Putnam's participation in the alleged fraud, FGIC must allege facts establishing circumstantial evidence of conscious misbehavior or recklessness.  *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 351 (S.D.N.Y. 2011).  None of the sources cited in the Amended Complaint contains any facts suggesting that Putnam knowingly or recklessly made any material misstatements or omissions.

---

sponsored CDOs and higher than the total fee on all but six Magnetar-sponsored CDOs.  (Am. Compl. ¶ 44.)  The Amended Complaint, however, fails to identify the sources upon which these information and belief allegations are based, as required by Rule 9(b).  *See G-I Holdings, Inc. v. Baron & Budd*, No. 01 Civ. 0216 (RWS), 2004 WL 1277870, at *2 (S.D.N.Y. June 10, 2004) (Sweet, J.).  These allegations, moreover, say nothing about whether the fixed percentage fee was high for so-called "typical," non-Magnetar CDOs.  The correspondence cited by FGIC, discussed above, shows that it was not.

[20] Similarly, it defies economic reason to believe that Putnam would seek to establish a "foothold in the market for managing . . . CDOs" (Am. Compl. ¶ 6) by abdicating its collateral management responsibilities, and acceding to the design of a CDO allegedly built to fail.

a.   The *Loreley* Emails Do Not Plead Conscious
     Misbehavior or Recklessness

The Amended Complaint cites to a number of emails disclosed in the *Loreley*

action which it claims "confirm the control which Magnetar exercised over the Pyxis asset

selection process, and Putnam's abdication of responsibility for managing the Pyxis collateral."

(Am. Compl. ¶ 89.)  But an examination of these emails reveals no evidence of such control, and

instead shows that Putnam independently selected Pyxis's collateral.  Indeed, Judge Schweitzer

had these very same emails before him in *Loreley* when he dismissed the plaintiff's claims

against Putnam.  (*See* Hora Decl. Ex. 7; *id.* Ex. 8.)

The August 2006 email exchange cited in paragraph 98 of the Amended

Complaint, also submitted in *Loreley*, actually *disproves* Plaintiff's main thesis.  Rather than

evidencing that "Putnam did in fact allow Magnetar to exercise . . . secret control over the Pyxis

portfolio," as FGIC claims (*see* Am. Compl. ¶ 93), these emails show just the opposite:  Putnam

reported that the "collateral pool" it was buying "score[d] well on [Putnam's] risk scoring

model," and that only after it finished a "benchmarking" analysis which involved doing

"preliminary work across a range of deals" would Putnam pursue additional trades.  (Hora Decl.

Ex. 13 at 2-3.)  In response, Mr. Prusko replied that Magnetar "[would] buy CDO CDS on names

of [Putnam's] *choosing* at mid-market, or bid list +3bp, whatever you prefer."  (*Id.* at 2

(emphasis added).)  Thus, not only was Putnam performing the analyses that one would expect

of a collateral manager, it was receiving offers from Magnetar to purchase specific CDS on

competitive terms, and on names of Putnam's choosing.  Later emails in the chain are even more

damaging to Plaintiff's claim, as Mr. Prusko asked Alexander Rekeda of Calyon to "stay on top

of Putnam CDO situation," and stated that he "[didn't] like that [Putnam] [was] buying CDO's

without us knowing about it"—showing that Putnam, not Magnetar, was selecting the collateral. (*See id.* at 1; Am. Compl. ¶ 99.)

The May 2006 email string among DB, Calyon, and Magnetar, *but not Putnam*, cited in paragraph 91 of the Amended Complaint also does not aid Plaintiff's allegations.  (Am. Compl. ¶ 91; *see* Hora Decl. Ex. 14.)  These emails do not copy Putnam, and were sent before Putnam entered into its engagement letter to serve as collateral manager and before Calyon agreed to provide warehouse financing for Pyxis.  In the emails, Mr. Prusko of Magnetar discussed the equity investors' desired internal rate of return on Pyxis, and referenced the fact that Putnam had purportedly learned of that desired rate.  The emails, however, say absolutely nothing to indicate that, if selected as collateral manager, Putnam would participate in a fraud whereby it would build a toxic CDO and abdicate its role as collateral manager to Magnetar.

Citing two June 2006 email strings, FGIC next alleges a "'behind the scenes' arrangement" whereby "[Calyon] or Putnam" purportedly granted Magnetar veto rights over assets proposed for the Pyxis warehouse. (Am. Compl. ¶ 93.)  FGIC omits to mention, however, that when Calyon asked Magnetar in the same emails whether it was suggesting that the document be structured "behind the scenes," Magnetar responded, "No, not at all."  (*See* Hora Decl. Ex. 15.)  In any event, the June 2006 emails cited by Plaintiff copy *no Putnam employees*, and the draft letter between Calyon, DB, and Magnetar purportedly granting Magnetar veto rights over assets to be included in the warehouse (Hora Decl. Ex. 9) fails to raise any inference of fraud against Putnam for the same reasons already discussed in Section IA1, *supra*:  among other things, there are no well-pleaded facts that the letter was ever executed; that Putnam knew about the arrangement; that Magnetar ever exercised the purported veto; or that Putnam ever honored any request to remove or block collateral.

26

The remaining *Loreley* emails cited by Plaintiff similarly fail to support Plaintiff's claims.

The September 2006 exchange between Putnam and Calyon cited in paragraph 106 of the Amended Complaint (*see also* Hora Decl. Ex.16) indicates the unremarkable fact that Putnam became aware at that time of a small short position taken by Magnetar in Pyxis.  As discussed above, the Offering Memorandum disclosed that investors would be taking short positions in Pyxis through back-to-back hedging arrangements with Calyon.  There is no allegation that Putnam arranged for this short position, nor are any facts pleaded to support FGIC's conclusory assertion that Putnam "was aware" that the credit protection Magnetar had purchased "far exceeded Magnetar's long position."  (*See* Am. Compl. ¶ 54.)  Even if FGIC could properly make such allegations, there is not any basis to infer that Magnetar controlled Putnam's selection of collateral based on the fact that Putnam was aware of this or any other short position.

The November 2006 exchange between Calyon and Magnetar cited in paragraph 54 of the Amended Complaint, in which Calyon asks Mr. Prusko if he wanted to purchase protection on Pyxis, again *does not include any Putnam personnel*.  (*See* Am. Compl. ¶ 54; Hora Decl. Ex. 17.)

And the last *Loreley* email Plaintiff cites, claiming that it confirms "Putnam's abdication of its collateral selection responsibilities to Magnetar," consists of a discussion between Calyon, DB, and Magnetar (but again, *not Putnam*) of an entirely separate CDO and collateral manager.  As discussed in Section IB1 above, this email addresses the benign issue of whether the collateral manager in an unrelated deal should give equity holders, whose long investment is subject to the collateral manager's performance, a right to terminate the collateral

manager.  (*See* Am. Compl. ¶¶ 108-09; Hora Decl. Ex.12.)  There is no discussion of any alleged abdication of the responsibilities of a collateral manager, let alone by Putnam.

    None of the *Loreley* emails pleads any facts showing conscious misbehavior or recklessness.

> **b.    FGIC's References to Allegations in the MSD's Administrative Complaint Do Not Establish Conscious Misbehavior or Recklessness**

    FGIC's blind quotation of emails cited in the MSD's administrative complaint also fails to plead conscious misbehavior or recklessness.  Even if the Court could consider the administrative complaint, and it cannot for the reasons discussed on page 12 above, the allegations drawn from it do not plead scienter.  First, the administrative complaint does not even make any scienter allegations against Putnam.  Second, it egregiously mischaracterizes the emails it references.  FGIC unwittingly repeats this error.

    Although the MSD's administrative complaint repeatedly refers to "recommendations" from Magnetar, many of the communications cited show that Magnetar reviewed collateral ***only after*** it had been selected and purchased by Putnam.  (*See, e.g.*, MSD Administrative Complaint, Hora Decl. Ex. 18 at ¶¶ 98 & 102, Am. Compl. ¶¶ 94-95 & Hora Decl. Exs. 19 & 20.)  In other instances, the administrative complaint is simply wrong in asserting that Magnetar recommended assets that were purchased for Pyxis.[21]  Numerous other emails reflect only that Magnetar expressed an interest in selling protection on virtually ***any*** CDS asset Putnam selected.  (*See, e.g.*, Hora Decl. Ex. 18 ¶ 103 (Magnetar stating it would sell protection on "***any*** deal late 05 up to now, don't have to stick to new deals") (emphasis added),

---

[21]   For example, according to the administrative complaint, Putnam allegedly sought approval to purchase "the same three assets the Co-Head of Structured Credit at Magnetar had recommended for Pyxis 2006."  (Hora Decl. Ex. 18 ¶ 112.)  This is a plain misreading of the cited emails, which make clear that the assets were originally identified as investment candidates *by Putnam, not Magnetar*.  (Am. Compl. ¶ 101 & Hora Decl. Ex. 21.)

Am. Compl. ¶ 96 & Hora Decl. Ex. 22; *see also* Hora Decl. Ex. 18 ¶ 105 ("*[a]ny* recent

mezz[anine] [asset backed securities] deal is fine.") (emphasis added), Am. Compl. ¶ 98 & Hora

Decl. Ex. 13.)

   The email communications referenced in the administrative complaint reinforce

the fact that Putnam was free to accept or reject the assets being discussed, as it deemed

appropriate in its independent judgment.  (*See*, *e.g.*, Hora Decl. Ex. 18 ¶ 105 (Magnetar stating it

would buy CDS "*on names of [Putnam's] choosing*") (emphasis added), Am. Compl. ¶ 98 &

Hora Decl. Ex. 13; Hora Decl. Ex. 18 ¶ 141 (Magnetar had pre-warehoused certain assets for

Pyxis ABS CDO 2007-1 "*which [Putnam] can take if [it] like[s] them.*") (emphasis added) &

Ex. 23.)  This is exactly what Putnam did.

   The administrative complaint also cites to email communications in which

Magnetar complained about collateral assets purchased by Putnam.  (Hora Decl. Ex. 18 ¶¶ 185-

86.)  But these emails hardly demonstrate Magnetar's control over the asset selection process;

they evidence Putnam's independence.  One such email, for instance, reflects Magnetar's

frustration that Putnam was "buying CDO's without [Magnetar] knowing about it."  (Hora Decl.

Ex. 18 ¶ 105, Am. Compl. ¶ 99 & Ex. 13.)  This correspondence does not support the inference

that Magnetar had the ability to direct Putnam's asset selection.

   As made clear by the emails cited by the MSD, Putnam repeatedly advised

Magnetar that Putnam intended to select the collateral assets with the best fundamental value.

For instance, in an email with Magnetar dated July 7, 2006, early in the collateral selection

process for Pyxis, Putnam's CDO Team Leader emphasized that Putnam would only select

collateral assets that it thought would perform well, stating:  "*We are going to pick the deals that

have the best fundamental value*.  We, of course, would pick different deals as the best short

candidates (in terms of being a hedge against sub-prime issues)."  (Hora Decl. Ex. 22 (emphasis added).)

Remarkably, the MSD quotes substantial portions of this email but misleadingly uses ellipses to give a nefarious gloss to this exchange.  (Hora Decl. Ex. 18 ¶ 103.)  Thus, the MSD quotes the sentence before and the sentence after Putnam's statement that "***We are going to pick the deals that have the best fundamental value***" (emphasis added), but somehow left out the sentence in which Putnam announced its intent to select collateral with the "***best fundamental value***" – a sentence that goes directly to the key issue in this case.  Similarly, the MSD manages to quote Magnetar's statement that its short trades were a "natural delta hedge," but then elects to use ellipses rather than include the rest of the sentence:  "***even if they are the best names***."  (Hora Decl. Ex. 18 ¶ 32 & Ex. 22.)  FGIC quotes the same email out of context in the Amended Complaint.  (*See* Am. Compl. ¶ 96.)  Far from helping FGIC, the emails cited in the administrative complaint disprove FGIC's claims.

### C.    The Amended Complaint Does Not Adequately Plead Loss Causation

To establish loss causation, a plaintiff must plead and prove "that the misrepresentations directly caused the loss about which plaintiff complains."  *Laub v. Faessel*, 297 A.D.2d 28, 31 (1st Dep't 2002).  Here, FGIC alleges in a conclusory fashion that "as a direct, proximate, and foreseeable result of Putnam's conduct, [it] has suffered harm."  (Am. Compl. ¶ 146).  In support of this conclusory assertion, FGIC alleges that:  (i) it "never would have entered into the Pyxis Guaranty had it known Putnam was not acting independently in the selection of assets for the Pyxis portfolio," and (ii) it "would not have entered into the Pyxis Guaranty had it known Magnetar, whose economic interests conflicted with FGIC's, had any role whatsoever in the selection of assets for the Pyxis portfolio."  (*Id.* ¶ 129.)  These allegations may plead "transaction" or "but-for" causation, but do not plead loss causation.

FGIC's conclusory allegation that it would not have insured its subsidiary's swap if it had been aware of Magnetar's alleged role in the Pyxis CDO says nothing about what actually caused FGIC's losses.  FGIC's alleged loss coincided with an industry-wide mortgage meltdown and the resulting decline in the value of mortgage-backed securities.  Indeed, FGIC admits that by the time Pyxis closed in October 2006, "default rates on subprime mortgages . . . [had already begun] to rise."  (Am. Compl. ¶ 35.)  As the Second Circuit has explained:

> [W]hen the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases, and a plaintiff's claim fails when it has not adequately ple[]d facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events.

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005) (quotation marks omitted); *see also Footbridge*, 2010 WL 3790810, at *22.  To avoid dismissal, FGIC must "allege[] facts that would allow a factfinder to ascribe some rough proportion of the whole loss to [defendant's] misstatements."  *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007).

Although FGIC claims that its damages flow from entering into the transaction (Am. Compl. ¶¶ 146, 155), it fails to draw a causal connection between the alleged misstatements and its alleged losses, or to differentiate between losses caused by the market-wide meltdown and losses allegedly caused by misrepresentations.  Moreover, there is no allegation that Putnam could have selected any set of assets within the confines of the Pyxis CDO's Eligibility Criteria that would have avoided an event of default.  In these circumstances, FGIC has failed to sufficiently plead loss causation.[22]

---

[22] *See, e.g., Luminent Mortg. Capital, Inc. v. Merrill Lynch & Co.*, 652 F. Supp. 2d 576, 594 (E.D. Pa. 2009) (plaintiff failed to plead loss causation where it "ma[de] no allegations that would allow the Court to apportion any losses between Defendants' misrepresentations and the significant declines in market value for mortgage-backed securities") (internal quotations omitted); *Healthcare Fin. Grp., Inc. v. Bank Leumi USA*, 669 F. Supp. 2d 344, 349-50 (S.D.N.Y. 2009) (same); *Laub*, 297 A.D.2d at 31 (same).

## II.   FGIC'S NEGLIGENT MISREPRESENTATION CLAIM SHOULD BE DISMISSED BECAUSE FGIC FAILS TO ALLEGE A SPECIAL RELATIONSHIP

The absence of any alleged facts reflecting a special or privity-like relationship between FGIC and Putnam requires dismissal of the negligent misrepresentation claim. *Amusement Indus. v. Stern*, 786 F. Supp. 2d 758, 778 (S.D.N.Y. 2011); *J.A.O. Acquisition Corp. v. Stavitsky*, 8 N.Y.3d 144, 148 (2007).  "New York strictly limits negligent misrepresentation claims to situations involving 'actual privity of contract between the parties or a relationship so close as to approach that of privity."  *Anschutz Corp. v. Merrill Lynch & Co.,* 690 F.3d 98, 114 (2d Cir. 2012) (citation omitted).  Indeed, so significant is the relationship of near or actual privity that the Second Circuit has stated that "under New York law, a plaintiff may recover for negligent misrepresentation only where the defendant owes her a fiduciary duty."  *Stewart v. Jackson & Nash*, 976 F.2d 86, 90 (2d Cir. 1992).  "New York courts generally do not permit negligent misrepresentation claims based on arm's-length transactions between sophisticated counterparties."  *Landesbank Baden-Württemberg v. Goldman Sachs & Co.*, 821 F. Supp. 2d 616, 624 (S.D.N.Y. 2011); *see MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 87 A.D.3d 287, 296 (1st Dep't 2011) ("Generally, a special relationship does not arise out of an ordinary arm's length business transaction between two parties.").

No contractual or fiduciary relationship existed between Putnam and FGIC.  To begin with, the offering documents and the Collateral Management Agreement expressly disclaimed that Putnam was acting as a fiduciary or a financial or investment adviser for any investor.  (*See* Hora Decl. Ex. 10 at 2 ("None of  . . . the Putnam Advisory Company, LLC . . ., or any of their respective affiliates are acting as financial adviser nor in [a] fiduciary capacity [i]n respect of the transaction to any investor. . . ."); (Hora Decl. Ex. 1 at iii ("In making an investment decision, investors must rely on their own examination of the co-issuers and the

32

terms of the offering, including the merits and risks involved.").)  This precludes as a matter of

law any claim of a fiduciary or similar duty.  *See, e.g., M&T Bank Corp. v. Gemstone CDO VII,*

*Ltd.*, 68 A.D.3d 1747, 1749 (4th Dep't 2009) (dismissing negligent misrepresentation claim

against CDO collateral manager where "[t]he written information, including a 'Preliminary

Offering Circular' and 'Debt Investor Presentation,' contained numerous disclaimers and advised

plaintiff to perform its own due diligence"); *Landesbank Baden-Württemberg v. Goldman Sachs*

*& Co.*, 821 F. Supp. 2d at 624 (dismissing negligent misrepresentation claim where "the

[Offering] Circular expressly disclaimed any special relationship").

   Nor is there any allegation in the Amended Complaint that Putnam and FGIC had

a pre-existing relationship of trust and confidence.  As this Court has recognized, "[u]nder New

York law, it is well established that [a] defendant is not liable [for] breach of fiduciary duty or

for negligent misrepresentation unless a prior relationship existed between the defendant and

plaintiff."  *Primavera Familienstiftung v. Askin*, No. 95 Civ. 8905 (RWS), 1996 U.S. Dist.

LEXIS 12683, at *52 (S.D.N.Y. Aug. 22, 1996) (Sweet, J.) (internal quotations omitted)

(citations omitted); *see also M&T Bank Corp.*, 68 A.D.3d at 1749 (finding that "there is no . . .

special relationship in this case, particularly in light of the fact[] that the parties had no

relationship prior to this arm's length transaction . . ."); *HSH Nordbank, AG v. UBS AG*, No.

600562/08, 2008 N.Y. Misc. LEXIS 10416, *16 (Sup. Ct., N.Y. County Oct. 21, 2008) (finding

no special relationship where "there was no relationship of trust between the parties pre-dating

the transactions").

   Finally, Plaintiff's contention that Putnam's purportedly superior knowledge

established a special relationship has repeatedly been rejected by New York courts, especially

where, as here, FGIC is a sophisticated financial institution.[23]  *See, e.g., MBIA Ins. Corp.*, 87

A.D.3d at 297 ("The claim that [defendant] had superior knowledge of the particulars of its own

business practices is insufficient to sustain the [negligent misrepresentation] cause of action.");

*Sebastian Holdings, Inc. v. Deutsche Bank AG*, 78 A.D.3d 446, 447 (1st Dep't 2010) ("Plaintiff's

alleged reliance on defendant's superior knowledge and expertise in connection with its foreign

exchange trading account ignores the reality that the parties engaged in arm's-length transactions

pursuant to contracts between sophisticated business entities that do not give rise to fiduciary

duties.").

## III.   FGIC'S NEGLIGENCE CLAIM SHOULD BE DISMISSED BECAUSE FGIC FAILS TO ALLEGE THE EXISTENCE OF A DUTY OWED BY PUTNAM

The negligence claim against Putnam should be dismissed for the same reasons as

the negligent misrepresentation claim—namely, the absence of any relationship giving rise to the

requisite duty.  *See, e.g., Pension Comm. of the Univ. of Montreal v. Bank of Am. Secs. LLC*, 446

F. Supp. 2d 163, 198 (S.D.N.Y. 2006).  Under New York's economic loss doctrine, recovery for

pecuniary loss premised on negligence requires "actual privity" or the "functional equivalent of

privity."  *Travelers Cas. & Sur. Co. v. Dormitory Auth.*, 734 F. Supp. 2d 368, 378-82 (S.D.N.Y.

2010).  "New York courts restrict plaintiffs who have suffered economic loss, but not personal or

property injury, to an action for the benefits of their bargains."  *Manhattan Motorcars, Inc. v.*

*Automobili Lamborghini, S.p.A.*, 244 F.R.D. 204, 220 (S.D.N.Y. 2007) (citations omitted)

(quotations omitted).  Having failed to adequately allege the existence of a special relationship

with Putnam, Plaintiff's negligence claim should be dismissed.

---

[23] In 2006 alone, FGIC engaged in 11 separate CDO transactions.  *See* FGIC Quarterly Operating Review 1st Quarter 2012, p. 8, *available at* http://www.fgic.com/investorrelations/financialreports/qor2012q1.pdf.

## CONCLUSION

For the reasons set forth above, Putnam respectfully requests that the Court grant

its motion to dismiss the Amended Complaint with prejudice.

Dated:  New York, New York   MILBANK, TWEED, HADLEY & MᶜCLOY LLP
    December 21, 2012    1 Chase Manhattan Plaza
              New York, New York  10005
              (212) 530-5000


              By:   /s/ *Sean M. Murphy*
                 James N. Benedict
                Sean M. Murphy
                Thomas A. Arena
                Robert C. Hora
                William P. Gross
                *Attorneys for Defendant*
                *Putnam Advisory Company, LLC*