UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FINANCIAL GUARANTY INSURANCE
COMPANY,

                          Plaintiff,

-against-

THE PUTNAM ADVISORY COMPANY,
LLC,

                          Defendant.

---

12 Civ. 7372 (RWS)

**ECF Case**
**Electronically Filed**

**PLAINTIFF'S MEMORANDUM OF
LAW IN OPPOSITION TO
DEFENDANT'S MOTION TO
DISMISS THE AMENDED
COMPLAINT**


QUINN EMANUEL URQUHART
& SULLIVAN, LLP

Peter E. Calamari
(petercalamari@quinnemanuel.com)
A. William Urquhart
(billurquhart@quinnemanuel.com)
Sean Baldwin
(seanbaldwin@quinnemanuel.com)

51 Madison Avenue, 22nd Floor
New York, New York 10010
Tel:  212-849-7000
Facsimile:  212-849-7100

*Attorneys for Plaintiff Financial Guaranty
Insurance Company*


February 8, 2013

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................1

FACTUAL BACKGROUND ......................................................................................7

A.    The Pyxis Guaranty.............................................................................7

B.    The Pyxis CDO ...................................................................................7

C.    Putnam Induced FGIC to Issue the Pyxis Guaranty by Representing that It—and It Alone—Would Select the Pyxis Collateral.........................................10

D.    Contrary to Its Representations, Putnam Abdicated Control Over Pyxis Collateral Selection to Magnetar, and Concealed Magnetar's Role.....................12

    1.    The *Loreley* Evidence Confirms Putnam's Fraud......................................13

    2.    The Evidence from the Massachusetts Secretary of State's Investigation Confirms Putnam's Fraud. ...............................................15

    3.    The Fact that Pyxis Invested in Fifteen Other Magnetar CDOs Confirms Putnam's Fraud. ...........................................................16

    4.    Huge Overlaps Between the Pyxis Portfolio and Those of Other Magnetar CDOs Confirm Putnam's Fraud. ...............................................17

    5.    The Cross-Referencing and Portfolio Correlations Observed between Constellation CDOs Generally Confirm Putnam's Fraud. ..........17

    6.    Pyxis' Circumvention of Limits on ABX Index Investments Confirms Putnam's Fraud. ...........................................................18

    7.    Pyxis' Inclusion of Offset Trades of a Type Unique to Magnetar CDOs Confirms Putnam's Fraud.................................................18

    8.    The Absence of Prime RMBS in Pyxis, Contrary to Putnam's Representations, Confirms Putnam's Fraud. ...............................................19

    9.    Magnetar's Control Over Collateral Selection for Its CDOs Generally Confirms Putnam's Fraud. ...........................................................19

E.    Putnam Profited from Its Fraud, and FGIC Lost Millions...................................20

ARGUMENT ...........................................................................................................20

i

I.  THE AMENDED COMPLAINT ADEQUATELY ALLEGES FRAUD. .......................21

    A.  FGIC Need Only Plead Facts Supporting a Reasonable Inference of Fraud.........21

    B.  FGIC Has Adequately Alleged that Putnam Misrepresented that It Would
        Select the Pyxis Portfolio Independently, and that It Omitted to Disclose
        that a Net Short Investor Would in Fact Control Portfolio Selection. ..................23

    C.  FGIC Has Adequately Alleged Scienter. ...............................................................25

        1.  FGIC Has Adequately Alleged Motive.....................................................25

        2.  FGIC Has Adequately Alleged Conscious Misbehavior or
            Recklessness. ............................................................................................27

    D.  FGIC Has Adequately Alleged Loss Causation.....................................................27

II. THE AMENDED COMPLAINT ADEQUATELY ALLEGES NEGLIGENT
    MISREPRESENTATION AND NEGLIGENCE...............................................................28

CONCLUSION .....................................................................................................................29

# TABLE OF AUTHORITIES

**Page**

## Cases

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007) ................................................................................21

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009) ...............................................................................20, 22

*Bayerische Landesbank AG v. Aladdin Capital Mgmt LLC*,
    692 F.3d 42 (2d Cir. 2012) ..........................................................................6, 28

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) .........................................................................................22

*In Re CRM Hldgs., Ltd. Sec. Litig.*,
    No. 10-cv-975 (RPP), 2012 U.S. Dist. LEXIS 66034 (S.D.N.Y. May 10, 2012) .................15

*Cohen v. Stevanovich*,
    722 F. Supp. 2d 416 (S.D.N.Y. 2010) ..............................................................26

*Holmes v. Grubman*,
    568 F.3d 329 (2d Cir. 2009) ............................................................................21

*HSH Nordbank AG v. UBS AG*,
    95 A.D.3d 185 (1st Dep't 2012) ......................................................................25

*Lattanzia v. Deloitte & Touche LLP*,
    476 F.3d 147 (2d Cir. 2007) ............................................................................27

*Ledford v. Rapid-Am. Corp.*,
    No. 86-cv-9116 (JFK), 1988 U.S. Dist. LEXIS 79 (S.D.N.Y. Jan. 8, 1988) .........................15

*Lipsky v. Commonwealth United Corp.*,
    551 F.2d 887 (2d Cir. 1976) ............................................................................15

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc. et al.*,
    936 N.Y.S.2d 513 (N.Y. Sup. 2012) ...............................................................6, 27

*In Re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
    218 F.R.D. 76 (S.D.N.Y. 2003) .......................................................................15

*Naughright v. Weiss*,
    857 F. Supp. 2d 462 (S.D.N.Y. 2012) ..............................................................21

*Pellman v. Cinerama, Inc.*,
    503 F. Supp. 107 (S.D.N.Y. 1980) ..................................................................21

*Pludeman v. Northern Leasing Sys., Inc.*,
    10 N.Y.3d 486 (2008) ..................................................................................22, 23

*Ross v. A.H. Robins Co., Inc.*,
    607 F.2d 545 (2d Cir. 1979) ........................................................................21

*Selevan v. N.Y. Thruway Auth.*,
    584 F.3d 82 (2d Cir. 2009) ..........................................................................20

*Small v. Lorillard Tobacco Co.*,
    94 N.Y.2d 43 (1999) ....................................................................................21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ................................................................................22, 26

*In Re Wachovia Equity Sec. Litig.*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011) ....................................................25, 27

## <u>Statutes</u>

Fed. R. Civ. P. 8 ..............................................................................................21, 22

Fed. R. Civ. P. 9(a) ................................................................................................26

Fed. R. Civ. P. 9(b) .......................................................................................5, 21, 22

Fed. R. Civ. P. 10(b) ..............................................................................................26

Fed. R. Civ. P. 12(b)(6) ..........................................................................................20

N.Y. C.P.L.R. § 3106(b) .........................................................................................22

Plaintiff Financial Guaranty Insurance Company ("FGIC") respectfully submits this memorandum of law in opposition to Defendant The Putnam Advisory Company, LLC's ("Putnam") motion to dismiss the Amended Complaint ("AC").

## PRELIMINARY STATEMENT

The Amended Complaint alleges, with considerable particularity, that: (1) to induce FGIC to provide $900 million of insurance (the "Pyxis Guaranty") on a credit default swap transaction ("swap" or "CDS") relating to the Pyxis ABS 2006-1 collateralized debt obligation ("CDO") ("Pyxis"), Putnam represented that it—and it alone—would select the collateral for Pyxis, acting independently and in the interests of long investors and using Putnam's own proprietary selection process; (2) Putnam concealed from FGIC that the Pyxis collateral selection process was actually controlled by Magnetar Capital LLC ("Magnetar"), a net short investor in Pyxis whose financial interests were therefore adverse to FGIC's; (3) had FGIC known this, it would not have provided insurance on Pyxis—on any terms—and thus would not have suffered tens of millions of dollars in losses when the Pyxis portfolio collapsed; and (4) had FGIC not provided insurance on Pyxis, Pyxis would not have closed, and thus Putnam would not have reaped the millions in fees it received for its putative management of Pyxis.

Putnam does not dispute that it represented that it would select the Pyxis collateral itself. After all, that was its responsibility as collateral manager.  Putnam made these representations both in the Pyxis offering materials and in direct written and oral communications with FGIC during meetings, calls and email exchanges in the course of FGIC's extensive due diligence relating to Pyxis.

However, Putnam asserts that FGIC has not adequately alleged that these representations—*i.e.,* that Putnam in fact abdicated its role in picking collateral to Magnetar, which it knew was a net short investor—were false.  This is absurd.  FGIC has made numerous

1

specific factual allegations as to each of these matters, based not on news reports or conjecture, as Putnam asserts, but rather on publicly available documentary evidence.  These include emails, letters and agreements in the *Loreley* litigation brought by Pyxis investors against Putnam, as well as documentary evidence and sworn testimony by Putnam employees collected in an investigation by the Massachusetts Secretary of State that led to another complaint against Putnam with respect to Pyxis (the "Massachusetts Complaint").

Among other things, FGIC alleges that:

- Magnetar selected Putnam to act as the collateral manager for Pyxis;

- Jim Prusko (Magnetar) used to work for Putnam and supervised Carl Bell (Putnam), who was supposed to be primarily responsible for selecting the Pyxis collateral;

- Prusko (Magnetar) and Michael Henriques (Deutsche Bank, Magnetar's co-equity investor on Pyxis) discussed with Bell (Putnam) Magnetar's CDO short-selling strategy, both generally and with respect to Pyxis,

- Prusko (Magnetar) insisted that Putnam would "have to play ball" on Pyxis, and executed a "behind the scenes" side letter giving Magnetar and Deutsche Bank "veto rights over any" collateral purchased for Pyxis;

- Prusko (Magnetar) and Bell (Putnam) had numerous communications in which Prusko made clear which collateral Prusko wanted to include in the Pyxis portfolio, and Bell made just as clear his willingness to accommodate Prusko;

- Prusko (Magnetar), Bell (Putnam) and other Putnam employees had numerous communications in which Prusko made clear his intention to short tens of millions of dollars of the collateral he was selecting for Pyxis—far more than Magnetar's equity stake in Pyxis—and Putnam agreed to help him do so;

- Prusko (Magnetar) and Bell (Putnam) specifically discussed having Pyxis enter into swaps referencing the low-rated ABX Index and its components, and increasing the synthetic portion of the Pyxis portfolio, to allow Magnetar to make sizable short sales with respect to these assets;

- Bell (Putnam) and Alex Rekeda (Calyon, Pyxis' structurer) discussed the importance of concealing Magnetar's involvement in the selection of the Pyxis collateral, and Magnetar's short-selling strategy with respect to Pyxis;

2

- Prusko (Magnetar), Henriques (Deutsche Bank) and Rekeda (Calyon) remarked on Putnam's compliance with Magnetar's wishes as to the Pyxis portfolio, noting that Magnetar's CDOs, including Pyxis, were "not CDOs but … structured separate accounts [for the benefit of Magnetar and Deutsche Bank]," and that "Putnam got it";

- Magnetar selected Putnam to act as collateral manager for the Pyxis ABS CDO 2007-1 Ltd. Transaction ("Pyxis 2"), confirming its satisfaction with Putnam's cooperation on Pyxis; and

- After Pyxis defaulted, Bell (Putnam) joked with Prusko (Magnetar) about how much money Magnetar had made from its short-selling strategy, while continuing to conceal Magnetar's involvement in Pyxis from investors.

Further confirming Putnam's abdication of its collateral selection responsibilities to Magnetar, the Amended Complaint alleges that: (1) the Pyxis portfolio included collateral exposing Pyxis, directly or indirectly, to losses from 15 other Magnetar CDOs; (2) there was a remarkably high overlap between the assets in the Pyxis portfolio and those in the portfolios of other Magnetar CDOs; (3) the statistical likelihood of the interconnections and portfolio overlaps among Magnetar's CDOs occurring by chance (*i.e.,* without Magnetar's influence) was less than one in a billion; (4) the Pyxis portfolio contained no "prime" (*i.e.,* less risky) residential mortgage-backed securities ("RMBS"), despite Putnam's representation that the portfolio would include $145 million of such securities, indicating that Putnam had changed its original collateral selection strategy in a way that weakened the portfolio and could only be explained by its desire to align itself with Magnetar's short-selling strategy; (5) Putnam circumvented the portfolio limitation on low-rated ABX Index investments by investing in components of the ABX Index as well as the Index itself; (6) the Pyxis portfolio included offset trades on ABX Index components of a type unique to Magnetar CDOs; and (7) e-mails and other evidence adduced in numerous lawsuits involving other Magnetar CDOs indicate that Magnetar engaged in short sales with respect to its CDOs as a general matter and exercised tight control over the selection of all of

their portfolios, making it, at best, implausible that Magnetar would not have also controlled portfolio selection for Pyxis.

Putnam does not actually deny FGIC's allegations.  Instead, its primary response to these allegations is to argue that some of the facts alleged might be interpreted differently.  For example, Putnam asserts that the "veto" side letter may never have been executed, and that Putnam may not have been aware of it.  The Amended Complaint alleges, however, that Putnam was aware of it.  Additional facts buttress that allegation: (1) the letter expressly required Putnam to obtain Magnetar's approval for any investments; (2) the Amended Complaint alleges that Putnam in fact allowed Magnetar not only to vet, and to veto, investments, but also to purchase CDOs for Pyxis directly; and (3) Magnetar and Deutsche Bank were sufficiently satisfied with Putnam's cooperation on Pyxis ("Putnam got it") that Putnam was selected to manage Pyxis 2.  Thus, Putnam's contentions not only raise disputes of fact inappropriate for a motion to dismiss but also ignore that, read as a whole, the Amended Complaint supports—indeed, renders all but inescapable—an inference that Putnam abdicated collateral selection to Magnetar.

Putnam also answers claims of *fraud* and *misrepresentation* with an irrelevant argument to the effect that, technically, it did not breach its *contractual* obligations.  For example, Putnam argues that the composition of the Pyxis portfolio is within the contractual parameters for the portfolio.  But FGIC's claim is not based on failure to meet contractual requirements as to the composition of the portfolio.  Rather, FGIC's core claim is based on Putnam's misrepresentations as to who *controlled* the selection of assets for that portfolio.  FGIC alleges that it was told the assets would be selected by Putnam—acting alone—and it would never have issued insurance on Pyxis had it known that Magnetar was involved.  FGIC's allegations that Putnam represented that the portfolio would contain $145 million of prime RMBS when it

4

actually contained none, and that Putnam circumvented the portfolio limitation on ABX Index investments, support the inference that Putnam was acting at Magnetar's behest, since this behavior was highly deceptive to FGIC but highly accommodative to Magnetar.  Not incidentally, the resulting changes to the portfolio exposed Pyxis to significant risk without a corresponding reward, and cannot be explained on any basis other than Putnam's submission to Magnetar.

Putnam also argues that FGIC should not be allowed to rely on facts alleged in the Massachusetts Complaint, because that proceeding is unresolved.  But FGIC does not rely on the Massachusetts *Complaint*.  Rather, it relies on the documentary *evidence* and *sworn testimony* of Putnam's own witnesses set forth in that Complaint.  Putnam cites no support for the proposition that the evidence underlying another complaint cannot be used in this lawsuit.

Putnam's further argument that FGIC has not adequately pled scienter is also without merit.  Under both Rule 9(b) and New York law, intention may be alleged generally, and thus allegations raising a plausible inference of scienter will suffice.  In arguing that FGIC has not met this standard, Putnam again raises inappropriate factual disputes which are in any event unpersuasive.  For example, Putnam argues that FGIC has failed to plead motive because, compared with other deals, its fees were not high in percentage terms, and that its monetary incentive was not sufficiently large to induce it to commit fraud.  These are questions of fact.  Moreover, even if these points could be resolved at this stage, Putnam still fails to explain away several other facts: (1) Putnam's fees were in the multiple millions of dollars; (2) they were high in absolute terms, since Pyxis was almost four times the size of a typical CDO; (3) they continued to be paid long after Pyxis began to default, and indeed after Pyxis actually defaulted; (4) Putnam received not only these fees but also the promise of further deal volume from

Magnetar, which materialized when Putnam was selected to manage Pyxis 2; and (5) the incentives of the Putnam CDO team that worked on Pyxis (and presumably reaped most of the fees) were very different from the incentives of the Putnam organization as a whole.  Putnam also inappropriately disputes factual allegations indicating its willful wrongdoing—for example, its complicity with the secret "veto" side letter and its discussions with Calyon about concealing Magnetar's role—which separately support a plausible inference of scienter.

Next, Putnam argues that FGIC has failed to plead loss causation.  Again, this is wrong. FGIC alleges that the very wrong complained of—that the Pyxis collateral was selected by an investor with interests adverse to FGIC—caused the collateral to be significantly more risky than it would otherwise have been, and thus to default earlier, triggering FGIC's obligations under the Pyxis Guaranty.  Putnam's argument also fails for another reason: FGIC seeks rescissory damages, which do not require proof of loss causation.  *MBIA Ins. Corp. v. Countrywide Home Loans, Inc. et al.,* 936 N.Y.S.2d 513, 523-4 (N.Y. Sup. 2012).

Finally, Putnam's argument that FGIC has failed to allege a special relationship or duty necessary to support its claims for negligent misrepresentation and negligence is squarely refuted by a recent decision of the Second Circuit holding that such a relationship was adequately pled where the complaint alleged that a CDO investor was induced to purchase notes by a collateral manager's non-contractual representations—materially identical to Putnam's representations— that the investor could rely on its care and competence in selecting and managing the CDO's portfolio.  *Bayerische Landesbank AG v. Aladdin Capital Mgmt LLC*, 692 F.3d 42 (2d Cir. 2012).

For all of these reasons, Putnam's motion should be denied in its entirety.

## FACTUAL BACKGROUND

### A.    The Pyxis Guaranty

This action arises out of FGIC's entry into the Pyxis Guaranty, which insured payment of all obligations owed by FGIC's wholly-owned subsidiary, FGIC Credit Products Ltd, under a swap transaction referencing Pyxis (the "Pyxis Swap").  AC ¶ 8.  Under the Pyxis Swap, FGIC Credit Products LLC agreed that, if Pyxis defaulted, it would make all the payments owed by Calyon on an underlying swap between Calyon and Pyxis referencing the $900 million Super Senior Swap issued by Pyxis.  *Id.* ¶ 8.[1]  Thus, FGIC effectively assumed the risk of liability under the Pyxis Super Senior Swap, in exchange for Calyon's premium payments.  If FGIC had not issued the Pyxis Guaranty, Pyxis would not have closed and Putnam would not have earned the large fees it did from both Pyxis and Pyxis 2.  *Id.*

### B.    The Pyxis CDO

Pyxis was one of at least 26 "Constellation" CDOs sponsored by Magnetar.  *Id.* ¶ 41.  Magnetar took an equity position in each of these CDOs, but a much larger short position.  Magnetar ensured that the Constellation CDOs would be managed in accordance with its preferences, generally by controlling the selection of their portfolios.  *Id.* ¶¶ 34-41, 126-144.  As a net short investor, Magnetar was positioned to profit if the Constellation CDOs were to fail, and fail they did:  according to ProPublica, about 96% of Magnetar's deals were in default by the end of 2008, compared with 68% for comparable CDOs.  *See* Declaration of Robert C. Hora in Support of Defendant's Motion to Dismiss ("Hora Decl."), Ex. 5, p. 3.

---

[1]    A CDO is a special purpose vehicle that purchases, or enters into a swap referencing, a portfolio of assets—such as bonds or loans—and issues securities which then make payments to investors based on the income generated by the assets.  AC ¶ 23.  A CDS, in turn, is a transaction in which one party sells protection to a counterparty in respect of a security (*i.e.*, agrees to make payments to the counterparty in the event of certain specified events, such as non-payment of amounts due on the security) in exchange for premium payments.  *Id.* ¶ 33.

Pyxis, like Magnetar's other CDOs, was a "hybrid" CDO, meaning that part of its $1.5 billion portfolio (23%) consisted of "cash" assets (*i.e.*, asset-backed debt securities that Pyxis actually purchased) and the rest of the portfolio (77%) consisted of "synthetic" assets. These "synthetic" assets were created through CDSs in which Pyxis mimicked the economics of purchasing asset-backed debt securities by selling protection to counterparties on those debt securities in exchange for premium payments that were akin to the coupon payments Pyxis would have received had they purchased the referenced security itself. AC ¶ 42.

Pyxis was a managed CDO, with a portfolio that could change at any time, at the discretion of the collateral manager. Consequently, FGIC and other investors were heavily dependent on the experience, independence and integrity of the collateral manager. *Id.* ¶¶ 30, 63. As Putnam itself stated in the Pyxis Offering Memorandum, "[b]ecause the composition of the [portfolio] will vary over time, *the performance of the [portfolio] depends heavily on the skills of the Collateral Manager* in analyzing, selecting, and managing the [portfolio]." *Id.* ¶ 28 (emphasis added).

The putative collateral manager for Pyxis was Putnam. *Id.* ¶ 44. Magnetar and Putnam had a very close relationship: the Magnetar executive chiefly responsible for putting together the Constellation CDOs, Jim Prusko, had previously worked at Putnam, and had supervised Carl Bell, the Putnam employee who was supposed to be responsible for selecting the Pyxis portfolio. *Id.* ¶ 88. Like all of Magnetar's CDOs, Pyxis was substantially larger than a typical CDO, and thus generated unusually large fees for the collateral manager. *Id.* ¶ 44. Putnam's fixed management fee of 15 basis points was higher than the fixed fee paid to the collateral manager in all but three of Magnetar's 26 CDOs, and higher than the *total* fee—including both fixed and incentive fees—on all but six of Magnetar's CDOs. *Id.* In addition, Putnam received an

"incentive fee" on Pyxis of a further five basis points. *Id.* ¶ 45. Contrary to Putnam's assertion (Br. 8), this "incentive fee" was not in reality dependent on Pyxis' performance, but, as emails between Magnetar, Deutsche Bank and Calyon attest, was "virtually assured" by Magnetar's "significant control" of Pyxis. AC ¶ 45.[2]

After Pyxis closed, Putnam worked with Magnetar on a second Pyxis CDO, Pyxis 2, which closed in early 2007. *Id.* ¶ 49. If Putnam had not cooperated with Magnetar on Pyxis, Magnetar would have refused to work with it on any other CDOs—as it in fact did when another collateral manager refused to cooperate with it on a different CDO. *Id.* ¶ 41.

Magnetar was a net short investor in Pyxis, whose interests were therefore opposed to those of long investors and FGIC. *Id.* ¶¶ 51-53. Although Magnetar held $41.25 million of equity, because of Pyxis' "triggerless" structure, it received payments of over $20 million before and even after the deal began to fail. By contrast, senior noteholders received total payments of only $7.45 million (*id.* ¶ 52)—belying Putnam's claim that Magnetar took the "first risk" on Pyxis, (Br. 9). As collateral manager for Pyxis, with access to all of the Pyxis deal documents and trustee reports, Putnam was necessarily aware of all of this. As Putnam was also aware, Magnetar's short positions on Pyxis totaled far more than its long position. AC ¶¶ 92, 96-97, 100, 103-06. Putnam knew this in large part because it helped Magnetar to arrange tens of millions of dollars of these short sales. *Id.*

---

[2]   Putnam's unsupported contention (Br. 22) that, if Pyxis had not defaulted, it would have received $18 million in fees rather than the $5.7 million it in fact received, again raises a factual dispute inappropriate for a motion to dismiss, and is in any case irrelevant. As the Amended Complaint alleges, if Putnam had not agreed to cooperate with Magnetar's scheme, it would not have been selected to manage Pyxis at all, and would thus have received *no* fees. AC ¶ 41. Nor would it have been selected to manage Pyxis 2, for which it received an additional $3.1 million. *Id.* ¶ 50.

**C.    Putnam Induced FGIC to Issue the Pyxis Guaranty by Representing that It—and It Alone—Would Select the Pyxis Collateral.**

In July 2006, Calyon and Putnam began to market Pyxis to FGIC.  *Id.* ¶ 60.  In order to assure FGIC of the quality of the Pyxis portfolio, Putnam represented, both in the Pyxis offering materials and in other written and oral communications, that Putnam would select the assets for the portfolio, acting independently and in good faith in the interests of long investors.  *Id.* ¶ 63. Thus, the Pyxis Pitchbook, which Putnam helped to prepare, highlighted the fact that "The Putnam Advisory Company, LLC will serve as Collateral Manager."  *Id.* ¶¶ 66-67.  Similarly, the October 2, 2006 Offering Memorandum for Pyxis, again prepared by Calyon and Putnam, represented that the "Fixed Income Group" of Putnam "will select and manage the Collateral" (*id.* ¶ 84), and that, pursuant to the Pyxis Collateral Management Agreement, Putnam was required to "supervise and direct the investment and reinvestment of the Collateral" and to "perform its obligations hereunder and under the Indenture with reasonable care and in good faith using a degree of skill and attention no less than that which the Collateral Manager exercises with respect to comparable assets that it manages for others with similar objectives and policies, and to carry out its obligations hereunder in a manner consistent with the practices and procedures followed by prudent institutional managers of national standing," (*id.* ¶ 85).

Further confirming the importance of Putnam's role, extensive portions of the Pitchbook and the Offering Memorandum related specifically to Putnam's duties in selecting the Pyxis portfolio.  The Pitchbook alone represented, among other things, that:

- Putnam has "deep, experienced management teams";
- Putnam's "Investment Philosophy—CDOs" is that "Putnam should actively drive the product structure";
- Putnam believes that "CDO management" requires "[r]igorous portfolio construction";

- "Each CDO [managed by Putnam] leverages Putnam's expertise and presence in the structured product market and the full capabilities and resources of Putnam's CDO Management platform";
- Putnam is a "[l]eader in compliance and transparent business practices;"
- Putnam has "[s]easoned leaders committed to investment excellence and high fiduciary standards";
- Putnam's "goal is to generate excellent long term investment results;"
- "The key to long term investment success is *modest outperformance* achieved consistently over shorter time periods";
- Putnam has "a high degree of expertise in both the design of a conservative and stable CDO structure and the management of the underlying fixed income collateral";and
- "Putnam seeks to design and undertake transactions that have a high probability of success." *Id.* ¶¶ 66-69 (emphasis in original); Hora Decl., Ex. 10.

Putnam made similar written and oral representations to FGIC during FGIC's extensive due diligence for Pyxis.  AC ¶¶ 71-79.   In emails during July 2006, Putnam: (1) described the elaborate procedure it used to obtain the best possible terms for Pyxis' RMBS and CDO investments; (2) discussed whether new issues it was considering for the Pyxis portfolio were trading at premium or tighter spreads; and (3) explained which of the RMBS to be included in the portfolio were held on Putnam's books.  *Id.* ¶¶ 71-72, 74.   During a subsequent on-site review of Putnam's operations in Boston, Putnam discussed: (1) its views as to the market environment for RMBS and CDOs; (2) its investment strategy for Pyxis; and (3) its credit selection, approval and surveillance process.  *Id.* ¶ 74-75.   Putnam also represented that the Pyxis Portfolio would include only a limited amount of low-rated ABX Index securities—a limitation reflected in the Pyxis Offering Memorandum and indenture, which specified a strict concentration limit on Pyxis' ABX Index Securities bucket.  *Id.* ¶ 75.   In a subsequent conference call, Putnam further discussed its strategy for selecting and managing Pyxis' RMBS investments, and represented that it performed extensive due diligence with respect to prospective RMBS investments.  *Id.* ¶ 76.

Putnam, through Calyon, also provided what it purported to be the final target portfolio for Pyxis, which showed that at least $145 million of the Pyxis portfolio would be prime RMBS assets.  *Id.* ¶ 77.  FGIC's MBS team spent three weeks analyzing this portfolio before submitting a recommendation in favor of the Pyxis Guaranty to FGIC's Structured Finance Committee, which approved the transaction.  *Id.* ¶¶ 78, 80.  As it transpired, there were no prime RMBS assets in the final Pyxis portfolio—indicating that Putnam had bowed to Magnetar's will in selecting the final Pyxis collateral, since there is no other reasonable explanation for such a significant, last-minute, and undisclosed change in investment strategy.  *Id.* ¶¶ 77, 125.[3]

### D.    Contrary to Its Representations, Putnam Abdicated Control Over Pyxis Collateral Selection to Magnetar, and Concealed Magnetar's Role.

Putnam's representations were egregiously false.  Most importantly, as Putnam deliberately concealed from FGIC, the Pyxis portfolio was not in fact selected by Putnam, acting diligently and independently in the interests of long investors like FGIC, but was instead selected by a net short investor, Magnetar.  *Id.* ¶ 87.  Had FGIC known this, it would never have issued the Pyxis Guaranty.  *Id.* ¶¶ 1, 11, 146.

FGIC's allegations are based on a wealth of documentary evidence and testimony disclosed in numerous lawsuits relating to Magnetar's CDOs—including, most notably, documents and testimony of Putnam's own witnesses specifically relating to Pyxis, which came to light in the *Lorelei* lawsuit and the Massachusetts Complaint—as well as substantial other evidentiary sources.  Contrary to Putnam's assertion, the Amended Complaint does not "rel[y] heavily on news reports."  Br. 10.

---

[3]  Putnam's argument that FGIC could have discovered that there were no prime RMBS in the final portfolio if it had re-reviewed the final portfolio before closing (Br. 18) ignores that FGIC had no reason to doubt Putnam's word that the final target portfolio would be close, if not identical to, the final portfolio and to repeat the exhaustive portfolio review it had just performed.

1.     **The *Loreley* Evidence Confirms Putnam's Fraud.**

Contrary to Putnam's assertion, the documentary evidence that emerged in *Loreley* after the defendants in that case filed motions to dismiss was not taken into account by the *Loreley* court in dismissing the plaintiffs' claims against Putnam and NIBC (the collateral manager on Orion 2006-1 ("Orion")).  This evidence was not referenced in the First Amended Complaint or in the court's decision, which simply held that the four corners of the First Amended Complaint lacked sufficient particularity to sustain a fraud claim.  *See* Declaration of Sean P. Baldwin in Support of Plaintiff's Opposition to Defendant's Motion to Dismiss the Amended Complaint, Ex. A; Hora Decl., Ex. 6.

The *Loreley* evidence, without more, demonstrates that:

- In June 2006, Jim Prusko (Magnetar) told Alex Rekeda (Calyon) and Michael Henriques (Deutsche Bank) that "plenty of managers will do this deal.  I want to do it with [Putnam] for a variety of reasons, but *they have to play ball.*"  AC ¶ 91 (emphasis added).

- A month later, Calyon, Magnetar and Deutsche Bank executed a "warehouse side letter giving DB and Magnetar *veto rights over any warehouse asset.*"  *Id.* ¶ 93 (emphasis added).  This side letter required Putnam or Calyon to provide prompt notification of any proposed Pyxis investments.  *Id.*  This agreement was made "behind the scenes"— "between CALYON and DB & Magnetar only"—plainly in order to keep Magnetar's involvement secret from investors.[4]  *Id.*

- Subsequently, Putnam did in fact allow Magnetar to exercise secret control over the Pyxis portfolio.  Magnetar, both directly and through Calyon, exchanged lists of assets acceptable to Magnetar with Putnam (specifically, with Carl Bell), which included Magnetar's own CDOs.  *Id.* ¶ 98.  Moreover, Magnetar made clear to Putnam that it was itself "*going to source the CDO exposure synthetically.  We will buy CDO CDS* on names

---

[4]  Contrary to Putnam's equivocation (Br. 15), Putnam must have been aware of this agreement, since the agreement required Putnam to provide notice of proposed investments (AC ¶ 93).  Moreover, the fact that Prusko said "No, not at all" in response to an email proposing that this agreement be made "behind the scenes" (Br. 26) is at best equivocal (this could mean any number of things, including that Prusko did not want to leave an incriminating paper trail, since he also asked for the phone number of the author of the e-mail, implying that he would rather have called him than have responded in writing (Hora Decl., Ex. 15)), and ignores the fact that the final "veto" arrangement, as confirmed by Putnam's subsequent conduct, was exactly as this email described (AC ¶ 93).

of your choosing at mid-market, or bid list +3bp, whatever you prefer. *Any recent mezz abs deal is fine. I can send you a list of what's in our other deals if it's helpful.*" *Id.* (emphasis added). Prusko then provided Carl Bell with a list of "*[t]ypical names that we see in other deals a lot,*" including Orion and Cetus (both Magnetar deals). *Id.* (emphasis added).

- Prusko also sent a private email to Alex Rekeda (Calyon), stating that, although he was "*not too worried about Putnam doing anything rash,*" "*[i]f they add any CDO exposure that is not sourced by me, I want Michael [Henriques] and I to have a long look at it first.*" *Id.* ¶ 99 (emphasis added). After Rekeda agreed to this, Prusko reiterated that he did not want Putnam "buying CDO's without us knowing about it," and that he would "*check in with Carl [Bell], just saw him, thought we were on the same page with us buying the cdo cds.*" *Id.* (emphasis added).[5]

- Putnam's cooperation with Magnetar is still further confirmed by an exchange of emails between Magnetar and Deutsche Bank with respect to the Orion 2006-2 Ltd. transaction ("Orion 2"), the successor to Orion. In this exchange, Michael Henriques (Deutsche Bank) specifically contrasted Putnam's acquiescence on Pyxis with NIBC's recalcitrance on Orion 2 (on which NIBC was slated to act as collateral manager). *Id.* ¶ 108. Henriques asked if NIBC wanted to "go back to the regular style CDOs with 400mm mezz deals, scrapping for cash bonds, spending 9 months on ramp-up and 3-months marketing, to get 40bps running on a 400mm balance," and pointed out that "[i]n those deals there is no single party that can exercise significant control so that their smaller fee stream is virtually assured," and that "the velocity of deals is much lower and the effort to buy those 400mm of bonds will be higher than our 1.5bln." *Id.*. Remarkably, he went so far as to say that "*[t]hese deals are not CDOs, but they are structured separate accounts.*" *Id.* (emphasis added). Most significantly, for present purposes, he concluded: "*I think Putnam got it.* NIB doesn't." *Id.* (emphasis added).

- Later in the same exchange, Henriques reiterated that "I don't think [NIBC's responses] reflect a spirit of partnership that is appropriate for a *separate account mandate,*" and complained that "we are being treated like a typical 3rd party cdo investor, but does nib have any asset management clients *who directly engaged them and pay $5.5mm/yr in fees?*" *Id.* ¶ 109 (emphasis added). Again, he drew a telling comparison to Putnam: "*We*

---

[5] Putnam asserts that the fact that Prusko told Bell he would buy CDO CDS "on names of your choosing," and that he was concerned that Putnam might be buying CDOs without his knowledge, indicates Putnam's independence. Br. 29. However, Putnam ignores that Prusko made clear which limited list of names he expected Putnam to "choose" from and that he did not believe Putnam "would do anything rash," that he intended to stamp out any sign of such independence, that he believed he and Carl Bell "were on the same page with [Magnetar] buying the cdo cds," and that he would "check in with Carl" to confirm this. AC ¶¶ 98-99. The fact that Putnam not only continued to act as the collateral manager for Pyxis but was also selected to act as the collateral manager for Pyxis 2 confirms that Putnam satisfied Magnetar on this score, since Magnetar had no compunction about excluding collateral managers from other deals when they failed to comply with its demands. *Id.* ¶ 41.

*have provided a precedent with respect to Putnam.*" *Id.* (emphasis added). Thus, in seeking to convince NIBC to accede to Magnetar's and Deutsche Bank's demands to exercise control over the CDO, Henriques pointed to Putnam as an example or "precedent" of a firm willing to manage CDOs as structured accounts for the benefit of Magnetar and Deutsche Bank, understanding that they were far more than "typical 3d party cdo investor[s]." *Id.*[6]

- At the same time Magnetar was controlling the selection of assets for the Pyxis portfolio, it was also engaging in short sales with respect to that portfolio, and Putnam knew this. In September 2006, for example, when a Calyon employee questioned whether a trade ticket showing Magnetar purchasing the short side of a CDS for the Pyxis portfolio was correct (since he had understood it was supposed to be Citigroup), Putnam confirmed: "*It is definitely Magnetar.*" *Id.* ¶ 106 (emphasis added).[7]

## 2. The Evidence from the Massachusetts Secretary of State's Investigation Confirms Putnam's Fraud.

The evidence derived from the Massachusetts Secretary of State's investigation, set forth in the Massachusetts Complaint, corroborates and underscores Putnam's complicity with Magnetar's shorting scheme. Contrary to Putnam's assertion (Br. 12), the allegations in the Amended Complaint based on this evidence are not immaterial as a matter of law. The cases cited by Putnam merely hold that the fact that a complaint has been filed against the defendant in another unresolved proceeding is not, in itself, evidence of the matters complained of.[8] They do not hold that the evidence underlying that other complaint is inadmissible, and it is that

---

[6] Inexplicably, Putnam asserts that these emails do not relate to Putnam's conduct on Pyxis. Br. 27. In fact, that is precisely what they relate to, since they compare Putnam's conduct on Pyxis directly to NIBC's conduct on Orion 2.

[7] This trade ticket provides still further support for the inference that Putnam abdicated its portfolio selection responsibilities to Magnetar, since it indicates that Magnetar got the trading orders for two of its deals mixed up, that Putnam instructed Calyon to execute the trade for Pyxis, and that Putnam then reversed the instruction when Magnetar realized its mistake. In other words, Putnam was following Magnetar's orders, not exercising its own independent judgment. AC ¶ 107.

[8] *See Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 892-94 (2d Cir. 1976); *In Re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 218 F.R.D. 76, 78 (S.D.N.Y. 2003); *In Re CRM Hldgs., Ltd. Sec. Litig.*, No. 10-cv-975 (RPP), 2012 U.S. Dist. LEXIS 66034, at *77-78 (S.D.N.Y. May 10, 2012); *Ledford v. Rapid-Am. Corp.*, No. 86-cv-9116 (JFK), 1988 U.S. Dist. LEXIS 79, at *3 (S.D.N.Y. Jan. 8, 1988).

evidence—both emails and the testimony of Putnam's own witnesses—on which FGIC relies in making its allegations.  That evidence shows that:

- Magnetar selected Putnam to act as the collateral manager for Pyxis.  AC ¶ 90.

- Jim Prusko and Michael Henriques discussed Magnetar's CDO shorting strategy extensively with Carl Bell.  *Id.* ¶ 93.

- Prusko and Bell had numerous communications in which Prusko made clear which collateral he wanted to include in the Pyxis portfolio, and his intention to buy the Pyxis CDO collateral himself; and in which Bell made clear his willingness to accommodate him.  *Id.* ¶¶ 93-95, 100-05, 107.

- Prusko, Bell and other Putnam employees had numerous communications in which Prusko made clear his intention to short tens of millions of dollars of Pyxis collateral, as well as Pyxis itself, and in which Putnam worked to help him do so.  *Id.* ¶¶ 92, 96-97, 100, 103-06.

- Prusko and Bell specifically discussed having Pyxis enter into swaps referencing the low-rated ABX Index and its components, and increasing the synthetic portion of the Pyxis portfolio, to allow Magnetar to make sizable shorts against these assets.  *Id.* ¶ 96.

- Since Putnam knew that Magnetar was short-selling tens of millions of dollars of Pyxis assets (*id.* ¶¶ 92, 96-97, 100, 103-06), and since Putnam, as collateral manager for Pyxis, knew Magnetar's long position on Pyxis was only $21 million (*id.* ¶ 59), Putnam was well aware that Magnetar was a net short investor .

- Bell actively concealed Magnetar's involvement in, and its short-selling strategy for, Pyxis.  *Id.* ¶¶ 111-112.

- After Pyxis defaulted, Bell joked with Prusko about how much money Magnetar had made from its short-selling strategy, and Putnam continued to conceal Magnetar's involvement in Pyxis from investors.  *Id.* ¶ 113.

### 3.    The Fact that Pyxis Invested in Fifteen Other Magnetar CDOs Confirms Putnam's Fraud.

As a further demonstration of Magnetar's influence over Pyxis portfolio selection, Pyxis invested heavily in other Magnetar CDOs in an undisclosed arrangement designed to fuel Magnetar's broader CDO shorting machine.  *Id.* ¶ 115  In fact, Putnam ultimately invested *over half* of Pyxis' cash allocated to CDO investments in four other Magnetar CDOs—even though

there were *223* ABS CDOs issued in 2006 alone from which Putnam could have made its selection.  *Id.*  These four Magnetar CDOs were in turn invested in yet more Magnetar CDOs, meaning that Pyxis ultimately had exposure to at least fifteen Magnetar CDOs.  *Id.*  Not surprisingly, all fifteen defaulted—and Magnetar profited from each default.  *Id.*  Moreover, at least six other Magnetar CDOs owned securities issued by Pyxis.  *Id.* ¶ 117.

### 4.    Huge Overlaps Between the Pyxis Portfolio and Those of Other Magnetar CDOs Confirm Putnam's Fraud.

Further confirming Magnetar's control of Pyxis, there was a remarkably high correlation between the issuers whose securities were included in Pyxis' portfolio and the issuers whose securities were included in other Constellation CDOs.  *Id.* ¶ 119.  For instance, of the 163 unique CUSIPs in the Pyxis Portfolio, fully 90 CUSIPs (or 55%) referenced RMBS or CDOs whose securities were included in at least five other Magnetar CDOs, while 45 CUSIPs (or 28%) referenced RMBS or CDOs whose securities were included in at least ten other Magnetar CDOs. *Id.*  There is no way all this could have happened by chance—especially given that there were well over *1,000* RMBS issued in 2005-2007 (more than half in 2006 alone) from which the RMBS in the Pyxis portfolio could have been selected, and there were more than *500* ABS CDOs issued in the same period from which the CDOs in the Pyxis Portfolio could have been selected.  *Id.* ¶ 119.

### 5.    The Cross-Referencing and Portfolio Correlations Observed between Constellation CDOs Generally Confirm Putnam's Fraud.

Given the substantial cross-referencing and portfolio correlation between all Constellation CDOs, not merely Pyxis, FGIC retained a firm of economic consultants to perform a statistical analysis to assess the likelihood of this correlation occurring by chance if all Constellation CDO managers had been acting independently.  *Id.* ¶ 120.  This analysis concluded

that "[t]he probability of this happening by chance across independent portfolio managers is less than 1 in a billion." *Id.*

> **6.    Pyxis' Circumvention of Limits on ABX Index Investments Confirms Putnam's Fraud.**

Putnam also concealed the extent to which Pyxis sold protection on the ABX Index of low-rated RMBS by causing Pyxis to sell protection against both the ABX Index itself and the individual constituent RMBS in the ABX Index. *Id.* ¶ 121.  In total, Pyxis sold protection on $240 million of RMBS comprising all 40 constituents included in the ABX BBB- 06-1 and ABX BBB- 06-2 Indices—more than three times the specified concentration limit—which significantly increased the risk profile of the Pyxis portfolio and thus worked in favor of a net short investor like Magnetar, at the expense of long investors like FGIC.  *Id.*  That Putnam engaged in this sort of deceptive behavior against the interests of long investors is very difficult to explain unless Putnam was taking direction from Magnetar.  Moreover, the documents in the Massachusetts Complaint confirm that Magnetar did indeed tell Putnam it wanted to increase the synthetic component of the portfolio to enable Pyxis to make more ABX Index investments that Magnetar could short-sell.  *Id.* ¶ 96.

> **7.    Pyxis' Inclusion of Offset Trades of a Type Unique to Magnetar CDOs Confirms Putnam's Fraud.**

Magnetar's control over the Pyxis portfolio is further confirmed by the fact that, on at least three occasions, Pyxis purchased protection to offset previously acquired exposures to individual components of an ABX Index.  *Id.* ¶ 122.  These trades represent a unique signature technique executed as part of a complex ABX Index arbitrage strategy used by Magnetar in many of its CDOs, pursuant to which the CDO would buy protection (often from Magnetar) on an ABX Index component security to which the CDO had previously acquired a long exposure. *Id.*  Since this was a signature trading technique used only by Magnetar, it points to Magnetar's

control over these trades.  Moreover, the three Pyxis trades which were offset, and were thus removed from the portfolio, referenced 2005-vintage RMBS collateral, which was of higher quality than the 2006-vintage collateral that comprised most of Pyxis' collateral—thus supporting Magnetar's shorting strategy.  *Id.* ¶ 123.

### 8.     The Absence of Prime RMBS in Pyxis, Contrary to Putnam's Representations, Confirms Putnam's Fraud.

The Pyxis "target portfolio" provided to FGIC by Putnam initially included at least $60 million of prime RMBS assets.  *Id.* ¶ 125.  This was later revised to include at least $145 million of prime RMBS.  *Id.*  In fact, the final ramped portfolio did not contain a *single* prime RMBS asset.  *Id.*  Again, it is difficult to understand why Putnam would have engaged in such a deception, against the interests of long investors, unless it was at the behest of Magnetar.

### 9.     Magnetar's Control Over Collateral Selection for Its CDOs Generally Confirms Putnam's Fraud.

Email evidence from litigations relating to other Magnetar CDOs, most of which were settled for large amounts, shows that Magnetar exercised precisely the same control over asset selection on these other CDOs as on Pyxis, securing the acquiescence of banks and collateral managers with the promise of large, easily realized fees and deal volume.  *Id.* ¶ 126.  The striking similarity between Magnetar's conduct on each of these deals renders it even less plausible that Magnetar would have allowed Putnam to control the selection of the Pyxis portfolio.

For example:

- On **Orion**, Magnetar told the collateral manager: "We will buy protection from the deal on agreed upon names and that will fill the bucket."  *Id.* ¶ 127.

- On **Squared**, Magnetar exchanged lists of proposed CDO securities with the collateral manager (GSC), indicating which securities it wanted to short; and its recommendations were all complied with.  *Id.* ¶¶ 129-31.  Moreover, Magnetar stated that it regarded its equity position as "basically nothing," and that it was "*just doing it [i.e., taking the equity position]. . . to buy some protection.*"  *Id.* ¶ 128 (emphasis added).  By the time the deal

closed in May 2007, Magnetar's $600 million short position completely dwarfed its $8.9 million long position.  *Id.*

- On **Norma**, the structurer (Merrill Lynch) stated that: "A*pparently NIR allowed Magnetar to do some trading for their [Norma] portfolio (in the area of 600MM).  This accounted for a large chunk of trading that NIR originally didn't recognize.*"  *Id.* ¶ 134 (emphasis added).  Magnetar's behavior was so extreme that it prompted a Merrill corporate risk manager to ask: "*Dumb question.  Is Magnetar allowed to trade for NIR*?"  *Id.* (emphasis added).  Even on trades that NIR did execute for Norma, Magnetar exercised veto rights over the selection of the assets.  One Magnetar email stated: "*I definitely want to approve any CDO's that go in the deal*"—echoing Jim Prusko's statement to Alex Rekeda just two months earlier with respect to Pyxis.  *Id.* ¶ 135 (emphasis added).

- On **Carina**, Magnetar proposed to the collateral manager, State Street, that they "[d]iscuss ramping strategy, talk about each list as it goes out, plan for non-sub/mid-prime sectors, … *a few times a week*."  *Id.* ¶ 139 (emphasis added).  State Street agreed to do so.  *Id.*  Magnetar also told State Street it would buy protection on at least four synthetic deals included in the portfolio at Magnetar's behest.  *Id.* ¶ 140.

- On **Class V III**, Magnetar explored with Citigroup the possibility of taking both an equity position and a more substantial short position.  *Id.* ¶¶ 142-43.

### E.    Putnam Profited from Its Fraud, and FGIC Lost Millions

Putnam benefited from its fraud by earning larger than usual fees with relatively little risk or effort for serving as the collateral manager on both Pyxis and Pyxis 2 (neither of which positions it would have secured had it not cooperated with Magnetar).  *Id.* ¶ 145.  Putnam would not have received these benefits had it not induced FGIC to issue the Pyxis Guaranty, since without the Pyxis Guaranty Pyxis would not have closed.  *Id.* ¶¶ 8, 62.

By contrast, when Pyxis defaulted, FGIC was obliged to pay millions to discharge its obligations under the Pyxis Guaranty.  *Id.* ¶ 146.

### ARGUMENT

In deciding a motion to dismiss under Rule 12(b)(6), the Court must "assume all 'well-pleaded allegations' to be true, and 'determine whether they plausibly give rise to an entitlement to relief.'"  *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009) (quoting *Ashcroft v.*

*Iqbal*, 129 S. Ct. 1937, 1950 (2009)).  The Court must "construe plaintiff's complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor."  *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009) (internal quotation marks omitted).[9]

## I.   THE AMENDED COMPLAINT ADEQUATELY ALLEGES FRAUD.

To state a claim for fraud under New York laws, "the complaint must contain allegations of a representation of material fact, falsity, scienter, reliance and injury."  *Small v. Lorillard Tobacco Co.*, 94 N.Y.2d 43, 57 (1999).  The particularized allegations in the Amended Complaint adequately allege all of these requirements.

### A.   FGIC Need Only Plead Facts Supporting a Reasonable Inference of Fraud.

Although, under Fed. R. Civ. P. 9(b), fraud must be alleged with particularity, "[t]he requirement of particularity does not abrogate Rule 8, and it should be harmonized with the general directives . . . of Rule 8 that the pleadings contain 'a short and plain' statement of the claims or defense and (that) each averment should be 'simple, concise and direct.'"  *Ross v. A.H. Robins Co., Inc.*, 607 F.2d 545, 557 n.20 (2d Cir. 1979) (quoting Fed. R. Civ. P. 8).  Moreover, Rule 9(b) cannot be read in a vacuum.  As this Court has held, in words which are directly applicable here: "The Complaint here satisfies the requirements of Rule 9(b).  It does not simply assert fraudulent or deceptive conduct, but instead reasonably details the bases for those allegations.  *What defendants seem to demand is a pre-trial memorandum containing all the evidentiary support for plaintiffs' case.*"  *Pellman v. Cinerama, Inc.*, 503 F. Supp. 107, 111

---

[9]   In addition, "the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of and relied on when bringing suit, or matters of which judicial notice may be taken."  *Naughright v. Weiss*, 857 F. Supp. 2d 462, 469 (S.D.N.Y. 2012); *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

(S.D.N.Y. 1980) (emphasis added).  Similarly, the New York Court of Appeals, applying the New York equivalent of Rule 9(b), has held that:  "Although under Section 3106(b) the complaint must sufficiently detail the allegedly fraudulent conduct, *that requirement should not be confused with unassailable proof of fraud*.  Necessarily, then, Section 3106(b) may be met *when the facts are sufficient to permit a reasonable inference of the alleged conduct*."  *Pludeman v. Northern Leasing Sys., Inc.*, 10 N.Y.3d 486, 492 (2008) (emphasis added).

Moreover, under Rule 9(b), "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  Thus, FGIC is not obliged to plead scienter with particularity, but, as Putnam appears to concede (Br. 21), it need only meet the *Twombly* and *Iqbal* plausibility standard.[10]

Putnam's attempts to raise factual disputes regarding FGIC's allegations, to mischaracterize FGIC's claims, and to persuade the Court to ignore some of the Amended Complaint's most damning factual allegations, are without merit.  FGIC has more than met its pleading obligations under Rule 8 and Rule 9(b).

---

[10]  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).  Even in securities fraud claims, where a "strong inference" of scienter is required, the Supreme Court has cautioned that such an inference "need not be irrefutable, *i.e.*, of the smoking-gun genre, *or even the most plausible of competing inferences*", but merely "cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007) (emphasis added) (internal quotation marks omitted).  Moreover, the Court must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323 (emphasis in original). FGIC's allegations, read as a whole, meet even this exacting standard, creating a compelling inference of both motive and conscious misbehavior.

**B.** **FGIC Has Adequately Alleged that Putnam Misrepresented that It Would Select the Pyxis Portfolio Independently, and that It Omitted to Disclose that a Net Short Investor Would in Fact Control Portfolio Selection.**

Putnam was a well known, respected asset manager.  AC ¶¶ 63-64.  The Amended Complaint alleges that nothing was more important to FGIC than the independence and competence of the Pyxis collateral manager.  *Id.* ¶¶ 27-29, 63.  That was because the credit quality of the assets selected by the collateral manager would determine FGIC's risk.

Putnam does not dispute that it represented that it—and it alone—would select the Pyxis collateral, acting independently and in good faith in the interests of long investors.  Putnam made these representations both in the Pyxis offering materials and orally during meetings, calls and emails with FGIC in the course of FGIC's extensive due diligence on Pyxis.  *Id.* ¶¶ 64-79, 84-85.  Nor does Putnam dispute that it never disclosed Magnetar's involvement in Pyxis, nor the fact that Magnetar's financial interests were adverse to FGIC's because Magnetar was a net short investor.[11]

Rather, Putnam asserts, incredibly, that the Amended Complaint does not adequately allege that Putnam in fact abdicated its responsibility to select the Pyxis collateral to Magnetar.  Br. 14-16.  Ignoring most of the allegations in the Amended Complaint supporting this inference, Putnam bases its argument almost entirely on its assertion that FGIC cannot prove that the secret side letter granting Magnetar "veto powers" over Pyxis collateral selection was actually executed or that Putnam was aware of the agreement.  Br. 15.  But FGIC is not required to prove this at the pleading stage—although it can and in fact provides enough evidence to do so.  At this stage, all FGIC need do to adequately allege Putnam's misrepresentations is to plead facts supporting a

---

[11]   Putnam's assertion (Br. 19-20) that FGIC was aware that some party must necessarily be taking short positions on Pyxis is irrelevant.  What matters is that FGIC did not and could not know that the party taking those positions was also controlling Pyxis collateral selection.

reasonable inference that Magnetar was involved in collateral selection. *Pludeman v. Northern Leasing Sys., Inc.*, 10 N.Y.3d at 492. FGIC has clearly done this.

The factual allegations set forth in the Amended Complaint create not merely a reasonable but a compelling inference that Putnam, knowing Magnetar's financial interests were adverse to FGIC's, nevertheless allowed Magnetar to influence—indeed to have veto power—over the collateral selected for Pyxis. *See* pp. 2-4, 12-20 above. When the allegations concerning the "veto" letter are considered together with all of the other facts alleged in the Amended Complaint, it is, at a minimum, a reasonable inference that some form of this agreement must indeed have been made and that Putnam must have been aware of it, since: (1) the letter expressly required "Calyon *or the Investment Adviser [Putnam]*" to "promptly provide . . . notification" of any proposed asset purchases; (2) there is extensive evidence that Putnam in fact acted consistently with the terms of this agreement, allowing Magnetar not only to veto such investments but to purchase CDOs for Pyxis directly; and (3) Magnetar and Deutsche Bank were sufficiently satisfied with Putnam's cooperation ("Putnam got it") that Putnam was selected to manage Pyxis 2. *See* pp. 2-4, 12-20 above.

Putnam also asserts that FGIC has not adequately alleged that the Pyxis portfolio failed to comply with the eligibility requirements for Pyxis, and thus that FGIC has no claim based on the composition of the Pyxis portfolio. Br. 17-19. This is irrelevant.[12] FGIC's claims are not predicated on any misrepresentations by Putnam concerning the eligibility requirements, or any technical non-compliance with those requirements, but rather on Putnam's misrepresentations

---

[12]   It is also misleading. The Amended Complaint alleges that Putnam circumvented the Pyxis portfolio's concentration limits on low-rated RMBS sold on the ABX Index by causing Pyxis to sell protection against both the ABX Index itself and its individual constituent RMBS. AC ¶ 121. These investments—which created far greater effective exposure for Pyxis to the ABX Index than was contemplated or permitted—plainly contravened the spirit if not the letter of the Pyxis eligibility requirements.

and omissions concerning *who would select* the Pyxis portfolio, and specifically Putnam's concealment of the fact that Magnetar, not Putnam, would control the selection process. *See* AC ¶¶ 149-50.[13]

### C.    FGIC Has Adequately Alleged Scienter.

Contrary to Putnam's assertion, FGIC has adequately pled scienter, by alleging facts raising a plausible inference of both motive to commit fraud *and* of circumstantial evidence of conscious misbehavior or recklessness. *See In Re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 351 (S.D.N.Y. 2011).

### 1.    FGIC Has Adequately Alleged Motive.

The Amended Complaint alleges that Putnam had a compelling motive to commit fraud—namely, to secure unusually large fees with relatively little effort or risk for serving as the putative collateral manager for Pyxis. This is confirmed by emails attesting to the benefits of acting as the collateral manager on a Magnetar CDO compared to a typical CDO. *See* p. 14 above. Putnam's assertion that its fees on Pyxis were not unusually large focuses solely on its fee percentage (20 basis points rather than the customary 40 basis points for CDO collateral managers), and ignores other relevant facts: (1) Pyxis, like all of Magnetar's CDOs, was almost four times larger than a typical CDO, so the dollar value of Putnam's fees was twice as high as a typical CDO manager's; (2) 75% of its fee (15 basis points) was fixed (higher than the fixed fee on most Magnetar CDOs); and (3) its "incentive fee" was, as emails between Magnetar, Deutsche Bank and Calyon attest, "virtually assured" by Magnetar's "significant control" over

---

[13]    Thus, *HSH Nordbank AG v. UBS AG*, 95 A.D.3d 185 (1st Dep't 2012)—relied on by Putnam (Br. 18)—is irrelevant. In that case, HSH alleged that UBS induced it to enter into a CDS by misrepresenting the risk involved, which HSH could have discovered by ordinary due diligence (and with respect to which the disclaimers in the various deal documents precluded HSH from relying on defendants' representations). By contrast, FGIC's claims are not predicated on representations concerning portfolio risk, but rather on who selected the portfolio.

Pyxis.  *See* pp. 5, 8-9 above.  Moreover, Putnam secured additional lucrative deal volume from its cooperation with Magnetar when it was chosen as the collateral manager for Pyxis 2 a few months after Pyxis closed—which would certainly not have happened had it not cooperated with Magnetar on Pyxis.  *See* AC ¶¶ 41, 49, 145.

Contrary to Putnam's assertion (Br. 23), the desire to earn fees may indeed support a plausible inference of motive.  *Cohen v. Stevanovich,* 722 F. Supp. 2d 416, 429 (S.D.N.Y. 2010)—relied on by Putnam—is inapposite.  *First*, it relates to claims of market manipulation and securities fraud under Rules 9(a) and 10(b) of the Securities Exchange Act, for which the pleading standard is a "strong" inference of scienter, not a plausible inference.  *Second, Cohen* merely holds that a *generalized* profit motive, *without more*, is not sufficient to provide a compelling inference of scienter.  *Id.*  Where, by contrast, the complaint alleges that the defendant would realize "concrete benefits" from the fraud, that does suffice.  *Id.*[14]  Clearly, FGIC has alleged that Putnam realized "concrete benefits" from its fraud—namely, $5.7 million in fees on Pyxis and a further $3.1 million on Pyxis 2, without the typical effort and risk required of managers of non-Magnetar CDOs.  AC ¶ 10 n.2.

Putnam's further argument that these fees were not sufficient to justify fraud, and that it would have been irrational for it to have taken direction on collateral selection from a net short investor because payment of its fees depended on Pyxis performing well (Br. 23-24), are disputes of fact inappropriate for a motion to dismiss.  In any event, both arguments are without merit. As to the first, the incentives of the CDO team that actually worked on Pyxis (and presumably reaped most of the fees) were very different from the incentives of Putnam as a whole.  As to the second, Putnam's assertion that payment of its fees required Pyxis to perform well is belied by

---

[14]   As the Supreme Court has held—again in a securities fraud case—"personal financial gain may weigh heavily in favor of a scienter inference."  *Tellabs*, 551 U.S. at 325.

the fact that Putnam continued to receive its fees long after Pyxis began to fail and even after it suffered an Event of Default.  AC ¶¶ 46-47.

2.    **FGIC Has Adequately Alleged Willful Misbehavior or Recklessness.**

Putnam also inappropriately disputes factual allegations concerning its conscious wrongdoing—for example, its complicity with the secret "veto" side letter.  *See* pp. 4, 13-15 above.  The Amended Complaint sets forth substantial circumstantial evidence of Putnam's willful misbehavior or recklessness, which separately supports a plausible inference of scienter. *In Re Wachovia*, 753 F. Supp. at 351.  These allegations include that: (1) Putnam was indeed complicit in the secret "veto" agreement (*see* pp. 4, 13-15 above); (2) Putnam knowingly abdicated to Magnetar its responsibility to select the Pyxis portfolio (*see* pp. 2-4, 12-20 above); (3) Putnam willfully acquiesced in, and indeed facilitated, Magnetar's shorting of Pyxis despite its knowledge that Magnetar was controlling portfolio selection (*see* pp. 12-20 above); and (4) Putnam, both in collusion with Calyon and on its own initiative, actively concealed Magnetar's involvement in Pyxis collateral selection from Pyxis investors and FGIC (*see* pp. 2-4, 13-15 above).

D.    **FGIC Has Adequately Alleged Loss Causation.**

Putnam's argument that FGIC has failed to plead loss causation ignores that FGIC seeks rescissory damages, which do not require proof of loss causation.  *MBIA Ins. Corp. v. Countrywide Home Loans, Inc. et al.,* 936 N.Y.S.2d 513, 523-4 (N.Y. Sup. 2012).  In any event, FGIC has adequately pled loss causation, by alleging "facts that would allow a factfinder to ascribe some rough proportion of the whole loss to [defendants'] misstatements."  *Lattanzia v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007).  FGIC alleges that the very wrong of which it complains—that the Pyxis collateral was selected by a net short investor with interests adverse to long investors—caused the collateral to be far more likely to default than that of a

27

typical CDO, even in the event of market-wide losses.  AC ¶¶ 10, 13.  Indeed, this is borne out by the fact that 96% of Magnetar's deals—including Pyxis—were in default by the end of 2008, compared with 68% for comparable CDOs.  Hora Decl., Ex. 5, p. 3.  Thus, FGIC has adequately alleged loss causation.[15]

## II.   THE AMENDED COMPLAINT ADEQUATELY ALLEGES NEGLIGENT MISREPRESENTATION AND NEGLIGENCE.

Putnam's sole ground for seeking dismissal of FGIC's claims for negligent misrepresentation and negligence—that FGIC has failed to allege the special relationship or duty necessary to support these claims (Br. 32-34)—is squarely refuted by the recent decision of the Second Circuit in *Bayerische Landesbank AG v. Aladdin Capital Mgmt LLC*, 692 F. 3d 42 (2d Cir. 2012).

In that case, the complaint alleged that a CDO investor was induced to purchase notes by a collateral manager's representations—made, like Putnam's, both in marketing materials and in a face-to-face meeting between representatives of the investor and the manager—that the manager's interests were aligned with the investor's and that the investor could rely on the manager's care and competence in managing the CDO's portfolio.  Similarly here, FGIC was induced to issue the Pyxis Guaranty by Putnam's representations that it would select the collateral for Pyxis acting independently and diligently in the interests of long investors and FGIC, and by Putnam's representation in the Offering Memorandum that it would "perform its obligations hereunder and under the Indenture with reasonable care and in good faith."  AC ¶ 85.  Under *Bayerische,* these allegations are more than sufficient to establish the special relationship or duty necessary to support FGIC's negligence-based claims.

---

[15]   It is also a question of fact whether the housing crisis was an intervening cause of FGIC's losses or was itself the result of widespread fraud by market participants such as Putnam.

**<u>CONCLUSION</u>**

For the foregoing reasons, FGIC respectfully requests that Putnam's Motion to Dismiss

be denied.

Dated: New York, New York
February 8, 2013

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By: _____ /s/ Peter E. Calamari _____
Peter E. Calamari
(petercalamari@quinnemanuel.com)
A. William Urquhart
(billurquhart@quinnemanuel.com)
Sean Baldwin
(seanbaldwin@quinnemanuel.com)
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000
*Attorneys for Plaintiff Financial Guaranty*
*Insurance Company*

29