UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FINANCIAL GUARANTY INSURANCE COMPANY,<br><br>        Plaintiff,<br><br>  -against-<br><br>THE PUTNAM ADVISORY COMPANY, LLC,<br><br>        Defendant. | No. 12-cv-7372 (RWS)<br><br>**ECF CASE**<br>**Electronically Filed** |

# REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PUTNAM ADVISORY COMPANY, LLC'S <u>MOTION TO DISMISS THE AMENDED COMPLAINT</u>

MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP

James N. Benedict
Sean M. Murphy
Thomas A. Arena
Robert C. Hora
William P. Gross
1 Chase Manhattan Plaza
New York, New York 10005
(212) 530-5000

*Attorneys for Defendant*
*Putnam Advisory Company, LLC*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................... ii

ARGUMENT .................................................................................................................................. 1

I.    FGIC'S CONCESSION THAT ALL SECURITIES SELECTED MET THE PYXIS CDO'S ELIGIBILITY CRITERIA IS FATAL TO ITS CLAIMS ....................... 1

II.   FGIC FAILS TO PLEAD SCIENTER ................................................................... 2

     A.    Putnam's Alleged Motive for Fraud, Increased Fees, Is Directly Refuted by the Documents On Which FGIC Relies .............................................. 2

     B.    The Amended Complaint Fails to Allege Conscious Misbehavior or Recklessness ................................................................................................ 5

III.  THE AMENDED COMPLAINT FAILS TO PLEAD LOSS CAUSATION ................. 10

IV.  THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR NEGLIGENT MISREPRESENTATION OR NEGLIGENCE ....................................... 12

CONCLUSION .......................................................................................................................... 13

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*,
   692 F.3d 42 (2d Cir. 2012) .................................................................................................. 12, 13

*Ins. Co. of Penn. v. Park & Pollard Co.*,
   190 A.D. 388 (1st Dep't 1920) ....................................................................................................10

*JSMS Rural LP v. GMG Capital Partners III, LP*,
   No. 04 Civ. 8591 (SAS), 2006 WL 1867482 (S.D.N.Y. July 6, 2006) ...................................10

*Landesbank Baden-Wurttemberg v. Goldman Sachs & Co.*,
   821 F. Supp. 2d 616 (S.D.N.Y. 2011) ........................................................................................13

*Laub v. Faessel*,
   297 A.D.2d 28 (1st Dep't 2002) .................................................................................................10

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005) .......................................................................................................11

*M&T Bank Corp. v. Gemstone CDO VII, Ltd.*,
   68 A.D.3d 1747 (4th Dep't 2009) ...............................................................................................13

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*,
   936 N.Y.S.2d 513 (Sup. Ct. N.Y. County 2012) ..................................................................10, 11

*SEC v. Price Waterhouse*,
   797 F. Supp. 1217 (S.D.N.Y. 1992) .............................................................................................4

*Siti-Sites.com, Inc. v. Verizon Commc'ns, Inc.*,
   No. 10 Civ. 3751 (DLC), 2010 WL 5392927 (S.D.N.Y. Dec. 29, 2010) ....................................4

*St. Clair Shores Gen. Emps. Ret. Sys. v. Eibeler*,
   745 F. Supp. 2d 303 (S.D.N.Y. 2010) .......................................................................................10

*United States v. Lloyds TSB Bank PLC*,
   639 F. Supp. 2d 326 (S.D.N.Y. 2009) .........................................................................................4

**RULES**

Rule 9(b) of the Federal Rules of Civil Procedure ..........................................................................1

Rule 12(b)(6) of the Federal Rules of Civil Procedure……………………………………………1

Putnam Advisory Company, LLC ("Putnam") respectfully submits this reply memorandum of law in support of its motion, pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the Amended Complaint (the "Amended Complaint") filed by Financial Guaranty Insurance Company ("Plaintiff" or "FGIC") with prejudice.

## ARGUMENT

### I. FGIC'S CONCESSION THAT ALL SECURITIES SELECTED MET THE PYXIS CDO'S ELIGIBILITY CRITERIA IS FATAL TO ITS CLAIMS

Far from identifying any actual defect in the Pyxis portfolio, FGIC acknowledges in its Opposition that the portfolio was exactly as it had been described to FGIC, in great detail, in more than 40 pages of the Offering Memorandum ("OM"). FGIC's concession that the Pyxis portfolio met the OM's extensive eligibility requirements (Pl. Mem. at 24) is fatal to its claim that it was misled concerning the selection and nature of the assets that made up the Pyxis portfolio.

Although FGIC contends, for instance, that Putnam "concealed the extent to which Pyxis sold protection on the ABX Index" because Pyxis sold protection on securities that were listed on the index in addition to the index itself (Pl. Mem. at 18, 24 n.12),[1] FGIC acknowledges that the portfolio complied with the actual criteria set out in the OM. As Putnam's opening brief showed, and FGIC does not dispute, the OM restricted only the amount of synthetic securities that *directly* referenced the indices, and *did not* prohibit the inclusion of particular securities simply because they happened to be a component of an index. (Putnam Mem. at 19, citing Hora Decl. Ex. 1, at 118.). No inference of fraud can be drawn from Putnam's compliance with the OM's eligibility requirements.

---

[1] As used herein, "Pl. Mem." refers to Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss the Amended Complaint, dated February 8, 2013 [Doc. # 15]; "Putnam Mem." refers to Putnam's Memorandum of Law in Support of its Motion to Dismiss the Amended Complaint, dated December 21, 2012 [Doc. #10]; and "Hora Decl." refers to the Declaration of Robert C. Hora, dated December 21, 2012 [Doc. #11].

Similarly, although FGIC repeatedly contends that it was misled by "target" portfolios supposedly indicating that the Pyxis portfolio would contain varying amounts of prime RMBS assets (Pl. Mem. at 3, 19), FGIC does not dispute that the OM's eligibility criteria did *not* require the Pyxis CDO to contain any minimum amount of prime RMBS assets. Moreover, the offering documents put FGIC on notice that these targets were "indicative" and "subject to change without further notice." (Investor Presentation, Hora Decl. Ex. 10 at 14.) FGIC has not alleged that it was unable to check the final Pyxis portfolio against these "targets" prior to executing the guaranty of its subsidiary's swap.

FGIC has no basis to complain about the Pyxis portfolio's composition: the portfolio contained exactly what was described in the OM.

## II. FGIC FAILS TO PLEAD SCIENTER

### A. Putnam's Alleged Motive for Fraud, Increased Fees, Is Directly Refuted by the Documents On Which FGIC Relies

The Opposition clings to the irrational theory that Putnam abdicated its duties as collateral manager to Magnetar and acquiesced in the design of a transaction it knew would fail—all so that another party, Magnetar, could reap billions as a result of the alleged fraud while Putnam's fees, by contrast, were dependent on the success of the transaction.

Try as it might, FGIC cannot escape the fact that under the terms of the Collateral Management Agreement, Putnam was fully incentivized to select only the best performing assets for the Pyxis portfolio. If a particular collateral asset defaulted, Putnam would no longer receive its management fee with respect to that security. (Putnam Mem. at 7-8.) For Putnam intentionally to design Pyxis to fail defies logic, as it would *deprive* Putnam of its fees, rather than guarantee or increase them.

Ignoring the flawed logic of its own allegations, FGIC asserts that Putnam had a

2

"compelling motive to commit fraud" because it would purportedly earn "unusually large fees" for managing the Pyxis CDO. (Pl. Mem. at 25.) But the Opposition concedes that 40 basis points, double Putnam's maximum 20 basis-point fee, was the "customary" fee for collateral managers. (*Id.*) The fact that Pyxis was larger than the "typical" RMBS transaction (Pl. Mem. at 25) does not supply a motive to defraud. Putnam earned its fee only if the underlying collateral performed well and generated sufficient cash flow to allow Pyxis to meet its payment obligations to noteholders. If the collateral failed, Putnam would not receive its management fee on defaulted collateral, no matter how large the Pyxis CDO was.

FGIC attempts to sidestep this inconvenient fact by mischaracterizing Putnam's 15-basis point senior collateral management fee as "fixed." (Pl. Mem. at 25.) But Putnam's senior collateral management fee was not "fixed", and is nowhere described in any of the deal documents as "fixed". (*See* Putnam Mem. at 8.) Under the terms of the Collateral Management Agreement and Indenture, once a collateral asset defaulted, Putnam would no longer receive its senior fee with respect to that asset. (*See id.*) That Putnam received roughly $5 million in fees for managing the Pyxis CDO (Pl. Mem. at 26) is unremarkable, and does not supply an inference of motive: Had Pyxis not defaulted, Putnam's fees would have been more than three times greater. (*See* Putnam Mem. at 22.)

Plaintiff's assertion that Putnam's subordinated incentive fee was "virtually assured" by Magnetar's alleged "significant control" over the Pyxis portfolio also has no basis. (Pl. Mem. at 25-26.) As set forth in Putnam's opening brief, the supposed evidence that FGIC quotes in support of this assertion includes no Putnam personnel, concerns a different CDO, a different collateral manager, and has nothing to do with incentive fees. (Putnam Mem. at 23.) In any event, Plaintiff's claim that Putnam's incentive fee, which would only be paid if the Pyxis

3

CDO performed well, was somehow guaranteed by Magnetar's alleged selection of the Pyxis portfolio makes no sense: If Pyxis were designed to fail, as FGIC alleges, then Putnam would be sacrificing its incentive fee, not assuring it.

FGIC's allegation that the Pyxis deal involved "relatively little effort or risk" (Pl. Mem. at 25) also runs counter to common sense: Putnam's alleged participation in a billion-dollar fraud and creation of a toxic CDO would involve tremendous risk to Putnam's reputation and business. *See United States v. Lloyds TSB Bank PLC*, 639 F. Supp. 2d 326, 342 (S.D.N.Y. 2009) (stating that "common sense" indicated that a "substantial international bank" would not risk its reputation by engaging in securities fraud when it had "no financial incentive other than to maintain the patronage of a fee-generating client"); *SEC v. Price Waterhouse*, 797 F. Supp. 1217, 1242 (S.D.N.Y. 1992) ("It is highly improbable that an accountant would risk surrendering a valuable reputation for honesty and careful work by participating in a fraud merely to obtain increased fees."). Further, if the Pyxis CDO failed, as FGIC claims it was designed to, it would be of no benefit to Putnam to expend "relatively little effort" in selecting collateral: Putnam would be deprived of its fees with respect to any defaulted collateral.

Implicitly recognizing that Putnam had no incentive to commit fraud, FGIC speculates that the "incentives of the CDO team that actually worked on Pyxis (and presumably reaped most of the fees) were very different from the incentives of Putnam as a whole." (Pl. Mem. at 26.) But this allegation does not appear anywhere in the Amended Complaint, and FGIC cannot amend its pleading through statements made in its opposition briefing. *See Siti-Sites.com, Inc. v. Verizon Commc'ns, Inc.*, No. 10 Civ. 3751 (DLC), 2010 WL 5392927, at *5 (S.D.N.Y. Dec. 29, 2010). Even it could, FGIC's use of the word "presumably" is telling: FGIC's speculative assertion is unsupported by any well-pleaded facts concerning the CDO

4

team's compensation.

Finally, citing a September 2006 email between Magnetar and a different collateral manager, regarding a different CDO and the potential for cumulative business with that different manager, FGIC claims that Magnetar promised and Putnam secured "additional lucrative deal volume from its cooperation with Magnetar." (Pl. Mem. at 26 (citing Am. Compl. ¶ 41).) But this email has nothing to do with Putnam, and the allegation that Putnam acted as collateral manager on a second CDO in which Magnetar invested one year later does not raise an inference of fraudulent intent: There are no well-pleaded facts tying Putnam's selection as collateral manager for that CDO to any fraudulent conduct with respect to the Pyxis CDO. The Amended Complaint's bare allegation that Magnetar "promis[ed]" Putnam additional deal volume if it cooperated in the purported fraud (*see* Am. Compl. ¶ 49)—unmoored to any facts regarding the who, what, where, or when—falls well short of the particularity requirements of Rule 9(b).

### B. The Amended Complaint Fails to Allege Conscious Misbehavior or Recklessness

Stripped of its impermissible reliance on allegations involving other CDOs and collateral managers, anonymous news reports about Magnetar, and unattached, unverifiable statistical analyses by unidentified consultants that supply no actual facts regarding Putnam's conduct with respect to Pyxis (*see* Putnam Mem. at 9, 11, 15-16), FGIC's allegations relating to Putnam come down to a handful of allegations copied from the MSD's unproven, and strongly contested, administrative complaint against Putnam, and a handful of emails that were before Justice Schweitzer when he dismissed claims identical to FGIC's in the prior Pyxis litigation. None of this "evidence" supports FGIC's allegation that Putnam allowed Magnetar to "control" the selection of the Pyxis CDO's collateral assets.

5

FGIC does not seriously dispute that the Court may not consider and that it may not rely upon unproven allegations in the MSD's administrative complaint.  (*See* Putnam Mem. at 12; Pl. Mem. at 5.)  Instead, FGIC responds by claiming that the Amended Compliant relies on the alleged "evidence" underlying the administrative complaint, not its allegations.  (Pl. Mem. at 5, 15-16.)  But the administrative complaint does not contain any evidence:  it is a pleading comprised of *allegations*, just like FGIC's complaint.  And where the administrative complaint purports to quote emails or depositions transcripts, none of which FGIC has ever seen, it does so in a grossly misleading fashion.  FGIC's Amended Complaint merely blindly copies the MSD's defective allegations.

To take just one example, the MSD's administrative complaint badly mischaracterizes an email with Magnetar dated July 7, 2006, in which Putnam's CDO Team Leader emphasized that Putnam would only select collateral assets that it thought would perform well, stating:  "***We are going to pick the deals that have the best fundamental value***.  We, of course, would pick different deals as the best short candidates (in terms of being a hedge against sub-prime issues)."  (Hora Decl. Ex. 18 ¶ 103 & Ex. 22.)  The administrative complaint quotes the sentence before and the sentence after Putnam's statement that "***We are going to pick the deals that have the best fundamental value***" (emphasis added), but misleadingly uses an ellipsis to omit the sentence in which Putnam announced its intent to select collateral with the "***best fundamental value***".  FGIC unwittingly quotes the same email out of context in the Amended Complaint.  (*See* Am. Compl. ¶ 96.)  Numerous other examples abound.  (*See* Putnam Mem. at 28-30.)  Such defects are precisely why it has long been the rule that a plaintiff may not rely on unproven allegations in other proceedings to support his or her claims.

The *Loreley* emails, most of which do not copy Putnam and many of which do not

6

even concern Pyxis, likewise do not support an inference of scienter by Putnam. Citing a June 2006 email exchange solely between Magnetar, Calyon, and Deutsche Bank attaching a draft warehouse agreement, FGIC asserts that Putnam was "complicit" in a "secret" side letter among Calyon, Magnetar, and Deutsche Bank allegedly giving Magnetar "veto" power over Pyxis portfolio assets. (*See* Pl. Mem. at 27; Am. Compl. ¶ 93; *see also* Hora Decl. Ex. 9 (email from Calyon to Magnetar attaching draft agreement)). FGIC argues this draft demonstrates Putnam's "complicity" in the alleged fraud because it required "Calyon or the Investment Adviser" to provide notification of asset purchases to Deutsche Bank and Magnetar. (Pl. Mem. at 24.) But there are no well-pleaded allegations that this draft agreement was ever signed, that Putnam consented to or was ever informed of the alleged agreement, that Putnam ever honored any request by Deutsche Bank or Magnetar to remove collateral from the Pyxis CDO warehouse, or that the purported veto right was exercised for any purpose other than to build the most suitable portfolio for Pyxis.[2]

      FGIC's reliance on an August 2006 email exchange between Putnam and Magnetar regarding the Pyxis CDO ramp up also does not help FGIC. Far from evidencing that "Putnam did in fact allow Magnetar to exercise secret control over the Pyxis portfolio" (Pl. Mem. at 13), the email illustrates the opposite: that Putnam independently selected the collateral. In the email, Putnam stated it was undertaking a "benchmarking" analysis on the Pyxis collateral pool, that the pool performed "well on [its] risk scoring model," that it was doing "preliminary work across a range of deals," and that "once this benchmarking is finished" it would "be able to pursue a couple of synthetic trades [for the Pyxis portfolio]." (Hora Decl. Ex.

---

[2] The draft agreement was expressly conditioned upon Magnetar maintaining its early commitment to purchase the Pyxis CDO's equity, surviving only "for so long as the respective Equity Purchase Letter has not been terminated." (Hora Decl. Ex. 9.) There is nothing unusual or improper about an equity investor seeking input on the content of a CDO's portfolio.

13 at 2-3.)  Nothing in the email indicates that Magnetar was directing the selection of the collateral or that Putnam "abdicated" portfolio selection to Magnetar.

A later email in that chain, cited by FGIC to show Magnetar's alleged control of the asset selection for the Pyxis portfolio, is similarly devastating to FGIC's claims.  In that email, Magnetar plainly told Putnam it would take the short position on swaps referencing *CDOs of Putnam's choosing*.  (*See* Hora Decl. Ex. 13 at 2.)  FGIC attempts to minimize this statement's impact by claiming that Mr. Prusko of Magnetar "made clear which limited list of names he expected Putnam to 'choose' from."  (Pl. Mem. at 14 n.5.)  This, again, misrepresents the document, in which Mr. Prusko tells Putnam he was willing to buy "*[a]ny* recent mezz abs deal," and offers, "I can send you a list of what's in our other deals *if it is helpful*."  (*See* Hora Decl. Ex. 13 at 2 (emphasis added).)

FGIC's emphasis on what it concedes to be "a private email" between Mr. Prusko of Magnetar and Alex Rekeda of CA-CIB, in which Mr. Prusko states he is "not too worried about Putnam doing anything rash" and that he wanted Michael Henriques of Deutsche Bank (the other equity investor) to look at additional CDO exposure added to Pyxis by Putnam (Pl. Mem. at 14) similarly does not support its allegations of Putnam's scienter.  The email copies no Putnam personnel, and is not alleged to have ever been distributed to Putnam.  Mr. Prusko's comment that Putnam was "buying CDO's without [Magnetar] knowing about it," moreover, is directly at odds with Plaintiff's claim that Putnam abdicated portfolio selection to Magnetar.  (Hora Decl. Ex. 13 at 1.)  And Magnetar and Deutsche Bank had reason to be concerned about the asset selection:  they both had substantial equity stakes in Pyxis.

FGIC's reliance on the November 2006 "exchange of emails between Magnetar and Deutsche Bank with respect to the Orion 2006-2 Ltd transaction" (Pl. Mem. at 14) also does

8

not support FGIC's claim of fraud for the reasons already discussed in Section IIA:  The email exchange deals with a different CDO in which Putnam is not alleged to have been involved (Orion 2006-2 Ltd); deals with a different collateral manager (NIBC); copies *no one* from Putnam; and concerns whether equity investors (not short investors) in Orion 2006-2 Ltd. will have a right to terminate NIBC as collateral manager.  (Hora Decl. Ex. 12.)  None of this supports a fraud claim against Putnam with respect to its selection of assets for Pyxis.

Plaintiff's assertion that the *Loreley* emails confirm that, "[a]t the same time Magnetar was controlling the selection of assets for the Pyxis portfolio," Putnam knew that Magnetar was net shorting the Pyxis portfolio is similarly unsupported by the cited email exchanges.  (Pl. Mem. at 15.)  The cited exchange, a September 2006 email string between Putnam and CA-CIB attaching a trade ticket showing that Magnetar purchased a small amount of protection on Pyxis, does not do anything to demonstrate that Magnetar "controlled" the asset selection for Pyxis, nor does it support the Amended Complaint's conclusory allegation that Putnam knew that Magnetar had an overall net short position  (Hora Decl. Ex. 16.)

The June 2006 email string among DB, Calyon, and Magnetar, *but not Putnam*, cited in paragraph 91 of the Amended Complaint also does not help FGIC.  (*See* Pl. Mem. at 13.) These emails, which do not copy any Putnam personnel, discuss the equity investors' desired internal rate of return on Pyxis.  (*See* Hora Decl. Ex. 14.)  They say nothing to indicate that, if selected as collateral manager, Putnam would participate in a fraud in which it would build a toxic CDO and abdicate its role as collateral manager to Magnetar.

The Amended Complaint contains no well-pleaded allegations that Putnam consciously or recklessly engaged in a fraud whereby it abdicated its collateral selection duties to Magnetar, or acquiesced in the design of a CDO intended to fail.

9

### III. THE AMENDED COMPLAINT FAILS TO PLEAD LOSS CAUSATION

FGIC's contention that it need not prove loss causation because it seeks "rescissionary damages" is meritless. Regardless of whether rescissionary damages are an appropriate form of damages in this case—and they are not—FGIC must still prove all elements of its common law tort claims, each of which requires proof that FGIC suffered an economic loss as a result of Putnam's alleged conduct. *See, e.g., JSMS Rural LP v. GMG Capital Partners III, LP*, No. 04 Civ. 8591 (SAS), 2006 WL 1867482, at *4 (S.D.N.Y. July 6, 2006) (plaintiff seeking rescission must "still prove . . . that it suffered an economic loss caused by defendant's alleged misconduct"); *Laub v. Faessel*, 297 A.D.2d 28, 31 (1st Dep't 2002) ("Loss causation is the fundamental core of the common-law concept of proximate cause: 'An essential element of . . . any . . . tort, is that there be some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered.'").

Even assuming for the sake of argument that a plaintiff is relieved of any burden of proving loss causation where it seeks rescissionary damages—and FGIC cites no compelling authority on that point—FGIC has no entitlement to rescissionary damages. Such damages are available only where the remedy of rescission, while theoretically available, is not a practical form of relief. *St. Clair Shores Gen. Emps. Ret. Sys. v. Eibeler,* 745 F. Supp. 2d 303, 315 (S.D.N.Y. 2010). FGIC cannot establish that it has any basis for rescission against Putnam. As a matter of law, rescission is available only where the parties are in privity of contract. *See, e.g., Ins. Co. of Penn. v. Park & Pollard Co.,* 190 A.D. 388, 393 (1st Dep't 1920) ("It is a general rule that the plaintiff must be a party or privy to a contract to entitle him to maintain a suit in equity for its cancellation or rescission."). FGIC, however, was not in contractual privity with Putnam, the collateral manager. To the contrary, FGIC alleges that it entered into a contract with non-party Calyon, the Pyxis CDO's arranger/underwriter, whereby it guaranteed a swap between

10

Calyon and FGIC's subsidiary.

Contrary to FGIC's contention, *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.,* 936 N.Y.S.2d 513 (Sup. Ct. N.Y. County 2012), does not excuse FGIC from having to plead loss causation. The court in *MBIA* analyzed claims brought by an insurer against an underwriter of mortgage-backed securities. Although the underwriter had not entered into an insurance contract with MBIA, the court specifically construed the underwriter, which had arranged the securitizations, to have been an applicant for insurance under the New York Insurance Law and, on that limited basis, held that the insurer could pursue claims under the Insurance Law and common law fraud for rescissionary damages. Putnam, in its limited role as collateral manager of the Pyxis CDO, did not apply for any insurance or enter into any contracts with FGIC. In any event, *MBIA* did not hold that a party seeking rescissionary damages does not need to plead and prove loss causation.

Finally, FGIC's suggestion that it has adequately pleaded loss causation because the Pyxis collateral was "far more likely to default than that of a typical CDO" is not supported by well-pleaded allegations. Plaintiff nowhere alleges that there was any pool of collateral that could have conformed to Pyxis's detailed eligibility criteria and that would have avoided an event of default.[3] *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005) ("When the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors . . . a plaintiff's claim fails when it has not adequately pled facts which, if proven, would show its loss was caused by the alleged misstatements as opposed to intervening events.") (internal quotation marks omitted).

---

[3] FGIC's contention that the "housing crisis" may not have been an intervening cause of FGIC's losses because the crisis itself may have been the "result of widespread fraud by market participants" is not supported by any allegations in the Amended Complaint.

## IV. THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR NEGLIGENT MISREPRESENTATION OR NEGLIGENCE

Plaintiff contends that the Second Circuit's recent decision in *Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42 (2d Cir. 2012), establishes the sufficiency of its allegations that Putnam purportedly owed a duty to FGIC. *Bayerische* does not so hold. *Bayerische* recognized that under New York law, the "scope of the 'orbit of duty' to third parties must be carefully examined" and that the plaintiff must "demonstrate a relationship between plaintiff and defendant that is 'so close as to approach that of privity, if not completely one with it.'" *Id.* at 59-60. The plaintiff in *Bayerische* sufficiently alleged such a close relationship where, among other things, the Portfolio Management Agreement supported the conclusion that Bayerische was a third party beneficiary and the parties' alleged course of conduct indicated that the portfolio manager "was aware that its work as Portfolio Manager would be relied on by Bayerische." *Id.* at 60.

Such facts are missing here. Neither the Collateral Management Agreement nor the parties' course of conduct, as alleged by FGIC, demonstrate a relationship approaching privity between FGIC and Putnam. Section 20 of the Collateral Management Agreement specifically identified the narrow set of third party beneficiaries thereunder, and notably did not include FGIC—which acted as a guarantor of a third-party swap between Calyon and a FGIC subsidiary—as a party for whose benefit Putnam would be performing its obligations. (Hora Decl. Ex. 2 at 30). Moreover, the Offering Documents, on which FGIC claims it relied, made clear that FGIC was required to perform its own due diligence and, in stark contrast to the facts in *Bayerische*, was not permitted to rely on any third party including the collateral manager. Thus, the OM stated, in bolded capital letters, that no investor was permitted to rely on any representations other than those set forth in the OM, and that, in making an investment decision,

investors "must rely on their own examination of the co-issuers and the terms of the offering, including the merits and risks involved."[4] (Hora Decl. Ex. 1 at iii). In fact, FGIC alleges that it did its own diligence "analyzing the ramped RMBS-backed portion of the Pyxis Portfolio (91% of the ramped portfolio), reviewing each individual bond for originator, issuer and servicer strength and adequacy of internal credit enhancement in comparison to the credit profile of the underlying loan pools." (Am. Comp.¶ 78). These circumstances are materially different from those alleged in *Bayerische*. Consequently, FGIC has not alleged a basis upon which to impose a fiduciary or similar duty running from Putnam to FGIC.

## CONCLUSION

For the reasons set forth above and for those set forth in its opening brief, Putnam respectfully requests that the Court grant its motion to dismiss the Amended Complaint with prejudice.

Dated:  New York, New York
       March 1, 2013

MILBANK, TWEED, HADLEY & McCLOY LLP
1 Chase Manhattan Plaza
New York, New York  10005
(212) 530-5000

By:  /s/ Sean M. Murphy
    James N. Benedict
    Sean M. Murphy
    Thomas A. Arena
    Robert C. Hora
    William P. Gross
    *Attorneys for Defendant*
    *Putnam Advisory Company, LLC*

---

[4] As explained in Putnam's opening brief, the existence of disclaimer language effectively precludes any claim of a fiduciary or similar duty. (Putnam Mem. at 32-33) *See, e.g., M&T Bank Corp. v. Gemstone CDO VII, Ltd.*, 68 A.D.3d 1747, 1749-50 (4th Dep't 2009) (negligent misrepresentation claim against a CDO collateral manager dismissed where disclaimers were present in deal documents and advised plaintiff to perform its own due diligence); *Landesbank Baden-Wurttemberg v. Goldman Sachs & Co.*, 821 F. Supp. 2d 616, 624 (S.D.N.Y. 2011) (negligent misrepresentation claim dismissed where Offering Circular expressly disclaimed any special relationship). Nothing in the *Bayerische* opinion disturbs the well-settled principle that sophisticated parties conducting arms' length transactions are precluded from asserting a claim of fiduciary or similar duty where such disclaimer language is present.