UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FINANCIAL GUARANTY INSURANCE
COMPANY,

       Plaintiff,

  -against-

THE PUTNAM ADVISORY COMPANY,
LLC,

       Defendant.

No. 12-cv-7372 (RWS)

**ECF CASE**
**Electronically Filed**

---

### MEMORANDUM OF LAW IN SUPPORT OF THE PUTNAM ADVISORY COMPANY, LLC'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

MILBANK, TWEED, HADLEY &
   M<sup>c</sup>CLOY LLP
James N. Benedict
Sean M. Murphy
Thomas A. Arena
Robert C. Hora
1 Chase Manhattan Plaza
New York, New York 10005
(212) 530-5000

*Attorneys for Defendant*
*The Putnam Advisory Company, LLC*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... II

PRELIMINARY STATEMENT .................................................................................. 1

BACKGROUND .......................................................................................................... 4

    A.    The Pyxis ABS CDO 2006-1 ...................................................................... 4

    B.    Putnam's Limited Role as Collateral Manager for the Pyxis CDO ...................... 5

    C.    FGIC ........................................................................................................ 6

ARGUMENT ............................................................................................................... 7

I.    THE SECOND AMENDED COMPLAINT FAILS ADEQUATELY TO PLEAD
LOSS CAUSATION ........................................................................................... 7

II.    FGIC FAILS TO STATE A CLAIM FOR FRAUD .............................................. 10

    A.    FGIC Fails to Plead an Actionable Misrepresentation or Omission ................... 11

        1.    FGIC Fails to Allege Any Misrepresentations Regarding Putnam's
Role ............................................................................................... 11

        2.    FGIC's Claim Based on the Composition of the Pyxis Portfolio
Fails ............................................................................................... 13

        3.    FGIC Fails to Allege a Misrepresentation or Omission as to the
Identity of Any Short Counterparty ................................................... 15

    B.    FGIC Fails to Allege That Putnam Acted With Scienter ................................... 16

        1.    FGIC Fails to Allege a Plausible Motive for Putnam's Participation
in the Alleged Fraud ........................................................................ 16

        2.    FGIC Fails to Allege Circumstantial Evidence of Conscious
Misbehavior or Recklessness ............................................................ 19

III.    FGIC HAS FAILED TO STATE A CLAIM FOR NEGLIGENT
MISREPRESENTATION AND NEGLIGENCE ................................................... 23

CONCLUSION ............................................................................................................ 26

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ACA Fin. Guar. Corp. v. Goldman, Sachs & Co.,*
106 A.D.3d 494 (N.Y. App. Div. 2013) ........................................................................ 14-15

*ATSI Commc'ns, Inc. v. Shaar Funds, Ltd.,*
493 F.3d 87 (2d Cir. 2007)........................................................................................10

*Bayerische Landesbank v. Aladdin Capital Mgmt. LLC,*
692 F.3d 42 (2d Cir. 2012)........................................................................................24

*City of Westland Police and Fire Ret. Sys. v. Metlife, Inc.,*
928 F. Supp. 2d 705 (S.D.N.Y. 2013)........................................................................8

*Cohen v. Stevanovich,*
722 F. Supp. 2d 416 (S.D.N.Y. 2010).......................................................................19

*Dexia SA/NV v. Bear, Stearns & Co., Inc.,*
929 F. Supp. 2d 231 (S.D.N.Y. 2013).........................................................................7

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.,*
165 F. Supp. 2d 615 (S.D.N.Y. 2001).........................................................................7

*Epirus Capital Mgmt., LLC v. Citigroup, Inc.,*
No. 09 Civ 2594, 2010 WL 1779348 (S.D.N.Y. Apr. 29, 2010)............................14

*Fin. Guar. Ins. Co v. Putnam Advisory Co.,*
No. 12 Civ 7372, 2013 WL 5230818 (S.D.N.Y. Sept. 10, 2013) .................................. passim

*Footbridge Ltd. Trust v. Countrywide Home Loans, Inc.,*
No. 09 Civ 4050, 2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010)......................................8, 10

*G-I Holdings, Inc. v. Baron & Budd,*
No. 01 Civ 0216, 2004 WL 1277870 (S.D.N.Y. June 10, 2004)............................19

*Graham Packaging Co., L.P., v. Owens-Ill., Inc.,*
67 A.D.3d 465 (N.Y. App. Div. 2009) .......................................................................16

*HSH Nordbank AG v. UBS AG,*
95 A.D.3d 185 (N.Y. App. Div. 2012) .......................................................................14

*HSH Nordbank, AG v. UBS AG,*
No. 600562/08, 2008 WL 4819599 (N.Y. Sup. Ct. Oct. 21, 2008) .........................25

*In re Merrill Lynch Auction Rate Sec. Litig.,*
851 F. Supp. 2d 512 (S.D.N.Y. 2012)........................................................................15

*In re Wachovia Equity Sec. Litig.,*
    753 F. Supp. 2d 326 (S.D.N.Y. 2011) ................................................................19

*Janby v. Canadian Solar, Inc.,*
    No. 10 Civ. 4430 (RWS), 2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ..............23

*Janus Capital Grp., Inc. v. First Derivative Traders,*
    131 S. Ct. 2296 (2011) ........................................................................................14

*Landesbank Baden-Württemberg v. Goldman, Sachs & Co.,*
    821 F. Supp. 2d 616 (S.D.N.Y. 2011) ................................................................24

*Laub v. Faessel,*
    297 A.D.2d 28 (N.Y. App. Div. 2002) ..................................................................7

*Lentell v. Merrill Lynch & Co.,*
    396 F.3d 161 (2d Cir. 2005) ..............................................................................7-8

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC,*
    No. 12 Civ. 3723, 2013 WL 1294668 (S.D.N.Y. Mar. 28, 2013) ................... passim

*Loreley Fin. (Jersey) No. 7 Ltd. v. Credit Agricole Corp. & Inv. Bank,*
    Index No. 650673/2010 (N.Y. Sup. Ct. June 9, 2011) ..........................................21

*Luminent Mortg. Capital, Inc. v. Merrill Lynch & Co.,*
    652 F. Supp. 2d 576 (E.D. Pa. 2009) ....................................................................8

*M&T Bank Corp. v. Gemstone CDO VII, Ltd.,*
    68 A.D.3d 1747 (N.Y. App. Div. 2009) ........................................................24, 25

*Naughright v. Weiss,*
    857 F. Supp. 2d 462 (S.D.N.Y. 2012) ..................................................................4

*Permasteelisa, S.p.A. v. Lincolnshire Mgmt., Inc.,*
    16 A.D.3d 352 (N.Y. App. Div. 2005) ................................................................16

*Primavera Familienstiftung v. Askin,*
    No. 95 Civ. 8905, 1996 WL 494904 (S.D.N.Y. Aug. 30, 1996) ...........................25

*Solow v. Citigroup, Inc.,*
    507 F. App'x 81 (2d Cir. 2013) ............................................................................8

The Putnam Advisory Company, LLC ("Putnam") respectfully submits this memorandum of law in support of its motion, pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the Second Amended Complaint ("SAC") filed by Financial Guaranty Insurance Company ("FGIC"), with prejudice.

## PRELIMINARY STATEMENT

This is the third attempt by FGIC, a sophisticated financial institution, to plead an actionable claim arising out of FGIC's poorly-timed investment decision, on the eve of the 2007 financial crisis, to guarantee a swap transaction based on the performance of Pyxis ABS CDO 2006-1 Ltd. ("Pyxis"). In dismissing FGIC's fraud claim against Putnam, the collateral manager for Pyxis, the Court rejected FGIC's assertion that it was not required to plead loss causation and held that FGIC had failed to plead that there was "*any* pool of collateral that could have avoided default while still conforming to Pyxis' detailed eligibility criteria."[1] In the Second Amended Complaint, FGIC tacks on a few conclusory allegations in an effort to show that various CDOs in which Magnetar Capital LLC ("Magnetar") took an equity position, of which Pyxis is alleged to have been just one of more than a dozen, experienced events of default slightly earlier than some other CDOs issued during the 2006 calendar year. None of these new allegations suffices to establish loss causation. The Second Amended Complaint fails to cure the principal failing of the prior pleading—namely, it does not allege that any other portfolio of assets capable of meeting Pyxis' detailed eligibility criteria would have avoided default on a materially different timeframe during the unprecedented market events of 2007 and 2008.

Separate and apart from its failure to plead a viable theory of loss causation, FGIC does not plead either that Putnam made any material misrepresentations or omissions to FGIC or

---

[1] *Fin. Guar. Ins. Co v. Putnam Advisory Co.*, No. 12 Civ. 7372, 2013 WL 5230818, at *3 (S.D.N.Y. Sept. 10, 2013) (emphasis in original) ("Opinion"). Citations to the Opinion take the form "Op. at __".

that Putnam acted with scienter—pleading deficiencies that also require the dismissal of FGIC's fraud claim.  The core of the Second Amended Complaint is the sensational allegation that Putnam intentionally selected "toxic assets" for the express purpose of causing a $1.5 billion CDO to fail, all so that a third party, Magnetar, could reap hundreds of millions of dollars on short positions referencing Pyxis' collateral assets.  (SAC ¶¶ 38, 182.)

FGIC, however, fails to allege any facts to support its contention that Putnam did anything to mislead prospective investors.  Putnam was not responsible for the vast majority of information contained in the Offering Memorandum or other materials distributed to investors.  Even if Putnam bore such responsibility, FGIC cannot point to anything in the offering materials that was inaccurate.  The Offering Memorandum described at great length the composition of the securities that would be collateralizing Pyxis (the vast majority of which were subprime and mid-prime residential mortgage-backed securities ("RMBS")), the relatively low credit rating of those securities (many of which were rated "BBB"), and all structural features of the CDO.  In page after page of carefully drafted disclosures, the Offering Memorandum detailed the very risks relating to the assets FGIC claims were misrepresented.  FGIC does not identify any assets selected by Putnam for the Pyxis portfolio that violated any of the detailed Eligibility Criteria set forth in the Offering Memorandum.

Nor does FGIC allege a plausible theory of scienter.  FGIC alleges that Putnam, a large and respected financial institution, knowingly engaged in a billion-dollar fraud to earn purportedly "high" collateral manager fees.  (SAC ¶ 46.)  But FGIC's own allegations establish that Putnam's fee percentages were *well below* the customary rate for a CDO collateral manager.  Further, a significant portion of Putnam's fee was subordinated to the payments owed by Pyxis to noteholders.  The remainder of Putnam's fee was calculated on the basis of a monthly

portfolio asset amount that *excluded* defaulted securities.  In other words, if Pyxis failed in whole or even in part, Putnam would not receive its full fee.  Contrary to FGIC's assertion, this fee structure created the exact opposite of a motive to create a CDO that would fail.

Similarly, the Second Amended Complaint contains no well-pleaded allegations of Putnam's conscious misbehavior.  Like the Amended Complaint, the Second Amended Complaint relies upon a number of press reports and pleadings filed in other lawsuits, but none of these sources establishes that Putnam intentionally selected "toxic assets" designed to cause Pyxis to fail.  The emails referenced in these sources, which have been blindly copied by FGIC, do not show that Magnetar directed the selection of collateral assets or that Putnam allowed Magnetar or any other party to veto any assets Putnam had selected for the CDO.  Nor do these emails evidence that Putnam knew the size of Magnetar's short position or that Putnam had any reason to believe there was anything improper with an equity investor in a CDO seeking to hedge its long exposure with short positions.

Finally, FGIC does not add any new allegations to cure its deficient negligence and negligent misrepresentation claims.  In dismissing these claims, the Court held that FGIC, a sophisticated financial institution, had failed to allege any facts reflecting a special or privity-like relationship between FGIC and Putnam.  Specifically, the Court noted:  (i) that the offering materials on which FGIC alleged it had relied expressly disclaimed that Putnam was assuming any fiduciary obligations to any noteholder or investor; (ii) that FGIC was not a third-party beneficiary under Putnam's collateral management agreement; and (iii) that Putnam was not a party to FGIC's guaranty of a swap transaction referencing the Pyxis CDO.  (Op. at *4 n.3, *5.) FGIC makes no new allegations to overcome these pleading deficiencies.

3

## BACKGROUND

### A.    The Pyxis ABS CDO 2006-1

Pyxis was a "hybrid" CDO, meaning that its $1.5 billion collateral portfolio included both "cash" and "synthetic" assets.  (SAC ¶ 44.)  As fully disclosed in the Offering Memorandum, approximately 23% of the Pyxis portfolio was comprised of "cash" assets—that is, RMBS bonds, CDO notes, and other securities purchased by Pyxis.  (*Id.*)  The remaining roughly 77% (or $1.15 billion par value) of the portfolio was comprised of "synthetic" assets, created through credit default swaps ("CDS") referencing RMBS bonds, CDO notes, and other securities not actually owned by Pyxis.  (*Id.*)

The Offering Memorandum made clear that Putnam was not acting as a fiduciary to any prospective investors.  That document expressly warned the qualified institutional buyers to whom the Pyxis notes were offered that each investor must rely on its "own examination of the Co-Issuers and the terms of the offering, including the merits and risks involved."[2]  (Hora Decl. Ex. 1 at iii.)  Moreover, the Offering Memorandum disclosed that Putnam was not responsible for any information contained therein, except for extremely limited information set forth in a brief four-page section describing the Collateral Manager.  (*Id.* at ii.)

The Offering Memorandum also disclosed that sophisticated financial institutions would be taking enormous positions betting against Pyxis.  The Offering Memorandum reported that Pyxis was the protection seller or "long" counterparty for each of the CDS that comprised the overwhelming majority of the assets in the collateral portfolio; Pyxis received a premium

---

[2] Citations to exhibits to the  Declaration of Robert C. Hora in Support of Putnam's Motion to Dismiss the Second Amended Complaint, dated October 15, 2013 ("Hora Decl.") take the form "Hora Decl. Ex. __".  "When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of and relied on when bringing suit, or matters of which judicial notice may be taken."  *Naughright v. Weiss*, 857 F. Supp. 2d 462, 469 (S.D.N.Y. 2012).

from the "short" counterparties in exchange for the obligation "to make loss payments" to the short counterparties if the referenced collateral assets performed poorly. (*See* SAC ¶ 44.) The Offering Memorandum made clear that the CDO's arranger and underwriter, Calyon, which assumed these short positions in the first instance, would transfer some or all of the risk of these positions through back-to-back hedging arrangements with other market participants selected in its "sole discretion." (Hora Decl. Ex. 1 at 48; *see also* SAC ¶ 45.) Accordingly, FGIC was on notice that institutional investors whose identities it would not know were, in the aggregate, making enormous "short" bets that the Pyxis collateral would perform poorly.

The Offering Memorandum also warned investors that the Pyxis portfolio would be "primarily backed by subprime RMBS" (SAC ¶¶ 6, 51)—loans made to borrowers with weaker credit histories and high debt-to-income ratios. Indeed, the Offering Memorandum disclosed that *a minimum* of 80% of the RMBS in Pyxis, and a *maximum* of 100%, would be collateralized by subprime and mid-prime mortgages. (*See* Hora Decl. Ex. 1 at 31, 124, 139-40; *see also* SAC ¶ 82 ("This deal allows FGIC to take exposure to the *subprime RMBS sector* . . . .") (emphasis added).)

## B. Putnam's Limited Role as Collateral Manager for the Pyxis CDO

Putnam was not a fiduciary to investors in Pyxis. Putnam had a contractual obligation, to the Pyxis CDO, to "supervise and direct the investment and reinvestment of the Collateral" in accordance with the detailed Eligibility Criteria and Collateral Quality Tests prescribed in the CDO Indenture. (Pyxis Collateral Management Agmt., Hora Decl. Ex. 2 at § 2(a); Pyxis Indenture, *id.* Ex. 3 at 237-52.) FGIC does not allege that the collateral Putnam selected did not meet any of these detailed criteria or tests, or that any of the collateral received lower credit ratings than required by the Indenture or other offering documents.

Putnam's fee arrangement gave it every incentive to select performing assets that

5

would not default.  Under the Collateral Management Agreement, Pyxis agreed to pay Putnam a monthly senior collateral management fee in an amount equal to 0.15% *per annum* of the portfolio's Monthly Asset Amount, and a quarterly subordinated incentive collateral management fee in an amount equal to 0.05% *per annum* of the portfolio's Monthly Asset Amount.  (Hora Decl. Ex. 2 at §§ 8(a)-(b).)  Although FGIC calls the senior fee "fixed" (*see* SAC ¶ 46), it was not.  The definition of "Monthly Asset Amount" expressly excluded any collateral assets that had defaulted.  (*See* Hora Decl. Ex. 3 at 40, 43-44.)  Thus, any defaults would decrease the Monthly Asset Amount and the size of both the senior and subordinated fees. In addition, Putnam's right to receive the quarterly subordinated fee was also junior to the Pyxis noteholders' rights to receive interest payments on their securities.  (*See* Hora Decl. Ex. 1 at 70-74.)  As stated in the Offering Memorandum, Putnam would receive its incentive fee only ***after*** all six classes of noteholders (from Class A-1 through Class X) received the amount each such class was entitled to receive per distribution date.  (*Id.* at 74.)

C.    **FGIC**

FGIC was not an investor in Pyxis.  It did not purchase any notes or equity issued by Pyxis, and it did not enter into any CDS that were to be included in the Pyxis portfolio. Instead, according to FGIC, it "insured payment of all obligations owed by FGIC's wholly-owned subsidiary, FGIC Credit Products LLC, under a CDS referencing Pyxis . . . ."  (SAC ¶ 8.) Under the CDS guaranteed by FGIC, "FGIC Credit Products LLC agreed that, if Pyxis defaulted, it would make all the payments owed by Calyon" on a $900 million CDS between Calyon and Pyxis, in which Calyon was the protection seller.  (*Id.*)  According to FGIC, it entered into its guaranty "to take exposure to the subprime RMBS sector. . . ."  (*Id.* ¶ 82.)  FGIC alleges that it performed rigorous "due diligence" prior to issuing its guaranty, including "an analysis of the deal's structure . . . and the assets that would be included in the Pyxis Portfolio."  (*Id.* ¶ 73.)

6

## ARGUMENT

### I.   THE SECOND AMENDED COMPLAINT FAILS ADEQUATELY TO PLEAD LOSS CAUSATION

As the Court correctly recognized in its Opinion, FGIC failed to support the Amended Complaint's speculative assertions that Putnam was responsible for its alleged losses "with facts sufficient to demonstrate that there was *any* pool of collateral that could have avoided default while still conforming to Pyxis' detailed eligibility criteria." (Op. at *3 (emphasis in original)); *see also Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005). The Second Amended Complaint fails to rectify this basic pleading deficiency. While FGIC alleges, without any support, that Putnam would have picked a different portfolio of collateral assets if it had not been under Magnetar's alleged "control" (SAC ¶ 154), FGIC has not alleged any facts showing what this purported portfolio would have consisted of, let alone any facts indicating that such a portfolio would have prevented Pyxis' default or caused it to default later than it did.

To plead loss causation under New York law, FGIC "must plead facts that indicate that the information concealed by the defendant['s] misrepresentations was the reason the transaction turned out to be a losing one." *Dexia SA/NV v. Bear, Stearns & Co., Inc.*, 929 F. Supp. 2d 231, 243 (S.D.N.Y. 2013) (quotations omitted); *see also Laub v. Faessel*, 297 A.D.2d 28, 31 (N.Y. App. Div. 2002) (plaintiff must plead "that the misrepresentations directly caused the loss about which plaintiff complains").[3] As the Second Circuit has recognized:

> "[W]hen the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases," and a plaintiff's claim fails when "it has not adequately

---

[3] As the Court properly recognized, FGIC's argument that it was relieved of pleading loss causation because it seeks only rescissory damages is simply incorrect. (Op. at *4); *see also Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 165 F. Supp. 2d 615, 627 n.2 (S.D.N.Y. 2001) (Sweet, J.).

ple[]d facts which, if proven, would show that its loss was caused
by the alleged misstatements as opposed to intervening events."

*Lentell*, 396 F.3d at 174 (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 27 F. 3d 763, 772 (2d Cir. 1994)).[4] FGIC's Second Amended Complaint adds little to its prior pleading, and it still fails to plead that Magnetar's alleged control of collateral selection for Pyxis, as opposed to the global financial crisis, was the cause of its losses.

In an attempt to buttress its deficient loss causation allegations, FGIC relies on a chart purporting to compare the default rates of unspecified CDOs allegedly sponsored by Magnetar with unidentified, purportedly "comparable" non-Magnetar, mezzanine CDOs of 2006 vintage. (SAC ¶ 156.) FGIC asserts that "Magnetar's CDOs in fact defaulted in greater numbers, and more quickly, than *comparable CDOs*." (*Id.* (emphasis added).) FGIC, however, fails to plead any other facts about these supposedly comparable CDOs. Pyxis had detailed eligibility criteria spanning more than 40 pages of the Offering Memorandum, and specific payment waterfall and other structural elements. (*See* Hora Decl. Ex. 1 at 115-55.) FGIC does not plead that any of these other 2006 CDOs, whether the alleged "Magnetar" CDOs or unspecified "comparable CDOs," had the same asset eligibility criteria, payment waterfall, trigger structure, or other features of Pyxis. FGIC has not alleged any basis to conclude that this chart is anything but an apples-to-oranges comparison. As such, it does not suffice to plead loss causation.

---

[4] *See also Footbridge Ltd. Trust v. Countrywide Home Loans, Inc.*, No. 09 Civ. 4050, 2010 WL 3790810, at *22 (S.D.N.Y. Sept. 28, 2010) (a complaint must "include facts which, if proven, would show that the loss in value of plaintiff's Securities was caused by the alleged misstatements as opposed to the 'broader market declines'"); *Solow v. Citigroup, Inc.*, 507 F. App'x 81, 82 (2d Cir. 2013) (holding that the complaint "fail[ed] to distinguish the effects of the fraud alleged from those caused by the adverse market conditions existing at the time"); *City of Westland Police and Fire Ret. Sys. v. Metlife, Inc.*, 928 F. Supp. 2d 705, 715 (S.D.N.Y. 2013) (same); *Luminent Mortg. Capital, Inc. v. Merrill Lynch & Co.*, 652 F. Supp. 2d 576, 594 (E.D. Pa. 2009) (plaintiff failed to plead loss causation where it "ma[de] no allegations that would allow the Court to apportion any losses between Defendants' misrepresentations and the significant declines in market value for mortgage-backed securities") (internal quotations omitted).

FGIC's conclusory allegation that Putnam replaced $145 million of prime RMBS assets purportedly included in a "target portfolio" with subprime RMBS assets that were supposedly "weaker and more liable to default" also fails to plead loss causation. (SAC ¶ 157.) The Second Amended Complaint contains no well-pleaded allegations that Magnetar "directed" Putnam to replace prime RMBS assets with subprime assets. Moreover, FGIC fails to identify what these prime RMBS assets were, what assets supposedly replaced them, and why the failure to include them caused Pyxis to default. Tellingly, there are no allegations in the Second Amended Complaint that the inclusion of these unspecified prime RMBS assets, which would have comprised less than 10% of the Pyxis collateral, would have prevented the default of either the Pyxis CDO or the third-party swap that FGIC guaranteed. This allegation also does not suffice to plead loss causation.

FGIC also presents a table listing purportedly "Magnetar-selected" collateral amounting to $167 million and asserts that, on average, these assets defaulted after 1.5 years while the remainder of the Pyxis collateral pool defaulted, on average, in 1.85 years. (SAC ¶ 159.) To begin with, FGIC offers no basis for its assertion that Magnetar in fact selected these assets. Moreover, the difference between 1.5 years and 1.85 years is a matter of just months and, if anything, shows that defaults in the collateral that could have been selected within the strict confines of Pyxis' eligibility criteria would have occurred no matter what was picked. Notably, while FGIC attempts to ascribe significance to this difference of just .35 years, it fails to allege how it was damaged by the fact that some collateral assets in Pyxis defaulted a handful of months sooner than others in the same collateral pool.

Of critical importance is that FGIC still *does not allege* that the default of any of these assets allegedly selected by Magnetar would have caused Pyxis *as a whole* to default or

caused the swap underlying FGIC's Guaranty to incur payment obligations.  These assets comprised roughly 10% of the collateral underlying Pyxis.  It is irrelevant whether a particular asset included in the CDO defaulted unless it caused the *CDO itself* to default and impacted FGIC's payment obligations under the Pyxis Guaranty.  FGIC's speculative assertion that "[t]he default of these assets in turn substantially contributed to Pyxis' collapse and to FGIC's losses under the Pyxis Guaranty" is unsupported by any factual allegations and remains insufficient to adequately plead loss causation.  (SAC ¶ 161.)

Grasping at straws, FGIC alleges that because $95.5 million of the purportedly "Magnetar-selected" assets defaulted prior to the collapse of Bear Stearns, the default of such collateral was "necessarily caused primarily by their inherent defects, not by the financial crisis." (*Id.* ¶ 160.)  This only underscores the infirmity of FGIC's loss causation allegations.  FGIC does not (and cannot) allege that the collapse of Bear Stearns in March of 2008 was the cause of, or marked the beginning of, the financial crisis, nor does it explain what alleged "inherent defects" in these assets would have caused them to default, not as a result of market events, but instead as a result of Magnetar's alleged selection.  Despite multiple opportunities, FGIC still fails to plead loss causation.  Its fraud claim should be dismissed.

## II.    FGIC FAILS TO STATE A CLAIM FOR FRAUD

Although the Opinion did not address the sufficiency of FGIC's allegations of misrepresentations and omissions or its allegations of Putnam's purported scienter, those allegations are also deficient and provide a separate and independent basis on which to dismiss the Second Amended Complaint.[5]

---

[5] FGIC's common-law fraud claim is subject to the heightened pleading requirements of Rule 9(b).  *Footbridge Ltd.*, 2010 WL 3790810, at *7, *25 ; *see also ATSI Commc'ns, Inc. v. Shaar Funds, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

**A.    FGIC Fails to Plead an Actionable Misrepresentation or Omission**

**1.    FGIC Fails to Allege Any Misrepresentations Regarding Putnam's Role**

FGIC asserts, in the face of directly contrary disclosures in the Offering Memorandum, that Putnam purportedly told long investors that it would act "diligently and independently" in their interests.  (SAC ¶¶ 65, 82.)  FGIC claims that this supposed representation was false because Magnetar, not Putnam, allegedly controlled the selection of the CDO's collateral.  (*Id.* ¶¶ 1, 18, 183.)  Although the Second Amended Complaint is heavy on conclusory allegations, it contains no well-pleaded facts to support this claim.

FGIC cites a draft agreement between Calyon, Deutsche Bank, and Magnetar, but *not* Putnam, that included a term that would have given Magnetar purported "veto rights" over assets selected for the Pyxis CDO's warehouse.  (*See Id.* ¶ 95; Draft Agreement, Hora Decl. Ex. 5.)  But nowhere does FGIC allege well-pleaded facts showing (i) an agreement including this draft term, which was expressly conditioned on Magnetar maintaining its early commitment to purchase Pyxis' equity, was ever signed; (ii) that Putnam knew about this arrangement[6]; (iii) that this proposed veto right was ever exercised; (iv) that Putnam, Calyon, or any other party ever honored any request by Magnetar to remove or block collateral from the Pyxis warehouse, let alone to substitute "toxic" assets for "good" ones; or (v) that FGIC did not have the ability to inspect the warehoused assets prior to issuing its guaranty.

FGIC also claims that there was a "remarkably high correlation between the issuers whose securities were held or referenced by Pyxis and the issuers whose securities were held or referenced by" other CDOs sponsored by Magnetar, and speculates that Putnam therefore

---

[6]  FGIC speculates that Putnam was aware of the agreement because it required "Calyon or the Investment Adviser" to provide notification of asset purchases to Deutsche Bank and Magnetar.  (SAC ¶ 95.)  But Putnam could not be bound to language in an agreement to which it was not a party, and there are no well-pleaded allegations that Putnam consented to or was informed of such an arrangement.

must have allowed Magnetar to select the portfolio.  (SAC ¶ 121.)  In an effort to cloak this speculation with an air of authority, FGIC relies on an alleged "statistical analysis," which it does not attach to the Second Amended Complaint, performed by an unidentified consultant concluding that the alleged correlation across various Magnetar-sponsored CDOs "*may* indicate that the portfolio selection by independent portfolio managers was influenced by an external factor." (*Id.* ¶ 122 (emphasis added).)  But there are no well-pleaded factual allegations that Putnam had any involvement in these other Magnetar CDOs, knew the contents of their portfolios, or did not perform a rigorous, independent analysis of any of the common collateral.[7] This unidentified consultant's untested opinions do not and cannot supply any particularized factual allegations about Putnam itself or the collateral selection process for Pyxis.

Judge Sullivan's recent decision in *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*, No. 12 Civ. 3723, 2013 WL 1294668 (S.D.N.Y. Mar. 28, 2013) ("*Wells Fargo*"), considered and rejected almost identical allegations in determining that the plaintiff failed to plead a fraud claim against collateral managers in so-called Magnetar CDOs.  As in the Second Amended Complaint, the *Wells Fargo* plaintiffs alleged (i) that Magnetar held an undisclosed short position in the CDOs at issue, (ii) that the collateral managers "knowingly abdicated" their responsibility to select collateral assets to Magnetar, and (iii) "to curry favor" with Magnetar, the collateral managers "selected assets that would cause [the CDO] to fail." *Id.* at *9, *11, *14.  In holding that the *Wells Fargo* complaint "fail[ed] to plead facts that raise a plausible inference of a material misrepresentation or omission, much less a strong inference of scienter, under the Rule 9(b) standard," *id.* at *9, Judge Sullivan rejected the plaintiffs'

---

[7] FGIC's assertion that Putnam "included offset trades on ABX index components of a type unique to" (SAC at 52) other CDOs in which Magnetar invested fails for the same reasons—there is no well-pleaded allegation:  (i) that Putnam knew the composition of these other CDOs, (ii) that these alleged "offset" trades violated any of the Eligibility Criteria, or (iii) that Putnam failed to perform an independent analysis of these trades.

contention that email exchanges in which Magnetar was kept apprised of the collateral selection process provided an adequate basis for the fraud claims in that case. *See id.* at *4-5, *11-12, *14. Importantly, Judge Sullivan rejected the plaintiffs' argument that there was anything "improper about Magnetar's hedging its exposure to the equity tranche," or with Magnetar "wish[ing] to be kept apprised of which assets were going into the CDO," or with Magnetar "sourcing" the short positions of the CDOs selected for the collateral pool. *Id.* at *10. The court held that "with or without a hedging strategy . . . Magnetar would not be acting inappropriately by seeking a user-friendly collateral manager." *Id.* at *12.

### 2. FGIC's Claim Based on the Composition of the Pyxis Portfolio Fails

FGIC's allegation that the amount of "prime" RMBS assets in the final Pyxis portfolio selected by Putnam differed from the amount of "prime" RMBS assets set forth in various "target" portfolios that FGIC purportedly received likewise fails to plead any actionable misrepresentation or omission. (*See* SAC ¶¶ 72, 79, 157.)

Fatal to FGIC's claim is the absence of any allegation that a *single* asset in the $1.5 billion portfolio failed to comply with the CDO's detailed Eligibility Criteria. (*See* Hora Decl. Ex. 1 at 115-55.) The Offering Memorandum contained more than 50 pages of disclosures concerning the composition of the collateral assets and the Eligibility Criteria governing the selection of those assets. (*Id.* at 112-68.) Among other things, the Offering Memorandum disclosed that not less than 80% of the Pyxis portfolio's assets would consist of subprime and mid-prime RMBS assets. (*Id.* at 124, 139-40.) There was no corresponding minimum concentration of prime RMBS assets—in other words, the Offering Memorandum disclosed and FGIC was on notice that the Pyxis portfolio could contain *no* prime RMBS assets.

Likewise, the "Pitchbook" upon which FGIC claims it relied for its purported

13

understanding that the portfolio would contain a minimum amount of prime RMBS expressly stated that its pie chart setting forth a proposed "asset type distribution" was "indicative," and that "[a]ll information contained herein is preliminary and subject to change without further notice." (Hora Decl. Ex. 4 at 14.)  Nothing in the Pitchbook purported to "set forth the ramped portfolio that had been purchased for the CDO to date" (SAC ¶ 72), as FGIC now claims, and no investor or other market participant reading the disclosures in the offering documents could have been misled into believing that the portfolio would consist of any minimum amount of "prime RMBS" assets.[8]  *See Epirus Capital Mgmt., LLC v. Citigroup, Inc.*, No. 09 Civ. 2594, 2010 WL 1779348, at *5-6 (S.D.N.Y. Apr. 29, 2010) (CDO investors failed to state securities fraud claim where the offering materials explicitly disclosed the nature of the collateral being selected).

Moreover, though FGIC complains that the final Pyxis portfolio differed from the various "target" portfolios it received, conspicuously absent is any allegation that FGIC made any effort to obtain either the portfolio as it existed at closing on October 3, 2006, or the final, fully-ramped portfolio, which it easily could have compared with the "target" portfolio it alleges it received on August 9, 2006.  (*See* SAC ¶ 79.)  As a sophisticated party, FGIC had "a duty to exercise ordinary diligence and conduct an independent appraisal of the risk," *HSH Nordbank AG v. UBS AG*, 95 A.D.3d 185, 195 (N.Y. App. Div. 2012) (internal quotations omitted), and it plainly had the ability to do so.  (*See* SAC ¶ 73 (FGIC "performed due diligence . . . focusing on an analysis of . . . the assets that would be included in the Pyxis portfolio")); *see also ACA Fin.*

---

[8] FGIC's assertion that an "initial launch email" stating that "the collateral manager [Putnam] is able to cherry-pick the collateral for this portfolio . . . with the ability to focus on seasoned product" was false because 60% of the Pyxis portfolio supposedly was not seasoned also states no claim against Putnam.  (SAC ¶ 67; *see also* Hora Decl. Ex. 6.) There is no allegation that the CDO's terms required any specific amount of seasoned product.  Nor is there any well-pleaded allegation of what type of collateral security constituted "seasoned product," which was not a defined term in the Offering Memorandum or a component of any of the Eligibility Criteria governing the selection of collateral assets.  In any event, *Calyon*, not Putnam, made this statement.  Putnam cannot be held liable for it.  *See Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2303 (2011) ("[W]e will not expand liability beyond the person or entity that ultimately has authority over a false statement.").

14

*Guar. Corp. v. Goldman, Sachs & Co.*, 106 A.D.3d 494, 497 (N.Y. App. Div. 2013); *In re Merrill Lynch Auction Rate Sec. Litig.*, 851 F. Supp. 2d 512, 536-37 (S.D.N.Y. 2012).

Finally, there is no well-pleaded factual allegation to support the contention that Putnam "concealed the extent to which Pyxis sold protection on the ABX Index of low-rated RMBS." (SAC ¶ 123.) The Eligibility Criteria disclosed in the Offering Memorandum specified concentration limits on the ABX Index and the indices contained therein, not on the constituent RMBS. (*See* Hora Decl. Ex. 1 at 118 (providing that aggregate amount of CDS referencing any of series of indices included in the ABX Index could not exceed 5% of the Pyxis portfolio, and that aggregate amount of CDS referencing any one such series could not exceed 2% of Pyxis portfolio).) FGIC's attempt to create new collateral selection criteria not set forth in the Offering Memorandum should be rejected.

### 3. FGIC Fails to Allege a Misrepresentation or Omission as to the Identity of Any Short Counterparty

FGIC has no cause to complain that it was unaware that a Pyxis equity investor, Magnetar, allegedly took certain short positions on the CDO's assets. (*See* SAC ¶ 45.) FGIC makes no well-pleaded allegation that Putnam believed Magnetar was engaged in anything other than ordinary hedging, or that Putnam knew the overall size of Magnetar's hedges. And the Offering Memorandum expressly disclosed to Pyxis' sophisticated investors that 77% of the Pyxis portfolio (or $1.15 billion of the total $1.5 billion par value portfolio) would be comprised of CDS in which the Pyxis CDO would act as the long counterparty. (Hora Decl. Ex. 1 at 18, 34, 169.) By definition, a sizable commercial entity had to assume the "short" side of these CDS trades, and it would have been readily apparent to FGIC, a sophisticated monoline insurer, that

15

these short counterparties would have economic interests diametrically opposed to its own. (*See* SAC ¶¶ 44-45.)[9]

**B.    FGIC Fails to Allege That Putnam Acted With Scienter**

**1.    The Second Amended Complaint Fails to Allege a Plausible Motive for Putnam's Participation in the Alleged Fraud**

According to FGIC, Putnam engaged in a billion-dollar fraud, risked its reputation and business, abdicated its duties as collateral manager, and intentionally assisted in the creation of a CDO designed to fail, all to put hundreds of millions of dollars in the pocket of Magnetar, and to earn for itself collateral management fees that, paradoxically, were dependent on Pyxis performing well and meeting its payment obligations.  In *Wells Fargo*, the court rejected a theory of scienter asserted against a CDO collateral manager identical to the one FGIC alleges here:

> [E]ven if scienter could be based on a party's desire to accrue fees and cultivate business, Plaintiffs do not explain how Defendants would help their bottom line by facilitating a massive scheme to scuttle their own financial instruments.  Failures such as those would presumably lead to fewer future opportunities for [the sponsor or collateral manager] to earn fees.

*Wells Fargo*, 2013 WL 1294668, at *14.

FGIC attempts to gloss over the fact that a significant portion of Putnam's collateral management fee was junior to the interest payments to be made to Pyxis noteholders. (*See* Hora Decl. Ex. 1 at 70-74.)  In other words, Putnam would receive the subordinated fee (0.05% of the Monthly Asset Amount) *only if* Pyxis performed well enough to first pay all six

---

[9] The Pyxis Offering Memorandum also clearly disclosed that the CDO's arranger, Calyon, which assumed these short positions in the first instance, expected to enter into a series of "back-to-back hedging transactions" transferring some or all of the risk of these positions to other market participants selected by Calyon in its "sole discretion."  (Hora Decl. Ex. 1 at 48; *see also* SAC ¶ 45.)  This fundamental aspect of the Pyxis transaction was also depicted in a large diagram in the Investor Presentation on which FGIC claims it relied.  (*See* Hora Decl. Ex. 4 at 10 (illustrating CDS between short counterparties and Calyon, with Calyon acting as intermediary facing Issuer); SAC ¶ 68 (referencing Investor Presentation).)  The Pyxis offering documents thus made abundantly clear that participants would have no information as to the identities of the ultimate short counterparties on the CDS in the Pyxis portfolio. (Hora Decl. Ex. 1 at 48; SAC ¶ 45.)  FGIC cannot plead fraud where it knew that it lacked information and proceeded anyway. *Permasteelisa, S.p.A. v. Lincolnshire Mgmt., Inc.*, 16 A.D.3d 352, 352 (N.Y. App. Div. 2005); *Graham Packaging Co., L.P., v. Owens-Ill., Inc.*, 67 A.D.3d 465, 465 (N.Y. App. Div. 2009).

classes of noteholders the maximum amount they were entitled to receive on each applicable

distribution date.  Further, under the terms of the Collateral Management Agreement, *both*

Putnam's senior and subordinated fees depended on a calculation that specifically excluded

defaulted collateral.  (*See* Hora Decl. Ex. 3 at 40, 43-44.)   Putnam simply had no incentive to

design a CDO that would fail:  any defaults would (and did) directly reduce the size of its fees.

       In an effort to evade the implications of this fee structure, FGIC alleges that

Putnam continued to be paid its subordinated fee until Pyxis defaulted in December 2008 (SAC

¶¶ 48-49), is "*still* receiving part of its fixed fee from Pyxis" (*id.* ¶ 49), and to date "has been

paid $5,707,429" in its role as collateral manager (*id.* ¶ 50).  None of this, however, helps FGIC.

That Putnam allegedly received its subordinated incentive fee until December 2008 cannot

establish a motive on Putnam's part to abdicate its collateral selection responsibilities or design a

toxic CDO:  if Pyxis had *not* defaulted, Putnam would have continued to receive $750,000 per

year in incentive payments, or roughly $3,750,000 more over the last five years.  Similarly, the

fact that Putnam has received a small amount in senior fees (roughly $320,000 as alleged) since

Pyxis defaulted does not raise a plausible motive to defraud:  if Pyxis had not defaulted,

Putnam's senior fees would have amounted to $2.25 million per year, or approximately *thirty-*

*five* times as much over the last five years.[10]  In fact, had Pyxis not defaulted, Putnam would

have received more $20 million since 2006, far more than the $5.7 million FGIC alleges.

       FGIC next attacks Putnam's subordinated fee by arguing, erroneously, that this

fee was "not dependent on Pyxis performing well, but rather on Magnetar receiving its targeted

return," which FGIC claims was "effectively guaranteed" by provisions in the Pyxis Indenture

giving the equity and Class X noteholders larger payments of principal and interest than senior

---

[10]  Under the terms of the Collateral Management Agreement, Putnam was entitled to be paid only for its
management of *performing, non-defaulted* collateral assets.  (*See* Hora Decl. Ex. 2 § 8(a).)

noteholders in the first five years of the CDO's existence so long as Pyxis avoided default.  (SAC ¶ 47.)  But, contrary to FGIC's argument, the governing transaction documents establish that the subordinated fee *was absolutely* dependent on Pyxis performing well.  Under the Pyxis Indenture, Putnam's incentive fee was expressly dependent on (i) Pyxis not defaulting, and (ii) *all* CDO investors, including the senior noteholders, *first* receiving the amounts they were entitled to on each quarterly distribution date.  (Hora Decl. Ex. 3 at 224.)

FGIC's assertion that Putnam's subordinated fee was "virtually assured" by Magnetar's alleged "control" over the Pyxis portfolio (SAC ¶¶ 47, 112) is empty rhetoric. Plaintiff quotes out of context a November 2006 email between Deutsche Bank and Calyon that includes no Putnam personnel, discusses an unrelated collateral manager (NIBC), concerns a different CDO (Orion 2) in which Putnam is not alleged to have participated, mentions nothing about subordinated fees, and addresses the irrelevant issue of whether Orion 2's long (not short) investors should be entitled to terminate the collateral manager.  (*See* Hora Decl. Ex. 7.)  Nothing in this email remotely supports FGIC's contention that Putnam's subordinated fee would be "virtually assured."  In fact, FGIC's assertion is at odds with its theory of its case:  FGIC alleges that Magnetar exercised its alleged "control" for the singular goal of causing Pyxis to default.  If that were the case, Magnetar's "control" would not have "assured" the payment of Putnam's management fees; its control would have "assured" their termination.  (*See* SAC ¶ 47.)

FGIC's allegation that Putnam's senior collateral management fees were purportedly higher than customary because of Pyxis' $1.5 billion size (*see id.* ¶ 46) likewise fails adequately to allege motive.  A larger CDO necessarily involves more assets to select and manage, and the emails cited in the Second Amended Complaint show that Putnam's 0.15% senior and 0.05% subordinated fee rates were in fact much less than the 0.40% rate on smaller,

so-called "regular style" $400 million CDOs. (*Id.* ¶ 110.)  The desire to earn ordinary fees is not a permissible basis for inferring scienter or motive to defraud.  *See, e.g., Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 429 (S.D.N.Y. 2010) (Sweet, J.).  This principle applies with even greater force to less than ordinary fees.[11]

FGIC's allegation that Magnetar "promis[ed]" Putnam "additional, similarly lucrative deal volume," which was purportedly "realized when Putnam was selected to serve as collateral manager for a second Pyxis CDO" (SAC ¶¶ 51, 112), also fails to allege motive.  No well-pleaded facts tie Putnam's selection as collateral manager for Pyxis ABS CDO 2007-1 Ltd. to any fraudulent conduct with respect to Pyxis, and the Second Amended Complaint does not and cannot supply any particularized facts, as required by Rule 9(b), regarding who made the alleged "promise," when it was made, to whom it was made, or what was said.[12]

## 2.      FGIC Fails to Allege Circumstantial Evidence of Conscious Misbehavior or Recklessness

Having failed to allege any plausible motive for Putnam's participation in the alleged fraud, FGIC's allegations of conscious misbehavior or recklessness must be correspondingly greater.  *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 351 (S.D.N.Y. 2011).  None of the sources cited in the Second Amended Complaint, however, contain any facts suggesting that Putnam knowingly or recklessly made any material misstatements or omissions.

---

[11]  FGIC alleges, solely on information and belief, that Putnam's senior fee on the Pyxis CDO was higher (by apparently a mere five basis points) than the senior fee paid to the collateral manager in all but three Magnetar-sponsored CDOs and higher than the total fee on all but six Magnetar-sponsored CDOs. (SAC ¶ 46.)  But FGIC fails to identify the sources upon which these information and belief allegations are based, as required by Rule 9(b). *See G-I Holdings, Inc. v. Baron & Budd*, No. 01 Civ. 0216, 2004 WL 1277870, at *2 (S.D.N.Y. June 10, 2004) (Sweet, J.).  These allegations, moreover, say nothing about whether the fixed percentage fee was high for so-called "typical," non-Magnetar CDOs.  The correspondence cited by FGIC, discussed above, shows that it was not.

[12]  FGIC's conclusory allegation that Putnam would not have been selected as collateral manager in the first place unless it agreed to allow Magnetar to construct a toxic portfolio does not plead scienter. (*See* SAC ¶¶ 6-7, 10.)  This is just another way of asserting that Putnam agreed to commit a fraud in exchange for ordinary fees, which courts have long held does not constitute a motive to defraud. *See, e.g., Cohen*, 722 F. Supp. 2d at 429.

FGIC repeatedly cites to allegations purportedly referencing emails between

Putnam and Magnetar that have been set forth in an administrative complaint filed by the

Massachusetts Securities Division (the "MSD").  But many of the emails cited by the MSD show

that Magnetar reviewed collateral *only after* it had been selected and purchased by Putnam.

(*See, e.g.*, MSD Administrative Complaint, Hora Decl. Ex. 8 ¶¶ 98 & 102; *id.* Exs. 9 & 10; SAC

¶¶ 96-97.)  Numerous other emails referenced in the MSD administrative complaint reflect only

that Magnetar expressed an interest in buying protection on virtually *any* CDS asset Putnam

selected.  (*See, e.g.*, Hora Decl. Ex. 8 ¶ 103 (Magnetar stating it would buy protection on "any

deal late 05 up to now, don't have to stick to new deals"); SAC ¶ 98 & Hora Decl. Ex. 11; *see*

*also* Hora Decl. Ex. 8 ¶ 105 ("*[a]ny* recent mezz[anine] [asset backed securities] deal is fine.")

(emphasis added), SAC ¶ 100 & Hora Decl. Ex. 12.)

Moreover, the emails referenced in the MSD administrative complaint also

reinforce that Putnam was free to accept or reject the assets being discussed, as it deemed

appropriate in its independent judgment.  (*See, e.g.*, Hora Decl. Ex. 8 ¶ 105 (Magnetar stating it

would buy CDS "*on names of [Putnam's] choosing*") (emphasis added), SAC ¶ 100 & Hora

Decl. Ex. 12; Hora Decl. Ex. 8 ¶¶ 139-141 (Magnetar had pre-warehoused certain assets for

Pyxis ABS CDO 2007-1 "*which [Putnam] can take if [it] like[s] them.*") (emphasis added) &

Ex. 13.)  This is exactly what Putnam did.

The administrative complaint also cites emails in which Magnetar complained

about collateral assets purchased by Putnam.  (Hora Decl. Ex. 8 ¶¶ 185-86.)  These emails hardly

demonstrate Magnetar's control over the asset selection process; they evidence Putnam's

independence.  (Hora Decl. Ex. 8 ¶ 185 & Ex. 14 (Magnetar stating it was not pleased with

Putnam over its asset selection); Hora Decl. Ex. 8 ¶ 105, SAC ¶ 101 & Ex. 12 (Magnetar

expressing frustration that Putnam was "buying CDO's without [Magnetar] knowing about it").)

As made clear by the emails cited by the MSD, Putnam repeatedly advised

Magnetar that Putnam intended to select the collateral assets with the best fundamental value.

For instance, in an email with Magnetar dated July 7, 2006, early in the collateral selection

process for Pyxis, Putnam emphasized that it would only select collateral assets that it thought

would perform well, stating: "*We are going to pick the deals that have the best fundamental

value*. We, of course, would pick different deals as the best short candidates (in terms of being a

hedge against sub-prime issues)." (Hora Decl. Ex. 11 (emphasis added).)[13]

The other emails referenced in the Second Amended Complaint were obtained

from a complaint filed against Putnam in *Loreley Financing (Jersey) No. 7 Ltd. v. Credit

Agricole Corporate & Investment Bank*, a case in which the court dismissed a fraud claim against

Putnam brought by a different investor in the Pyxis CDO. *Loreley*, Index No. 650673/2010

(N.Y. Sup. Ct. June 9, 2011). (Hora Decl. Ex. 15.) Those emails, all of which were before the

*Loreley* court at the time it granted Putnam's motion to dismiss (*see* Plotnick Aff. at 3-6, Hora

Decl. Ex. 16; Reply, Hora Decl. Ex. 17), are as benign as the emails cited in the MSD complaint.

> 1. The August 2006 email exchange cited in paragraph 100 of the Second Amended
> Complaint actually *disproves* Plaintiff's thesis that Putnam "allow[ed] Magnetar to
> exercise . . . secret control over the Pyxis portfolio." (SAC ¶ 95.) Putnam reported that
> the "collateral pool" it was buying "score[d] well on [Putnam's] risk scoring model,"
> and that only after it finished a "benchmarking" analysis which involved doing
> "preliminary work across a range of deals" would Putnam pursue additional trades.

---

[13] The MSD quotes substantial portions of this email but misleadingly uses ellipses to give a nefarious gloss to this exchange. (Hora Decl. Ex. 8 ¶ 103.) Thus, in its administrative complaint, the MSD quoted the sentences before and after Putnam's statement that "*We are going to pick the deals that have the best fundamental value*" (emphasis added), but failed to include the sentence in which Putnam announced its intent to select collateral with the "*best fundamental value*"—a sentence that goes directly to the key issue in this case. Similarly, the MSD quoted Magnetar's statement that its short trades were a "natural delta hedge," but then used ellipses to exclude the rest of the sentence: "even if they are the best names." (Hora Decl. Ex. 8 ¶ 32 & Ex. 13.) FGIC continues to cite the same email out of context in the Second Amended Complaint, even though Putnam pointed out the egregious misquoting of this email in its motion to dismiss the Amended Complaint. (*See* SAC ¶ 98.)

(Hora Decl. Ex. 12 at 2-3.)  In response, Mr. Prusko of Magnetar replied that Magnetar "[would] buy CDO CDS *on names of [Putnam's] choosing* at mid-market, or bid list +3bp, whatever you prefer." (*Id.* at 2 (emphasis added).)  Later emails in the chain are even more damaging to FGIC's claim, as Mr. Prusko told Alexander Rekeda of Calyon that he "[didn't] like that [Putnam] [was] buying CDO's without us knowing about it"—showing that Putnam, not Magnetar, was selecting the collateral. (*See id.* at 1; SAC ¶ 101.)

2.    The May 2006 email string among Deutsche Bank, Calyon, and Magnetar, *but not Putnam*, cited in paragraph 93 of the Second Amended Complaint also does not aid Plaintiff's allegations. (SAC ¶ 93; *see* Hora Decl. Ex. 18.)  These emails do not copy Putnam, and were sent before Putnam entered into its engagement letter to serve as collateral manager and before Calyon agreed to provide warehouse financing for Pyxis. These emails say nothing to indicate that, if selected as collateral manager, Putnam would abdicate its role to Magnetar.

3.    FGIC cites two June 2006 email strings as purported evidence of a "'behind the scenes' arrangement" whereby "[Calyon] or Putnam" purportedly granted Magnetar veto rights over assets proposed for the Pyxis warehouse. (SAC ¶ 95.)  FGIC omits to mention, however, that when Calyon asked Magnetar in the same emails whether it was suggesting that the document be structured "behind the scenes," Magnetar responded, "No, not at all." (*See* Hora Decl. Ex. 19.)  In any event, the emails cited by FGIC copy *no Putnam employees*, and there are no well-pleaded facts that the letter was ever executed; that Putnam knew about the arrangement; that Magnetar ever exercised the purported veto; or that Putnam ever honored any request to remove any collateral it had selected.

4.    The September 2006 exchange between Putnam and Calyon cited by FGIC (*see* SAC ¶ 56; Hora Decl. Ex. 20) indicates the unremarkable fact that Putnam became aware at that time of a small short position taken by Magnetar in Pyxis collateral.  As discussed above, the Offering Memorandum disclosed that investors would be taking short positions in Pyxis through back-to-back hedging arrangements with Calyon.  There is no allegation that Putnam arranged for this short position, nor are any facts pleaded to support FGIC's conclusory assertion that Putnam "was aware" that the credit protection Magnetar had purchased "far exceeded Magnetar's long position." (*Id.*)

5.    The November 2006 exchange between Calyon and Magnetar cited by FGIC (*See* SAC ¶ 56; Hora Decl. Ex. 21), in which Calyon asks Mr. Prusko if he wanted to purchase protection on Pyxis, again *does not include any Putnam personnel*.

6.    The November 4, 2006 email, after the Pyxis CDO closed, reflects a discussion among Calyon, Deutsche Bank, and Magnetar (*but not Putnam*) of an entirely separate CDO and collateral manager.  This email addresses the benign issue of whether the collateral manager in an unrelated deal should give equity holders, whose long investment is subject to the collateral manager's performance, a right to terminate the collateral manager. (*See* SAC ¶ 130; Hora Decl. Ex.7.)

Considered separately or in combination, these emails do not suffice to establish any abdication of Putnam's responsibilities as collateral manager.[14]

## III.   FGIC HAS FAILED TO STATE A CLAIM FOR NEGLIGENT MISREPRESENTATION AND NEGLIGENCE

FGIC's sparse additions to the Amended Complaint do not cure the pleading defects that were fatal to its negligence and negligent misrepresentation claims.  In granting Putnam's prior Motion to Dismiss, this Court held that to prevail on such claims, FGIC must allege facts showing that the relationship between FGIC and Putnam was "sufficiently close so as to 'approach that of privity.'"  (Op. at *4.)  Because the parties were "sophisticated commercial entities acting in an arm's length context," this Court held that FGIC had to allege facts other than Putnam's purported superior knowledge relating to Pyxis.  (*Id.* (citing *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.,* 87 A.D.3d 287, 297 (N.Y. App. Div. 2011)).)

FGIC fails to add any new particularized allegations to revive its defective claims. FGIC references (but does not describe) a meeting at Putnam's offices and "phone interviews" it allegedly conducted with Putnam, but alleges nothing about what was said during this meeting or at these interviews.  FGIC alleges, at the highest level of generality possible, that unnamed persons from Putnam represented that "Putnam would exercise its professional expertise" in managing the Pyxis CDO—representations that FGIC claims it relied upon in making its investment decision and that give rise to a fiduciary duty running from Putnam to FGIC.

The problem for FGIC is that the documents upon which FGIC concedes it relied (*see* SAC ¶¶ 68-71) expressly disclaim any creation of a special duty.  As this Court recognized,

---

[14] FGIC also attempts to buttress its fraud claims by referencing a consent order entered into by Deutsche Bank concerning different CDOs and other proceedings involving different CDOs. (*See* SAC ¶¶ 129-145.)  Putnam is not alleged to have had any involvement in these transactions, and they are insufficient to plead fraud with respect to Putnam.  *See Janby v. Canadian Solar, Inc.*, No. 10 Civ. 4430 (RWS), 2012 WL 1080306, at *5 (S.D.N.Y. Mar. 30, 2012) ("Allegations contained in the complaint of an unrelated matter . . . cannot establish the particularized facts necessary to support this securities fraud claim").

the offering documents expressly disclaimed that Putnam was acting as a fiduciary or a financial or investment adviser for any investor.  (*See* Hora Decl. Ex. 4 at 2 ("None of . . . the Putnam Advisory Company, LLC . . ., or any of their respective affiliates are acting as financial adviser nor in [a] fiduciary capacity . . . to any investor. . . ."); *id.* Ex. 1 at iii ("[I]nvestors must rely on their own examination of the co-issuers and the terms of the offering, including the merits and risks involved").)  This precludes as a matter of law any claim of a fiduciary or similar duty. *See, e.g.*, *M&T Bank Corp. v. Gemstone CDO VII, Ltd.*, 68 A.D.3d 1747, 1749 (N.Y. App. Div. 2009) (dismissing negligent misrepresentation claim against CDO collateral manager where "'Preliminary Offering Circular' and 'Debt Investor Presentation' . . . contained numerous disclaimers and advised plaintiff to perform its own due diligence"); *Landesbank Baden-Württemberg v. Goldman, Sachs & Co.*, 821 F. Supp. 2d 616, 624 (S.D.N.Y. 2011) (dismissing negligent misrepresentation claim where "the [Offering] Circular expressly disclaimed any special relationship").  FGIC has alleged no new facts to overcome these express disclaimers.

FGIC's attempt to shoehorn this case into the fact pattern present in *Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42 (2d Cir. 2012), is also unavailing.  Even assuming FGIC could make well-pleaded allegations that Putnam made direct representations to FGIC intended to induce its reliance, such allegations could not override the Offering Memorandum's express disclaimers that all prospective investors were required to perform their own due diligence, that no investor was permitted to rely on any representations other than those set forth in the Offering Memorandum, and that, in making an investment decision, investors "must rely on their own examination of the co-issuers and the terms of the offering, including the merits and risks involved."  (Hora Decl. Ex. 1 at iii.)  Nor, in stark contrast to *Bayerische*, can FGIC establish that it was a third-party beneficiary under the Collateral Management Agreement.

24

Section 20 of the Collateral Management Agreement, which specifically identifies the third party

beneficiaries thereunder, does not name FGIC.  (Hora Decl. Ex. 2 at § 20.)

   Nor is there any allegation in the Second Amended Complaint that Putnam and

FGIC had a pre-existing relationship of trust and confidence.  As this Court has recognized,

"[u]nder New York law, it is well established that [a] defendant is not liable [for] breach of

fiduciary duty or for negligent misrepresentation unless a prior relationship existed between the

defendant and plaintiff."  *Primavera Familienstiftung v. Askin*, No. 95 Civ. 8905, 1996 WL

494904, at *18 (S.D.N.Y. Aug. 30, 1996) (Sweet, J.) (internal quotations and citations omitted);

*see also M&T Bank Corp.*, 68 A.D.3d at 1749 (finding that "there is no . . . special relationship in

this case, particularly in light of the fact[] that the parties had no relationship prior to this arm's

length transaction . . ."); *HSH Nordbank, AG v. UBS AG*, No. 600562/08, 2008 WL 4819599

(N.Y. Sup. Ct. Oct. 21, 2008) (same).

   The allegations of Putnam's purported duty to FGIC are as infirm as the claims

asserted against the CDO collateral managers in *Wells Fargo*, where Judge Sullivan rejected any

suggestion that the collateral managers had a duty to disclose information about Magnetar's

trading strategy to debt investors.  *See Wells Fargo*, at *10-12.  Judge Sullivan pointed out, as is

the case here, that all pertinent features of the CDOs at issue, including the terms of any payout

feature benefiting the equity holders, were fully disclosed in offering circulars that had been

made available to the debt investors.  *Id.* at *11, *13.  Moreover, just as FGIC has failed to do

here, the *Wells Fargo* plaintiffs failed to identify any provision in the offering circulars that

prohibited the collateral managers from communicating with Magnetar or any other investor.  *Id.*

   In view of the foregoing, FGIC's claims for negligence and negligent

misrepresentation should be dismissed with prejudice.

25

## CONCLUSION

For the reasons set forth above, Putnam respectfully requests that the Court grant

its motion to dismiss the Second Amended Complaint with prejudice.

Dated:  New York, New York  
       October 15, 2013

MILBANK, TWEED, HADLEY & McCLOY LLP  
1 Chase Manhattan Plaza  
New York, New York  10005  
(212) 530-5000

By:   /s/ Robert C. Hora  
    James N. Benedict  
    Sean M. Murphy  
    Thomas A. Arena  
    Robert C. Hora

*Attorneys for Defendant*  
*The Putnam Advisory Company, LLC*