UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FINANCIAL GUARANTY INSURANCE
COMPANY,

                           Plaintiff,

-against-

THE PUTNAM ADVISORY COMPANY,
LLC,

                           Defendant.

---

12 Civ. 7372 (RWS)

**PLAINTIFF'S MEMORANDUM OF
LAW IN OPPOSITION TO
DEFENDANT'S MOTION TO
DISMISS THE SECOND AMENDED
COMPLAINT**

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

Peter E. Calamari
(petercalamari@quinnemanuel.com)
A. William Urquhart
(billurquhart@quinnemanuel.com)
Sean Baldwin
(seanbaldwin@quinnemanuel.com)
Paul P. Hughes
(paulhughes@quinnemanuel.com)

51 Madison Avenue, 22nd Floor
New York, New York 10010
Tel:  212-849-7000
Facsimile:  212-849-7100

*Attorneys for Plaintiff Financial Guaranty
Insurance Company*

October 29, 2013

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...........................................................................................1

FACTUAL BACKGROUND ..............................................................................................4

    A.     The Pyxis Guaranty and Pyxis CDO ....................................................4

    B.     Putnam Induced FGIC to Issue the Pyxis Guaranty by Representing that It—and It Alone—Would Select the Pyxis Collateral. ............................5

    C.     Contrary to Its Representations, Putnam Abdicated Control Over Pyxis Collateral Selection to Magnetar, and Concealed Magnetar's Role. .....................6

    D.     Putnam Profited from Its Fraud, and FGIC Lost Millions....................10

ARGUMENT ...................................................................................................................11

I.     THE SECOND AMENDED COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION .....................................................................................11

    A.     FGIC Is Not Required to Allege Loss Causation..................................11

    B.     The SAC Adequately Pleads Loss Causation .......................................13

II.    THE SECOND AMENDED COMPLAINT ADEQUATELY ALLEGES FRAUD........18

    A.     FGIC Need Only Plead Facts Supporting a Reasonable Inference of Fraud.........18

    B.     The SAC Adequately Alleges That Putnam Misrepresented That It Would Select The Pyxis Portfolio Independently............................................19

    C.     The SAC Adequately Alleges Scienter..................................................21

         1.     FGIC Has Adequately Alleged Motive......................................21

         2.     FGIC Has Adequately Alleged Willful Misbehavior or Recklessness. ...............................................................................22

III.   THE SECOND AMENDED COMPLAINT ADEQUATELY ALLEGES NEGLIGENT MISREPRESENTATION AND NEGLIGENCE. ....................................23

CONCLUSION................................................................................................................25

# TABLE OF AUTHORITIES

**Page**

## Cases

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)......................................................................................................11, 19

*Bayerische Landesbank v. Aladdin Capital Mgmt. LLC,*
    692 F.3d 42 (2d Cir. 2012)...........................................................................................3, 23, 24

*In re Bear Stearns Companies, Inc. Securities, Derivative, & ERISA  Litigation,*
    763 F. Supp. 2d 423 (S.D.N.Y. 2011)................................................................................13

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007)............................................................................................................19

*Chan v. Mui,*
    No. 92 CIV. 8258 (MBM), 1993 WL. 427114 (S.D.N.Y. Oct. 20, 1993)...........................11

*Cohen v. Stevanovich,*
    722 F. Supp. 2d 416 (S.D.N.Y. 2010)...............................................................................22

*Dexia SA/NV v. Bear, Stearns & Co., Inc.,*
    929 F. Supp. 2d 231 (S.D.N.Y. 2013)...............................................................................13

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,*
    165 F. Supp. 2d 615 (S.D.N.Y. 2001)...............................................................................11

*In re Fannie Mae 2008 Sec. Litig.,*
    742 F. Supp. 2d 382 (S.D.N.Y. 2010)...............................................................................14

*Fin. Guar. Ins. Co. v. Putnam Advisory Co.,*
    No. 12 CIV. 7372, 2013 WL. 5230818 (S.D.N.Y. Sept. 10, 2013)..................................12, 23

*Fogarazzo v. Lehman Bros., Inc.,*
    341 F. Supp. 2d 274 (S.D.N.Y. 2004)...............................................................................14

*Freudenberg v. ETrade Fin. Corp.,*
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)...............................................................................13

*Holmes v. Grubman,*
    568 F.3d 329 (2d Cir. 2009)...............................................................................................11

*HSH Nordbank AG v. UBS AG,*
    95 A.D.3d 185 (1st Dep't 2012) ........................................................................................20

*King County v. IKB Deutsche Industriebank AG,*
    708 F. Supp. 2d 334 (S.D.N.Y. 2010)...............................................................................14

*Lattanzio v. Deloitte & Touche LLP,*
    476 F.3d 147 (2d Cir. 2007).................................................................................14

*Lentell v. Merrill Lynch & Co.,*
    396 F.3d 161 (2d Cir. 2005)..............................................................2, 14, 15, 18

*Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC,*
    No. 12 Civ. 3723, 2013 WL. 1294668 (S.D.N.Y. Mar. 28, 2013) .........................21

*MBIA Ins. Corp. v. Countrywide Home  Loans, Inc.,*
    105 A.D.3d 412 (1st Dep't 2013) .................................................................2, 12

*MBIA Ins. Co v. Countrywide Home Loans Inc.,*
    936 N.Y.S.2d 513 (Sup. Ct. N.Y. Country 2012) ........................................11, 12

*Pellman v. Cinerama, Inc.,*
    503 F. Supp. 107 (S.D.N.Y. 1980) ...............................................................19

*Pludeman v. Northern Leasing Sys., Inc.,*
    10 N.Y.3d 486 (2008) ................................................................................19

*Primavera Familienstiftung v. Askin,*
    No. 95 Civ. 8905, 1996 WL. 494904 (S.D.N.Y. Aug. 30, 1996) ..........................25

*Selevan v. N.Y. Thruway Auth.,*
    584 F.3d 82 (2d Cir. 2009)...........................................................................11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007)...............................................................................19, 22

*In Re Wachovia Equity Sec. Litig.,*
    753 F. Supp. 2d 326 (S.D.N.Y. 2011) ......................................................21, 23

## Statutes

Fed. R. Civ. P. 9(b) ......................................................................3, 13, 18, 19

Fed R. Civ. P. 12(b)(6).......................................................................................11

N.Y. Ins. Law § 3105....................................................................2, 11, 12, 13

N.Y. Ins. Law § 3106 .......................................................................................12

Plaintiff Financial Guaranty Insurance Company ("FGIC") respectfully submits this memorandum of law in opposition to Defendant The Putnam Advisory Company, LLC's ("Putnam") motion to dismiss the Second Amended Complaint ("SAC").

## PRELIMINARY STATEMENT

The SAC alleges that, to induce FGIC to provide $900 million of insurance (the "Pyxis Guaranty") on a credit default swap transaction ("swap" or "CDS") relating to the Pyxis ABS 2006-1 collateralized debt obligation ("CDO") ("Pyxis"), Putnam represented that it—and it alone—would select the collateral for Pyxis, acting independently and in good faith in the interests of long investors.  This was false.  In fact, Putnam allowed Magnetar Capital LLC ("Magnetar"), a net short investor in Pyxis whose financial interests were adverse to FGIC's, to control collateral selection for Pyxis.  Had FGIC known this, it would not have provided insurance on Pyxis—on any terms—and thus would not have suffered tens of millions of dollars in losses when the Pyxis portfolio collapsed; and Putnam would not have reaped millions of dollars in fees for its putative management of Pyxis.

Putnam does not dispute that it represented it would select the Pyxis collateral itself. Instead, Putnam argues that FGIC's claims for fraud, negligence and negligent misrepresentation must fail because FGIC has failed to allege (1) loss causation, *i.e.*, a causal connection between Putnam's misrepresentations and FGIC's losses, (2) the falsity of Putnam's representations, (3) Putnam's scienter (necessary for FGIC's fraud claim), or (4) a "special relationship" (necessary for FGIC's negligence-based claims).  All of these arguments are without merit.

***Loss Causation***  Putnam's argument that FGIC has not adequately pled loss causation fails for two independent reasons.  *First,* FGIC does not need to allege loss causation to establish its fraud claims, because an insurer alleging fraud in the inducement of an insurance contract, as FGIC does here, need not prove loss causation.  *See MBIA Ins. Corp. v. Countrywide Home*

*Loans, Inc.*, 105 A.D.3d 412, 412 (1st Dep't 2013) ("*MBIA II*") (affirming that under N.Y. Ins. Law § 3105(b), an insurer may recover payments made pursuant to an insurance policy without resort to rescission and without proof of loss causation). This applies to misrepresentations made by "or by the authority of" the applicant for insurance or the insured, *see* N.Y. Ins. Law § 3105(a)—language the Court overlooked in its prior decision dismissing FGIC's amended complaint. Putnam's alleged misrepresentations were undeniably made "by the authority of" Calyon—both the applicant for insurance and the insured under the Pyxis Guaranty—because most of Putnam's misrepresentations were made in the offering materials prepared by Calyon and presented by Calyon to FGIC to induce it to issue the Pyxis Guaranty.

*Second*, in any event, the SAC more than satisfies the Rule 8 notice pleading requirements for loss causation. The SAC contains extensive allegations—most of which were not contained in the amended complaint—that raise, at a minimum, a plausible inference that FGIC "would have been spared all or an ascertainable portion of [its] loss absent [Putnam's] fraud." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005). Specifically, the SAC alleges that (1) Magnetar CDOs have defaulted in significantly greater numbers and more quickly than comparable non-Magnetar CDOs; (2) certain assets selected by Magnetar for the Pyxis portfolio were significantly more likely to default than assets that Putnam would have selected acting independently—most notably, a $145 million tranche of prime RMBS that Putnam originally targeted for Pyxis and then replaced with $145 million of definitionally weaker subprime RMBS; (3) $167 million of assets that FGIC can identify, without discovery, as having been selected by Magnetar *did in fact* default more quickly than other assets in the Pyxis portfolio; and (4) $95.5 million of known Magnetar-selected assets defaulted before the financial crisis even began—clearly, then, not because of the financial crisis but because of their inherent

defects.  Putnam's response to each of these allegations is to raise factual disputes that are both inherently implausible and cannot be resolved on the pleadings.

**Falsity of Putnam's Representations**  Putnam asserts that FGIC has not adequately alleged that Putnam's representations as to the Pyxis collateral selection process were false.  This is absurd.  The SAC contains dozens of specific factual allegations demonstrating Putnam's abdication of its role in collateral selection to Magnetar.  Putnam isolates a few of these facts and argues that, ignoring the remaining allegations, they might be open to different interpretations.  But reading *all* of the alleged facts together, the SAC not only supports but renders all but inescapable an inference that Putnam indeed abdicated control of collateral selection.

**Scienter**  Putnam's argument that FGIC has not adequately pled scienter is without merit.  FGIC has more than met its obligation under Rule 9(b) to allege facts raising a plausible inference of motive—specifically, Putnam's motive to earn millions of dollars in fees that were virtually assured by Magnetar's control of Pyxis—and also of conscious wrongdoing by Putnam—for example, Putnam's complicity with a secret side agreement giving Magnetar "veto powers" over the assets to be selected for the Pyxis portfolio.

**"Special Relationship"**  Finally, Putnam's argument that FGIC has failed to allege a "special relationship" necessary to support its negligence-based claims is squarely refuted by the Second Circuit's decision in *Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42 (2d Cir. 2012).  *Bayersiche* held that a "special relationship" was adequately alleged where a CDO investor, to the knowledge of the portfolio manager, relied on the manager's expertise and the manager directly represented to the investor that it would manage the portfolio in the investor's interests.  Contrary to Putnam's argument and the Court's prior ruling, this holding did not depend on the fact that the investor was a third-party beneficiary of the portfolio

management agreement.  Moreover, the Second Circuit made this holding despite the fact that the offering circular contained precisely the same disclaimers as the offering documents here.

## FACTUAL BACKGROUND

### A.    The Pyxis Guaranty and Pyxis CDO

Pursuant to the Pyxis Guaranty, FGIC, in return for Calyon's premium payments, insured payment of all obligations owed to Calyon by a FGIC subsidiary under a swap transaction referencing $900 million of payment obligations owed by Pyxis to Calyon (the "Pyxis Swap"). SAC ¶ 7.  If FGIC had not issued the Pyxis Guaranty, Pyxis would not have closed and Putnam would not have earned the large fees it did from Pyxis.  *Id.*

Pyxis was one of 26 "Constellation" CDOs sponsored by Magnetar, in each of which Magnetar took an equity position but a much larger short position.  *Id.* ¶¶ 36-42, 129-150. Specifically, Magnetar was a net short investor in Pyxis—as Putnam well knew, because it helped to arrange many of Magnetar's short positions.  *Id.* ¶¶ 53-61.  As a net short investor, Magnetar stood to profit if Pyxis failed.  Thus, Magnetar's interests were directly opposed to those of long investors and FGIC.

Like Magnetar's other CDOs, part of Pyxis' $1.5 billion portfolio (23%) consisted of "cash" assets (*i.e.*, asset-backed debt securities that Pyxis actually purchased) and part (77%) consisted of "synthetic" assets created through CDSs in which Pyxis sold protection to counterparties on asset-backed debt securities in exchange for premium payments.  *Id.* ¶ 44.

Pyxis was a managed CDO, with a portfolio that could change at any time at the discretion of the collateral manager, Putnam.  Consequently, FGIC and other investors were heavily dependent on the experience, independence and integrity of Putnam.  *Id.* ¶¶ 31, 65.  As Putnam itself stated in the Pyxis Offering Memorandum, "[b]ecause the composition of the

[portfolio] will vary over time, the performance of the [portfolio] depends heavily on the skills of the Collateral Manager in analyzing, selecting, and managing the [portfolio]."  *Id.* ¶ 30.

Like all of Magnetar's CDOs, Pyxis was substantially larger than a typical CDO, and thus generated unusually large fees for Putnam, which, as emails between Magnetar, Deutsche Bank and Calyon attest, were "virtually assured" by Magnetar's "significant control" of Pyxis.  *Id.* ¶¶ 46-47, 110, 112.  Moreover, if Putnam had not cooperated with Magnetar on Pyxis, Magnetar would not have hired it for any other CDOs, *id.* ¶ 43—specifically, a second Pyxis CDO, Pyxis ABS 2007-1 ("Pyxis 2"), from which Putnam earned millions more in fees, *id.* ¶ 51.

### B.   Putnam Induced FGIC to Issue the Pyxis Guaranty by Representing that It—and It Alone—Would Select the Pyxis Collateral.

In July 2006, Calyon and Putnam began to market Pyxis to FGIC.  *Id.* ¶ 62.  To assure FGIC of the quality of the Pyxis portfolio, Putnam represented, both in the Pyxis offering materials and in other written and oral communications, that Putnam would select the assets for the portfolio, acting independently and in good faith in the interests of long investors.  *Id.* ¶ 65. Among other things, Putnam represented that it would "perform its obligations hereunder and under the Indenture with reasonable care and in good faith using a degree of skill and attention no less than that which the Collateral Manager exercises with respect to comparable assets that it manages for others with similar objectives and policies . . . ."  *Id.* ¶ 87.

The Pyxis Pitchbook and Offering Memorandum contained extensive representations that Putnam would select the Pyxis portfolio and describing Putnam's duties, strategy and "long-term investment" goals in doing so.  *Id.* ¶¶ 66-72, 86-87.  Putnam made similar written and oral representations to FGIC in the course of FGIC's extensive due diligence for Pyxis, including in emails during July 2006 and in an August 2006 on-site review of Putnam's operations in Boston and a follow-up conference call.  *Id.*  ¶¶ 73-74, 76-78.

Putnam also represented that the Pyxis Portfolio would include only a limited amount of low-rated (and thus highly risky) ABX Index securities—a limitation reflected in the Pyxis Offering Memorandum and indenture, which specified a strict concentration limit on Pyxis' ABX Index Securities bucket.  *Id.* ¶ 77.  In addition, Putnam represented, through a "target portfolio" provided to FGIC a few weeks before closing on which FGIC relied in approving the Pyxis Guaranty, that at least $145 million of the Pyxis portfolio would be prime RMBS, which, by definition, are less risky than subprime RMBS.  *Id.* ¶ 79.

### C.    Contrary to Its Representations, Putnam Abdicated Control Over Pyxis Collateral Selection to Magnetar, and Concealed Magnetar's Role.

Putnam's representations were egregiously false.  The Pyxis portfolio was not in fact selected by Putnam, acting diligently and independently in the interests of long investors like FGIC, but was instead selected by a net short investor, Magnetar.  *Id.* ¶ 89.  Had FGIC known this, it would never have issued the Pyxis Guaranty.  *Id.* ¶¶ 1, 9, 153.

FGIC's allegations are based on a wealth of documentary evidence and testimony disclosed in numerous lawsuits relating to Magnetar's CDOs—including, most notably, documents and testimony of Putnam's own witnesses specifically relating to Pyxis, which came to light in a lawsuit brought against Putnam and Calyon by investors in Pyxis and a complaint filed by the Securities Division of the Commonwealth of Massachusetts against Putnam relating to its role in Pyxis.  Based on this evidence, FGIC alleges, among other things, that:

- Magnetar selected Putnam to act as the collateral manager for Pyxis (*id.* ¶ 91);

- Jim Prusko (Magnetar) used to work for Putnam and supervised Carl Bell (Putnam), who was primarily responsible for selecting the Pyxis collateral (*id.* ¶ 90-91);

- Prusko and Michael Henriques (Deutsche Bank, Magnetar's co-equity investor on Pyxis) discussed Magnetar's CDO shorting strategy with Bell (*id.* ¶¶ 93-95, 99-101, 110, 115, 130, 145);

- Prusko insisted that Putnam would "have to play ball" on Pyxis, and executed a "behind the scenes" side letter giving Magnetar and Deutsche Bank "veto rights over any" collateral purchased for Pyxis (*id.* ¶¶ 93, 95);

- Prusko and Bell had numerous communications in which Prusko made clear which collateral he wanted to include in the Pyxis portfolio, and Bell made clear his willingness to accommodate Prusko.  Among other things, Prusko told Bell that he would "source the CDO exposure synthetically" himself, and told Alex Rekeda (Calyon) that he did not want Putnam "buying CDO's without us knowing about it," and that he thought Putnam was "on the same page with us buying the cdo cds" (*id.* ¶¶ 91-93, 95-107, 120);

- Prusko, Bell and other Putnam employees had numerous communications in which Prusko made clear his intention to short tens of millions of dollars of the collateral he was selecting for Pyxis—far more than Magnetar's equity stake in Pyxis—and Putnam agreed to help him do so (*id.* ¶¶ 91-93, 98-99, 109);

- Prusko and Bell specifically discussed having Pyxis enter into swaps referencing the low-rated ABX Index and its components, and increasing the synthetic portion of the Pyxis portfolio, to allow Magnetar to make sizable shorts against these assets (*id.* ¶¶ 95, 98);

- Bell and Rekeda discussed the importance of concealing Magnetar's involvement in the selection of the Pyxis collateral, and Magnetar's shorting strategy with respect to Pyxis (*id.* ¶ 113);

- Prusko, Henriques and Rekeda remarked on Putnam's compliance with Magnetar's wishes as to the Pyxis portfolio, noting that Magnetar's CDOs, including Pyxis, were "not CDOs but … structured separate accounts [for the benefit of Magnetar and Deutsche Bank]," and that "Putnam got it" (*id.* ¶ 110);

- Magnetar selected Putnam to act as collateral manager for Pyxis 2, confirming its satisfaction with Putnam's cooperation on Pyxis (*id.* ¶¶ 51, 91, 112); and

- After Pyxis defaulted, Bell joked with Prusko about how much money Magnetar had made from its short-selling strategy, while continuing to conceal Magnetar's involvement in Pyxis from investors (*id.* ¶ 115).

The SAC also sets forth numerous additional allegations confirming Magnetar's control over Pyxis' portfolio selection.  *First*, Putnam invested *over half* of Pyxis' cash allocated to CDO investments in four other Magnetar CDOs—even though there were *223* ABS CDOs issued in 2006 alone from which Putnam could have made its selection.  *Id.* ¶ 117.  These four Magnetar

CDOs were in turn invested in yet more Magnetar CDOs, meaning that Pyxis ultimately had exposure to at least fifteen Magnetar CDOs. *Id.* Not surprisingly, all fifteen defaulted. *Id.*

*Second*, there was a remarkably high correlation between the issuers of securities included in Pyxis' portfolio and the issuers of securities included in other Constellation CDOs. *Id.* ¶ 121. For instance, of the 163 unique CUSIPs in the Pyxis Portfolio, fully 90 CUSIPs (or 55%) referenced RMBS or CDOs whose securities were included in at least five other Magnetar CDOs, while 45 CUSIPs (or 28%) referenced RMBS or CDOs whose securities were included in at least ten other Magnetar CDOs. *Id.* This was despite the fact that there were well over *1,000* RMBS issued in 2005-2007 from which the RMBS in the Pyxis portfolio could have been selected, and there were more than *500* ABS CDOs issued in the same period from which the CDOs in the Pyxis portfolio could have been selected. *Id.*

*Third*, given the substantial cross-referencing and portfolio correlation between all Constellation CDOs, not just Pyxis, FGIC retained a firm of economic consultants to perform a statistical analysis to assess the likelihood of this correlation occurring by chance if all Constellation CDO managers acted independently. *Id.* ¶ 122. This analysis concluded that the probability of this happening by chance was less than one in a billion. *Id.*

*Fourth*, Putnam concealed the extent to which Pyxis sold protection on the ABX Index of low-rated RMBS by causing Pyxis to sell $240 million of protection against both the ABX Index and its constituent RMBS—more than three times the specified concentration limit for Pyxis' ABX Index investments. *Id.* ¶ 123. By significantly increasing Pyxis' risk profile, this worked in favor of a net short investor like Magnetar at the expense of long investors like FGIC. *Id.*

*Fifth*, Pyxis purchased protection to offset previously acquired exposures to individual components of an ABX Index—a unique technique used by Magnetar in many of its CDOs as part of a complex ABX Index arbitrage strategy. *Id.* ¶¶ 124-25.

*Sixth*, although Putnam provided FGIC with a "target portfolio" for Pyxis that included $145 million of prime RMBS, the final ramped portfolio did not contain a *single* prime RMBS asset. The only plausible explanation for such a significant, last-minute, undisclosed change in investment strategy, which worked in the interests of short investors and against long investors, is that Putnam bowed to pressure from Magnetar to replace the prime RMBS collateral with much riskier (and more likely to default) subprime RMBS collateral. *Id.* ¶¶ 79, 127-28.

*Finally*, email evidence from litigations relating to other Magnetar CDOs, most of which were settled for large amounts, shows that Magnetar exercised the same control over asset selection on these other CDOs as on Pyxis. *Id.* ¶ 129. Among other things: (1) Magnetar exchanged lists of proposed CDO securities with its collateral managers, just as it did on Pyxis, indicating which securities it wanted to short, and its recommendations were complied with (*id.* ¶¶ 132-33); (2) Magnetar described its equity position on one deal as "basically nothing," and said it was "just doing it . . . to buy some protection" (*id.* ¶ 131); (3) the collateral manager on another deal "allowed Magnetar to do some trading for their portfolio (in the area of 600MM)" (*id.* ¶ 137); (4) Magnetar warned the collateral manager on another deal not to acquire any collateral that was not "sub/mid-prime" (*i.e.*, that did not have a high risk of default) without Magnetar's "pre-ok"—similar to the "veto powers" agreement proposed for Pyxis—and Magnetar's co-equity sponsor on Pyxis, DBSI, explained this "pre-ok" on the basis that "this is not just sponsoring a cdo, but really a highly structured separate account mandate. . . . [I]t is the nature of the arrangement, and with the other deals [including Pyxis], we definitely have that

interaction" (*id.* ¶ 145); (5) on the same deal, Magnetar increased the fee paid to both the structurer and the collateral manager with respect to certain collateral they allowed Magnetar to short into the deal, stating: "[W]ant to reward for good behavior" (*id.*); and (6) Magnetar discussed with DBSI whether they could "hide" Magnetar's involvement in its CDOs (*id*).

The striking similarity between Magnetar's conduct on all of these CDOs renders it even less plausible that it would have allowed Putnam to control the selection of Pyxis collateral. Moreover, since the SAC was filed, still more evidence has come to light to this effect, in a SEC Cease and Desist Order relating to the Orion CDO which shows, among other things, that Magnetar discussed with the warehouse manager ("Merrill") an arrangement whereby Merrill and Magnetar would "pick mutually agreeable [collateral] managers to work with, Magnetar plays a significant role in the structure and composition of the portfolio . . . and in return [Magnetar] retain[s] the equity class and [Merrill] distribute[s] the debt." *See In the Matter of Harding Advisory LLC and Wing F. Chau* (October 18, 2013), Declaration of Sean P. Baldwin in Support of Plaintiff's Opposition to Defendant's Motion to Dismiss the Second Amended Complaint ("Baldwin Decl."), Ex. A at 5.

> **D.      Putnam Profited from Its Fraud, and FGIC Lost Millions**

Putnam benefited from its fraud by earning larger than usual fees with relatively little risk or effort for serving as the collateral manager on both Pyxis and Pyxis 2 (neither of which positions it would have secured had it not cooperated with Magnetar).  SAC ¶ 151.  By contrast, when Pyxis defaulted, FGIC was obliged to pay millions to discharge its obligations under the Pyxis Guaranty.  *Id.* ¶ 152.

## ARGUMENT[1]

### I.   THE SECOND AMENDED COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION

Putnam argues that FGIC's fraud claim should be dismissed because the SAC does not adequately allege loss causation.  Br. 7-10.  This is wrong for two independent reasons.  *First*, FGIC need not prove or allege loss causation because its claim is for fraud in the inducement of an insurance contract.  *Second*, in any event, the SAC more than adequately satisfies the Rule 8 notice pleading standard for loss causation.

#### A.   FGIC Is Not Required to Allege Loss Causation

While it is generally true that a plaintiff alleging common law fraud must allege loss causation, this is not the case where the plaintiff is an insurer alleging fraud in the inducement of an insurance contract.[2]  In such circumstances, the plaintiff's fraud claim is informed by New York common law and N.Y. Insurance Law Section 3105, which entitles an insurer to "avoid any contract of insurance or defeat recovery thereunder" if it was induced to enter into the contract by a material misrepresentation of fact.  *See* N.Y. Ins. Law § 3105(b); *MBIA Ins. Co v. Countrywide Home Loans Inc.*, 936 N.Y.S.2d 513, 521, 523-4 (Sup. Ct. N.Y. Country 2012) ("*MBIA I*").  As the First Department has held, this law further entitles an insurer to recover

---

[1]   In deciding a motion to dismiss under Fed R. Civ. P. 12(b)(6), the Court must "assume all ‚well-pleaded allegations' to be true, and ‚determine whether they plausibly give rise to an entitlement to relief.'"  *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).  The Court must "construe [a] complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor."  *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009) (internal quotation marks omitted).

[2]   FGIC respectfully submits that, even if its claim were not for fraud in the inducement of an insurance contract, it would still not be required to prove loss causation because it seeks, among other things, rescissory relief.  Where a plaintiff seeks rescission—or its monetary equivalent, rescissory damages—the better view is that a link between the misrepresentation and the loss ultimately suffered by the plaintiff is simply irrelevant.  *Compare Chan v. Mui*, No. 92 CIV. 8258 (MBM), 1993 WL 427114, at *2 n.2 (S.D.N.Y. Oct. 20, 1993) ("[a]lthough plaintiff did not allege damages or loss causation specifically, his claim of fraudulent inducement is not defective because . . . he may obtain a remedy of rescission instead of damages for that form of fraud") *and* 60A N.Y. Jur. 2d Fraud and Deceit § 184 (a plaintiff need not show "pecuniary loss by reason of the fraud in order to obtain rescission of the transaction or contract induced by it") *with Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 165 F. Supp. 2d 615, 627 n. 2 (S.D.N.Y. 2001).

"payments made pursuant to an insurance policy without resort to rescission" *and without proof of loss causation.* *MBIA II*, 105 A.D.3d at 412 (affirming lower court's holding that "pursuant to Insurance Law §§ 3105 and 3106, plaintiff was not required to establish causation in order to prevail on its fraud and breach of contract claims"); *see also MBIA I*, 936 N.Y.S.2d at 523-524 ("It is without basis in case law to require [the plaintiff] to provide a causal link between the alleged misrepresentations and [the losses suffered by the plaintiff].").

In its prior ruling, the Court held that the law on fraud in the inducement of an insurance contract was inapplicable because Putnam "did not apply for any insurance, nor did it enter into any sort of contract—insurance-related or otherwise—with FGIC." *Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, No. 12 CIV. 7372, 2013 WL 5230818, at *4 (S.D.N.Y. Sept. 10, 2013) ("Opinion"). But the law on fraudulent inducement of an insurance contract expressly applies not only to misrepresentations made by the applicant for insurance or the insured, but also to misrepresentations made "by the authority of" the applicant or the insured. *See* N.Y. Ins. Law § 3105(a) (defining "representation" as "a statement as to past or present fact, made to the insurer by, *or by the authority of*, the applicant for insurance or the prospective insured") (emphasis added).

Calyon was both the applicant for insurance and the insured under the Pyxis Guaranty. SAC ¶¶ 2, 7, 62-63, 88. Putnam's alleged misrepresentations were undeniably made "by the authority of" Calyon, because most of Putnam's misrepresentations were made in the offering materials—most notably, in the Pitchbook and the Offering Memorandum—which, in turn, were prepared by Calyon and were presented by Calyon to FGIC specifically to induce FGIC to issue the Pyxis Guaranty. *Id.* ¶ 68; Hora Decl., Ex. 1. Clearly, Putnam cannot argue that its misrepresentations were not made by the authority of the entity that prepared the very documents

12

in which those misrepresentations were made and then actively used those misrepresentations to persuade FGIC to issue the Pyxis Guaranty.  Thus, under N.Y.  Ins. Law § 3105 and *MBIA II*, FGIC need not allege loss causation to sustain its fraud claim arising out of Putnam's misrepresentations.

### B.    The SAC Adequately Pleads Loss Causation

In any event, the SAC more than adequately meets the pleading standard for loss causation.  Allegations of loss causation are not subject to the heightened pleading standard of Rule 9(b), but need merely satisfy the notice pleading standard in Rule 8(a), under which "a short and plain statement . . . that provides defendants with some indication of the loss and the causal connection that the plaintiff has in mind" will suffice.  *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010) (Sweet, J.) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)); *In re Bear Stearns Companies, Inc. Securities, Derivative, & ERISA Litigation*, 763 F. Supp. 2d 423, 488 (S.D.N.Y. 2011) (Sweet, J.) (same).  Rule 8(a) "is not meant to impose a great burden on plaintiffs."  *Freudenberg*, 712 F. Supp. 2d at 202 (quoting *Dura*, 544 U.S. at 347).

Moreover, a party alleging loss causation need not "rule out all competing theories" as to the cause of its losses.  *In re Bear Stearns,* 763 F. Supp. 2d at 488 ("Furthermore, at the motion to dismiss stage, the . . . Complaint need not rule out all competing theories for the [loss]; that is an issue to be determined by the trier of fact on a fully developed record.").  *Lentell*, 396 F.3d at 174, relied on by Putnam, Br. 8, is not to the contrary.  *See Dexia SA/NV v. Bear, Stearns & Co., Inc.*, 929 F. Supp. 2d 231, 243 (S.D.N.Y. 2013) ("*Lentell* does not place upon plaintiffs the heavy burden of pleading facts sufficient to exclude other non-fraud explanations.") (internal quotation marks omitted).  *Lentell* merely holds that the occurrence of a market-wide phenomenon "decreases" the prospect that a plaintiff's loss was caused by the alleged fraud, and

that a plaintiff in such circumstances must allege facts sufficient to "support an inference" that it "would have been spared all or an ascertainable portion of [its] loss absent the fraud."  *Lentell*, 396 F.3d at 174-75; *see also Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007) (under Rule 8(a), a plaintiff need only allege "facts that would allow a fact-finder to ascribe some rough proportion of the whole loss to [defendants'] misstatements").

As long as this relatively low threshold is met, the court should permit the plaintiff to proceed to establish its case through discovery, even where the court suspects that the intervening market-wide phenomenon will ultimately prove to be the major or sole cause of the plaintiff's losses.  *See In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 414 (S.D.N.Y. 2010) ("Although it may be likely that a significant portion, if not all, of Plaintiffs' losses were actually the result of the housing market downturn and not these alleged misstatements, at this stage of pleading, the Court need not make a final determination as to what losses occurred and what actually caused them, and need only find that Plaintiffs' allegations are plausible.") (internal quotation marks omitted); *King County v. IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334, 343, 346 (S.D.N.Y. 2010) ("*Lentell* does not say that the existence of a market-wide phenomenon necessarily eliminates a plausible causal connection between plaintiffs' losses and defendants' alleged fraud. . . . [E]ven though I am uncertain whether plaintiffs will be able to ultimately prove that any portion of their losses were caused by the defendants' conduct as opposed to the credit crisis, that is not their burden at this stage."); *Fogarazzo v. Lehman Bros., Inc.*, 341 F. Supp. 2d 274, 285 (S.D.N.Y. 2004) (even where it "appear[s] on the face of the pleading that recovery is very remote and unlikely" and it is uncertain "whether a plaintiff is likely to prevail ultimately," this is "not the test" at the motion to dismiss stage).

The SAC's loss causation allegations more than satisfy the requirements of Rule 8.

Relying solely on publicly available information, and without the benefit of any discovery, the

SAC contains extensive factual allegations, most of which were not contained in the amended

complaint, that are sufficient to support a plausible inference that FGIC "would have been spared

all or an ascertainable portion of [its] loss absent [Putnam's] fraud." *Lentell*, 396 F.3d at 175.

*First*, the SAC alleges that Magnetar CDOs have defaulted in greater numbers and more

quickly than comparable non-Magnetar CDOs.  SAC ¶ 156.  As of December 2008, when Pyxis

defaulted, 94% of Magnetar's 2006-vintage mezzanine CDOs had defaulted, while only 40% of

non-Magnetar 2006-vintage mezzanine CDOs had done so.  Moreover, as of April 2012 (the

most recent publicly available data), all of Magnetar's 2006-vintage mezzanine CDOs had

defaulted, while only 72% of non-Magnetar vintage mezzanine CDOs had done so. *Id.*  Putnam

asserts that the SAC does not allege that these non-Magnetar CDOs were comparable.  Br. 8.

That is specious.  The SAC compares the performance of Magnetar and non-Magnetar CDOs

with identical vintages and identical collateral classes—the two key characteristics influencing

risk.  SAC ¶ 156.  Putnam asserts that differences as to other, narrower characteristics (*e.g.*,

payment waterfall and trigger structure) may also be relevant to risk.  Br. 8.  But these

characteristics are clearly less significant than the vintage and collateral class, and how much

weight should be attributed to them, if any, raises questions of fact that cannot be resolved on a

motion to dismiss.  The analysis in the SAC, comparing CDOs with identical primary risk

characteristics, reveals a clear, market-wide pattern:  Magnetar CDOs defaulted in greater

numbers and more quickly than other CDOs.  SAC ¶156.

*Second*, the SAC alleges that certain assets selected by Magnetar for Pyxis were

significantly more likely to default than assets that Putnam would have selected acting

independently. *Id.* ¶157. For example, Putnam's target portfolio for Pyxis included $145

million of prime RMBS, but the final portfolio contained only subprime RMBS. *Id.* ¶¶ 126-28,

157. Subprime RMBS—which are based on mortgage loans issued to borrowers with lower

credit ratings and a higher probability of defaulting on mortgage payments—are intrinsically

more risky than prime RMBS. *Id.* ¶ 126. Contrary to Putnam's assertion that FGIC does not

allege that Putnam replaced the prime assets in the portfolio with subprime assets at Magnetar's

direction, Br. 9, the SAC alleges that Magnetar's control is the only plausible explanation for this

decision, SAC ¶¶ 126-28, 157, and that this was consistent with Magnetar's insistence

throughout the Pyxis collateral selection process on selecting knowingly weak assets to promote

its shorting strategy, *id.* ¶¶ 89-150. Putnam's further assertion that FGIC has not specifically

identified the prime assets that Putnam would have selected absent Magnetar's control, Br. 9,

ignores that this information is exclusively in Putnam's control and cannot be obtained without

discovery. In any event, whichever prime assets Putnam selected would have been significantly

stronger—and thus significantly less likely to default, even in a difficult market-wide

environment—than the Magnetar-selected subprime RMBS, because prime assets are by

definition stronger than subprime assets.

   *Third*, the SAC alleges that $167 million of assets that FGIC is able to identify, even

without discovery, as having been selected by Magnetar *did in fact* default more quickly than

other assets in the Pyxis portfolio. SAC ¶¶ 158-60. The average life before default of known

Magnetar-selected assets was 1.5 years, compared to 1.85 years for other assets—almost 25%

longer. *Id.* ¶ 159. Putnam asserts that the SAC offers "no basis" for the allegation that Magnetar

selected any of these assets. Br. 9. That is false: the SAC provides compelling evidence that

Magnetar selected each such asset. *See* SAC ¶¶ 96-109, 117-20, 123-35. Putnam also contends

that the difference between the default rates of known Magnetar-selected assets and other assets

is insignificant, and that FGIC's analysis merely proves that default would ultimately have

occurred no matter what collateral was selected.  Br. 9-10.  In fact, the analysis demonstrates that

the known Magnetar-selected assets were significantly weaker than the other assets—and this

despite the fact that there were likely many more Magnetar-selected assets in the Pyxis portfolio

of which FGIC does not yet know, which, if they also defaulted at a higher rate than the other

assets in the portfolio, would increase the difference between the rate of default of the Magnetar

and non-Magnetar assets in the portfolio to significantly more than 25%.

More importantly, there is no way for FGIC to know without discovery which assets

Putnam would have selected in place of those selected by Magnetar, or whether those assets

would also ultimately have defaulted.  Through discovery, FGIC will be able to establish exactly

which assets in the Pyxis portfolio were selected by Magnetar, and to compare the default rates

and ratios of those assets with other potential assets meeting Pyxis' eligibility criteria, including

assets originally chosen by Putnam and subsequently replaced by Magnetar and assets that

Putnam would likely have chosen absent Magnetar's influence.  It is only through such an

exercise that FGIC will be able to establish exactly which portion of the losses ultimately

sustained by FGIC was attributable to Putnam's fraud.

*Fourth*, the SAC alleges that a considerable portion—$95.5 million—of known

Magnetar-selected assets defaulted before the events that precipitated the financial crisis and a

market-wide decline in house prices even occurred—indeed, $63 million of these assets

defaulted as early as 2007.  SAC ¶ 160.  Necessarily, therefore, these defaults could not have

been caused by market-wide events but must have been caused by the assets' inherent defects.

Thus, there is a direct causal link between Magnetar's improper selection of those assets and

FGIC's losses.  Putnam asserts, without elaborating, that the financial crisis may have begun

before early 2008.  Br. 10.  But when exactly it began, and when and how much a market-wide

decline in house prices began to influence the performance of individual RMBS, are complex

questions of fact that obviously cannot be resolved on a motion to dismiss.

Putnam's final objection to FGIC's loss causation allegations is that they only pertain to a

portion of Pyxis' collateral, and that "[i]t is irrelevant whether a particular asset in the CDO

defaulted unless it caused the CDO *itself* to default and impacted FGIC's payment obligations

under the Pyxis Guaranty."  Br. 9-10 (emphasis in original).  Again, this is specious.  How much

of the Pyxis collateral would need to default to cause Pyxis itself to default is a question of fact

that cannot be resolved on a motion to dismiss.  Moreover, as explained above, without the aid of

discovery, FGIC has been forced to rely on limited publicly available information to identify

Magnetar-selected assets.  It is likely that Magnetar in fact selected a much larger proportion of

the Pyxis collateral, which was sufficiently large to cause a default by Pyxis itself—indeed,

Magnetar itself clearly believed this was the case, because many of its short positions were taken

against senior Pyxis notes, not individual portfolio assets, from which it could only benefit if

Pyxis itself defaulted.  SAC ¶¶ 56-58.

Taking all of these allegations into account, the SAC pleads facts sufficient to support, at

a minimum, a plausible inference that FGIC "would have been spared all or an ascertainable

portion of [its] loss absent [Putnam's] fraud."  *Lentell*, 396 F.3d at 175.

## II.     THE SECOND AMENDED COMPLAINT ADEQUATELY ALLEGES FRAUD

### A.     FGIC Need Only Plead Facts Supporting a Reasonable Inference of Fraud.

Although Rule 9(b) requires that fraud be alleged with particularity, that requirement is

satisfied where the plaintiff, as here, "does not simply assert fraudulent or deceptive conduct, but

instead reasonably details the bases for those allegations." *Pellman v. Cinerama, Inc.*, 503 F.

Supp. 107, 111 (S.D.N.Y. 1980); *see also Pludeman v. Northern Leasing Sys., Inc.*, 10 N.Y.3d

486, 492 (2008) (applying New York equivalent of Rule 9(b), and holding that "[CPLR] Section

3106(b) may be met when the facts are sufficient to permit a reasonable inference of the alleged

conduct"). Moreover, under Rule 9(b), "[m]alice, intent, knowledge, and other conditions of a

person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Thus, FGIC is not obliged to

plead scienter with particularity, but, as Putnam appears to concede, Br. 21, need only meet the

*Twombly* and *Iqbal* plausibility standard.[3]

### B.   The SAC Adequately Alleges That Putnam Misrepresented That It Would Select The Pyxis Portfolio Independently.

Putnam does not dispute that it represented that it would select the Pyxis collateral itself,

acting independently and in good faith in the interests of long investors. Putnam made these

representations in the Pyxis offering materials, as well as in emails with FGIC and in the August

3, 2006 meeting and follow-up August 7, 2006 conference call that took place in the course of

FGIC's extensive due diligence on Pyxis. SAC ¶¶ 62-79, 86-88. Nor does Putnam dispute that

it never disclosed Magnetar's involvement in Pyxis, nor the fact that Magnetar's financial

interests were adverse to FGIC's because Magnetar was a net short investor.[4]

Rather, Putnam asserts, incredibly, that the SAC does not adequately allege that Putnam

in fact abdicated its responsibility to select the Pyxis collateral to Magnetar. Br. 11-13. Putnam

---

[3] *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). Indeed, even in securities fraud claims, where a "strong inference" of scienter is required, the Supreme Court has cautioned that such an inference "need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences," but merely "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007) (internal quotation marks omitted). Moreover, the Court must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323 (emphasis in original).

[4] Putnam's assertion, Br. 16, that FGIC was aware that some party must necessarily be taking short positions on Pyxis is irrelevant. What matters is that FGIC did not and could not know that the party taking those positions also controlled Pyxis collateral selection, because Putnam represented that *it* would select the collateral.

ignores most of the allegations in the SAC supporting this inference, and bases its argument almost entirely on the assertion that FGIC cannot prove that the secret side agreement granting Magnetar "veto powers" over Pyxis collateral selection was actually executed or that Putnam was aware of this agreement.  Br. 11.

This argument ignores all of the other evidence set forth in the SAC, which—even without the draft "veto powers" side letter—creates not merely a reasonable but a compelling inference that Putnam, knowing Magnetar's financial interests were adverse to FGIC's, nevertheless allowed Magnetar to control—indeed, to have veto power over—the Pyxis collateral selection process.  *See* pp. 6-10 above.  Moreover, when all of these  allegations are considered together with the "veto powers" side letter, it is, at a minimum, a reasonable inference that some understanding similar to the "veto powers" agreement must indeed have been reached, and that Putnam must have been aware of it, because: (1) the letter expressly required "Calyon *or the Investment Adviser [Putnam]*" to "promptly provide . . . notification" of any proposed asset purchases; (2) there is extensive evidence that Putnam in fact acted consistently with the terms of this agreement, allowing Magnetar not only to veto such investments but to purchase CDOs for Pyxis directly; (3) there is evidence in lawsuits relating to other Magnetar CDOs of similar "veto" or "pre-ok" arrangements; and (4) Magnetar and Deutsche Bank were sufficiently satisfied with Putnam's cooperation ("Putnam got it") that Putnam was selected to manage Pyxis 2.  *See id.*[5]

---

[5]   Putnam's assertion that FGIC has not adequately alleged that the Pyxis portfolio failed to comply with the eligibility requirements for Pyxis is irrelevant.  Br. 13-15.  FGIC's claims are not predicated on misrepresentations by Putnam concerning the eligibility requirements, or technical non-compliance with those requirements, but rather on Putnam's misrepresentations and omissions concerning *who would select* the Pyxis portfolio.  *See* SAC ¶¶ 163-65.  Thus, *HSH Nordbank AG v. UBS AG*, 95 A.D.3d 185 (1st Dep't 2012)—relied on by Putnam, Br. 14—is irrelevant.  In that case, HSH alleged that UBS induced it to enter into a CDS by misrepresenting the risk involved, which HSH could have discovered by ordinary due diligence (and with respect to which the disclaimers in the various deal documents precluded HSH from relying on defendants' representations), not by misrepresenting who would select the portfolio.  *Id.* at 186-88.

Putnam's reliance on *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC,* No. 12 Civ. 3723, 2013 WL 1294668 (S.D.N.Y. Mar. 28, 2013) is misplaced.  Br. 12.  The allegations in that case were deemed insufficient because they were based exclusively on a small handful of vaguely worded e-mails, none of which provided direct evidence of Magnetar's involvement in asset selection.  *Wells Fargo*, 2013 WL 1294668, at *10-12.  By contrast, the allegations in the SAC are based on a wealth of documentary evidence and testimony—including documents and testimony of Putnam's own witnesses relating directly to Pyxis—attesting unequivocally to Magnetar's role in selecting collateral for Pyxis.  SAC ¶¶ 89-150.

### C.   The SAC Adequately Alleges Scienter.

FGIC has adequately pled scienter by alleging facts raising a plausible inference of both motive to commit fraud and of circumstantial evidence of conscious misbehavior—each of which, in itself, is sufficient to support an inference of scienter.  *See In Re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 348 (S.D.N.Y. 2011).

### 1.   FGIC Has Adequately Alleged Motive.

The SAC alleges that Putnam had a compelling motive to commit fraud—namely, to secure unusually large fees with relatively little effort or risk for serving as the putative collateral manager for Pyxis.  This is confirmed by emails attesting to the benefits of acting as the collateral manager on a Magnetar CDO compared to a typical CDO.  *See* SAC ¶ 110.  Putnam's assertion that its fees on Pyxis were not unusually large, Br. 18-19, focuses solely on its fee percentage (20 basis points rather than the customary 40 basis points for CDO collateral managers), and ignores that:  (1) Pyxis, like all of Magnetar's CDOs, was almost four times as large as a typical CDO, so the dollar value of Putnam's fees was almost twice as high as a typical CDO manager's; (2) 75% of Putnam's fee (15 basis points) was fixed (higher than the fixed fee on most Magnetar CDOs); and (3) Putnam's "incentive fee," like its fixed fee, was "virtually

assured" by Magnetar's "significant control" over Pyxis, as emails between Magnetar, Deutsche Bank and Calyon attest. *See id.* ¶¶ 46-47, 110, 112. Moreover, Putnam secured additional lucrative deal volume from its cooperation with Magnetar when it was chosen as the collateral manager for Pyxis 2 a few months after Pyxis closed—which would certainly not have happened had Putnam not cooperated with Magnetar on Pyxis. *See id.* ¶¶ 51, 151.[6]

Putnam's argument that its fees were not sufficient to justify its commission of fraud, Br. 17, raises a question of fact that cannot be resolved on a motion to dismiss. Putnam's further assertion that payment of its fees required Pyxis to perform well, *id.*, is belied by the fact that Putnam continued to receive its fees long after Pyxis began to fail, and even after it suffered an Event of Default. *Id.* ¶¶ 48-49. Finally, Putnam's unsupported contention, Br. 18, that, if Pyxis had not defaulted, it would have received more than it in fact received, is irrelevant: if Putnam had not agreed to cooperate with Magnetar's scheme, it would not have been selected to manage Pyxis at all—or Pyxis 2—and would thus have received *no* fees. SAC ¶¶ 46, 51, 151

### 2.   FGIC Has Adequately Alleged Willful Misbehavior or Recklessness.

The SAC sets forth substantial circumstantial evidence of Putnam's willful misbehavior or recklessness, including that: (1) Putnam was complicit in the secret "veto powers" agreement; (2) Putnam willfully acquiesced in and aided Magnetar's shorting of Pyxis at the same time as it allowed Magnetar to control collateral selection; and (3) Putnam, in collusion with Calyon, actively concealed Magnetar's involvement in Pyxis from Pyxis investors and FGIC. *See* pp. 6-

---

[6]   Contrary to Putnam's assertion, Br. 18-19, the desire to earn fees may indeed support a plausible inference of motive. *See Tellabs*, 551 U.S. at 325 (holding, again in a securities fraud case, that "personal financial gain may weigh heavily in favor of a scienter inference."). *Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 429 (S.D.N.Y. 2010)—relied on by Putnam—is inapposite. *First*, it relates to claims of market manipulation and securities fraud under Rules 9(a) and 10(b) of the Securities Exchange Act, for which the pleading standard is a "strong" inference of scienter, not a plausible inference. *Id. Second, Cohen* merely holds that a *generalized* profit motive, without more, is not sufficient to provide a compelling inference of scienter. *Id.* Where, as here, the complaint alleges that the defendant would realize "concrete benefits" from the fraud—namely, $5.7 million in fees on Pyxis and a further $3.1 million on Pyxis 2, without the typical effort and risk required of managers of non-Magnetar CDOs, SAC ¶¶ 50, 52—that is sufficient. *Id.*

10 above.  These allegations separately support a plausible inference of scienter.  *In Re Wachovia*, 753 F.2d at 351.

## III.    THE SECOND AMENDED COMPLAINT ADEQUATELY ALLEGES NEGLIGENT MISREPRESENTATION AND NEGLIGENCE.

Putnam's sole ground for seeking dismissal of FGIC's negligence-based claims—that FGIC has failed to allege a "special relationship" or duty necessary to support these claims, Br. 23-24—is squarely refuted by the Second Circuit's decision in *Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42 (2d Cir. 2012).

In *Bayerische*, the plaintiff CDO investor was allegedly induced to purchase notes by the representations of the CDO's portfolio manager—made, like Putnam's, both in marketing materials and in a face-to-face meeting—that the manager's interests were aligned with the investor's and that the investor could rely on the manager's care and competence in managing the CDO's portfolio.  *Id.* at 58-61.  The manager sought dismissal on the basis that the alleged facts did not support an inference of a "special relationship."  *Id.*  The court upheld the investor's claim, primarily on the basis that the investor, as here, was known to the manager and relied on it to perform its obligations pursuant to the portfolio management agreement ("PMA")—equivalent to the collateral management agreement here—and that the manager, like Putnam, had helped to solicit the investor's investment and had represented that it would manage the CDO in the investor's favor, evincing an understanding and intent that the investor would rely on its performance.  *Id.* at 61.

Although, as Putnam argues, Br. 24, and as the Court noted in dismissing FGIC's amended complaint, Opinion at *5, the investor in *Bayerische* was a third-party beneficiary of the PMA, that was not necessary to the Second Circuit's decision.  Indeed, the Court expressly held that the portfolio manager's duty of care arose not out of the contract but "out of the

independent characteristics of the relationship between Bayerische and Aladdin, and the circumstances under which Bayerische purchased the Notes linked to the Reference Portfolio that Aladdin, under the PMA, was to manage." *Bayerische*, 692 F.3d at 45. Similarly here, Putnam's duty of care arises out of contractually independent characteristics—namely, FGIC's reliance on Putnam's expertise and Putnam's knowledge and direct encouragement of such reliance. SAC ¶¶ 175-80. Nor would it make any sense to hold that an express third-party beneficiary noteholder, third-party beneficiary or otherwise, was entitled to relief but FGIC was not, given that FGIC's participation, unlike a noteholder's, was critical to the closing of the transaction, *id.* ¶ 64—which is why Putnam solicited FGIC's participation so assiduously.

Putnam's further argument, Br. 24, that the Offering Memorandum contained disclaimers advising investors not to rely on representations other than those made in the Offering Memorandum and to "rely on their own examination of the co-issuers and the terms of the offering," and further stating that Putnam was not acting in the capacity of a "fiduciary" or "investment advisor," is similarly unavailing. Materially identical disclaimers were contained in the *Bayersiche* Offering Circular,[7] but they did not preclude the Second Circuit from holding that a "special relationship" arose under the circumstances.[8]

---

[7] *See* Baldwin Decl., Ex. B (Declaration of Jason Mogel in Opposition to Defendant Aladdin Capital Management LLC's Motion to Dismiss, Ex. B, Dkt. No. 23-2, *Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*, 11 Civ. 673 (DLC) (S.D.N.Y. July 8, 2011)) at 8-9 ("In connection with the purchase of the Offered Notes . . . none of [certain enumerated parties, including the Collateral Manager] is acting as a fiduciary or financial or investment adviser for the purchaser"; "In connection with the purchase of the Offered Notes . . . the purchaser has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisors to the extent it has deemed necessary, and it has made its own investment decisions . . . based upon its own judgment and upon any advice from such advisors as it has deemed necessary and not upon any view expressed by [the Collateral Manager]"; "In connection with the purchase of the Offered Notes . . . the purchaser is not relying . . . upon any advice, counsel or representations [made by the Collateral Manager] other than in this Offering Circular for such Offered Notes and any representations expressly set forth in a written agreement with [the Collateral Manager].")

[8] Moreover, Putnam's representations that it would "select and manage the Collateral" acting "with reasonable care and in good faith" were made, *inter alia*, in the Offering Memorandum, SAC ¶¶ 86-87, on which investors, including FGIC, were advised to rely by the very disclaimers to which Putnam draws attention. Further, FGIC's extensive due diligence efforts, and the representations made by Putnam in the course of those efforts, *id.* ¶¶ 73-80, were exactly the sort of "examination" that investors were urged to rely on by those same disclaimers.

Moreover, contrary to Putnam's assertion, Br. 23, FGIC does not argue that a special relationship arose solely out of Putnam's "superior knowledge."  Rather, FGIC argues that such a relationship arose, as in *Bayerische*, out of FGIC's known reliance on Putnam's representations that it would employ its superior knowledge in the interests of long investors.  Putnam's further argument that FGIC and Putnam did not have a "pre-existing relationship," Br. 25, is also irrelevant.  Indeed, *Primavera Familienstiftung v. Askin*, No. 95 Civ. 8905, 1996 WL 494904 (S.D.N.Y. Aug. 30, 1996), relied on by Putnam, recognizes that a special relationship may exist where the parties did *not* have a "pre-existing relationship."  *Id.*, at *18.

## <u>CONCLUSION</u>

For the reasons set forth above, FGIC respectfully requests that Putnam's Motion to Dismiss the SAC be denied.

Dated: New York, New York
October 29, 2013

> QUINN EMANUEL URQUHART &
> SULLIVAN, LLP
> By:      /s/ Peter E. Calamari
> Peter E. Calamari
> (petercalamari@quinnemanuel.com)
> A. William Urquhart
> (billurquhart@quinnemanuel.com)
> Sean Baldwin
> (seanbaldwin@quinnemanuel.com)
> Paul P. Hughes
> (paulhughes@quinnemanuel.com
>
> 51 Madison Avenue, 22nd Floor
> New York, New York  10010
> (212) 849-7000
>
> *Attorneys for Plaintiff Financial Guaranty*
> *Insurance Company*