UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FINANCIAL GUARANTY INSURANCE COMPANY,<br><br>　　　　　Plaintiff,<br><br>　-against-<br><br>THE PUTNAM ADVISORY COMPANY, LLC,<br><br>　　　　　Defendant. | No. 12-cv-7372 (RWS)<br><br>**ECF CASE**<br>**Electronically Filed** |

**REPLY MEMORANDUM OF LAW IN FURTHER
SUPPORT OF THE PUTNAM ADVISORY COMPANY, LLC'S
<u>MOTION TO DISMISS THE SECOND AMENDED COMPLAINT</u>**

　　　　　　　　　　　　　　　　　　MILBANK, TWEED, HADLEY &
　　　　　　　　　　　　　　　　　　　McCLOY LLP

　　　　　　　　　　　　　　　　　James N. Benedict
　　　　　　　　　　　　　　　　　Sean M. Murphy
　　　　　　　　　　　　　　　　　Thomas A. Arena
　　　　　　　　　　　　　　　　　Robert C. Hora
　　　　　　　　　　　　　　　　　1 Chase Manhattan Plaza
　　　　　　　　　　　　　　　　　New York, New York 10005
　　　　　　　　　　　　　　　　　(212) 530-5000

　　　　　　　　　　　　　　　　　*Attorneys for Defendant*
　　　　　　　　　　　　　　　　　*The Putnam Advisory Company, LLC*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ......................................................................................................ii

ARGUMENT ................................................................................................................................ 1

I.    FGIC MUST PLEAD LOSS CAUSATION TO AVOID DISMISSAL ........................... 1

II.   THE SECOND AMENDED COMPLAINT STILL FAILS TO PLEAD LOSS CAUSATION ...................................................................................................................... 3

III.  FGIC FAILS ADEQUATELY TO PLEAD SCIENTER ................................................... 7

IV.  THE SECOND AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR NEGLIGENT MISREPRESENTATION OR NEGLIGENCE ......................................... 9

CONCLUSION ............................................................................................................................ 11

## **Table of Authorities**

**Page(s)**

**CASES**

*Anwar v. Fairfield Greenwich, Ltd.*,
  286 F.R.D. 258 (S.D.N.Y. 2012) ...................................................................................................7

*Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*,
  692 F.3d 42 (2d Cir. 2012)..............................................................................................................9

*Cohen v. Stevanovich*,
  722 F. Supp. 2d 416 (S.D.N.Y. 2010).............................................................................................9

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
  165 F. Supp. 2d 615 (S.D.N.Y. 2001).............................................................................................3

*Falcon Crest Diamonds, Inc. v. Dixon*,
  655 N.Y.S.2d 232 (N.Y. Sup. Ct. 1996) ...................................................................................1-2

*Fin. Guar. Ins. Co v. Putnam Advisory Co.*,
  No. 12 Civ. 7372, 2013 WL 5230818 (S.D.N.Y. Sept. 10, 2013) .................................. passim

*Fogarazzo v. Lehman Bros., Inc.*,
  341 F. Supp. 2d 274 (S.D.N.Y. 2004).............................................................................................4

*Hammerstone NV, Inc. v. Hoffman*,
  No. 09 CV 2685, 2010 WL 882887 (S.D.N.Y. Mar. 10, 2010)............................................7, 8

*Hechter v. N.Y. Life Ins. Co.*,
  46 N.Y.2d 34 (1978) ........................................................................................................................2

*In re MBTE Prods. Liab. Litig.*,
  No. 00-1898, MDL 1358, 2005 WL 106936 (S.D.N.Y. Jan. 18, 2005) ...................................2

*Ins. Co. of Penn. v. Park & Pollard Co.*,
  180 N.Y.S. 143 (N.Y. App. Div. 1920) ........................................................................................2

*Joffee v. Lehman Bros., Inc.*,
  410 F. Supp. 2d 187 (S.D.N.Y. 2006) ...........................................................................................4

*Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.*,
  821 F. Supp. 2d 616 (S.D.N.Y. 2011)..........................................................................................10

*Laub v. Faessel*,
  745 N.Y.S.2d 534 (N.Y. App. Div. 2002) ....................................................................................9

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005)..................................................................................4

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  No. 12 Civ. 3723, 2013 WL 1294668 (S.D.N.Y. Mar. 28, 2013) ............................9

*M&T Bank Corp. v. Gemstone CDO VII, Ltd.*,
  891 N.Y.S.2d 578 (N.Y. App. Div. 2009) ...............................................................10

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*,
  963 N.Y.S.2d 21 (N.Y. App. Div. 2013) ...................................................................2

*Megaris Furs, Inc. v. Gimbel Bros., Inc.*,
  568 N.Y.S.2d 581 (N.Y. App. Div. 1991) .................................................................4

*Postler & Jaeckle Corp. v. Cnty. of Monroe Indus. Dev. Agency*,
  153 Misc. 2d 392 (N.Y. Sup. Ct. 1992) ...................................................................2

*Solar Travel Corp. v. Nachtomi*,
  No. 00 CIV 3564, 2001 WL 641151 (S.D.N.Y. June 8, 2001).................................9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)..................................................................................................9

*Woods v. Maytag Co.*,
  807 F. Supp. 2d 112 (S.D.N.Y. 2011)........................................................................3

**STATUTES**

N.Y. Ins. Law § 3105 (McKinney 2013) .......................................................................2

N.Y. Stat. Law § 301, cmt. 2 (McKinney 2013)............................................................2

**OTHER AUTHORITIES**

Nat'l Comm'n on the Causes of the Fin. & Econ. Crisis, *The Financial Crisis Inquiry
  Report: Final Report* (2011) ...................................................................................7

The Putnam Advisory Company, LLC ("Putnam") respectfully submits this reply memorandum of law in support of its motion, pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the Second Amended Complaint ("SAC") filed by Financial Guaranty Insurance Company ("Plaintiff" or "FGIC") with prejudice.[1]

## ARGUMENT

### I. FGIC MUST PLEAD LOSS CAUSATION TO AVOID DISMISSAL

In dismissing the First Amended Complaint ("FAC"), this Court correctly held that FGIC had failed to plead loss causation because it had not alleged any facts showing that "there was any pool of collateral that could have avoided default while still conforming to Pyxis' detailed eligibility criteria." (Op. at *3.)  In so holding, the Court specifically rejected FGIC's contention that Section 3105 of the New York Insurance Law excused FGIC from pleading loss causation because Putnam "did not apply for any insurance, nor did it enter into any sort of contract—insurance-related or otherwise—with FGIC."  (*Id.* at *4.)

In its Opposition, FGIC concedes that "*Calyon* was both the applicant for insurance and the insured under the Pyxis Guaranty" (Pl. Br. at 12 (emphasis added)), that Putnam was not a party to Calyon's swap with FGIC's subsidiary, and that Putnam was not a party to the Guaranty that FGIC provided to Calyon.  FGIC, nevertheless, claims that Section 3105 applies to Putnam because Putnam supposedly made statements to FGIC "by the authority of" Calyon in connection with Calyon's alleged application for financial guaranty insurance.  In other words, FGIC claims, without a shred of support, that Putnam acted as Calyon's agent.  *See Falcon Crest Diamonds, Inc. v. Dixon*, 655 N.Y.S.2d 232, 236 (N.Y. Sup. Ct. 1996) (construing

---

[1] All capitalized terms not defined herein have the same meaning as defined in Putnam's Memorandum of Law in Support of its Motion to Dismiss the Second Amended Complaint, dated October 15, 2013 [Doc. # 24]; citations thereto take the form "Put. Br. at __".  Citations to Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss the Second Amended Complaint ("Opposition"), dated October 29, 2013 [Doc. # 27] take the form "Pl. Br. at __".  Citations to *Fin. Guar. Ins. Co v. Putnam Advisory Co.*, No. 12 Civ. 7372, 2013 WL 5230818 (S.D.N.Y. Sept. 10, 2013) ("Opinion") take the form "Op. at __".

"by the authority of" to mean that one may make a representation under Section 3105 through a broker).[2]  FGIC's argument fails on several grounds.

First, nothing in Section 3105 abrogates the requirement that FGIC plead and prove loss causation to prevail on its common-law fraud claim.  Under New York law "the common law is never abrogated by implication" and "must be held no further changed than the clear import of the language used in a statute absolutely requires."  N.Y. Stat. Law § 301, cmt. 2 (McKinney 2013).  Insurance Law Section 3105, by its terms, addresses only two situations: (i) where an insurer seeks to "avoid any contract of insurance" *ab initio*—that is, seeks to rescind it, or (ii) seeks to "defeat recovery thereunder"—*i.e.*, defeat a counterparty's attempt to recover under an insurance contract.  Neither situation is present here.  FGIC has no basis for rescission *against Putnam*.  Rescission is available only where the parties are in privity of contract.  *See, e.g., Ins. Co. of Penn. v. Park & Pollard Co.,* 180 N.Y.S. 143 (N.Y. App. Div. 1920) ("[P]laintiff must be a party or privy to a contract to . . . maintain a suit in equity for its cancellation or rescission").  Nor can FGIC "defeat recovery" under the Guaranty by suing Putnam.  Putnam is not a party to the Guaranty, and FGIC has already paid Calyon under it.[3]

Second, FGIC pleaded no facts to support its contention that Putnam acted as Calyon's agent or broker in obtaining the Guaranty.  Where, as here, a purported agency

---

[2]  *See also Postler & Jaeckle Corp. v. Cnty. of Monroe Indus. Dev. Agency*, 153 Misc. 2d 392 (N.Y. Sup. Ct. 1992) (quoting 2 N.Y. Jur. 2d Agency § 1, at 471 (1979)) (An agent is "one who, *by the authority of* another, undertakes to transact some business or manage some affairs on account of another." (emphasis added)).

[3]  To the extent *MBIA Insurance Corp. v. Countrywide Home Loans, Inc.*, 963 N.Y.S.2d 21 (N.Y. App. Div. 2013), and the trial court decision it partially affirmed held that the phrase "defeat recovery thereunder" in Section 3105 could encompass damages claims based on common-law fraud, those cases are distinguishable:  *MBIA* involved claims for recovery of damages against the very *counterparty* to the insurance contract who had *received payments* under the policy.  Putnam was not party to the Guaranty, and received no payments from FGIC.  Moreover, neither case is binding here.  *See In re MBTE Prods. Liab. Litig.*, No. 00-1898, MDL 1358, 2005 WL 106936, at *13 (S.D.N.Y. Jan. 18, 2005) (A federal court is not bound, even by an intermediate state appellate court ruling, if it believes the state's highest court would interpret a statute differently).  The common law may not be overridden absent a "clear and specific legislative intent."  *Hechter v. N.Y. Life Ins. Co.*, 46 N.Y.2d 34, 39 (1978).  Nothing in Section 3105 clearly and specifically abrogates FGIC's duty to plead and prove loss causation.

relationship "is an integral element of an alleged fraud, courts have required the facts establishing agency be pled with Rule 9(b) particularity." *Woods v. Maytag Co.*, 807 F. Supp. 2d 112, 121 (S.D.N.Y. 2011). "Essential to the agency relationship is that the agent acts subject to the principal's direction and control." *Id.* (citations omitted). The SAC lacks any facts from which the Court could find that Putnam acted as Calyon's agent—*i.e.*, acted subject to Calyon's direction and control—in procuring the Guaranty. According to FGIC, Putnam acted "by the authority of" Calyon because "most of Putnam's [alleged] misrepresentations were made in offering materials . . . which, in turn, were *prepared by Calyon* and were *presented by Calyon* to FGIC . . . ." (Pl. Br. at 12 (emphasis added).) But the SAC nowhere alleges that Calyon directed or controlled Putnam's statements or directed Putnam to make any statements to FGIC regarding the Guaranty. FGIC's concession that the offering materials were "prepared by Calyon" and "presented by Calyon to FGIC," to the contrary, shows that Calyon acted for itself to obtain a guaranty for *its* benefit with respect to a swap to which *it*, not Putnam, was a party.[4]

## II. THE SECOND AMENDED COMPLAINT STILL FAILS TO PLEAD LOSS CAUSATION

In dismissing the FAC, this Court correctly held that FGIC had failed adequately to allege that the information purportedly concealed by Putnam was the reason the Pyxis Guaranty turned out to be a "losing" transaction, noting that FGIC had not alleged any "facts sufficient to demonstrate that there was *any* pool of collateral that could have avoided default while still conforming to Pyxis' detailed eligibility criteria." (Op. at *3 (emphasis in original).) Although FGIC attempts to minimize its pleading burden, it is well established that where, as

---

[4] FGIC's footnote argument that it need not prove loss causation because it seeks rescissory relief likewise has no merit. This Court, relying on its decision in *Emergent Capital Investment Management, LLC v. Stonepath Group, Inc.*, 165 F. Supp. 2d 615, 627 n.2 (S.D.N.Y. 2001), already rejected this proposition in dismissing the FAC. (Op. at *4.) Moreover, as discussed above, rescission is available only where the parties are in privity of contract. FGIC has not alleged that Putnam was a party to the Guaranty or in privity with any party.

3

here, the plaintiff's loss "coincides with a marketwide phenomenon causing comparable losses to other investors, . . . a plaintiff's claim fails when it has not adequately pled facts which . . . would show that its loss was caused by the alleged misstatements as opposed to intervening events." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005) (quotations omitted); *see also Megaris Furs, Inc. v. Gimbel Bros., Inc.*, 568 N.Y.S.2d 581 (N.Y. App. Div. 1991).[5] The relatively few new allegations in the SAC fall well short of establishing that any of FGIC's losses, which were remarkably similar to those suffered by other investors who took long positions on the housing market, were caused by any alleged wrongdoing by Putnam.

FGIC relies heavily on its conclusory allegations that the 18 so-called "Magnetar CDOs" (of which Pyxis was just one) performed more poorly than many of the "non-Magnetar CDOs" issued during 2006. (*See* Pl. Br. at 15; SAC ¶ 156.) But the SAC fails to allege why this overbroad comparison is relevant to loss causation. FGIC nowhere alleges that Pyxis or any of the other "Magnetar CDOs" had the same set of structural features, including eligibility criteria, collateral quality tests, overcollateralization levels, payment priorities or waterfall structures, as any of the "non-Magnetar CDOs" to which FGIC seeks to compare them.

Minimizing its pleading obligations, FGIC argues that it need do no more than compare the performance of CDOs with "identical vintages" and "identical collateral classes" because these are supposedly the "two key characteristics influencing risk," and that other purportedly "narrower" characteristics, such as the trigger and waterfall structures are "clearly less significant . . . ." (Pl. Br. at 15.) There are three insuperable flaws with this argument.

---

[5] None of the cases cited by FGIC are at odds with the Second Circuit's holding in *Lentell* that a plaintiff must allege facts sufficient to show that its loss was caused by the defendant's alleged misstatements as opposed to a market-wide event. In fact, *Fogarazzo v. Lehman Brothers, Inc.*, 341 F. Supp. 2d 274, 285 (S.D.N.Y. 2004), on which FGIC principally relies, was decided prior to *Lentell*, and did not involve an intervening factor remotely comparable to the market-wide housing collapse at issue here. This Court previously declined to follow *Fogarazzo* precisely because it pre-dated *Lentell*. *See Joffee v. Lehman Bros., Inc.*, 410 F. Supp. 2d 187, 193 (S.D.N.Y. 2006) (Sweet, J.).

4

First, FGIC fails to allege the meaning of "identical vintages" and "identical collateral classes"—broad terms that the SAC leaves undefined.[6]  Second, FGIC fails to allege how the Magnetar CDOs and the hundreds of non-Magnetar CDOs issued during 2006 could have had "identical collateral classes" given that they all included different sets of RMBS and CDOs as collateral. And, third, FGIC fails to allege any basis for its contention that "vintage" and "collateral classes," however defined, are more "significant" than any number of other structural features such as payment priority and levels of overcollateralization, especially when the metric under assessment is the default rate suffered by investors exposed to the senior tranche of CDOs.

FGIC next tries to salvage its loss causation allegations by speculating that certain assets purportedly "selected by Magnetar" were significantly more likely to default than assets that Putnam purportedly "would" have selected otherwise.  (Pl. Br. at 15-16.)  There is no well-pleaded allegation in the SAC, however, that but for Magnetar's supposed override of Putnam's collateral management responsibilities, Putnam would have selected other assets that would have performed better than those in the Pyxis collateral pool.  Still missing from the SAC is any allegation that there was any set of assets Putnam could have selected that would have complied with the detailed eligibility requirements and constraints set forth in the Pyxis Offering Memorandum and still have avoided default.  The absence of any such allegation is not surprising given that, as this Court previously observed, a whopping 91% of all U.S. CDO securities of any vintage had been downgraded by the end of 2008.  (*See* Op. at *3.)

FGIC rehashes stale allegations in faulting Putnam for not having included $145 million of prime RMBS assets in the Pyxis collateral pool.  Based on the assertion that "prime

---

[6] In support of its broad assertion that the SAC has compared CDOs of "identical asset classes," FGIC argues only that the Magnetar CDOs and the purportedly "comparable" non-Magnetar CDOs were "mezzanine" CDOs, a general term used to describe CDOs that had one or more "mezzanine" level tranches between its highest rated notes and its equity.  (Pl. Br. at 15.)  To suggest that all such mezzanine CDOs have "identical asset classes" is preposterous; the variation among such CDOs is virtually unlimited.

assets are by definition stronger than subprime assets" (Pl. Br. at 16), FGIC speculates that Pyxis might not have defaulted had such assets been included in the final collateral pool.  But FGIC does not make any well-pleaded allegations to support this conclusion.  The amount of prime assets that FGIC now claims would have been crucial to the performance of the Pyxis CDO was miniscule—less than 10% of the $1.5 billion Pyxis collateral pool.  FGIC fails to show how the inclusion of these assets would have prevented a default.

    FGIC continues to place great reliance on its allegation that $167 million of assets purportedly selected by Magnetar defaulted, on average, 0.35 years earlier (a matter of months) than the rest of the Pyxis portfolio.  (*See* Pl. Br. at 16.)  The SAC, however, does not allege with any particularity the basis for FGIC's allegation that Magnetar, rather than Putnam, chose these assets for inclusion in Pyxis.  If anything, the allegation that Magnetar selected a mere 10% of the collateral pool is directly at odds with the central theme of the SAC—namely, that Putnam ceded *all* of its collateral selection responsibilities to Magnetar and that, under the control of Magnetar, Putnam picked *only* bad assets that were designed to cause Pyxis to crater as quickly as possible.  In this context, it makes no sense to compare one set of Pyxis collateral assets to another because, under FGIC's theory, all of the selected collateral assets were toxic and chosen with the express intent of causing the transaction to fail.

    Moreover, even accepting *arguendo* that loss causation can be alleged by comparing the relative default rates of different Pyxis collateral, there is no allegation that the $167 million of collateral identified by FGIC caused Pyxis as a whole to default, thereby triggering FGIC's Guaranty.  That roughly 10% of the Pyxis collateral assets defaulted approximately four months before the average of the rest of $1.5 billion portfolio does not permit the conclusion that FGIC's losses were caused by Putnam's alleged wrongdoing as opposed to

6

the market-wide collapse of the housing industry.  If anything, this minor difference reinforces the conclusion that Putnam could not have chosen any assets consistent with Pyxis' eligibility requirements that would *not* have defaulted due to the financial crisis.

Lastly, FGIC asserts that a handful of assets in the Pyxis collateral pool "defaulted before the events that precipitated the financial crisis and a market-wide decline in housing prices even occurred," including $67 million in assets (under 5% of the total Pyxis collateral) that "defaulted as early as 2007." (Pl. Br. at 17.)  Contrary to FGIC's assertion, however, this does not evidence that these defaults were attributable to anything but the market-wide events relating to the burgeoning financial crisis.  Numerous sources, including the Financial Crisis Inquiry Report, on which this Court relied in dismissing the FAC (Op. at *3), establish that the crisis began well before 2008.[7]  FGIC also does not allege, because it cannot, that removing these $67 million in assets from the Pyxis portfolio would have prevented Pyxis from defaulting.

## III.    FGIC FAILS ADEQUATELY TO PLEAD SCIENTER

As an initial matter, FGIC misstates the law in arguing that it "is not obliged to plead scienter with particularity . . . ." (Pl. Br. at 19.)  The law is squarely to the contrary.  *See Anwar v. Fairfield Greenwich, Ltd.*, 286 F.R.D. 258, 260 (S.D.N.Y. 2012) (With respect to both federal securities and common-law fraud claims, "Rule 9(b) also requires a plaintiff to plead with particularity facts giving rise to a strong inference" of scienter); *Hammerstone NV, Inc. v. Hoffman*, No. 09 CV 2685, 2010 WL 882887, at *11 (S.D.N.Y. Mar. 10, 2010) (dismissing common-law fraud claim for failure to plead scienter with sufficient particularity).  FGIC also misstates the law in contending that "Putnam's argument that its fees were not sufficient to

---

[7] Nat'l Comm'n on the Causes of the Fin. & Econ. Crisis, *The Financial Crisis Inquiry Report: Final Report* 251 (2011) (noting that the "onset of the crisis" was "summer 2007"); *id.* at 276 ("[T]he rating agencies continued to downgrade mortgage-backed securities and CDOs through 2007.  By January 2008, as a result of the stress in the mortgage market, S&P had downgraded 3,389 tranches of residential mortgage–backed securities and 1,383 tranches from 420 CDOs.")

justify its commission of fraud . . . raises a question of fact that cannot be resolved on a motion to dismiss." (Pl. Br. at 22.) As the cases Putnam cites demonstrate, questions as to the sufficiency of scienter allegations are routinely resolved on motions to dismiss. *See, e.g.*, *Hammerstone,* 2010 WL 882887, at *11. FGIC's illogical theories of scienter warrant dismissal.

FGIC makes no plausible allegation that Putnam had any financial motive to participate in a $1.5 billion CDO it knew would fail, all so that another entity, Magnetar, could reap a windfall. FGIC cannot overcome the indisputable fact that Putnam's collateral management fees were dependent, in their entirety, on the success of the transaction. (Put. Br. at 6 (citing Hora Decl. Ex. 3).) Under the Collateral Management Agreement and the Pyxis Indenture, if a collateral asset defaulted, Putnam would not receive a collateral management fee with respect to that security. (Put. Br. at 17-18.) For Putnam intentionally to contribute to Pyxis' failure therefore defies logic, as it would *deprive* Putnam of fees. In this context, FGIC's assertion that Putnam's subordinated incentive fee was "virtually assured" by Magnetar's "significant control" over the Pyxis portfolio is meaningless rhetoric. (Pl. Br. at 21-22.) Any purported control exercised by Magnetar for the alleged purpose of causing Pyxis to fail would not have "assured" Putnam's fee; it would have "assured" that Putnam did not receive its fee.

FGIC next argues that Putnam had a financial incentive to participate in the alleged fraud because it hoped to "secure[] lucrative deal volume from its cooperation with Magnetar." (*Id.* at 22.) But the SAC contains no well-pleaded facts tying Putnam's selection as collateral manager for the second CDO to any wrongdoing regarding the first transaction. Regardless, it would have been patently unreasonable for Putnam to engage in a billion-dollar fraud in exchange for customary fees because it sought an opportunity to participate in a second billion-dollar fraud, for which it would also receive customary fees. The reputational damage

incurred would far outweigh any customary fees generated by a follow-on transaction. *See, e.g.*, *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, No. 12 Civ. 3723, 2013 WL 1294668, at *14 (S.D.N.Y. Mar. 28, 2013) ("[E]ven if scienter could be based on a party's desire to accrue fees and cultivate business, Plaintiffs do not explain how Defendants would help their bottom line by facilitating a massive scheme to scuttle their own financial instruments").[8]

## IV. THE SECOND AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR NEGLIGENT MISREPRESENTATION OR NEGLIGENCE

According to FGIC, this Court has egregiously misread the Second Circuit's decision in *Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42 (2d Cir. 2012). Putnam submits that Your Honor got it right.[9] *Bayerische* held that, in order for a duty to arise out of a "special relationship," the plaintiff must "demonstrate a relationship between plaintiff and defendant that is 'so close as to approach that of privity, if not completely one with it.'" *Id.* at 59-60. The Second Circuit held that the plaintiff in *Bayerische* had sufficiently alleged such a close relationship where, among other things, the Portfolio Management Agreement supported the conclusion that Bayerische was a third-party beneficiary and the portfolio manager's conduct indicated its knowledge and consent to the investor's reliance on its performance. *Id.* at 60.

As the Court correctly held in dismissing the FAC, such facts are not present here. (Op. at *4-5.) Neither the Collateral Management Agreement nor the parties' alleged course of

---

[8] FGIC attempts to argue that, contrary to the cases cited in Putnam's opening brief, "the desire to earn fees may indeed support a plausible inference of motive." (Pl. Br. at 22 n.6.) But the case it cites, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), is inapposite: as FGIC concedes, the Court's brief discussion of the matter concerns *personal*, rather than institutional, financial gain. *Id.* at 325. The SAC nowhere alleges that a Putnam employee was motivated to participate in the fraud because of personal financial incentive. FGIC also attempts to distinguish *Cohen v. Stevanovich*, 722 F. Supp. 2d 416 (S.D.N.Y. 2010), which held that a generalized profit motive is insufficient to provide a compelling inference of scienter, by asserting that Putnam's fees from Pyxis and Pyxis 2 were known, "concrete benefits." (Pl. Br. at 22 n.6.) But the size of Putnam's fees were not "known" in in advance; they were dependent on the performance of the CDOs and their underlying collateral.

[9] The Court need not reach this issue if it holds that the SAC fails to plead loss causation, which is an element of claims for negligence and negligent misrepresentation. *See Solar Travel Corp. v. Nachtomi*, No. 00 CIV 3564, 2001 WL 641151, at * 6 (S.D.N.Y. June 8, 2001); *Laub v. Faessel*, 745 N.Y.S.2d 534, 536 (N.Y. App. Div. 2002).

9

conduct demonstrates a relationship approaching privity between FGIC and Putnam. As highlighted in Putnam's opening brief (Put. Br. at 24-25), Section 20 of the Collateral Management Agreement identified the narrow set of third party beneficiaries thereunder, and notably did not include FGIC—a guarantor of a third-party swap between Calyon and a FGIC subsidiary that was not part of the Pyxis CDO itself. (Hora Decl. Ex. 2 § 20.) Unlike the plaintiff in *Bayerische*, neither FGIC nor its subsidiary actually purchased any CDO notes. In addition, the Offering Memorandum stated in bolded capital letters that no investor could rely on any representations other than those set forth therein. The Offering Memorandum also warned that, in making an investment decision, investors "must rely on their own examination of the co-issuers and the terms of the offering, including the merits and risks involved." (Hora Decl. Ex. 1 at iii.)

        The existence of disclaimer language effectively precludes any claim of a fiduciary or similar duty.[10] *See, e.g.*, *M&T Bank Corp. v. Gemstone CDO VII, Ltd.*, 891 N.Y.S.2d 578, 581 (N.Y. App. Div. 2009) (negligent misrepresentation claim against a CDO manager dismissed where disclaimers in deal documents advised plaintiff to perform its own due diligence); *Landesbank Baden-Wurttemberg v. Goldman, Sachs & Co.*, 821 F. Supp. 2d 616, 624 (S.D.N.Y. 2011); *see also* Put Br. at 23-24. Putnam was entitled to rely on these disclaimers and FGIC cannot overcome them by merely alleging, in conclusory fashion, that it spoke to Putnam prior to issuing the Guaranty. If the law were otherwise, collateral managers would never speak to potential investors for fear of creating a duty where none was intended.

---

[10] In its Opposition, FGIC argues for the first time that the Offering Circular in the securitization transaction at issue in *Bayerische* contained disclaimer language similar to that in the Pyxis Offering Memorandum. But the portfolio manager in *Bayerische* did not argue in its Second Circuit briefing that disclaimer language precluded the existence of a duty, and there is no evidence that the Second Circuit considered such an argument in holding that the specific allegations in that case were sufficient to give rise to a duty running from the portfolio manager to the plaintiff.

## **CONCLUSION**

For the reasons set forth above and for those set forth in its opening brief, Putnam respectfully requests that the Court grant its motion to dismiss the Second Amended Complaint with prejudice.

Dated:  New York, New York  
       November 5, 2013

MILBANK, TWEED, HADLEY & McCLOY LLP  
1 Chase Manhattan Plaza  
New York, New York  10005  
(212) 530-5000

By:   /s/ Thomas A. Arena  
    James N. Benedict  
    Sean M. Murphy  
    Thomas A. Arena  
    Robert C. Hora  
    *Attorneys for Defendant*  
    *The Putnam Advisory Company, LLC*