DBKZFGIM                    Motion

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  FINANCIAL GUARANTY INSURANCE
   COMPANY,
4
               Plaintiff,
5
               v.                          12 CV 7372 (RWS)
6
   THE PUTNAM ADVISORY COMPANY,
7  LLC,

8              Defendant.

9  ------------------------------x

10                                    November 20, 2013
                                      12:05 p.m.
11
   Before:
12
                    HON. ROBERT W. SWEET,
13
                                      District Judge
14
                         APPEARANCES
15
   QUINN EMANUEL URQUHART & SULLIVAN LLP
16      Attorneys for Plaintiff
   BY:  SEAN P. BALDWIN
17
   MILBANK, TWEED, HADLEY & McCLOY
18      Attorneys for Defendant
   BY:  THOMAS A. ARENA
19

20

21

22

23

24

25

1

2           THE COURT:  Financial Guarantee Against Putnam.

3           MR. ARENA:  Good afternoon, your Honor, Thomas Arena

4    of Milbank, Tweed, Hadley & McCloy for the defendant Putnam

5    Advisory Company.  We're here on a motion to dismiss the second

6    amended complaint.

7           Your Honor, I have a binder of several exhibits that I

8    may refer to during my oral argument.  May I hand it up?

9           THE COURT:  Pleased to have it.  Thank you.

10          MR. ARENA:  Your Honor, we're here on the motion to

11   dismiss the second amended complaint that your Honor may recall

12   in September of this year your Honor dismissed the first

13   amended complaint filed by FGIC on two principal grounds.

14          With respect to FIGIC's fraud claim, your Honor

15   dismissed that without prejudice for failure to plead loss

16   causation.

17          With respect to FIGIC's negligence base claims,

18   negligence and negligent misrepresentation, your Honor

19   dismissed those claims for failure to plead the existence of a

20   special relationship between FGIC and Putnam, the collateral

21   manager of the Pyxis CDO at issue, sufficient to give rise on

22   behalf of Putnam of a duty to disclose.

23          We don't believe, your Honor, that the very limited

24   amendments that had been made to the second amended complaint

25   fix those pleading defects.

DBKZFGIM                              Motion

1              In addition, your Honor, we believe that there is a

2      separate and independent basis on which to dismiss the fraud

3      claim, which is the failure to plead scienter.

4              I'm mindful of the fact, your Honor, that you have a

5      room full of counsel, and I'm also mindful that we've argued

6      this before.  I'll try to be as telescoped as possible.

7              Let me start with loss causation, your Honor, just a

8      couple of background facts as to what I believe the operative

9      allegations are of the second amended complaint.

10             There is the Pyxis CDO, which closed in October of

11     2006.  Putnam, my client, was the collateral manager for that

12     CDO.  The gravamen of the complaint is that there was an equity

13     investor -- there were actually two equity investors, but ones

14     at issue here.  The two equity investors were Deutsche Bank and

15     Magnetar.  And the allegation is that Magnetar in fact

16     controlled and directed Putnam's selection of assets for the

17     collateral pool supporting the CDO; and that Magnetar did this

18     because, in addition to having an equity interest in the deal,

19     Magnetar was also shorting, taking the short counter position

20     of some of this credit default swaps in the collateral pool.

21     And so the allegation is, Putnam, you entered into this fraud,

22     a billion dollar fraud, you selected collateral with the

23     express design of causing this CDO to tank, it was a $1.5

24     billion CDO, and you did this to put money in the pocket of

25     Magnetar.

1            With respect to loss causation, your Honor -- and just

2    one other point about FGIC.  FGIC is not a note holder.

3    They're not a note holder.  They didn't buy any notes.  FGIC is

4    here because FGIC issued a guaranty to Calyon.  Who is Calyon?

5    Calyon is the arranger of the CDO.  Calyon is not a defendant

6    in this case.  But FGIC issued a guaranty to Calyon where the

7    guaranty was supporting a credit default swap that FGIC

8    subsidiary, also not a party to this lawsuit, had entered into

9    with Calyon.  And the credit default swap was essentially one

10   where FIGIC's subsidiary was guaranteeing the performance of

11   the Pyxis CDO itself.  Putnam is not a party to that guaranty,

12   it's not party to the credit default swap, FGIC is not a note

13   holder.

14           So, loss causation.  At the outset, FGIC argues, we

15   don't even have to plead or prove loss causation because our

16   fraud claim is based upon an instrument of insurance, and under

17   Section 3105 of the New York State Insurance Code, we don't

18   have to prove loss causation.

19           As your Honor held in your September decision

20   dismissing the first amended complaint, that is not what the

21   insurance code provides with respect to an entity that's a

22   defendant like Putnam, which was not a party to the insurance

23   contract.  We think your Honor got it right back then.  We

24   think that's still the right analysis.

25           The one case that, the one case that FGIC appears to

DBKZFGIM                         Motion

 1   rely upon, the principal reliance is a New York State case
 2   called MBIA versus Countrywide.  And in that case, your Honor,
 3   while the Court held that you don't have to -- plaintiff does
 4   not have to prove loss causation where they are bringing a
 5   fraud claim based upon an instrument of insurance, the
 6   defendant in that case, unlike Putnam here, was a party to the
 7   insurance contract.  Putnam received no proceeds under this
 8   guaranty.  The suggestion that Putnam should be liable for
 9   rescissionary damages for a guaranty that FGIC entered into
10   with another entity and that FGIC doesn't even have to prove
11   that Putnam's alleged misstatements caused its loss, I would
12   submit is unprecedented in New York State.
13          So I believe your Honor got it right, that Putnam --
14   that FGIC, excuse me, has to plead and prove loss causation.
15          The next line of defense that FGIC has thrown up is,
16   well, our pleading is governed by 8(a), not 9(b)  And I would
17   refer your Honor to your decision in Cohen versus Stevanovich,
18   722 F. Supp. 2d, 416, I believe it's a 2010 decision.  It's the
19   last decision that I'm aware of in which your Honor has opined
20   on this issue, where this Court clearly held that loss
21   causation for fraud claims is governed by 9(b).  Whether
22   governed by 9(b) or 8(a), however, I would submit that FGIC has
23   not adequately alleged loss causation, no matter -- under
24   whatever standard is to be applied here.
25          As your Honor noted in your September decision of this

DBKZFGIM                    Motion

1    year in dismissing the first amended complaint, 91 percent of

2    all U.S. issued CDOs had defaulted by the end of 2008.  Pyxis

3    2006 is not a statistical outlier.  And the test that your

4    Honor put to FGIC, which I believe is the appropriate one, is

5    you have to plead -- FGIC has to plead with particularity that

6    there was some set of collateral that Putnam would have

7    selected and intentionally didn't select because of Magnetar's

8    alleged control, and had Putnam selected that other collateral,

9    that this deal would not have defaulted.  I don't believe that

10   FGIC has adequately alleged that to be the case.  I don't

11   believe that FGIC can allege that to be the case.

12           Here's what FGIC alleges in their second amended

13   complaint, the new allegations.  First, painting with the

14   broadest brush possible, FGIC alleges that all of the Magnetar

15   CDOs -- and it alleges that there were 18, 18 Magnetar CDOs

16   that were issued during 2006 -- Putnam is alleged to have been

17   involved in only one.  But the 18 Magnetar CDOs had all

18   defaulted by 2012; whereas, in contrast, all of the other CDOs

19   issued during 2006, only 72 percent had defaulted as of the end

20   of 2012.  And they suggest that this is an apples to apples

21   comparison, and it proves that Magnetar's control somehow

22   caused Pyxis to default and it would not have otherwise

23   defaulted had Magnetar not had this alleged control.  I would

24   submit that this is not an apples to apples comparison.  FGIC

25   nowhere alleges that Pyxis or any of these other so-called

DBKZFGIM                          Motion

1    Magnetar CDOs had the same set of structural features,

2    eligibility criteria, collateral quality tests, over

3    collateralization levels, payment priorities, waterfall

4    structures, as all of the other CDOs of which only 72 percent

5    failed by 2012.  I just think it's an apples to oranges

6    comparison, and it just doesn't mean all that much where they

7    have to allege loss causation.

8            They allege that if not for Magnetar's alleged

9    involvement, Putnam would have selected better performing

10   assets.  I submit that this is totally speculative.  There is

11   no basis in the second amended complaint to show that but for

12   Magnetar's involvement, Putnam intended to select some other

13   asset.

14           And I would note, your Honor, and I'll get into this

15   in more detail in a bit, this is not one of those cases where

16   there are e-mails in which the collateral manager or the

17   arranger refers to collateral in pejorative terms, pigs or the

18   worst.  We've all seen them.  They've been in the press.  This

19   is not one of those cases.  There are no allegations along

20   those lines.

21           FGIC also argues, they have an analysis towards the

22   end of their second amended complaint, that they've identified

23   $167 million of assets, collateral assets purportedly selected

24   by Magnetar that FGIC argues defaulted .35 of a year, four

25   months, five months earlier than the rest of the collateral

1   assets in the Pyxis collateral pool.

2          I just want to take a step back for a second to

3   consider this new allegation in light of FGIC's overall theory

4   because it's totally inconsistent.  FGIC's overall theory,

5   which is set forth at paragraph four of the second amended

6   complaint, is that Putnam seeded the entire collateral

7   selection process to Magnetar; that Magnetar was the master

8   puppeteer and FGIC just -- that Putnam just did Magnetar's

9   bidding.  I don't believe there is proof for that, but that's

10   their core allegation.

11          So to go from there in paragraph four, which reads

12   there is overwhelming evidence that the Pyxis collateral

13   selection process was controlled and directed by Magnetar, to

14   go from there to an analysis where FGIC says towards the end of

15   their second amended complaint, well, we've isolated $167

16   million worth of collateral out of a $1.5 billion collateral

17   pool, and we think we have evidence that Magnetar, or we're

18   alleging that Magnetar directed Putnam to pick these assets.

19   And we can show that these assets defaulted .35 of a year

20   earlier than the rest, the other 90 percent of the collateral

21   assets, and that somehow evidences loss causation.  In addition

22   to being incontinent with their principal theory, I would also

23   submit that, if anything, this minor discrepancy in time, if

24   anything, reinforces the conclusion that Putnam could not have

25   chosen any assets consistent with the Pyxis eligibility

DBKZFGIM                          Motion

1    criteria and have avoided an event of default.

2            The Pyxis notes, your Honor, were set to mature in

3    2046.  This was potentially a 40 year deal.  The deal closed in

4    2006.  The pyxis notes were scheduled -- they had a 40 year

5    maturity.

6            Now, there's some variations on that.  The notes could

7    have been paid off early.  But to suggest in light of a

8    potential 40 year deal that some collateral assets, a small

9    sliver, 10 percent or so defaulted .35 of a year earlier than

10   the rest of the collateral assets, I submit is de minimis and

11   does not show that there was any set of assets that Putnam

12   could have selected consistent with the collateral, the

13   collateral eligibility criteria and still avoided an event of

14   default.

15           Let me turn then, your Honor, to scienter.  I know

16   your Honor did not rule on the sufficiency of the fraud claim

17   with respect to scienter in your September decision, but I

18   believe that there is a rock solid argument that the complaint,

19   the second amended complaint does not adequately allege

20   scienter, and that the fraud claim can be dismissed on that

21   ground as well.

22           At the outset, there's also a dispute between the

23   parties as to whether 8(a) or 9(b) governs.  I recognize that

24   9(b) says that a defendant's intent and knowledge can be

25   averred generally.  But I also submit that the case law is

1    pretty clear that scienter is governed by the heightened

2    pleading requirement of 9(b), in particular where there are

3    allegations of alleged conscious misbehavior, the deliberate

4    intentional misconduct that are being used to argue that as a

5    basis for a defendant's scienter.  And there's substantial

6    authority to that effect, your Honor.  There's Judge Sullivan's

7    recent decision in Loreley versus Wells Fargo, there's Judge

8    Baer's decision in Hammerstone, there's the Anwar case from

9    this Court -- from this district, excuse me, which we also cite

10   in our case, and there's other authority to that effect.

11         But let me get into their theory of scienter.  So

12   FGIC's theory, I submit, is neither plausible nor cogent

13   whether you're applying 8(a) or 9(b).  And what they're arguing

14   is that Putnam engaged in a billion dollar plus fraud, risked

15   its reputation and business, all to put millions of dollars in

16   the pocket of -- not of Putnam, but of some third party that's

17   not a defendant here, Magnetar.

18         What was Putnam getting out of this?  Fees, collateral

19   management fees; fees, which, under the operative collateral

20   management agreement, could have been, could have been as high

21   as $3 million a year.  I believe those are customary fees in

22   and of themselves.  Case law is legion that mere desire to

23   obtain customary fees for doing a transaction does not support

24   a strong inference of scienter.  But I mentioned that Putnam

25   could have received $3 million a year as its fees, but it

1   didn't.  It received far less.  In fact, it received far less

2   than customary fees.  And if the mere receipt of customary fees

3   can't support a strong inference of scienter, then the receipt

4   of a small fraction of customary fees a fortiori can't support

5   a strong inference of scienter.

6           And why did Putnam receive a fraction of its customary

7   fees?  Well, it goes to the structure of the fee arrangement

8   that it had with the Pyxis CDO.  And there were two aspects to

9   cut to Putnam's fees.  This was a senior fee and a subordinated

10  fee.  In total, they amounted to 20 basis points, 20 basis

11  points applied against a $1.5 billion collateral pool.  That's

12  how you get to $3 million a year as to what Putnam could have

13  earned.

14          However -- and this is set forth in the collateral

15  management agreement which we've attached to our pleadings, and

16  it's also set forth in the indenture which we've attached to

17  our pleadings -- the senior fee was a 15 basis point fee.  FGIC

18  argues that fee was fixed.  They say in their complaint, it's a

19  fixed fee.  It's anything but fixed.  Because as set forth in

20  the collateral management agreement and the indenture, the 15

21  base point fixed fee was to be applied against the monthly

22  asset amount, the monthly value of the collateral, the notional

23  value on the collateral assets, minus any defaulted securities.

24          So to the extent that Putnam, and as alleged by FGIC,

25  picked collateral assets that it knew and had the intent would

DBKZFGIM                        Motion

fail and tank this deal, Putnam would not collect its 15 basis

point fixed fee with respect to that defaulted security.

Now, is that a motive to commit a fraud?  If the

theory is you're doing all this to get your fee, by following

through on the alleged fraud you're depriving yourself of

getting the very fees that FGIC argues is your incentive for

doing this deal.  It's neither plausible nor cogent.  Under

8(a) or 9(b) or any other analysis, it makes no sense.  It

collapses of its own weight.  That's the fixed fee.

There's also a five basis point subordinate fee.  It's

referred to in FGIC's pleadings as an incentive fee.  Here's

how that worked.  Not only was the five basis point

subordinated fee subject to the monthly asset amount minus any

defaulted security -- so subject to the same defect as the

senior fee -- but the five basis point subordinated fee was

also in the back of line under the priority of payments.  And I

will show you, your Honor, where that is.  We make reference to

it in our pleading, but it's set forth in the collateral

management agreement and in the indenture.

So again, FGIC's theory.  Putnam, at Magnetar's

direction and control, you pick assets that you knew would fail

and tank this deal.  But if that's the case and Putnam was

trying to cause this deal to default, Putnam's subordinated

fee, five basis points, was at the back of the line.  So if all

the note holders and the equity holders didn't get paid, Putnam

1    wasn't getting paid its subordinated fee and in fact Putnam did

2    not get paid its subordinated fee.  Putnam stood to earn, if

3    this deal worked smoothly, $3 million a year.  Through the date

4    of the filing of the initial complaint in this matter,

5    Putnam -- it's alleged that Putnam received fees totaling 5.7

6    million.  It could have made 18 million.  It only received 5.7

7    million because this deal didn't perform well.  Again, is that

8    a motive to defraud or a motive not to commit fraud?

9              So that brings us, your Honor, to the issue of

10   conscious misbehavior.  And the law is clear that where there

11   are allegations of motive are weak or are nonexistent, under

12   the law conscious misbehavior has to be pleaded at a

13   correspondingly greater level.  In Judge Baer's language in

14   Hammerstone, there has to be pleading of, quote, deliberate

15   illegal conduct, deliberate illegal conduct.  The second

16   amended complaint, like the first amended complaint, referred

17   to a number of e-mails that were referenced in a state lawsuit

18   brought against Putnam by a note holder called Loreley.  It

19   also makes reference to some e-mails that were referred to in

20   an administrative complaint that was filed in Massachusetts by

21   the Massachusetts Securities Division.  And, parenthetically,

22   with respect to the Loreley state court lawsuit, the second

23   amended complaint alleges that Putnam and the other defendants

24   settled that lawsuit.  That is factually incorrect.  Justice

25   Schweitzer dismissed the Loreley complaint against Putnam for

DBKZFGIM                    Motion

1   failure to plead a claim.  And the plaintiff in that action

2   filed a stipulation of discontinuance stopping the action.

3   There was no settlement by Putnam.  There was no payment of

4   money.  There was a dismissal decision issued by Justice

5   Schweitzer, and a stipulation of discontinuance filed by the

6   plaintiff.  Putnam paid no money, settled nothing.

7           So conscious misbehavior.  I put in front of your

8   Honor some selected exhibits.  And I'm, again, I'm mindful of

9   the hour.  I just want to go through a couple because I would

10  submit that these exhibits, they don't show that Putnam ever

11  honored any suggestion by Magnetar to remove a security from

12  the collateral pool and put something else in its stead.

13  Here's what they show.  And, your Honor, let me ask you, invite

14  the Court to turn to tab two, exhibit 11 of the Orr affidavit.

15  I've highlighted some language, your Honor.  But this is one of

16  the exhibits used to suggest that Putnam engaged in conscious

17  misbehavior.  And I've highlighted the language, your Honor.

18  At the bottom of the first page there is an e-mail from a

19  gentleman by the name of James Prusko of Magnetar to Carl Bell

20  of Putnam.  And Prusko writes to Bell of Putnam, would love

21  your list of best short candidates.  Very hard to get off

22  sizeable CDO, CDS trades unless they are done against a deal,

23  but our gig is really more macro anyway, not a securities

24  selection play.  So Prusko to Bell is saying, your Honor, you

25  know, we're taking some short positions, but we're not

1   necessarily shorting specific collateral in this deal or

2   anything like that.  And that e-mail followed what I think is a

3   very telling e-mail from Carl Bell, July 7th, 2006, where Bell

4   writes to Prusko, I knew you planned to use mez ABS CDOs as

5   part of your hedge, but I am not sure why you would hedge with

6   the deals that we go long in Pyxis.  We, Putnam, are going to

7   pick the deals that have the best fundamental value.  We, of

8   course, would pick different deals as the best short candidates

9   in terms of being a hedge against sub prime issues.

10          FGIC's theory is that this is a communication between

11  two coconspirators in a billion dollar fraud.  And yet at a

12  time when neither side presumably has any reason to think that

13  anyone will be looking over their shoulder, that has any reason

14  to think that this e-mail is going to be the subject of a

15  motion to dismiss in federal court, Bell of Putnam writes, we

16  are going to pick the deals that have the best fundamental

17  value.  We would pick different deals as the best short

18  candidates in terms of being a hedge against sub prime issues.

19          Now, is that evidence of the deliberate illegal

20  conduct?  I submit it's evidence of the exact opposite.  Tab

21  three, your Honor, is of similar, of a similar ilk.  Again, if

22  you look at page three of exhibit 12 behind tab three, you have

23  an e-mail from Carl Bell to persons at Calyon, and a gentleman

24  by the name of Mike Henriques who is with Deutsche Bank, one of

25  the other equity holders, in which he writes -- I'm on page

1    three -- quote, we, Putnam, are doing preliminary work across a

2    range of deals, and when this benchmarking is finished, we will

3    be able to pursue a couple of synthetic trades.  Again, Putnam,

4    we're doing our own work, we're doing our own benchmarking

5    analysis.  Prusko responds, we are going to source the CDO

6    exposure synthetically.  We will buy CDOs CDS on names of your

7    choosing at mid market.  On names of your choosing.  Again, is

8    Magnetar being the master puppeteer or is Magnetar buying --

9    taking the short position on CDS based on securities selected

10   by Putnam?

11        Then Magnetar goes on and says, any recent mez ABS

12   deal is fine.  Again, directed the selection of collateral

13   basically saying, Putnam, whatever you provide us would be

14   fine, we'll take the short position; I can send you a list of

15   what's on our other deals if it's helpful.  Typical names that

16   we see a lot in other deals are the following, many others of

17   similar ilk.

18        Again, at a time when no one has any reason to believe

19   that anyone is looking over their shoulders, FGIC's theory is

20   this is an alleged communication between alleged

21   coconspirators, and yet Magnetar is saying we'll buy CDO CDS on

22   names of your choosing.

23        It was no surprise to FGIC or any other entity that

24   had an investment interest in this CDO that there would be a

25   sophisticated financial institution taking the short side of

1   the CDS trades in the collateral pool.  By definition, for any

2   credit default swap you have an entity that's short, you have

3   an entity that's long.  Any investor that's long knows there's

4   someone else taking a short position with respect to the credit

5   default swap.  Those are the e-mails, your Honor, involving

6   Putnam.

7           There are other e-mails that may have been referred to

8   in the second amended complaint, two of which I want to draw

9   your attention to or invite your attention to.  Behind tab four

10  there's an e-mail between Calyon and James Prusko of Magnetar

11  and Mike Henriques of Deutsche Bank, in which those three

12  entities talk about, on page three, executing an agreement

13  giving Deutsche Bank and Magnetar veto power 24 -- the usual 24

14  hours to object to any proposed asset that goes in the

15  collateral pool.  They talk about the usual 24 hours.  Now,

16  Deutsche Bank is one of the parties here on this e-mail

17  exchange.  Deutsche Bank is not a party to this lawsuit.

18  Deutsche Bank is not alleged to have a short interest in this

19  deal.  Deutsche Bank was one of the equity holders along with

20  Magnetar.  As the equity holder, under certain scenarios they

21  take the first loss.  The usual 24 hours, I would submit, is

22  consistent with an interpretation that the equity holders want

23  to know what collateral is going into the collateral pool.

24  What's significant, however, is Putnam is not on this e-mail.

25  There's no suggestion that Putnam was a party to this

DBKZFGIM                    Motion

1    transaction, knew anything about it.  I don't think there's

2    anything wrong with it on its face.  But Putnam's not even

3    alleged to have been party to this transaction.

4            So, your Honor, I would submit then that not only is

5    there no well pleaded allegation of loss causation, there is no

6    well pleaded allegation of scienter.

7            Two other very quick points, your Honor.  One is, I

8    would invite the Court to look at Judge Sullivan's recent

9    decision in Loreley versus Wells Fargo.  That's another

10   complaint that was brought against collateral managers, two

11   collateral managers with respect to so-called Magnetar CDOs.

12   Judge Sullivan dismissed the fraud base claims with prejudice

13   finding, among other things, that failure to plead scienter, a

14   failure to plead intentional misstatements.  And he noted, just

15   as is the case here, that the fact that Magnetar held a short

16   interest does not give rise to a fraud.  The fact that

17   collateral, the collateral managers talk to the equity holders

18   with respect to the selection of collateral does not suggest

19   any impropriety.  And the fact that the collateral managers

20   spoke to Magnetar in order to curry favor with Magnetar, again

21   is not something that gives rise to an intent to defraud.

22           So lastly, your Honor, let me address the negligence

23   and negligent misrepresentation claims.  Your Honor held in

24   your September decision, correctly we believe, of course, that

25   there was not an adequate allegation of a special relationship

between Putnam and FGIC.  And, again, I don't believe there

would have been a basis for such an allegation if FGIC was a

note holder, but FGIC's not even a note holder.  They issued a

guaranty in support of a credit default swap entered into by a

subsidiary with Calyon.

        There are two New York State cases that I believe are

directly relevant here, the M&T Bank case in the Fourth

Department, and the HSH case versus UBS in the First

Department.  Both make clear that there is not such a special

relationship under New York law where the collateral manager --

between the collateral manager and a note holder; whereas here,

the offering memoranda contained express disclaimers saying

there was no special relationship, there was no fiduciary duty,

and that the note holders and other prospective investors were

to do their own analysis prior to making an investment.

        FGIC is relying on the Second Circuit decision in

Bayerische.  Your Honor I believe correctly distinguished

Bayerische.  There is one -- the issue in Bayerische was one of

relationship between the collateral manager and note holders.

FGIC is not a note holder.  And, two, the Second Circuit made

no mention of the fact that the offering memoranda, like the

offering memoranda here, contained express disclaimers that

there was no special relationship between the collateral

manager and anyone else.

        Nor, in contrast to Bayerische, under the collateral

DBKZFGIM                    Motion

1   management agreement here is there I believe any basis to

2   argue, and FGIC in fact does not argue, that FGIC was a third

3   party beneficiary under the collateral management agreement.

4            For all those reasons, I believe Bayerische is not

5   applicable, and the appropriate pertinent authority is the HSH

6   case and the M&T Bank case.

7            If your Honor has no questions, I'll sit down.  Thank

8   you.

9            THE COURT:  Thank you.

10           MR. ARENA:  Thank you.

11           MR. BALDWIN:  Good afternoon, your Honor, Sean Baldwin

12   for FGIC.  I'd like to address each of Putnam's arguments in

13   turn.

14           First, FGIC must plead loss causation; second, that

15   FGIC has not met the Rule Eight notice pleading standard for

16   loss causation; third, that FGIC has not adequately alleged

17   scienter; and, lastly, that FGIC hasn't adequately alleged the

18   special relationship necessary for the negligence by its claims

19   in the second amended complaint.

20           But to begin with, I'd like to note that Putnam seems

21   to have dropped its argument made in its opening brief that

22   FGIC has failed to plead an actionable misrepresentation.

23   There can be no real dispute that the second amended complaint

24   more than adequately alleges that Putnam represented that it

25   would select the Pyxis collateral independently and in good

DBKZFGIM                          Motion

1    faith in the interests of law and business and that Putnam did

2    not in fact do that, but rather allowed Magnetar to control

3    collateral selection even though Magnetar was a net short

4    investor whose interests were directly adverse to those of long

5    investors and FGIC.

6         The second amended complaint contains a wealth of

7    particularized factual support for this allegation, far more

8    than is required of the pleading stage, and sufficient for the

9    summary judgment stage I would respectfully submit.

10        Nor can there be any really dispute that if FGIC had

11   known that the Pyxis collateral was being selected by a net

12   short investor, it would not have issued the Pyxis guaranty,

13   and, thus, FGIC would have suffered no losses whatsoever when

14   Pyxis defaulted.  This ought to go without saying.  No insurer

15   would provide $900 million of insurance on a deal that it knew

16   was being built to fail.

17        Nevertheless, Putnam argues that under the general

18   common law of fraud, FGIC must plead not only that it would not

19   have issued the Pyxis guaranty absent Putnam's fraud, but also

20   that its losses were proximately caused by the facts that

21   Putnam misrepresented, Magnetar's control and its adverse

22   selection of Pyxis collateral.

23        The Court found that loss causation is required under

24   general common law rules even where rescission or recissory

25   damages are sought, and I will not attempt to reargue this

1    point today.

2            But what I will argue is that the general common law

3    rule does not apply here because FGIC is a financial guaranty

4    insurer governed by New York insurance law, and its claim is

5    that it was induced to issue an insurance policy by material

6    misrepresentations.

7            Putnam concedes that the First Department held in MBIA

8    v. Countrywide that under Section 3105 of New York insurance

9    law, a claim by an insurer that it was induced to issue an

10   insurance policy by a material misrepresentation does not

11   require proof of loss causation.  That was the specific holding

12   in that decision.  The First Department held that under Section

13   3105 MBIA could recover claims paid pursuant to its insurance

14   policies issued on RMBS sponsored by Countrywide without resort

15   to rescission and without proof of loss causation.

16           And contrary to Putnam's argument in its briefs, the

17   First Department's decision is not new or unprecedented.  It

18   follows a long line of authority, including decisions of the

19   New York Court of Appeals, some of which are cited in the lower

20   court decision by Justice Branston, and some of which predate

21   Section 3105, that hold that an insurer need not prove loss

22   causation to make out a claim for material misrepresentation in

23   the inducement of an insurance contract.

24           So these cases dispose of Putnam's argument made in

25   its brief that under the First Department's reading in MBIA,

1    Section 3105 implicitly abrogates common law.  As these cases

2    show, the First Department's reading in Section 3105 itself

3    simply apply preexisting common law.

4              In the seminal case of Gear V. Union Mutual Life

5    Insurance Company, which is cited in justice Branston's

6    decision, it's at 273 NY 261, a 1937 case, it predated Section

7    3105 and even its predecessor Section 1149 of New York

8    insurance law.  An applicant for life insurance misrepresented

9    that he had not received hospital treatment within the past

10   five years, and then died of carbon monoxide poisoning, an

11   unrelated event.  There was no suggestion that the cause of

12   death was related to the conditions for which he received

13   hospital treatment.  Nevertheless, the Court of Appeals held,

14   quote, that the erroneous statement on the application deprived

15   the insurer of its freedom of choice to decide which risks it

16   would insure, and that was sufficient without more for the

17   insurer to deny coverage under the insured's policies.  That's

18   at 270 of the decision.

19             Now Putnam concedes that Section 3105 applies to

20   misrepresentations made by all or by the authority of the

21   insured or the applicant for insurance.  And it also concedes

22   that Calyon was both the insured and the applicant under the

23   Pyxis guaranty.

24             But Putnam argues that FGIC's misrepresentations were

25   not made by the authority of Calyon, because Putnam wasn't

1    technically Calyon's agent.  Putnam cites to no case holding

2    that a misrepresentation must be made by an agent to be made by

3    the authority of the applicant or the insured.  It cites

4    instead to a case or two that where the misrepresentations were

5    made by an intermediary between the applicant and the insurer

6    who communicated with the insurer quite separately from the

7    applicant.  And in those cases, in that context there's

8    understandably doubt about whether the misrepresentations were

9    made by the authority of the applicant, unless there's an

10   agency relationship between the insurer and the -- I'm sorry --

11   between the applicant and the intermediary.

12        Those cases held that an agency relationship was

13   sufficient to establish that the misrepresentations were made

14   by the authority of the applicant, but they did not hold, and

15   Putnam cannot find a single case that holds, that such a

16   relationship is necessary to show that misrepresentations were

17   made by the authority of the insured or the applicant.

18        And in this case there is no need for any such

19   relationship to establish this fact.  Because here there is no

20   doubt that the misrepresentations were made by the authority of

21   Calyon.  This is because Calyon included Putnam's

22   misrepresentations in its offering materials in order to induce

23   FGIC to issue the Pyxis guaranty.  Obviously, Calyon authorized

24   the content of its own offering materials.  So here there is no

25   need to show that Putnam was acting as Calyon's agent in making

1    the misrepresentations.  They were clearly made to FGIC by the

2    authority of Calyon because they were made to FGIC by Calyon.

3    They were transmitted to -- they were made by Putnam, but

4    transmitted to FGIC by Calyon.  And that's undisputed.

5           Next, Putnam argues that MBIA is distinguishable

6    because, and I'll quote this because this is a very significant

7    mistake.  In their reply at page two, note three, they say,

8    quote, MBIA involved claims for recovery of damages against the

9    very counter party to the insurance contract who had received

10   payments under the policy.  That is wrong.  Countrywide was not

11   the counter party to the policies in MBIA, and it did not

12   receive payments under the policies.  The insured entities were

13   the RMBS trusts, and those trusts received payments under the

14   policies.  Countrywide's only relationship to the policies was

15   that it applied to MBIA to issue the policies.  To that end,

16   Countrywide entered into agreements for each RMBS with MBIA,

17   pursuant to which MBIA agreed to issue the policies, but they

18   were not the insurance contracts subject to Section 3105 under

19   which MBIA paid claims.  Those contracts were the policies

20   issued by MBIA to the trust.  So Countrywide was in a

21   materially identical position to Putnam.  It made the

22   misrepresentations that induced the insurer to issue insurance

23   policies, but it was neither the counter party to the policies,

24   nor did it receive any payments under the policies.

25   Countrywide's motive for making those misrepresentations, like

DBKZFGIM                    Motion

Putnam's, was simply to ensure that the transactions closed

because like Putnam, Countrywide could only benefit if the

transactions closed.

         Despite all that, the First Department expressly held

that MBIA could recover claims paid pursuant to its policies

from Countrywide without resort to rescission and without proof

of loss causation.  If MBIA could recover its losses under its

policies against Countrywide without proof of loss causation,

FGIC should be able to do likewise against Putnam.

         Now last, in a truly last ditch argument, Putnam

argues that the Court can just ignore MBIA because it was

issued by the First Department, not by the highest court in the

state, the Court of Appeals.  And that's also wrong.  MBIA is a

decision of a New York court applying New York law that has not

been overruled and is not subject to appeal.  It is axiomatic

that a federal court apply New York law, should be governed by

such a decision.  That, for instance, is the holding in

Travelers Insurance Co. V. 633 Third Associates, 14 F.3d at

119.

         The case that Putnam sites In Re:  MTBE is

distinguishable.  That case involved a situation where the

state law was  "uncertain" or "ambiguous" because an

intermediary Appellate Court and a trial court disagreed in

their interpretation of a recently enacted statute.

         Here, the First Department, Justice Branston agreed

entirely that loss causation was not required under a very well

established statute, New York insurance law Section 3105, and

they applied a line of authority to reach that conclusion that

included Gear and other decisions of the Court of Appeals that

hold unequivocally that an insurer need not prove loss

causation to make out a claim for material misrepresentation in

the inducement of a insurance contract.

        But in any case, your Honor, the second amended

complaint adequately alleges loss causation under any standard,

whether the standard is 9(b) or 8(a).  But I'd like to begin by

pointing out that the standard is 8(a).  The standard, as your

Honor has repeatedly held in fraud cases, including in

securities fraud cases, has held that loss causation,

allegations of loss causation are not subject to the heightened

pleading standard of Rule 9(b), but must merely satisfy the

8(a) notice pleading standard, and under which, as your Honor

has said, it is sufficient to provide "a short and plain

statement that provides defendants with some indication of the

loss and the causal connection that the plaintiff has in mind."

That's your Honor's Freudenberg decision from 2010, the same

year as the Cohen v. Stevanovich case that Mr. Arena referred

to.  That's your Honor's decision In Re:  Bear Stearns, same

year.  And as your Honor also held in In Re:  Bear Stearns, the

party alleging loss causation need not rule out all competing

theories as to the cause of its losses.

1          Similarly, in Dexia, a case that we cite, a 2013 case,

2     this Court held -- not your Honor -- but this Court held that

3     Lentell, the case primarily relied on by Putnam, does not place

4     upon plaintiffs the heavy burden of pleading facts sufficient

5     to exclude other non-fraud explanations.  In fact Lentell

6     expressly held that a number of things that I'd like to quote;

7     one, loss causation is a fact-based inquiry.  That's at 174;

8     that if the loss was caused by an intervening event like a

9     general fall in the price of internet stocks, the chain of

10    causation is a matter of proof at a trial and not to be decided

11    on a rule 12(b)(6) motion to dismiss.  That's also at 174.  And

12    finally, it held, all reasonable inferences are drawn in the

13    plaintiff's favor on a motion to dismiss.  And that's at 174,

14    175.

15         Now, Lentell also held, as Putnam points out, that the

16    occurrence of a market-wide phenomenon, quote, decreases the

17    prospect that a plaintiff's loss was caused by the alleged

18    fraud.  But it went on to make clear that that did not require

19    dismissal of the complaint as long as the complaint alleged

20    facts sufficient to, quote, support an inference that the

21    plaintiff would have been spared all or an ascertainable

22    portion of its loss absent the fraud.  That's at 175.

23         Now I note that Lentell says ascertainable, not

24    ascertained.  What Putnam is insisting is that FGIC must prove

25    at the pleading stage exactly how much of its losses were

1    caused by Magnetar's adverse selection.  That is not the

2    standard FGIC must make.  All FGIC must show at this stage is

3    facts supporting an inference that some ascertainable portion

4    of its losses were caused by the misrepresented facts, namely,

5    Magnetar's adverse selection.

6           If FGIC can do this -- if FGIC has done this, as I

7    submit it has in the second amended complaint, the Court should

8    permit it to proceed to establish its case through discovery

9    even where it suspects the intervening market wide phenomenon

10   will ultimately prove to be the major or sole cause of the

11   plaintiff's losses.  Again, that's your Honor's holding in In

12   Re:  Bear Stearns quoting In Re:  Fannie Mae at 507.  Although

13   it may be likely that a significant portion, if not all of

14   plaintiff's losses were actually the result of the housing

15   market downturn, and not these alleged misstatements, at this

16   stage of pleading the Court need not make a final determination

17   as to what losses occurred and what actually caused them, and

18   need only find that plaintiff's allegations are plausible.

19          Now, the second amended complaint more than meets this

20   standard.  It alleges facts supporting an inference that the

21   assets that were adversely selected for Pyxis by Magnetar

22   defaulted both more quickly and to a greater extent than the

23   assets Putnam would have selected had it acted independently.

24   And, of course, at this stage without discovery FGIC cannot

25   provide a complete list of the assets that Magnetar selected

DBKZFGIM                        Motion

1    for Pyxis, nor can it list exactly which assets Putnam would

2    have selected for Pyxis had it acted independently.  That's the

3    nature of a fraud case.  Prior to discovery, these facts are

4    known only to the defendant.

5          But even without discovery, FGIC has actual managed to

6    allege facts from which a far more than plausible inference can

7    be drawn that it will be able to establish that some

8    ascertainable portion of its loss was attributable to

9    Magnetar's adverse selection which was concealed by Putnam.

10         First, by the end of 2008, 96 percent of Magnetar's

11   2006 vintage CDOs -- Pyxis was 2006 vintage -- had defaulted.

12   Only 40 percent of non-Magnetar mezzanine CDOs from that

13   vintage had defaulted.  Putnam said, well, what's a mezzanine

14   CDO?  It could be anything from -- anything that's got a

15   mezzanine tranche of securities in it.  As Putnam well knows,

16   everyone used the term mezzanine to mean sub prime.  If that's

17   all we need to do to change that to make to adequately allege

18   loss causation we'll say sub prime, your Honor, because that's

19   exactly what we're referring to, and everyone in the industry

20   understood that.  If Putnam wants to dispute that as a question

21   of fact, it cannot be resolved on this motion to dismiss, but

22   it will be resolved in our favor.

23         By 2010, so as of 2008, by the end of 2008 when Pyxis

24   defaulted, we're talking 96 percent of Magnetar's CDOs from

25   2006, and only 40 percent, less than half of non-Magnetar

1   mezzanine sub prime CDOs defaulted.  By 2010, all Magnetar CDOs

2   had defaulted from that vintage, but only 63 percent of non-

3   Magnetar mezzanine 2006 CDOs.  And according to the most recent

4   publicly available data, still only 30 -- sorry -- only

5   70 percent of non-Magnetar 2006 mezzanine CDOs have defaulted.

6   And if they've got this far, your Honor, they're not likely --

7   there are not likely to be many more of them defaulting at this

8   point.  In other words, Magnetar's CDOs, including Pyxis,

9   defaulted both more quickly than comparable CDOs and to a

10  greater extent than comparable CDOs.  And both of these are

11  critical points.

12          The first, that Magnetar's CDOs defaulted more

13  quickly, is sufficient in itself to establish loss causation.

14  If FGIC suffered losses more quickly because of adverse,

15  Magnetar's adverse selection, if it was required -- if it was

16  liable under its $900 million Pyxis guaranty more quickly as a

17  result of Magnetar's adverse selection, then it was deprived of

18  the use of potentially $900 million for a period that it would

19  not have been deprived of it had Putnam selected the collateral

20  independently.  That loss, in itself, is ascertainable and

21  substantial.

22          But FGIC has gone further than that and has alleged

23  that almost 30 percent, as I say, of non-Magnetar CDOs never

24  defaulted at all.  And if the assets that Putnam had selected

25  for Pyxis or, sorry, if the assets that Putnam would have

1   selected acting independently were the assets that backed the

2   non-defaulted CDOs, then Pyxis would not have defaulted either.

3   But there's no way for us to know, without discovery, which

4   assets Magnetar selected or which assets Putnam would have

5   selected acting independently.

6           Putnam also said it would include $145 million of

7   prime RMBS in the Pyxis portfolio.  That was in the target

8   portfolio that it had provided to FGIC in August of 2006.

9           Because Magnetar controlled collateral selection,

10  Putnam never put a single prime RMBS into Pyxis.  It dropped it

11  completely and included $145 million of sub prime RMBS instead.

12          On its face, $145 million of sub prime RMBS is far

13  more likely to default than 145 million of prime.  That's what

14  prime versus sub prime means.

15          Putnam says, well, this only affected 10 percent of

16  the collateral.  But it's only one of the types of collateral

17  that FGIC has identified as having been put into Pyxis as a

18  result of Magnetar's adverse selection.

19          FGIC has also identified another hundred -- well, we

20  don't know if there are another hundred because we don't have

21  the -- we don't have the full set of Magnetar's selected

22  assets.  But FGIC has identified $167 million of assets that

23  were definitely selected by Magnetar.  In its brief, not today,

24  but in its brief Putnam says, well, FGIC hasn't proved these

25  were selected by Magnetar.  No, we haven't proved it, your

1    Honor, because we don't have to prove it here.  We're alleging

2    it.  But even at this pleading stage, we have provided

3    substantial evidence supporting our allegation that $167

4    million of assets were selected by Magnetar.  And these assets,

5    we provided -- we've given you the cites to the paragraph

6    numbers in the complaint -- these assets defaulted

7    significantly more quickly than the other assets for which we

8    do not know one way or the other, whether they were selected by

9    Magnetar.  Putnam says, well, it's only .35 of a month on --

10   sorry -- of a year on average difference.

11          First of all, we don't know if that's the actual

12   difference between all actually Magnetar selected assets and

13   all non-Magnetar selected assets, because we don't know without

14   discovery which assets were selected by Magnetar.  And we don't

15   know what Putnam would have selected otherwise.

16          But what we can say for sure is that the ones that

17   Magnetar definitely selected, defaulted on average .35 of a

18   year faster than the non-Magnetar or the non-known Magnetar

19   selected.  That is not an insignificant number, an

20   insignificantly length of time for a $900 million investment.

21   That $900 million that Pyxis was -- sorry -- FGIC was deprived

22   of the use of the .35 of a year is an ascertainable loss for

23   FGIC regardless of anything else that we may be able to prove.

24   And as I say, if we can get discovery, find out what Magnetar

25   actually selected and what Putnam would have selected if it was

1    acting independently -- if it was doing what Mr. Arena referred

2    to in tab two of his exhibits and selecting the assets with the

3    best fundamental value, we have no idea what the difference

4    would have been.  It could have been far more.  And it could

5    have been some of the assets would never have defaulted, enough

6    of them that Pyxis would -- sorry -- FGIC would never have

7    incurred any liability.

8           Finally, FGIC has identified $95 million of assets

9    that defaulted in 2007 or early 2008 before Bear Stearns

10   collects.  Putnam says, well, so what?  We don't know if Bear

11   Stearns was the beginning of the financial crisis.  True, it's

12   a question of fact when the financial crisis began.  But we do

13   know that a large amount, 60 million defaulted in -- 66 million

14   defaulted in 2007 before anyone could claim there was a

15   financial crisis.  Somehow these assets defaulted before there

16   was any market wide phenomenon affecting housing prices.  Those

17   assets had to have defaulted as a direct result of their

18   inherent defects, and those were assets selected by Magnetar.

19   Our allegation is Putnam would not have selected those assets,

20   absent Magnetar's control.

21          Finally, Putnam argues that FGIC has only alleged

22   adverse selection of a portion of the collateral, and it may

23   not be sufficient, that portion may not be sufficient to have

24   reached the threshold at which FGIC's guaranty kicked in.  That

25   was $600 million of the 1.5 billion.  It was only the top 900

DBKZFGIM                     Motion

 1    that FGIC insured.  But we do not know how many assets Magnetar

 2    selected.  So we don't know whether that threshold was reached

 3    and we can not know, and Putnam cannot know.  It's a question

 4    of fact whether that threshold was reached.  So I submit that

 5    we've adequately alleged loss causation, even though we don't

 6    need to, your Honor.

 7              Putnam spent most of its presentation today, Mr. Arena

 8    spent most of it talking not about loss causation, but about

 9    scienter.  We have alleged facts strongly supporting the

10    inference both that Putnam had a motive to commit fraud and

11    that it engaged in conscious wrongdoing.

12              Let me begin with motive.  Putnam does not appear to

13    dispute that motive can be alleged generally.  That's what Rule

14    9(b) says, it can be alleged generally.

15              But the second amended complaint does much more than

16    allege it generally.  The second amended complaint alleges that

17    Putnam was paid fees for its work on Pyxis that were twice as

18    large as those paid to the collateral manager on a normal CDO

19    at that time.  Putnam says, well, the rate on a normal CDO was

20    40 basis points and we only got 20 basis points.  But that

21    ignores that Pyxis was four times as large as a normal CDO.

22    Documents that we have cited to, we've quoted in the complaint,

23    show that a normal CDO was something like $400 million at the

24    time, and Pyxis was 1.5 billion.  So half of four times as much

25    is twice as much.

1        Now, Putnam then says, but their fees were
2    subordinated 5 percent of their -- sorry -- five of their 20
3    basis points were subordinated, and they would only get those
4    if Pyxis actually succeeded.  It's just not true.  They keep
5    getting paid fees long after Pyxis began to default, after the
6    collateral began to default.  As we cite in the amended
7    complaint, in the second amended complaint, paragraphs 48 and
8    49, Putnam got a lot of fees after everyone else had stopped
9    being paid, apart from Magnetar.

10       The senior note holders got nothing after that date,
11   the collateral began to default, but Putnam kept getting paid.
12   It kept getting paid its fixed and its subordinated fee.  And
13   it kept getting paid its fixed fee for years after Pyxis itself
14   defaulted.

15       So Putnam -- actually take a step back -- Putnam was
16   getting paid for years after the entire CDO had defaulted.  It
17   didn't get as much, but it got something.  So Putnam's argument
18   that these fees were not guarantied or that it depended on the
19   performance of the CDO are simply false.

20       And not only that, but one of the documents that we
21   cited to your Honor, which Putnam drew attention to, it's
22   Exhibit six of their, or tab six of their exhibit.  In that
23   document, Michael Henriques of Deutsche Bank, who left Deutsche
24   Bank after Pyxis closed and went to join Jim Prusko at
25   Magnetar, said, referring to all Magnetar's CDOs, including

1    Pyxis, that the collateral managers fees on those CDOs were

2    virtually assured -- that's his quote -- by Magnetar's

3    significant control of the CDOs.  That's in fact what happened.

4    Putnam says it wouldn't have been worth the reputational risk

5    to its institution to have engaged in this Pyxis fraud that

6    it's alleged to have engaged in.  But whether it's worth it or

7    not is a question of fact.  And Putnam ignores that the

8    individuals who actually worked on Pyxis, most notably Carl

9    Bell, and who stood to gain most of the fees from Pyxis, may

10   well have had very different motives from the institution as a

11   whole.  Putnam says it would have made more if Pyxis had

12   succeeded.  But it would have made nothing at all if it hadn't

13   cooperated with Magnetar.  Because as we allege in the

14   complaint, again with evidence to back it up, Putnam would not

15   have been selected to work as the collateral manager on either

16   Pyxis or Pyxis 2007-1 if it hadn't cooperated with Magnetar,

17   and its selected assets that as the tab that Mr. Arena referred

18   to were fundamentally, you know, had fundamental value,

19   whatever the term was.  So Putnam would have made nothing if it

20   had not allowed Magnetar to adversely select the collateral.

21          Now, separately, the second amended complaint alleges

22   facts that strongly support an inference of conscious

23   wrongdoing, and that is sufficient in itself to establish

24   scienter.  The second amended complaint alleges that Putnam was

25   complicit in the, quote, veto powers by which Magnetar was

DBKZFGIM                    Motion

1    granted veto powers over the collateral for Pyxis.  And if I

2    can draw your attention again to tab four of Putnam's exhibit,

3    your Honor, that is the veto powers cited, or it's the e-mail

4    referring to the veto powers cited.  That e-mail states in the

5    language that Putnam has highlighted, Calyon hereby agrees --

6    this is on the fourth page of it, I think -- Calyon hereby

7    agrees that each of Deutsche Bank and Magnetar for so long as

8    the respective equity purchase letter has not been terminated,

9    shall have the right to object to the proposed acquisition of

10   any asset pursuant to the warehouse agreement within 24 hours

11   after notification thereof has been sent to Deutsche Bank and

12   Magnetar by Calyon or the investment advisor.  The investment

13   advisor is Putnam -- provided that one of Calyon or the

14   investment advisor will promptly provide such notification.

15          Putnam was required under this agreement to provide

16   notice to Magnetar of assets it was proposing to include in

17   Pyxis, and Magnetar had a right to veto those assets.

18          Now Magnetar -- sorry -- Putnam's counsel says there

19   is no evidence that this thing was actually executed.  It's

20   true we don't have an executed copy of it.  We haven't had

21   discovery yet, your Honor.  But what we do know, even without

22   discovery, is that it is absolutely clear that the arrangement

23   envisaged in that letter was in fact implemented.  The second

24   amended complaint alleges dozens of communications between

25   Putnam and Magnetar in which Magnetar made clear which assets

1   it wanted included in Pyxis, and that it wanted to short those

2   assets, and in which Putnam agreed, Carl Bell, agreed to select

3   these assets and to help Magnetar short them.

4           Putnam disputes the import of some of these

5   communications.  If you look at tab three Putnam says -- it

6   highlights a piece of this which talks about Magnetar says, we

7   will buy CDO CDS or names of your choosing at mid market, and

8   any recent mez ABS deal is fine, I can send you a list of

9   what's in our other deals if that's helpful.  But then he goes

10  on to say typical names that we see in other deals a lot, plus

11  our other deals that are priced, and he gives a list.  Two of

12  those, by the, way are Magnetar CDOs.

13          What Putnam ignores is the subsequent e-mails in this

14  chain.  In the next e-mail Mr. Prusko from Magnetar writes to

15  Alex Racada from Calyon, who shortly after this transaction

16  closed, went off to Nomura to do very similar thing with the

17  Nomura transaction and he ended up being barred from the

18  securities industry this year or last year as a result of his

19  conduct at Nomura.  And Mr. Prusko says to Racada, please stay

20  on top of Putnam's CDO situation, get a little nervous when I

21  hear about Bill piddling disk access to them, although not too

22  worried about Putnam doing anything rash.  In other words, he's

23  reasonably confident Putnam will do what they're told.  And in

24  the very next e-mail he says -- sorry -- Racada says, sure I'll

25  keep an eye on them.  And Prusko then says, don't like that

1   they are buying CDOs without us knowing about, at least I don't

2   think I knew about it, I'll check in with Carl, just saw him,

3   thought we were on the same page with us buying the CDS.

4           This is not a man who thinks that Putnam is acting

5   independently.  This is a man who thinks he's got him under his

6   thumb.  At an absolute minimum it's a question of fact.

7           Tab two that Putnam refers to in this exhibit.  If you

8   look at the date on that document, your Honor, that's July 7,

9   2006.  That's when Putnam's just getting into the process of

10  ramping up the collateral.  They are just starting to talk

11  about it with Magnetar.  And at that point Carl Bell is saying,

12  we'll select assets with the best fundamental value.

13          That changed.  By August, Carl Bell was under

14  Magnetar's thumb and doing what he's told.  And let's not

15  forget Carl Bell and Prusko's relationship.  Bell used to work

16  for Prusko when Prusko was at Putnam.  That's why Bell was

17  selected.  That's why Putnam was selected, to manage Pyxis.

18          The second amended complaint also alleges

19  communications in which Putnam and Calyon sought to conceal

20  Magnetar's role from investors.  And it alleges in another

21  document that Putnam inexplicably shows your Honor, that after

22  Pyxis closed, Michael Henriques of Deutsche Bank discussed the

23  nature of Magnetar's CDOs with Magnetar and Calyon.  This is

24  tab five of their exhibits.  If you look at tab five, I have

25  highlighted the language that they like, and that ignored the

1    part that actually matters from our point of view.  At the end

2    of the e-mail, which talks about programs -- they're talking

3    here about a subsequent deal, a deal NIB was being hired to act

4    as collateral manager on.  And they're saying that they may

5    want to fire or at least have the opportunity, option to fire

6    NIB if they feel they're not doing a good job.  What do they

7    mean by that?  They say, perhaps NIB would rather go back to

8    the regular style CDOs with $400 million mixed deals scrapping

9    for cash bonds, spending nine months on ramp up and three

10   months marketing to get 40 basis points running on a $400

11   million balance.  That's why Putnam wanted to do this deal so

12   it didn't have to do all of that.

13        Then they go on to say, these deals are not CDOs, but

14   they are structured separate accounts.  They are designed for

15   the benefit of the equity investor.  And he concludes:  I think

16   Putnam got it, NIB doesn't.  He specifically distinguishes

17   Putnam's equity on Pyxis from NIB's recalcitrance.

18        And, finally, proving Putnam's complicity and

19   conscious wrongdoing, Putnam was hired for Pyxis 2007-1, which

20   closed after Pyxis -- sorry was ramped rammed after Pyxis

21   2006-1.  That would not have happened, as we allege, had Putnam

22   not cooperated with Magnetar on Pyxis, had Putnam done what NIB

23   was threatening to do on Orion two.  Those facts, your Honor, I

24   submit, are more than sufficient to satisfy the scienter

25   pleading requirements.  Loreley v. Wells Fargo, Justice

1    Sullivan's decision -- Judge Sullivan's decision is completely

2    irrelevant.  We are not disagreeing with Judge Sullivan's

3    decision, but it was based on a totally different set of facts.

4    Those facts involved I think three e-mails.  Nothing like the

5    e-mails that we've got, nothing like the incriminating

6    communications between the collateral manager and Magnetar.

7            Lastly, your Honor, the special relationship

8    sufficient to support a negligence base claim.  I respectfully

9    submit -- I recognize your Honor's decision, but I ask you to

10   consider three points which, in our view, make this case

11   indistinguishable from Bayerische, the Second Circuit's case,

12   which held that a special relationship was adequately alleged.

13           First of all, Putnam argues, and the Court previously

14   held, that this case is distinguishable from Bayerische because

15   in Bayerische, the investor was an express third-party

16   beneficiary under the CDO transaction documents.  I submit that

17   that is irrelevant.

18           The Court in Bayerische expressly held that the

19   portfolio managers duty of care arose not out of contract, but,

20   quote, out of independent characteristics of the relationship

21   between Bayerische and Aladdin, which was the portfolio

22   manager.  That's at page 45.

23           Second, Putnam argues, and the Court held that

24   Bayerische was distinguishable because the investor in that

25   case purchased securities issued by the CDO, while FGIC insured

DBKZFGIM                    Motion

1  a credit default swap.  And I respectfully submit that that is

2  a distinction without a difference.  And that's what the

3  Commodities Future Modernization Act made absolutely clear when

4  it expressly provided that the federal securities laws apply

5  equally to swaps referencing securities as to direct purchases

6  of securities.  Both types of investment are functionally or

7  economically identical.

8           In fact, FGIC's investment in Pyxis was far more

9  significant than the investors' investment in Bayerische.

10  FGIC's guaranty insured payments on the $900 million super

11  senior tranche of Pyxis.  That was 60 percent of the total

12  value of the CDO.  That's why FGIC went to all the trouble it

13  did, engaging in extensive e-mail conversation with Putnam by

14  directly and through Calyon, and having conference calls about

15  Pyxis, and even it going to Boston to have an in-person meeting

16  with Putnam at its offices, to secure Putnam's assurances that

17  it would select the Pyxis collateral independently and in good

18  faith, and using its expertise and experience, and to find out

19  what that expertise and experience consisted of, and what

20  collateral selection technology and process Putnam would use,

21  what guidelines.  All of that only mattered because it

22  believed, FGIC believed Putnam was selecting the collateral.

23           And as the complaint also alleges, FGIC's investment,

24  unlike the Bayerische investor, was essential to Pyxis' closing

25  and so it was essential to Putnam reaping the benefits it hoped

DBKZFGIM                    Motion

1   to reap from Pyxis.  That's why Putnam made the representations

2   it did on which FGIC chiefly relied in issuing the Pyxis

3   guaranty.

4        And it's the combination of those factors, FGIC's

5   known dependence on Putnam and Putnam's known dependence on

6   FGIC, the mutual symbiotic relationship, that's what creates

7   the special relationship here.  Those facts are even more

8   compelling, I submit, than the Bayerische facts given the much

9   greater importance of FGIC to the transaction as a whole.

10        And lastly Putnam argues, and the Court's decision

11  held, that the disclaimers in the offering memorandum advising

12  investors not to rely on reps other than those in the offering

13  memorandum and to rely on their own due diligence, bar a

14  special relationship here.  I'll begin by saying I think

15  Mr. Arena may have misspoke.  I think he said disclaimers

16  didn't -- that the disclaimers here said there was no special

17  relationship.  They didn't say that.  He's just inferring that.

18  They didn't say anything of the sort, and that's not what

19  they -- that's not the conclusions you draw from those

20  disclaimers.  As we show in our brief exactly, the same

21  disclaimers were contained in the Bayerische offering

22  materials, and they did not preclude the Second Circuit from

23  holding the special relationship existed.  Putnam tries to wish

24  those disclaimers away.  But those disclaimers should not have

25  made any difference.  Not only did they not make a difference,

DBKZFGIM                    Motion

 1   but there was no reason for them to.  Because Putnam's

 2   misrepresentations as to its role in collateral selection were

 3   made as well as orally and through e-mails and phone calls, in

 4   person meetings, in the very offering memorandum on which the

 5   disclaimers stated that FGIC should rely, and because FGIC did

 6   precisely the due diligence that the offering memorandum said

 7   it should do.  It went to Boston.  It talked to Putnam.  It

 8   examined extensively Putnam's expertise, experience, collateral

 9   selection process, and it obtained extensive representations

10   from Putnam as to that process, as to its experience and

11   expertise to ensure that its $900 million investment would be

12   in safe hands.

13          Putnam knew FGIC was relying on it and actively sought

14   to induce FGIC to rely on it to ensure that the transaction

15   closed and it could reap all the benefits it anticipated from

16   the transaction, and that it did reap -- that's why a special

17   relationship existed and why the second amended complaint

18   adequately alleges negligence based claim.  Thank you, your

19   Honor.

20          MR. ARENA:  Very very briefly, your Honor.

21          Your Honor, let me start with the argument about

22   scienter and fees, then I'll circle back to loss causation and

23   duty, and I'll even touch upon the absence of an allegation,

24   the absence of a sufficient allegation of a material

25   misrepresentation or omission.

1              Fees.  FGIC's counsel argued that Putnam continued to
2    receive fees well after, well after the deal defaulted.  Well,
3    I would invite the Court's attention to paragraph 48 of FGIC's
4    second amended complaint.  The argument was made, Putnam
5    continued to receive subordinated incentive fees.  Really?
6    Their pleading.  As of December 10, 2008, Putnam had received
7    cumulative subordinated fees of 1,331,647 through two years
8    after the deal closed.  Here's how much in cumulative
9    subordinate fees Putnam received through July of 2012, three
10   and a half years later; the same exact amount.  Had the deal
11   not failed, Putnam would have continued to receive those fees
12   through today.  They stopped receiving those fees through
13   December 2008.  Their pleading, not ours.

14             Senior fees, the 15 basis points senior fees.  These
15   are based upon the collateral assets that are continuing to
16   perform.  Through December 10, 2008, two years after the deal
17   fails, two years after the deal closes, total fees
18   approximately 4.1 million.  Again, if the deal doesn't fail,
19   Putnam is getting 2.25 million a year.  They get 4.1 through
20   December 10, 2008.  Through July 2012, they get a total of
21   cumulatively 4.375.  Those, yes, Putnam is continuing to get
22   senior fees, but it's a drip from the faucet.  It's not 2.25
23   million a year.  Again, is that a motive to commit the fraud or
24   a motive not to commit a fraud?  I submit it's the latter, your
25   Honor.

1           With respect to some of the e-mails that are referred

2   to here I put in front of the Court.  FGIC's best argument with

3   respect to exhibit 12 behind tab three -- I'm sorry -- behind

4   tab two where Mr. Bell of Putnam says, we are going to pick the

5   deals that have the best fundamental value?  Apparently, their

6   argument is, well, that's early in the stage before you were

7   corrupted.  Apparently that's their best argument.

8           However, they ask the Court to draw negative inference

9   from the fact there is a so-called veto agreement which would

10  give Putnam -- I'm sorry -- which would give Magnetar and

11  Deutsche Bank 24 hours in which to object to the selection of

12  collateral assets.  Strangely enough, that draft agreement, not

13  alleged to have been executed, that draft agreement is from

14  June, one month before Mr. Bell says in an e-mail to

15  Mr. Prusko, we're only going to pick the assets with the best

16  fundamental value.

17          Behind tab three there's the e-mail exchange.  Prusko

18  writes to Mike Henriques of Deutsche Bank -- this is Magnetar

19  to Deutsche Bank, two equity holders -- don't like that they,

20  Putnam, are buying CDOs without us knowing about it.  That's

21  the last e-mail in the chain.

22          It's their obligation, it's their burden to plead

23  conscious misbehavior by Deutsche Bank.  The best that they can

24  do is to come up with e-mails like this which show that Putnam

25  is acting independently.

DBKZFGIM                    Motion

 1          With respect to their loss causation arguments, your

 2   Honor, I kept hearing from FGIC's counsel, we need discovery,

 3   discovery will show which assets Magnetar picked and which

 4   assets Putnam would have picked but for Magnetar's control.  I

 5   submit it's their burden at the pleading stage, governed by

 6   9(b), to have evidence.  They brought an important claim, a

 7   fraud claim against Putnam, a well respected member of the

 8   corporate community charging Putnam with the participation of a

 9   billion dollar fraud.  It's their burden.  If they don't have

10   the factual allegations now, the case ought to be dismissed

11   with prejudice.  This is their second amended complaint.

12   They've already had two bites at the apple.  They can't hang

13   their hat on just give us discovery.

14          With respect to the $167 million in assets they

15   suggest that they have evidence that Magnetar directed Putnam

16   to select, where is it?  Where is it?  Their theory is Putnam

17   was totally under Magnetar's control.  Now we have sort of the

18   fallback position; well, maybe some of the assets were directed

19   to be selected by Magnetar, and had you not selected those and

20   you selected something else the deal wouldn't have failed.

21   It's highly speculative, your Honor.

22          With respect to whether they even need to prove loss

23   causation.  What I would say about that is your Honor got it

24   right in your decision.  The MBIA case which they suggest is on

25   all fours with this case is not similar.  Countrywide was the

1   applicant for the insurance.  They were the applicant for

2   insurance.  Putnam was not an applicant for insurance.  Putnam

3   wasn't a party.  They didn't ask for the guaranty.  They didn't

4   sign for the guaranty.  They weren't a counterparty.  They

5   didn't negotiate it.  Period, full stop.  That's a meaningful

6   distinction.

7          And then with respect to Bayerische, your Honor, they

8   argue, well, in Bayerische the offering memorandum contained

9   similar disclaimers and the Court in Bayerische didn't find

10   that to be disqualifying as to whether there was a special

11   relationship on the facts of that case between the collateral

12   manager and the investor.  There was no suggestion in the

13   Bayerische opinion that the Court even focused on disclaimers

14   in the offering memorandum.

15          FGIC's counsel are very enterprising.  They rooted

16   through the records.  They found the offering memo for the deal

17   that was subject to the Bayerische opinion, and they found the

18   offering memo.  There's no suggestion that was even argued as

19   it is here that the disclaimer language foreclosed the

20   existence of a special duty.

21          Does it, as a matter of law, foreclose the existence

22   of a special duty?  I would invite the Court's attention to the

23   HSH case and the M&t bank case, both cases decided under New

24   York lawsuit Fourth Department with respect to M&T, First

25   Department with respect to the HSH case.  Both seem to hold

DBKZFGIM                    Motion

squarely that existence of this disclaimer language, similar to

the type of disclaimer language here, forecloses the existence

of a special relationship.

         If you think about it, your Honor, we have a situation

where FGIC is saying, forget what's in the disclaimer language.

If you talk to us, we can allege based on the fact that you

talked to us that there is a special relationship.  If every

collateral manager was subject to having a potential duty

foisted upon itself simply because it talked to a potential

investor, they would never talk to any potential investors if

the disclaimer language is meaningless and can be simply

pleaded around.

         Unless the Court has any questions, your Honor, I'll

rest on the brief.

         I will note one thing, which is Putnam has not

abandoned its arguments which are set forth in our brief

regarding the failure to plead an actionable mis-rep or

omission.  We cite the Wells Fargo case by Judge Sullivan which

we think is clearly on all fours.  The argument's made that

that decision is completely irrelevant.  Well, here's what was

alleged by the Wells Fargo plaintiffs, if you'll indulge me

just one minute.

         One, they alleged that Magnetar held a short position

in the CDOs at issue; two, that the collateral managers

knowingly abdicated their responsibility to select collateral

1   assets to Magnetar; three, in order to curry favor with

2   Magnetar, the collateral managers selected assets that would

3   cause the CDO to fail; and, four, the Wells Fargo plaintiffs

4   alleged that the collateral managers were accountable for

5   allegedly false statements in the offering circulars, saying

6   that the collateral managers would select and monitor the

7   collateral in the CDOs at issue.

8           Those are precisely the allegations here, precisely

9   the allegations here.  To suggest that that case is, quote,

10  completely irrelevant, close quote, doesn't pass the red face

11  test.

12          And what did Judge Sullivan hold?  He held that there

13  was nothing improper -- his words -- improper about Magnetar

14  hedging its exposure to the equity tranche, Magnetar wishing to

15  be kept apprised of which assets were going into the CDO,

16  Magnetar sourcing the short positions on the credit default

17  swaps in the collateral pool.

18          That's exactly the same allegations here.  Judge

19  Sullivan held that there was not -- there was neither an

20  actionable mis-rep or omission, nor was there an adequate

21  allegation of scienter.  Thank you, your Honor.

22          THE COURT:  Thank you all very much.  As you might

23  anticipate, I'll reserve decision.

24          MR. ARENA:  Thank you.

25          MR. BALDWIN:  Thank you, your Honor.
                (Adjourned)