UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FINANCIAL GUARANTY INSURANCE
COMPANY,

               Plaintiff,

            -against-

THE PUTNAM ADVISORY COMPANY, LLC,

             Defendant.

12 Civ. 7372 (RWS)

**NOTICE OF APPEAL**

      NOTICE IS HEREBY GIVEN that Plaintiff Financial Guaranty Insurance Company, by and through its undersigned attorneys, appeals to the United States Court of Appeals for the Second Circuit from each and every part of this Court's final Judgment entered on April 28, 2014 [Dkt. Nos. 33, 34].

Dated: New York, New York
      May 16, 2014

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By:  /s/ Peter E. Calamari
       Peter E. Calamari
       (petercalamari@quinnemanuel.com)
       Sean P. Baldwin
       (seanbaldwin@quinnemanuel.com)
       Paul P. Hughes
       (paulhughes@quinnemanuel.com)

       51 Madison Avenue, 22nd Floor
       New York, NY 10010
       (212) 849-7000

       *Attorneys for Plaintiff*

*Attorneys for Defendant*:

James N. Benedict
(jbenedict@milbank.com)
Sean M. Murphy
(smurphy@milbank.com)
Thomas A. Arena
(tarena@milbank.com)
Robert C. Hora
(rhora@milbank.com)

MILBANK, TWEED, HADLEY &
M^cCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Phone:  (212) 530-5000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

FINANCIAL GUARANTY INSURANCE COMPANY,

                  Plaintiff,

   - against -

THE PUTNAM ADVISORY COMPANY, LLC

                  Defendant.

------------------------------------X

12 Civ. 7372 (RWS)

OPINION

A P P E A R A N C E S :

   Attorneys for the Plaintiff

   QUINN EMANUEL URQUHART & SULLIVAN, LLP
   51 Madison Avenue, 22nd Floor
   New York, New York 10010
   By:  Peter E. Calamari, Esq.
       A. William Urquhart, Esq.
       Sean Baldwin, Esq.
       Paul P. Hughes, Esq.

   Attorneys for the Defendant

   MILBANK, TWEED, HADLEY & MCCOY LLP
   1 Chase Manhattan Plaza
   New York, New York 10005
   By:  James N. Benedict, Esq.
       Sean M. Murphy, Esq.
       Thomas A. Arena, Esq.
       Robert C. Hora, Esq.



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/28/14

**Sweet, D.J.**

The Defendant Putnam Advisory Company, LLC ("Putnam" or "Defendant") has moved to dismiss the Second Amended Complaint ("SAC") filed by Plaintiff Financial Guaranty Insurance Company ("FGIC" or "Plaintiff") alleging (1) fraud, (2) negligent misrepresentation, and (3) negligence pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. Based on the conclusions set forth below, Defendant's motion is granted.

## I.   Prior Proceedings

On October 1, 2012, FGIC filed a complaint against Putnam in which it asserted causes of action for fraud, negligent misrepresentation and negligence. FGIC subsequently filed an amended complaint ("AC") that asserted the same claims, and Defendant moved to dismiss. Defendant's motion to dismiss the AC was granted on September 10, 2013, with leave to replead within 20 days. *See Financial Guar. Ins. Co. v. Putnam Advisory Co.*, No. 12 Civ. 7372, 2013 WL 5230818 (S.D.N.Y. Sept. 10, 2013) ("*FGIC I*"). FGIC filed the SAC on September 30, 2013, again alleging fraud, negligent misrepresentation and negligence.

1

The instant motion was heard and marked fully submitted on November 20, 2013.

## II.  <u>Allegations of the SAC</u>

The following facts, assumed to be true, are taken from the SAC:

The allegations of the SAC arises out of Putnam's alleged misrepresentation of the management of a Collateralized Debt Obligation ("CDO") called Pyxis ABS CDO 2006-1 ("Pyxis") to FGIC, which provided a financial guaranty insurance policy to Pyxis (the "Pyxis Guaranty").  Plaintiff alleges that Putnam fraudulently misrepresented it, and it alone, would select the collateral for Pyxis and that it would do so acting independently and in good faith in the interests of long investors (*i.e.*, investors for profit when the investment performs as designed and succeeds).  Plaintiff alleges that Putnam made these misrepresentations to induce Plaintiff to insure $900 million of credit protection on Pyxis, which ensured that Pyxis would close, but that Putnam did not select the Pyxis collateral independently or in good faith.  Instead, Plaintiff alleges that Putnam allowed the collateral selection process to be controlled by Magnetar Capital LLC ("Magnetar"), a hedge fund

2

manager with short investments on Pyxis (*i.e.*, investments that would pay off if Pyxis defaulted).

CDO's are special purchase financial vehicles that purchases, or assumes the risk of, a portfolio of assets ("portfolio"), such as bonds or loans, and issues securities. They take cash flow-generating assets and repackaged them into tranches that can be sold to investors. A CDO's portfolio can include a variety of assets, such as commercial or residential mortgage-backed securities ("CMBS" and "RMBS," respectively), securities issued by other CDOs or credit default swaps ("CDS") referencing those types of obligations. The pooled assets in the portfolio are essential debt obligations that serve as collateral for the CDO. Ideally, the assets that form the CDO portfolio generate a stream of cash flows (*e.g.*, from mortgage payments) that the CDO uses to pay its expenses and make interest and principal payments to the CDO's note holders. Any remaining cash flows go to the CDO's equity investors, if there are any. Whether a CDO's issued securities will be repaid in full depends primarily on the CDO's structure and the credit quality (and subsequent performance) of the portfolio of assets in the CDO. Thus, for a CDO comprised primarily of RMBS, CDO noteholders will be more likely to receive promised payments of interest and principal if the rate of collection on the

3

underlying individual mortgages is high.  The higher the credit
quality of the mortgages in the portfolio, the more likely
payments to the CDO note holders will be made.  (SAC ¶ 25).

To buy their portfolio of assets, CDOs raise money
from investors by issuing multiple classes of notes and equity
interests.  A CDO's notes are not necessarily all subject to the
same level of risk.  Rather, CDO notes are issued in "tranches"
representing different levels of risk (and therefore potential
reward).  This is achieved by creating a hierarchical structure
of note holders in the CDO.  The senior tranche of a CDO
typically receives the highest "AAA" rating.  "Super senior" CDO
tranches, which are intended to be even more remote from loss,
are senior to another tranche that is also rated AAA. Because
the most senior tranches receive proceeds from the CDO portfolio
first, they bear the lowest risk of sustaining losses in the CDO
structure.  (*Id.* ¶ 26).

Correspondingly, CDO notes do not all offer the same
level of anticipated return to their purchasers.  The interest
on CDO notes is set according to their expected level of risk.
More junior tranches generally offer higher interest, but are
exposed to a higher risk of shortfalls, because their position
in the CDO structure exposes them to losses in the portfolio

4

before the more senior notes.   The more senior tranches, on the other hand, receive lower investment returns because they benefit from greater subordination and thus carry lower risk. (*Id.* ¶ 27).

*The Pyxis CDO*

Pyxis was designed to be a "managed CDO," whereby the assets for the CDO were to be selected by a collateral manager, and the composition of the portfolio may change from time to time. (*Id.* ¶ 29).  Managing a CDO portfolio typically involves, among other things, selecting the assets for inclusion in the initial portfolio, monitoring the credit status of the individual underlying assets, reinvesting payment proceeds from maturing underlying assets and making substitutions in the portfolio of assets (*i.e.*, buying and selling assets) to the extent consistent with the CDO's operative agreements.   A collateral manager, therefore, can greatly impact a CDO's performance and either lower or raise its risk profile. (*Id.*).

Pyxis was a "hybrid" CDO: its $1.5 billion portfolio (the "Pyxis Portfolio") included both "cash" and "synthetic" underlying assets.   (SAC ¶ 44).   Approximately 23% (or $350 million par value) of the assets in Pyxis was comprised of

"cash" assets, that is, investments that Pyxis actually purchased. The remaining 77% (or $1.15 billion par value) of the Pyxis Portfolio was comprised of "synthetic" assets, which are assets created through credit default swaps that referenced other asset-backed securities not actually owned by Pyxis.[1] (Id.). In these credit default swaps, Pyxis sold credit protection to counterparties in exchange for premium payments. The performance of these securities would thus determine the returns (or losses) to Pyxis under the credit default swaps. If the assets performed well, Pyxis would enjoy the premium payments without having to make any credit protection payments. However, if the assets performed badly, then Pyxis would have to make credit protection payments to the credit default swap counterparty, potentially up to the full notional amount of the referenced obligation. (Id.).

Pyxis took the risk that the securities would not perform through selling protection to Calyon Corporate and

---

[1] Credit default swaps are commonly used forms of credit protection (similar to credit insurance) in which, in return for the payment of premiums by one party (the "buyer" of credit protection), the counterparty (the "seller" of credit protection) agrees to make payments upon the occurrence of one or more agreed upon "Credit Events" (as defined in the CDS transaction documents), generally including, without limitation, a default by the issuer of a specified security to pay when due the principal of or interest on that security. (SAC ¶ 35). In general, the buyer of credit protection has a "short" position with respect to the specified security, since it will be entitled to a payment if the specified security defaults. Conversely, the seller—and through the seller, the guarantor—of credit protection has a "long" position with respect to the specified security, since it bears the risk of default by the issuer on the specified security. (Id.).

6

Investment Bank ("Calyon"). (*Id.* ¶ 45). Calyon performed the role of credit protection buyer, in that it paid the premiums to Pyxis under the credit default swap in exchange for protection payments in the event that one or more Credit Events occurred on any of the Portfolio assets. For most of the specified assets, Calyon represented that it acted only as an intermediary, meaning that the ultimate short positions were held by other market participants whose identity was never disclosed. This was achieved through a series of "back to back hedging transactions" between Calyon and other counterparties. (*Id.*). In this way, Calyon effectively acted as a conduit for parties willing to take a short position on particular assets, with Pyxis acting as the "long" investor. Payments under the credit default swaps would flow between Pyxis and the ultimate short counterparty via Calyon; if the referenced assets performed well, Pyxis would simply receive its premium, which was paid by the short counterparty to Calyon and then passed from Calyon to Pyxis (with Calyon keeping a portion of the premium for itself). If the referenced assets performed badly, Pyxis would be obligated to make loss payments that would ultimately flow to the short party via Calyon. (*Id.*).


*Magnetar*


7

Magnetar was founded in 2005. From its launch in 2005 through 2007, Magnetar grew 500% in terms of assets under management, from approximately $1.5 billion under management to approximately $9 billion. (SAC ¶ 36). Plaintiff alleges that this growth occurred largely from profits from Magnetar's shorting scheme: Magnetar would facilitate the creation of CDOs with portfolios of RMBS and CDO securities ultimately backed by RMBS. Magnetar then shorted those very same CDOs, generally by means of credit default swaps, and netted substantial profits when they defaulted. (*Id.*)

In early 2006, as default rates on subprime mortgages in the United States began to rise, Magnetar began to bet heavily against securities backed by subprime mortgages. (*Id.* ¶ 37). It did so by shorting subprime RMBS and RMBS CDOs through the use of credit default swaps. Under the credit default swaps Magnetar entered, if one or more Credit Events occurred on any of the underlying RMBS and RMBS CDOs, Magnetar would receive payments under the credit default swaps. (*Id.*).

During this period, Magnetar found it increasingly difficult to buy large amounts of credit default swap protection on subprime RMBS CDO tranches, because there were not many investors willing to take the most risky, equity stakes in CDOs.

(*Id.* ¶ 38).   Plaintiff alleges that to solve this problem,
Magnetar worked secretly with a number of collateral managers to
launch a series of CDOs which were designed by Magnetar to allow
it to take short positions on billions of dollars of subprime
mortgage bonds at below-market costs.   (*Id.*).   Magnetar served
as the equity investor for these CDOs, making it possible to
procure investors willing to take long positions in the CDOs.
(*Id.*).   In return, Magnetar had control of the composition of
the assets within the CDOs.   (*Id.*).   Magnetar's short position
to its equity position was often 6-to-1 or even higher, meaning
that when a Magnetar CDO failed, the payoff on Magnetar's short
positions was at least six times the amount of Magnetar's equity
investment in the CDO.   (*Id.* ¶ 42).

## *Pyxis and Magnetar*

Putnam acted as the putative collateral manager on
Pyxis. For its role as collateral manager, Putnam was to receive
a fixed (or "senior") fee of fifteen basis points, or 0.15% of
the outstanding principal of the Pyxis CDO per year. Because of
the size of Pyxis, which, like all Constellation CDOs, was far
larger than a typical CDO (with an initial deal volume of $1.5
billion), Putnam's fixed fee would be $2.25 million for the
first year.   (*Id.* ¶ 46).   Plaintiff alleges that Putnam's fixed

9

fee of 15 basis points (0.15%) was higher than the fixed fee paid to the collateral manager in all but three of Magnetar's 26 CDOs, and higher than the total fee, including both fixed and incentive fees, on all but six of Magnetar's CDOs. (*Id.*). In addition to its fixed fee, Putnam was also to receive an additional "incentive" (or "subordinated") fee of five basis points, amounting to $0.75 million for the first year. (*Id.* ¶ 47). Payment of this fee was dependent not on Pyxis performing well, but rather on Magnetar receiving its target return, which in turn was effectively guaranteed by certain provisions favoring the equity investors in the Pyxis governing documents. (*Id.*). The fee structure allowed Putnam to receive its fixed and subordinated fees long after Pyxis began to fail. (*Id.* ¶ 48). The SAC alleges that Putnam was motivated to cooperate with Magnetar on Pyxis because Putnam saw Magnetar as the key to entering the structure finance CDO market. (*Id.* ¶ 51). Indeed, Putnam was selected to serve as collateral manager for a second Pyxis CDO, Pyxis ABS CDO 2007-1 ("Pyxis 2"), which closed just a few months after Pyxis. (*Id.*).

The equity ("Preference Shares") and the lowest tranche of notes ("Class X Subordinated Notes") issued by Pyxis were held equally by Magnetar and Deutsche Bank. (SAC ¶ 53). Although the Preference Shares had a nominal value of $82.5

million, Magnetar and Deutsche Bank bought them at a 75%
discount, for a total payment of $20.625 million. (*Id.*) In
addition, Magnetar and Deutsche Bank paid a total of $61.875
million for their Class X Subordinated Notes, meaning that they
each paid a total of $41.25 million for the shares and notes
they held in Pyxis. (*Id.*).

　　　　Pyxis, like Magnetar's other CDOs, was structured in
such a way that, as long as it avoided default, the preference
shares and Class X notes would receive much larger payments of
principal and interest than the senior notes during the first
five years of its existence, by which time they would both be
fully paid out—and they would receive a large portion of their
investment back within just over a year if Pyxis avoided default
for that long, which it did. (*Id.* ¶ 54). This structure could
only be altered with the consent of the preference shareholders:
Magnetar and Deutsche Bank. (*Id.*). Thus, the typical CDO
triggers which would have redirected funds away from the
holdings of Magnetar and Deutsche Bank to senior note holders in
the event of certain events reflecting deterioration in the
performance of the portfolio were removed, and Magnetar's risks
and eventual losses, despite owning the equity and lowest
(usually most risky) tranche of notes in Pyxis, were lower than
those of senior note holders. (*Id.*). Magnetar also received an

11

upfront payment as a rebate to the purchase price of long positions taken by the Magnetar funds. For Pyxis, this was $4.5 million. (*Id.* ¶ 55).

Overall, Magnetar's long position on Pyxis by the time Pyxis defaulted was approximate $21 million. (*Id.* ¶ 56). In comparison, Magnetar's short position on the CDOs in which it invested averaged approximately 7% of the aggregate assets of those CDOs. This amounts to, by estimate, a total of $105 million short position on Pyxis. (*Id.* ¶ 57). Magnetar also bought other protection on Pyxis from dealers who wished to offset their exposure; the protection amounted to a total of $60 million. (*Id.* ¶ 58).

*Putnam's Representations To FGIC*

In July 2006, Putnam, with Calyon, began marketing Pyxis. As with all CDOs, the financial success of Pyxis was totally dependent upon the performance of the underlying collateral. In early July 2006, Calyon contacted FGIC to solicit credit protection for the Pyxis CDO. Calyon represented that the CDO would be managed by Putnam, who would select its portfolio acting independently and in good faith in the best interests of the investors. (SAC ¶ 62). Under the deal Calyon

12

presented to FGIC, FGIC was to insure all payments owed by its wholly-owned subsidiary FGIC Credit Products LLC under a credit default swap which would provide credit protection on the $900 million Super Senior Pyxis tranche. (*Id.* ¶ 63). The closing of the Pyxis CDO required FGIC or another investor to provide this insurance. (*Id.* ¶ 64).

To induce FGIC to issue the Pyxis Guaranty, Putnam represented to FGIC that it was an experienced and reputable collateral manager and that it would select the assets for the Pyxis Portfolio diligently and independently in the interest of long-term investors. (*Id.* ¶¶ 65-71). Putnam also initially represented that the "target portfolio" for Pyxis would include at least $60 million of prime RMBS assets. (*Id.* ¶ 72). Prime RMBS assets are RMBS in which the underlying loans are made to "prime" borrowers, that is, those with high credit scores and other characteristics indicating a high likelihood of repayment of the loan. Mid-prime and subprime RMBS, by contrast, consist of loans made to higher risk borrowers.

Documents provided by Putnam to FGIC, such as the Pyxis Pitchbook and Offering Memorandum, contained extensive representations that Putnam would select the Pyxis portfolio and described Putnam's duties, strategy and "long-term investment"

13

goals in doing so.   (*Id.* ¶¶ 66-72, 86-87). Putnam made similar
written and oral representations to FGIC in the course of FGIC's
extensive due diligence for Pyxis. (*Id.* ¶¶ 73-74, 76-78).

On August 3, 2006, as part of FGIC's due diligence,
Putnam and FGIC met face-to-face.   (*Id.* ¶ 77).   During this
meeting, Putnam, led by Carl Bell, represented that Putnam, and
Putnam alone, would select and manage the assets in the Pyxis
Portfolio.   (*Id.* ¶ 77).   Putnam also made affirmed to FGIC
during this meeting Putnam's experience, independence and
integrity.   (*Id.*).   In a follow-up due diligence call with FGIC,
Putnam again made clear that it would select and manage the
assets for Pyxis, and that it had considerable experience in the
RMBS market, particularly in the market for subprime RMBS, of
which the Pyxis Portfolio would primarily be composed.   (*Id.* ¶
78).

On August 9, 2006, Putnam provided an updated target
portfolio that purported to show the final target portfolio for
Pyxis for FGIC's review and analysis.   (*Id.* ¶ 79).   This target
portfolio showed that at least $145 million of the Pyxis
Portfolio would be prime RMBS assets, almost two and a half
times the amount of such assets previously slated for the
portfolio.   (*Id.* ¶ 79).   There were no prime assets in the final

14

portfolio.  (*Id.* ¶ 75).

FGIC would ultimately provide the Pyxis Guaranty.  The Pyxis Guaranty insured payment of all obligations owed by FGIC's wholly-owned subsidiary, FGIC Credit Products LLC, under a CDS referencing Pyxis (the "Pyxis Swap").  (*Id.* ¶ 8).  Under the Pyxis Swap, in return for Calyon's payment of premiums, FGIC Credit Products LLC agreed that, if Pyxis defaulted, it would make all the payments owed by Calyon on its underlying swap with Pyxis.  (*Id.*).

## *Magnetar's Control Of Putnam And Pyxis*

The SAC alleges that Putnam's representations to FGIC as to its independence were false.  Plaintiff's allegations as to Magnetar's control over Pyxis include the following:

- Magnetar selected Putnam to act as the collateral manager for Pyxis.  (SAC ¶ 91).

- Magnetar was actually in control over the Pyxis asset selection process, and Magnetar used Pyxis as a vehicle for its short strategy.  (*Id.* ¶¶ 91-92).  According to the testimony of Carl Bell (Head of Investments at Putnam), Jim Prusko (Magnetar executive) approached Bell to ask if Putnam would act as the collateral manager for Pyxis.  Prusko used to work for Putnam and supervised Bell while he was at the company.  Prusko made clear to Bell that Pyxis would have a hybrid structure focused on "subordinate . . . BBB rated residential bonds."  (*Id.* ¶ 92).

15

- Prusko and Michael Henriques (Deutsche Bank, Magnetar's co-equity investor on Pyxis) discussed Magnetar's CDO shorting strategy with Bell. (*Id.* ¶¶ 93-95, 99-101, 110, 115, 130, 145).

- Prusko insisted that Putnam would "have to play ball" on Pyxis, and executed a "behind the scenes" side letter giving Magnetar and Deutsche Bank "veto rights over any" collateral purchased for Pyxis. (*Id.* ¶¶ 93, 95).

- Prusko and Bell had numerous communications in which Prusko made clear which collateral he wanted to include in the Pyxis portfolio. Prusko told Bell that Magnetar would "source the CDO exposure synthetically" and that "[w]e will buy CDO CDS on names of your choosing." Prusko further told Alex Rekeda (Calyon) that he did not want Putnam "buying CDO's without us knowing about it," and that he thought Putnam was "on the same page with us buying the cdo cds [sic]." (*Id.* ¶¶ 91-93, 95-107, 120).

- Prusko, Bell and other Putnam employees had communications in which Prusko made clear Magnetar's intention to short tens of millions of dollars of the collateral he was selecting for Pyxis. In one communication, Prusko suggested to Bell that Putnam increase the synthetic portion of Pyxis, which would allow Magnetar to short more of the assets in Pyxis. (*Id.* ¶ 98). Prusko explained: "It's very hard to get off sizable CDO CDS trades unless they're done against a deal, and this is a natural delta hedge against our equity." Bell replied: "Got it. So when we find a deal we want to buy, we shouldn't put in an order with the syndicate desk but have Calyon broker a synthetic trade between you and [Pyxis] at an agreed upon level?" Prusko responded: "That would be preferable ...." (*Id.* ¶ 98; *see also id.* ¶¶ 91-93, 98-99, 109).

- Bell and Rekeda discussed the importance of concealing Magnetar's involvement in Pyxis. As Rekeda explained: "any time a manager is trying to negotiate a structure, while mentioning the equity investor, it immediately raises a redflag . . . . we should try to offer [the investor] some other rationale rather than interests [sic] of the junior investors." (*Id.* ¶ 113).

- Magnetar selected Putnam to act as collateral manager for Pyxis 2 due to its satisfaction with Putnam's cooperation on Pyxis. (*Id.* ¶¶ 51, 91, 112).

16

- After Pyxis defaulted, Bell joked with Prusko about how much money Magnetar had made from its short-selling strategy. (*Id.* ¶ 115).

Putnam's investments in the Pyxis CDOs itself were allegedly suspicious:

- Putnam invested over half of Pyxis' cash allocated to CDO investments in four other Magnetar CDOs, even though there were 223 ABS CDOs issued in 2006 alone from which Putnam could have selected. (*Id.* ¶ 117).

- There was a high correlation between the issuers of securities included in Pyxis' portfolio and the issuers of securities included in other Constellation CDOs. 55% of the referenced RMBS or CDOs in the Pyxis Portfolio were included in at least five other Magnetar CODs, and 28% of referenced RMBS or CDOs were included in at least ten other Magnetar CDOs. (*Id.* ¶ 121). There were over 1,000 RMBS and 500 ABS CDOs issued in 2005-2007. (*Id.*). Economic consultants retained by Plaintiff concluded that the probability of this happening by chance was less than 1 in a billion. (*Id.* ¶ 122).

- Putnam concealed the extent to which Pyxis sold protection on the ABX Index of low-rated RMBS. The ABS Index is an independent benchmark designed to measure the overall value of mortgages made to borrowers with subprime or weak credit. Magnetar pushed Putnam to push the limit represented to Pyxis investors on investment in the ABX Index to a level more than three times the specified concentration limit. This led to a greater concentration of risk on a small number of transactions and worked in favor of Magnetar's short investments. (*Id.* ¶ 123).

Plaintiff alleges that both Putnam and Magnetar believed that the assets Magnetar selected for Pyxis would be more likely to default than the assets Putnam would have

17

selected had it acted independently. (*Id.* ¶ 155). Moreover, Magnetar's CDOs defaulted in greater numbers, and defaulted more quickly, than comparable CDOs. (*Id.* ¶156).

On April 30, 2008, the credit rating of the tranche of Pyxis notes that FGIC had insured (the "Super Senior Tranche") was downgraded from AAA to C. Ultimately, Pyxis defaulted and FGIC incurred potential liability of up to $900 million under the Pyxis Guaranty. (*Id.* ¶ 152).

## III. **Discussion**

### A.   *The Applicable Standard*

Putnam has moved to dismiss FGIC's claims of fraud, negligent misrepresentation and negligence pursuant to Rule 12(b)(6) and, to the extent applicable, Rule 9(b) and the PSLRA. On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), all factual allegations in the complaint are accepted as true, and all inferences are drawn in favor of the pleader. *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *County of Suffolk, N.Y. v. First Am. Real Estate*

18

*Solutions*, 261 F.3d 179, 187 (2d Cir. 2001) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995), *cert. denied*, 519 U.S. 808, 117 S. Ct. 50, 136 L. Ed. 2d 14 (1996)).

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 663, 129 S. Ct. 1937, 1940, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). This is not intended to be an onerous burden, as plaintiffs need only allege facts sufficient in order to "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

For claims that sound in fraud, the complaint "must satisfy the heightened pleading requirements set forth in Rule 9(b), as well as the pleading standard mandated by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b)." *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir.2012). Under Rule 9(b), a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state when and where

the statements were made, and (4) explain why the statements were made, and (4) explain why the statements were fraudulent." *Id.* (quoting *Rombach v. Chang,* 355 F.3d 164, 170 (2d Cir. 2004)) (quotation marks omitted). Under the PSLRA, a plaintiff must (1) "specify each misleading statement," (2) "set forth facts on which a belief that a statement is misleading was formed," and (3) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* (quoting *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 345 (2005)) (quotation marks and brackets omitted).

B.   *The SAC Has Failed To State A Claim For Fraud*

As previously noted in *FGIC I,* to state a claim for fraud under New York law, a plaintiff must allege "a material misrepresentation of fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages." *FGIC I,* 2013 WL 5230818, at *2 (quoting *Eurycleia Partners, LP v. Seward & Kissel, LLP,* 910 N.E.2d 976, 979 (N.Y. 2009)). "[L]oss causation is an element of New York common law fraud action." *Gordon Partners v. Blumenthal,* 293 Fed. App'x 815, 818 (2d Cir. 2008) (citing *Laub v. Faessel,* 745 N.Y.S.2d 534, 536 (3d Dep't 2002)). To adequately allege loss causation, a plaintiff "must plead facts that indicate that the information

20

concealed by the defendant['s] misrepresentations was the reason the transaction turned out to be a losing one." *Dexia SA/NV v. Bear, Stearns & Co., Inc.,* No. 12 Civ. 4761(JSR), 2013 WL 856499, at *8 (S.D.N.Y. Feb. 27, 2013) (quoting *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 769 (2d Cir. 1994)) (quotation marks omitted).

Reraising an argument it previously made, FGIC contends that it is not required to allege loss causation under New York common law and Insurance Law § 3105, which entitles an insurer to "avoid any contract of insurance or defeat recovery thereunder" if it was induced to enter into an insurance contract by a material misrepresentation of fact. *See* N.Y. Ins. Law § 3105(b); *see also MBIA Ins. Co v. Countrywide Home Loans Inc.,* 936 N.Y.S.2d 513, 523-24 (N.Y. Sup. Ct. 2012) ("*MBIA I*"). FGIC contends § 3105(b) entitles an insurer to recover "payments made to an insurance policy without resort to rescission" and without proof of loss causation. *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.,* 105 A.D.3d 412, 412 (1st Dep't 2013) ("*MBIA II*") (affirming lower court's holding that "pursuant to Insurance Law §§ 3105 and 3106, plaintiff was not required to establish causation in order to prevail on its fraud and breach of contract claims"); *see also MBIA I*, 936 N.Y.S.2d at 523-24 ("It is without basis in case law to require [the plaintiff] to

21

provide a causal link between the alleged misrepresentations and [the losses suffered by the plaintiff].").

*FGIC I* previously held that the law on fraud in the inducement of an insurance contract and *MBIA I* was inapplicable because Putnam "did not apply for any insurance, nor did it enter into any sort of contract—insurance-related or otherwise—with FGIC." 2013 WL 5230818, at *4. FGIC contends that § 3105 is nevertheless applicable because it applies not only to misrepresentations made by the applicant for insurance or the insured, but also to misrepresentations made "by the authority of" the applicant or the insured. *See* N.Y. Ins. Law § 3105(a) (defining "representation" as "a statement as to past or present fact, made to the insurer by, or by the authority of, the applicant for insurance or the prospective insured").

Calyon was the applicant for insurance and the insured under the Pyxis Guaranty. (SAC ¶¶ 2, 7, 62-63, 88). Putnam was neither a party to the Pyxis Guaranty nor a party to Calyon's swap with FGIC's subsidiary. Putnam's alleged misrepresentations thus must be made "by the authority of" Calyon for § 3105 to apply. To act "by the authority of" Calyon, Putnam must have acted as Calyon's agent under New York law. *See Falcon Crest Diamonds, Inc. v. Dixon*, 655 N.Y.S. 2d

22

232, 236 (N.Y. Sup. Ct. 1996) (construing "by the authority of" to mean that "a party may make a material representation through a broker"). "Courts in this District have required that facts establishing agency be pled with Rule 9 particularity where the agency relationship itself was an integral element of the alleged fraud." *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 111 n.6 (S.D.N.Y. 2009) (citing *Kolbeck v. LIT Am., Inc.*, 923 F. Supp. 557, 569 (S.D.N.Y. 1996)); *see also Woods v. Maytag Co.*, 807 F. Supp. 2d 112, 121 (E.D.N.Y. 2011) (if a purported agency relationship "is an integral element of an alleged fraud, courts have required the facts establishing agency be pled with Rule 9(b) particularity"). The SAC alleges no facts to support an inference that Putnam acted as Calyon's agent or broker in obtaining the Pyxis Guaranty or when it made its representations to FGIC. FGIC contends that "most of Putnam's [alleged] misrepresentations were made in offering materials . . . which, in turn, were prepared by Calyon and were presented by Calyon to FGIC" (Opp. at 12), but the SAC does not allege that Calyon directed Putnam's statements in the offering materials regarding the Pyxis Guaranty. Instead, as FGIC concedes, the materials were "prepared by Calyon" and "presented by Calyon to FGIC." (*Id.*). As such, the SAC does not allege sufficient facts for an inference that Putnam was acting "by the authority" of Calyon when it made its statements in the offering materials or to

23

FGIC.

In any event, § 3105 contemplates two situations: (i) where an insurer seeks to "avoid any contract of insurance," that is, to rescind the contract, or (ii) seeks to "defeat recovery thereunder." N.Y. Ins. Law § 3105. New York common law "is never abrogated by implication" and "must be held no further changed than the clear import of the language used in a statute absolutely requires." N.Y. Stat. Law § 301, cmt. 2 (McKinney 2013). Neither situation proposed in § 3105 is present here. Rescission is available only where the parties are in privity of contract. *See, e.g.*, *Ins. Co. of Penn. v. Park & Pollard Co.*, 180 N.Y.S. 143 (1st Dep't 1920). FGIC has no contract with Putnam, and rescission is not available here.[2] Similarly, FGIC cannot "defeat recovery" under the Pyxis Guaranty by bringing suit against Putnam, as Putnam is not a party to the Guaranty. Consequently, § 3105 is inapplicable here.

Turning to loss causation, the SAC has not sufficiently pled that Magnetar's alleged control of the collateral selection process for Pyxis caused FGIC's losses, as

---

[2] FGIC contends that where a plaintiff seeks rescission, the link between the misrepresentation and the loss ultimately suffered is irrelevant, thus loss causation need not be pled here because FGIC seeks rescissory relief. However, as noted, rescission is not available here.

opposed to the global financial crisis. Allegations of loss
causation are not subject to the heightened pleading standard of
Rule 9(b); they need merely to satisfy the notice pleading
standard in Rule 8(a), under which "a short and plain statement
. . . that provides defendants with some indication of the loss
and the causal connection that the plaintiff has in mind" will
suffice. *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d
171, 202 (S.D.N.Y. 2010) (quoting *Dura Pharms., Inc. v. Broudo*,
544 U.S. 336, 347 (2005)); *In re Bear Stearns Co., Inc. Sec.,
Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 488 (S.D.N.Y.
2011) (same); *see also In re Bristol Myers Squibb Co. Sec.
Litig.*, 586 F.Supp.2d 148, 163 (S.D.N.Y. 2008) (noting that
there is no heightened standard for pleading loss causation).
For pleading purposes, loss causation exists "if the risk that
caused the loss was within the zone of risk concealed by the
misrepresentations and omissions alleged by a disappointed
investor." *Lentell v. Merrill Lynch & Co., Inc.,* 396 F.3d 161,
173 (2d Cir. 2005).

When a loss occurs around the time of a marketwide
economic collapse, loss causation issues are difficult.

> "[W]hen the plaintiff's loss coincides with a
> marketwide phenomenon causing comparable losses to
> other investors, the prospect that the plaintiff's

> loss was caused by the fraud decreases," and the
> plaintiff's claim fails when "it has not adequately
> ple[]d facts which, if proven, would show that its
> loss was caused by the alleged misstatements as
> opposed to intervening events."

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005). To plead loss causation in the backdrop of a marketwide downturn, the complaint must allege facts that support "an inference that . . . plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud." *Id.* at 175; *see also Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007) (under Rule 8(a), a plaintiff need only allege "facts that would allow a fact-finder to ascribe some rough proportion of the whole loss to [defendants'] misstatements"). Therefore, to state a claim, the SAC must allege that Putnam's misstatements regarding its independence or omissions regarding Magnetar's involvement in Pyxis caused some proportion of the loss suffered by FGIC.

The SAC alleges loss causation with the following alleged facts: First, compared to non-Magentar CDOs, Magnetar CDOs defaulted in greater numbers, and defaulted more quickly than comparable CDOs. (SAC ¶ 156). Second, certain assets selected by Magnetar for Pyxis were significantly more likely to default than assets that Putnam would have selected acting

26

independently, namely that $145 million prime RMBS in the original target portfolio was swapped with $145 subprime RMBS. (*Id.* ¶ 157). Third, the assets in the Pyxis Portfolio alleged to have been selected by Magnetar defaulted more quickly than other assets in the Pyxis portfolio. (*Id.* ¶¶ 158-60). Fourth, $95.5 million of known Magnetar-selected assets defaulted before the events that precipitated the financial crisis. These allegations, taken together, do not allow for an inference of loss causation.

As an initial matter, the SAC does not allege how Magnetar's selection of assets in the Pyxis Portfolio caused Pyxis to default, the event that would trigger the Pyxis Guaranty and FGIC's loss. (*Id.* ¶ 8). The pool of assets alleged to be controlled by Magnetar represented roughly 11% of the $1.5 billion collateral pool, and the SAC does not allege how the selection of safer assets in this 11% pool would have prevented a default. Similarly, the SAC alleges that $145 million of prime RMBS was swapped with $145 million of subprime RMBS, but this represents only 10% of the portfolio. Putnam also represented to FGIC in the due diligence process that the Pyxis Portfolio would be composed primarily of subprime RMBS.

In addition, the SAC does not allege that but for

27

Magnetar's override of Putnam's collateral management
responsibilities, Putnam would have selected other assets that
would have performed better than those in the Pyxis collateral
pool. Even though Putnam's original target portfolio for Pyxis
included a substantial amount of prime RMBS that was swapped for
subprime RMBS, the SAC does not make any allegation that there
are any set of assets Putnam could have selected that would have
complied with the Pyxis eligibility requirements and constraints
set forth in the Offering Memoranda and still would have avoided
default. Similarly, FGIC's allegation that $95.5 million of
known Magnetar-selected assets defaulted before the events that
precipitated the financial crisis does not promote an inference
that the defaults were caused by anything other than marketwide
events leading up to the market downturn in 2008. Even if the
Magnetar-selected assets in the Pyxis portfolio defaulted more
quickly than other assets, there is nothing in the SAC that
alleges that this 11% of the portfolio defaulting 4.2 months
ahead of the remaining Pyxis assets was sufficient to cause
Pyxis to default ahead of any market-wide downturn or isolates
Pyxis' default in any reasonable manner from the market
downturn.

     The SAC provides a comparison that shows that compared
to non-Magnetar CDOs, Magnetar CDOs defaulted in greater

numbers, and defaulted much more quickly, than comparable CDOs. (SAC ¶ 156). As of December 2008, when Pyxis defaulted, 94% of Magnetar's 2006-vintage mezzanine CDOs had defaulted, while only 40% of non-Magnetar 2006-vintage mezzanine CDOs had done so. As of April 2012, all 18 of Magnetar's 2006-vintage mezzanine CDOs had defaulted while only 72% of 2006-vintage non-Magnetar mezzanine CDOs had defaulted. However, this comparison does not necessarily lead to an inference that Putnam's misrepresentation caused FGIC's losses. The comparison itself is problematic, as the SAC does not plead what exactly made the Magnetar and non-Magnetar CDOs comparable, including whether the alleged Magnetar CDOs or comparable CDOs had the same asset eligibility criteria, payment waterfall, trigger structure or other features of Pyxis. FGIC alleges that the CDOs compared have identical vintages and collateral classes, but FGIC fails to allege any basis that vintage and collateral classes are more significant than any of other structural features. FGIC further fails to show how the Magnetar CDOs and the hundreds of non-Magnetar CDOs issued during 2006 could have had identical collateral classes and can be compared with each other given that they likely all included different sets of RMBS and CDOs as collateral, and the SAC does not provide any link as to this comparison and to the Pyxis Portfolio and its default.

As with the AC, FGIC has not provided the SAC with any alleged facts sufficient to infer that there was any pool of collateral that could have avoided default while still conforming to Pyxis' detailed eligibility criteria. *See FGIC I*, 2013 WL 5230818, at *3 (citing *Lentell*, 396 F.3d at 174). Since only Pyxis' default would trigger the loss to FGIC, the SAC has failed to "allege[ ] facts that would allow a factfinder to ascribe some rough proportion of the whole loss to the . . . misstatements," rather than external market forces. *City of Westland Police and Fire Ret. Sys. v. MetLife, Inc.*, 928 F. Supp. 2d 705, 715 (S.D.N.Y. 2013) (quoting *Lentell*, 396 F.3d at 174). Accordingly, the SAC has failed to plead loss causation, and FGIC's fraud claim must be dismissed.

## C.    The SAC Has Failed To State A Claim For Negligence Or Negligent Misrepresentation

In granting Putnam's prior Motion to Dismiss, *FGIC I* held that to prevail on FGIC's claims for negligence or negligent misrepresentation, FGIC must allege facts showing that the relationship between FGIC and Putnam was "sufficiently close as to approach that of privity'" since it was undisputed that "there is no actual privity between the parties." *FGIC I*, 2013 WL 5230818, at *4 (quoting *Anschutz Corp. v. Merrill Lynch &*

*Co., Inc.*, 690 F.3d 98, 114 (2d Cir. 2012)).

As in its opposition to the previous Motion to Dismiss, FGIC contends that a "special relationship" was formed between Putnam and FGIC as delineated in *Bayerische Landesbank, New York Branch v. Aladdin Capital Management LLC*, 692 F.3d 42 (2d Cir. 2012). The SAC provides new allegations regarding this special relationship, including references to a meeting at Putnam's offices and phone interviews between Putnam and FGIC. The SAC also alleges that "FGIC sought and received directly from Putnam representations and assurances to the effect that Putnam would exercise its professional expertise to manage and independently select the collateral for the Pyxis Portfolio." (SAC ¶ 180). These representations were made "directly to FGIC on August 3, 2006, August 7, 2006, and on other occasions," as well as in "the Pitchbook, Offering Memorandum, Term Sheet, and Collateral Management Agreement." (*Id.*). The SAC alleges that FGIC relied on the assurances, which "created a 'special relationship' of trust and confidence between Putnam and FGIC." (*Id.* ¶ 181).

As an initial matter, the documents upon which FGIC relied expressly disclaim any creation of a special duty. "[T]he Pyxis Pitchbook . . . expressly stated that "[n]one of

31

. . . the Putnam Advisory Company, LLC . . . , or any of their respective affiliates are acting as a financial advisor nor in [a] fiduciary capacity [i]n respect of the transaction to any investor . . . ." *FGIC I*, 2013 WL 5230818, at *4 n.3). Similarly, the "Presentation for Investors" for Pyxis, dated July 2006 and cited in the SAC (SAC ¶¶ 68-18), states that "[n]one of . . . the Putnam Advisory Company, LLC . . . , or any of their respective affiliates are acting as financial adviser nor in [a] fiduciary capacity . . . to any investor . . . ." (Hora Decl. Ex. 4 at 2). The Pyxis Offering Memorandum states that "investors must rely on their own examination of the co-issuers and the terms of the offering, including the merits and risks involved." (*Id.* Ex. 1 at iii). Such disclosures preclude any claim of a direct fiduciary or similar duty. *See, e.g.*, *M&T Bank Corp. v. Gemstone CDO VIL Ltd.*, 68 A.D.3d 1747, 1749 (4th Dep't 2009) (dismissing negligent misrepresentation claim against CDO collateral manager where "'Preliminary Offering Circular' and 'Debt Investor Presentation' . . . contained numerous disclaimers and advised plaintiff to perform its own due diligence"); *Landesbank BadenWiirttemberg v. Goldman, Sachs & Co.*, 821 F. Supp. 2d 616, 624 (S.D.N.Y. 2011) (dismissing negligent misrepresentation claim where "the [Offering] Circular expressly disclaimed any special relationship").

32

FGIC contends that a special relationship was still formed, notwithstanding this language in the documents, as similar language was contained in the *Bayerische* offering circular but the *Bayerische* court still held that a "legal duty" arose between the third-party beneficiary of notes and the notes issuer. *Id.* at 59.

As previously noted in *FGIC I*, in *Bayerische*, the plaintiff, Bayerische Landesbank ("BL") had purchased notes sold by a CDO (the "Alladin CDO") that was structured, marketed and managed by defendant Alladin. 692 F.3d at 46. In ignoring the disclaimer language and finding a legal duty between BL and Alladin, *Bayerische* emphasized the totality of representations and circumstances the issuer made to the third-party notes purchaser, including the issuer's marketing materials, face-to-face meetings with the issuer and statements made by the issuer, which were enough to conclude that a sufficiently close relationship had developed between Bayerische and Alladin. *Id.* at 59. Notably, the Portfolio Management Agreement in *Bayerische* had an "end and aim" to install Aladdin as the manager of the portfolio on behalf of the noteholders and Bayerische. *Id.* at 60.

Unlike in *Bayerische*, FGIC was the guarantor of the

33

third-party swap between Calyon and a FGIC subsidiary and not a direct third-party beneficiary.    Section 20 of the Collateral Management Agreement identified the third-party beneficiaries thereunder, and does not name FGIC. (Hora Decl. Ex. 2 at § 20). While FGIC's participation was critical to the closing of the transaction (SAC ¶ 64), the "end and aim" of Pyxis was not for FGIC's benefit.    In *Bayerische*, the investing relationship between Alladin, the CDO marketer and manager, and Bayerische, a third-party notes holder was much closer in scope and shared goals than the one a guarantor of a transaction has with a CDO manager.    FGIC's benefit was not the "end and aim of the transaction," *Credit Alliance*, 65 N.Y.2d at 549, 493 N.Y.S.2d 435, 483 N.E.2d 110 (emphasis omitted) (quoting *Glanzer v. Shepard*, 233 N.Y. 236, 135 N.E. 275 (1922)), and FGIC has not alleged sufficient facts to demonstrate how FGIC, as a guarantor, could have a relationship with Putnam that can be "'so close as to approach that of privity, if not completely one with it.'" *Bayerische*, 692 F.3d at 60 (quoting *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 550, 493 N.Y.S.2d 435, 483 N.E.2d 110 (N.Y. 1985)).

FGIC contends that a special relationship did arise from FGIC's known reliance on Putnam's representations that it would employ its superior knowledge of the interests of long

34

investors.   However, as previously noted in *FGIC I*, Putnam's superior knowledge and reliance by FGIC does not create the requisite special relationship.   *FGIC I*, 2013 WL 5230818, at \*4; *see also MBIA Ins. Corp. v. Countrywide Home Loans, Inc.,* 87 A.D.3d 287, 297 (1st Dep't 2011) (finding that "[t]he claim that [the defendant] had superior knowledge of the particulars of its own business practices is insufficient to sustain [a] cause of action [for negligent misrepresentation]" where the plaintiff "ha[d] failed to allege facts showing that these sophisticated commercial entities engaged in anything more than an arm's length business transaction"); *Sebastian Holdings, Inc. v. Deutsche Bank AG,* 78 A.D.3d 446, 447 (1st Dep't 2010) ("[The plaintiff]'s alleged reliance on defendant's superior knowledge and expertise . . . ignores the reality that the parties engaged in arm's-length transactions pursuant to contracts between sophisticated business entities that do not give rise to [the type of] fiduciary duties [necessary to support a negligent misrepresentation claim]").   To increase the scope of the "orbit of duty" a defendant owes to include any party who relied upon a defendant and the defendant's superior knowledge where no privity exists between the party and the defendant would significantly broaden the scope of liability under "special relationship" cases, a factor the Circuit Court warned against in *Bayerische*.   *Bayerische*, 692 F.3d at 59 ("[I]n the absence of

35

privity, the scope of the 'orbit of duty' to third parties must be carefully examined 'to limit the legal consequences of wrongs to a controllable degree and . . . protect against crushing exposure to liability.'" (quoting *Strauss v. Belle Realty Co.,* 65 N.Y.2d 399, 402, 492 N.Y.S.2d 555, 482 N.E.2d 34 (N.Y. 1985))).   Accordingly, a "special relationship" has not been established based on the allegations contained in the SAC, and FGIC has failed to allege facts sufficient to state a claim for negligence or negligent misrepresentation.

## IV.   **Conclusion**

Based on the conclusions set forth above, the Defendant's motion to dismiss the SAC is granted and the SAC is dismissed.

It is so ordered.

**New York, NY**
**April 28, 2014**

ROBERT W. SWEET

36

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
FINANCIAL GUARANTY INSURANCE
COMPANY,

|  |  |
|---|---|
| USDC SDNY |  |
| DOCUMENT |  |
| ELECTRONICALLY FILED | 4/28/2014 |

                              Plaintiff,                    12 **CIVIL** 7372 (KBF)

           -against-                                        **JUDGMENT**

THE PUTNAM ADVISORY COMPANY, LLC,

                              Defendant.
------------------------------------------------------------X

        Whereas Defendant having moved to dismiss the Second Amended Complaint ("SAC")

pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure (Doc. # 23) on

October 15, 2013, and the matter having come before the Honorable Robert W. Sweet, United

States District Judge, and the Court, on April 18, 2014, having rendered its Opinion (Doc. # 33),

granting Defendant's motion, and dismissing the SAC, it is,

        **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in

the Court's Opinion dated April 28, 2014 (Doc. # 33), the Defendant's motion to dismiss the SAC

is granted and the SAC is dismissed.


**DATED:** New York, New York
             April 28, 2014


                                        **RUBY J. KRAJICK**
                                        _____
                                        **Clerk of Court**
                        **BY:**
                                        _____
                                        **Deputy Clerk**