UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

FINANCIAL GUARANTY INSURANCE COMPANY,

          Plaintiff,          12 Civ. 7372

  -against-                 OPINION

THE PUTNAM ADVISORY COMPANY, LLC,

          Defendants.

------------------------------------X

A P P E A R A N C E S:

    Attorneys for the Plaintiff

    QUINN, EMMANUEL, URQUHART, OLIVER & SULLIVAN
    335 Madison Avenue, 17th Floor
    New York, NY 10017
    By:  A. William Urquhart, Esq.
        Paul Peter Hughes, Esq.
        Peter E. Calamari, Esq.
        Sean Patrick Baldwin, Esq.

    Attorneys for the Defendant

    MILBANK, TWEED, HADLEY & McCLOY, LLP
    28 Liberty Street
    New York, NY 10005
    By:  Robert Charles Hora, Esq.
        Sean Miles Murphy, Esq.
        Thomas A. Arena, Esq.

Sweet, D.J.,

Defendant Putnam Advisory Company, LLC ("Putnam" or the "Defendant") has moved to compel the production of four categories of documents from Plaintiff Financial Guaranty Insurance Company ("FGIC" or the "Plaintiff"). For the reasons set forth below, the motion is granted in part and denied in part.

## Prior Proceedings

This is the first major motion since remand in this common-law fraud and misrepresentation case, in which FGIC, a stock insurance company, alleges that Putnam made false representations about, or negligently mismanaged, a collateralized debt obligation ("CDO") named Pyxis ABS CDO 2006-1 ("Pyxis"). (See Second Amended Complaint (the "SAC"), Dkt. No. 22.) An extensive summary of FGIC's claims and allegations is available in the Court's April 28, 2014 Opinion. Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC, No. 12 Civ. 7372, 2014 WL 1678912, at *1-7 (S.D.N.Y. Apr. 28, 2014).

FGIC initiated this case on October 1, 2012, with the filing of a Complaint that was subsequently amended. (Dkt. Nos.

1 & 4.) On December 21, 2012, the Defendant filed a motion to dismiss (Dkt. No. 9), which was heard on March 21, 2013 and granted by an Opinion dated September 10, 2013. Fin. Guar. Ins. Co. v. Putnam Advisory Co., No. 12 Civ. 7372, 2013 WL 5230818 (S.D.N.Y. Sept. 10, 2013). That Opinion gave leave to replead, and FGIC subsequently filed its Second Amended Complaint (Dkt. No. 22), the pleading which remains operative. Putnam filed a new motion to dismiss on October 15, 2013 (Dkt. No. 23), which was heard on November 20, 2013 and granted by the April 24, 2014 Opinion. FGIC, 2014 WL 1678912. The Plaintiff appealed the dismissal to the Second Circuit, which reversed and remanded in an opinion dated April 15, 2015. Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC, 783 F.3d 395 (2d Cir. 2015). After the case returned to the District Court, Putnam filed its answer on May 15, 2015 (Dkt. No. 45), and discovery commenced.

The instant motion to compel discovery was filed by Putnam on August 25, 2015. (Dkt. No. 52.) FGIC filed its opposition papers on September 1, 2015 (Dkt. No. 55), Putnam replied on September 3, 2015 (Dkt. No. 57), and the motion was heard on October 7, 2015.

**Applicable Standard**

Federal district courts have broad discretion in deciding motions to compel. See Grand Cent. P'ship. Inc. v. Cuomo, 166 F.3d 473, 488 (2d Cir. 1999). Federal Rule of Civil Procedure 26 states:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense-including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action.

If a party objects to discovery requests, that party bears the burden of showing why discovery should be denied. Freydl v. Meringolo, 09 Civ. 07196(BSJ)(KNF), 2011 WL 256608-7, at *3 (S.D.N.Y. June 16, 2011). Specifically, the resisting party must show how, "despite the broad and liberal construction afforded the federal discovery rules, each request is not relevant, or how each request is overly broad, burdensome, or oppressive, by submitting affidavits or offering evidence revealing the nature of the burden." Sokol v. Wyeth, Inc., No. 07 Civ. 8442, 2008 WL 3166662, at *3 (S.D.N.Y. Aug. 4, 2008). Where the party responding to the motion agrees to provide the discovery requested, a motion to compel becomes moot. See, e.g., Decker v. Nagel Rice LLC, 716 F.Supp.2d 228, 236 (S.D.N.Y. 2010).

**The Motion to Compel is Granted in Part and Denied in Part**

Putnam seeks to compel FGIC's production of four categories of documents: 1) post-closing documents concerning the Pyxis CDO; 2) documents regarding FGIC's damages, including the deed of settlement that gave rise to the alleged damages in this case, and documents relating to other transactions that might have been included in that settlement; 3) a set of documents concerning FGIC's other investments in CDOs and Residential Mortgage-Backed Securities; and 4) documents relating to a firm of economic consultants used by FGIC to analyze Putnam's management of the Pyxis CDO, whose work FGIC referred to in the SAC and in its Second Circuit briefing.

Post-Closing Documents

In its motion to compel, Putnam seeks documents from FGIC created after the closing of the Pyxis transaction that reflect FGIC's surveillance or monitoring of the Pyxis collateral. (D.'s Br., Dkt. No. 53, at 6.) In its opposition papers, FGIC agreed to turn over the documents requested. (Pl.'s Opp. Br., Dkt. No. 55, at 8.) Putnam's reply papers evince no objections to FGIC's disclosure. (See D.'s Reply Br., Dkt. No. 57, at 9-10.) Since the respondent has agreed to provide the requested

discovery, the motion to compel has been mooted. See Stinson v. City of New York, No. 10 Civ. 4228, 2015 WL 4610422, at *3 (S.D.N.Y. July 23, 2015); Decker v. Nagel Rice LLC, 716 F. Supp. 2d 228, 236 (S.D.N.Y. 2010).

Damages-Related Documents

Putnam also seeks a category of documents regarding FGIC's alleged damages. Analysis of the merits of this request requires an examination of the structure of the Pyxis transaction, in particular a $900 million credit default swap between the Pyxis CDO and Calyon, the bank that structured and issued the CDO. Under the swap, Calyon performed the role of credit protection buyer, paying premiums to Pyxis in exchange for payments from Pyxis if the assets in Pyxis' portfolio suffered negative credit events.[1] (See SAC ¶ 45.) Meanwhile, Calyon sought credit protection from FGIC, engaging in a credit default swap with FGIC's wholly-owned subsidiary, FGIC Credit Products LLC, with FGIC itself insuring all of its subsidiary's payments. (See id. ¶¶ 62-63.) FGIC alleges that the transaction would not have closed without its agreement to provide that insurance (id. ¶ 64) and that it only did so in

---

[1] Calyon then passed its short position (the ability to profit if Pyxis did poorly) on to other parties. See id.

reliance on Putnam's representations about its management of Pyxis' portfolio. (Id. ¶ 180.)

Of relevance to the instant motion, FGIC stated in its Amended Rule 26(a) disclosures that it seeks damages based on its payments under a Termination Agreement that settled its obligations to Calyon. (Dkt. No. 54, Ex. 2, at 6.) The text of the Termination Agreement, however, indicates that it is a settlement of claims based on Pyxis and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ (Dkt. No. 54, Ex. 4, at 6.) Putnam seeks four subcategories of damages-related documents: 1) a "Deed of Settlement" between FGIC and Calyon which it argues gave rise to the Termination Agreement; 2) documents concerning the ▮▮▮▮▮▮▮▮▮▮, 3) documents concerning the ▮▮▮▮▮▮▮▮▮▮, and 4) documents relating to a CDO transaction named Havenrock II, a separate FGIC transaction in which it used Pyxis CDO notes as collateral. (D.'s Br. at 12.)

In its opposition brief, FGIC limits its objections to disclosure of the Deed of Settlement and documents concerning Havenrock II. It contends that the Termination Agreement and the Deed of Settlement are unrelated, and that the latter document is concerned only with the Havenrock II transaction. As to Havenrock II, FGIC concedes that the CDO referenced Pyxis in its portfolio, but notes that the Havenrock transaction took

7

place "mere months after Pyxis closed, and before [FGIC] became aware of Putnam's fraud." (Pl.'s Opp. Br. at 11.) The parties differ as to whether Havenrock is relevant to the damages in this action; FGIC states that the two matters are entirely separate, while Putnam cites in its reply brief to two incidents where FGIC at least implied that Havenrock-related damages made up part of the relief it is seeking in this action. Either way, no matter when the alleged fraud was discovered, FGIC's decision to increase its exposure to Pyxis, several months after closing and presumably after conducting due diligence in evaluating a new investment, does warrant scrutiny. That decision, and the data and reasoning that went into it, is relevant to the extent and reasonableness of its reliance on Putnam's representations.

In its briefing, FGIC indicated its willingness to turn over documents relating to the Havenrock II transaction "to the extent that any . .. reference Pyxis." (Pl.'s Opp. Br. at 11 n.9.) This concession is insufficient; Havenrock documents are subject to discovery if they relate to Pyxis or Putnam, whether or not they reference those terms by name. See U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co., No. 12 Civ. 6811, 2013 WL 1728933, at *4 (S.D.N.Y. Apr. 22, 2013). As to the Deed of Settlement, although the parties dispute whether it relates to the Termination Agreement, and thus to FGIC's alleged damages, it is FGIC, as the party resisting discovery, that bears the

burden of establishing that the document is not relevant, see Sokol v. Wyeth, Inc., No. 07 Civ. 8442, 2008 WL 3166662, at *3 (S.D.N.Y. Aug. 4, 2008). Because FGIC has not carried that burden, the Deed of Settlement must be produced.

Documents Relating to FGIC's Portfolios

Putnam is also seeking documents concerning FGIC's other CDO and RMBS investments, outside of and unrelated to Pyxis. After FGIC objected to these requests as burdensome and overbroad, Putnam agreed to limit its requests to 1) a list of all RMBS or ABS (Asset-backed Securities) CDOs to which FGIC was exposed from January 2006 through the filing of the SAC; 2) documents showing the losses suffered by FGIC on those investments; and 3) any memoranda submitted to FGIC's credit committee, structured finance committee, or other equivalent committee seeking approval of each such transaction. (D.'s Br. at 14-15.) Putnam argues, without citing to any authority in its main brief, that these documents bear on FGIC's sophistication, and on whether it "blindly" relied on Putnam's representations regarding Pyxis. (Id. at 14.) Putnam also contends in its reply brief that these documents are relevant to loss causation. (D.'s Reply Br. at 6.)

Inquiry into this area is denied because FGIC's general knowledge of the market is "too tenuously related to any plausible defense to be a proper subject of discovery." Assured Guar. Mun. Corp. v. UBS Real Estate Sec., Inc., No. 12 Civ. 1579, 2012 WL 5927379, at *4 (S.D.N.Y. Nov. 21, 2012). FGIC's decisionmaking regarding CDOs that are completely unrelated to Pyxis would have limited probative value, if any, while the documents sought, describing CDO-related losses incurred during a period of financial crisis where such losses were rampant, are likely to be at least significantly burdensome to produce. FGIC shall produce to Putnam a list of the mortgage- and asset-backed CDOs to which it was exposed and a good-faith estimate of the total losses suffered from the area as a whole, but no further discovery into unrelated investments will be required at this time.

## FGIC's Economic Analysis

Lastly, Putnam seeks the production of an economic analysis commissioned by FGIC for this litigation. Although expert reports and other such documents prepared for the purpose of litigation are normally covered by the attorney-client and work product privileges, Putnam contends that FGIC waived any such

protection when it cited to and quoted from the analysis in the SAC, and when it used the report in its Second Circuit briefing.

In Paragraph 122 of the SAC, FGIC declares that it retained a firm of economic analysts to assess the likelihood that a suspicious pattern of referenced securities in Pyxis and other related CDOs could have occurred by chance, rather than by design. That paragraph also includes three bullet-pointed quotations from the analysis, concluding that the pattern "may indicate that the portfolio selection by independent portfolio managers was influenced by an external factor," that "the probability of this happening by chance across independent portfolio managers is less than 1 in a billion," and that the likelihood was similar to that observed in cases involving fraudulent options backdating. The analysis was referenced in order to show that the selection of financial instruments in Pyxis' portfolio was in fact conducted in conjunction with Magnetar Capital LLC ("Magnetar"), a hedge fund with a short position in Pyxis, with the goal of having Pyxis fail, creating a profit for Magnetar. See id. FGIC also referred to the report in its briefing before the Second Circuit.[2]

---

[2] Although FGIC did not directly cite to Paragraph 122 of the SAC in its Second Circuit briefing, it does repeatedly assert that it had independently confirmed without discovery that Pyxis' collateral was not selected independently, but rather for Magnetar's benefit, a clear reference to the economic analysis. (See, e.g., FGIC. App. Br., Decl. of Thomas A. Arena, Dkt. No. 58, Ex. 4, at 32.) The briefing also cites Paragraph 158 of the SAC, which also references the analysis. (Id. at 33.)

11

Both the attorney-client and work product privileges may be waived if a party puts the privileged communication at issue by relying on it to support a claim or defense. Koumoulis v. Independent Fin. Mktg. Grp., Inc., 295 F.R.D. 28, 40 (E.D.N.Y. 2013). FGIC has done so here; by utilizing the report in the SAC and before the Second Circuit, it waived its right to object to disclosure of the report's contents. See United States v. Nobles, 422 U.S. 225, 239-40 (1975); In re Grand Jury Proceedings, 219 F.3d 175, 191 (2d Cir. 2000) ("the Court in Nobles found it crucial that the [party] elected to make affirmative use of the report and then shield it from scrutiny").

In its briefing, FGIC attempts to rehabilitate the privilege over the report by promising not to utilize the analysis in the future, including at trial. (Pl.'s Opp. Br. at 17.) It cites to the Appellate Division, First Department's holding in MBIA Insurance Corp. v. Countrywide Home Loans, Inc., 93 A.D.3d 574, 575 (1st Dep't 2012) for the proposition that mere reference to a privileged document in a pleading does not amount to a waiver of privilege. However, that opinion also based its holding on the fact that the party asserting the privilege did not "need the privileged materials concerning the review to sustain its causes of action." Id.; see also Ambac Assur. Corp. v. DLJ Mortg. Capital, Inc., 92 A.D.3d 451, 452

12

(1st Dep't 2012) (finding no at-issue waiver from use of consultant report where the complaint could stand even if all references to it were stricken). Viewed under that standard, the reference to the analysis in FGIC's complaint, standing alone, does not constitute a waiver. However, by referring to the analysis during the Second Circuit's review of this Court's decision on the motion to dismiss – in which the Circuit determined that FGIC's allegations were "sufficient to state claims for fraud, negligent misrepresentation, and negligence," FGIC, 783 F.3d at 402 – FGIC has already used the report to sustain its causes of action, rendering MBIA distinguishable.[3] Since FGIC "inject[ed] the contents of a privileged communication into the litigation" by utilizing it in connection with a dispositive motion, the "at issue" waiver applies. See JA Apparel Corp. v. Abboud, No. 07 Civ. 7787, 2008 WL 111006, at *3 (S.D.N.Y. Jan. 10, 2008); RLS Assocs., LLC v. United Bank of Kuwait, PLC, No. 01 Civ. 1290, 2003 WL 1563330, at *2 (S.D.N.Y. Mar. 26, 2003).[4]

---

[3] FGIC contends that its discussion of the economic analysis in its appellate papers should carry no weight because the analysis played no role in the Circuit's decision. While Judge Straub's opinion does not directly cite any of the SAC paragraphs that reference the analysis, it does extensively discuss FGIC's allegations that Putnam's selection of the Pyxis collateral was not independent and conducted in favor of Magnetar, an assertion that the analysis was conducted to support. See FGIC, 783 F.3d at 399–401.

[4] In its discussion of "at issue" waiver, FGIC cites to only one case in which the party resisting discovery used privileged material in connection with a dispositive motion, as opposed to merely in a pleading. That case, Mass. Mut. Life Ins. Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 293 F.R.D.

Having determined that there was a waiver, it is necessary to determine its scope. In its motion to compel, Putnam is seeking "all documents concerning the 'economic consultant' analysis," including 1) any reports, 2) any documents provided to the consultants in preparation for the reports, 3) any communications between FGIC, its lawyers, and the consultants, and 4) documents sufficient to identify the consultants and their qualifications. (D.'s Br. at 15, 15 n.6.) The determination of the scope of a waiver of the attorney-client and work-product privileges "lies within the sound discretion of the district court." Convole, Inc. v. Compaq Computer Corp, No. 00 Civ. 5141, 2006 WL 2788234, at *2 (S.D.N.Y. Sept. 27, 2006). Here, the scope of the waiver should be drawn narrowly.

Under Federal Rule of Evidence 502(a), a disclosure of privileged information only extends to undisclosed materials if 1) the waiver was intentional, 2) the disclosed and undisclosed communications or information concern the same subject matter, and 3) they ought in fairness to be considered together. The 2007 advisory committee notes to Rule 502 provide further guidance, explaining that a voluntary disclosure "generally results in a waiver only of the communication or information

---

244 (D. Mass. 2013), was decided under Massachussetts law, id. at 254, although it did extensively analyze several New York cases. To the extent that Mass Mutual stands for the proposition that a party cannot place a document at issue by utilizing it in connection with a dispositive pretrial motion, the Court disagrees with that holding.

14

disclosed; a subject matter waiver [] is reserved for those unusual situations in which fairness requires a further disclosure of related, protected information, in order to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary." These considerations are not present here; although FGIC may have put the analysis itself at issue by utilizing it in litigation, there is no indication that its disclosure was done in an incomplete, manipulative, or misleading manner, and none of the ancillary documents that Putnam seeks were utilized in the SAC or before the Second Circuit. FGIC is therefore only required to produce the analysis document referred to in the SAC.

## Conclusion

Putnam's motion to compel is granted in part and denied in part, as set forth above.

It is so ordered.

New York, NY
February 26, 2016

ROBERT W. SWEET
U.S.D.J.