Ibe9fina

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

FINANCIAL GUARANTY INSURANCE
COMPANY,

                Plaintiff,

            v.                      12 CV 7372 (RWS)

THE PUTNAM ADVISORY COMPANY,
LLC,

                Defendant.

------------------------------x

                           New York, N.Y.
                           November 14, 2018
                           12:12 p.m.

Before:

                HON. ROBERT W. SWEET

                                 District Judge

                    APPEARANCES

SELENDY & GAY PLLC
      Attorneys for Plaintiff
BY:  SEAN P. BALDWIN
      WILLIAM RATHGEBER

MILBANK, TWEED, HADLEY & MCCLOY, LLP
      Attorneys for Defendant
BY:  THOMAS A. ARENA
      SEAN M.MURPHY
      SAMANTHA A. LOVIN
      ALLISON S. MARKOWITZ

Ibe9fina

| | |
|---|---|
| 1 | (Case called) |
| 2 | MR. BALDWIN:  What I have -- I assume you will only |
| 3 | likely hear from me once, your Honor, so I'd like to address |
| 4 | both Putnam's summary judgment motion and our motion in the |
| 5 | same motion. |
| 6 | Does that make sense to you? |
| 7 | THE COURT:  That's all right.  Sure. |
| 8 | MR. BALDWIN:  So just like to begin, Putnam's summary |
| 9 | judgment motion is totally inappropriate because every element |
| 10 | of FGIC's claims is supported by extensive evidence which |
| 11 | Putnam disputes or purports to dispute.  Every page of Putnam's |
| 12 | briefs is devoted to arguments about the weight of the |
| 13 | evidence.  Putnam can't get summary judgment by weighing the |
| 14 | evidence.  It's the jury's job to resolve those disputes. |
| 15 | And, in fact, this is where our motion comes in.  The |
| 16 | evidence supporting FGIC's negligence claims based on the |
| 17 | target portfolios sent to FGIC in the Peach Colored |
| 18 | Spreadsheet, or the PCS, into the rating agencies in the rating |
| 19 | agency portfolios is so strong that it really is not genuinely |
| 20 | disputable. |
| 21 | So, if anything, summary judgment should be granted to |
| 22 | FGIC on those claims leaving the remaining claims to be |
| 23 | resolved at trial.  But, at a minimum, Putnam is not entitled |
| 24 | to summary judgment on any claims. |
| 25 | I'll begin with the collateral selection claims which |

Ibe9fina

1   were the heart of the case before discovery when we discovered

2   there were actually misrepresentations about the content of the

3   portfolio as well.

4           Putnam's duty and what it represented it would do to

5   investors and to FGIC was to select the Pyxis collateral in the

6   interests of all investors.  It was the collateral manager.

7   Putnam concedes in its opposition brief that the job of a

8   collateral manager was to select a portfolio that met the

9   agreed-upon portfolio constraints for all of the participants

10  in the transaction, to use its judgment and expertise to select

11  the collateral of interests of all participants, including

12  FGIC.  Putnam told FGIC it was pleased to have an investor like

13  FGIC as its client.

14          And Magnetar, the equity investor, the principal

15  equity investor in FGIC, believed itself that the collateral

16  manager had what it called fiduciary duties to the participants

17  in the transaction.

18          Jim Prusko of Magnetar said, he testified it was

19  Magnetar's view that the manager of a deal has duties to all

20  the liability holders in the deal.

21          But Putnam didn't comply with those duties.  It

22  focused solely on the equity investors' interests in selecting

23  the Pyxis portfolio.  It treated Pyxis as a separate account

24  mandate for the benefit of the equity investors.  And those

25  aren't my words.  That's the equity investors' own words which

Ibe9fina

1    I'll get to in a moment.

2         The equity investors made their collateral preferences

3    quite clear to Putnam before hiring it.  They said to Putnam

4    that they were pursuing a long-short correlation trading

5    strategy, which meant they wanted the portfolio to be highly

6    correlated with their short positions; otherwise, it was a risk

7    they could lose on both their short and long positions.

8         The equity investors' short positions were against

9    post-2005H1 or first half of '05 subprime RMBS related Baa2 or

10   lower.  So they were the assets the equity investors wanted in

11   Pyxis.  They wanted to exclude prime and pre-2005H2 RMBS and

12   assets rated above Baa2.

13        But they wanted more than correlation.  Correlation

14   was a hedge for them.  If the portfolio performed well, they

15   would make money on their equity.  But if it performed badly,

16   they would make materially more money on their short

17   investments for the simple reason they had a lot more short

18   investments.

19        The evidence is undisputed that Magnetar -- Magnetar's

20   own counsel has provided us with the evidence which Putnam says

21   is inadmissible, but we will provide it at trial, we will

22   provide the actual evidence from Magnetar if Putnam continues

23   to insist on it -- that Magnetar's investment -- short

24   investments in Pyxis were four times its long investments.  So

25   Magnetar stood to do best out of Pyxis if Pyxis failed.

Ibe9fina

And Putnam knew that.  Putnam knew very well what Magnetar's plan was.  It was to buy a portfolio that was essentially likely to fail.  But if it didn't fail, then it would at least be hedged because the portfolio would be highly correlated.

So, how do I know Putnam knew that?

Exhibit D of the large book I showed you contains an e-mail that Putnam's -- sorry, that Michael Henriques, one of the equity investors who was at Deutsche Bank at the time of the deal and then after the deal closed he went to Magnetar, joined Jim Prusko.

In July, 2007, he sent an e-mail to Carl Bell, the head guy from Putnam, on Pyxis.  The market is crashing or starting to crash and Pyxis is starting to suffer serious losses.  He says to Bell, "These are fun days, eh?"  And proposes dinner.  Bell replies, "Sure.  Going to bring your money bags?"

August 2007 Rob Bloemker from Putnam.  This is Exhibit E.  He writes to Prusko from Magnetar and he says, "Are you enjoying this market?"

Prusko replies, "Making truckloads of loot like u read about."

Putnam knew exactly what Magnetar's strategy was and that it benefited from more losses.

So, Putnam treated -- Putnam helped Magnetar and

6

Ibe9fina

1  Deutsche Bank do exactly what they wanted.  It treated Pyxis as

2  a structured separate account mandate for the equity investors.

3         Again, those aren't my words.  If you look at Exhibit

4  G, you will see on the first e-mail at the top of the first

5  page it says in the second line, it reinforces that this is not

6  just sponsor -- sorry.  I'm actually looking at the wrong one.

7  I apologize.

8         If you look at Exhibit F.  This is March 27, 2006 when

9  Putnam is being hired by Magnetar to manage Pyxis.  And

10 Deutsche Bank's, Michael Henriques, later Magnetar, says

11 Putnam, in the third paragraph, is open to this type of deal

12 since they view it more as a highly structured separate account

13 mandate for the equity investor, Magnetar.

14        Pyxis was sold as a CDO.  Not a highly structured

15 separate account mandate for the equity investor.

16        July 27.  Exhibit G.  July 27 of the same year.

17 Henriques is discussing another constellation CDR, Carina.  And

18 he's talking about how Prusko has said to the manager that he

19 wants a certain kind of asset to be precleared with him.

20        And Henriques says, "I agree that Jim's e-mail is

21 going to sound wacky to the CDO group's ears, but I think it

22 reinforces that this is not just sponsoring a CDO but really a

23 highly structured separate account mandate.  I think DB and

24 SSGA..." SSGA is State Street, the manager on the deal "...may

25 be bothered by that, but that's the nature of the arrangement

Ibe9fina

1    and with the other deals we definitely have better

2    interaction."  One of those other deals was Pyxis.  We

3    definitely have better interaction with Putnam.  State Street

4    might be bothered by it, but Putnam was fine with it.

5        Exhibit H.  November 2006.  After Pyxis is closed.

6    Putnam is doing -- sorry.  Magnetar is doing another deal on

7    Orion 2 with another manager, NIB.

8        And Michael Henriques, again, says, in the first

9    e-mail, the last lines of the -- sorry, the second e-mail on

10   the third page.  "These deals are not CDOs, but they are

11   structured separate accounts.  I think Putnam got it.  NIB

12   doesn't."

13       What he was doing there was complaining about a number

14   of things that NIB was doing that he didn't like and that

15   Prusko didn't like.

16       He was saying in particular, among other things, that

17   NIB was not buying newer bonds.

18       And Calyon explained to him -- newer meaning new issue

19   bonds.  What Calyon explained to him was that NIB feel very

20   strongly -- this is in Alex Rekeda's response to e-mail,

21   saying, "NIB feel very strongly that the older vintage bonds

22   that they have in the portfolio have by far superior credit

23   characteristics compared to the bonds they can pick up in the

24   market now."

25       Henriques testified at his deposition that he believed

Ibe9fina

1    NIB believed bonds that were just six months older had by far

2    superior credit characteristics.  But he didn't want those in

3    the deal.  He wanted NIB to go ahead and buy new issues.  He

4    replied that NIB responses were unacceptable and don't reflect

5    the spirit of partnership that's appropriate for a separate

6    account mandate.  He said, "I feel like we're being treated

7    like a typical third party CDO investor but we directly engaged

8    NIB and paid them $5.5 million a year in fees."So it couldn't

9    be clearer.  Putnam was hired and paid by the equity investors

10   and as a result was expected to do their bidding and that's

11   what Putnam did.

12        Putnam gave the equity investors the right to veto

13   Putnam's collateral selections.  It provided the equity

14   investors with a daily trade lock for Pyxis.  No other investor

15   got that.  The equity investors did.  Putnam -- Prusko was

16   going through the log everyday to see what was in there; and if

17   he had a problem with it, the understanding was he would tell

18   Putnam about it.

19        Putnam also provided the equity investors with an

20   updated target portfolio it prepared with Calyon on August 29,

21   2006.  It provided it to the equity investors on September 5

22   and it asked for their approval of it.

23        This updated target portfolio is critical.  It's the

24   document that Putnam relies on to say that FGIC should have

25   known this deal was totally different from what it understood

Ibe9fina

from the PC years.  In fact, FGIC never got it before it

committed to the deal.  It went to the equity investors.  And

the equity investors were asked to approve it, and it

substantially reduced the amount of prime RMBS and assets rated

above Baa2 in the portfolio from the amounts disclosed in all

prior target portfolios, and it asked the equity investors to

approve it.

             And the equity investors and Putnam understood that

the equity investors would walk away from the deal if Putnam

bought assets they didn't like.

             And this is perhaps the most significant testimony in

the whole case.  If you look at Exhibit I, this is the

testimony again of Mr. Henriques.  On page 78 of his

deposition.  He said, he was asked:  Was it appropriate for an

equity investor to have the right to object to or veto any of

the assets going into a CDO warehouse prior to closing if they

didn't have the risk of loss on the warehouse?

             He answered:  I think the form of objection it would

have been appropriate was to say I'm buying equity in the

transaction and if it has these assets in it I won't buy equity

in the transaction.  It's up to the manager whether or not they

want to do it at that point.  In other words, my way or the

highway.

             Later on, he said:  I do remember cases where the

manager had a different view, like NIB and in Orion 2, and we

Ibe9fina

1    just didn't buy the equity.

2            And then he was asked:  Do you believe Putnam

3    understood with respect to Pyxis that if they bought assets

4    that you didn't like for the warehouse you wouldn't buy the

5    equity?

6            And he answered they:  Probably understood, yes.

7            They understood because he had discussed it with them.

8    The whole arrangement was that Magnetar would control and

9    Deutsche Bank, but primarily Magnetar, would control the

10   collateral selection.

11           And the result of this was that there weren't many

12   disputes between the equity investors and Putnam.  The reason

13   for that was that the equity -- that Putnam knew exactly what

14   the equity investors want.  They told them they didn't want

15   seasoned assets, they didn't want prime, and they didn't want

16   higher-rated assets.  So Putnam didn't select those.  It

17   complied with these undisclosed portfolio constraints.

18           There were undisclosed constraints.  Putnam makes a

19   big point of the fact that the portfolio constraints -- the

20   disclosed ones were complied with.  What's critical here is

21   there were undisclosed categories of assets that were excluded.

22   And they were the good quality assets that the debt investors,

23   particularly FGIC, were most interested in.

24           Putnam excluded prime RMBS and pre-2005H2 RMBS from

25   Pyxis.  He put some pre-2005H2 in there, but not until months

Ibe9fina

1    after Pyxis closed, and less than half of what it had told

2    FGIC.  And it drastically limited the volume of assets rated

3    above Baa2.

4          And Putnam says it did so based on its own judgment.

5    But if that's the case, why did every single target portfolio

6    Putnam showed investors contain material amounts of prime RMBS,

7    seasoned RMBS, and materially more assets rated above Baa2 than

8    the actual portfolio?

9          Putnam obviously understood it was critical to get a

10   balanced portfolio that met the interests of and wishes of all

11   of the investors, including FGIC; that those sort of assets had

12   to have some representation; there had to be some

13   diversification in the portfolio.  In fact, there was virtually

14   none because the equity investors didn't want it.

15         Putnam also excluded CDOs that were backed by higher

16   quality assets.  Putnam included a disproportionate share of

17   mezzanine bonds issued by Constellation CDOs, Jim Prusko's

18   Magnetar CDOs, helping Magnetar to offload these bonds in a

19   difficult market.  And these bonds performed materially worse

20   than comparable mezzanine CDO bonds.  And we've got evidence of

21   that.  We've laid it out in the briefs.

22         Putnam also included a large amount of the ABX index

23   and the subprime RMBS index and its component securities in

24   Pyxis.  These were exactly the assets that Magnetar was

25   shorting in huge amounts, Baa2 and lower-rated RMBS, subprime,

Ibe9fina

unseasoned.  And those were the assets that, at Magnetar's

insistence, Putnam put into the deal in large quantities.  And

it didn't just put some of their index in; it put a lot in.

And it put the components securities of the ABX index in there.

So although it technically didn't violate the

limitation on the amount of the ABX index that could go in

there, in fact there were three times the amount of ABX index

or its component securities in the portfolio than the indenture

contemplated.

And that's all fine because that was disclosed, as

Putnam keeps on saying, that was disclosed in the portfolio.

What wasn't disclosed was that Putnam didn't like half of the

assets in the ABX index.

Putnam's own Carl Bell said we don't like -- we like

half of this.  We don't like the other half.  John Van Tassel

said the same thing.

Putnam says well but we shorted out of the deal.  We

bought protection on some of those assets that we didn't like.

That's true.  They bought it on some.  They didn't buy

it on all of the assets they didn't like.  There were tens of

millions of dollars of investments in Pyxis that Putnam

specifically did not like, said it didn't like.  The only

reason they were there was that they were the assets Magnetar

was shorting and it wanted its portfolio to be correlated to

those.  They were also the highest risk assets in the portfolio

Ibe9fina

1    and those were the ones that were most likely to cause it to

2    crater as they did.

3           None of this makes sense if Putnam was exercising its

4    own judgment.  It only made sense if Putnam was doing what the

5    equity investors wanted and it complied exactly with their

6    preferences.

7           Why did Putnam agree?  Putnam says it just doesn't

8    make any sense.  It makes perfect sense.

9           They knew, as I just explained, as I just showed, the

10   equity investors wouldn't buy the equity if Putnam did not

11   select a portfolio that met their requirements.  Putnam knew

12   that if the equity investors didn't buy the equity, Pyxis

13   wouldn't close and Putnam would lose millions of dollars in

14   fees on Pyxis, would lose out on four to five more

15   Constellation CDOs that had been promised to it.

16          That's exactly what was written down in a draft

17   agreement right at the beginning of this whole deal.  Putnam

18   was going to get four to five more CDOs from Magnetar.  That

19   was its understanding in March.

20          And it would be forced, instead of doing these

21   Constellation CDOs, to do typical CDOs, which were much harder

22   to do because you had to do more work, you didn't have an

23   equity investor that was sponsoring or guaranteeing that

24   someone would buy at the highest risk.  You had to go out there

25   and find the assets yourself and find if investors yourself.

Ibe9fina

1          It would require greater risk because there was a high

2    likelihood it wouldn't close if you couldn't find equity

3    investors.

4          And it would be smaller fees than Constellation CDOs.

5          And all of this is laid out, again, in Michael

6    Enrique's e-mail of November 2006, Exhibit H.

7          He actually says that, "I don't think there are any

8    other investors offering a hundred percent sponsorship of

9    $1.5 billion mezzanine deals."  That's what Magnetar was doing.

10   He testified at his deposition that although the manager's fees

11   for Constellation CDOs were lower as a percentage of the assets

12   than the non-Magnetar CDOs, they were higher overall because

13   Constellation CDOs were four times as big as typical CDOs.

14         He said that the velocity of non-Magnetar CDOs is much

15   lower.

16         And basically he said the non-Magnetar CDOs, managers

17   had to scrap for everything.  High risk it wouldn't work, and

18   they had to work a lot harder for lower fees.

19         That's why they did this.  That's why they did

20   Magnetar's bidding.

21         Now FGIC reasonably, obviously reasonably relied on

22   Putnam's judgment and expertise in insuring Pyxis.  Carl Bell

23   admitted that FGIC had never done a deal like Pyxis before.

24   This is a very important document too, Exhibit L.

25         In the middle of August, 2006 FGIC actually decided it

Ibe9fina

didn't want to do Pyxis.  Even with the data and the PCS it was

still reluctant to do it because it felt like this was still

too concentrated a subprime risk.

And at that point it admitted -- sorry.  Carl Bell

wrote an e-mail internally, which is Exhibit L, which said that

FGIC has never been involved in a deal like this before.  They

chose the deal with Putnam as a test case.  When they finished

their work on the collateral concentrated subprime risk.  They

wanted 40 percent subordination.  Calyon wouldn't offer more

than 35 percent at that point.  Eventually Calyon raised it to

40 percent.  That's why FGIC did the deal.  And they also

offered an extra premium.  But essentially FGIC was going to

pull the deal if they didn't get 40 percent, and that was with

the PCS data, assuming that was the portfolio.

So, it was critical to FGIC that all the higher

quality assets that were in the PCS be actually in the

portfolio.  And FGIC had to rely on Putnam's judgment in

selecting the collateral because the portfolio wasn't fully

ramped before closing.  And it was never going to be fully

ramped before closing.

The offering materials said the portfolio would only

be 85 percent fully ramped and in the end it was 91 percent.

But there was no way for FGIC to know exactly what the final

portfolio looked like before it closed.  That was the nature of

these deals.  They were all done based on target portfolios and

16

Ibe9fina

the integrity of the offering of the collateral manager.  And

Putnam also had the discretion after closing to change up to

five percent of the portfolio a year at its discretion.  That's

the reinvestment period for five years.

So even after closing FGIC still had to rely on

Putnam's good faith and exercise of its own judgment and

expertise because it could be changing up to 25 percent of the

portfolio over five years.

And Putnam also had more expertise than FGIC in

selecting assets for a CDO likes Pyxis, both because it had

much more sophisticated technology, and it had a trading desk

which gave it access to much more market information than FGIC.

FGIC was operating at the AAA, which was supposed to

be risk-free level of the market.  It was relying on managers

like Putnam and their expertise to ensure that those risks

were, indeed, AAA.

And it did its sense of due diligence on Putnam,

recorded -- reflected in the record and reflected in the credit

application to ensure Putnam had the necessary expertise.  It

met with Putnam in person.  It met with -- it had conversations

with Putnam on the phone.  That's where the PCS came from.

And FGIC obtained target portfolios, the PCS, and

performed its own analysis of both the ramped and target assets

to crosscheck Putnam's work.

So the evidence strongly support FGIC's claim that

Ibe9fina

Putnam misrepresented it would select the Pyxis collateral
using its own judgment in the interests of all participants and
that, in fact, Putnam complied with the equity investors'
undisclosed collateral preferences.  But Putnam did more than
that.  Putnam knew -- and that's the collateral selection
misrepresentation.

          And here's the target portfolio misrepresentations.
Putnam knew that if the debt investors and FGIC knew what was
actually going to be in this portfolio, totally subprime
virtually all Baa2 or less, and totally unseasoned, or
virtually totally unseasoned, then they would not participate.
That would just be too risky.  It would be a totally
undiversified, highly risky subprime deal.

          So Putnam lied about what would be in the portfolio.
It misrepresented how many higher quality assets the portfolio
would contain.

          And it did it -- if you look on page nine, slide nine,
you'll see every single one of the target portfolios, every
one, including the September 8 one that FGIC -- that Putnam
claims should have alerted FGIC to problems here.  Every one of
them stated that there would be more higher quality assets in
the deal than, in fact, were in there.

          And there's a very clear pattern as to how these
misrepresentations were made.  Initially, just at marketing
period, the initial marketing period, there were three target

Ibe9fina

 1    portfolios sent in July and August, each of which -- one of

 2    them is the same one resent, but each of which said four

 3    percent prime, focus on seasoned product, 19 percent above

 4    Baa2.

 5            Then FGIC gets into serious due diligence in

 6    discussions with Putnam, talks through all of the problems it

 7    has with the portfolio as it looks right now and what it wants

 8    to see in there, focuses specifically on prime, seasoned and

 9    higher than Baa2.  And all of a sudden -- and asks for a target

10    portfolio.  And now the August 8 PCS says there will be

11    10.63 percent prime, 4.8 percent subprime -- pre-2005H2, and

12    almost 29 percent above Baa2.

13            And then the rating agency portfolio, sent just three

14    days later, which Putnam reviewed and called "our portfolio,"

15    said 10.4 percent prime in Fitch and 7.5 in S&P and nothing in

16    Moody's because Moody's had a different threshold for prime.

17    And then the only one of them that talked about the pre-2005H2

18    was Moody's.  It actually said 5.1 percent pre-2005H2.  And

19    then the two that rated -- that had Moody's ratings said

20    20 percent Moody's ratings.

21            Then FGIC commits to the Pyxis guarantee.  Putnam

22    admits in its reply brief that FGIC committed to the Pyxis

23    guaranty on September 6.

24            Suddenly, September 8, FGIC gets a term sheet that

25    says 2 percent prime and 20 percent above Baa2.  And I'll

Ibe9fina

explain why that's totally irrelevant because FGIC, one, had

already committed and got it under terms where it was never

going to understand what it was.  And then, September 15, it

was contradicted by the Fitch presale report, which Putnam

reviewed, which said 10.4 percent prime and 20 percent Baa2 or

more.

        The actual portfolio at closing in October 2006

contained no prime, no assets below pre2005H2 and no -- and

only 12.2 percent -- not 29 percent, not even 20 percent --

12.2 percent assets rated above Baa2.

        And when it was fully ramped it still contained no

prime, just 2.3 percent pre-2005H2 and fifteen-and-a-half

percent above Baa2.  It was it was that materially different

portfolio than had been represented to FGIC, to the rating

agencies and to the rest of the investors.

        These were not forward-looking statements,

particularly the statements in the PCS and the rating agency

portfolio.  They weren't pie charts.  They were actual lists of

assets, both ramped and target assets.  And they were

representations of present fact that at that time Putnam had

analyzed and selected but not yet acquired these assets for the

portfolio.  And all of these target portfolios were also

actionable because at that time Putnam knew they were false.

        It's not credible that Putnam believed the PCS and

rating agency portfolios had all these higher quality assets in

Ibe9fina

1    them in mid-August 2006 and then suddenly, less than six

2    weeks -- or six weeks later it had none of them.  And it's

3    especially not credible when their exclusion comported exactly

4    with the equity investors' wishes.

5          Now, there are two sets of target portfolios, as I

6    said, that we're specially focused on:  The rating agency

7    portfolios and the PCS.

8          We'll start with the rating agency portfolios because

9    there is no genuinely undisputed facts about them.  Frankly, I

10   don't think about there are about the PCS but the rating agency

11   is simple.

12         Putnam requested, reviewed, and commented on the

13   rating agency portfolios.  It knew exactly what was in them.

14         And if you look at Exhibit M, in the first page there,

15   there's an e-mail there from a guy called Michael Malm, Mike

16   Malm at Putnam.  Mike Malm was the man at Putnam who was

17   responsible for the RMBS that went into FGIC -- Pyxis, that was

18   selected.  He was the guy who actually selected that, worked

19   for Carl Bell.  And he's talking here with someone from Calyon

20   about the S&P rating agency portfolio.  And he says, "I see in

21   the S&P file, something about the default rates.  To confirm,

22   are these the outputs based on our target portfolio?"

23         He knew this was the same portfolio that Putnam was

24   using.  This was Putnam's target portfolio.

25         The rating agencies -- he also knew, and Putnam knew

Ibe9fina

1  that these portfolios that the rating agency received were

2  clearly false because they were obvious on their face.

3  Putnam's own experts conceded that.  And the rating agencies'

4  portfolios, even more egregiously, were materially different

5  from each other.  The one that was sent to S&P, had the S&P

6  ratings listed in there, not surprisingly, for each asset in

7  the deal.  And for each of the target assets it had the rating

8  explicit.  The Fitch pre-rating agency portfolio also had the

9  S&P ratings listed.  And they were totally different from the

10  S&P ratings listed for the same assets in the S&P portfolio.

11  Even the same data points for the same assets, they were

12  different.

13          And then there were differences as to the

14  classification of whether they were prime -- some of that was

15  because Moody's had a different classification.  Some of it was

16  just random.  There were differences in tranche sizes.  There

17  were differences in a whole lot of factors which are all laid

18  out in the briefs.

19          Putnam had to see this because their own experts say

20  it was obvious.  But Putnam said nothing about it.  Putnam

21  didn't have a problem with the rating agencies using,

22  obviously, totally inaccurate portfolios.

23          So, FGIC actually relied on these portfolios on their

24  accuracy.  And this obviously should go without saying.  Any

25  investor and any insurer on the senior tranche is going to rely

Ibe9fina

1    on the portfolios -- sorry, on the tranches that it's insuring

2    having the required ratings.  But here it was even more clear.

3    It was a condition precedent to Pyxis closing.  Pyxis couldn't

4    close unless each of the notes had the -- and the tranche

5    sizes, the notes were defined as tranche -- not just levels but

6    also amounts, had the required ratings.  If the AAA attachment

7    point was wrong or any of the attachment points were wrong,

8    that means the tranche sizes were wrong too.  It meant there

9    were assets in there that had different actual ratings to the

10   stated ratings, all based on false rating agency portfolios.

11           So FGIC required, relied on the credit ratings to

12   close because they were a condition precedent to closing.  And

13   the credit ratings were obviously based on the rating agency

14   portfolios.  Putnam doesn't dispute that.  And FGIC relied on

15   their accuracy as a result.

16           Now FGIC had to rely on the accuracy of those rating

17   agency portfolios because it didn't have access to them.  Only

18   Putnam, Calyon and the rating agencies did.  So FGIC had to

19   rely on Putnam, the collateral manager responsible for

20   collateral selection, with superior knowledge to everyone of

21   the target assets to ensure their accuracy.

22           But, in fact, the rating agency portfolios were

23   obviously materially false.  And, again, despite Putnam's

24   brief, there is no real dispute about this.  FGIC's expert, his

25   name is Fiachra O'Driscoll, he was the head of CDO -- the CDO

Ibe9fina

group at Credit Suisse at exactly this time for a number of
years, including 2006.  And what he did for a living was make
sure that his deals had the right ratings.  That -- the assets
in his deals would obtain the ratings he required to close his
deals.  He knew this backwards, how to calculate the AAA
attachment point based on the information then available to
him.  He even doesn't need a lot of information to be able to
do that.

        Putnam says he has to be able to run it through the
model.  That's not true.  He may have to run it through the
model to know exactly what the rating would have been, but what
he can tell is how much more the rating would be based on
certain characteristics.  And in this case, based simply on one
characteristic, which is the fact that the prime assets that
were represented in the PCS were actually subprime assets and
were, therefore, much higher correlated, much more highly
correlated to the other subprime assets in the deal.

        It necessarily follows that the AAA attachment point
would have been 4.62 percent higher, at least, than the rating
agencies set it at, which means that the deal -- one of the
conditions precedent for the deal would not have closed -- I'm
sorry, for the deal to close would not have been met.

        And Putnam says, recognizing how damaging this
testimony is, that this opinion is inadmissible because
O'Driscoll didn't disclose his analysis.

24

Ibe9fina

```
 1              That's simply not true.  On May 7 of this year

 2     O'Driscoll explained his reasoning in his rebuttal report.

 3     June 26, a week, nearly six weeks later, O'Driscoll further

 4     explained his reasoning, over six pages of depositions to

 5     Mr. Arena, and he explained he had done some written

 6     calculations.  Mr. Arena said I want to see those written

 7     calculations -- no.  Actually what he said was he complained

 8     that they weren't produced and said -- and I said:  Well, we'll

 9     produce them if you want.  They're not going to make any

10     difference.  The reasoning is all in there, but you can look at

11     them.  They're just his explanation of how he got to those

12     numbers.  It's just his working of the numbers.

13              Putnam said not only they didn't -- we didn't produce

14     them -- within the discovery period, all of this happened

15     within discovery.  Putnam never said we want to take his

16     expert -- we want to take his deposition again to find out how

17     he came up with this.  It knew how he came up with this.  It's

18     really simple.

19              And in opposition -- so Putnam's had this information

20     about O'Driscoll's analysis for six months.  It's had a chance

21     to test it, to cross-examine him and has never asked to open or

22     examine his deposition.

23              And in opposition to Putnam's summary judgment motion

24     we submitted a declaration from Mr. O'Driscoll explaining it to

25     the court.  And Putnam still hasn't submitted a single thing
```

Ibe9fina

1    from its expert explaining what's wrong with Mr. O'Driscoll's

2    analysis.  Because there is nothing wrong.  It's a really

3    simple matter of math that follows from the fact that the

4    correlation between subprime assets and all day or primary RMBS

5    under the S&P model which is set forth in his report is .1.

6    Different sectors.  Whereas, the correlation between subprime

7    RMBS and subprime RMBS is .3.

8             That difference alone accounts for the 4.62 difference

9    in the AAA attachment point.

10            Then he actually says that's actually a conservative

11   estimate because there are two other factors in the deal which

12   he lays out in his declaration which would make it even higher.

13            So the deal couldn't have closed if the rating

14   agencies had seen the actual portfolios, at least it couldn't

15   have closed on the terms that it did.  It was, therefore,

16   material these mistakes.

17            And Putnam's expert doesn't mention -- sorry.

18   Putnam's expert didn't mention these rating agency

19   confirmations that Putnam relies on in his deposition.  He

20   never mentioned them.  For the first time, on summary judgment,

21   we heard about those from Putnam.  Putnam suddenly found the

22   fact in that in February of 2007 the rating agencies had

23   confirmed their ratings.

24            The deal was finally fully ramped in January.  It was

25   audited and sent to the rating agencies at the beginning of

Ibe9fina

1   February.  And a couple days later they issue what are

2   obviously pro forma confirmations of their ratings that have

3   not been based on a rereview of the actual portfolio that was

4   fully ramped but rather just redoing -- rather what they had

5   done previously?

6          How do we know that?  Putnam says it's incredible.

7   We're accusing the rating agency of lying and not doing their

8   job.  Yes, we are.  We are accusing the rating agencies of

9   exactly what the FCIC accused them of and the SEC.

10         And if you turn to the Exhibit Q you will see that

11  this happened all the time.  That's the SEC report.  Issues

12  identified.  And the Commission starts examinations of select

13  credit rating agencies.  On page 2, top bullet says, "the

14  surveillance processes used by the rating agencies appear to

15  have been less robust than the processes used for initial

16  ratings."

17         If you then turn to page 21, you'll see there's a

18  bullet in the middle of the page, "Resources appear to have

19  impacted the timeliness of surveillance efforts."  The first

20  sub-bullet says, "In an internal email at one firm, an

21  analytical manager in the structured finance surveillance group

22  noted:  'I think the history has been to only rereview a deal

23  under new assumptions/criteria..." new assumptions includes,

24  obviously, a different portfolio "...when the deal is flagged

25  for some performance reason.'"

Ibe9fina

1          As of February 2007 there was nothing -- FGIC hadn't

2     started defaulting.  There was no reason to believe, according

3     to the rating agencies, that there was a need to go back and

4     rereview it.  So they never looked at the actual portfolio.

5          And how do we know that for sure?  We know that for

6     sure because, first, they issued their rating agency

7     confirmations within a day or two of starting work on it.  And

8     they couldn't possibly have done the work.  It took weeks and

9     weeks to do the initial ratings based on the review of the

10    actual portfolio.  Had they reviewed -- sorry.  Based on the

11    rating agency portfolios.  Had they reviewed the actual

12    portfolio, they couldn't possibly have done it in two days.

13         They also made no comment.  There were no

14    communications with Putnam.  Why does this portfolio look

15    totally different from what we reviewed in August?

16         Again, the only explanation is they never looked at

17    it, the actual portfolio.

18         And the most dispositive point, and that dispositive

19    point, is Putnam still hasn't provided any expert support for

20    its suggestion that Mr. O'Driscoll's calculations, a simple

21    matter of math based on a simple correlation factor, is wrong.

22         So, if the attachment point for Pyxis, the AAA

23    attachment point had been just 5 percent higher, 4.62 percent

24    higher, a condition precedent to closing wouldn't have been met

25    and Pyxis wouldn't have closed on the terms.  And we argue that

1   that means FGIC would have closed on twice the AAA attachment

2   point that is supported by the evidence, by the credit

3   application.  It's also supported by the fact that the only

4   other deal FGIC ever did that was like Pyxis, Ischus 3, which

5   Putnam acknowledges was very similar to Pyxis, also closed at

6   two times an actual AAA.  The three deals that Putnam cites

7   where FGIC closed at one times AAA are obviously different.

8   One of them was entitled to close at seasoned RMBS,

9   two-and-a-quarter years seasoned, that the manager had managed

10  for some time.  Obviously that's a different risk.  And the two

11  C-Bass CDOs that Putnam cites came before Carl Bell's e-mail.

12  They came months before.  Carl Bell's e-mail acknowledged that

13  at that point in August FGIC had never done a deal like Pyxis

14  before.  So they clearly were not like Pyxis either.  They

15  were -- they composed RMBS service by the manager's own

16  servicing subsidiary.

17          But in any case there is no need to resolve that

18  question now because the only real question for the purpose of

19  our motion is was -- were the rating agency portfolio

20  misrepresentations material?  The answer is clearly they were

21  because they would have increased the natural AAA attachment

22  point.

23          And on the PCS.  Putnam says there no evidence it knew

24  about the PCS.  And that's clearly false too.  Putnam had done

25  due diligence meetings with FGIC right before the PCS was

Ibe9fina

1    issued.  On August 7, the day that PCS was asked for, Putnam
2    had a due diligence conference call with FGIC.  And FGIC was
3    asking in those meetings and that conference call about prime
4    seasoned and higher quality assets, higher rated.  Right after
5    that meeting, that call on August 7 ended, Elizabeth Menhenett
6    of FGIC, who was responsible for this deal, spoke to Carl Bell,
7    still on the same call.  That's what the testimony from
8    Mr. Bell is.  There was such a call.  He just doesn't remember
9    what was said.  Elizabeth Menhenett remembers what was said
10   because she wrote it down immediately afterwards.

11           She asked Bell for all of the details of the name sets
12   bought versus ones that's likely but not yet bought yet.

13           And Bell said to her, he could have said well I'll
14   just give you them because I'm the collateral manager, it's
15   easy for me.  Instead what he said is:  Calyon is managing the
16   warehouse process and Calyon has all these details.  So he told
17   her to go off to get it from Calyon.  And she did.

18           Now he says there is no way he would have told her to
19   go to Calyon for this because Putnam never shared a list of
20   target assets with Calyon.  He testified to that effect.

21           But Menhenett's e-mail was written directly after
22   their conversation took place.  And she obviously had a clear
23   recollection of it.  She had no reason to mischaracterize it.
24   He, on the other hand, doesn't recall it or claims not to
25   recall it.

Ibe9fina

1              And Putnam did share a list of target assets with

2      Calyon because that's exactly what the rating agency portfolios

3      were.  The rating agency that -- the portfolios that Putnam

4      described as our portfolio must have come from Putnam.  Putnam

5      reviewed them, said their our portfolios.  They clearly came

6      from Putnam.

7              So Putnam clearly knew that FGIC had received from

8      Calyon the PCS or the information in the PCS because Putnam

9      told it to do so.  And Putnam also knew what was in the PCS.

10             And it says there is no evidence it knew what was in

11     the PCS.  There's a lot of circumstantial evidence.  Putnam

12     knew it was going to be sent because it told FGIC to get it

13     from Calyon.  Putnam knew Calyon couldn't be relied on and it

14     had to double check all its work and had to monitor its

15     communications with investors.  Just a week before the PCS was

16     sent it said to Calyon:  I want to see all your communications

17     with investors.

18             So it's not credible that Putnam didn't want to see

19     what Calyon sent FGIC unless it knew what Calyon was sending

20     FGIC.

21             And internal e-mails indicate that the Calyon team

22     that prepared this PCS was specifically instructed to reach out

23     to Putnam for help.

24             And Putnam says well there is no e-mail proving it.

25     Who knows what they did?  Maybe they called them and talked

Ibe9fina

```
 1    through what was supposed to be in there.  Maybe they had

 2    already disclosed it weeks before.

 3              The evidence strongly suggests that Calyon understood

 4    the target portfolio information in the PCS reflected Putnam's

 5    views.  Why?  Because just a few days had later Putnam's --

 6    sorry, Calyon sent Putnam the rating agency portfolios which

 7    were very similar to the PCS.  If Putnam had thought there was

 8    something way wrong with the assets in the target portfolio it

 9    sent the rating agencies, it would never have sent them to

10    Putnam unchallenged.  It would have disguised them.  If Calyon

11    had been responsible for this fraud, it wouldn't have just said

12    to Putnam here's our defective portfolio.  And it certainly

13    wouldn't have had -- it would have been very concerned that

14    Putnam would is have said something wrong, you know, something

15    is obviously wrong.  In fact, Putnam said nothing was wrong.

16    Putnam said it's our portfolio.  And that was very similar, if

17    not the same, as the PCS.

18              So the obvious inference is that Putnam did have input

19    into the PCS and did have input into the rating agency

20    portfolios and, therefore, knew they were false because the

21    errors were obvious on their face.

22              But let's assume for the moment in that Putnam didn't

23    know, didn't actually know what was in the PCS.  At a minimum,

24    it should have known.  Putnam is the collateral manager.

25    Putnam -- FGIC was Putnam's client.  Putnam said so to FGIC.
```

Ibe9fina

1    FGIC asked Putnam for the information in the PCS and Putnam

2    said get it from Calyon.  Putnam knew how important the PCS was

3    to FGIC.  FGIC had just told it during due diligence how

4    important it was that it get higher quality assets, prime,

5    seasoned, higher rated.

6            Putnam knew Calyon was chronically unreliable.

7    There's a whole laundry list of problems in our briefs.  And

8    all of its work in investor communications had to be closely

9    monitored.  And dispositively.  A week after telling FGIC to

10   get the target portfolio from Calyon, Putnam reviewed the

11   rating agency portfolios which were also obviously incorrect.

12           So if it didn't already know what was in them, it must

13   have -- it must have raised a huge red flag for Putnam.  And it

14   must have thought:  Well what on earth did Calyon just sent

15   FGIC.  But Putnam never said anything to FGIC or Calyon about

16   it.  The obvious conclusion it actually knew it but at a

17   minimum it should have known.

18           And the misrepresentations in the PCS, Putnam tries to

19   play them down and say these things didn't matter.  If you look

20   at slide 20 you'll see the misrepresentations laid out.  The

21   PCS said 10.6 prime RMBS.  There were actually none.  It said

22   4.8 percent pre-2005H2.  There was none in closing and

23   2.3 percent in fully ramped.  Assets rated above Baa2 28.9

24   percent; actually 15.5 percent.  And the WARF, the Weighted

25   Average Rating Factor.  Putnam admits that the WARF for the

Ibe9fina

actual portfolio was 504.  The Weighted Average Rating Factor,

according to Putnam's own expert, Professor Longstaff, was 450.

That is a dramatically lower WARF; i.e., a dramatically lower

risk.  The PCS was obviously a less risky portfolio and that's

the deal that FGIC relied on in evaluating Pyxis.

        Now how do we know that?  Bell said FGIC is wary of

doing a deal with concentrated subprime risk.  It will only

attach at 40 percent based on that portfolio.

        During due diligence FGIC asked for and obtained from

Calyon and Putnam extensive information on the prime, seasoned

and higher rated assets in Pyxis.  Right from the beginning it

focused on the seasoning.

        In Exhibit W you'll see FGIC asked Calyon to provide

more information on the seasoning of the assets in the ramped

portfolio.

        If you look there at the top of the first page there,

this is an e-mail to Putnam from Calyon saying that FGIC has

just asked us, it says that:  There is no information about the

seasoning on Bloomberg of the assets in the target portfolio

that FGIC had just received -- sorry, the ramped portfolio.

This was just the 82 initially ramped assets.  Didn't have

seasoning information on Bloomberg.  FGIC would like more

details.

        It wanted to know the seasoning.  It mattered to it.

It talked to Putnam about seasoning in its meetings.  Putnam

Ibe9fina

 1   said:  Well there's all sorts of reasons why we don't want

 2   seasoned assets.  The bottomline is they didn't want seasoned

 3   assets because they were not what the equity investors wanted.

 4        And Putnam -- sorry.  And then a week after receiving

 5   the PCS FGIC asked Calyon for a version of the PCS with more

 6   detail about the assets in it, the ramped and target assets.

 7   And Calyon provided it.  And that's Exhibit Y.  This is --

 8   sorry, Exhibit X.

 9        Calyon -- sorry.  Putnam says:  Well FGIC just took

10   the PCS and never asked Calyon -- Putnam to confirm it.

11        FGIC asked Calyon to confirm it.  Putnam had told it

12   to get the information from Calyon.  So FGIC asked Calyon a

13   week later:  Give us more information about these assets.  And

14   Calyon sends back exactly the same list of assets with a lot

15   more information.  Calyon gives them the same target portfolio

16   that Putnam must have seen.  And FGIC focused specifically on

17   the primary RMBS in the PCS.  It asked for and obtained from

18   Calyon an updated spreadsheet that contained just the primary

19   RMBS, that's Exhibit Y; again, with additional detail about

20   these assets.  And FGIC focused on the seasoned assets in the

21   PCS.  That's Exhibit Z.  It had a communication with Calyon

22   about the performance of seasoned assets.  And FGIC's credit

23   application explicitly confirmed its reliance.  It said we are

24   relying on these additional assets.

25        Now FGIC had to rely on the target portfolio.  As I

Ibe9fina

1    said earlier, the portfolio wasn't fully ramped before closing.

2    And it had to commit before pricing, as Putnam admits, which

3    was weeks before closing.

4            So, FGIC asked Putnam for the list of the assets, the

5    target assets which it had to rely on.

6            And then Putnam said not only was FGIC its client but

7    go get the assets from Calyon.  They can provide them.

8            And before asking for those assets FGIC made clear to

9    Putnam just how important these -- the target assets were to

10    it, the higher quality, in particular.  And then it analyzed

11    the PCS in detail, as reflected in its credit application.

12            So FGIC reasonably relied on the PCS essentially

13    because Putnam told it to rely on the PCS.  And it did its best

14    to confirm it, confirm it with Calyon as Putnam had told it to

15    do.

16            And Putnam says its reliance on the PCS was not

17    reasonable because on September 8, 2006 FGIC received a pricing

18    e-mail attaching a term sheet on page seven of which was a pie

19    chart that showed the portfolio would contain just 2 percent

20    prime RMBS.  To begin with it also showed it contained

21    20 percent assets rated above Baa2 and the two percent prime

22    was false.

23            But much more importantly, FGIC had already committed

24    to Pyxis on September 6.  It was no longer focused on the

25    economics of the transaction, as Putnam knew, because it told

Ibe9fina

Putnam that.  It was focused on the papering of the transaction and that's how it ended up getting this term sheet.  And this term sheet is particularly telling about Putnam's real motivation here.  Because this term sheet and this pie chart on the term sheet was based on a target portfolio that Putnam had discussed with Calyon a week before.  Putnam had, actually on August 29, had a discussion with Calyon about what should be in the target portfolio.  It should be dramatically less than was in the PCS of all the higher quality assets.  And then the next day Ben Lee of Calyon sends Putnam a revised or updated target portfolio showing what Putnam had told it to show it.

        But Putnam never sent that to FGIC or to the investors or to anyone else except for the equity investors on September 5, the day before FGIC committed to the deal.  And what it sent it to them for was to get their approval of it. They approved it.

        And then it still didn't go to FGIC until after FGIC approved the deal.  Putnam knew FGIC was about to approve the deal.  It waited until September 7 to release this target portfolio, updated target portfolio, which was still false. And it waited until September 7 to release it to the subordinate investors, not FGIC; and certainly not the rating agencies, who were never appraised of this updated target portfolio.

        FGIC only got this updated target portfolio because

Ibe9fina

the pricing e-mail also attached the offering memorandum.  And
FGIC specifically asked Calyon for the draft offering
memorandum so it could look at some language related to trades.
That language -- sorry.  That was then sent to FGIC as an
attachment to the pricing e-mail.  And the term sheet happened
incidentally to be attached.  FGIC had already reviewed two
versions of the term sheet, which were identical to each other,
and neither of which had a pie chart or a portfolio in it, a
target portfolio; had no reason to think that this term sheet
was any different from the others and nothing in the e-mail
said it's any different.

So FGIC wasn't focused on it.  It had already
committed and it had no idea that this materially changed the
whole portfolio profile.

So FGIC -- so Putnam -- and then a week later Putnam
approved the Fitch presale report which showed 10.4 percent
primary RMBS and 20 percent assets rated above Baa2 and so
contradicted what it claims FGIC should have relied on in the
term sheet.

The last thing I just want to talk briefly about is
damages.  FGIC's losses here were $782 million.  That's what it
was exposed to as a result of the Pyxis guarantee.

There is no dispute that if FGIC had not commuted its
obligations it would have been obligated, beginning in 2016, to
pay $728 million.  Putnam's experts agree that that number is

Ibe9fina

1  accurate.

2          But Putnam says, while FGIC commuted it and therefore

3  it only suffered $74.5 million.  But then it contradicts

4  itself.

5          In its opposition -- sorry, it's reply brief, Putnam

6  agrees that what the commutation agreement did was mitigate

7  FGIC's losses.  The commutation agreement Putnam says was FGIC

8  mitigating its losses and FGIC's commutation agreement was just

9  an effort to mitigate its losses; in other words, FGIC's losses

10  were not just the 74.5.  That was the commutation or the

11  mitigation of FGIC's losses.

12          The actual losses that were -- FGIC was guaranteeing

13  to have to pay was 782 million.  It sended up only paying 74.5.

14  So we agree, obviously, its losses are capped at its

15  out-of-pocket -- I mean its recovery, its damages are capped at

16  its out-of-pocket commutation payment amount.

17          Now how much of that amount is FGIC entitled to?  It's

18  entitled to all of it for the simple reason that the Pyxis

19  guaranty by its own terms could not be canceled, which means

20  that every loss that Pyxis suffered under the Pyxis guaranty,

21  every amount it had to pay under the guaranty necessarily

22  followed from the misrepresentations that induced it to enter

23  the guaranty.  And this is fundamentally different from a

24  standard case like a purchase of stock where the purchaser

25  learns it's defrauded and then can offload its exposure by

Ibe9fina

selling the stock at whatever the stock can then recover and then it can get the difference from the fraudster.

FGIC couldn't offload its exposure under the Pyxis guaranty from the moment it signed it unless Calyon agreed to commute its obligations and then, obviously, the commutation payment would cap its losses.

And Putnam says well this would expose -- this would make Putnam effectively FGIC's insurer.  That's not true.  FGIC is only entitled to recover reasonably foreseeable losses under the Pyxis guaranty, as this Court held in the Primavera case. One of the most obviously reasonable foreseeable losses if you continue to hold on to an exposure is that the market will go down and you will end up losing money on it.  So we agree there is a limitation.  If Martians land on earth and that causes the value to go down or the exposure to be incurred that's not reasonably foreseeable.  But if the housing market collapses and FGIC ends up having to pay on an irrevocable guaranty, that is obviously reasonably foreseeable.

Now, at FGIC -- Putnam cites to Ambac.  We disclosed Ambac in our original brief.  Ambac is distinguishable because there the defendants' representations, the Court expressly held each of the representations related to the loans in the transaction, not the transaction as a whole.  The plaintiff could only recover losses on loans that breached those representations.  Here, Putnam's representations related to the

Ibe9fina

1    transaction as a whole, related to the credit profile of the

2    overall portfolio.  The whole point of FGIC was that it wanted

3    a diversified portfolio.  It wanted higher quality as well as

4    lower.  It didn't matter what was what as long as there was

5    enough diversification.  It was a diversified portfolio that

6    was represented.

7            And also the process was misrepresented by which the

8    collateral was selected.  That obviously relates to the whole

9    transaction.  So FGIC can recover losses on misrepresentations

10   on the transaction as a whole.

11           Putnam can't take advantage of the commutation

12   agreement to avoid liability.  It says that even if it's found,

13   this is Putnam's argument:  Even if it's found to have

14   fraudulently induced FGIC to agree to this irrevocable

15   obligation that definitely caused it $74.5 million of actual

16   out-of-pocket losses, Putnam doesn't have to pay any damages

17   because FGIC commuted its obligation with Calyon.

18           But that's not -- that's exactly what the collateral

19   source doctrine is designed to prevent.  Putnam is seeking a

20   windfall.  Assuming it actually committed fraud, it says it

21   doesn't have to pay anything.

22           The collateral source doctrine says if FGIC obtained

23   relief or mitigation of its losses from a third party source,

24   Calyon in this case, then it doesn't need -- sorry, then that

25   doesn't get counted in Calyon's favor.  The only limitation on

Ibe9fina

1    Calyon's -- sorry, in Putnam's favor.  The only limitation in

2    Putnam's favor is the out-of-pocket role.  We only actually

3    paid 74.5 million.  That's the limit.

4          And then that really gives Putnam a massive benefit

5    because under our expert's analysis the damages that were

6    directly attributable were either the entire amount, 782

7    million, Putnam only has to pay 74, or at least 150 based on

8    the higher attachment point which, again, is dramatically

9    higher.

10         So Putnam is already getting the benefit of this

11   settlement -- it's not a settlement, it's a termination,

12   commutation.  It's already getting the benefit.  It just wants

13   to wipe out its obligation altogether even if it's fraud.

14         And Putnam also ignores that the collateral source

15   rule -- Putnam then says:  Well, the collateral source rule

16   doesn't apply and we can take advantage of the rule under

17   New York law that it can reduce its liability by the amount of

18   a settlement with a joint tortfeasor.

19         Calyon is not a joint tortfeasor.  No one sued Calyon.

20   Putnam hasn't alleged that Calyon was a joint tortfeasor.

21   Putnam hasn't put forth any evidence that Calyon is a joint

22   tortfeasor.  All of the evidence that's before the Court

23   indicates that Calyon was following Putnam's instructions.

24   None of the evidence makes sense unless Calyon was doing what

25   Putnam wanted.

42

Ibe9fina

         So Putnam is the sole tortfeasor.  So there is no
reason to apportion liability between joint tortfeasors because
there aren't two joint tortfeasors.

         At a minimum, Putnam -- FGIC can show that it suffered
substantial, proximately caused losses based on a higher
attachment point or a worse performing portfolio.  Either it
can show that it would have, in fact, attached at twice the
natural AAA attachment point or at 50 percent based on the PCS.
In either case, it comes out 50 percent.  That's $150 million
less exposure it would have incurred under the Pyxis guaranty.
That's at least the case.

         If you take into account not just -- one thing Putnam
tries to do is isolate each of these representations.  If you
take all three of them into account, if you take into account
that Putnam misrepresented that it was going to select the
collateral independently, using its own judgment, and the
portfolio contained no prime, very little pre-2005H2 and just
15 percent above Baa2, and it only contained CDOs that likewise
excluded those assets, and it contained large amounts of the
ABX index and its constituents that Putnam didn't like, FGIC
obviously either would not have done the deal at all or would
have done it on materially different terms and probably
materially higher than 50 percent attachment point.  And so the
damages would be substantially higher.  That is a question of
fact for the jury.  We're not asking the Court to resolve that

Ibe9fina

question now.  But the reality is that is going to be resolved

by the jury and it could well be that the damages are higher

than the losses -- the losses were higher than 150 million,

capped at 74.5.

     And then the last point that has been briefly

mentioned in the case -- in the briefs is that this entire

scheme of Magnetar's had a material impact on the financial

crisis.  It really -- Putnam says we say Putnam caused the

financial crisis.  Of course we don't say that.  What we say is

that Putnam played a role in the financial crisis by helping

Magnetar implement its scheme.  What Magnetar's scheme did was

keep the housing market alive for a year longer.  That's what

FGIC's expert whose report is in evidence shows.  It kept the

housing market alive for a year longer than it would have

otherwise.

     At the time Magnetar started doing its CDOs, the

market was starting to drop.  If people didn't do CDOs, there

was no one to buy RMBS.  If no one bought RMBS, there was no

one to buy mortgages.  If no one was buying mortgages,

mortgages wouldn't get issued to subprime borrowers and housing

prices would have started to drop because they couldn't get

mortgages and then the whole thing would have started to fall

in June or early 2006.

     Instead, Magnetar started a series of CDOs that kept

the market propped up for another year during which housing

44

Ibe9fina

1   prices rose and the result was that when the collapse happened

2   it happened -- it was far more severe than it would have been

3   had it happened in early '06.  And Putnam was an integral part

4   of that scheme because Putnam was the first reputable manager

5   to do or to agree to do a Magnetar CDO.

6           Once Putnam signed on, Magnetar wasn't just using

7   fly-by-night guys who had only been around a few years.  It was

8   using managers who had been around a hundred years that had a

9   real reputation and that knew -- and that the market relied on.

10   So the market -- investors would invest and other managers

11   would get onboard with other parts of the scheme.  Putnam was

12   to be -- helped Magnetar get this thing off the ground.

13           And so Putnam helped Magnetar do what exacerbated the

14   financial crisis.  And under FHFA v. Nomura which we cite in

15   our briefs, the Second Circuit held that a defendant cannot

16   hide behind a financial crisis that it helped to cause even if

17   only to a tiny degree as an intervening, independent

18   intervening cause of the plaintiffs' losses.  And that's

19   exactly what Putnam is trying to do here, saying we can't show

20   how different this would have performed absent a financial

21   crisis that sort of swamped everything.  Putnam helped

22   exacerbate that.  Under Nomura -- and Nomura was based, by the

23   way, on the Second Circuit's decision in this case.  So, Putnam

24   can't simply say there is a financial crisis and that's the

25   problem.  Putnam helped that.  It didn't cause it alone,

Ibe9fina

obviously.  It helped.  And under <u>Nomura</u> that bars it from relying on it.

OK.  I've taken enough of your time.  Thank you very much.

MR. ARENA:  Your Honor, Thomas Arena from Milbank for Putnam.  Your Honor, I do have a PowerPoint and some exhibits. May I hand them up?

THE COURT:  Sure.

MR. ARENA:  Your Honor if it's acceptable to the Court I'd like to address issues relating to liability.  My colleague, Mr. Murphy, would ask for an opportunity to address damages.  I will try to be as absolutely telescoped and as streamlined as I can be, your Honor.

THE COURT:  OK.

MR. ARENA:  Your Honor, I'm not going to chase Mr. Baldwin's argument down every rabbit hole, every assertion of fact with which Putnam disagrees.  Putnam has submitted a 56.1 statement, a 56.1 counterstatement that sets forth our view of the facts.  It sets forth the support that we cite for each and every allegation, each and every factual assertion that we made.

My purpose today, your Honor, is to be as telescoped as I can because I think that there is a streamlined path to summary judgment on each of the alleged misrepresentations made by FGIC.

Ibe9fina

1           When I say a streamlined path, I'm underselling what

2      I'm about to tell you because I think there are multiple

3      streamlined, straightforward paths to summary judgment on each

4      and every misrepresentation that they make.

5           So, your Honor, FGIC alleges at this point, it's now

6      clear, three alleged misrepresentations.  And these

7      misrepresentations underpin each of their claims for fraud, for

8      negligent misrepresentation and negligence.

9           Those three alleged misrepresentations, when you cut

10     through all of the facts, when you cut through everything:

11     One, that a spreadsheet called the Peach Colored Spreadsheet,

12     sometimes referred to as the PCS, by its initials, that that

13     was false; that was a spreadsheet that was sent by Calyon, the

14     arranging bank for the transaction.  Mr. Baldwin didn't talk a

15     lot about Calyon.  Calyon was the arranging bank.  It

16     structured the transaction.  Putnam was just a collateral

17     manager.  Calyon sent the Peach Colored Spreadsheet target

18     portfolio to FGIC.  That's alleged misrepresentation number

19     one.  That target portfolio purportedly was false.

20          Two, target portfolios that were sent by Calyon,

21     arranging bank, to the rating agencies -- they weren't sent by

22     Putnam, spent by Calyon to the rating agencies, those were

23     false.

24          And then third, there is an amorphous claim that

25     Mr. Baldwin referred to it as the portfolio content

Ibe9fina

misrepresentation.  But the suggestion is Putnam didn't select

assets according to its own judgment and that's allegedly

false.

FGIC's theories, each and every one, I submit to you

is unprecedented.  And I want to address them one at a time in

as telescoped and as straightforward manner that I can, your

Honor.

So let's take the Peach Colored Spreadsheet first.

Let's be clear about what it is.  It's a document that was

prepared by Calyon.  It contains two parts.  Part one, a

statement of historical fact, the 98 assets that had been

selected as of that date for the ramped portfolio.  That

constitutes approximately 75 percent of the final portfolio.

That information went to, was sent by Calyon to FGIC.  FGIC got

it.  Here, fellows, here's three-quarters of the portfolio

assets that we have ramped to date.  And then there's a second

part.  There are about 50 assets.  They're in peach shading,

Judge.  And those are represented to be target assets by Calyon

for the yet-to-be ramped, remaining 25 percent of the

portfolio.

What's this about?  FGIC's claiming:  Well, that

target portfolio, when you consider the peach colored assets it

indicated that there would be ten percent prime.  It indicated

that there would be a whopping 4.8 percent of the assets that

were from 2005H1, not later.  And it reflected that

Ibe9fina

28.8 percent would be rated above Baa2 by Moody's.  And that

misled us, according to FGIC.

I'm on page four of my outline, your Honor.

Point number one, the first streamline path to summary

judgment:  Putnam didn't make this representation.  Putnam

didn't -- there is zero evidence in the case.  Putnam didn't

prepare the PCS.  It didn't send it to Calyon.  There is no

evidence Putnam even saw it.

This would be the first case in history, your Honor,

where a Court held a defendant liable for a misrepresentation

it didn't make and it never even saw it.  Putnam didn't see

this.  There is no evidence in the record that Putnam ever saw

it.  No witness testified to that.  There is no document to

that effect.  The e-mail by which Calyon sent the Peach Colored

Spreadsheet to FGIC did not copy Putnam.

So the only way that FGIC can tie Putnam to this

document is that it relies on the disputed testimony of a

single witness, Ms. Menhenett, its lead underwriter, who said:

Putnam told me to get the targeted assets for the remaining

25 percent of the portfolio from Calyon.

We don't agree with that, your Honor.  But your Honor

doesn't have to resolve this factual dispute.  Because even if

it were true that Putnam told Ms. Menhenett, "Get it from

Calyon," there's still no evidence that Putnam knew what

information Calyon had sent to FGIC.  And they cite no cases

Ibe9fina

1    that a defendant can be liable for an alleged misrepresentation

2    it didn't make and it didn't know existed.

3            So let me lead -- that leads to the second streamlined

4    path for summary judgment in favor of Putnam as it relates to

5    the PCS.  There wasn't a misrepresentation.  It's a target

6    portfolio.  The portion -- the portion that they're complaining

7    about, it's a target.  It's a forward-looking statement.

8            The cover e-mail, your Honor -- and this is in my

9    binder that I handed up, if you flip to Arena Exhibit 16,

10   that's the exhibit number that relates to the declaration that

11   I submitted in support of Putnam's summary judgment motion.  I

12   have there the actual e-mail by which Calyon, not Putnam,

13   forwarded the PCS to FGIC and we highlighted language.  That's

14   our highlighting.  That's not part of the original document.

15           Mr. Anand of Calyon, "Just to highlight a few points,

16   the assets highlighted in the peach color are the target assets

17   we anticipate in the portfolio.  They are not yet traded as

18   indicated in the final.  The rest of the assets are currently

19   in the portfolio."

20           That's the 75 percent that had already been selected.

21           "I must also remind you that Alex Rekeda," of Calyon,

22   not a Putnam employee, the senior Calyon banker on the deal,

23   "has not yet checked over this pool.  So please be aware that

24   there might be some changes he may wish to make as the deal

25   ramps up further."

Ibe9fina

1          Pretty clear.  FGIC is being told the targeted assets

2     are anticipated, not traded.  They haven't been checked over by

3     the senior Calyon banker and they are subject to change.

4          Under the law we cite the Duane Reade case but there

5     is substantial authority on this point, Judge.  This is well

6     established law.  For a forward-looking statement to be

7     actionable, you have to show that the speaker held an opinion

8     that the projected information -- that the speaker didn't

9     believe that the projected information was true.

10          Here, the speaker is Calyon.  It's not even Putnam.

11     And there is no evidence that Putnam, even if it did know about

12     these assets, these targeted assets, thought that they were

13     false.  So that's a second path to summary judgment for Putnam

14     on this claim.

15          On the issue of Putnam's knowledge.  FGIC's briefs,

16     they cobble back and forth between willful blindness and actual

17     knowledge.  In their opening brief they talk quite a bit about

18     willful blindness.  We thought that Putnam was willfully blind

19     to the falsity of the PCS.

20          Well, we pointed out:  Willful blindness is pretty

21     inapplicable.  It's a very high standard.  But, moreover, there

22     is no authority that a claim that a forward-looking statement

23     is false can be established by willful blindness.  The cases

24     suggest you need actual knowledge.  So we point that out.

25          In their opposition brief, the reply brief, they say

Ibe9fina

1    we've got evidence of actual knowledge.  No, they don't, Judge.

2    There is no evidence that Putnam ever saw the PCS or knew what

3    was in it.

4         They have a fallback claim.  Their fallback claim is

5    we have some e-mails by which Putnam found Calyon to be

6    unreliable.  You knew that Calyon was unreliable, Putnam,

7    therefore, you really should have checked on what Calyon had

8    sent to Ms. Menhenett when she asked you for the targeted

9    assets for the remaining 25 percent of the deal.

10        I would submit that these e-mails, if anything, they

11   show Putnam's diligence.  But not a single one of those e-mails

12   cited by FGIC relate in any way to a lack of confidence by

13   Putnam as it relates to Calyon's preparation of target

14   portfolios.

15        FGIC's briefs are replete with statements along the

16   lines of Putnam must have known, Putnam must have known.

17   That's not a basis, your Honor, to avoid summary judgment.

18   They need to cite evidence.

19        There's a suggestion made by Mr. Baldwin that well

20   we're not just complaining about the PCS.  All of the target

21   portfolios were false.  And there were a number of them.

22   Mr. Baldwin made the argument here that they were Putnam's

23   target portfolios.  In point of fact, they were Calyon's target

24   portfolios.  Every target portfolio was sent out by Calyon, not

25   by Putnam.  Put was copied on some of them, not the PCS, but

Ibe9fina

1       they were all prepared by and sent out by Calyon.

2               Now, to the extent that we want to talk about target

3       portfolios and what FGIC knew or didn't know about whether they

4       were forward-looking statements, your Honor, I would invite the

5       Court's attention to the first exhibit tab in the binder,

6       exhibit -- Arena Exhibit 12 which are excerpts from the

7       investor presentation that was circulated by Calyon to

8       potential investors.  It's laden with cautionary disclosures,

9       laden with disclaimers.

10              The disclosures, among other things, and we've

11      highlighted some of them in the copy that we handed out, the

12      target portfolio is described as an indicative asset type

13      distribution.  Among the forward-looking statements that it

14      identifies are portfolio compositions.  It discloses some

15      important factors which could cause actual results or

16      performance to differ materially from those expressed or

17      implied in any forward-looking statements including the actual

18      composition of a collateral.

19              Your Honor, think about it.  Here's a list of targeted

20      assets.  You just don't go into the local Duane Reade and buy

21      the targeted assets.  You have to find a willing buyer.  You

22      have to find a price that works.  There's a lot that goes into

23      it.  Its subject to market forces.  And that's what these

24      disclosures were telling potential participants in the deal

25      such as FGIC.  They all were being told that these were

Ibe9fina

forward-looking statements.  And there were careful, specific

disclaimers accompanying each of these target portfolios.

FGIC argues you never -- you had a duty to correct.

We relied upon Putnam.  We relied upon you.  You had a duty to

correct.  And you never corrected.  We dispute that Putnam had

a duty to correct.  We dispute that the target portfolios were

false.  We dispute that Putnam made any false representations

in connection with the target portfolios.  But, if Putnam had a

duty to correct, it corrected.

September 5, 2006.  So just to place this in context.

The deal -- the first investor presentation goes out in early

July.  The PCS is sent by Calyon to FGIC on August 7.  The deal

closes in October of 2006, October 3.  So between the PCS and

before the closing, on September 5, one month after Calyon sent

the PCS to FGIC, Putnam sent an updated target portfolio to

Calyon with the following directions.  And this, your Honor, is

the third tab, tab 26, or Exhibit 26.  And we've highlighted,

your Honor, several things in this cover e-mail, and then I'll

go to the excerpt of the attachment.  The cover e-mail from

Mr. Bell, who is the lead Putnam employee on this deal, he

sends his e-mail to six Calyon recipients.

It's true, as Mr. Baldwin notes, he also adds

Mr. Prusko of Magnetar and Mr. Henriques of Deutsche Bank.

They were the equity sponsors of the deal.  There's nothing

unholy about that, your Honor.  But Mr. Bell sends this e-mail

Ibe9fina

1   to six Calyon recipients.  And he attaches the target

2   portfolio.  And here's what he says, first line, which I have

3   highlighted, "We have updated the target portfolio based on our

4   aggregation to date."  So we've updated the target.  "The

5   revised portfolio is broadly consistent -- has been sent -- or

6   has been shown to investors in the pitch book."  That's the

7   same document that's Arena Exhibit 12, the first document in

8   this binder.

9         And then he writes, "We would like this target

10  portfolio to be reflected in the term sheet provided to

11  investors prior to pricing."

12        So that's Putnam sending an updated target portfolio

13  to Calyon with the request that Calyon, which as part of its

14  job, circulates this updated target portfolio to potential

15  participants in the deal.  That was Calyon's responsibility.

16  There is no suggestion that it was Putnam's job to send out

17  target portfolios.  It didn't do that at all.  That was Calyon

18  as the arranger's responsibility.

19        Then, your Honor, if you look to the attachment -- and

20  this is highlighted in a number of places -- but it shows two

21  things that I think are relevant to this motion.  One, what's

22  the amount of prime assets in the updated target portfolio that

23  Putnam wants Calyon to send to all participants in the deal?

24  1.25 percent.  Not the 10 percent in the PCS that Putnam never

25  saw.  1.25 percent.

Ibe9fina

1          The final -- the amount of prime assets in the final

2     portfolio.  It wasn't zero as FGIC suggests.  The Pyxis

3     indenture defined prime specifically to be RMBS that had an

4     aggregate FICO store in excess of 675.  That was the definition

5     of prime.  According to that definition, 1.82 percent of the

6     final portfolio was prime.

7          Target says 1.25.  Final portfolio.  You did a little

8     better if you like prime.  You got 1.82.

9          What's the amount of assets in this target portfolio

10    rated above Baa2 of Moody's?

11         I calculated, Judge -- my math is not perfect, but I

12    calculated it to be 16 percent or 16.25 percent.  Again, the

13    final percentage in the final portfolio of 15.47.

14         That's what we're talking about, Judge.  Where is the

15    fraud?  Where is the negligent misrepresentation?  Where is the

16    failure to correct something that wasn't even false to begin

17    with?  To the extent there was a duty to correct, it was

18    corrected.

19         In their reply brief FGIC makes an incredible

20    assertion.  It's truly an incredible assertion.  And I'm

21    reading from their reply brief, page 11.  On September 5 Carl

22    Bell finally sent the updated target portfolio not to Calyon

23    but to Jim Prusko of Magnetar and Michael Henriques of Deutsche

24    Bank.  That's a quote from their reply brief.

25         Judge, if you flip to the front page there are six

Ibe9fina

Calyon employees who received this e-mail.  The notion that

FGIC can claim that this was sent not to Calyon but to Magnetar

and Henriques is mind-boggling.  I've leave it at that.

I've got another path quite streamlined to summary

judgment.  Actual and reasonable reliance.  FGIC cannot

establish either.

In his presentation today FGIC's counsel made no

mention of the fact that starting in February of 2007 after the

deal closed FGIC received information from two sources, the

FGIC trustee -- I'm sorry, the Pyxis trustee which was LaSalle

Bank, a subsidiary of ABN AMRO, totally separate from Pyxis,

totally separate from Putnam, totally separate from Calyon.

They received trustee reports as to the actual composition of

the final portfolio.

Two, they received access to a website maintained by

Putnam for participants in the deal.  Putnam maintained its own

website where it produced month in, month out information about

all of the collateral assets in the deal.  And it gave FGIC

access.  It's not disputed.  FGIC received the trustee reports.

That's not disputed.

If I can invite your Honor to turn to the fourth tab

in the binder, Arena Exhibit 10.  This is the February 2007

trustee report sent to FGIC, being circulated by Frances Sexton

of FGIC to Ms. Menhenett their lead underwriter on the Pyxis

deal.  Forty pages containing every conceivable fact about

Ibe9fina

every asset in the deal: How much was prime.  How much was

subprime.  Year of issuance.  Ratings.  Amount above Baa2.

Amount below Baa2.  It was all there.

It was also in Putnam's website that Putnam maintain.

Remember, Judge, the claim is Putnam is trying to pull the wool

over everyone's eyes.  Putnam is defrauding people.  Putnam is

making misrepresentations.  Putnam has a duty to correct

portfolios.  They're hiding information.

Putnam is also maintaining a website to which it gives

FGIC access and updates monthly reports, month in, month out,

with all of the exact identity and information about all of the

assets in the deal.  And that, your Honor, is set forth in the

fifth tab, Arena Exhibits 56 to 60.

And if you flip throw those, Judge, the last set of

documents behind the last blue page are all the assets in the

deal, including their rating, the amount, whether they're

subprime, mid prime.  It's all there.  It's all there.  It's

all there.  You didn't hear FGIC say anything about that during

their argument today.

Why is that relevant?  Well I think it's relevant for

a number of reasons.  It shows no intent to defraud.  It shows

that FGIC got relevant information.  It shows that to the

extent that there was a duty to correct, it was corrected.

But there's another reason.  FGIC's counsel made

reference to the fact that this deal allowed Putnam as

Ibe9fina

1     collateral manager to trade up to five percent of the

2     collateral assets every year.  FGIC had the right at any point,

3     right, had the ability to pick up the phone and call Putnam.  I

4     want more prime.  I'm upset that only 2.3 percent of the deal

5     is from the first half of 2005.  I'd like a slightly higher

6     percentage consistent with the PCS of 4.8.  Can you do that for

7     me?

8            They never complained once.  They received all this

9     information.  They never complained ever.

10           And, your Honor, I would refer the Court respectfully

11    to your own decision in Granite Partners.  Sophisticated

12    parties, and FGIC was surely a sophisticated party, as I'll get

13    to, are under a duty to make affirmative efforts to protect

14    themselves from a misrepresentation and they can't be heard to

15    complain when they don't make diligent inquiries.

16           FGIC had all this information.  It never complained

17    once, Judge.  What does that tell you?

18           Let me briefly address this argument that FGIC was

19    locked into the Pyxis guaranty on September 6.  The suggestion

20    was made during counsel's argument that we don't dispute that.

21           I don't really know what to make of that, your Honor.

22    Here's what I would have to say.  I remember in first year law

23    school I learned that an executory contract that couldn't be

24    performed within one year had to be in writing.

25           When did FGIC commit to the deal, according to their

Ibe9fina

argument?  September 6.  There is nothing special about
September 6, 2006.  That was the date of their internal credit
application approval.  That's all September 6 is, is the date
that their credit committee said sure, go forward.  They didn't
sign any agreements on September 6.  In fact, they didn't sign
an agreement that committed them to the deal until October 3.

        Why is it so important for FGIC to claim well we were
committed by September 6?  Because they want to absolve
themselves of any responsibility of looking at subsequent
target portfolios or information that they received after the
closing.  It won't fly, your Honor.  It just won't fly.

        As a matter of law, FGIC was not legally bound until
October 3.  And if they didn't like the final portfolio, which
was 91 percent ramped at the time of closing, they could have
raised their hand and said we're not participating; we thought
the deal would be different.  They never did so.

        Now, I don't want to go off on a tangent, your Honor,
but if FGIC's position is we were committed as of September 6,
2006.  I really don't know what we're doing here and I say that
because FGIC didn't file suit -- it was a long time ago but
they didn't file suit until October 1 of 2012, more than six
years after they say they were committed to the deal.  So if
that's really their position, I think they're time barred on
all their claims.

        Let me move on, Judge.  I'm mindful of the time.  Let

Ibe9fina

1    me try to move on and push forward.

2              Materiality.  I told you that there were a number

3    of -- a number of streamlined paths to summary judgment.  I

4    think materiality is one.  FGIC picks and chooses which target

5    portfolios they want to rely upon.  They select -- they select

6    a PCS which is August 7, 2006.  But they received target

7    portfolios before.  They received target portfolios after that.

8    They all had slightly different amounts of prime.  They had

9    slightly different amounts of assets rated above Baa2.

10             FGIC never drew anyone's attention to:  Well, we

11   really need to have this amount of prime.  They don't rebut any

12   of the cases cited by Putnam that such small differences, such

13   small discrepancies are not material.

14             The fact that FGIC never commented on these varying

15   amounts of prime or 2005H1 RMBS or assets rated above Baa2 we

16   submit evidences the insignificance of these small variations.

17             I just want to speak a second about FGIC's duty.

18   There's a lot of discussion about Putnam's duty.  What was

19   FGIC's duty?

20             Assume for the sake of argument that FGIC was

21   committed to the deal as of September 6 as they argue.  It was

22   their decision to proceed with the transaction knowing that

23   they didn't have access to the final portfolio.  They made --

24   they were not babes in the woods.  They were not infants.  They

25   made that decision.  And where a party proceeds with a

Ibe9fina

1    transaction knowing it's not received full or complete

2    information, it's reliance cannot be deemed reasonable or

3    justifiable.  That's the KNK case that we cite.

4         And as I noted, your Honor, not to belabor the point,

5    Pyxis was not fully ramped until January 2007.  FGIC had four

6    months from October 2006 until the date it was fully ramped to

7    ask Putnam to acquire different assets.  And, as I noted even

8    after the closing, Putnam had the ability to the trade up to

9    five percent of the portfolio assets each year.

10        There were two occasions postclosing, your Honor, two

11   occasions where FGIC in writing said the deal is performing as

12   expected.  The first is behind Arena Exhibit 45, that tab.

13   This is a closing memo, signed by Ms. Menhenett, on October 30,

14   where she affirms, "There were no material differences between

15   the closed transaction and the transaction approved by the

16   SEC."

17        FGIC argues well that was October 30.  The deal still

18   wasn't fully ramped.  Give us a pass on that one.  Fine.

19        Look at Arena 46.  This is an amendment request form

20   from April 2007.  By this date FGIC has already received

21   several iterations of the trustee reports showing all the

22   assets in the deal.  They've received access to Putnam's

23   website showing all the assets in the deal.  And we highlighted

24   the language in which four FGIC representatives, including

25   Ms. Menhenett, represents "the deal is performing as expected."

Ibe9fina

1          This amendment request form was prepared because at

2     that point in time Putnam had a change in ownership.  And it's

3     owner, Marsh & McLennan, had sold it to a Canadian insurance

4     company called Great West.  As a consequence of that change in

5     control of Putnam, FGIC was in a position where it had to

6     consent to the change of control.  And they did so.  And they

7     represented, "the deal is performing as expected."

8          Judge, let me turn quickly to the other two alleged

9     misrepresentations.  Many of the arguments that I just made

10    apply with the same force to these other alleged

11    misrepresentations.  So I want to be telescoped, and I will try

12    to just point out what's unique to -- arguments that are unique

13    to each of these other alleged misrepresentations.

14         Alleged misrepresentation number two.  Target

15    portfolios sent to the rating agencies were false.

16         My first point is FGIC never saw these.  FGIC never

17    saw these target portfolios.  I don't know how it could have

18    relied on them.  It claims it was committed to Pyxis on

19    September 6.  The rating agencies didn't issue their ratings

20    until after that date.  FGIC, therefore, could not have relied

21    on those ratings.

22         FGIC's briefs make reference to a presale report

23    prepared by Fitch, one of the three rating agencies that

24    reflects that the deal was expected to have 10 percent prime.

25    There is no evidence that any FGIC witness ever received or

Ibe9fina

reviewed this report.  No one has testified to that effect
whatsoever.

FGIC claims:  Well maybe we didn't rely on the actual
rating agency portfolios, we didn't see those; but we relied on
the ratings that were issued as a consequence of the rating
agencies getting those target portfolios.  And, by the way, an
attachment point, an initial AAA attachment point of
20.43 percent was a condition of the deal.

Well, what do they cite as the evidence that a 20.43
initial AAA attachment point was a condition of the deal?  They
cite a document called the securities purchase agreement
between Calyon and Pyxis.  That document was executed on
October 3 a month before FGIC says it was committed to the
deal.  So it didn't rely upon that either.

Let me address the rating confirmation letters because
I think this puts the stake in the heart of this particular
argument.  The suggestion is that if only the rating agencies
had received the final portfolio they would have changed the
initial AAA attachment point.  And that's relevant, they're
building a house of cards, because if the initial AAA
attachment point was slightly higher we would have insisted
that FGIC attach at an even higher level.

That's all debatable, your Honor.  But the predicate
for that is false because we know the rating agencies did
receive the final portfolio.  And the rating agencies, after

Ibe9fina

receipt of the final portfolio, each one of them separately

confirmed their ratings for the deal for each of the note

classes including the initial AAA attachment point of 20.43.

And I've attached each of the rating agency letters as

Exhibits 42 through 44, behind that tab.  And I've highlighted

the relevant language.  There is no dispute that the rating

agencies are represented, that they are confirming their

preexisting ratings based on the final portfolio sent to them

that had been audited and circulated by the trustee.

So what's FGIC's response to this?  The response is to

say in an expert declaration, belatedly submitted in an

opposition brief to summary judgment, that the rating agencies,

each of them, has lied.  That's their sole defense.  And that's

why they're pushed, your Honor, to saying something so,

frankly, irresponsibly baseless.

What's the evidence that the rating agencies lied?

FGIC never subpoenaed any of the rating agencies.  They never

deposed any of the rating agencies.  They never asked any of

the fact witnesses any questions about the rating agencies.

There were no questions about the rating agencies' portfolios

or questions about the confirmation letters.  There was no such

questions.

And by the way, if -- if the -- the suggestion is,

hey, Putnam, you had a duty to correct these target portfolios

that had been sent by Calyon to the rating agencies but you,

Ibe9fina

1   Putnam, we're going to put on you a duty to correct them.

2   Putnam corrected them.  It sent the final portfolios to each of

3   the rating agencies who confirmed their ratings.  That puts the

4   stake in this argument.

5           Let me address Mr. O'Driscoll briefly.  He's FGIC's

6   expert.  He's the author of the expert declaration submitted in

7   connection with their opposition memo.  I would submit his

8   expert declaration is incompetent, baseless and untimely.  And

9   if I could just focus on something that counsel said earlier.

10  We have -- Putnam absolutely disputes Mr. O'Driscoll's

11  suggestion that by running the rating agencies' methodology you

12  would derive a slightly higher initial AAA attachment point.

13  Of course we dispute that.

14          Here's what happened in this case, Judge, and I'll let

15  the Court sort it out.

16          Mr. O'Driscoll put in a reply declaration in which he

17  said that his -- his opinion about the initial AAA attachment

18  point was based on his experience, his experience.  FGIC

19  produced no work papers in support of that claim.  None.

20          They didn't do it during expert document disclosure.

21  And they didn't do it before Mr. O'Driscoll was deposed.

22          I deposed Mr. O'Driscoll.  So your opinion is based on

23  your experience?  No, no.  I have work papers.

24          Well where are they?  How come they weren't produced

25  earlier?

Ibe9fina

1          His deposition took place on June 26.  Expert

2    discovery closed on June 30.  Counsel for FGIC faults me and

3    faults Putnam's counsel for not seeking a chance to redepose

4    him with respect to documents and work papers that they failed

5    to timely produce.

6          In any event, his opinion is totally speculative.

7    Here is the basis for his opinion.  He said if the rating

8    agencies had the final portfolio they would have reached a

9    higher AAA attachment point.

10          Well there are three rating agencies.  Rating agency

11   number one, Moody's.  He didn't purport to run Moody's model;

12   didn't provide any testimony about what Moody's model would be.

13          Rating agency number two, Fitch.  He didn't run the

14   Fitch model.  He didn't purport to run the Fitch model.

15          Rating agency number three, S&P.  I was able to run

16   the S&P model but I lacked, according to his own testimony, the

17   inputs necessary to run that model.

18          Your Honor, if we are at trial in this matter we

19   absolutely will be showing that Mr. O'Driscoll did not run the

20   proper, the proper model for S&P.

21          Assume for the sake of argument that each of the

22   rating agencies did not run any of their models, they just

23   reconfirmed their ratings.  Isn't that the end of it, Judge?

24   Isn't that the end of it?

25          Rating agencies have the right to rate tranches

Ibe9fina

1   however they see fit.  We know they received the final

2   portfolio.  They confirmed their ratings.  That should be the

3   end of it.  The suggestion that the rating agencies lied

4   because we're going to pick through some statement in an SEC

5   report which, by the way, in and of itself says nothing of the

6   rating agencies routinely lied in connection with the

7   preparation of confirmation letters.  That's not what the SEC

8   report says.

9         The suggestion that FGIC would have attached at a

10  50 percent attachment point if only the AAA attachment point

11  had been 25.  Not a single FGIC witness testified to that.  If

12  you review their 56.1 statement, there's not a single FGIC

13  witness who said that at any point.  And in 2006 alone FGIC

14  ensured tranches in at least three other CDOs at their initial

15  AAA attachment point.  Not at two times that amount.

16        FGIC points out:  Well, the Ischus deal, which was

17  similar in structure to the Pyxis deal, they attached at two

18  times the amount.  OK.  Well, there were three other incidents

19  of CDOs backed by lower-rated subprime RMBS of various vintages

20  where they did not.

21        The last alleged misrepresentation, Judge.  Putnam

22  would select a Pyxis portfolio based on its own judgment or

23  what FGIC's counsel refers to as the portfolio content

24  misrepresentation.

25        I should note at the outset that this alleged

Ibe9fina

misrepresentation, and I invite the Court to read their briefs,
it's totally amorphous as to what the actual misrepresentation
is.  Who said what to whom when?

         Judge, I don't know.  It appears to be a couple of
things.  One, FGIC appears to be saying well in our -- in the
offering memo there is a representation or there is a statement
at some point that FGIC -- I'm sorry, Putnam will select the
collateral based on their own judgment, based on their own
research and judgment.  And they say well you didn't do that.
And here is the evidence that we have that you, Putnam, you
picked collateral assets that you didn't like, that weren't
based on your judgment.

         One, there were 153 assets in this deal.  Twelve of
them were CDOs.  So it was a CDO that in part held positions in
twelve other CDOs.  Four of those twelve CDOs were other
Magnetar deals.  And they said it can't be the case that you
would have picked other Magnetar CDOs for this Magnetar CDO
absent Magnetar telling you to do that.

         That's pure speculation, your Honor.  There is no
evidence that Magnetar told Putnam to include these four assets
in the collateral pool of 153.

         And I would note FGIC insured tranches in other CDOs
at the same time as Pyxis that had great exposure to Magnetar
CDOs than Pyxis.  There's nothing unusual about this amount of
Magnetar CDOs.  It constituted a whopping total of 3.6 percent

Ibe9fina

1   of the final pool.  That's the first piece of evidence.

2          The second is:  Well, we think you put in exposure to

3   the ABX index and we don't think you like those assets.

4          So, your Honor, in the sleeve of this binder I added

5   two exhibits.  The first is an e-mail exchange that counsel for

6   FGIC referenced which the argument was you didn't like 10 of

7   the 20 assets in a particular ABX series and that proves that

8   you didn't like that asset, Putnam.

9          Well, here's what Carl Bell actually says in the

10  e-mail.  He writes, "We need to fine tune, but our guess is

11  we'd like about 10 of the 20 bonds in one of these ABX indices

12  on a held-to-maturity basis so the ABX could be used.  One, a

13  cheaper way to source some of the bonds that we like."

14         Judge, it's not our role to second guess Mr. Bell

15  about whether this was a good investment for the deal or a bad

16  investment for the deal.  The question is:  Did he personally

17  think that this was a good investment?  And he writes here,

18  "This is a cheaper way to source some of the bonds that we

19  like."  There is no basis to argue or to infer from this

20  document that Mr. Bell did not like these assets.

21         As it relates to the ABX.  I don't want to confuse

22  matters.  The whole notion that FGIC was surprised by the

23  amount of ABX in the deal sort of strikes us as fairly odd.

24  Counsel made reference to the fact that FGIC received a ramp

25  portfolio on July 18.  That ramp portfolio at that point in

Ibe9fina

1    time reflected about two-thirds of the final assets that would

2    be in the deal, about a billion dollars worth.  Of that billion

3    dollars, 75 million consisted of ABX securities; 176 consisted

4    of ABX constituent securities.

5            Putnam didn't hide from anyone that it liked these

6    assets or that it was putting them in the deal.  And FGIC never

7    complained.

8            Which brings me to the other e-mail identified by

9    counsel where Putnam purportedly put an asset in the deal that

10   it didn't like.  And it's a single page, your Honor, with two

11   sides.

12           At one point John Van Tassel, the author of the

13   e-mail, is having an e-mail exchange with James Prusko, the

14   equity sponsor of Pyxis at Magnetar and he writes, he writes,

15   "Regarding ABX constituent securities.  If it's in the

16   warehouse, we indicated the notional amount."  By that he means

17   if we like the asset, we bought it, it's indicated in the

18   notional amount.  If you turn the page, your Honor, there are a

19   number of assets, not highlighted, which have notional amounts

20   next to them.  That means that they've been acquired by Putnam

21   for the deal.

22           "If we like it," he goes on to say, "and the spread is

23   too tight, it's highlighted in blue."  So then you see there

24   are three ABX constituent securities highlighted in blue.

25           Mr. Van Tassel is saying:  I like these but the spread

Ibe9fina

1   is too tight; in other words, the price isn't right; it's too

2   expensive.

3           "And if we like it but we haven't tried to buy it yet,

4   it's in orange."  There are roughly nine or ten of those

5   assets.

6           And then he writes, "All others we don't like."  So

7   those would be -- the "all others we don't like" would be the

8   ones that are not highlighted that have a zero notional amount

9   next to them.  And there are about 13 of those.

10          Here's how many of the assets that Putnam, Mr. Van

11  Tassel, didn't like that they acquired for the deal.  Zero.

12  Zero.

13          The ones that he didn't like, they didn't buy any.

14          Here's what they did.  In order to juice the returns,

15  to show that they didn't like those assets, there were three of

16  them that Putnam arranged for the deal to short.  So normally

17  Putnam bought assets for Pyxis.  They went long those assets.

18  With respect to three assets that Mr. Van Tassel particularly

19  did not like, they shorted those assets.

20          Again, the question is not whether he was right or

21  wrong.  The question is:  Was he trying to put assets that he

22  didn't like in the deal?  This document can't be read any way

23  other than he put assets in the deal that he liked.

24          Undisclosed portfolio constraints.  FGIC's argument is

25  you put assets in the deal or you selected assets according to

Ibe9fina

undisclosed portfolio constraints.  You were hiding the absence

of prime.  You were hiding the absence of 2005H1 assets.  You

were hiding the percentage of assets that would be rated above

Baa2.  Nonsense.

Just a couple of quick points, your Honor.  Their own

credit application.  This is the credit application that FGIC

took and went to its credit application saying we want to do

this deal.  What did they highlight?

One, a WARF of five hundred; a targeted WARF of five

hundred.  That means a Weighted Average Rating Factor.  A WARF

of five hundred correlates to an overall aggregate rating

between Baa2 and Baa3.

A weighted average spread of two hundred.  That was

the target.  That's consistent with newer issuances.  At least

80 percent subprime and mid prime.  And no minimum amounts of

prime.  They knew what they were signing up for.  They

recommended doing this deal.  Their own words.  It gives us

access -- exposure to the subprime RMBS sector.

A few other quick points.  FGIC was sophisticated.  I

don't want to get into a theoretical dispute with Putnam, more

sophisticated, was FGIC more sophisticated.  There's an

assertion, which I don't believe is based on any evidence, that

Putnam had more sophisticated models.  I don't know what the

evidence is of that in the record.

FGIC was sophisticated.  It insured tranches in 18

73

Ibe9fina

1   CDOs, many of them backed by subprime with a rating between

2   Baa2 and Baa3.  Those 18 deals had a notional exposure of in

3   excess of $11 billion.

4          In addition, it insured 250 RMBS for a total notional

5   exposure of 31 billion.  Many of them were subprime RMBS.  This

6   was not their first rodeo.

7          They have sophisticated underwriting and surveillance

8   capabilities.  They told the board that they had the ability to

9   model the cash flows to analyze the default rates.  They had a

10  sophisticated surveillance structure in place to monitor each

11  closed transaction on an ongoing basis.  They told the board

12  that and they had that function.  Whether they used it or not

13  is on them.  It's not on Putnam.

14         And lastly, before I turn it over to Mr. Murphy on

15  damages, their credit application.  They had the ability to

16  look at, at that point in time, up to 98 acquired assets, close

17  to 75 percent of the final portfolio.  And there was statement

18  after statement in that credit application.  We didn't hear

19  anything about this during argument.  Statement that Putnam had

20  selected a strong and diverse mixture of collateral assets.

21  FGIC's conclusion was:  No adverse selection.  The portfolio

22  was not concentrated in what FGIC would perceive as weaker

23  issuers, originators or servicers.  The quality of issuers,

24  originators and servicers was represented at the market.

25  Strong mixture.  Quality appears to be comparable to our own

Ibe9fina

subprime book.  Top subprime originators, issuers and servicers

in the portfolio.  Does not exhibit any adverse selection.  And

they recommended approval on the expressed basis that the deal

would allow FGIC to take exposure to the subprime RMBS sector.

        Your Honor, if you have no questions, I'll turn it

over to Mr. Murphy.

        MR. MURPHY:  Good afternoon, your Honor.

        Sean Murphy for defendant and I'm going to very

briefly deal with damages and loss causation which start at

slide 25 in the dec my colleague has already handed up.

        I would submit, your Honor, that the issues of loss

causation and damages are very well suited issues for summary

judgment because FGIC and Putnam don't really disagree over the

damages that FGIC is seeking.  It's really just an issue of law

as to whether legally they're entitled to those damages because

FGIC wants to recover all of their damages.  They handed up a

dec.  Slide 28:  FGIC is entitled to recover all of its losses.

They want every penny back they ever lost and the issue is

whether the law allows that.  And the law is a good place to

start.

        Slide 25, your Honor.  Damages for New York cases that

the measure is out-of-pocket losses which requires proof of an

actual pecuniary loss sustained as a direct result of the

alleged misrepresentation.

        And loss causation, same concept, your Honor.  Not

Ibe9fina

terribly unusual.  The plaintiff has to distinguish between
losses attributable to the fraud on the one hand versus
market-wide forces.  And that's obviously very relevant here
given this was a subprime deal in the middle of a subprime
crisis.

FGIC fails to meet its burden on both of these
elements.  In fact, FGIC doesn't really ever try, your Honor.
As I've just pointed out on slide 28, they keep saying they're
entitled to all of their losses.  They want every penny they
lost in the deal back.  They never say well this loss was
attributable to the misrepresentation and this was attributable
to market.  They spend all their time relying on arcane
theories that say they should get all their losses back.

If you look at slide 26, your Honor, I think to
understand what damages might flow from FGIC's losses you first
have to understand their losses, what was the money that they
actually paid out under the swap.  Again, these are not
damages.  These are just losses.

The only money that FGIC ever paid out under this swap
was a hundred million dollar payment in July 2009 to Calyon to
settle their exposure in Pyxis and two other CDOs.  That was
the only money they ever paid.  They never paid a penny more
than that.  Period.  Full stop.  That's the absolute universe
of losses for which we have to determine how much of that was
attributable to any alleged misrepresentations.

Ibe9fina

1              FGIC, it handed up a dec, your Honor, and at page or

2      slide 27 of their dec they say FGIC's losses under the Pyxis

3      guaranty were 782 million.  FGIC's losses under the Pyxis

4      guaranty were 782 million.  That's the most misleading title

5      I've ever seen.  If you read carefully underneath it they say

6      the losses were 782 because that's what FGIC would have had to

7      pay had they not settled their exposure seven years early

8      before it was due.  The swap didn't require them to pay a penny

9      until September 2016, long before those losses were occurred or

10     incurred.  They settled it for a fraction of what their

11     exposure would have been.

12             It makes no sense to talk about what your losses

13     hypothetically would have been had you not commuted your

14     exposure.  It's like bringing a securities fraud suit and

15     saying well I lost a lot of money in the stock.  Fortunately, I

16     sold it before they occurred but, you know, we shouldn't talk

17     about the losses that occurred after I mitigated.  It makes no

18     sense.  Their losses, not their damages, their total losses

19     were a hundred million dollars.

20             So, how would you prove loss causation or damages,

21     your Honor, when their out-of-pocket or total expenditures

22     until the swap were a hundred million?  It's very

23     straightforward under the law.  How much of that hundred

24     million was attributable to the alleged misrepresentation,

25     assuming you can prove liability.  And FGIC doesn't really

Ibe9fina

attempt to do this.  They submitted an expert report and they
don't want to talk about how much that hundred million is
attributable to anything Putnam did because nothing Putnam did
caused any of the losses, your Honor.  That's not really
disputed.

          Mr. Baldwin talked a lot about:  Oh, prime, we thought
there would be ten percent prime.  Their expert calculated that
prime would have hurt Pyxis's performance.  The lack of prime
actually helped FGIC, if at all.

          If you look a lot slide 28 your Honor, they have now
in their opposition brief they have no evidence of it, but
they've submitted in their brief that they can prove how much
of the hundred million was attributable to the alleged
misstatements and it's based on the single theory that FGIC
would have attached at 50 percent.  And you heard Mr. Baldwin
and Mr. Arena talk about that.  They suggest if they had
attached at 50 percent they would have had lower loss reserves
and then they would have negotiated a different settlement with
Calyon.

          This theory is what's known as an alternative
contractual bargain under New York law.  Again, I don't think
FGIC disputes that.  It's simply how does the law treat that
alternative transaction.  And New York Courts routinely reject
alternative transactions as speculative.

          And Mr. Baldwin argues that the transaction here is

Ibe9fina

1    not speculative because there's a rare exception when there's a

2    concrete offer on the table.  And I will concede New York law

3    says there's a rare exception when you have a concrete

4    contractual bargain on the table that you could have done, that

5    has been recognized as a potential source of damages.

6            But that's not the case here, your Honor.  And if you

7    look at slide 29, FGIC's theory of -- it's far more speculative

8    than those rejected by New York Courts.  In fact, there are two

9    independent alternative bargains here, both of which are highly

10   speculative; the first being would they attach at 50 percent,

11   which requires a lot of speculation as to whether Calyon would

12   have agreed to that; and the second alternative transaction is

13   that that in turn would have led to a different negotiation of

14   a lower commutation payment with Calyon.  And that is clearly

15   speculative, your Honor.  And we know that because Calyon or

16   FGIC submitted a declaration with their opposition brief by

17   Mr. Donnelly, who was the lead negotiator of the commutation

18   payment.  And he said:  If we had made lower demands to Calyon,

19   we don't know they would have responded to it, he calls it an

20   unanswerable counterfactual.

21           So we know there is no concrete offer on the table not

22   to attach at 50 percent and not to settle at an amount less

23   than a hundred million.  These are the exact types of

24   alternative transactions courts have rejected as speculative.

25           Now, FGIC has two arguments as to why they're entitled

79

Ibe9fina

1   to all their damages.  The first, which I have on slide 30,

2   your Honor, is the collateral source rule.  That rule has

3   absolutely no application here.  The collateral source rule

4   is -- historically it's been used in personal injury cases and

5   medical malpractice cases where an insurance company covers

6   some of the plaintiff's medical expenses.  It's never been used

7   in a New York fraud case.  It's been severely restricted over

8   the last couple decades by the New York Courts and in fact

9   partially abolished by the legislature.

10          But even if it could apply in this case, it just -- it

11   has no application on these facts.  The only third party source

12   that could have even conceivably have covered some of the

13   FGIC's losses -- and I would submit there was no third party

14   that covered any of their losses -- but if you want to consider

15   Calyon's settlement a collateral source, the law says Calyon

16   can't be the collateral source.  Again, we cite cases in our

17   briefs that the source has to be wholly independent of the

18   transaction and the defendant and clearly Calyon is not.  I

19   would cite the In Re Emergency Beacon case cited in our brief

20   for that, your Honor.

21          What happened here is not a collateral source covering

22   FGIC's losses.  FGIC mitigated its losses.  That's it.  When a

23   plaintiff sells out of his exposure and ends his exposure

24   that's called mitigation, not collateral source.  And there is

25   no case that has taken anything close to the fact pattern here

Ibe9fina

1    and applied the collateral source rule.

2              Their other doctrine that they're relying on or other

3    theory that they're relying on that they're entitled to all of

4    their losses, your Honor, is irrevocability.  They say because

5    the guaranty was irrevocable they're entitled to all of their

6    losses.  And this is slide 31 in our dec, your Honor.

7              This fails for several reasons.  First, the guaranty

8    was revocable.  They didn't hold it to the full term.  They

9    commuted the exposure seven years early, in July 2009.  And

10   secondly, the theory that irrevocability alleviates your burden

11   of showing loss causation has been rejected three months ago by

12   the New York Court of Appeals and very recently by the First

13   Department in September, two months ago, expressly rejecting

14   this theory.

15             I won't belabor it except to say irrevocability has

16   never been held to entitle you to recover all your losses.

17   Never.  There are two cases talking about loss causation and

18   irrevocability, Ambac and NBIA and they both reject it.

19             And the last point, your Honor, before I sit down, is

20   slide 32.  I would point that the Ambac case is directly on

21   point for loss causation.  You really don't need to look any

22   further than this case to decide this issue.  It couldn't be

23   more on point.  It involved a monoline insurer just like FGIC

24   that issued an irrevocable financial guaranty that was required

25   to prove loss causation by isolating only those loans in the

Ibe9fina

1    pool that were the results of losses from a misrepresentation.

2          And on slide 32, your Honor, we quote -- this is from

3    FGIC's brief summarizing Ambac.  They say, "The Court found

4    that Ambac could not recover for losses on loans from which

5    there was no misrepresentation because that would allow it to

6    avoid its obligation to prove loss causation."

7          Exactly.  We agree.  You have to prove -- you have to

8    be able only to recover losses on loans where there was a

9    misrepresentation.  And that's not what FGIC's doing.

10          Take the PCS.  There is no dispute that 75 percent of

11   the assets in the PCS were already purchased.  They weren't

12   misrepresented, your Honor.  They were already in there.  FGIC

13   is saying they expected them to be in there.  They want to

14   recover the losses on those.  That position is impossible to

15   reconcile with Ambac.

16          I would just -- one other point on the hundred

17   million, your Honor.  There is a dispute -- there might be --

18   the one area where there is a dispute on is that FGIC is

19   claiming that of the hundred million dollar payment to Calyon

20   74.5 million of that is attributable to Pyxis.  Putnam greatly

21   disputes that number.  We think it's totally irrational because

22   there were three CDOs covered by the hundred million dollar

23   payment.  They allocated 74.5 to Pyxis and zero to one of them.

24   That had a 372 million dollar liability, potential liability

25   attached to it.  It would make no expense in the middle of a

Ibe9fina

1    financial crisis to settle that CDO for zero.

2            So we dispute that number.  You don't need to decide

3    that for purposes of our motion because even if you assume it's

4    74.5 you still have to come up with a theory to say how much of

5    that 74.5 is attributable to a misrepresentation.  FGIC doesn't

6    even try.

7            I would leave you with that one point, your Honor.

8    It's really undisputed that Putnam was not the cause of Pyxis's

9    failure.  You can't dispute that.  Their own expert says that.

10   Yet, plaintiff wants to recover all of their losses.  And that

11   is going in the absolute opposite direction of all the cases

12   post-Dura and all the cases, recent cases in New York on

13   damages.  It's just totally inconsistent with the law.

14           Thank you, your Honor.

15           THE COURT:  Thank you all very much.  Most useful.

16   Grateful.  I'd like to decide this from the bench right now but

17   somehow or other I feel that might be inappropriate so I will

18   reserve decision.  Thank you all.

19           (Adjourned)

20

21

22

23

24

25