UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FINANCIAL GUARANTY INSURANCE
COMPANY,

                Plaintiff,

       v.

THE PUTNAM ADVISORY COMPANY,
LLC,

                Defendant.

Case No. 12 Civ. 7372 (AT) (KNF)

## PLAINTIFF'S PRE-TRIAL BRIEF

Date:  February 3, 2020

Sean Baldwin
Joy Odom
Amy Nemetz
Margaret Larkin
William Rathgeber
SELENDY & GAY, PLLC
1290 Avenue of the Americas
New York, NY  10104
Tel: 212-390-9000
sbaldwin@selendygay.com

*Attorney for Plaintiff*
*Financial Guaranty Insurance Company*

**Table of Contents**

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND ................................................................................... 4

ARGUMENT ......................................................................................................... 5

I.   Putnam Committed Fraud and Negligent Misrepresentation by
     Causing FGIC to Be Provided with and by Failing to Correct the
     Materially False PCS ................................................................................... 5

     A.   Putnam Fraudulently Induced FGIC to Issue the Pyxis
          Guaranty by Causing FGIC to Be Provided with and Failing to
          Correct the PCS ................................................................................... 5

          1.   Through the PCS, Putnam made both affirmative
               misrepresentations and omissions of material fact about
               the content of the Pyxis portfolio ................................................. 5

          2.   Putnam knew the PCS was materially false ................................. 9

          3.   Putnam intended to defraud FGIC ............................................... 9

          4.   FGIC actually and reasonably relied on the PCS in
               deciding to insure Pyxis ........................................................... 11

          5.   Putnam's fraud caused FGIC to issue the Pyxis Guaranty
               on the terms it did and to suffer substantial losses ................... 12

     B.   Putnam Negligently Misrepresented and Omitted to Disclose
          the True Content of the Pyxis Portfolio by Causing FGIC to Be
          Provided with and Failing to Correct the PCS, Inducing FGIC to
          Issue the Pyxis Guaranty ................................................................... 14

II.  Putnam Committed Fraud and Negligent Misrepresentation by
     Misrepresenting Who Controlled Pyxis Collateral Selection and the
     Full Set of Pyxis Collateral Constraints, and by Omitting to Disclose
     that It Excluded Higher-Quality Assets at Magnetar's Direction ................. 15

III. Putnam Is Liable in Negligence for Its Misconduct with Respect to
     Pyxis ......................................................................................................... 18

IV.  FGIC Is Entitled to Recover Its Commutation Payment as Damages,
     Plus Pre-Judgment Interest and Punitive Damages ................................... 20

CONCLUSION ..................................................................................................... 23

i

## Table of Authorities

### Cases

*Abrams v. Bute,*
    138 A.D.3d 179 (2d Dep't 2016) ........................................................................ 18

*Aetna Cas. & Sur. Co. v. Aniero Concrete Co.,*
    404 F.3d 566 (2d Cir. 2005) ......................................................................... 7, 8

*AJ Contr. Co., Inc. v. Trident Managers, Inc.,*
    234 A.D.2d 195 (1st Dep't 1996) .................................................................... 19

*Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Secs. Corp.,*
    351 F. Supp. 2d 79 (S.D.N.Y. 2004) ............................................................... 18

*Ambac Assurance Corp. v. Countrywide Home Loans, Inc.,*
    No. 653979/2014, 2016 WL 8254810 (Sup. Ct. N.Y. Cty. Dec. 19, 2016) ........ 11

*Anunziatta v. Orkin Exterminating Co., Inc.,*
    180 F. Supp. 2d 353 (N.D.N.Y. 2001) ............................................................ 18

*Bayerische Landesbank v. Aladdin Capital Mgmt. LLC,*
    692 F.3d 42 (2d Cir. 2012) .............................................................................. 15

*BNP Paribas Mortg. Corp. v. Bank of Am., N.A.,*
    949 F. Supp. 2d 486 (S.D.N.Y. 2013) ............................................................. 14

*CMMF, LLC v. J.P. Morgan Inv. Mgmt., Inc.,*
    No. 601924/09, 2009 WL 6408599 (Dec. 10, 2009) ......................................... 18

*Creative Waste Mgmt., Inc. v. Capital Envtl. Servs., Inc.,*
    429 F. Supp. 2d 582 (S.D.N.Y. 2006) .......................................................... 7, 15

*Crigger v. Fahnestock & Co.,*
    443 F.3d 230 (2d Cir. 2006) .............................................................................. 5

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.,*
    343 F.3d 189 (2d Cir. 2003) ............................................................................ 12

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC,*
    783 F.3d 395 (2d Cir. 2015) ............................................................................ 15

*First Hill Partners, LLC v. BlueCrest Capital Mgmt. ,*
    52 F. Supp. 3d 625 (S.D.N.Y. 2014) ................................................................. 6

*Glidepath Holding B.V. v. Spherion Corp.,*
    590 F. Supp. 2d 435 (S.D.N.Y. 2007) ............................................................. 11

*Hydro Inv'rs, Inc. v. Trafalgar Power, Inc.*,
   227 F.3d 8 (2d Cir. 2000) ............................................................................ 14

*In re ICN/Viratek Sec. Litig.*,
   No. 87 Civ. 4296, 1996 WL 164732 (S.D.N.Y. Apr. 9, 1996) ............................ 6

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
   725 F.3d 65 (2d Cir. 2013) .......................................................................... 22

*In re Tribune Co. Fraudulent Conveyance Litig.*,
   No. 12-cv-6055, 2019 WL 294807 (S.D.N.Y. Jan. 23, 2019) .......................... 18

*Johnson v. Celotex Corp.*,
   899 F.2d 1281 (2d Cir. 1990) ...................................................................... 22

*Landon v. Kroll Lab. Specialists, Inc.*,
   91 A.D.3d 79 (2d Dep't 2011) ..................................................................... 18

*Lattanzio v. Deloitte & Touche LLP*,
   476 F.3d 147 (2d Cir. 2007) ........................................................................ 13

*Laub v. Faessel*,
   297 A.D.2d 28 (1st Dep't 2002) ................................................................... 12

*Lentell v. Merrill Lynch & Co., Inc.*,
   396 F.3d 161 (2d Cir. 2005) ........................................................................ 12

*Lorely Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   No. 12 Civ. 3723, 2019 WL 4450982 (S.D.N.Y. Sept. 17, 2019) ...................... 7

*Lorely Financing v. Wells Fargo*,
   797 F.3d 160 (2d Cir. 2015) ........................................................................ 13

*Matter of Scher Law Firm, LLP v. DB Partners I, LLC*,
   97 A.D.3d 590 (2d Dep't 2012) ..................................................................... 8

*MF Glob. Holdings, Ltd. v. PricewaterhouseCoopers LLP*,
   199 F. Supp. 3d 818 (S.D.N.Y. 2016) ........................................................... 19

*Muller-Paisner v. TIAA*,
   289 F. App'x 461 (2d Cir. 2008) .................................................................... 8

*Pasternack v. Lab. Corp. of Am. Holdings*,
   27 N.Y.3d 817 (2016) ................................................................................... 5

*Rosen v. Spanierman*,
   894 F.2d 28 (2d Cir. 1990) ............................................................................ 6

*Shenk v. Karmazin,*
  868 F. Supp. 2d 299 (S.D.N.Y. 2012) ................................................................. 9

*U.S. Bank N. A. v. BFPRU I, LLC,*
  230 F. Supp. 3d 253 (S.D.N.Y. 2017) ................................................................. 7

*U.S. Bank, N. A. v. UBS Real Estate Sec. Inc.,*
  205 F. Supp. 3d 386 (S.D.N.Y. 2016) ................................................................. 7

Pursuant to the Court's Individual Practices in Civil Cases and its Order dated September 11, 2019 (ECF No. 161), Plaintiff Financial Guaranty Insurance Company ("FGIC") respectfully submits this pre-trial brief.

## PRELIMINARY STATEMENT

This lawsuit arises out of Putnam's fraudulent and negligent misrepresentations and omissions, and its negligent misconduct, concerning a collateralized debt obligation ("CDO") called Pyxis ABS CDO 2006-1 ("Pyxis"). As the Pyxis collateral manager, Putnam misrepresented (1) the nature and quality of the Pyxis collateral and (2) the extent to which collateral selection was directed, through the imposition of undisclosed collateral constraints, by Pyxis's equity investors—primarily Magnetar Capital LLC ("Magnetar"), a hedge fund which was heavily shorting the Pyxis collateral and whose interests were directly adverse to FGIC's. Putnam made its misrepresentations and omissions to induce FGIC to provide a financial guaranty insurance policy on the $900 million super senior tranche of Pyxis debt (the "Pyxis Guaranty"), and both its misrepresentations and omissions and its negligent performance of its duties as collateral manager in fact caused FGIC to do so. In 2009, after Pyxis collapsed and as a direct and proximate consequence of Putnam's misconduct, FGIC paid $74.5 million to the beneficiary of the Pyxis Guaranty, Calyon Corporate and Investment Bank ("Calyon"), to commute its liability under the Pyxis Guaranty. FGIC seeks to recover its commutation payment as damages for Putnam's wrongdoing.

To induce FGIC to issue the Pyxis Guaranty, Putnam represented that it, and it alone, would select the Pyxis collateral, exercising its own independent judgment in the interests of all Pyxis investors. Putnam also represented that the only constraints on collateral selection were those disclosed in the Pyxis offering materials. These representations were false. In fact, as one of the equity investors

put it, Putnam treated Pyxis as "a highly structured separate account mandate for the equity investor," PX 47, and secretly worked hand in glove with Magnetar to select the Pyxis portfolio according to undisclosed collateral criteria.  At Magnetar's insistence, Putnam largely excluded from Pyxis certain classes of assets with strong credit quality—namely, (1) prime residential mortgage-backed securities ("RMBS") (*i.e.*, RMBS backed by prime residential mortgages); (2) "seasoned" RMBS issued before July 1, 2005 ("pre-2005H2 RMBS"); and (3) assets with credit ratings above BBB/Baa2/BBB (just above junk bond status).  Putnam also excluded from Pyxis any securities of CDOs that had high exposure to such prime, seasoned, or higher-rated assets.

By excluding these higher-quality assets, Putnam created a portfolio that was both highly risky and highly correlated with the types of assets Magnetar was shorting, furthering Magnetar's shorting scheme.  The collateral criteria disclosed in the Pyxis offering materials did not require exclusion of these higher-quality asset classes.  Putnam's undisclosed collateral constraints were designed to serve the interests of the equity investors, directly contrary to the interests of debt investors and FGIC, who favored a more diversified portfolio that included higher-quality assets to provide a buffer against losses on the portfolio's lower-quality assets in the event of a market downturn.

But Putnam went further.  In early August 2006, FGIC, concerned about the poor quality of the assets ramped to date, asked Putnam to provide it with "all the details" of the remaining "names" (*i.e.*, assets) that would "likely" be acquired for the portfolio.  PX 248.  Instead of providing this list itself or candidly disclosing that prime, seasoned, and higher-rated assets would be largely excluded at the direction of a short investor, Putnam directed FGIC to obtain the requested list of assets from Calyon and then knowingly allowed Calyon to provide FGIC with, and failed to correct, a materially false target portfolio showing substantially inflated volumes of

prime, seasoned, and higher-rated assets (the "peach-colored spreadsheet" or "PCS"). As Putnam knew, FGIC relied heavily on the materially misleading PCS in deciding to issue the Pyxis Guaranty on the terms it did.

FGIC alleges fraud, negligent misrepresentation, and negligence based on Putnam's misrepresentations and omissions about (1) the PCS and (2) the Pyxis collateral selection process and undisclosed portfolio constraints. Both sets of misrepresentations and omissions caused FGIC substantial harm. If Putnam had provided FGIC with an accurate target portfolio or corrected the misrepresentations in the PCS, then FGIC would have known that prime, seasoned, and higher-rated assets were largely excluded from the portfolio and would have evaluated Pyxis on that basis. But even if Putnam was not responsible for the PCS—as it falsely claims—Putnam still misled FGIC by misrepresenting the Pyxis collateral selection process and collateral criteria. If Putnam had not misrepresented who selected the collateral and the true collateral constraints, and had frankly acknowledged that higher-quality assets were excluded from the portfolio, then, regardless of the PCS, FGIC would have evaluated Pyxis on the basis that such assets were excluded. In either case, FGIC would not have issued the Pyxis Guaranty on the terms it did: FGIC would have attached (if at all) at least 10% higher, and it would have been exposed to losses of at least $150 million less when Pyxis collapsed.

In addition, Putnam committed actionable negligence (1) by failing to ensure the PCS was accurate or at least to correct its errors, (2) by failing to disclose the truth about the Pyxis collateral selection process and the Pyxis collateral criteria, and (3) by taking direction about Pyxis collateral selection from a short investor whose interests were directly contrary to debt investors' and FGIC's, without disclosing that it was doing so. Again, had Putnam exercised the standard of care of a reasonable collateral manager, FGIC would have insisted on a 50% attachment point under the

3

Pyxis Guaranty and would have incurred correspondingly less liability when Pyxis collapsed.

FGIC seeks to recover the entire amount of its $74.5 million commutation payment as the direct and proximate result of Putnam's wrongdoing. FGIC's increased liability resulting from Putnam's misconduct exceeded the amount of FGIC's commutation payment to Calyon ($74.5 million). Because (1) the commutation payment was a fully recoverable mitigation expense of mitigating FGIC's liability under the Pyxis Guaranty, and (2) the collateral source rule bars Putnam from obtaining the benefit of Calyon's forgiveness of FGIC's liability beyond the amount of the commutation payment, the entire commutation payment is recoverable as damages. At a minimum, FGIC will prove that its loss reserves for Pyxis would have been substantially lower had it been exposed to $150 million fewer losses. Thus, FGIC's commutation payment, which was negotiated by FGIC on the basis of its loss reserves, would have been correspondingly lower, and this difference is recoverable as damages. FGIC also seeks punitive damages based on Putnam's wanton and reckless misconduct, which, among other things, helped to materially exacerbate the U.S. subprime crisis, and pre-judgment interest.

## FACTUAL BACKGROUND

The facts to be proved at trial are summarized in FGIC's briefs in support of its motion for partial summary judgment and in opposition to Putnam's motion for summary judgment. ECF No. 118 (Pl. Mem. in Support of its Mot. for Summ. J.) at 4-23. FGIC respectfully refers the Court to those summaries.

All defined terms have the same meaning as in those briefs and in the Court's Order on Summary Judgment (ECF No. 160).

## ARGUMENT

I.   **Putnam Committed Fraud and Negligent Misrepresentation by Causing FGIC to Be Provided with and by Failing to Correct the Materially False PCS**

A.   **Putnam Fraudulently Induced FGIC to Issue the Pyxis Guaranty by Causing FGIC to Be Provided with and Failing to Correct the PCS**

To establish fraud, a plaintiff must demonstrate (1) a material misrepresentation or omission of fact, (2) that the defendant knew was false, (3) that the defendant made with the intent to defraud, (4) on which the plaintiff reasonably relied, and (5) that caused the plaintiff's damages. *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006); ECF No. 160 at 13.  At trial, FGIC will prove each of these elements with respect to Putnam's PCS misrepresentations and omissions.

1.   **Through the PCS, Putnam made both affirmative misrepresentations and omissions of material fact about the content of the Pyxis portfolio**

Putnam made both affirmative material misrepresentations *and* omissions of material fact concerning the content and quality of the Pyxis portfolio by causing FGIC to be provided with and by failing to correct the materially misleading PCS. PX 253.

*Affirmative misrepresentation.*  Under New York law, a defendant need not make a statement directly to the plaintiff to be liable for fraud; instead, the defendant need only to have *intended* the misrepresentation to be conveyed to the plaintiff. *Pasternack v. Lab. Corp. of Am. Holdings*, 27 N.Y.3d 817, 828 (2016) ("[I]ndirect communication can establish a fraud claim, so long as the statement was made with the intent that it be communicated to the plaintiff and that the plaintiff rely on it"; defendant can be liable when "third party act[s] as a conduit to relay the false statement to plaintiff, who then relie[s] on [it] to his detriment."); *Rosen v.*

*Spanierman*, 894 F.2d 28, 33 (2d Cir. 1990) ("A third party can recover damages for a fraudulent misrepresentation if he can establish that… the defendants intended the misrepresentation to be conveyed to him.") (citation omitted); *see also In re ICN/Viratek Sec. Litig.*, No. 87 Civ. 4296, 1996 WL 164732, at *3 (S.D.N.Y. Apr. 9, 1996) ("We have no doubt that a company may so involve itself in the preparation of reports and projections by outsiders as to assume a duty to correct material errors in those projections." (cited in ECF No. 160 at 15)).

After FGIC asked Putnam to provide it with "add[itiona]l details" of the remaining "names" (*i.e.*, assets) that would "likely" be acquired for the Pyxis portfolio, Putnam affirmatively caused FGIC to be supplied with false information about these assets.  PX 248.  Putnam did so by directing FGIC to obtain the PCS from Calyon, whom it knew would supply misleading information. *Id.*; ECF No. 167-30 (Menhenett Tr.) at 223:7-18.  By assuring FGIC that "Calyon knows everything [Putnam] already bought and [Putnam] intend[s] to buy" for Pyxis, PX 248, Putnam implicitly recognized that "the PCS reflects the actions and intentions of *Putnam*, not Calyon," ECF No. 160 at 16 (emphasis in original)—especially since it was the role of Putnam, not Calyon, to select the Pyxis collateral. *Id.*

**Omission of material fact.**  Separately, Putnam's failure to correct the knowingly false information contained in the PCS constituted a culpable omission of material fact.

"A duty to disclose" sufficient to support a claim for fraudulent or negligent misrepresentation "arises … 'where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge[,] or … where a party has made a partial or ambiguous statement, whose full meaning will only be made clear after complete disclosure.'" *First Hill Partners, LLC v. BlueCrest Capital Mgmt.*, 52 F. Supp. 3d 625, 637-38 (S.D.N.Y. 2014) (quoting *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566,

582 (2d Cir. 2005)); *see also Lorely Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, No. 12 Civ. 3723, 2019 WL 4450982, at *13 (S.D.N.Y. Sept. 17, 2019) (same); *Creative Waste Mgmt., Inc. v. Capital Envtl. Servs., Inc.*, 429 F. Supp. 2d 582, 609 (S.D.N.Y. 2006) (same); *U.S. Bank N. A. v. BFPRU I, LLC*, 230 F. Supp. 3d 253, 260-62 (S.D.N.Y. 2017) (same).

When FGIC asked Putnam to provide a list of target assets, Putnam directed it to obtain this information from Calyon.  Putnam knew or must have known the information Calyon provided was materially false.  Among other things, just three days after telling FGIC to obtain the target portfolio from Calyon, Putnam reviewed and approved similarly false target Pyxis portfolios that Calyon had provided to the rating agencies.  PX 280, 281, 283, 293, 295, 347; ECF No. 197-6 (Longstaff Tr.) at 215:7-216:8 (conceding "significant differences" among rating agency portfolios after a "cursory" review).  Given its contemporaneous knowledge and approval of these materially false target portfolios, Putnam must have known the target portfolio sent to FGIC was also materially false and must either have directed or approved Calyon's provision of such misleading information.

At a minimum, Putnam's awareness that the Rating Agency Portfolios were materially false triggered a duty to inquire into the accuracy of the PCS.  Despite this, Putnam neither asked Calyon to show it the portfolio information it had sent to Putnam, nor notified FGIC that the information in the PCS might be incorrect.  ECF No. 167-8 (Bell 8/25/2017 Tr.) at 553:14-534:5.  Under these circumstances, Putnam's failure to inquire into the accuracy of the PCS amounted to willful blindness, which, under New York law, is equivalent to actual knowledge of the PCS's inaccuracy.  *See U.S. Bank, N. A. v. UBS Real Estate Sec. Inc.*, 205 F. Supp. 3d 386, 425 (S.D.N.Y. 2016) (holding that defendant's willful blindness established requisite knowledge); *see also Matter of Scher Law Firm, LLP v. DB Partners I, LLC*, 97 A.D.3d 590, 591-

92 (2d Dep't 2012) (when a party has "sufficient information to impose a duty upon it to make further inquiry … its failure to do so constitute[s] 'willful blindness'").

Putnam knew FGIC had no way to independently assess the accuracy of the information in the PCS, nor any reason to doubt its accuracy, since Putnam had told FGIC to obtain this information from Calyon. ECF No. 167-30 (Menhenett Tr.) at 223:7-18. Putnam also knew FGIC relied on the PCS to evaluate the Pyxis Guaranty, since that was precisely why FGIC had asked Putnam for this information. *Id.* at 226:4-13; PX 242, 243, 247.

Thus, Putnam knew it "possesse[d] superior knowledge, not readily available to [FGIC], and kn[ew] that [FGIC was] acting on the basis of mistaken knowledge"— triggering "a duty to disclose" correct information about the Pyxis portfolio to FGIC. *Aetna Cas. & Sur. Co.*, 404 F.3d at 582. Putnam's failure to confirm the accuracy of or correct the PCS violated this duty of disclosure and constituted a culpable omission of material fact. *Id.*

**Materiality.** The false and misleading information in the PCS was material. A material misstatement or omission is one that a "reasonable investor would have considered significant in making investment decisions." *Muller-Paisner v. TIAA*, 289 F. App'x 461, 462 (2d Cir. 2008). Putnam knew the quality of the collateral to be acquired for Pyxis was of primary importance to FGIC—as it would be to any reasonable insurer—in deciding whether and to what extent to insure Pyxis. PX 234, 237. Again, as Putnam knew, this was precisely why FGIC had asked Putnam for a list of target assets. Confirming this, FGIC specifically asked about the higher-quality collateral to be included in Pyxis on multiple other occasions during its due diligence process. PX 242, 245.

### 2.     Putnam knew the PCS was materially false

Putnam knew the information in the PCS was materially false.  Putnam was responsible for selecting the Pyxis collateral and knew Calyon could not be relied upon to communicate information accurately to investors or FGIC.  Putnam knew Calyon made "painful" errors it "d[id] not understand," was "somewhat slop[p]y and overwhelmed," and that its performance of its duties was "screw[ed]-up," "unacceptable to Putnam," and "highly concerning."  PX 204, 216, 230, 239, 297, 354, 356.  Putnam even drafted a letter to Moody's—which it apparently chose not to send—advising Moody's that Calyon's analysis was flawed.  PX 354.  But despite all this, Putnam never asked Calyon or FGIC to provide it with the PCS to confirm its accuracy.  The only credible explanation is that Putnam already knew what was in the PCS, or at least knew enough to know it was false and turned a blind eye so it could disclaim responsibility.

This inference is inescapable given that, as noted above, just three days after Putnam told FGIC to obtain the target portfolio from Calyon, Putnam reviewed and approved the materially false target portfolios that Calyon sent to the rating agencies.  PX 280, 281, 283.  Given this information, Putnam must have known the target portfolio Calyon provided contemporaneously to FGIC was also materially false.

At a minimum, as noted above, Putnam's awareness that the Rating Agency Portfolios were materially false triggered a duty to inquire into the accuracy of the PCS, and Putnam's failure to verify the PCS's accuracy amounted to willful blindness, equivalent to actual knowledge.

### 3.     Putnam intended to defraud FGIC

At trial, FGIC will demonstrate scienter by proving Putnam had both motive and opportunity to commit fraud. *Shenk v. Karmazin*, 868 F. Supp. 2d 299, 305 (S.D.N.Y. 2012) (citation omitted).  Putnam obviously had the opportunity to defraud

FGIC by misrepresenting the content of the Pyxis portfolio, because Putnam was the party responsible for selecting the Pyxis collateral.  Putnam also had a clear motive to do so.

Putnam was handpicked by Magnetar to be the collateral manager for Pyxis and was fully aware of Magnetar's long/short correlation trading strategy.  ECF 167-13 (Cronin Tr.) at 97:21-98:13, 99:24-100:23; ECF 167-15 (Bell 8/24/2017 Tr.) at 126:21-127:17; PX 33, 377.  Magnetar offered to have Putnam manage up to five additional Constellation CDOs—in fact, Putnam had already been selected to manage another Constellation CDO before Pyxis even closed.  ECF No. 167-8 (Bell 8/25/2017 Tr.) at 544:13-545:21; PX 256.  These CDOs would have garnered huge fees for Putnam, especially because Constellation CDO managers earned fees more than double those of ordinary CDO managers.  ECF No. 181-2 (Henriques Tr.) at 99:18-100:12.  Thus, Putnam was highly motivated to ensure Magnetar was satisfied with its performance as Pyxis collateral manager by ensuring that the Pyxis portfolio furthered Magnetar's long-short correlation trading strategy.

Putnam also knew FGIC was very concerned about the quality of the Pyxis collateral.  FGIC expressly asked about prime, seasoned, and higher-rated assets during the due diligence process and raised concerns about the lack of such collateral in the portfolio.  And Putnam knew the reason FGIC asked for the Pyxis target assets was that it wanted to confirm they would be of higher quality and more diversified than those ramped to date.  Putnam also knew that if FGIC did not agree to insure Pyxis, Pyxis would not close—indeed, Putnam and Calyon specifically discussed "develop[ing] the strategy on dealing with FGIC," as "FGIC is the only party that can prevent this deal from hap[penn]ing on time."  PX 241.

Thus, Putnam was highly motivated to lie to FGIC about the quality of the Pyxis collateral to ensure the deal closed and to secure the financial benefits promised by Magnetar in connection with Pyxis and other Constellation CDOs.

> **4.    FGIC actually and reasonably relied on the PCS in deciding to insure Pyxis**

FGIC relied on the PCS and on Putnam's failure to correct the inaccurate information therein in deciding whether and on what terms to insure Pyxis.  FGIC asked Putnam for the information in the PCS for this purpose, and it relied on the PCS in preparing the Pyxis credit application, on the basis of which its Credit Committee approved the Pyxis Guaranty.  PX 325.  To help prepare the credit application, FGIC requested and obtained from Calyon substantial additional information about the assets in the PCS—specifically the prime RMBS.  PX 284.

FGIC's reliance was reasonable.  To determine whether reliance is reasonable, the court must consider "the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Glidepath Holding B.V. v. Spherion Corp.*, 590 F. Supp. 2d 435, 459 (S.D.N.Y. 2007).  "[T]he [fact-finder] must determine whether [plaintiff] availed itself of the 'means available to it' given its 'size and sophistication.'" *Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, No. 653979/2014, 2016 WL 8254810, at *114 (Sup. Ct., N.Y. Cty. (Dec. 19, 2016) (citation omitted).

FGIC had to rely on Putnam to provide it with truthful information about the collateral.  As collateral manager, Putnam had superior knowledge about the assets it was choosing for the Pyxis portfolio.  The only way FGIC could "avail[] itself of the 'means available to it'" to ascertain the content of the Pyxis portfolio, *Ambac Assurance Corp.*, 2016 WL 8254810, at *114, was to ask Putnam for this information.  FGIC did exactly that, and at Putnam's direction obtained this information from Calyon.

Moreover, as a practical matter, FGIC had to commit to the deal before pricing, which occurred several weeks before closing, *see* PX 339; and Putnam retained

11

discretion to continue adding assets to the Pyxis portfolio even after closing, PX 212, 364.  Thus, FGIC necessarily had to rely on Putnam to provide it with accurate target portfolio information.  Putnam also expressly represented that it viewed FGIC as its client, assuring FGIC it would receive the same level of service as Putnam's other clients.  PX 336; ECF No. 167-8 (Bell 8/25/2017 Tr.) at 555:12-22 (testifying Putnam "wanted to provide a level of service to [FGIC] that would be similar to" its other clients).

For all these reasons, FGIC's reliance on the PCS was reasonable.

### 5.    Putnam's fraud caused FGIC to issue the Pyxis Guaranty on the terms it did and to suffer substantial losses

To prove fraud, FGIC must demonstrate both transaction causation and loss causation.  *Laub v. Faessel*, 297 A.D.2d 28, 31 (1st Dep't 2002).

To prove transaction causation, FGIC must establish that it would not have entered the Pyxis Guaranty on the terms it did absent Putnam's fraud. *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005).  FGIC's attachment point under the Pyxis Guaranty was 40%.  PX 325, 362.  Had Putnam provided FGIC with a truthful target Pyxis portfolio, "FGIC would instead have attached at 50%."  ECF No. 164-17 (Donnelly Decl.) ¶ 10.  FGIC noted multiple times that it preferred a 50% attachment point and, even taking into account the information in the PCS, it was still reluctant to insure more than 50%.  PX 244, 275, 290, 306.  Thus, absent the PCS, FGIC would not have entered the transaction on the terms it did, establishing transaction causation.

To prove loss causation, FGIC must show a "causal link between the alleged misconduct and the economic harm" it "ultimately suffered." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003).  It is sufficient to show facts "that would allow a factfinder to ascribe some rough proportion of the whole loss to the misstatements." *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147,

158 (2d Cir. 2007). Had FGIC issued the Pyxis Guaranty at a 50% attachment point, it would have been exposed to losses of at least $150 million less when Pyxis failed. ECF No. 204-1 (Snow Decl.) ¶ 35. This would have eliminated the *first* $150 million of FGIC's liability after the subordinate Pyxis debt was wiped out, because the liability resulting from FGIC's lower attachment point was the first liability FGIC incurred. *Id.* ¶ 51. In addition, the actual Pyxis portfolio performed materially worse than the PCS portfolio, exposing FGIC to greater losses. *Id.* ¶¶ 44-47.

Had FGIC been exposed to fewer losses under the Pyxis Guaranty, its commutation payment would have been lower: "attaching at a higher point in the capital structure of that deal [] would have resulted in a corresponding reduction of [FGIC's] loss reserves for that deal," which "would have resulted in a corresponding reduction in the amount FGIC would have been willing to pay … to commute the policy." ECF No. 164-7 ¶¶ 9-10. Thus, absent the PCS, FGIC's commutation payment would have been smaller, establishing loss causation. *See* ECF No. 160 at 35 ("if Putnam's alleged misrepresentations caused FGIC to enter into a different commutation agreement than it would have entered into if it knew the truth, loss causation could be established.").

As the Court held in its Summary Judgment Order, "[t]his is true despite the financial crisis." ECF No. 160 at 38 ("Assuming a financial crisis, if FGIC had been told the truth about the Pyxis collateral, and attached at 50% instead of 40%, it would likely have commuted its liability anyway, just for less."). Putnam's misrepresentations therefore "increased the chance of [FGIC's] ultimate losses" regardless of the market crash. *Lorely Financing v. Wells Fargo*, 797 F.3d 160, 186-87 (2d Cir. 2015); *see also* ECF No. 160 at 39 ("FGIC's exposure to increased liability, and its increased 'chance of [] ultimate losses,' was independent of the financial crisis; it existed before it and would have existed without it.").

### B. Putnam Negligently Misrepresented and Omitted to Disclose the True Content of the Pyxis Portfolio by Causing FGIC to Be Provided with and Failing to Correct the PCS, Inducing FGIC to Issue the Pyxis Guaranty

By directing FGIC to obtain the PCS from Calyon and then failing to correct it, Putnam also negligently misrepresented and omitted to disclose the true content, asset diversification, and credit quality of the Pyxis portfolio.

To establish negligent misrepresentation or omission, FGIC must prove that (1) Putnam had a duty as a result of a special relationship to give correct information, (2) Putnam made a false representation or omission that it knew or should have known was incorrect, (3) Putnam knew FGIC desired the information for a serious purpose, (4) FGIC was intended to rely and act upon it, and (5) FGIC reasonably relied on it to its detriment. *BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 949 F. Supp. 2d 486, 508 (S.D.N.Y. 2013) (Sweet, J.) (citing *Hydro Inv'rs, Inc. v. Trafalgar Power, Inc.*, 227 F.3d 8, 20 (2d Cir. 2000)).

With the exception of the "special relationship" requirement, all of the elements of negligent misrepresentation are established by the same evidence as shows Putnam's fraud.  Moreover, negligent misrepresentation does not require proof of scienter; it is sufficient to show Putnam should have known the PCS was false. The evidence that Putnam knew Calyon was unreliable and could not be trusted to communicate information accurately to investors, but that Putnam did nothing to confirm the accuracy of the PCS—even after becoming aware of the materially false target portfolios Calyon had sent to the rating agencies—more than satisfies this requirement.

With respect to the special relationship requirement, as the Second Circuit held in this case, a special relationship exists when (1) the defendant is aware that its work will be used for a particular purpose, (2) there was reliance by a third party known to the defendant in furtherance of that purpose, and (3) there existed some

conduct by the defendant linking it to that known third party evincing the defendant's understanding of the third party's reliance. *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 406 (2d Cir. 2015); *see also Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 59-60 (2d Cir. 2012); *Creative Waste Mgmt.,* 429 F. Supp. 2d at 609.

As explained above, as the collateral manager, Putnam had superior knowledge of the collateral it would include in the portfolio; FGIC asked Putnam for a list of the assets to be acquired for Pyxis and Putnam directed FGIC to obtain this information from Calyon; and Putnam knew FGIC was relying on this information to decide whether and on what terms to issue the Pyxis Guaranty. Putnam also told FGIC that it regarded FGIC as its client, and Putnam's lead manager on Pyxis, Carl Bell, testified that he believed Putnam owed FGIC the same duties as it owed all of its clients.

Under the *Bayerische* test, these facts created a special relationship that triggered Putnam's duty to give FGIC correct portfolio information and to ensure the accuracy of the PCS. Putnam's failure to do so, coupled with the fact that it knew or should have known the PCS was materially false and FGIC's reasonable reliance on the PCS to its detriment, establishes negligent misrepresentation.

## II. Putnam Committed Fraud and Negligent Misrepresentation by Misrepresenting Who Controlled Pyxis Collateral Selection and the Full Set of Pyxis Collateral Constraints, and by Omitting to Disclose that It Excluded Higher-Quality Assets at Magnetar's Direction

In addition to misrepresenting the content of the Pyxis portfolio by causing FGIC to be shown the materially false PCS, Putnam also misrepresented and omitted to disclose the truth about who controlled selection of the Pyxis collateral and the full set of collateral constraints applied to such selection.

15

Putnam affirmatively represented that (1) it would select the Pyxis collateral independently based on its own judgment from the full universe of eligible assets, and (2) the only constraints on eligible assets were those set forth in the Pyxis offering materials. These representations were made in direct communications between Putnam and FGIC and in numerous offering materials provided to FGIC before its credit committee approved the Pyxis Guaranty on September 6, 2006, including the Pyxis Pitchbook, draft term sheets, and the draft Offering Memorandum and Indenture sent to FGIC on August 29, 2006. *See*, *e.g.*, PX 314 (Aug. 29, 2006 draft Offering Memorandum) ("the performance of [Pyxis] depends heavily on the skills of [Putnam] in analyzing, selecting and managing" the portfolio; Putnam will "manage the selection, acquisition and disposition" of the Pyxis Portfolio based on its own "research, credit analysis and judgment" and "the restrictions set forth in the Indenture"); *id.* (August 29, 2006 Indenture) (detailing portfolio constraints); ECF No. 167-30 (Menhenett Tr.) at 144:14-20 ("[W]e also talked about, we did see in the warehouse portfolio a prime bucket, so we did generally talk about, then what's your intentions? And the communication was generally … *they intended to use it to balance out the deal*.") (emphasis added), 221:3-6 ("He wanted the bucket, and he felt … there was names to choose from to make use of the bucket to make a more balanced pool.").

Each of these representations were false. Far from selecting the collateral independently, at Magnetar's direction Putnam imposed additional *undisclosed* collateral constraints designed to further Magnetar's long-short correlation trading scheme, directly contrary to the interests of other investors and FGIC. ECF No. 167-15 (Bell 8/24/2017 Tr.) at 126:21-127:17; ECF No. 181-2 (Henriques Tr.) at 81:4-22; PX 33, 97, 158, 165. To ensure the portfolio was as highly correlated as possible with the unseasoned, subprime, lower-rated assets Magnetar was shorting, Putnam largely excluded prime and seasoned RMBS and higher-rated assets from the

portfolio. *See, e.g.*, ECF No. 167-8 (Bell 8/25/2017 Tr.) at 508:7-509:7; PX 169. Putnam affirmatively concealed Magnetar's influence over collateral selection and the true collateral constraints because it knew if it disclosed that higher-quality assets were being excluded at the direction of a short investor, FGIC would not have issued the Pyxis Guaranty on the terms it did and Pyxis would not have closed, denying Putnam the profits it stood to make from Pyxis and from the other CDOs Magnetar had promised it.

Putnam knew its representations about the collateral selection process and the true collateral constraints were false, because Putnam knew what collateral constraints had been disclosed and knew it was also excluding higher-quality eligible assets at Magnetar's direction.   Putnam also knew that FGIC—and all debt investors—relied heavily on its independent judgment in selecting eligible assets subject only to the disclosed portfolio criteria; that was why it repeatedly reassured investors to this effect in the offering materials.   And FGIC's reliance on these representations in issuing the Pyxis Guaranty was obviously reasonable, since Putnam held itself out as a collateral manager acting in the interests of all investors and regarded FGIC as its client. *Supra* § I.A.

Putnam's misrepresentations and omissions concerning the collateral selection process and the true collateral constraints caused FGIC harm independently of Putnam's PCS misrepresentations and omissions.   Even if (counter-factually) Putnam were not responsible for the PCS, Putnam's collateral selection misrepresentations would still provide an independent basis for finding Putnam liable.  If Putnam had disclosed that higher-quality assets were being excluded from the Pyxis portfolio at the direction of a short investor, FGIC would have known the PCS was false and would have evaluated the Pyxis Guaranty on the basis that the portfolio excluded higher-quality assets.   Thus, if Putnam had not made its misrepresentations and omissions about the collateral selection process and the

17

collateral criteria, FGIC would either not have insured Pyxis at all or would have insisted on a 50% attachment point.

## III.  Putnam Is Liable in Negligence for Its Misconduct with Respect to Pyxis

When a professional "[holds] itself out to be a reliable professional, capable of performing the job in a careful, professional manner," it becomes "obliged to use reasonable care." *Anunziatta v. Orkin Exterminating Co., Inc.*, 180 F. Supp. 2d 353, 358 (N.D.N.Y. 2001).   New York courts specifically recognize that investment managers owe a duty to their clients.  *CMMF, LLC v. J.P. Morgan Inv. Mgmt., Inc.*, No. 601924/09, 2009 WL 6408599, at *5 (Dec. 10, 2009); *In re Tribune Co. Fraudulent Conveyance Litig.*, No. 12-cv-6055, 2019 WL 294807, at *14 (S.D.N.Y. Jan. 23, 2019) ("[A] legal duty independent of contractual obligations may be imposed by law as an incident to the parties' relationship and ... several types of defendants—including professionals—can be held liable in tort for failure to exercise reasonable care, irrespective of their contractual duties." (citation omitted)); *Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 351 F. Supp. 2d 79, 99 n.21 (S.D.N.Y. 2004) ("[There] is no reason why financial advisers, unlike lawyers, doctors, and accountants, should be exempt from liability for negligent performance of their professional duties."); *Landon v. Kroll Lab. Specialists, Inc.*, 91 A.D.3d 79, 84 (2d Dep't 2011) (holding that a party may be liable in negligence where it "undertook to perform" a service and was "negligent in the performance of th[at] undertaking").

When an action sounds in professional negligence, the defendant breaches its duty if it deviates from the standard of skill or care used by similar professionals. *Abrams v. Bute*, 138 A.D.3d 179, 184 (2d Dep't 2016).  "[E]vidence of the customary practices of other [professionals]. . . is admissible to establish that standard, and plaintiff is entitled to show that [the defendant's actions or omissions were] . . . a

deviation from such standard and accepted practices." *AJ Contr. Co., Inc. v. Trident Managers, Inc.*, 234 A.D.2d 195, 196 (1st Dep't 1996); *see also MF Glob. Holdings, Ltd. v. PricewaterhouseCoopers LLP*, 199 F. Supp. 3d 818, 830 (S.D.N.Y. 2016) ("The standard of care required of a professional demands that he or she exercise the skill and knowledge normally possessed by members of his or her trade or profession in good standing in similar communities.").

Putnam deviated from the standard of care expected of collateral managers. Putnam was responsible for selecting and managing the Pyxis collateral and knew that FGIC, like all Pyxis investors, was relying on it to provide accurate information about the Pyxis collateral. Putnam also knew that Calyon could not be relied on to communicate accurately with investors. Yet, when FGIC—Putnam's client—asked Putnam for a list of the assets to be acquired for Pyxis, Putnam referred FGIC to Calyon and then concededly failed to follow up to ensure Calyon had provided accurate information, even though it knew Calyon had sent materially inaccurate target portfolios to the rating agencies.

Putnam also knew that FGIC, like all Pyxis investors, was relying on Putnam's expertise in selecting the Pyxis collateral from the universe of eligible assets, but that the criteria for determining eligible assets disclosed in the Pyxis offering materials were incomplete and misleading. Yet Putnam never disclosed these facts.

Putnam also knew that FGIC, like all Pyxis investors, was relying on Putnam to perform its duties independently in good faith in the interests of all investors, which was critical because the interests of debt and equity investors frequently conflicted. ECF No. 167-3 (O'Driscoll Rpt.) at ¶¶ 15-16. Yet, as one of the equity investors put it, Putnam treated Pyxis as "a highly structured separate account mandate for the equity investor," PX 47, and secretly excluded higher-quality, more diversified assets from the Pyxis portfolio at the direction of a short investor whose interests were directly contrary to FGIC's. Putnam knew or should have known that

19

FGIC would have balked at insuring Pyxis—at least on the terms it did—had it known these facts, but Putnam said nothing.

Under these circumstances, Putnam failed to meet the duty of care applicable to a CDO collateral manager.  Had Putnam not breached its duty of care, FGIC would not have issued the Pyxis Guaranty, at least on the terms it did, and would not have suffered the harm it did when Pyxis collapsed.  At a minimum, FGIC would have insisted on an attachment point of 50% and would have incurred at least $150 million less liability when Pyxis collapsed.  ECF No. 164-17 ¶ 10.

## IV.   FGIC Is Entitled to Recover Its Commutation Payment as Damages, Plus Pre-Judgment Interest and Punitive Damages

FGIC seeks to recover as damages the full amount of the $74.5 million commutation payment it made to Calyon to eliminate its liability under the Pyxis Guaranty.

Putnam's misconduct caused FGIC to incur liability greater than the amount of its commutation payment.  Because Putnam is required to pay FGIC's reasonable mitigation expenses (including the commutation payment), and, separately, because Putnam is not entitled to the benefit of Calyon's forgiveness of FGIC's liability above the amount of the commutation payment, FGIC may recover the entire commutation payment as damages.  See ECF No. 216 (Snow *Daubert* Opp.) at 8-18.

At a minimum, FGIC will prove that its loss reserves for Pyxis would have been substantially lower had it been exposed to losses of $150 million less.  Thus, FGIC's commutation payment, which was based on its loss reserves, would have been correspondingly lower.  This difference is recoverable as damages.

As explained above, FGIC entered into the Pyxis Guaranty at a 40% attachment point based on Putnam's misrepresentations, omissions, and negligent misconduct.  Absent Putnam's wrongdoing, FGIC would only have entered into the

Pyxis Guaranty (if at all) at a 50% attachment point.  ECF No. 164-17 ¶ 10.  Attaching at 50% would have reduced FGIC's total liability by $150 million when Pyxis failed. ECF No. 164-17 ¶¶ 7, 10; ECF No. 164-10 (Snow Rpt.) ¶ 51-52.  This would have eliminated the first $150 million of liability incurred by FGIC after the subordinate Pyxis debt was wiped out, because the liability resulting from FGIC's lower attachment point constituted the first losses to which FGIC was exposed. ECF No. 164-10 ¶ 51.  Because FGIC's total liability would have been lower, FGIC's loss reserves for Pyxis would have been lower. ECF No. 164-17 ¶¶ 9-10.  Any decrease in FGIC's loss reserves "would have resulted in a corresponding reduction in the amount FGIC would have been willing to pay … to commute the policy" because FGIC negotiates its commutation payment for each deal as a discount from.  ECF No. 164-17 ¶¶ 9-10.

At trial, FGIC will prove how much lower both its loss reserves and its commutation payment would have been had it attached at 50% rather than 40%. FGIC will first establish what its loss reserves were at the time of the commutation payment based on a 40% attachment point.  FGIC will next establish what its loss reserves would have been at a 50% attachment point.  Finally, FGIC will establish what its commutation payment would have been based on its loss reserves at a 50% attachment point.

Derek Donnelly will testify that FGIC used a model to help determine its loss reserves for each CDO.  This model accounted for FGIC's overall exposure on a deal and calculated gross projected losses and the net present value of those projected losses at a given time.  FGIC then adjusted the net present value based on expected premium payments for Pyxis and across all of its deals with Calyon to reflect the fact that all Calyon CDS contracts were governed by a single ISDA master agreement, and failure to pay a premium under any deal would lead to cross-defaults.  Finally, FGIC added its expected loss adjustment expense to calculate the final adjusted loss

reserve total.  Applying this methodology to the terms of the actual Pyxis Guaranty, *i.e.*, with a 40% attachment point, FGIC's loss reserve total as of July 2009 was $152,747,325.  Applying the same methodology based on a 50% attachment point—reducing FGIC's overall exposure on the deal by $150 million—yields a loss reserve figure of $78,330,171.

FGIC agreed to commute its liability under the Pyxis Guaranty for $74,461,394 million.  This commutation payment was approximately 48.7% of FGIC's loss reserves for Pyxis at the time.  Applying the same proportion to FGIC's loss reserves at a 50% attachment point would generate a commutation payment of $38,184,457.  That is $36,276,937 lower than FGIC actually paid to commute its Pyxis liability.  Thus, at a minimum, FGIC is entitled to recover $36,276,937 as damages, plus pre-judgment interest.

Finally, FGIC seeks punitive damages based on Putnam's wrongdoing, which was not only wanton and reckless, or at a minimum grossly negligent, but also—as FGIC's expert Fiachra O'Driscoll opines—played a significant role in exacerbating the U.S. subprime crisis and the resulting global financial crisis.  ECF No. 167-3 (O'Driscoll Report) at 1, 88-103; *see In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 127 (2d Cir. 2013) ("[p]unitive damages, in contrast to compensatory damages, are awarded to punish a defendant for wanton and reckless or malicious acts and to protect society against similar acts"; "[s]uch conduct 'need not be intentionally harmful but may consist of actions which constitute willful or wanton negligence or recklessness.'"); *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1288 (2d Cir. 1990) (same).

## <u>CONCLUSION</u>

For the reasons set forth above, FGIC should prevail on each of its claims at trial and should be awarded compensatory damages, punitive damages, and pre-judgment interest.

Dated:  February 3, 2020

Respectfully submitted,

Sean Baldwin
Joy Odom
Amy Nemetz
Margaret Larkin
William Rathgeber
SELENDY & GAY, PLLC
1290 Avenue of the Americas
New York, NY  10104
Tel: 212-390-9000
sbaldwin@selendygay.com

*Attorney for Plaintiff*
*Financial Guaranty Insurance*
*Company*