UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FINANCIAL GUARANTY INSURANCE
COMPANY,

                Plaintiff,

     -against-

THE PUTNAM ADVISORY COMPANY, LLC,

                Defendant.

No. 12 Civ. 7372 (AT) (KNF)

**ECF Case**
**Electronically Filed**

## DEFENDANT THE PUTNAM ADVISORY COMPANY, LLC'S
## PRETRIAL MEMORANDUM OF LAW

MILBANK LLP
Thomas A. Arena (tarena@milbank.com)
Sean M. Murphy (smurphy@milbank.com)
Katherine Goldstein (kgoldstein@milbank.com)
Kingdar Prussien (kprussien@milbank.com)
Samantha A. Lovin (slovin@milbank.com)
Allison S. Markowitz (amarkowitz@milbank.com)
55 Hudson Yards
New York, New York 10001
Telephone: (212) 530-5000

*Attorneys for Defendant*
*The Putnam Advisory Company, LLC*

February 3, 2020

## Table of Contents

PRELIMINARY STATEMENT ............................................................................. 1

ARGUMENT ...................................................................................................... 3

I.      FGIC CANNOT PREVAIL ON ITS COMMON LAW FRAUD CLAIM ............ 3

     A.    The August Target Portfolio Is Not A Material Misrepresentation Made By Putnam ................................................................................................ 5

           1.    Putnam Did Not "Make" The August Target Portfolio ................. 5

           2.    The August Target Portfolio Was Not Material To FGIC's Decision To Insure Pyxis ................................................................ 7

     B.    Putnam Did Not Know That The Representations In The August Target Portfolio Were False ................................................................................. 9

           1.    FGIC Cannot Use Willful Blindness To Establish Knowledge Of Falsity Of A Forward-Looking Statement ...................................... 9

           2.    Putnam Was Not Willfully Blind To The August Target Portfolio ................................................................................................ 10

     C.    Putnam Did Not Possess An Intent To Deceive FGIC Because Putnam Did Not Know About The August Target Portfolio, And Even If It Did, It Had No   Intent to Defraud FGIC ................................................................ 12

     D.    FGIC Did Not Reasonably Rely On The August Target Portfolio In Deciding To Insure Pyxis ............................................................................ 14

           1.    FGIC Did Not Actually Rely On The August Target Portfolio In Deciding Whether To Insure Pyxis ................................................ 14

           2.    FGIC Did Not Justifiably Rely On The August Target Portfolio Because FGIC Was A Sophisticated Entity And Received Subsequent Corrective Disclosures From Putnam ........................ 18

     E.    FGIC's Losses Were Not Caused By The Representations In The August Target Portfolio .......................................................................................... 22

           1.    FGIC Cannot Prove That But For The August Target Portfolio, It Would Not Have Insured Pyxis .................................................... 22

           2.    FGIC Cannot Prove That Its Losses Were Caused By The August Target Portfolio .......................................................................... 22

II.     FGIC CANNOT PREVAIL ON ITS NEGLIGENT MISREPRESENTATION CLAIM...................................................................................................... 26

    A.     There Was No Special Relationship Between Putnam And FGIC .......... 27

    B.     The August Target Portfolio Was Not Made By Putnam And Was Not A False Representation That Putnam Should Have Known Was Incorrect . 29

        1.     Putnam Did Not "Make" The Representation At Issue ............... 29

        2.     Putnam Had No Reason To Know That The August Target Portfolio Was Incorrect................................................................. 29

    C.     FGIC Cannot Prove That Putnam Knew FGIC Desired The August Target Portfolio For A Serious Purpose ................................................................. 30

    D.     FGIC Did Not Actually Intend To Rely On The August Target Portfolio In Deciding Whether To Insure Pyxis ........................................................... 30

    E.     FGIC Did Not Reasonably Rely On The August Target Portfolio To Its Detriment In Deciding To Insure Pyxis ................................................... 31

        1.     FGIC Did Not Reasonably Rely On The August Target Portfolio In Deciding Whether To Insure Pyxis................................................. 31

        2.     FGIC's Losses Were Not Caused By The Representations In The August Target Portfolio ............................................................... 31

III.    FGIC CANNOT PREVAIL ON ITS NEGLIGENCE CLAIM ............................ 32

    A.     There Was No Special Relationship Between Putnam And FGIC, And Putnam Had No Duty To Provide FGIC With Correct Information......... 32

    B.     Even If Putnam Owed A Duty To FGIC, Putnam Did Not Breach That Duty....................................................................................................... 33

    C.     Even If Putnam Breached Its Duty, FGIC Cannot Prove That Its Losses Were Substantially Caused By That Breach Rather Than The Financial Crisis ..................................................................................................... 34

IV.     FGIC IS ENTITLED TO RECOVER ONLY ITS ACTUAL PECUNIARY LOSS ................................................................................................................. 35

V.      FGIC WAS UNDER A DUTY TO MITIGATE ITS DAMAGES ..................... 37

CONCLUSION.................................................................................................................. 37

## TABLE OF AUTHORITIES

**Cases**                                                       **Page(s)**

*Aboeid v. Saudi Arabian Airlines, Inc.*,
2011 WL 2470091 (E.D.N.Y. June 17, 2011) ...........................................................................14

*AG Capital Funding Partners, L.P. v. State St. Bank & Tr. Co.*,
842 N.E.2d 471 (N.Y. 2005) ...................................................................................................33

*AHW Inc. P'Ship v. Citigroup Inc.*,
980 F. Supp. 2d 510 (S.D.N.Y. 2013) .....................................................................................36

*Amusement Indus., Inc. v. Stern*,
786 F. Supp. 2d 758 (S.D.N.Y. 2011) .....................................................................................31

*In re Austl. & N.Z. Banking Grp. Ltd. Sec. Litig.*,
2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009) ...........................................................................7

*B.N.E. Swedbank, S.A. v. Banker*,
1993 WL 152392 (S.D.N.Y. Mar. 8, 1993) .............................................................................35

*Banco Indus. de Venezuela, C.A. v. CDW Direct, L.L.C.*,
888 F. Supp. 2d 508 (S.D.N.Y. 2012) .....................................................................................32

*Banque Arabe et Internationale D'Investissement v. Maryland Nat. Bank*,
57 F.3d 146 (2d Cir. 1995) ......................................................................................................14

*Basis PAC-Rim Opportunity Fund (Master) v. TCW Asset Mgmt. Co.*,
48 N.Y.S.3d 654 (App. Div. 2017) .........................................................................................23

*Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*,
692 F.3d 42 (2d Cir. 2012) ......................................................................................................27

*Brown v. New Commodore Cruise Line Ltd.*,
2000 WL 45443 (S.D.N.Y. Jan. 19, 2000) .............................................................................32

*Cacchillo v. Insmed, Inc.*,
551 Fed. App'x 592 (2d Cir. 2014)...........................................................................26, 29, 30, 31

*Cameron Int'l Corp. v. Precision Castparts Corp.*,
2010 WL 148142 (S.D. Tex. Jan. 13, 2010) ...........................................................................35

*CBS Inc. v. Ziff–Davis Pub. Co.*,
75 N.Y.2d 496 (1990) ..............................................................................................................14

*Channel Master Corp. v. Aluminum Ltd. Sales, Inc.*,
151 N.E.2d 833 (N.Y. 1958)......................................................................................................3

*City of New York v. Fedex Ground Package Sys., Inc.*,
    314 F.R.D. 348 (S.D.N.Y. 2016) ..................................................................36

*Cohen v. Koenig*,
    25 F.3d 1168 (2d Cir. 1994)...................................................................4, 9

*Connaughton v. Chipotle Mexican Grill, Inc.*,
    75 N.E.3d 1159 (N.Y. 2017)...................................................................34

*Crigger v. Fahnestock & Co.*,
    443 F.3d 230 (2d Cir. 2006)............................................................3, 12, 21

*De Sole v. Knoedler Gallery, LLC*,
    139 F. Supp. 3d 618 (S.D.N.Y. 2015)........................................................18

*DoubleLine Capital LP v. Odebrecht Fin., Ltd.*,
    323 F. Supp. 3d 393 (S.D.N.Y. 2018)........................................................31

*Elghanian v. Harvey*,
    671 N.Y.S.2d 206 (App. Div. 1998)..........................................................28

*Elkind v. Liggett & Myers, Inc.*,
    635 F.2d 156 (2d Cir. 1980).....................................................................5

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
    343 F.3d 189 (2d Cir. 2003)...................................................................18

*Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*,
    375 F.3d 168 (2d Cir. 2004)...................................................................29

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
    783 F.3d 395 (2d Cir. 2015)............................................................1, 21, 22

*Glob.-Tech Appliances, Inc. v. SEB S.A.*,
    563 U.S. 754 (2011)...........................................................................10

*Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*,
    58 F. Supp. 2d 228 (S.D.N.Y. 1999).........................................................18

*Gregor v. Rossi*,
    992 N.Y.S.2d 17 (App. Div. 2014)...........................................................28

*High Point Design, L.L.C. v. LM Ins. Corp.*,
    2016 U.S. Dist. LEXIS 12690 (S.D.N.Y. Feb. 3, 2016).......................................35

*HSH Nordbank AG v. UBS AG*,
    95 A.D.3d 185 (N.Y. App. Div. 2012) .......................................................28

*In re IAC/InterActiveCorp Sec. Litig.,*
    478 F. Supp. 2d 574 (S.D.N.Y. 2007)................................................................4

*KNK Enters., Inc. v. Harriman Enters., Inc.,*
    33 A.D.3d 872 (N.Y. App. Div. 2006) ............................................................19

*Kortright Capital Partners LP v. Investcorp Inv. Advisors Ltd.,*
    392 F. Supp. 3d 382 (S.D.N.Y. 2019)........................................................26, 30

*Lama Holding Co. v. Smith Barney Inc.,*
    88 N.Y.2d 413 (1996) ......................................................................................34

*Landesbank Baden-Wurttemberg v. Goldman Sachs & Co.,*
    821 F. Supp. 2d 616 (S.D.N.Y. 2011)............................................................28

*Lentell v. Merrill Lynch & Co.,*
    396 F.3d 161 (2d Cir. 2005)............................................................................23

*Lerner v. Fleet Bank, N.A.,*
    459 F.3d 273 (2d Cir. 2006)...........................................................................3, 9

*LLC v. John Hancock Life Ins. Co.,*
    37 Misc. 3d 1204(A), 2012 NY Slip Op 51880(U) (Sup. Ct. 2012)...............12

*Lombard v. Booz-Allen & Hamilton, Inc.,*
    280 F.3d 209 (2d Cir. 2002).......................................................................32, 34

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.,*
    87 A.D.3d 287 (N.Y. App. Div. 2011) ...........................................................26

*In re Merrill Lynch Auction Rate Sec. Litig.,*
    2011 WL 536437 (S.D.N.Y. Feb. 9, 2011).....................................................26

*Muller-Paisner v. TIAA,*
    289 F. App'x 461 (2d Cir. 2008) ......................................................................7

*Murray v. Xerox Corp.,*
    811 F.2d 118 (2d Cir. 1987).............................................................................4

*In re N. Telecom Ltd. Sec. Litig.,*
    42 F. Supp. 2d 234 (S.D.N.Y. 1998)................................................................5

*New Jersey Carpenters Health Fund v. Residential Capital, LLC,*
    2010 WL 1257528 (S.D.N.Y. Mar. 31, 2010) ...........................................4, 26, 29

*Orlando v. Kukielka,*
    836 N.Y.S.2d 252 (App. Div. 2007) ...............................................................30

*Prickett v. New York Life Ins. Co.*,
   896 F. Supp. 2d 236 (S.D.N.Y. 2012)....................................................................12

*Prime Mover Capital Partners L.P. v. Elixir Gaming Techs., Inc.*,
   898 F. Supp. 2d 673 (S.D.N.Y. 2012).................................................................5, 9

*Ritani, L.L.C. v. Aghjayan*,
   970 F. Supp. 2d 232 (S.D.N.Y. 2013)..................................................................35

*RKA Film Fin., LLC v. Kavanaugh*,
   100 N.Y.S.3d 611 (Sup. Ct. 2018).......................................................................28

*S.E.C. v. Wellshire Securities, Inc.*,
   773 F. Supp. 569 (S.D.N.Y. 1991) .......................................................................5

*Estate of Sampson v. Georgeson Shareholder, Inc.*,
   412 F.3d 103 (2d Cir. 2005)................................................................................20

*Slayton v. Am. Exp. Co.*,
   604 F.3d 758 (2d Cir. 2010)..................................................................................9

*Solin v. Domino*,
   501 F. App'x 19 (2d Cir. 2012) ...........................................................................34

*Spithogianis v. Haj-Darwishm*,
   2008 WL 82188 (S.D.N.Y. Jan. 7, 2008) ...........................................................36

*Stagl v. Delta Airlines, Inc.*,
   52 F.3d 463 (2d Cir. 1995)..................................................................................34

*Stutman v. Chem. Bank*,
   95 N.Y.2d 24 (2000) ...........................................................................................18

*Taylor Precision Prod., Inc. v. Larimer Grp., Inc.*,
   2018 WL 4278286 (S.D.N.Y. Mar. 26, 2018) ......................................................7

*Tiffany (NJ) Inc. v. eBay, Inc.*,
   576 F. Supp. 2d 463 (S.D.N.Y. 2008).................................................................11

*Tyman v. Pfizer, Inc.*,
   2017 WL 6988936 (S.D.N.Y. Dec. 27, 2017) .....................................................27

*Urstadt Biddle Properties, Inc. v. Excelsior Realty Corp.*,
   885 N.Y.S.2d 510 (App. Div. 2009) .....................................................................3

*Wild v. Catholic Health Sys.*,
   21 N.Y.3d 951 (2013) .........................................................................................34

*Woori Bank v. Citigroup Inc.*,
    2013 WL 1235648 (S.D.N.Y. Mar. 27, 2013) .......................................................................29

**Statutes**

15 U.S.C. § 78bb(a)(1) .................................................................................................................5

Defendant The Putnam Advisory Company, LLC ("Putnam") respectfully submits this pretrial memorandum of law pursuant to Paragraph V(C)(ii) of the Court's Individual Practices.

## PRELIMINARY STATEMENT

The only claims at issue in this trial concern alleged misstatements about proposed targeted assets for Pyxis ABS CDO 2006-1 ("Pyxis"), as represented in an August 8, 2006 target portfolio (the "August Target Portfolio"). The August Target Portfolio allegedly included targeted assets reflecting that approximately 10% of the portfolio would consist of "prime" Residential Mortgage Backed Securities ("RMBS") and 4.8% would consist of RMBS from the first half of 2005 ("2005H1 RMBS"). It is upon this sole document that Plaintiff Financial Guaranty Insurance Company ("FGIC") must attempt to prove its remaining claims for common law fraud, negligent misrepresentation, and negligence. As will be shown at trial, FGIC is unable to prove any of these claims.

*First*, FGIC cannot prove common law fraud by clear and convincing evidence, the standard of proof applicable to its fraud claim. The August Target Portfolio was a forward-looking statement subject to change. In any event, Putnam was not the "maker" of the document. The portfolio was created by Calyon Corporate and Investment Bank ("Calyon"), *not* Putnam. Putnam neither saw the August Target Portfolio or knew it existed. Moreover, any alleged misrepresentations in the August Target Portfolio were immaterial: the differences between the asset composition of the August Target Portfolio and the actual portfolio were *de minimis*, and based on other target portfolios and communications with Putnam, FGIC knew Pyxis would contain extremely low levels of prime RMBS and 2005H1 assets. FGIC likewise did not reasonably rely on the August Target Portfolio in deciding to insure Pyxis (the "Pyxis Guaranty"). FGIC, a sophisticated entity that performed its own extensive analyses before and

after deciding to insure Pyxis, relied on the assets in a portfolio from July 2006 (the "July Portfolio") when it agreed to the transaction.  FGIC also received an updated target portfolio in September 2006 (the "September Target Portfolio") showing only 2% prime RMBS, rather than the August Target Portfolio's alleged 10% prime RMBS.  Additionally, Putnam had no intent to defraud FGIC—under the deal documents, Putnam was not entitled to receive any collateral management fees on defaulting RMBS assets, and its fees were actually lower than collateral management fees on many other CDOs.  Finally, FGIC cannot prove that its losses were caused by any alleged misrepresentations in the August Target Portfolio.  FGIC's losses were caused by the financial crisis, which caused many of the CDOs insured by FGIC in 2006 and 2007 to suffer significant losses.

*Second*, FGIC cannot prove its negligent misrepresentation claim by a preponderance of the evidence.  In addition to the reasons set forth above regarding common law fraud, FGIC's negligent misrepresentation claim likewise fails because a special relationship did not exist between FGIC and Putnam.  Nor can FGIC prove that Putnam should have known that the August Target Portfolio—a document Putnam did not create and never saw— was incorrect.  FGIC did not have a contractual relationship with Putnam, and the Pyxis documents expressly disclaimed that Putnam owed any fiduciary duty to FGIC.

*Third*, FGIC cannot prove its negligence claim by a preponderance of the evidence.  Again, there was no special relationship between the parties, obviating any potential duty Putnam could have owed to FGIC.  Even if Putnam did owe FGIC a duty, Putnam did not breach it:  Putnam ensured that FGIC regularly received and had access to documents and data concerning Pyxis both before and after FGIC agreed to participate in the transaction.  Included among these documents were reports on the website that Putnam maintained for Pyxis and

monthly Pyxis trustee reports; these reports showed all 186 assets in the final Pyxis portfolio, plus the amounts of prime RMBS, 2005H1 assets, and assets rated above Ba2 in the deal. Despite this information and the fact that FGIC could have asked Putnam to acquire different assets for Pyxis after closing, FGIC never did so. To the contrary, FGIC twice confirmed in writing that Pyxis was "performing as expected."

## ARGUMENT

## I.    FGIC CANNOT PREVAIL ON ITS COMMON LAW FRAUD CLAIM

For FGIC to prevail on its fraud claim, it must prove by clear and convincing evidence that: (1) Putnam made a material misrepresentation; (2) Putnam knew of the misrepresentation's falsity at the time of the representation; (3) Putnam possessed an intent to defraud; (4) FGIC reasonably relied on the misrepresentation; and (5) FGIC's damages were caused by the misrepresentation. *See Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006); *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 291 (2d Cir. 2006).[1]

As a preliminary matter, FGIC's claim for common law fraud based on the August Target Portfolio is fundamentally flawed. Under New York law, the general rule is that a fraud claim is actionable only if it is based on a misrepresentation of "existing fact" rather than on a projection of future events. *Channel Master Corp. v. Aluminum Ltd. Sales, Inc.*, 151 N.E.2d 833, 835 (N.Y. 1958); *Urstadt Biddle Properties, Inc. v. Excelsior Realty Corp.*, 885 N.Y.S.2d 510, 512 (App. Div. 2009).

A fraud claim cannot be premised on a forward-looking statement, unless the forward-looking statement was "relatively concrete" and the plaintiff proves that the defendant did not

---

[1]    Unless otherwise specified, all internal quotation marks and citations are omitted herein.

have a good faith belief in the forward-looking statement at the time it was made. *See New Jersey Carpenters Health Fund v. Residential Capital, LLC*, 2010 WL 1257528, at *6 (S.D.N.Y. Mar. 31, 2010) (holding that representations that "predict future value and reliability" are "not actionable unless it is alleged that the opinions were not truly held"); *see also Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994) ("[A] relatively concrete representation as to a company's future performance, if made at a time when the speaker knows that the represented level of performance cannot be achieved, may ground a claim of fraud."); *Murray v. Xerox Corp.*, 811 F.2d 118, 121 (2d Cir. 1987) ("Under New York law, a failure to perform promises of future acts is not fraud unless there exists an intent not to comply with the promise at the time it is made.").

The August Target Portfolio is a forward-looking statement. The August Target Portfolio purported to list a number of "target" assets in peach-colored shading, which were potential assets for the remainder of the yet-to-be ramped Pyxis portfolio. (ECF No. 166 ¶ 25.) Calyon stressed to FGIC that the August Target Portfolio was subject to change. (*Id.* ¶ 24.) In fact, Calyon's cover email to FGIC noted that "the assets highlighted in a peach colour [sic] are the target assets we anticipate in the portfolio, they are not yet traded as indicated in the file." (*Id.*) There is no evidence that when Calyon prepared the August Target Portfolio, the target assets could not have been purchased, and there is no evidence that Putnam had no intention of purchasing these targeted assets in the future. To the contrary, the evidence shows something very different: Putnam had no knowledge of the August Target Portfolio or its contents.

Moreover, where future projections are accompanied by cautionary language, such language renders the representation inactionable. *See In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 586-87 (S.D.N.Y. 2007) (holding that projections couched in cautionary

language were "inactionable" under Section 10(b) and Rule 10b-5).[2] Here, Calyon expressly

cautioned FGIC that the lead Calyon banker on Pyxis had not reviewed the August Target

Portfolio and that the assets were subject to change. (*See* ECF No. 173-18.) Additionally, the

first page of the August Target Portfolio had a disclaimer stating that the information set forth

therein was not a representation as to future performance. (*Id.*)

### A.   The August Target Portfolio Is Not A Material Misrepresentation Made By Putnam

#### 1.   Putnam Did Not "Make" The August Target Portfolio

Calyon created the August Target Portfolio and sent it to FGIC. Under the law, for

Putnam to be liable for the Calyon-created August Target Portfolio, Putnam must have

"involved" or "entangled" itself in the preparation of the August Target Portfolio as to cause the

document to be fairly attributed to Putnam. *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 163

(2d Cir. 1980), *superseded by statute on other grounds*, 15 U.S.C. § 78bb(a)(1)). A party

becomes "involved" or "entangled" in a third party's statement if it reviews the statement and

represents that it "is true or at least in accordance with the [party's] views." *Id.*; *see also S.E.C.

v. Wellshire Securities, Inc.*, 773 F. Supp. 569, 573 (S.D.N.Y. 1991) (holding that the

involvement of the defendants did not approach the cooperation necessary to indicate

"entanglement" where, although there was evidence that the defendants reviewed a first draft, no

evidence was presented regarding any meetings between the defendants and a broker in

preparing drafts or final market letters that were published); *In re N. Telecom Ltd. Sec. Litig.*, 42

F. Supp. 2d 234, 249 (S.D.N.Y. 1998) (holding that the mere allegation, without more, that the

---

[2] "The elements of common law fraud are substantially identical to the elements of a Section 10(b) claim." *Prime Mover Capital Partners L.P. v. Elixir Gaming Techs., Inc.*, 898 F. Supp. 2d 673, 696 (S.D.N.Y. 2012).

challenged statement was based on information provided by defendants "does not suggest the kind of control or cooperation in the issuance of the report necessary to render defendants liable for its content").

Here, the evidence is unequivocal that Calyon alone prepared the August Target Portfolio and provided it to FGIC. (ECF No. 166 ¶ 24.) In providing the target portfolio to FGIC, Calyon did not represent that it was forwarding assets Putnam had identified. (*See id.*) Moreover, Calyon did not copy Putnam on the email attaching the document, or otherwise notify Putnam about the document's existence. (*See id.*; ECF No. 173-18.) Although FGIC claims that Putnam was on notice of the August Target Portfolio because Putnam's Managing Director, Carl Bell, allegedly told FGIC to obtain a target portfolio of specific assets from Calyon, this characterization of events is not true. Mr. Bell testified that it was not plausible that he would have instructed FGIC to obtain a portfolio of specific targeted assets from Calyon because Putnam would not have known what specific assets were available for purchase in the marketplace, as one can only buy what a third party is prepared to sell, (ECF No. 167-8 (Bell Tr.) at 521:8-523:5, 528:12-529:14, 530:5-16), as FGIC would have known was the case with any target assets. At most, Mr. Bell would have told FGIC to ask Calyon for the portfolio constraints and the broad categories of assets to be included in the Pyxis portfolio—similar to the type of target portfolio set forth in the July Investor Presentation—rather than specific assets. (*Id.* at 528:12-529:14.)

In any event, even assuming *arguendo* that Putnam knew about the existence of the August Target Portfolio, knowledge of the document does not equate to knowledge of the portfolio's *specific contents,* much less establish that Putnam "so entangled" itself in the target portfolio's contents that it should be deemed the document's "maker" as a matter of law.

Putnam did not review the August Target Portfolio and thus did not know what targeted assets were listed in the document.  Nor did Putnam ever represent that the specific target assets in the Calyon-created August Target Portfolio was in accordance with its views, which is necessary for the document to be attributed to Putnam.

### 2.     The August Target Portfolio Was Not Material To FGIC's Decision To Insure Pyxis

For a misrepresentation to constitute fraud, it must be material.  In other words, the misrepresentation must be "sufficiently important or relevant to influence the plaintiff's decision." *Taylor Precision Prod., Inc. v. Larimer Grp., Inc.*, 2018 WL 4278286, at *23 (S.D.N.Y. Mar. 26, 2018); *see also Muller-Paisner v. TIAA*, 289 F. App'x 461, 464 (2d Cir. 2008) (holding that a statement is material when "a reasonable investor would have considered [it] significant in making investment decisions").  When cautionary language accompanies the representation, such language negates the claim of materiality.  *See In re Austl. & N.Z. Banking Grp. Ltd. Sec. Litig.*, 2009 WL 4823923, at *13 (S.D.N.Y. Dec. 14, 2009) ("[T]he existence of cautionary language effectively negates the materiality of an alleged misstatement or omission.").

Here, the inclusion of prime or "seasoned" assets—assets from the first half of 2005— which were purportedly included in the August Target Portfolio, were not material to FGIC's decision to insure Pyxis.  First, there was a difference of only 2.5%—the difference between 4.8% and 2.3%—between the amount of 2005H1 RMBS that FGIC claims Putnam should have purchased pursuant to the August Target Portfolio and the amount of such assets in the final Pyxis CDO.  Moreover, at no point during the structuring of the Pyxis CDO did FGIC request the addition of a portfolio constraint requiring a minimum amount of 2005H1 RMBS.

Similarly, FGIC's credit application, a 40-page document summarizing FGIC's underwriting team's research and analysis of Pyxis (the "Credit Application"), observed without complaint the absence of any seasoned RMBS in the collateral pool, which FGIC noted would have assets only from the prior 12 months (a period that excluded 2005H1 RMBS). (ECF No. 173-5 at 26.) In fact, FGIC did not even rely on the assets in the August Target Portfolio in its Credit Application. Although the August Target Portfolio included a list of the 98 assets acquired for Pyxis through August 8, 2006, FGIC's Credit Application included only the 82 acquired assets set forth in the July Portfolio. (ECF No. 166 ¶¶ 40, 49.) The representations in the August Target Portfolio could not possibly be material if they were not important enough to be included in the document upon which FGIC's Structured Credit Committee *based its decision to insure Pyxis*.

Any alleged misrepresentation relating to the amount of prime RMBS in the Pyxis CDO was also not material. Although FGIC claims that, based on the August Target Portfolio, it expected 10% of the Pyxis CDO to consist of prime RMBS, FGIC was provided other target portfolios with lower percentages of prime RMBS, including the September Target Portfolio which it received a month after the August Target Portfolio but weeks before the Pyxis closing on October 3, 2006. (*See* ECF No. 166 ¶ 27.) The September Target Portfolio showed only 2% of prime RMBS, consistent with the final Pyxis portfolio. (*Id.*) The fact that FGIC never commented on, or attached any significance to, the many different target portfolios with varying amounts of prime RMBS proves that the amount of prime RMBS was not material to FGIC's participation in the Pyxis CDO. FGIC also knew that a Pyxis portfolio constraint required the portfolio to consist of *at least* 80% subprime or midprime RMBS, (ECF No. 173-5 at 17), and that Putnam preferred subprime RMBS assets, (ECF No. 166 ¶ 38). FGIC never objected to

- 8 -

these portfolio constraints or asked that Pyxis add a constraint requiring a minimum amount of prime RMBS or assets from a particular vintage. And, last but not least, the purportedly "prime" assets listed in the August Target Portfolio were not even prime—they were Option Arms or Alt-A securities, as was obvious from the names of the assets. (ECF No. 173-18; ECF No. 210-2 (Dolan Tr.) at 297:12-298:7.)

**B.      Putnam Did Not Know That The Representations In The August Target Portfolio Were False**

For FGIC to prove its fraud claim, it must prove by clear and convincing evidence that Putnam knew that the August Target Portfolio was false at the time it was sent by Calyon to FGIC. *See Lerner*, 459 F.3d at 291 ("To state a cause of action for fraud, a plaintiff must allege . . . knowledge by the party making the representation that it was false when made . . . ."). Additionally, as noted above, when the representation at issue is a forward-looking statement, the plaintiff must prove that the party that made the representation *knew* the representation could not be achieved at the time the representation was made. *See Cohen*, 25 F.3d at 1172 ("[A] relatively concrete representation as to a company's future performance, if made at a time when the speaker knows that the represented level of performance cannot be achieved, may ground a claim of fraud."). Because there is no evidence that Putnam ever saw the August Target Portfolio, FGIC will be unable to prove that Putnam knew the document was false.

**1.      FGIC Cannot Use Willful Blindness To Establish Knowledge Of Falsity Of A Forward-Looking Statement**

As a matter of law, willful blindness cannot be used to establish actual knowledge in the context of a forward-looking statement. In analogous circumstances involving securities fraud claims based on forward-looking statements, the law requires "actual knowledge." *Prime Mover Capital Partners*, 793 F. Supp. 2d at 667 (plaintiffs must prove forward-looking statement was

"made with actual knowledge" that it was false) (quoting *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010)). Because the August Target Portfolio is a forward-looking statement, FGIC must prove that Putnam had *actual knowledge* of the August Target Portfolio. FGIC cannot establish its fraud claim by establishing that Putnam had "constructive knowledge," through the legal construct of willful blindness, of a forward-looking statement it never saw.

### 2.      Putnam Was Not Willfully Blind To The August Target Portfolio

Even if FGIC could prove knowledge through a "willful blindness" theory, Putnam was not willfully blind to any alleged misrepresentations in the August Target Portfolio. To prove willful blindness, a mental state that "surpasses recklessness," FGIC must show that "(1) the defendant [] subjectively believe[s] that there is a high probability that a fact exists and (2) the defendant [has] take[n] deliberate actions to avoid learning of that fact." *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011).

In this case, FGIC asserts that Putnam was willfully blind to the contents of the August Target Portfolio because Putnam should have known Calyon would provide FGIC with false information and deliberately avoided learning of this false information. According to FGIC, "Putnam knew Calyon was unreliable, repeatedly made serious errors, and provided false information to investors." (ECF No. 118 at 31.) This is false. During summary judgment, FGIC cited to a modest number of emails in which Putnam, from time to time, was critical of Calyon as the parties put together the Pyxis transaction. (*See, e.g.*, ECF No. 167-42; ECF No. 167-37.) Although FGIC cites these emails as evidence of Calyon's unreliability, they are more probative of Putnam's diligence and good faith as Putnam ensured that the Pyxis transaction was properly structured. Moreover, none of the emails related to the composition of portfolio assets or communications with FGIC.

In fact, as evidence of Putnam's diligence and good faith, on September 5, 2006, Putnam sent Calyon an updated target portfolio showing that Pyxis would have just 1.25% prime RMBS and only 16.25% of assets rated above Ba2. (*See* ECF No. 115-26.)  In recommending that Calyon forward this updated target portfolio to investors, Putnam noted that Pyxis investors had not received portfolio data since the "pitch book" (the July Investor Presentation). (*See id.*)  If, as FGIC contends, Putnam had knowledge of the August Target Portfolio, Putnam surely would not have alluded to the July Investor Presentation as the last target portfolio that investors had received.  The target portfolio that Putnam sent to FGIC on September 5, 2006 was incorporated by Calyon in the September Target Portfolio provided to FGIC and note investors on September 8, 2006.

With Putnam's diligence in mind, it can hardly be said that Putnam "purposefully contrived to avoid learning" about the August Target Portfolio.  *See, e.g., Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 463, 514-15 (S.D.N.Y. 2008) (finding no willful blindness where defendant was "generally aware that counterfeit Tiffany jewelry was being" sold on its website, and "[defendant] took significant steps to prevent counterfeiting" such that it could not be said defendant "purposefully contrived to avoid learning of counterfeiting on its website, or that [defendant] failed to investigate once it learned of such counterfeiting"), *aff'd in part, rev'd in part on other grounds*, 600 F.3d 93 (2d Cir. 2010).  Contrary to FGIC's contention, it was not the collateral manager's role to monitor a structuring bank's communications with deal participants such as FGIC. (ECF No. 210-1 ¶¶ 111-112.)  Nor was it Putnam's job to tell FGIC to review documents that Calyon thought were important enough to send to investors and other deal participants.  The September Target Portfolio was included in a seven-page document entitled

"Summary of Key Terms." (ECF No. 166 ¶ 27.) Despite Putnam's efforts, FGIC did not bother to review the September Target Portfolio. (*Id.*)

### C.     Putnam Did Not Possess An Intent To Deceive FGIC Because Putnam Did Not Know About The August Target Portfolio, And Even If It Did, It Had No Intent to Defraud FGIC

For FGIC to prove its fraud claim, it must prove by clear and convincing evidence that Putnam had an intent to deceive FGIC. *See Crigger*, 443 F.3d at 234. Proof that a defendant had "a general profit motive, such as the motive to earn fees, is not a sufficient motive to commit fraud." *Prickett v. New York Life Ins. Co.*, 896 F. Supp. 2d 236, 246 (S.D.N.Y. 2012); *see also SSR II, LLC v. John Hancock Life Ins. Co.*, 37 Misc. 3d 1204(A), 2012 NY Slip Op 51880(U), *5 (Sup. Ct. 2012) ("[T]he motive to earn higher compensation is legally insufficient to infer scienter.").

FGIC alleges that Putnam had an intent to defraud FGIC because Putnam wanted to earn fees from Pyxis and because it had been promised future CDO deals by Pyxis's equity investor, Magnetar Capital LLC ("Magnetar"). This assertion is baseless and makes no sense. All of Putnam's fees – both its senior fee and its subordinated fee – were dependent on the underlying portfolio of securities *not* defaulting. If a collateral asset defaulted, Putnam would not receive its fee on the notional value of that asset. (ECF No. 166 ¶¶ 78-80; ECF No. 173-2 at ¶ 149; ECF No. 115-20 at 72-73, 78-79; ECF No. 210-1 ¶¶ 149, 155-157.) It therefore makes no sense that Putnam would knowingly engage in a $1.5 billion fraud by purchasing assets that it hoped would cause Pyxis to fail. In addition, Putnam's fee rate was not out of the ordinary; to the contrary, its senior fee of 15 basis points (of the notional amount of non-defaulting assets) and its subordinated fee of 5 basis points were lower than the fees paid to collateral managers on other CDOs. (ECF No. 210-1 ¶ 188.)

Furthermore, there is no evidence that Putnam acted with an intent to defraud.  Putnam worked diligently to ensure that FGIC received accurate information about the Pyxis collateral both before and after the deal closing.  As noted previously, before the closing, Putnam arranged for Calyon to send FGIC the September Target Portfolio.  (ECF No. 166 ¶¶ 26-27.)  After the closing, Putnam arranged for FGIC to have access to Putnam's website, and also made the necessary arrangements for FGIC to receive monthly trustee reports.  (*Id.* ¶¶ 53-55.)  Putnam's website, like the monthly trustee reports, contained detailed reports regarding each of the assets in the Pyxis collateral, both in the aggregate and individually.  Each of these reports detailed the amount of prime RMBS, 2005H1 RMBS, and assets rated above Ba2 in Pyxis.  Yet, FGIC never objected to the Pyxis portfolio composition or asked Putnam to adjust the assets in the deal.

FGIC also complains that a small portion—3.6%—of the Pyxis collateral consisted of other Magnetar-sponsored CDOs.  (ECF No. 166 ¶ 55.)  FGIC speculates that the inclusion of these assets must have resulted from some type of influence Magnetar imposed on FGIC.  The claim is meritless.  Because Putnam sourced the CDO assets in Pyxis in cash bond form (as opposed to credit default swaps), Putnam could only purchase recently-issued CDOs.  (ECF No. 210-1 ¶¶ 162-164.)  Magnetar-sponsored CDOs, due to their recent issuance, were among the CDOs most available for purchase.  (*Id.*)  The presence of Magnetar-sponsored CDOs in Pyxis was not unusual.  In fact, six other CDOs insured by FGIC around the same time as Pyxis included Magnetar-sponsored CDOs in their collateral pools.  (ECF No. 166 ¶ 65.)  One of these CDOs, Havenrock II, contained a whopping $577 million in Magnetar-sponsored deals, representing more than *25%* of the Havenrock II portfolio, standing in stark contrast to Pyxis's *3.6%.*  (*Id.* ¶ 66; *see* ECF No. 210-1 ¶ 99.)  Of the $577 million of Magnetar-sponsored CDOs in Havenrock II, $70 million consisted of Pyxis itself.  (ECF No. 210-1 ¶ 99.)  Yet Putnam had no

involvement in Havenrock II, and there is no suggestion or evidence that the Havenrock II structuring bank or collateral manager was doing Magnetar's bidding in including such massive amounts of Magnetar-sponsored CDOs in its collateral pool.

Moreover, the overall asset composition of Pyxis was consistent with other CDOs issued at the same time. As noted by Putnam's industry expert, John Dolan, "[s]everal other CDOs issued around the same time as Pyxis, including several non-Magnetar CDOs, had similar collateral characteristics, including vintage, ratings composition . . . ." (ECF No. 210-1 ¶¶ 21, 106-107.) None of these other CDOs was sponsored by Magnetar.

**D.      FGIC Did Not Reasonably Rely On The August Target Portfolio In Deciding To Insure Pyxis**

To satisfy the reliance element of common law fraud, FGIC must prove by clear and convincing evidence that it reasonably relied on the August Target Portfolio in deciding whether to insure the Pyxis CDO. *See Banque Arabe et Internationale D'Investissement v. Maryland Nat. Bank*, 57 F.3d 146, 156 (2d Cir. 1995) ("[Plaintiff] was also required to establish that it actually relied on the disclosure or lack thereof, and that such reliance was reasonable or justifiable."). To show reasonable reliance, FGIC must establish that it actually relied on the August Target Portfolio and that its reliance was justifiable. FGIC cannot make either showing.

**1.      FGIC Did Not Actually Rely On The August Target Portfolio In Deciding Whether To Insure Pyxis**

Under New York law, the plaintiff must establish that it actually relied on the alleged misrepresentation to maintain a claim for fraud. *Banque Arabe*, 57 F.3d at 156. This means that the plaintiff must have changed its position "in reliance on the truth of the alleged misrepresentations." *Aboeid v. Saudi Arabian Airlines, Inc.*, 2011 WL 2470091, at *3 (E.D.N.Y. June 17, 2011) (citing *CBS Inc. v. Ziff–Davis Pub. Co.*, 75 N.Y.2d 496, 502 (1990)).

- 14 -

The evidence demonstrates that FGIC did not rely on the August Target Portfolio in deciding to insure the Pyxis CDO. First, nowhere in the 40-page Credit Application for Pyxis did FGIC perform any specific credit analysis on any of the targeted 2005H1 assets in the August Target Portfolio (which constituted just 4.8% of the targeted portfolio). In fact, the Credit Application nowhere states that FGIC expected any portion of the Pyxis portfolio to be of any particular vintage. To the contrary, FGIC's Credit Application recognized, without complaint, that the ramped portfolio contained "no seasoned bonds" and that Putnam intended to source assets from the prior 12 months, a period that would exclude assets from 2005H1 or earlier. (ECF No. 166 ¶ 45.)

Second, as previously noted, FGIC's Credit Application did not take into account all 98 already-acquired assets listed in the August Target Portfolio; instead, the Credit Application made reference only to the 82 acquired assets listed in the July Portfolio. (ECF No. 166 ¶¶ 40, 49.)

Third, the Credit Application shows that FGIC did not run simulations or model cash flows on any of the target assets in the August Target Portfolio. (ECF No. 166 ¶ 49.) Instead, FGIC assumed that any prime bonds in the final portfolio would simply perform in a manner consistent with four assets FGIC had insured in other, unrelated deals. (*Id.* ¶ 47; ECF No. 210-1 ¶ 84.) None of those four bonds, however, was a prime RMBS; like the so-called "prime" RMBS in the August Target Portfolio, those four assets were either Alt-A or Option Arm securities. (ECF No. 166 ¶ 48.)

And, fourth, the Credit Application did not reflect that any particular percentage of the collateral assets would have a Moody's credit rating above Ba2. To the contrary, the Credit Application recognized that Pyxis was targeted to have a Weighted Average Rating Factor of

- 15 -

approximately 500, which reflects an average, aggregate rating between BBB and BBB- — the Standard & Poor's ratings that correlate to Baa2 and Baa3 by Moody's, respectively.  (ECF No. 173-5 at 8, 23.)

Additionally, after receiving internal approvals to proceed with the Pyxis transaction, FGIC regularly received information showing the exact composition of assets in the deal.  (ECF No. 166 ¶¶ 53-55.)  FGIC's Surveillance team, the group assigned to monitoring Pyxis after closing, had standing procedures to review the monthly trustee reports of all CDOs FGIC had insured.  (*Id.* ¶ 13; *see also* ECF No. 210-1 ¶¶ 68-71.)  At trial, Putnam will show that FGIC's Surveillance team received and reviewed the monthly Pyxis trustee reports for the express purpose of monitoring the CDO's collateral performance.  (*See* ECF No. 166 ¶¶ 54-55.)   Putnam will also establish that on April 6, 2007, the Surveillance team prepared an internal report showing the relative amounts of prime RMBS in various CDOs FGIC had insured.  (*See* Ex. 1.)[3] That report showed that Pyxis had only 2% prime RMBS.  (*Id.*)   Nor was this report buried in the back of a file cabinet.  To the contrary, it was widely circulated within FGIC; among its recipients were FGIC's President, its Chief Credit Risk Officer, the entire Surveillance team, and the entire CDO FGIC team.  (*Id.*)  Yet, despite the report's highlighting of the amount of prime RMBS in Pyxis, FGIC never once objected to Pyxis's asset composition.  In fact, on two occasions after the Pyxis closing, FGIC confirmed that the closed transaction was consistent with the proposed transaction on which it had based its decision to participate.  (*Id.* ¶¶ 56-57.)  As late as April 2007, FGIC represented in writing that "the deal is performing as expected."  (*Id.* ¶ 57.)

_____

[3]      Unless otherwise indicated, citations to "Ex. __" refer to the exhibits to the Declaration of Thomas Arena in Support of Defendant The Putnam Advisory Company, LLC's Pretrial Memorandum of Law, filed contemporaneously herewith.

Likewise, FGIC cannot establish that it relied on the August Target Portfolio in agreeing

to a 40% attachment point for the Pyxis Guaranty; such an attachment point meant that Pyxis

would have to suffer losses wiping out 40% of its collateral assets before FGIC's insurance

obligations would be triggered under the transaction.  FGIC puts forward a convoluted theory of

reliance, arguing that had the rating agencies assessed a target portfolio more closely aligned to

the final portfolio, the rating agencies would have required a 25% initial AAA attachment point

for Pyxis notes (rather than the initial AAA attachment point of 20.43% in the deal).  (*See* ECF

No. 173-45 (O'Driscoll Tr.) at 259:5-260:7, 272:5-12.)  FGIC's industry expert, Fiachra

O'Driscoll, speculates that if the initial AAA attachment point were 25%, FGIC would have

insisted on establishing an attachment point for the Pyxis Guaranty of 50%, not 40%, because

FGIC only insured tranches at two times the initial AAA attachment point.  (*See* ECF 167-58 ¶

29.)

Every step of FGIC's theory of reliance is contrary to the evidence.  There is no evidence

that the rating agencies would have required a 25% initial AAA attachment point if they had

examined the final Pyxis portfolio.  Indeed, each of the three rating agencies *re-confirmed* their

ratings for each class of Pyxis notes based on the final Pyxis portfolio.  (ECF No. 166 ¶ 77.)

Moreover, there is no credible evidence that FGIC would have demanded a 50% attachment

point for the Pyxis Guaranty if the initial AAA attachment point had been set at 25%.  No

witness testified that FGIC would have conditioned its participation in Pyxis at exactly two times

the initial AAA attachment point, and no document supports the conclusion that FGIC insisted,

as an iron-clad rule, that it only insures a CDO tranche at two times the initial AAA attachment

point.  In fact, FGIC insured numerous CDOs at less than two times the initial AAA attachment

point.  (*See* Ex. 2; Ex. 3; Ex. 4; *see* ECF 210-1 at Ex. 9.)  Nor is there evidence that Calyon

would have agreed to offer FGIC the opportunity to issue the Pyxis Guaranty at a 50%
attachment point; the evidence strongly suggests the contrary. (*See* ECF No. 164-14.)

### 2. FGIC Did Not Justifiably Rely On The August Target Portfolio Because FGIC Was A Sophisticated Entity And Received Subsequent Corrective Disclosures From Putnam

New York law requires the plaintiff to have been justified in relying on the alleged
misrepresentation at issue. Reliance is justifiable when a reasonable person would attach
significance to the representation "in determining his choice of action in the transaction in
question." *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 30 (2000). When determining whether a
plaintiff's reliance is justifiable, one must consider the context in which the representation was
made, such as by "focusing on the level of sophistication of the parties, the relationship between
them, and the information available at the time of the operative decision." *De Sole v. Knoedler
Gallery, LLC*, 139 F. Supp. 3d 618, 642 (S.D.N.Y. 2015); *see also Emergent Capital Inv. Mgmt.,
LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 195 (2d Cir. 2003) ("In assessing the reasonableness
of a plaintiff's alleged reliance, we consider the entire context of the transaction, including
factors such as its complexity and magnitude, the sophistication of the parties, and the content of
any agreements between them."); *see also Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 58
F. Supp. 2d 228, 259 (S.D.N.Y. 1999) ("Sophisticated parties may well be under a duty to make
affirmative efforts to protect themselves from misrepresentations . . . and cannot be heard to
complain when they fail to make diligent inquiries.").

FGIC's sophistication is beyond dispute. By 2006, FGIC "was one of the four largest
players in the global financial guaranty insurance industry" and "a substantial portion of FGIC's
insurance was written on structured products, including RMBS and CDOs." (ECF No. 210-1 ¶¶
52, 58-62.) In internal documents, FGIC highlighted its ability to "rigorously examine" a deal's

"structural components," to develop cash flow models to test a deal's portfolio assets against a range of stress scenarios, and to review all "reporting made available to the trustee" to ensure that a closed deal was performing as expected. (ECF No. 166 ¶¶ 11-12; *see* ECF No. 210-1 ¶ 20.) FGIC used its resources and sophistication to provide insurance on 250 RMBS and 18 CDOs, most of which contained subprime RMBS. (ECF No. 166 ¶ 16.) The notional value of FGIC's RMBS exposures exceeded $31 billion, and the notional value of its CDO exposures was roughly $11 billion. (*Id.*)

More particularly, FGIC's Credit Application for Pyxis repeatedly showcases its sophistication in analyzing CDOs. The Credit Application is replete with reports on the extensive analyses FGIC performed regarding the deal, including cash flow analyses, default analyses, and analyses of asset correlation. (ECF No. 166 ¶¶ 35-38, 40, 42-44, 45-47, 49-51.) As noted by Putnam's industry expert, Mr. Dolan, "[p]rior to making its decision to participate in Pyxis, FGIC performed extensive analysis of the collateral, including re-rating all of the underlying collateral, re-categorizing the midprime securities as subprime, and calculating expected losses under a range of scenarios." (ECF No. 210-1 ¶¶ 72, 77-82.) FGIC's analyses did not terminate with the closing of CDOs it insured. FGIC established a surveillance team of talented professionals dedicated to "monitor[ing] all closed transactions on a monthly basis using FGIC's proprietary surveillance database." (ECF No. 166 ¶ 13; *see also* ECF No. 210-1 ¶¶ 68-71.)

Reliance is not justifiable where a party proceeds with a transaction knowing it has not received complete information. *See KNK Enters., Inc. v. Harriman Enters., Inc.*, 33 A.D.3d 872, 872 (N.Y. App. Div. 2006) ("Here, the plaintiff, who was represented by counsel, decided to proceed with the transaction, despite knowing that it had not received full information

- 19 -

concerning the transaction; thus its reliance cannot be considered reasonable or justifiable."). Here, the evidence is undisputed that FGIC was told the August Target Portfolio was preliminary and subject to change. By its witnesses' own admission, FGIC understood that the assets were targets—that is, projections—and FGIC also knew that such targets were anything but ironclad promises that Pyxis would purchase these exact targeted assets in the future. Putnam, as collateral manager, could only arrange for Pyxis to purchase assets made available for sale, at a price Putnam thought appropriate, by a willing seller not under Putnam's control. FGIC never sought to confirm with Calyon or Putnam whether the target assets in the August Target Portfolio had been acquired, but it easily could have at any point before or after the closing.

More importantly, reliance is not justified when the plaintiff is provided with updated information that updates or corrects the original representations. *Estate of Sampson v. Georgeson Shareholder, Inc.*, 412 F.3d 103, 109-10 (2d Cir. 2005) (affirming dismissal of Rule 10b–5 claim where reliance on the alleged misstatements was unjustifiable given that the defendant "subsequently received additional letters" containing accurate information). As noted above, one month before the Pyxis transaction closed, FGIC received the September Target Portfolio showing that the deal was expected to have 2% prime RMBS. (ECF No. 166 ¶ 27.) After the closing, FGIC received monthly trustee reports detailing every conceivable feature of the final Pyxis portfolio. (*Id.* ¶¶ 54-55.) FGIC also obtained access to Putnam's website for Pyxis, which again listed each of the final portfolio assets and contained aggregated information showing the amounts of prime RMBS and the ratings of the collateral securities in Pyxis. (*Id.* ¶ 53.) At any point, if FGIC were in fact troubled by the relative amounts of prime RMBS or so-called "seasoned" assets in the deal, FGIC could have asked Putnam to adjust the portfolio's

composition pursuant to its ability to trade up to 5% of the portfolio on an annual basis. (*See* ECF No. 173-5 at 2.) FGIC never made such a request.

Moreover, where, as here, the plaintiff is a sophisticated entity "engaged in major transactions," and "enjoy[s] access to critical information but fail[s] to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance." *Crigger*, 443 F.3d at 235. Here, FGIC "enjoy[ed] access to critical information" concerning Magnetar's role as Pyxis's equity sponsor as well as Magnetar's CDO trading strategy. On August 29, 2006, FGIC's lead underwriter on Pyxis, Elizabeth Menhenett, received a *Derivatives Week* article reporting that Magnetar "is dominating the market for asset-backed securities collateralized debt obligations" and "[m]arket participants speculate the fund is shorting other parts of the capital structure against its long equity positions." (ECF No. 166 ¶¶ 59-60; *see also* ECF No. 210-1 ¶ 95.) *The article identified Pyxis as a Magnetar-sponsored "Constellation" CDO.* (ECF No. 166 ¶ 60.) A few weeks later, on September 28, 2006, a Merrill Lynch research report discussed a "long-short" trading strategy in which hedge funds purchased a CDO's equity and shorted the CDO's higher-rated tranches. (*Id.* ¶ 63.) Lynn Finkel, a Managing Director in FGIC's CDO group and Ms. Menhenett's direct supervisor, circulated the Merrill Lynch report to FGIC's entire CDO team, noting that "the triggerless deals referenced below are the Magnitar [sic] deals." (*Id.*) At no point did FGIC's CDO team disclose any of this information to FGIC's Structured Credit Committee *despite knowing that Magnetar was an equity investor in Pyxis*. (*Id.* ¶¶ 58-63.) In fact, according to Ms. Menhenett, she did not believe Magnetar's CDO trading strategy and sponsorship of CDOs were relevant to FGIC's decision of whether to participate in Pyxis because it did not "affect [FGIC's] investment thesis." (*Id.* ¶ 61.)

- 21 -

**E.     FGIC's Losses Were Not Caused By The Representations In The August Target Portfolio**

For Putnam to be liable for fraud, FGIC's damages must have been caused by the representations in the August Target Portfolio. *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 402 (2d Cir. 2015) ("To state a claim for fraud under New York law, a plaintiff must allege . . . a material misrepresentation . . . which caused injury to the plaintiff."). This requires FGIC to prove by clear and convincing evidence both transaction causation and loss causation. *Id.* (holding that to satisfy the causation element, a plaintiff must allege transaction causation and loss causation).

**1.     FGIC Cannot Prove That But For The August Target Portfolio, It Would Not Have Insured Pyxis**

Common law fraud requires FGIC to prove transaction causation by clear and convincing evidence, or, in other words, that but for the representations in the August Target Portfolio, FGIC would not have agreed to insure the Pyxis CDO. Transaction causation means that the "defendant's misrepresentation induced plaintiff to engage in the transaction in question." *Fin. Guar. Ins. Co.*, 783 F.3d at 402. Similar to the above analysis on actual reliance, there is no evidence that but for the August Target Portfolio, FGIC would not have agreed to insure the Pyxis CDO. As stated, the Credit Application for Pyxis—the document upon which FGIC's Structured Credit Committee *relied in approving the transaction*—featured assets from the July Portfolio, *not* the August Target Portfolio. (ECF No. 166 ¶¶ 40, 49.)

**2.     FGIC Cannot Prove That Its Losses Were Caused By The August Target Portfolio**

Common law fraud also requires FGIC to prove loss causation by clear and convincing evidence, or, in other words, that the representations in the August Target Portfolio were the actual cause of FGIC's losses. Loss causation means that the "misrepresentations directly caused

the loss about which plaintiff complains." *Fin. Guar. Ins. Co.*, 783 F.3d at 402.  In other words, loss causation "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Id.*

As is relevant here, "'when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases', and a plaintiff's claim fails when it has not proven 'that its loss was caused by the alleged misstatements as opposed to intervening events.'" *Basis PAC-Rim Opportunity Fund (Master) v. TCW Asset Mgmt. Co.*, 48 N.Y.S.3d 654, 656-57 (App. Div. 2017) (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005) (alteration omitted)).  "Indeed, when an investor suffers an investment loss due to a market crash [ ] of such dramatic proportions that [the] losses would have occurred at the same time and to the same extent regardless of the alleged fraud, loss causation is lacking." *Id.*

FGIC's losses in connection with Pyxis were caused by the market-wide financial crisis which impacted *all* CDOs backed by subprime RMBS issued during the same period.  (ECF No. 166 ¶ 84; *see* ECF No. 210-1 ¶¶ 24, 143.)  By March 2012, fourteen of the sixteen similar CDOs issued in the one-month period before and after the pricing date of Pyxis—including eight non-Magnetar CDOs—had defaulted.  (ECF No. 166 ¶ 89.)  Even FGIC's witnesses admitted that the "strain in the CDO market . . . was largely attributed to RMBS and subprime RMBS," (*id.* ¶ 85), and that the RMBS subprime rating downgrades were "widespread," (*id.* ¶ 87).  The global financial crisis severely impacted FGIC's entire CDO book.  By October 2010, every CDO insured by FGIC from January 2006 to July 2007 had been downgraded from AAA to below investment grade, (*id.* ¶ 88), and by March 2012, nearly every one of these CDOs had defaulted or suffered substantial losses, (*id.* ¶ 89).  One of FGIC's witnesses testified that the decline in the

mortgage market in 2007 and 2008 was "probably one of the most significant factors" causing the losses on FGIC's CDO book. (*Id.* ¶ 91.)

As such, it is no surprise that FGIC's own damages expert, Dr. Karl Snow, calculated that Pyxis would have suffered terrible losses *no matter its composition*. (ECF No. 166 ¶¶ 92-94.) According to Dr. Snow, "if the only misrepresentation was there should have been 10 percent more prime [RMBS] in the portfolio, then I've calculated zero damages." (*Id.* ¶ 94.) Dr. Snow testified that the addition of more prime RMBS would have only *increased* FGIC's exposure under the terms of the Pyxis Guaranty, not reduced it. (*Id.*) The reason is that prime RMBS had less subordination—fewer mortgage loans—as collateral than subprime RMBS of the same credit rating; as a result, it would take fewer loan defaults to impact a prime RMBS bond than a subprime RMBS bond. It is not the case, contrary to FGIC's suggestion, that a prime RMBS bond of a certain credit rating was a safer investment than a subprime RMBS bond of the same rating.

Notwithstanding the admissions of its own damages expert and the fact that the financial crisis wiped out all CDOs backed by subprime RMBS issued during late 2006 and early 2007, FGIC argues that any losses it suffered were independent of the meltdown in the subprime mortgage market. FGIC's theory of loss causation and damages is built on four speculative and baseless predicates:

*First*, FGIC argues that had the rating agencies received the "actual" Pyxis portfolio—as opposed to the target portfolio provided by Calyon—they would have established a 25.05% initial AAA attachment point as opposed to the 20.43% attachment point they in fact required;

*Second*, FGIC contends that had the rating agencies required a 25.05% initial AAA attachment point, FGIC would have insisted on a 50% attachment point for the Class A-1 notes it insured, as opposed to the 40% attachment point it agreed to;

*Third*, FGIC asserts that had it insured at a 50% attachment point, it would have established lower loss reserves when Pyxis began to fail; and

*Fourth*, FGIC speculates that had its loss reserves been lower, it would have reached an agreement with Calyon to pay less than what it ultimately did to commute its exposure to Pyxis (the "Commutation Payment"). (*See* ECF No. 200-6 ¶ 29; ECF No. 200-7 ¶¶ 17, 25-26.)

Every link in this chain of loss causation is contrary to the evidence. (1) The rating agencies did in fact review the final Pyxis portfolio. As Putnam fully knew, the Pyxis Indenture required each of the rating agencies to confirm their ratings of Pyxis notes based on the final, audited portfolio. (*See* ECF No. 115-20 at 172.) Each of the rating agencies did just that, thereby confirming the appropriateness of a 20.43% initial AAA attachment point. (ECF No. 166 ¶ 77.) (2) As noted above, FGIC's claim that it only insured CDOs at two times the initial AAA attachment point is meritless; for many CDOs, FGIC issued its guaranty at less than two times that attachment point. (*See* Ex. 2; Ex. 3; Ex. 4; ECF 210-1 at Ex. 9.) In any event, there is no evidence that Calyon would have agreed to structure FGIC's Pyxis participation at a 50% attachment point. Rather, the evidence strongly suggests that Calyon was not willing to do so. (*See* ECF No. 164-14.) (3) There is no evidence of what loss reserves FGIC would have established if it had attached at 50%; its principal witness on this subject has attested that the question is unanswerable. (ECF No. 164-17 ¶ 10.) (4) There is no evidence that Calyon would have agreed to commute FGIC's exposure under the Pyxis Guaranty for less than the sum it had agreed to. No Calyon witness has so testified; FGIC has a total failure of proof on this subject.

- 25 -

## II.   FGIC CANNOT PREVAIL ON ITS NEGLIGENT MISREPRESENTATION CLAIM

For FGIC to prevail on its negligent misrepresentation claim, it must prove by a preponderance of the evidence that:  (1) Putnam had a duty, as a result of a special relationship, to give correct information; (2) Putnam made a false representation that it should have known was incorrect; (3) the information supplied in the representation was known by Putnam to be desired by FGIC for a serious purpose; (4) FGIC intended to rely and act upon it; and (5) FGIC reasonably relied on the representation to its detriment.  *See Cacchillo v. Insmed, Inc.,* 551 Fed. App'x 592, 595-96 (2d Cir. 2014).

As with the common law fraud analysis above, forward-looking statements are not actionable under the circumstances present here.  Under Second Circuit law, "[s]tatements of prediction or expectation about future events cannot give rise to a negligent misrepresentation or fraud claim."  *In re Merrill Lynch Auction Rate Sec. Litig.,* 2011 WL 536437, at *12 (S.D.N.Y. Feb. 9, 2011); *see also Cacchillo,* 551 F. App'x at 596 ("The alleged misrepresentation cannot be a promise of future conduct, which are not actionable as negligent misrepresentations under New York law."); *Kortright Capital Partners LP v. Investcorp Inv. Advisors Ltd.,* 392 F. Supp. 3d 382, 402 (S.D.N.Y. 2019) ("Generally, an actionable misrepresentation must be factual in nature and not promissory or relating to future events that might never come to fruition.").

Forward-looking statements can only be actionable if the plaintiff can prove that the defendant did not have a good faith belief in the forward-looking statement at the time it was made.  *See New Jersey Carpenters,* 2010 WL 1257528, at *6 (holding that representations that "predict future value and reliability" are "not actionable unless it is alleged that the opinions were not truly held").  Even assuming Putnam knew the contents of the August Target

Portfolio—and it did not—there is no evidence that Putnam believed Pyxis would not purchase the targeted assets at the time Calyon sent the document to FGIC.

### A.   There Was No Special Relationship Between Putnam And FGIC

For FGIC to prove its claim of negligent misrepresentation, it must prove by a preponderance of the evidence that Putnam owed FGIC a duty to provide correct information in the August Target Portfolio, based on a special relationship between the parties. *See MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 87 A.D.3d 287, 288 (N.Y. App. Div. 2011) ("[N]egligent misrepresentation requires a showing of a special relationship of trust or confidence between the parties which creates a duty for one party to impart correct information to another, and a special relationship does not generally arise out of an ordinary arm's length business transaction between two parties."). To establish such a special relationship, FGIC must show that there was either a contractual relationship between the parties or a relationship so close as to approach that of a contractual relationship. *Tyman v. Pfizer, Inc.*, 2017 WL 6988936, at *14 (S.D.N.Y. Dec. 27, 2017) ("The New York Court of Appeals has reiterated time and again that . . . there must be a showing that there was either actual privity of contract between the parties or a relationship so close as to approach that of privity.").

When there is no contractual privity between the parties and the special relationship is premised on a relationship between the parties so close that it approaches contractual privity, the plaintiff must establish that: (1) "the defendant had awareness that its work was to be used for a particular purpose"; (2) "there was reliance by a third party known to the defendant in furtherance of that purpose"; and (3) "there existed some conduct by the defendant linking it to that known third party evincing the defendant's understanding of the third party's reliance." *Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 59 (2d Cir. 2012).

- 27 -

There was no contractual privity between Putnam and FGIC; the only contractual relationship that FGIC entered into was with Calyon (the entity that provided the August Target Portfolio to FGIC). Nor can FGIC prove a special relationship based on the *Bayerische* factors. The August Target Portfolio was not Putnam's "work," as Putnam played no role in creating the document. Because Putnam did not know of the existence of the August Target Portfolio, it was not aware that FGIC purportedly would rely on its contents to determine whether to participate in Pyxis. And, as set forth above, FGIC did *not* rely on the August Target Portfolio in its Credit Application—it relied on the July Portfolio and other assets from its RMBS holdings to test the CDO's projected assets. (*See* ECF No. 166 ¶¶ 40, 49.)

Notably, New York courts have repeatedly held that in negligent misrepresentation cases, "the requisite relationship between the parties must have existed before the transaction from which the alleged wrong emanated, and not as a result of it." *Gregor v. Rossi*, 992 N.Y.S.2d 17, 19 (App. Div. 2014); *RKA Film Fin., LLC v. Kavanaugh*, 100 N.Y.S.3d 611 (Sup. Ct. 2018) (same); *Elghanian v. Harvey*, 671 N.Y.S.2d 206, 206 (App. Div. 1998) (same). This consideration is dispositive in this case because there was no pre-existing relationship between the parties and it is not disputed that FGIC and Putnam did not have any commercial dealings prior to Pyxis.

Moreover, under New York law, no duty can be established where the defendant disclaims any sort of fiduciary or similar relationship. *See, e.g., Landesbank Baden-Wurttemberg v. Goldman Sachs & Co.*, 821 F. Supp. 2d 616, 624 (S.D.N.Y. 2011) (dismissing negligent misrepresentation claim where the offering documents "expressly disclaimed any special relationship"); *HSH Nordbank AG v. UBS AG*, 95 A.D.3d 185, 208 (N.Y. App. Div. 2012) (dismissing negligent misrepresentation claim where defendant disclaimed any advisory

relationship).  Here, FGIC received numerous documents, including offering documents and

marketing presentation materials, that expressly disclaimed any fiduciary or special duty running

from Putnam to any other party.  (*See* ECF No. 166 ¶ 20; ECF No. 173-1 at iii (stating that in

making an investment decision, investors "must rely on their own examination of the co-issuers

and the terms of the offering, including the merits and risks involved").)

### B.    The August Target Portfolio Was Not Made By Putnam And Was Not A False Representation That Putnam Should Have Known Was Incorrect

#### 1.    Putnam Did Not "Make" The Representation At Issue

For Putnam to be liable for negligent misrepresentation, FGIC must prove by a

preponderance of the evidence that Putnam made the representation at issue.  *Cacchillo*, 551 Fed.

App'x at 595-96; *see also Woori Bank v. Citigroup Inc.*, 2013 WL 1235648, at *5 (S.D.N.Y.

Mar. 27, 2013) (dismissing plaintiff's negligent misrepresentation claim where he "failed to

allege that there were any specific actionable misstatements or omissions that are attributable to"

the defendants).  As set forth above, it was Calyon, not Putnam, that created the August Target

Portfolio and provided it to FGIC; Putnam did not know about the document.  *See supra* Section

I(A)(1).

#### 2.    Putnam Had No Reason To Know That The August Target Portfolio Was Incorrect

For FGIC to prove its negligent misrepresentation claim, it must also prove by a

preponderance of the evidence that Putnam should have known that the August Target Portfolio

was incorrect.  *Cacchillo*, 551 Fed. App'x at 596.  As with fraud, because the August Target

Portfolio is a forward-looking statement, this factor requires FGIC to prove that Putnam did not

believe the alleged misrepresentations in the document were true at the time it was sent to FGIC.

*See New Jersey Carpenters Health Fund*, 2010 WL 1257528, at *6 (holding that statements that

"predict future value and reliability . . . are not actionable unless it is alleged that the opinions were not truly held"). Because Putnam never saw the August Target Portfolio and did not know of its contents, FGIC cannot prove that Putnam should have known the document was false.

### C.   FGIC Cannot Prove That Putnam Knew FGIC Desired The August Target Portfolio For A Serious Purpose

For FGIC to prove its negligent misrepresentation claim, it must prove by a preponderance of the evidence that Putnam knew FGIC desired the August Target Portfolio for a serious purpose. *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004) ("There must be knowledge or its equivalent on the defendant's part that the information is desired for a serious purpose."). Again, because Putnam did not know about the August Target Portfolio, FGIC cannot establish that Putnam knew FGIC wanted that particular document for a serious purpose.

### D.   FGIC Did Not Actually Intend To Rely On The August Target Portfolio In Deciding Whether To Insure Pyxis

FGIC must also prove by a preponderance of the evidence that it intended to rely on the August Target Portfolio when it decided to insure Pyxis. *See Cacchillo*, 551 Fed. App'x at 595-96 ("To prove negligent misrepresentation under New York law, a plaintiff must show that . . . the plaintiff intended to rely and act upon [the representation]."); *see also Kortright Capital Partners LP*, 392 F. Supp. 3d at 402 (same). As previously stated, FGIC cannot establish this element. *See supra* Section I(D)(1).

E.   **FGIC Did Not Reasonably Rely On The August Target Portfolio To Its Detriment In Deciding To Insure Pyxis**

1.   **FGIC Did Not Reasonably Rely On The August Target Portfolio In Deciding Whether To Insure Pyxis**

To establish the reliance element of negligent misrepresentation, FGIC must prove by a preponderance of the evidence that it reasonably relied on the August Target Portfolio in deciding whether to insure Pyxis. *See Cacchillo,* 551 Fed. App'x at 595-96.  Here, as for common law fraud, FGIC's sophistication and means are relevant considerations in determining the reasonableness of its purported reliance. *See Orlando v. Kukielka*, 836 N.Y.S.2d 252, 255 (App. Div. 2007) (holding plaintiffs' reliance unreasonable as a matter of law where plaintiffs were "sophisticated businesspersons" who relied on a broker's misrepresentation despite conducting their own audit and obtaining different results).  As was the case for common law fraud, FGIC cannot establish reasonable reliance because:  (1) FGIC was a sophisticated party; (2) FGIC never sought to confirm with Calyon or Putnam whether the target assets in the August Target Portfolio had been acquired, despite knowing the document was incomplete; (3) FGIC received subsequent updated disclosures, including the September Target Portfolio; and (4) FGIC had the ability to ask Putnam to adjust the composition of the Pyxis portfolio after closing and it never did so. *See supra* Section I(D)(2).

2.   **FGIC's Losses Were Not Caused By The Representations In The August Target Portfolio**

FGIC must also prove that it relied on the August Target Portfolio to its detriment. *Cacchillo*, 551 F. App'x at 595-96.  In other words, FGIC must prove that its damages were directly caused by the alleged misrepresentations in the August Target Portfolio. *See DoubleLine Capital LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 461 (S.D.N.Y. 2018) ("A plaintiff must also allege that such reliance was to its detriment, *i.e.*, that the misrepresentations

directly caused the loss about which plaintiff complains . . . ."). Because the "causation requirement for a negligent misrepresentation claim is the same as the causation requirement for a claim of fraud," *Amusement Indus., Inc. v. Stern*, 786 F. Supp. 2d 758, 778 (S.D.N.Y. 2011), FGIC must prove both transaction causation and loss causation. As was the case with common law fraud, *see supra* Section I(E)(1), there is no transaction causation because FGIC's Structured Credit Committee relied on the July Portfolio in approving the Pyxis transaction, *not* the August Target Portfolio. Similarly, FGIC cannot prove loss causation because it cannot show that its losses were caused by the August Target Portfolio rather than the global financial crisis. *See supra* Section I(E)(2).

## III.   FGIC CANNOT PREVAIL ON ITS NEGLIGENCE CLAIM

For FGIC to prevail on its negligence claim, it must establish by a preponderance of the evidence that: (1) Putnam owed FGIC a duty; (2) Putnam breached that duty; and (3) FGIC suffered injury substantially caused by that breach. *See Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 215 (2d Cir. 2002).

### A.   There Was No Special Relationship Between Putnam And FGIC, And Putnam Had No Duty To Provide FGIC With Correct Information

For FGIC to prevail on its negligence claim, it must prove by a preponderance of the evidence that Putnam owed a duty to FGIC. *Banco Indus. de Venezuela, C.A. v. CDW Direct, L.L.C.*, 888 F. Supp. 2d 508, 512 (S.D.N.Y. 2012). As with FGIC's claim for negligent misrepresentation, to establish this duty FGIC must prove a special relationship between itself and Putnam. (*See* ECF No. 160 (Summary Judgment Order) at 42-43 (equating the "duty" element of negligence with that of negligent misrepresentation, and requiring proof of a special relationship for negligence).) FGIC cannot prove such a relationship with Putnam because Putnam did not make the August Target Portfolio, FGIC did not rely on the August Target

Portfolio in deciding to insure the Pyxis CDO, and despite previous communications with FGIC regarding Pyxis, Putnam had no understanding that FGIC would potentially rely on the August Target Portfolio, a document Putnam did not prepare or even know existed. *See supra* Section II(A).

**B.     Even If Putnam Owed A Duty To FGIC, Putnam Did Not Breach That Duty**

Even if FGIC could establish that Putnam owed a duty to FGIC—which it did not—FGIC cannot prove that Putnam breached that duty.  Breach of duty means a failure to exercise "ordinary care," or the "degree of care which a reasonably prudent [party] would have exercised under the same circumstances." *Brown v. New Commodore Cruise Line Ltd.*, 2000 WL 45443, at *3 (S.D.N.Y. Jan. 19, 2000).  Here, when considering whether Putnam exercised "ordinary care," one must account for the practice and customs of other companies engaged in the same industry as Putnam. *See AG Capital Funding Partners, L.P. v. State St. Bank & Tr. Co.*, 842 N.E.2d 471, 478 (N.Y. 2005) ("[E]vidence of industry practice and standards is admissible to establish a duty of care.").  The evidence is clear that collateral managers are not responsible for advising CDO investors.  It is the role of structuring banks to act as the conduit of deal information to CDO investors, just as it is the structuring bank that contracts with insurers to guarantee the performance of CDO note classes.  (ECF No. 210-1 ¶¶ 111-112.)  In fact, Putnam's contractual arrangement with Calyon provided that Putnam would refrain from having such communications with a CDO's investors.  Thus, even if Putnam owed a duty to FGIC, the scope of that duty did not extend to providing FGIC with information about the Pyxis portfolio.

Moreover, even if it could be suggested that Putnam had a duty to provide investors with information about Pyxis's targeted collateral assets, Putnam arranged for Calyon to provide such information to FGIC.  On September 5, 2006, approximately four weeks before closing, Putnam

sent an updated target portfolio to Calyon and recommended its distribution to investors. (ECF No. 166 ¶ 26.) Calyon incorporated that information in the September Target Portfolio that it sent to FGIC. (*Id.* ¶ 27.) Putnam also ensured that FGIC obtained access to Putnam's website for Pyxis and that FGIC received the monthly Pyxis trustee reports. (*Id.* ¶¶ 53-55.) There can be no dispute that Putnam provided FGIC with accurate information concerning the Pyxis collateral and that Putnam "performed its role as [c]ollateral [m]anager in accordance with standard industry practice." (ECF No. 210-1 ¶¶ 23, 111, 115, 118-19.)

### C. Even If Putnam Breached Its Duty, FGIC Cannot Prove That Its Losses Were Substantially Caused By That Breach Rather Than The Financial Crisis

To sustain its negligence claim, FGIC must prove by a preponderance of the evidence that it suffered losses substantially caused by Putnam's breach. *Lombard*, 280 F.3d at 215. An act or failure to act is a substantial cause in bringing about a loss if a reasonable person would regard it as a cause of the loss. *See Wild v. Catholic Health Sys.*, 21 N.Y.3d 951, 955 (2013) ("An act or omission is regarded as a cause of an injury if it was a substantial factor in bringing about the injury. That is, if it had such an effect in producing the injury that reasonable people would regard it as a cause of the injury."). As with the causation analyses for common law fraud and negligent misrepresentation, FGIC cannot prove that its losses were caused by Putnam's alleged negligence rather than the financial crisis. *See Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 473 (2d Cir. 1995) ("If the intervening act is extraordinary under the circumstances, not foreseeable in the normal course of events, or independent of or far removed from defendant's conduct, it may well be a superseding act which breaks the causal nexus."); *see also* Section I(E)(b).

- 34 -

## IV.   FGIC IS ENTITLED TO RECOVER ONLY ITS ACTUAL PECUNIARY LOSS

Even if FGIC could prove any of its claims, Putnam is responsible only for "the actual pecuniary loss sustained as the direct result of the wrong or what is known as the out-of-pocket rule." *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (1996).  Under the out-of-pocket rule, "damages are to be calculated to compensate plaintiffs for what they lost because of the fraud, not to compensate them for what they might have gained.  There can be no recovery of profits which would have been realized in the absence of fraud." *Connaughton v. Chipotle Mexican Grill, Inc.*, 75 N.E.3d 1159, 1163 (N.Y. 2017) (alteration omitted); *see also Solin v. Domino*, 501 F. App'x 19, at *2 (2d Cir. 2012) (holding that negligent misrepresentation claims are limited to "out-of-pocket" damages).

In July 2009, more than seven years before FGIC would have had any payment obligations under the Pyxis Guaranty, FGIC negotiated a commutation payment with Calyon limiting its exposure to Pyxis and to two other CDOs for $100 million.  (ECF No. 166 ¶ 71.) FGIC asserts that it internally allocated $74.5 million as commutation of its specific exposure to Pyxis.  (*Id.* ¶ 73.)  To prove actual pecuniary loss, FGIC bears the burden of showing what portion of its Commutation Payment was directly attributable to Putnam's alleged misrepresentation. *See B.N.E. Swedbank, S.A. v. Banker*, 1993 WL 152392, at *2 (S.D.N.Y. Mar. 8, 1993) (stating that damages are awarded "for any loss which was *proximately caused* by" defendant (emphasis added)).

It is also FGIC's burden to establish that its internal allocation of $74.5 million of the Commutation Payment to Pyxis was reasonable. *See Cameron Int'l Corp. v. Precision Castparts Corp.*, 2010 WL 148142, at *3 (S.D. Tex. Jan. 13, 2010) ("The burden lies on the co-mingler to apportion [a lump settlement]; if he cannot, he bears all of the loss."); *see also High Point*

*Design, L.L.C. v. LM Ins. Corp.*, 2016 U.S. Dist. LEXIS 12690, at \*9 (S.D.N.Y. Feb. 3, 2016)

("[T]he law is clear that the party seeking to allocate expenses bears the burden of proving what

amount of allocation is appropriate once the insured has made a prima facie showing that certain

amounts were spent in its defense."). Here, the portion of the Commutation Payment allocated to

Pyxis was clearly arbitrary:  FGIC allocated $74.5 million to Pyxis while allocating $0 to one of

the other commuted CDOs.  (ECF No. 166 ¶¶ 72-74.)

Moreover, under the out-of-pocket rule, damages cannot be based on a speculative

alternative transaction. *See Ritani, L.L.C. v. Aghjayan*, 970 F. Supp. 2d 232, 251-52 (S.D.N.Y.

2013) ("[I]n New York, the loss of an alternative contractual bargain . . . cannot serve as a basis

for fraud or misrepresentation damages [where] the loss of the bargain was undeterminable and

speculative."); *AHW Inc. P'Ship v. Citigroup Inc.*, 980 F. Supp. 2d 510, 527 (S.D.N.Y. 2013)

(stating that New York law "bars claims that require a factfinder to cut through this many layers

of uncertainty and speculation").  Rather, in the "rare case" where an alternative transaction may

be the basis for damages, there must be "some quantifiable, concrete alternative opportunity."

*Spithogianis v. Haj-Darwishm*, 2008 WL 82188, at \*7 (S.D.N.Y. Jan. 7, 2008).

As stated above, FGIC alleges that had it known Pyxis would not contain the exact same

assets as those in the August Target Portfolio, it would have insisted on an attachment point of

50% rather than 40%.  FGIC, however, has never offered any evidence to show that Calyon

would have agreed to FGIC providing the Pyxis Guaranty at a 50% attachment point.  To the

contrary, the evidence demonstrates that Calyon would never have agreed to those terms.  (*See*

ECF No. 164-14.)  In addition, FGIC has never explained its method and manner of calculating

its alleged damages had it provided the Pyxis Guaranty at a 50% attachment point rather than

40%.  (*See* ECF No. 160 at 41 n.26.)  FGIC employee Derek Donnelly admitted that determining

"the ultimate size of the commutation payment" in response to a higher attachment point was an "unanswerable counterfactual." (ECF No. 164-17 ¶ 10.)

## V.    FGIC WAS UNDER A DUTY TO MITIGATE ITS DAMAGES

Finally, New York law requires an injured party to mitigate its damages.  This means that a party "is under an obligatory duty to make a reasonable effort to minimize the damages liable to result from such injury, and a failure to make such an effort will bar that party from recovering for those additional damages which result from such failure." *City of New York v. Fedex Ground Package Sys., Inc.*, 314 F.R.D. 348, 357 (S.D.N.Y. 2016).  Here, FGIC did not mitigate its losses.  As FGIC was aware, under the Pyxis Indenture Putnam had the right to trade up to 5% of the Pyxis portfolio each year. (*See* ECF No. 173-5 at 2.)  Yet FGIC never approached Putnam about adjusting the portfolio, even after FGIC had obtained monthly trustee reports showing the exact composition of Pyxis's assets and even after FGIC had prepared an internal report showing its awareness that Pyxis held just 2% prime RMBS.

## <u>CONCLUSION</u>

For the reasons set forth above, FGIC cannot prove that Putnam is liable for common law fraud, negligent misrepresentation, or negligence.

Dated: February 3, 2020
       New York, New York

MILBANK LLP

By: _____

Thomas A. Arena (tarena@milbank.com)
Sean M. Murphy (smurphy@milbank.com)
Katherine Goldstein (kgoldstein@milbank.com)
Kingdar Prussien (kprussien@milbank.com)
Samantha A. Lovin (slovin@milbank.com)
Allison S. Markowitz (amarkowitz@milbank.com)
55 Hudson Yards
New York, New York 10001
Telephone: (212) 530-5000

*Attorneys for Defendant*
*The Putnam Advisory Company, LLC*