# Milbank

**THOMAS A. ARENA**
*Partner*
55 Hudson Yards | New York, NY 10001-2163
T: 212.530.5828
tarena@milbank.com | milbank.com

February 13, 2020

**VIA ECF and E-mail**

Hon. Analisa Torres
United States District Court, Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007

    Re:    *Financial Guaranty Insurance Company v. The Putnam Advisory Company, LLC*, No. 12-cv-7372 (S.D.N.Y.)

Dear Judge Torres:

    We respectfully submit this letter on behalf of Defendant The Putnam Advisory Company, LLC ("Putnam") to request permission to file a motion to strike the recently disclosed damages theory put forward by Plaintiff Financial Guaranty Insurance Company ("Plaintiff" or "FGIC"). We apologize for burdening the Court with this application, but Putnam's request goes to a critical issue in this case, and absent relief from the Court, Putnam would be unfairly prejudiced by FGIC's pursuit of a new damages theory that FGIC did not allege in its Second Amended Complaint, did not set forth in its Rule 26 initial disclosures, and did not include in the reports of its damages expert, Karl Snow.

    In Plaintiff's Pre-Trial Brief filed on February 3, 2020, FGIC advanced for the first time a new theory of damages. (*See* ECF No. 238 ("Pl. Pre-Trial Br.") at 20-22.) Specifically, FGIC stated that it intends to put forward evidence of what a "but for" commutation payment would have been absent the alleged fraud by recalculating its loss reserves. (*Id.*) According to Plaintiff:

> Derek Donnelly will testify that FGIC used a model to help determine its loss reserves for each CDO. This model accounted for FGIC's overall exposure on a deal and calculated gross projected losses and the net present value of those projected losses at a given time. FGIC then

MILBANK LLP

NEW YORK | LOS ANGELES | WASHINGTON, D.C. | SÃO PAULO | FRANKFURT
LONDON | MUNICH | BEIJING | HONG KONG | SEOUL | SINGAPORE | TOKYO

adjusted the net present value based on expected premium payments for Pyxis and across all of its deals with Calyon to reflect the fact that all Calyon CDS contracts were governed by a single ISDA master agreement, and failure to pay a premium under any deal would lead to cross-defaults. Finally, FGIC added its expected loss adjustment expense to calculate the final adjusted loss reserve total. Applying this methodology to the terms of the actual Pyxis Guaranty, *i.e.*, with a 40% attachment point, FGIC's loss reserve total as of July 2009 was $152,747,325. Applying the same methodology based on a 50% attachment point—reducing FGIC's overall exposure on the deal by $150 million—yields a loss reserve figure of $78,330,171.

FGIC agreed to commute its liability under the Pyxis Guaranty for $74,461,394 million.[1] This commutation payment was approximately 48.7% of FGIC's loss reserves for Pyxis at the time. Applying the same proportion to FGIC's loss reserves at a 50% attachment point would generate a commutation payment of $38,184,457. That is $36,276,937 lower than FGIC actually paid to commute its Pyxis liability. Thus, at a minimum, FGIC is entitled to recover $36,276,937 as damages, plus pre-judgment interest.

(*Id.* at 21-22.) The loss reserve "model" on which Mr. Donnelly will testify was produced to Putnam on December 20, 2019, more than two years after the close of fact discovery and nearly 18 months after the close of expert discovery.[2]

At no point prior to the filing of its Pre-Trial Brief had FGIC previously disclosed that it would be seeking these specific damages at trial. FGIC's Second Amended Complaint makes no mention of the amount of FGIC's alleged damages, the commutation payment, or FGIC's loss reserves. (*See* ECF No. 22.) Federal Rules of Civil Procedure 26(a)(1)(A)(iii) required FGIC to disclose at the outset of the litigation "a computation of each category of damages claimed" as well as "materials bearing on the nature and extent of injuries suffered." FGIC's initial disclosures, served almost five years ago, omitted any discussion of loss reserves or any related loss reserve model; those initial disclosures nowhere state that FGIC would be seeking damages based on a "but for" commutation payment. And, FGIC's damages expert, Karl Snow, testified that he did not calculate the "but for" commutation payment that FGIC now claims it will put

---

[1] No evidence supports this proposition. FGIC and Calyon agreed to commute FGIC's exposure to three CDOs—one of which was Pyxis—for a $100 million commutation payment. FGIC *internally* allocated $74.5 million of this amount to the commutation of its Pyxis exposure, but Calyon never agreed to that allocation.

[2] The belated production of the loss reserve model is the subject of a pending Motion *in Limine* to Exclude Belatedly Produced Materials Regarding Loss Reserves. (*See* ECF No. 272.)

Hon. Analisa Torres
February 13, 2020
Page 3

forward at trial. (*See* ECF No. 203; ECF No. 204-3 ("Snow Tr.") at 125:15-18 ("Q. And you didn't try to calculate what a but-for termination payment would have been? A. No.").) In fact, Dr. Snow testified that FGIC's counsel did not ask him to perform such a computation. (*See* Snow Tr. at 226:3-228:16.)

Courts have consistently rejected damages theories in very similar situations. *See Reed Const. Data Inc. v. McGraw-Hill Companies, Inc.*, 2013 WL 1608489, at *2 (S.D.N.Y. Apr. 15, 2013) (precluding plaintiff from seeking damages under a belatedly-disclosed damages theory); *Roberts v. Ground Handling, Inc.*, 2007 WL 2753862, at *4 (S.D.N.Y. Sept. 20, 2007) (plaintiff's failure to disclose a damages theory in her Rule 26(a)(1)(C) initial disclosures was "alone sufficient to preclude her from submitting evidence of it at trial"); *Austrian Airlines Oesterreichische Lufverkehrs Ag v. UT Fin. Corp.*, 2005 WL 977850, at *2 (S.D.N.Y. Apr. 28, 2005) (precluding plaintiff from offering evidence of a damage theory that it did not disclose in its Rule 26(a)(1)(C) initial disclosures); *24/7 Records, Inc. v. Sony Music Entm't, Inc.*, 566 F. Supp. 2d 305, 318 (S.D.N.Y. 2008) (precluding plaintiff's theory of damages because it was not included in its Rule 26(a) disclosures and was presented "well after the close of discovery").

Here, there is no excuse for FGIC's belated disclosure of this damages theory based on a loss reserve model it failed to produce in discovery. Putnam would be unfairly prejudiced if FGIC were permitted to present this new theory at trial. FGIC's theory requires expert interpretation of the facts and data, as well as evaluation of the theory's underlying assumptions of an alternative but-for commutation payment. But FGIC has not provided the calculations, inputs, or outputs supporting its new damages estimate; Putnam has had no discovery on the belatedly-produced loss reserve model; and Putnam's experts have not had an opportunity to offer opinions on it.[3] In fact, Putnam's experts have tried to replicate FGIC's calculations using the loss reserve model, but have been unable to do so. As a result, Putnam has not evaluated FGIC's assumptions underlying its loss reserve model assuming a 50% attachment point, including the amounts and priority of principal and interest payments to the Pyxis tranches, the premium rates to which FGIC would have been entitled at a 50% attachment point, and the calculation of the discount rate FGIC applied to cash flows used in the model.

Moreover, other components of FGIC's damages calculation appear to be based on information from outside the loss reserve model. The model, for example, does not provide the basis for the "expected premium payments" across all of FGIC's deals with Calyon that FGIC

---

[3] Although Mr. Donnelly testified at deposition about the existence of a loss reserve model, Mr. Donnelly was unable to describe how it worked and FGIC never produced the model during discovery. The issue was moot, in any event, because FGIC's damages expert disclaimed that FGIC was seeking damages based on what a "but-for" commutation payment would have been in the absence of the alleged fraud. As Mr. Donnelly himself testified, what such a commutation payment would have been in such circumstances was "unanswerable." (*See* ECF No. 164-17 ¶ 10.)

Hon. Analisa Torres
February 13, 2020                                                                                                          Page 4

used to decrease its loss reserves. (*See* Pl. Pre-Trial Br. at 21.) Nor does the model provide the back-up for the "expected loss adjustment expense" that FGIC used to modify the output of the model. (*See id.* at 21-22.)

In sum, the model raises more questions than answers, including inexplicably (according to FGIC) estimating loss reserves in 2009 of just $78 million for $229 million of accrued liability that would be due just seven years later in 2016. (*See id.* at 22.)[4] Clearly, Putnam would be severely disadvantaged by allowing FGIC to proceed to trial on a damages theory on which Putnam has a very limited understanding because of FGIC's untimely disclosure.

We thank the Court for its consideration of this letter. Putnam would be prepared to file the requested motion on an expedited basis.

Respectfully submitted,

*/s/ Thomas A. Arena*

Thomas A. Arena

cc:   All Counsel of Record (*via* email)

---

[4]   Plaintiff's damages expert recently submitted a declaration (also untimely) that disclosed what FGIC's Pyxis liability would have been in June 2009 had it attached at 50% instead of 40%. (*See* ECF No. 217 (Snow Declaration dated December 13, 2019).) According to that declaration, FGIC's liability would have been reduced from $379 million to $229 million, a 40% reduction. (*Id.* ¶ 15.) Given that this would be a 40% reduction in FGIC's exposure, there is no rational explanation for FGIC's new claim that the commutation payment would have been $36.3 million instead of $74.5 million (a 51% reduction).