UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FINANCIAL GUARANTY INSURANCE
COMPANY,

                           Plaintiff,

           -against-

THE PUTNAM ADVISORY COMPANY, LLC,

                        Defendant.

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #: _____                │
│ DATE FILED:  2/19/2020           │
└─────────────────────────────────┘
```

12 Civ. 7372 (AT)

**ORDER**

ANALISA TORRES, United States District Judge:

Plaintiff, Financial Guaranty Insurance Company ("FGIC"), brings this action against Defendant, The Putnam Advisory Company, LLC ("Putnam"), asserting claims for fraud, negligent misrepresentation, and negligence. Compl., ECF No. 22. On September 10, 2019, the Court issued an order (the "Order") granting in part and denying in part Defendant's motion for summary judgment, denying Plaintiff's motion for summary judgment, and setting down the remaining claims for trial on April 27, 2020. Order, ECF No. 160. Before the Court are Plaintiff's motions to exclude the trial testimony of two of Defendant's expert witnesses, and Defendant's motions to exclude the trial testimony of two of Plaintiff's expert witnesses. ECF Nos. 191, 193, 198, and 202. For the reasons stated below, the motions are GRANTED in part and DENIED in part.

**BACKGROUND**[1]

As the Court described in detail in the Order, Plaintiff alleges that Defendant made a series of material misstatements about the makeup of a Collateralized Debt Obligation ("CDO"),[2] and Defendant's ability to independently pick the collateral for that CDO, in order to

---

[1] The Court presumes familiarity with the facts stated in the Order but sets them forth briefly here. *See* Order.

[2] Collateralized debt obligations are structured financial investment vehicles comprised of a portfolio of debt

fraudulently induce Plaintiff to provide financial guaranty insurance for the CDO.  2Order at 1–13.

Defendant acted as the collateral manager for Pyxis ABS CDO 2006-1 ("Pyxis"), a $1.5 billion subprime CDO comprised of 91.73% residential mortgage backed securities ("RMBS") and 8.27% CDOs.  *Id.* at 2.  Calyon Corporate and Investment Bank ("Calyon") served as the collateral "arranger" for Pyxis.  *Id.*  Plaintiff, a credit protection insurance company, provided financial guaranty insurance to Pyxis, agreeing to assume the liabilities of Pyxis in the event its debt suffered losses.  That insurance came in the form of a surety bond (the "Pyxis Guaranty"), which Plaintiff issued on October 3, 2006.  *Id.*

The Court granted Defendant's summary judgment motion with respect to Plaintiff's misrepresentation claims except for those arising from a document emailed to Plaintiff on August 8, 2006, and referred to as the "Peach Colored Spreadsheet" or "PCS."  *Id.* at 6, 48.  The PCS listed assets that had been acquired for Pyxis and a list of 53 "targeted assets," highlighted in peach color, which were to be acquired and included in the Pyxis portfolio.  *Id.* at 7.  The PCS indicated a target portfolio of 10.4% prime RMBS, 4.8 or 5.3% pre-2005H2 subprime RMBS, and 28.9% assets rated above Baa2 by Moody's.  *Id.*  Plaintiff alleges that the PCS was misleading because when Pyxis closed, the final portfolio did not contain any prime RMBS, pre-2005H2 subprime RMBS, and just 15.47% RMBS rated above Baa2.  *Id.* at 14–15.  When all of the Pyxis collateral had been selected, and the portfolio was "fully ramped," it contained 1.8% prime RMBS and 2.3% assets "by principal balance" that were issued in the first half of 2005.  *Id.* at 11.

In 2009, while under financial distress, Plaintiff negotiated a commutation agreement with Calyon by which it agreed to pay $100 million to discharge its liabilities associated with

---

instruments, such as notes issued by residential mortgage backed securities, or by other CDOs.  Order at 1 n.1.

Pyxis and two other CDOs.  *Id.* at 11.  Although the commutation agreement did not specify what portion of the total payment was attributable to which CDO, Plaintiff alleges that it allocated $74.5 million of that $100 million to Pyxis.  *Id.*

With respect to Plaintiff's damages, the Court held that damages are limited to the "actual pecuniary loss sustained as the direct result" of Defendant's misrepresentations.  *Id.* at 40 (quoting *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1373 (N.Y. 1996)).  In concrete terms, Plaintiff's recovery is limited to the portion of the commutation payment attributable to Defendant's alleged wrongdoing, and any hypothetical damages beyond the commutation payment are not cognizable.  *Id.*  The Court also held that the collateral source rule, which provides that a plaintiff's recoverable damages are not ordinarily reduced by payments received from a source that is independent of and collateral to the wrongdoer, is not implicated in this case because there is no collateral source covering a portion of Plaintiff's actual losses.  *Id.* at 40 n.25.

The parties now move to exclude their respective experts from offering certain opinions at trial.  Defendant moves to exclude the opinions of Plaintiff's experts Fiachra T. O'Driscoll and Karl N. Snow, Ph.D.  Plaintiff moves to exclude the opinions of Defendant's experts Francis Longstaff, Ph.D., CPA, CFA, and John H. Dolan.

## ANALYSIS

I.    Legal Standard

The admissibility of expert testimony is governed by Federal Rule of Evidence 702.  It provides in relevant part that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of

fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

District courts are the gatekeepers of expert testimony, responsible for "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). "The proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

Courts first address "the threshold question of whether a witness is 'qualified as an expert by knowledge, skill, experience, training, or education' to render his or her opinions." *Nimely v. City of New York*, 414 F.3d 381, 396 n.11 (2d Cir. 2005) (quoting Fed. R. Evid. 702). After considering the expert's qualifications, courts determine whether the expert testimony is reliable. In determining reliability, district courts consider certain factors "includ[ing] the theory's testability, the extent to which it 'has been subjected to peer review and publication,' the extent to which a technique is subject to 'standards controlling the technique's operation,' the 'known or potential rate of error,' and the 'degree of acceptance' within the 'relevant scientific community.'" *United States v. Romano*, 794 F.3d 317, 330 (2d Cir. 2015) (quoting *Daubert*, 509 U.S. at 593–94).

Even after determining that a witness is qualified as an expert, and that the opinion is reliable, courts ask "whether the expert's testimony (as to a particular matter) will assist the trier

4

of fact." *Nimely*, 414 F.3d at 397 (internal quotation marks and citations omitted). "[B]ecause the federal rules emphasize liberalizing expert testimony, doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility unless there are strong factors such as time or surprise favoring exclusions." *United States v. Jakobetz*, 955 F.2d 786, 797 (2d Cir. 1992) (internal quotations marks and citation omitted).

    II.    Plaintiff's Experts

        A.  Fiachra T. O'Driscoll

Plaintiff offers Fiachra O'Driscoll, formerly the co-head of CDO Structuring at Credit Suisse, to help the factfinder understand the complexities of the Pyxis CDO, assess the prevailing standards in the CDO structuring industry, and evaluate whether Defendant behaved in accordance with industry practice. Pl. O'Driscoll Opp. at 1–2, 7, ECF No. 213. He opines on a number of topics including: "(i) the risks associated with CDOs; (ii) the manner in which CDO managers should select CDO portfolios; (iii) CDO managers' responsibilities to investors; (iv) the information CDO managers should disclose to investors and the rating agencies; (v) the information required by rating agencies to rate CDO tranches; and (vi) the ways credit ratings affect the structures of and participation in CDOs." *Id.* at 2. Defendant moves to exclude many of O'Driscoll's opinions. The Court considers each of Defendant's arguments in turn.

        1.  Rating Agencies

Defendant seeks to exclude O'Driscoll's testimony regarding the attachment point the rating agencies calculated for the Pyxis. By way of background, a CDO is a complex structured finance product that is backed by a pool of loans. Def. O'Driscoll Mem. at 1 n.2, ECF No. 199. A CDO issues notes that are sold to institutional investors. *Id.* The notes are divided into different tranches that carry distinctive ratings based on the tranche's risk profile. *Id.* A CDO's

"initial AAA attachment point" is the amount of losses that a CDO can withstand before the first note tranche rated AAA suffers any losses. *Id.* The Pyxis CDO had an initial AAA attachment point of 20.43%. *Id.* at 1. O'Driscoll opines that the rating agencies required a 20.43% initial AAA attachment point based on a portfolio provided by Calyon and contends that if the rating agencies had received the final Pyxis portfolio, they would have established a 25.05% attachment point instead. *Id.* at 1–2. A higher attachment point, O'Driscoll argues, would have led Plaintiff to insure certain tranches of the Pyxis CDO at a higher attachment point, which would have required lower loss reserves on its part, and caused Plaintiff to pay less to commute its exposure to Pyxis. *Id.* at 2 n.3. Defendant moves to exclude O'Driscoll's proposed testimony because O'Driscoll is not qualified to opine on this subject, because his opinion is unreliable, and because he does not follow any established methodology. The Court agrees.

"In order for a witness to render opinion testimony at trial, he or she must be qualified as an expert by knowledge, skill, experience, training, or education" in the relevant field. *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 304 (S.D.N.Y. 2015) (internal quotation marks and citation omitted). The Court then compares "the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *Id.* (internal quotation marks and citation omitted). "An expert qualified in one subject matter does not thereby become an expert for all purposes. Testimony on subject matters unrelated to the witness's area of expertise is prohibited by Rule 702." *Id.* (internal quotation marks, citation, and alterations omitted).

The Court holds that O'Driscoll is not qualified to opine on what attachment point the rating agencies would have calculated if they had received the final Pyxis portfolio. First, O'Driscoll never worked at a rating agency. As a CDO structurer, he "worked closely with the

6

rating agencies for years . . . to secure credit ratings for his subprime RMBS-backed CDOs."  Pl.

O'Driscoll Opp. at 10.  Even if through this experience he became "intimately familiar" with

their requirements and the use and application of their models, *id.*, he never actually worked at a

rating agency that issues credit ratings, and the Court hesitates to allow O'Driscoll to do

something at trial, that he never did in practice.  He has not demonstrated that he possesses the

"knowledge, skill, experience, training, or education," to opine as to the attachment point that a

third-party he worked with, but never for, would have calculated.  Fed. R. Evid. 702.

O'Driscoll's opinion, therefore, falls outside of his area of expertise and Courts in this district

typically exclude expert testimony where the expert seeks to provide "[t]estimony on subject

matters unrelated to the witness's area of expertise."  *523 IP LLC v. CureMD.Com*, 48 F. Supp.

3d 600, 647 (S.D.N.Y. 2014); *see also Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558,

642 (S.D.N.Y. 2007).

 Moreover, as Plaintiff concedes, it is no longer possible to run the "CDO evaluator;" the

analytical tool the rating agencies used to determine the Pyxis credit ratings.  Pl. O'Driscoll

Opp. at 14.  O'Driscoll, then, would be providing an expert opinion as to what the rating

agencies would have done, using a methodology that the rating agencies did not use.

 O'Driscoll's opinion also contradicts the factual record.  For example, each of the rating

agencies issued a letter confirming its initial ratings for Pyxis based on the final portfolio.  Def.

O'Driscoll Mem. at 12.  O'Driscoll disputes this, and intends to testify that the rating agencies

could not have reviewed the actual Pyxis portfolio before issuing their rating confirmation letters

because if they had, they would have assigned different ratings for Pyxis.  Pl. O'Driscoll Mem. at

16.  In other words, O'Driscoll intends to challenge the credibility of the rating agencies.

Plaintiff argues that O'Driscoll's assertion is reasonable, and within his expertise, due to the

wealth of evidence suggesting that the rating agencies, overwhelmed with the flow of new CDOs, regularly "cut corners" in early 2007. *Id.* at 16.

It is inappropriate for O'Driscoll to opine on what the agencies would or should have done, or worse, question their credibility, when such agencies have already spoken through their issuance of confirmation letters. An expert may not opine on the credibility of another party. *LaSalle Bank Nat.l Ass'n v. CIBC Inc.*, 2012 WL 466785, at *7 (S.D.N.Y. Feb. 14, 2012) ("[A]n expert may not testify as to facts not within his personal knowledge, and may not opine as to a party's state of mind, whether a party acted in bad faith, or as to the credibility of witnesses."). Although the rating agencies are not "witnesses" in the traditional sense, O'Driscoll's testimony that the rating agencies could not have reviewed the final Pyxis portfolio is likewise an opinion which is not within his personal knowledge, goes to the rating agencies' state of mind, and questions their credibility—the type of opinions that courts in this district regularly exclude. *See id.*

Defendant's motion to exclude O'Driscoll's opinions concerning the rating agencies is, therefore, GRANTED.

### 2. The Predicate Facts for O'Driscoll's Opinions

"[A]n expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence." *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005) (citation omitted). Defendant contends that O'Driscoll's expert reports are narrative summaries that improperly invade the province of the jury. Def. O'Driscoll Mem. at 14–17. The Court disagrees.

At trial, the jury will be presented with a complicated set of facts regarding a financial transaction that took place more than ten years ago. The factual assertions an expert relies on

must be "supported by admissible evidence" and so O'Driscoll may not "present these facts to

the jury for the purpose of describing what actually took place." *Reach Music Pub., Inc. v.*

*Warner Chappell Music, Inc.*, 988 F. Supp. 2d 395, 404 (S.D.N.Y. 2013). He may, however,

"present these facts as the predicate for his opinion testimony." *Id.* The testimony of experts,

such as O'Driscoll, "will likely prove helpful in allowing the trier of fact to understand the

evidence better and providing the trier of fact with the necessary tools to make an ultimate

determination about whether or not" Defendant made a series of material misstatements about

the makeup of the Pyxis CDO. *S.E.C. v. U.S. Envtl., Inc.*, No. 94 Civ. 6608, 2002 WL

31323832, at *4 (S.D.N.Y. Oct. 16, 2002).[3]

Defendant's motion to exclude O'Driscoll's opinions as "factual narratives" is, therefore,

DENIED.

### 3. Legal Issues and Ultimate Issues of Fact

Defendant argues that O'Driscoll impermissibly opines on legal issues and ultimate

issues of fact and that those opinions should be excluded. Def. O'Driscoll Mem. at 18–21.

Defendant takes particular exception to O'Driscoll's opinion concerning the alleged materiality

of representations made to Plaintiff including what was "important" or "clearly significant" to

FGIC or other parties, as well as his opinions regarding reliance, causation, and duty. *Id.* at 19.

"An opinion is not objectionable just because it embraces an ultimate issue." Fed. R.

Evid. 704. "When an expert offers an opinion relevant to applying a legal standard . . . the

---

[3] For example, Defendant takes issue with paragraph 96 of O'Driscoll's report, which concerns the purpose of a "separate account." In this paragraph, O'Driscoll begins with a factual background: "[a] 'separate account,' in asset management parlance, is a portfolio of assets managed for just one investor as opposed to a fund in which different investors' holdings are commingled, such as a mutual fund." O'Driscoll Report ¶ 96, ECF No. 200-5. This is the predicate for O'Driscoll's opinion that, "[i]n other words, according to Deutsche Bank's Michael Henriques, [Defendant] regarded Pyxis as a portfolio to be managed primarily for the benefit of Deutsche Bank and Magnetar." *Id.*

expert's role is limited to describing sound professional standards and identifying departures

from them." *Restivo v. Hessemann*, 846 F.3d 547, 580 (2d Cir. 2017) (internal quotation marks

and citation omitted).  Such opinions "give a jury a baseline to help evaluate whether a

defendant's deviations from those standards" constitutes negligence.  *Id.*  Courts have, however,

excluded "expert testimony that expresses a legal conclusion."  *Hewitt v. Metro-N. Commuter

R.R.*, 244 F. Supp. 3d 379, 393 (S.D.N.Y. 2017) (internal quotation marks and citation omitted).

O'Driscoll may, therefore, identify the professional standards applicable to the parties'

interactions, and whether a party deviated from those standards.  *Restivo*, 846 F.3d at 580.  He

may for example, testify as to what a party in Plaintiff's position would have understood a

certain email or representation to mean, based on his experience and the relevant industry

standards.  O'Driscoll may not, however, testify definitively as to how Plaintiff understood a

certain representation, and whether that representation was "negligent" or "material," whether

the representation induced Plaintiff to participate in Pyxis, or whether Defendant owed Plaintiff a

duty.  *Highland Capital*, 379 F. Supp. 2d at 470 ("[I]t is axiomatic that an expert is not permitted

to provide legal opinions, legal conclusions, or interpret legal terms; those roles fall solely within

the province of the court." (internal quotation marks and citation omitted)).

Defendant's motion to exclude O'Driscoll's opinions for impermissibly opining on legal

issues and ultimate issues of fact is, therefore, GRANTED.

### 4.  Parties' State of Mind

Relatedly, Defendant contends that O'Driscoll opines on the state of mind of various

individuals and parties and seeks to exclude such testimony on the basis that it is impermissible

as a matter of law.  The Court agrees in part.

The question of a party's knowledge or intent "is a classic jury question."  *In re Rezulin*

*Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) (internal quotation marks and citation omitted); *see Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 45 (S.D.N.Y. 2016) ("[E]xperts may not offer opinions regarding the intent or motive of parties as part of their analysis."). An expert may, however, "offer testimony discussing ordinary practices and usages in a particular industry." *Id.* at 46 (internal quotation marks and citation omitted).

According to Plaintiff, O'Driscoll "explains the custom, practice and expectations that informed Pyxis to help the factfinder evaluate, among other things, the parties' understanding and intent." Pl. O'Driscoll Opp. at 27. O'Driscoll's report, however, does much more than this. His report is filled with assertions about the state of mind of Defendant and its employees, including things that they knew or should have known. *See* Def. O'Driscoll Mem. at 22; *see e.g.,* O'Driscoll Report ¶ 17, ECF No. 200-5 ("[Defendant] failed to disclose either of these constraints to Plaintiff, despite the facts that . . . it knew [Plaintiff] relied on this representation . . . it knew [Plaintiff] stood to benefit from a higher quality, more diversified portfolio; and [Defendant] knew Magnetar did not."); O'Driscoll Rebuttal Report ¶ 2, ECF No. 200-6 ("[Defendant] indisputably knew the rating agencies were sent a materially false target portfolio for Pyxis . . . "). Any opinion O'Driscoll offers must be grounded in industry practice and deviations from such practice; O'Driscoll may not testify as to what an individual or party's intent, motive, or knowledge was on any given time as these are factual issues reserved for the factfinder.

Defendant's motion to exclude O'Driscoll's opinions regarding the state of mind of various individuals and parties is, therefore, GRANTED. O'Driscoll's testimony must be "limited to describing sound professional standards and identifying departures from them." *Restivo*, 846 F.3d at 580 (internal quotation marks and citation omitted).

11

5.   RMBS Spreads

In his report, O'Driscoll attempts to quantify the impact of Defendant not independently selecting the assets that would constitute the Pyxis CDO.  O'Driscoll Report ¶¶ 186–187.  In calculating the impact, specifically, losses Plaintiff suffered as a result of Defendant not independently selecting the assets, O'Driscoll relies on his recollection of the average spreads for various RMBS bonds issued between 2004 and early-2006. [4]  *Id.* ¶ 189; Def. O'Driscoll Mem. at 24.  Defendant argues that his opinion regarding these average spreads is unreliable, speculative, and contradicted by his own belatedly produced workpapers and, therefore, should be excluded.  *Id.*  The Court disagrees.

O'Driscoll's opinion regarding RMBS spreads is based on his recollection, as a market participant, of the levels at which the relevant assets were trading at the time.  Pl. O'Driscoll Opp. at 18.  He traded cash and synthetic RMBS and CDOs and supervised other traders dealing in those securities.  Knowing the spreads at which RMBS and CDO securities traded was a core part of his job.  *Id.*  The Court finds, therefore, that O'Driscoll is qualified to provide his opinion regarding average RMBS spreads.  That his work papers may call his conclusions into doubt does not make his opinion inadmissible, because "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 596.

Defendant's motion to exclude O'Driscoll's opinion regarding RMBS spreads is, therefore, DENIED.

---

[4] A bond spread is the average difference in basis points between the London Interbank Offered Rate ("LIBOR") and the interest rates payable on assets in which the CDO invested.  Def. O'Driscoll Mem. at 24 n.21

6.   The Cause of the Financial Crisis

According to O'Driscoll, by allowing a third party, Magnetar Capital, a hedge fund, to exercise significant control over asset selection for Pyxis, Defendant "did not merely hurt [Plaintiff] and other investors in Pyxis."  O'Driscoll Report ¶¶ 13, 24.  Rather, O'Driscoll claims that Defendant's actions were a "causal factor in the 2007-08 financial crisis."  *Id.* ¶ 24.  O'Driscoll alleges that Magnetar sponsored 29 highly correlated CDOs—known as the Constellation CDOs—in each case, with the assistance of a willing investment manager like Defendant.  *Id.*  He argues that Defendant lent credibility to and materially assisted the actions of Magnetar, which in turn materially exacerbated the subprime crisis, helping to trigger the financial crisis.  Pl. O'Driscoll Opp. at 28–30; *see also* O'Driscoll Report ¶ 24 ("If not for the Constellation CDOs and willing investment managers like [Defendant], the collapse of the housing bubble and consequent financial crisis—which [Defendant] now maintains was the cause of [Plaintiff's] losses—would have come sooner and been far less severe.").  The Court holds that O'Driscoll is not qualified to opine on the cause of the financial crisis and, even if he were, the Court would exclude such evidence as prejudicial.

O'Driscoll, as Defendant points out, is not an economist, academic, or professional with experience relevant to financial crises.  Def. O'Driscoll Mem. at 26.  That O'Driscoll worked in an industry that was a part of the financial crisis does not make him an expert qualified to speak to the causes of such a crisis.  Whatever expertise he may have acquired as a CDO structurer does not mean that he has a basis to opine on the effects of one CDO on a global economic event.  Plaintiff has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied, *Williams*, 506 F.3d at 160, but it has failed to cite any examples of cases where a CDO structurer like O'Driscoll, or someone similarly

13

situated, was allowed to opine as to the cause of the financial crisis.

Even if O'Driscoll were qualified to offer such an opinion, the Court would exclude it because its probative value is substantially outweighed by a danger of unfair prejudice.  At trial, if the jury concludes that Defendant is liable, the jury will also have to decide whether Defendant's alleged misstatements about Pyxis collateral caused Plaintiff to (1) pay the $74.5 million commutation payment, or (2) pay a higher commutation payment than it otherwise would have.  Order at 37.  And though market forces may have contributed to Plaintiff's decision to commute liability, the Court has already held that Plaintiff's exposure to increased liability was independent of the financial crisis because it existed before the financial crisis and would have existed without it.  *Id.* at 39.  The probative value of O'Driscoll's testimony regarding the cause of the financial crisis is, therefore, limited, while the potential to inflame the jury is great.  Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . .  unfair prejudice . . . [or] . . .  misleading the jury.").

Defendant's motion to exclude O'Driscoll's opinion regarding the cause of the financial crisis is, therefore, GRANTED.

### 7.  Speculative Opinions

Lastly, Defendant argues that many of O'Driscoll's other opinions are based on speculation and conjecture.  Def. O'Driscoll Mem. at 28.  The Court agrees that two of the opinions identified in Defendant's brief should be excluded.

First, O'Driscoll opines that adding more prime assets would have caused Pyxis to perform better, even though he admits that he did not model such a scenario.  *Id.*  If O'Driscoll has not modeled such a scenario, than the Court has no mechanism for assessing the "theory's testability," whether there are "standards controlling the technique's operation," or even the

"potential rate of error;" factors the Court must assess in determining whether an expert's opinion is reliable. *Romano*, 794 F.3d 317, 330 (2d Cir. 2015) (internal quotation marks and citation omitted). The Court doubts the reliability of this opinion and, therefore, excludes it.

Second, O'Driscoll plans to testify that Pyxis equity holders had the right under the equity purchase agreement to walk away from Pyxis at any point before the September 2006 pricing date "unless they were satisfied with the transaction." *Id.* at 30. Because O'Driscoll's opinion amounts to a conclusion regarding the Pyxis equity holders' rights under a contract, and courts customarily exclude "expert testimony that expresses a legal conclusion," *Hewitt*, 244 F Supp. 3d at 393, the Court excludes this opinion.

The remaining opinions Defendant identifies concern what O'Driscoll expects would have happened in certain circumstances based on his experience. *See* Def. O'Driscoll Mem. at 28–29. Because these statements do not go to any parties' state of mind, which would be improper, the Court denies Defendant's motion as to those statements.

Defendant's motion to exclude certain opinions based on speculation and conjecture is, therefore, GRANTED with respect to O'Driscoll's opinions regarding the impact adding more prime assets would have had on Pyxis' performance, and the right of Pyxis equity holders to walk away from Pyxis, and is otherwise DENIED.

### B.  Karl N. Snow, Ph.D.

Dr. Snow, Plaintiff's expert on damages, is a professional economist employed by an economic consulting firm, whose academic work has focused on statistical modeling and valuation of financial assets. Snow Report at 1–2, ECF No. 204-1. In his expert report, he calculates the losses Plaintiff would have suffered had it not made the commutation payment in July 2009, and instead, continued to insure Pyxis until 2016, when the insurance payment would

have been due.  *See* Snow Report ¶¶ 50–84.  According to Dr. Snow, Plaintiff would have lost

$782 million as of September 2016 had it not terminated its obligations pursuant to the 2009

commutation payment.  *Id.* ¶¶ 36–37.  Through Dr. Snow's report, Plaintiff intends to prove that

at least $150 million of Plaintiff's liability was attributable to Defendant's wrongdoing, and

because this exceeds the $100 million commutation payment, Defendant must pay the full

amount of the commutation payment as damages associated with issuing the Pyxis Guaranty,

pursuant to the collateral source rule.  Pl. Snow Opp. at 7, ECF No. 216.  Defendant moves to

exclude this testimony on the ground that it is irrelevant and unhelpful to the jury because the

opinions are based on "hypothetical" calculations of what Plaintiff's total losses would have

been had it continued to insure Pyxis through 2016.  Def. Snow Mem. at 2, ECF No. 203.  The

Court agrees.

First, the Court has already found that the collateral source rule is not implicated in this

case.  Order at 40 n.25.  To the extent Plaintiff seeks to proffer Dr. Snow's opinion in support of

their argument that Defendant must pay the full amount of the commutation payment as

damages, pursuant to the collateral source rule, Pl. Snow Opp. at 2, that opinion is not "relevant

to the task at hand" and is excluded.  *Daubert*, 509 U.S. at 597.

Second, at trial, Plaintiff will have to prove what portion of the commutation payment, its

"actual pecuniary loss," is attributable to Defendant's alleged wrongdoing.  Order at 40 (quoting

*Lama Holding Co.*, 668 N.E.2d at 1373).  This is because the relevant question for the factfinder

under New York law is focused on "actual pecuniary loss" as opposed to hypothetical losses.

*See Lama Holding Co.*, 668 N.E.2d at 1373.  Plaintiff alleges that $74.5 million of the $100

million commutation payment was allocated for the Pyxis Guaranty.  Pl. Snow Opp. at 7.

According to Plaintiff, the amount it paid to commute its obligation under the Pyxis Guaranty

was calculated based on its loss reserves, or the best estimate of the present value of all future

Pyxis payments it would be obligated to make under each given policy.  Order at 34.  Dr. Snow's

calculation of "hypothetical" losses does not help the factfinder understand what portion of the

commutation payment was allocated to the Pyxis Guaranty or even how much liability Plaintiff

believed it was facing when it decided to commute its liability.  Dr. Snow's projections,

therefore, are contrary to New York law, and courts routinely exclude expert opinions in such

circumstances.  *See, e.g.*, *Kortright Capital Partners LP v. Investcorp Investment Advisers Ltd.*,

392 F. Supp. 3d 382, 397 (S.D.N.Y. 2019) (precluding expert testimony on damages where

damages opinion was inconsistent with New York law); *In re Mirena IUD Prods. Liab. Litig.*,

169 F. Supp. 3d 396, 421 (S.D.N.Y. 2016) (excluding expert opinion because it was "not

relevant to either Plaintiffs' or Defendants' theories" of the case, "would waste time, and would

unfairly prejudice Plaintiffs").

Defendant's motion to exclude Dr. Snow's testimony regarding hypothetical damages is,

therefore, GRANTED.

III.   Defendant's Experts

A.  Francis Longstaff, Ph.D., CPA, CFA

Plaintiff moves to exclude certain opinions proffered by Dr. Longstaff, retained by

Defendant to opine on the causes of Plaintiff's losses with respect to Pyxis.  Pl. Longstaff Mem.

at 1–2, ECF No. 192; Def. Longstaff Opp. at 3, ECF No. 211.  Dr. Longstaff is the Senior

Associate Dean and Director of the Doctoral Program at the UCLA Anderson School of

Management, where he is also the Allstate Professor of Insurance and Finance.  Longstaff

Report ¶ 1, ECF No. 197-7.  Much of his academic research and industry experience has focused

on the impact of financial crises on financial markets and security valuations.  *Id.* ¶ 3.  The Court

will address each opinion Plaintiff seeks to exclude in turn.

### 1.  Dr. Snow's Analyses and the Financial Crisis

Plaintiff's damages expert, Dr. Snow, conducted an analysis to determine Plaintiff's hypothetical losses under the Pyxis Guaranty had Defendant selected a portfolio consistent with its representations, such as the PCS.  Pl. Longstaff Mem. at 11.  Plaintiff seeks to prevent Dr. Longstaff from criticizing Dr. Snow's analysis for failing to take into account the effect of the financial crisis on Plaintiff's losses, on the grounds that such an opinion is incorrect and unhelpful to the jury.  *Id.* at 12.  Because the Court excluded Dr. Snow's opinion regarding hypothetical losses, Longstaff's opinion criticizing Dr. Snow's analysis is no longer relevant.  *See e.g.*, *United States Sec. & Exch. Comm'n v. Mudd*, No. 11 Civ. 9202 , 2016 WL 2593980, at *7 n.14 (S.D.N.Y. May 4, 2016) ("Because [experts'] reports and testimony have been excluded in their entirety, [rebuttal expert's] rebuttal is no longer necessary or relevant."); *Luitpold Pharm., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, No. 11 Civ. 681, 2015 WL 5459662, at *9 (S.D.N.Y. Sept. 16, 2015) ("As the Court has precluded [plaintiff's expert], there is no longer any reason for [the rebuttal experts] to testify.").

Plaintiff's motion to exclude Dr. Longstaff' opinion challenging Dr. Snow's analysis is, therefore, GRANTED.

### 2.  The Performance of "Comparable" CDOs

Dr. Longstaff conducted a number of analyses to assess Plaintiff's claim that Magnetar's alleged influence on Defendant's selection of assets for the Pyxis portfolio caused Pyxis to suffer greater losses than it would have but for Magnetar's influence.  Def. Longstaff Opp. at 11.  He concludes that "Pyxis' collateral performed no differently, on average, than other assets in the comparable RMBS [u]niverse that [Defendant] could have selected for Pyxis."  *Id.* (internal

quotation marks, citation, and brackets omitted).  Plaintiff seeks to exclude this testimony as

unreliable and unhelpful to the trier of fact.  Although issues regarding the methodology used by

Dr. Longstaff would go to weight instead of admissibility, the Court finds the conclusion he

reaches to be irrelevant, and, therefore, excludes his testimony.

Rule 702 "requires that the evidence or testimony assist the trier of fact to understand the

evidence or to determine a fact in issue."  *Daubert*, 509 U.S. at 591 (internal quotation marks

omitted).  "Expert testimony which does not relate to any issue in the case is not relevant and,

ergo, non-helpful."  *Id.* (internal quotation marks and citation omitted).  The Court granted

Defendant's summary judgment motion with respect to Plaintiff's misrepresentation claims

except for those arising from the PCS.  Order at 48.  Plaintiff's claim is that the PCS, which

listed the already-acquired and yet-to-be-acquired collateral assets chosen by Defendant, was

misleading because the final Pyxis portfolio did not contain many of the collateral assets the PCS

indicated would be acquired.  *Id.* at 14–15.  The relevant inquiry in assessing Plaintiff's claim,

therefore, is whether the assets Defendant selected for Pyxis, performed differently than the

assets Plaintiff believed were to be included, as indicated in the PCS.  *See* Pl. Longstaff Mem. at

16.  Dr. Longstaff's analysis does not help the trier of fact answer this question.  It does not tell

the factfinder how Pyxis would have performed if it had included the assets indicated in the PCS;

it simply tells the factfinder that if Pyxis' assets were swapped with their lookalikes, Pyxis would

have performed the same.  Such testimony is not helpful.

Plaintiff's motion to exclude Dr. Longstaff's opinion that Pyxis performance was similar

to that of comparable CDOs is, therefore, GRANTED.

### 3.  Comparison of Pyxis and Ischus

To rebut Plaintiff's arguments that Defendant's misconduct caused Plaintiff's losses, Dr.

19

Longstaff compared Pyxis with another CDO insured by Plaintiff, Ischus.  Pl. Longstaff Mem. at 16; Def. Longstaff Opp. at 15.  Longstaff concludes that Ischus was "similar in structure" and "performed similarly to Pyxis," and, therefore, Magnetar's influence on Defendant's collateral selection did not affect Plaintiff's losses.  Longstaff Report ¶¶ 14, 21.  As the Court found with Dr. Longstaff's previous opinion relating to "comparable CDOs," the Court again finds that, although Plaintiff's criticism of Dr. Longstaff's methodology goes to weight and not admissibility, the opinion is irrelevant and, therefore, excluded.

Rule 702 requires that Dr. Longstaff's testimony assist the trier of fact to understand a fact in issue.  *Daubert*, 509 U.S. at 591. Dr. Longstaff's opinion, comparing Pyxis to Ischus, does not bear on the relevant inquiry of whether Defendant, through misrepresentations, induced Plaintiff to provide financial guaranty insurance to Pyxis.  Such an opinion suggests only that CDOs were generally performing poorly, a fact that neither party disputes.

Plaintiff's motion to exclude Dr. Longstaff's opinion regarding Ischus is, therefore, GRANTED.

### 4.   Defendant and the Financial Crisis

As the Court has discussed, Plaintiff sought to offer their expert, O'Driscoll, to opine that Defendant lent credibility to and materially assisted Magnetar, actions that in turn materially exacerbated the subprime crisis, helping to trigger the financial crisis.  Pl. O'Driscoll Opp. at 28; *see also* O'Driscoll Report ¶ 24.  Defendant seeks to offer Dr. Longstaff to rebut O'Driscoll's opinion and testify that Defendant did not play a major role in the financial crisis.  Def. Longstaff Opp. at 17.  Because the Court excluded O'Driscoll's testimony regarding this topic, there is no opinion for Dr. Longstaff to rebut, making his opinion irrelevant and unnecessary. *See e.g.*, *Mudd*, 2016 WL 2593980, at *7 n.14 (S.D.N.Y. May 4, 2016) ("Because [experts']

20

reports and testimony have been excluded in their entirety, [rebuttal expert's] rebuttal is no

longer necessary or relevant."); *Luitpold Pharm.*, 2015 WL 5459662, at *9 ("As the Court has

precluded [plaintiff's expert], there is no longer any reason for [the rebuttal experts] to testify.").

    Plaintiff's motion to exclude Dr. Longstaff's opinion that Defendant did not contribute to

the financial crisis is, therefore, GRANTED, because the opinion is no longer necessary or

relevant.

5.   Size of the Commutation Payment

    Lastly, Dr. Longstaff challenges the reasonableness of Plaintiff's use of loss reserves to

allocate $74.5 million of its $100 million commutation payment to Pyxis and asserts that a

smaller portion of the commutation payment should have been attributed to Pyxis.  Pl. Longstaff

Mem. at 20; Def. Longstaff Opp. at 21.  As the Court has discussed, Plaintiff negotiated a

commutation agreement with Calyon in 2009 by which it agreed to pay $100 million to

discharge its liabilities associated with Pyxis and two other CDOs.  Order at 11.  Plaintiff

allocated the $100 million to each of the three CDOs based on its loss reserves.  *Id.* at 34.  Dr.

Longstaff, however, believes that the market-based method—otherwise known as "mark-to-

market"—which incorporates information available in the market to determine the market value

of each of the three CDOs, is a more appropriate method of allocating the commutation payment

to each of the three CDOs.  Pl. Longstaff Mem. at 20.  Based on their relative market value, Dr.

Longstaff allocates the commutation payment among the three CDOs.  *Id.*  Using this

methodology, Dr. Longstaff concludes that $55.4 million, not $74.5 million, of the commutation

payment should have been allocated to Pyxis.  *Id.*  Plaintiff moves to exclude this opinion on the

grounds that such an opinion is unhelpful and unreliable.  *Id.*  The Court declines to do so.

    Plaintiff's damages are limited to the actual pecuniary loss it sustained as the direct result

21

of Defendant's misrepresentations.  Order at 40.  Plaintiff, therefore, must establish what portion

of the commutation payment is a direct result of the alleged fraud that induced Plaintiff to

provide insurance to Pyxis.  The reasonableness of Plaintiff's loss allocation is a live issue in this

case.  As Plaintiff concedes, its theory that it made the payment to mitigate much greater losses

requires showing that it was a reasonable payment.  *See* Pl. Snow Opp. at 3–4, 18 ("To determine

whether the commutation payment reasonably mitigated [Plaintiff's] damages, the trier of fact

must determine how much FGIC would have had to pay under the Pyxis Guaranty had it not

made the commutation payment.").  Dr. Longstaff's opinion is relevant to the question of

reasonability.

Plaintiff also argues that Dr. Longstaff's opinion should be excluded because a mark-to-

market methodology is unreliable.  Pl. Longstaff Mem. at 22.  Plaintiff contends that Dr.

Longstaff ignores his own prior opinion acknowledging the illiquidity of the CDO market.[5]  *Id.*

The Court is unpersuaded by Plaintiff's argument, however, because any effect illiquidity would

have had on determining the market value of the three CDOs subject to the allocation would

have been equally borne by the three CDOs.  Moreover, to the extent the parties dispute the

validity of Plaintiff's methodology, which is based on its loss reserves, or Defendant's

methodology, which is based on mark-to-market, such a dispute goes to the weight, not

admissibility, of the experts' respective testimony.  *See, e.g.*, *In re Vitamin C Antitrust Litig.*, No.

05 Civ. 0453, 2012 WL 6675117, at *8 (E.D.N.Y. Dec. 21, 2012) (noting that plaintiffs' motion

"asks the Court to take sides in a dispute between experts about the intricacies of econometric

---

[5] Illiquidity assesses how easy it may be to sell an asset in the market.  Dr. Longstaff's mark-to-market method looks at the price Plaintiff's counterparties could receive from selling the insured bond, thereby commuting Plaintiff's obligation.  Longstaff Report ¶ 198.  From these prices, Plaintiff could compute the losses each CDO would incur and then allocate the commutation payment in proportion to the losses associated with each CDO.

modeling" which is "not the proper function of a *Daubert* motion"); *McCullock v. H.B. Fuller*, 61 F.3d 1038, 1044 (2d Cir. 1995) (finding that certain disputes as to faults in an expert's methodology "go to weight, not the admissibility, of the testimony").

Plaintiff's motion to exclude Dr. Longstaff's opinion that a smaller portion of the commutation payment should have been allocated to Pyxis is, therefore, DENIED.

### B. John H. Dolan

Plaintiff moves to exclude the testimony of Defendant's expert on CDOs, John H. Dolan. Pl. Dolan Mem. at 1–3, ECF No. 194. Dolan has over thirty years of experience in trading, structuring, investing in, and valuing agency and non-agency RMBS, agency collateralized mortgage obligations ("CMOs"), whole loans, CDOs, and commercial mortgage-backed securities ("CMBS"). [6] Dolan Report ¶ 3, ECF No. 197-2. He has held executive and senior-level positions at large portfolio managers and investment banks. *Id.* ¶ 4.

Dolan opines that Defendant's selection of Pyxis collateral and its disclosures to investors, including Plaintiff, were consistent with CDO industry practice at the time and that Plaintiff was a sophisticated CDO investor who possessed all the information needed to evaluate the Pyxis Guaranty. Dolan Report ¶¶ 20–25. Dolan also disputes the opinion of Plaintiff's expert, O'Driscoll, that the rating agencies would have insisted on higher subordination levels for Pyxis' AAA tranches, in other words, that the rating agencies would have rated Pyxis differently, absent Putnam's misrepresentations. *See* Pl. Dolan Mem. at 6, 15–16. Plaintiff argues that Dolan is not qualified to present these opinions because, with respect to his industry standards opinion, he has extremely limited experience with CDOs, and no experience with the

---

[6] "Agency RMBS" refers to securities issued by government-sponsored enterprises that include the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac"), and the Government National Mortgage Association ("Ginnie Mae").

type of CDOs at issue here, and with respect to his opinion on the rating agencies' assessment, he has no experience working with rating agencies to obtain credit ratings for CDOs. *Id.* at 2–3. The Court disagrees.

### 1.  Industry Standards and Investor Expectations

Dolan is qualified to opine on industry standards and investor expectations for the Pyxis CDO, which was launched in October 2006.  Order at 11.  The Pyxis CDO is comprised of 91.73% RMBS and 8.27% CDOs.  *Id.* at 2.  By 2017, Dolan had 30 years of experience monitoring, issuing, and investing in RMBS, the primary type of debt instrument included in the Pyxis CDO.  Def. Dolan Opp. at 10, ECF No. 209.  He was also personally involved in evaluating, managing, and investing in CDO products and served as the collateral manager for five separate CDOs issued between 2001 and 2006.  *Id.*  Because the qualification requirements of Rule 702 "must be read in light of the liberalizing purpose of the Rule," *United States v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985), the Court finds that Dolan is qualified to opine on this matter.

Plaintiff argues that Dolan is not qualified to offer expert testimony because his experience "overwhelmingly concerns the structuring of RMBS, not CDOs," Pl. Dolan Mem. at 11, and he does not have experience with the particular type of CDO at issue here, *i.e.*, CDOs backed by mezzanine subprime RMBS, *id.* at 13.  The law does not require, however, that an industry expert have managed a CDO with identical characteristics as the Pyxis CDO, in order for his testimony to be admissible.  "Courts in the Second Circuit liberally construe the expert qualifications requirement, and generally will not exclude expert testimony provided the expert has educational and experiential qualifications in a general field closely related to the subject matter in question."  *I.M. v. United States*, 362 F. Supp. 3d 161, 192 (S.D.N.Y. 2019) (internal

quotation marks and citation omitted).  The Court finds that Dolan's work evaluating RMBS

products and evaluating CDO products, including serving as a collateral manager on several

CDOs, give him experience in a field "closely related to the subject matter in question."  *Id.*

Plaintiff's arguments to the contrary attack Dolan's credibility, and the weight of his testimony,

not its admissibility.  *See Monterey v. City of New York*, No. 17 Civ. 4477, 2019 WL 5884466, at

*3 (S.D.N.Y. Nov. 12, 2019) ("Quibbles regarding a witness's qualifications or lack of

specialization go to the weight of the expert's testimony, not to its admissibility."); *see also*

*Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and

careful instruction on the burden of proof are the traditional and appropriate means of attacking

shaky but admissible evidence.").

 Plaintiff's motion to exclude Dolan's opinion regarding industry standards and investor

expectations for the Pyxis CDO is, therefore, DENIED.

### 2.  Opinion on Rating Agencies

 Dolan also intends to offer an opinion that the rating agencies had access to the final

Pyxis portfolio after Pyxis closed.  Def. Dolan Opp. at 23.  Defendant observes that after Pyxis

closed, the rating agencies received the Pyxis final portfolio and, although they downgraded

certain Pyxis note tranches, they did not downgrade the AAA-rated tranches.  Def. Dolan Opp. at

25.  The inference, perhaps, is that the rating agencies reviewed the final portfolio, and

determined that it was sufficient to support Pyxis' initial AAA composition, *id.*, an inference

Plaintiff disputes, because Plaintiff contends that if the rating agencies had received and

incorporated the final portfolio into their analysis, such agencies would have determined that the

portfolio was not sufficient to support Pyxis' initial AAA composition, Pl. Dolan Mem. at 15.

Plaintiff argues that Dolan has no experience engaging with the rating agencies to secure credit

ratings, *id.* at 16, and as such, can opine only that the rating agencies had *access* to the Pyxis portfolio, because he has no basis to opine that the rating agencies actually *reviewed* the final Pyxis portfolio, *id.* at 22.  Plaintiff's objection, then, turns on whether Dolan plans to opine that the rating agencies simply had access to the final Pyxis portfolio or whether they actually reviewed it.

The issue, however, appears to be moot, because Defendant concedes that the only opinion Dolan intends to offer, as to rating agencies, is that they had access to the final Pyxis portfolio after Pyxis closed.  Def. Dolan Opp. at 23.  Dolan's opinion on this matter is narrow and supported by his experience managing and investing in RMBS collateral assets.  Given the narrow nature of his opinion, and his experience working with rating agencies, the Court finds that Dolan is qualified to opine that the rating agencies had access to the final Pyxis portfolio. Dolan shall not, however, testify that the rating agencies actually reviewed this portfolio, as that would be outside of the limited opinion he is being proffered for.  Although Defendant suggests that "[o]ther evidence in this case establishes that the rating agencies 'actually reviewed' the final Pyxis portfolio in making its post-closing decision about what Pyxis note tranches to downgrade," *id.* at 23, Defendant shall have to prove this through that "other evidence;" not through Dolan's expert opinion.

Because the Court finds that Dolan is qualified to offer the limited opinion that the rating agencies had access to the final Pyxis portfolio, Plaintiff's motion to exclude the expert testimony of Dolan is DENIED.

**CONCLUSION**

For the reasons stated above, the Court resolves the parties' respective motions as summarized below.

- Fiachra T. O'Driscoll

  o Defendant's motion to exclude O'Driscoll's opinions concerning the rating agencies is GRANTED.

  o Defendant's motion to exclude O'Driscoll's opinions as "factual narratives" is DENIED.

  o Defendant's motion to exclude O'Driscoll's opinions for impermissibly opining on legal issues and ultimate issues of fact is GRANTED.

  o Defendant's motion to exclude O'Driscoll's opinions regarding the state of mind of various individuals and parties is GRANTED.

  o Defendant's motion to exclude O'Driscoll's opinion regarding RMBS spreads is DENIED.

  o Defendant's motion to exclude O'Driscoll's opinion regarding the cause of the financial crisis is GRANTED.

  o Defendant's motion to exclude certain opinions based on speculation and conjecture is GRANTED with respect to O'Driscoll's opinions regarding the impact adding more prime assets would have had on Pyxis' performance and the right of Pyxis equity holders to walk away from Pyxis, and is otherwise DENIED.

- Karl N. Snow, Ph.D.

  o Defendant's motion to exclude Dr. Snow's testimony regarding hypothetical damages is GRANTED.

27

- Francis Longstaff, Ph.D., CPA, CFA

  o Plaintiff's motion to exclude Dr. Longstaff' opinion challenging Dr. Snow's analysis is GRANTED.

  o Plaintiff's motion to exclude Dr. Longstaff's opinion that Pyxis performance was similar to that of comparable CDOs is GRANTED.

  o Plaintiff's motion to exclude Dr. Longstaff's opinion regarding Ischus is GRANTED.

  o Plaintiff's motion to exclude Dr. Longstaff's opinion that Defendant did not contribute to the financial crisis is GRANTED.

  o Plaintiff's motion to exclude Dr. Longstaff's opinion that a smaller portion of the commutation payment should have been allocated to Pyxis is DENIED.

- John H. Dolan

  o Plaintiff's motion to exclude Dolan's opinion regarding industry standards and investor expectations for the Pyxis CDO is DENIED.

  o Plaintiff's motion to exclude Dolan's opinion that the rating agencies had access to the final Pyxis portfolio is DENIED.

The Clerk of Court is directed to terminate the motions at ECF Nos. 191, 193, 198, and 202.

SO ORDERED.

Dated: February 19, 2020
New York, New York

_____
ANALISA TORRES
United States District Judge