UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FINANCIAL GUARANTY INSURANCE
COMPANY,

                    Plaintiff,

        v.

THE PUTNAM ADVISORY COMPANY,
LLC,

                    Defendant.

Case No. 12 Civ. 7372 (AT) (KNF)

## PLAINTIFF'S RESPONSE TO DEFENDANT'S
## PRE-TRIAL MEMORANDUM OF LAW

Date:  February 27, 2020

Sean Baldwin
Joy Odom
Amy Nemetz
Margaret Larkin
William Rathgeber
SELENDY & GAY, PLLC
1290 Avenue of the Americas
New York, NY  10104
Tel: 212-390-9000
sbaldwin@selendygay.com

*Attorney for Plaintiff*
*Financial Guaranty Insurance Company*

**Table of Contents**

PRELIMINARY STATEMENT ................................................................................ 1

Argument ............................................................................................................. 3

I.   The PCS Was an Actionable Misrepresentation Attributable to Putnam ........ 3

    A.   The PCS was an actionable representation ............................................. 3

    B.   Putnam made the misrepresentations in the PCS through Calyon ............................................................................................ 4

    C.   Putnam can be liable even if it did not see the PCS ............................. 5

    D.   Willful blindness satisfies the knowledge requirement for common-law fraud ........................................................................ 7

    E.   Putnam ignores its liability for its continuing omission to correct the materially false information in the PCS .......................... 9

II.  Putnam Had Fraudulent Intent ..................................................................... 12

III. FGIC Justifiably Relied on the PCS ............................................................... 13

I.   FGIC Will Prove the Required Causation ...................................................... 16

    A.   FGIC will prove transaction causation ................................................ 16

    B.   FGIC will prove loss causation ........................................................... 17

II.  Putnam's Arguments about the "Special Relationship" Required for FGIC's Negligence-Based Claims Are Incorrect ............................................ 18

    A.   Putnam misconstrues the "special relationship" required for a negligent misrepresentation claim ..................................................... 18

    B.   FGIC does not need to show a "special relationship" to prove its standalone negligence claim ............................................................. 21

III. Putnam's Legal Arguments Regarding Damages Are Without Merit ............ 21

CONCLUSION .................................................................................................... 26

## <u>Table of Authorities</u>

### <u>Cases</u>

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*,
    888 F. Supp. 2d 431 (S.D.N.Y. 2012) ................................................................... 9

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*,
    No. 08 Civ. 7508, 2013 WL 837536 (S.D.N.Y. Mar. 6, 2013) .......................... 20

*ACA Fin. Guar. Corp. v. Goldman, Sachs & Co.*,
    131 A.D.3d 427 (1st Dep't 2015) ..................................................................... 13

*Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*,
    404 F.3d 566 (2d Cir. 2005) ............................................................................. 10

*Alley Sports Bar, LLC v. SimplexGrinnell, LP*,
    58 F. Supp. 3d 280 (W.D.N.Y. 2014) .............................................................. 19

*Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*,
    57 F.3d 146 (2d Cir. 1995) ............................................................................... 10

*Basis Pac-Rim Opportunity Fund (Master) v. TCW Asset Mgmt. Co.*,
    977 N.Y.S.2d 665, 2013 WL 4873885 (Sup. Ct. N.Y. Cty. Sept. 10, 2013) ...... 13

*Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*,
    692 F.3d 42 (2d Cir. 2012) ......................................................................... 18, 19

*BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*,
    949 F. Supp. 2d 486 (S.D.N.Y. 2013) ................................................................ 6

*Cacchillo v. Insmed Inc.*,
    No. 1:10-CV-01199, 2013 WL 622220 (N.D.N.Y. Feb. 19, 2013) ...................... 6

*Caiola v. Citibank, N.A., N.Y.*,
    295 F.3d 312 (2d Cir. 2002) ............................................................................. 20

*Clearview Concrete Prods. Corp. v. S. Charles Gherardi, Inc.*,
    453 N.Y.S.2d 750 (2d Dep't 1982) ................................................................... 22

*Dallas Aerospace, Inc. v. CIS Air Corp.*,
    352 F.3d 775 (2d Cir. 2003) ............................................................................. 19

*DDJ Mgmt., LLC v. Rhone Grp. L.L.C.*,
    15 N.Y.3d 147 (2010) ...................................................................................... 14

*De Sole v. Knoedler Gallery, LLC,*
  139 F. Supp. 3d 618 (S.D.N.Y. 2015) ........................................................ 13, 14

*Den Norske Ameriekalinje Actiesselskabet v. Sun Print. & Publ. Assn.,*
  226 N.Y. 1 (1919) ................................................................................... 22

*EED Holdings v. Palmer Johnson Acquisition Corp.,*
  387 F. Supp. 2d 265 (S.D.N.Y. 2004) ....................................................... 10

*Elghanian v. Harvey,*
  671 N.Y.S.2d 266 (1st Dep't 1998) ............................................................ 18

*Elkind v. Liggett & Myers, Inc.,*
  635 F.2d 156 (2d Cir. 1980) ................................................................... 4, 5

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.,*
  104 F. Supp. 3d 441 (S.D.N.Y. 2015) ....................................................... 18

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC,*
  783 F.3d 395 (2d Cir. 2015) ..................................................... 12, 17, 19, 20

*First Hill Partners, LLC v. BlueCrest Capital Mgmt.,*
  52 F. Supp. 3d 625 (S.D.N.Y. 2014) ......................................................... 10

*Glob.-Tech Appliances, Inc. v. SEB S.A.,*
  563 U.S. 754 (2011) ............................................................................... 9

*Gregor v. Rossi,*
  992 N.Y.S.2d 17 (1st Dep't 2014) ............................................................ 18

*Health-Chem Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,*
  559 N.Y.S.2d 435 (Sup. Ct. N.Y. Cty. 1990) ............................................. 24

*High Point Design, LLC v. LM Ins. Corp.,*
  No. 14-cv-7878, 2016 WL 426594 (S.D.N.Y. Feb. 3, 2016) ........................... 24

*HSH Nordbank AG v. UBS AG,*
  941 N.Y.S.2d 59 (1st Dep't 2012) ............................................................ 20

*Hydro Inv'rs, Inc. v. Trafalgar Power, Inc.,*
  227 F.3d 8 (2d Cir. 2000) ........................................................................ 6

*Hyosung Am., Inc. v. Sumagh Textile Co., Ltd.,*
  25 F. Supp. 2d 376 (S.D.N.Y. 1998) ......................................................... 25

*In re IAC/InterActiveCorp Secs. Litig.,*
  478 F. Supp. 2d 574 (S.D.N.Y. 2007) ......................................................... 4

iii

*In re MarketXT Holdings Corp.*,
    No. 04-12078, 2006 WL 2864963 (Bankr. S.D.N.Y. Sept. 29, 2006) .............. 16

*KNK Enters., Inc. v. Harriman Enters., Inc.*,
    33 A.D.3d 872 (2d Dep't 2006) ........................................................................ 15

*Lanite Sales Co. v. Klevins Corp.*,
    128 N.Y.S.2d 182 (Sup. Ct. 1954) ................................................................... 22

*Laub v. Faessel*,
    297 A.D.2d 28 (1st Dep't 2002) ...................................................................... 16

*LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*,
    10 F. Supp. 3d 504 (S.D.N.Y. 2014) ............................................................... 20

*Lentell v. Merrill Lynch & Co., Inc.*,
    396 F.3d 161 (2d Cir. 2005) ............................................................................ 16

*Matter of Scher Law Firm, LLP v. DB Partners I, LLC*,
    97 A.D.3d 590 (2d Dep't 2012) ......................................................................... 8

*MF Global Holdings, Ltd. v. PricewaterhouseCoopers LLP*,
    199 F.Supp.3d 818 (S.D.N.Y. 2016) ............................................................... 21

*Mid Atl. Framing, LLC v. Varish Constr., Inc.*,
    117 F. Supp. 3d 145 (N.D.N.Y. 2015) ............................................................... 7

*Ninth Ave. & Forty-second St. Corp. v. Zimmerman*,
    217 A.D. 498 (1st Dep't 1926) .................................................................. 22, 26

*Ostano Commerzanstalt v. Telewide Sys., Inc.*,
    684 F. Supp. 1172 (S.D.N.Y. 1988) ................................................................ 22

*Pasternack v. Lab. Corp. of Am. Holdings*,
    27 N.Y.3d 817 (2016) ....................................................................................... 4

*Pasternack v. Lab. Corp. of Am.*,
    No. 10 Civ. 4426, 2014 WL 4832299 (S.D.N.Y. Sept. 29, 2014) ...................... 7

*Perfetto v. CEA Engineers, P.C.*,
    980 N.Y.S.2d 788 (2d Dep't 2014) .................................................................. 21

*Prime Mover Capital Partners, L.P. v. Elixir Gaming Techs., Inc.*,
    793 F.Supp.2d 651 (S.D.N.Y. 2011) ........................................................... 8, 19

*RKA Film Fin., LLC v. Kavanaugh*,
    100 N.Y.S.3d 611 (Sup. Ct. N.Y. Cty. 2018) .................................................. 19

*Rosen v. Spanierman,*
  894 F.2d 28 (2d Cir. 1990) ............................................................................. 4, 7

*Schumaker v. Mather,*
  133 N.Y. 590 (1892) ........................................................................................ 14

*State Street Trust Co. v. Ernst,*
  278 N.Y. 104 (1938) .......................................................................................... 9

*Stephenson v. Citco Group Ltd.,*
  700 F. Supp. 2d 599 (S.D.N.Y. 2010) ............................................................... 8

*Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank,*
  250 F.3d 87 (2d Cir. 2001) ............................................................................... 8

*Tellabs v. Makor Issues & Rights, Ltd.,*
  551 U.S. 308 (2007) ........................................................................................... 8

*Trust for the Certificate Holders of the Merrill Lynch Mortg. Pass-Through
  Certificates Series 1999-C1 v. Love Funding Corp.,*
  736 F. Supp. 2d 716 (S.D.N.Y. 2010) .............................................................. 25

*U.S. Bank, N. A. v. UBS Real Estate Sec. Inc.,*
  205 F. Supp. 3d 386 (S.D.N.Y. 2016) ................................................................ 8

*United States v. Connolly,*
  No. S1 16 Cr. 370, 2018 WL 2411216 (S.D.N.Y. May 15, 2018) ..................... 12

*United States v. RW Prof'l Leasing Servs. Corp.,*
  No. 02 CR 767, 2007 WL 1958904 (E.D.N.Y. June 27, 2007) ......................... 12

*Woori Bank v. Citigroup Inc.,*
  No. 12 Civ. 3868, 2013 WL 1235648 (S.D.N.Y. Mar. 27, 2013) ........................ 6

## **Rules**

Fed. R. Civ. P. 9 .................................................................................................... 6

Pursuant to the Court's Individual Practices in Civil Cases and its Order dated September 11, 2019 (ECF No. 161), Plaintiff Financial Guaranty Insurance Company ("FGIC") respectfully submits this brief in response to legal arguments raised in Putnam's pre-trial memorandum of law (ECF No. 254).

## PRELIMINARY STATEMENT

In its pre-trial brief, as in its ten motions *in limine*, Putnam attempts to narrow FGIC's entire case down to a single document—the PCS—and to isolate the PCS from the context in which it was provided to FGIC.  Putnam tries to wish away extensive evidence showing that (1) Putnam represented to FGIC and other Pyxis investors that it would select the Pyxis collateral itself from the full universe of eligible assets, including prime and seasoned RMBS and assets rated above BBB; (2) in fact, Putnam largely or entirely excluded all these categories of higher-quality assets at the direction of the equity investors, especially Magnetar, to further the equity investors' long-short correlation trading scheme at the expense of FGIC and Pyxis's other investors; (3) Putnam cooperated with Magnetar's scheme because it knew if it did not Magnetar would refuse to buy the Pyxis equity, in which case Pyxis would likely not close and Putnam would be deprived of its management fees on Pyxis and other Constellation CDOs Magnetar had promised it; (4) Putnam knew FGIC would not participate in Pyxis, at least on the terms required to ensure Pyxis closed, if it knew Putnam was excluding higher-quality assets at the direction of a short investor; (5) thus, when FGIC asked Putnam to provide it with the Pyxis portfolio, including the assets still to be acquired, Putnam told FGIC to obtain this information from Calyon, whom it knew or should reasonably have known would provide FGIC with a materially false portfolio (the PCS) containing substantial amounts of these higher-quality assets; (6) FGIC performed its credit analysis of Pyxis based on the false information in the PCS, and agreed to issue the Pyxis Guaranty at an attachment

point of 40%; (7) had FGIC known these higher-quality assets were largely excluded from the portfolio, it would have an insisted on an attachment point at least 10% higher or would not have insured Pyxis at all; and (8) in 2009, when its accrued losses under the Pyxis Guaranty were already $379 million, FGIC made a payment to Calyon of $74.5 million to mitigate its losses, which, absent Putnam's wrongdoing, would have been at least $36 million less.

Taken together, these facts establish that Putnam committed fraud, negligent misrepresentation, and negligence with respect to the PCS. They also establish that Putnam is liable for misrepresenting who selected the Pyxis collateral and from which universe of assets it selected it. As explained in FGIC's pre-trial brief (ECF No. 238) and Part I.A of FGIC's brief in opposition to Putnam's motions *in limine* (filed herewith), each of these claims remain viable following the Court's summary judgment order (ECF No. 160). But even if the PCS-based claims are the only remaining claims in the case, the evidence set forth above helps to prove the PCS claims by showing Putnam's knowledge of the false information in the PCS, its scienter, and FGIC's actual and reasonable reliance on the PCS. Because Putnam's pre-trial brief focuses solely on FGIC's PCS-based claims, FGIC will only address those issues in this responsive brief and respectfully refers the Court to its own pre-trial brief for further analysis of its claims based on Putnam's collateral selection misrepresentations.

As explained below, Putnam's arguments against liability with respect to the PCS depend largely on ignoring most of the compelling evidence set forth above. Putnam also misstates the legal elements FGIC must prove to establish its PCS-based claims and misconstrues both FGIC's damages theories and the relevant law.

**ARGUMENT**

## I.     The PCS Was an Actionable Misrepresentation Attributable to Putnam

### A.     The PCS was an actionable representation

Putnam argues "[t]he [PCS] is a forward-looking statement" that cannot support a fraud claim.  ECF No. 254 at 3-4.  To the contrary, as the Court already held, "the peach-colored data in the PCS are relatively concrete representations of Putnam's future performance as collateral manager in arranging the final Pyxis portfolio."  ECF No. 160 at 17-18.  "Whether the PCS is an actionable statement to which a fraud claim may attach depends on whether Putnam had knowledge of its incorrect content when it referred FGIC to Calyon, a question of fact for the jury.  The Court, therefore, cannot adopt Putnam's contention that the PCS is a forward-looking statement immune from a finding of fraud."  *Id.* at 18.  All that remains is to determine whether Putnam knew of the PCS or its contents, and whether Putnam actually intended to acquire the assets in the PCS or assets of a similar credit profile for Pyxis.  ECF No. 238 at 5-8.  At trial, FGIC will demonstrate Putnam knew the substance of the information in the PCS—that it contained substantial amounts of prime and seasoned RMBS and assets rated above BBB—and that Putnam never intended to acquire most of these higher-quality assets for Pyxis, because it was seeking to create a portfolio that was as highly correlated as possible with the equity investors' short investments, which were concentrated on subprime, unseasoned, BBB-rated RMBS.

Putnam reiterates its reliance on the purported disclaimers issued in connection with the PCS.  But the very case on which Putnam relies makes clear that such disclaimers do not protect against liability for forward-looking statements "where (1) the forward-looking statement was made with actual knowledge that it was false; or (2) where the forward-looking statement misrepresents present facts."

*In re IAC/InterActiveCorp Secs. Litig.*, 478 F. Supp. 2d 574, 586 (S.D.N.Y. 2007) (internal citation omitted).  That is what FGIC will prove.  Calyon's caution that the assets detailed in the PCS were subject to change and the boilerplate disclaimer contained on the PCS's first tab do not exonerate Putnam if Putnam never had any intention of acquiring those assets or assets with a similar credit profile.

## B.    Putnam made the misrepresentations in the PCS through Calyon

Putnam asserts that "[u]nder the law, for Putnam to be liable for the Calyon-created [PCS], Putnam must have 'involved' or 'entangled' itself in the preparation of the [PCS] as to cause the document to be fairly attributed to Putnam."  ECF No. 254 at 5 (quoting *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 163 (2d Cir. 1980)).  But the "'involved' or 'entangled'" standard articulated in *Elkind*, which stems from the federal securities fraud context, not New York law, is not the only basis on which a defendant can be found liable for statements of third parties.

As explained in FGIC's pre-trial brief, under New York law, "the defendant need only to have *intended* the misrepresentation to be conveyed to the plaintiff."  ECF No. 238 at 5; *Pasternack v. Lab. Corp. of Am. Holdings*, 27 N.Y.3d 817, 828 (2016) ("[I]ndirect communication can establish a fraud claim, so long as the statement was made with the intent that it be communicated to the plaintiff and that the plaintiff rely on it"; defendant can be liable when "third party act[s] as a conduit to relay the false statement to plaintiff, who then relie[s] on [it] to his detriment."); *Rosen v. Spanierman*, 894 F.2d 28, 33 (2d Cir. 1990) ("A third party can recover damages for a fraudulent misrepresentation if he can establish that… the defendants intended the misrepresentation to be conveyed to him.") (citation omitted).  That is what happened here.  Putnam told FGIC to obtain from Calyon the "add[itiona]l details" of the remaining "names" (*i.e.*, assets) that would "likely" be acquired for the Pyxis portfolio; and Putnam knew Calyon would provide FGIC with false information,

specifically about the volume of higher-quality assets in the portfolio.  *See* ECF No. 238 at 6.  Thus, Putnam affirmatively caused FGIC to be supplied with such false information.  In consequence, as this Court recognized, "the PCS reflects the actions and intentions of *Putnam*, not Calyon."  ECF No. 160 at 16.

Even under *Elkind*, Putnam would remain liable for the PCS.  *Elkind* held that a "company may so involve itself in the preparation of reports and projections by outsiders as to assume a duty to correct material errors in those projections.  This may occur when officials of the company have, by their activity, made an implied representation that the information they have reviewed is true or at least in accordance with the company's views."  *Elkind*, 635 F.2d at 163.  That applies here. As this Court observed, "[i]t was, after all, the role of Putnam and not Calyon, to 'select[] and monitor[] the collateral that backed Pyxis,'" and "an email from Calyon to Bell just three days before the PCS was sent suggests that Putnam was working closely with Calyon regarding FGIC's involvement."  ECF No. 160 at 16.  And Putnam's direction to FGIC to obtain information critical to its evaluation of the transaction from Calyon was an implied representation, again, that "the PCS reflects the actions and intentions of *Putnam*."  *Id*.  Putnam further entangled itself a week later, when it received, reviewed, and approved the target portfolios that Calyon sent to the rating agencies just three days after sending the PCS to FGIC.  Based on all this evidence, Putnam did "make" the PCS misrepresentations in every sense that matters here.

### C.    Putnam can be liable even if it did not see the PCS

Putnam claims that "FGIC cannot establish that Putnam knew FGIC wanted th[e] particular document" at issue (the PCS) "because Putnam did not know about the [PCS]" and never saw it.  ECF No. 254 at 30.  But FGIC will show Putnam knew FGIC would obtain the PCS from Calyon (because it directed it to do so), that the

information conveyed by the PCS was false, and that FGIC needed that information "for a serious purpose," which is sufficient to establish Putnam's liability. *BNP Paribas Mortg. Corp. v. Bank of Am., N.A.*, 949 F. Supp. 2d 486, 508 (S.D.N.Y. 2013) (Sweet, J.) (citing *Hydro Inv'rs, Inc. v. Trafalgar Power, Inc.*, 227 F.3d 8, 20 (2d Cir. 2000)).

Again, the case law Putnam relies on is inapposite. In *Cacchillo v. Insmed, Inc.*, the alleged misrepresentation was an oral statement by a physician concerning whether plaintiff would receive treatment should other events occur. *Cacchillo v. Insmed Inc.*, No. 1:10-CV-01199 (TJM/RFT), 2013 WL 622220, at *18 (N.D.N.Y. Feb. 19, 2013), *aff'd*, 551 F. App'x 592 (2d Cir. 2014) (cited in ECF No. 254 at 29). The Second Circuit affirmed summary judgment on plaintiff's negligent misrepresentation claim because there could be no "actionable misrepresentation of present fact" when it was "unknown at the time" the alleged misrepresentation was made whether those future events would occur. *Id.* This Court has already distinguished FGIC's claims from cases like *Cacchillo* when it rejected Putnam's contention that the PCS was, as a matter of law, a promise of future conduct, and held that the PCS was a "concrete representation" to FGIC of assets Putnam planned *at that time* to include in the Pyxis portfolio. *See* ECF No. 160 at 17-18. *Woori Bank v. Citigroup Inc.*, No. 12 Civ. 3868(LTS), 2013 WL 1235648 (S.D.N.Y. Mar. 27, 2013) is also inapposite. There, the court dismissed fraud and negligent misrepresentation claims under Rule 9(b) because plaintiff failed to identify, *inter alia*, any specific misstatement. *See id.* at *4-5. Here, by contrast, the PCS comprised a set of highly specific misstatements that were false because Putnam knew at the time they were made that it did not intend to include higher-quality assets in the Pyxis portfolio.

Under New York law, liability for negligent misrepresentation may attach where a "third party merely serves as a conduit for the misrepresentations to be relayed from the defendant to the plaintiff, so that the plaintiff would be induced to

act on them." *Pasternack v. Lab. Corp. of Am.*, No. 10 Civ. 4426(PGG), 2014 WL 4832299, at *17 (S.D.N.Y. Sept. 29, 2014), *aff'd sub nom.*, 839 F.3d 151 (2d Cir. 2016) (explaining that, under New York law, "if A. makes a false statement to B. for the purpose of being communicated to C., or intending that it shall reach and influence him, A. can be ... held liable to C." (alterations omitted) (internal citation omitted)); *see also Rosen*, 894 F.2d at 33 ("A third party can recover damages for a fraudulent misrepresentation if he can establish that… the defendants intended the misrepresentation to be conveyed to him" by a third party); *Mid Atl. Framing, LLC v. Varish Constr., Inc.*, 117 F. Supp. 3d 145, 153 (N.D.N.Y. 2015) ("[L]iability may be imposed for misrepresentations that are intended to be, and are in fact, communicated to a plaintiff through a third party and are thereby relied upon to the plaintiff's pecuniary detriment.") (collecting cases).

FGIC's position is consistent with this Court's summary judgment decision. ECF No. 160 at 16-17, 24, 26 (explaining Putnam's knowledge of "the PCS" *or* "the data it contained" and its intent to mislead FGIC are the relevant factual issues for this inquiry). FGIC will show that Putnam intended a misrepresentation about the volume of higher-quality assets in the Pyxis portfolio to be conveyed to FGIC, and that is precisely what Calyon conveyed. The only reason FGIC obtained the PCS from Calyon rather than Putnam was that *Putnam directed it to*. Putnam was responsible for the misrepresentations in the PCS.

### D.   Willful blindness satisfies the knowledge requirement for common-law fraud

According to Putnam's pretrial memorandum, FGIC cannot rely on the willful blindness doctrine "[a]s a matter of law" because the PCS is a "forward-looking statement." ECF No. 254 at 9. But this argument rests on a statutory requirement of the Private Securities Litigation Reform Act ("PSLRA") that has no connection to this case. The sole case Putnam cites is *Prime Mover Capital Partners, L.P. v. Elixir*

*Gaming Technologies, Inc.*, 793 F.Supp.2d 651, 667 (S.D.N.Y. 2011), *see* ECF No. 254 at 9-10, which concerned a private plaintiff's Section 10(b) claim governed by the PSLRA.   Under the PSLRA's statutory safe-harbor provision for forward-looking statements, a private plaintiff must allege the defendant possessed "actual knowledge" that its statements were false.   *Id.*   In *Prime Mover*, the plaintiff's failure to do so mandated dismissal of his complaint.   *Id.*   That outcome was dictated by the PSLRA's heightened pleading standards and safe-harbor provision, under which "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).   This federal statutory exemption is irrelevant here.

Putnam does not—and cannot—cite a single case holding that willful blindness is insufficient to establish common law fraud under New York law.   In fact, *Prime Mover* itself holds to the contrary:   "[I]t is not the case" that "New York … law requires a showing of actual knowledge to prove scienter."   *Prime Mover*, 793 F.Supp.2d at 672 n.106 (citing *Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 104 (2d Cir. 2001)) ("A New York common law fraud claim is defined as a representation of fact, which is untrue and *either known* by defendant to be untrue *or recklessly made*…." (emphasis added))).   This is consistent with other New York decisions.   *See U.S. Bank, N. A. v. UBS Real Estate Sec. Inc.*, 205 F. Supp. 3d 386, 425 (S.D.N.Y. 2016) (defendant's willful blindness satisfied knowledge element); *Matter of Scher Law Firm, LLP v. DB Partners I, LLC*, 97 A.D.3d 590, 591-92 (2d Dep't 2012) (when a party has "sufficient information to impose a duty upon it to make further inquiry … its failure to do so constitute[s] 'willful blindness'" sufficient to establish fraud); *Stephenson v. Citco Group Ltd.*, 700 F. Supp. 2d 599, 619 (S.D.N.Y. 2010) ("[U]nder New York law (as in the federal securities law context) this intent can be demonstrated by recklessness of sufficient degree to create an inference of intent.");

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 888 F. Supp. 2d 431, 444-45 (S.D.N.Y. 2012) ("Plaintiffs need not establish intent to defraud; rather plaintiffs may satisfy the scienter requirement by producing evidence of conscious misbehavior or recklessness.") (internal citation omitted); *State Street Trust Co. v. Ernst*, 278 N.Y. 104, 112 (1938) (explaining that "refusal to see the obvious, a failure to investigate the doubtful, if sufficiently gross, may furnish evidence leading to an inference of fraud… [such that] heedlessness and reckless disregard of consequence may take the place of deliberate intention").  Contrary to Putnam's argument, "the long history of willful blindness and its wide acceptance in the Federal Judiciary" and state courts confirms that evidence of willful blindness may satisfy the knowledge requirement of a common law fraud claims.  *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 768 (2011) (noting the long history of the willful blindness standard and seeing no reason not to apply it in patent cases).

FGIC, therefore, does not need to demonstrate at trial that Putnam "saw" the PCS and had "actual knowledge" of its falsity, as Putnam argues.  ECF No. 254 at 9-10.  Instead, FGIC may prevail by showing that Putnam was willfully blind to the materially false information in the PCS, which FGIC obtained from Calyon at Putnam's direction.

### E.   Putnam ignores its liability for its continuing omission to correct the materially false information in the PCS

Putnam ignores FGIC's claims sounding in omission.  In addition to showing that Putnam knew or was willfully blind to the false information in the PCS at the time it directed FGIC to obtain that information from Calyon, FGIC will also show that Putnam confirmed this information was false when it reviewed the Rating Agency Portfolios shortly afterwards, which contained similarly false information about the volume of prime and seasoned RMBS and higher-rated assets in the Pyxis portfolio, triggering a duty to correct those misrepresentations which Putnam failed

9

to meet.  *See* ECF No. 238 at 6-8.  Indeed, irrespective of the PCS, Putnam had a duty to correct the misapprehension, which it fostered through half-truths to FGIC about the collateral selection process and criteria, that the Pyxis portfolio would contain a diverse mix of seasoned, prime, and higher-rated assets to offset the risk associated with the subprime new-issue mezzanine RMBS that comprised the bulk of the collateral.  *See id.* at 16-18.

As noted in FGIC's Pre-Trial Brief, a "duty to disclose" sufficient to support a claim for fraudulent or negligent misrepresentation "arises … 'where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge[,] or … where a party has made a partial or ambiguous statement, whose full meaning will only be made clear after complete disclosure.'"  *First Hill Partners, LLC v. BlueCrest Capital Mgmt.*, 52 F. Supp. 3d 625, 637-38 (S.D.N.Y. 2014) (quoting *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 582 (2d Cir. 2005)).  At every point from the moment Pyxis was conceived until it was fully ramped in early 2007, Putnam had superior knowledge to FGIC concerning the composition of the Pyxis portfolio.  And after reviewing the materially false Rating Agency Portfolios sent shortly after the PCS, Putnam indisputably knew the PCS was likewise materially false.  *See* ECF No. 238 at 6-8.  Yet it never corrected the PCS, nor even asked Calyon or FGIC to show it what had been sent to FGIC.

Further, "[i]n business negotiations, an affirmative duty to disclose material information may arise from the need to complete or clarify one party's partial or ambiguous statement." *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank,* 57 F.3d 146, 155 (2d Cir. 1995); *see also EED Holdings v. Palmer Johnson Acquisition Corp.*, 387 F. Supp. 2d 265, 283 n.6 (S.D.N.Y. 2004) (citing *Banque* and noting that "once [defendant] made claims as to [his company's] wherewithal, he was Obligated [sic] not to omit material facts").  Putnam made a series of "partial or

ambiguous" statements to FGIC—for example, in the Pyxis Pitchbook and Launch Email, and its due diligence meetings with FGIC—about who was controlling collateral selection and from which universe of assets it was selecting the collateral. Those statements were partial or ambiguous because they failed to note that additional undisclosed constraints were being applied to further Magnetar's long-short correlation trading scheme, resulting in the exclusion of unseasoned, subprime, lower-rated assets that were not correlated with Magnetar's short positions. *See* ECF No. 238 at 16-17. Putnam had an ongoing obligation to correct these misleading half-truths and disclose to FGIC and other investors the full set of collateral constraints it was applying.

Nor is it sufficient for Putnam to assert "[t]here is no evidence that … the target assets [in the PCS] could not have been purchased, and there is no evidence that Putnam had no intention of purchasing these targeted assets in the future." ECF No. 254 at 4. Because Putnam never did acquire those target assets—or any assets that were remotely similar in credit quality—it necessarily follows that at some point, either before or at the time the PCS was sent or at some time soon thereafter, Putnam formed the intent not to acquire such assets. Yet Putnam never conveyed that intent to FGIC, which it knew was relying on the PCS. As this Court held, these showings may be sufficient under New York law to prove fraud. ECF No. 160 at 24-28.

Finally, Putnam seeks to exonerate itself by claiming that it disclosed the true Pyxis portfolio in the form of a pie chart in a term sheet attached to an offering memorandum which it never actually sent to FGIC, and which FGIC only received—from Calyon, not Putnam—two days after it had already practically committed to Pyxis, under circumstances in which it had no reason to review the term sheet or to believe there had been a fundamental change in the composition of the portfolio rendering the PCS materially inaccurate. As the Court held, the jury will decide

11

whether this is sufficient to exonerate Putnam.  ECF 160 at 23.  In so doing, the jury must apply the principles set forth above.

## II.   Putnam Had Fraudulent Intent

Putnam resurrects an argument that both this Court and the Second Circuit have already rejected: that FGIC cannot establish fraud because "a general profit motive, such as the motive to earn fees, is not a sufficient motive to commit fraud" without more.  ECF No. 254 at 12.  FGIC will present evidence of motive and scienter at trial that is far more than "a general profit motive," and the Second Circuit has already rejected Putnam's claim that this evidence, if proved, is insufficient to establish scienter.  *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC,* 783 F.3d 395, 405 (2d Cir. 2015) (rejecting Putnam's contention that a motive "to cooperate with Magnetar's scheme in exchange for unusually lucrative collateral management fees and additional business" was insufficient to establish fraud).

As this Court held, at trial FGIC will seek to prove scienter on the basis of "Putnam's duties as collateral manager, its understanding that [FGIC] required detailed collateral data to finalize the Pyxis Guaranty, its referral of FGIC to Calyon for the same despite serious red flags, and the surrounding context," and by showing that "Putnam was financially motivated to comply with the equity investors' collateral preferences, at the expense of the debt investors and FGIC" in order to obtain specific fees from Pyxis and other large Constellation CDOs that Magnetar had promised it.  ECF No. 160 at 26- 27.  This evidence is sufficient to establish fraudulent intent.  *See* ECF No. 238 at 9-10; *United States v. Connolly*, No. S1 16 Cr. 370 (CM), 2018 WL 2411216, at *7 (S.D.N.Y. May 15, 2018) ("Evidence concerning the defendants' compensation is plainly relevant to motive" to commit fraud); *United States v. RW Prof'l Leasing Servs. Corp.*, No. 02 CR 767(ADS)(MLO), 2007 WL 1958904, at *9 (E.D.N.Y. June 27, 2007) (explaining relevance of defendant's

"financial motive to engage in the fraud" based on being paid "over $4.3 million in commissions from the fraudulent [ ] loans he brokered"); *ACA Fin. Guar. Corp. v. Goldman, Sachs & Co.*, 131 A.D.3d 427, 429 (1st Dep't 2015) (concluding allegations of defendant's "long-term and economically rational interest in pleasing a client with whom it had already done billions of dollars in transactions and in positioning itself as a leader in the burgeoning market for the type of investment product" at issue supported inference of scienter); *Basis Pac-Rim Opportunity Fund (Master) v. TCW Asset Mgmt. Co.*, 977 N.Y.S.2d 665, 2013 WL 4873885, at *5-6 (Sup. Ct. N.Y. Cty. Sept. 10, 2013) (denying motion to dismiss common law fraud claim and rejecting defendant's "general motive" argument on the ground that complaint adequately alleged defendant was motivated to "lie about its RMBS selection process" because otherwise "no one would have been willing to invest… because the market… was virtually non-existent").

## III.   FGIC Justifiably Relied on the PCS

Putnam asserts that "[w]hen determining whether a plaintiff's reliance is justifiable, one must consider the context in which the representation was made, such as by 'focusing on the level of sophistication of the parties, the relationship between them, and the information available at the time of the operative decision.'" ECF No. 254 at 18 (quoting *De Sole v. Knoedler Gallery, LLC*, 139 F. Supp. 3d 618, 642 (S.D.N.Y. 2015)).  Putnam fails to explain how FGIC's purported sophistication might have been employed to detect Putnam's misrepresentations.  "[A]t the time of the operative decision" to participate in Pyxis on September 6, 2006, the "information available" to FGIC was the PCS, as explicitly documented and relied upon in the Pyxis Credit Application.

Putnam ignores that a plaintiff's investigation of misrepresented facts is generally irrelevant as a matter of law when the underlying facts are "peculiarly

within the [defendant's] knowledge." *DDJ Mgmt., LLC v. Rhone Grp. L.L.C.*, 15 N.Y.3d 147, 154 (2010) (quoting *Schumaker v. Mather*, 133 N.Y. 590, 596 (1892)). Where "reasonable steps" were taken to protect against deception, a plaintiff "should not be denied recovery merely because hindsight suggests that it might have been possible to detect the fraud when it occurred." *Id.* at 154.

Putnam notes that FGIC employed a surveillance team to monitor transactions after they closed. But, as the cases Putnam cites show, what matters is the plaintiff's reliance on "the information available *at the time of the operative decision*." ECF No. 254 at 18-19 (quoting *De Sole*, 139 F. Supp. 3d at 642). FGIC's surveillance efforts several months after closing have no bearing on whether FGIC was justified in issuing an irrevocable insurance policy on Pyxis based on the information available to it at the time it did so.

Again, Putnam argues it "provided [FGIC] with updated information that" corrected the PCS, in the form of the pie chart in the term sheet attached to the offering memorandum which was provided to FGIC—by Calyon, not Putnam—two days after FGIC had already practically committed to Pyxis under circumstances in which FGIC had no reason to review it. ECF No. 254 at 20. As the Court held, the jury will decide whether that is sufficient to undermine FGIC's reasonable reliance claim, or whether, by contrast, it is more evidence of Putnam's consciousness that it had misled FGIC and that it needed to cover its tracks. ECF No. 160 at 23.

Putnam's argument that FGIC's sophistication foreclosed justifiable reliance is unsound, even leaving aside Putnam's superior information concerning the content of the Pyxis portfolio. The Court also held it "is unpersuaded that FGIC's sophistication renders their reliance on the PCS unreasonable as a matter of law" because "an email from Bell suggests that FGIC was not experienced with this type of deal." ECF No. 160 at 22. FGIC have the same resources or expertise as Putnam in the analysis and management of this type of deal, nor of ABS CDOs generally—

that is why it hired Putnam to manage the portfolio. FGIC wanted a diversified portfolio that contained as many high-quality assets as possible within the disclosed portfolio constraints. It communicated this desire to Putnam and relied on Putnam to determine the best mix of these higher-quality assets. That was the job Putnam was hired to perform.

Putnam also argues that FGIC's reliance was unjustified because FGIC purportedly "proceed[ed] with a transaction knowing it ha[d] not received complete information." ECF No. 254 at 19 (quoting *KNK Enters., Inc. v. Harriman Enters., Inc.*, 33 A.D.3d 872, 872 (2d Dep't 2006)). FGIC did not agree to insure the Pyxis super-senior tranche with *no* visibility into the final 25% of the portfolio—to the contrary, it asked Putnam for all the details of the assets still to be purchased for the portfolio and was directed to obtain the PCS from Calyon, which showed the portfolio would contain a substantial volume of the higher-quality assets FGIC had made clear to Putnam it wanted to see in the portfolio. Contrary to Putnam's assertion, FGIC did not assume Putnam would necessarily acquire the precise assets disclosed in the PCS, but rather that it would acquire assets of a similar type and credit profile. It was reasonable for FGIC to rely on Putnam to do this, but Putnam never had any intention of doing so. That establishes both justifiable reliance and fraud.

Finally, Putnam argues that FGIC should have somehow availed itself of its purported "general knowledge" that Magnetar was pursuing a long-short trading strategy to smoke out Putnam's fraud. ECF No. 254 at 21. Rumors that Magnetar may have been pursuing a long-short trading strategy did not "affect [FGIC's] investment thesis" because FGIC believed, based on Putnam's representations, that Putnam was selecting the collateral itself from the entire universe of eligible assets and that the Pyxis portfolio would contain a substantial volume of prime and seasoned RMBS and higher-rated assets to offset the risk on the lower-quality assets in the deal. Whatever strategy Magnetar may or may not have been pursuing, FGIC

15

had no reason to believe that Putnam would subordinate its judgment to Magnetar's to help further Magnetar's strategy nor that the specific portfolio information Putnam caused to be provided to FGIC in the PCS was materially false.

## I.   FGIC Will Prove the Required Causation

### A.   FGIC will prove transaction causation

Putnam argues FGIC must establish that, but for Putnam's misrepresentations in the PCS, FGIC "would not have insured Pyxis" at all.  ECF No. 254 at 22.  Putnam is incorrect.  To establish transaction causation, FGIC must prove that Putnam's misrepresentations in the PCS "induced [FGIC] to engage in the transaction *in question*"—here, a transaction under which FGIC insured the super-senior Pyxis tranche at a 40% attachment point.  *Laub v. Faessel*, 297 A.D.2d 28, 31 (1st Dep't 2002) (emphasis added); *see also Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005).  Putnam provides no support for its contrary interpretation, nor can it.  Proof that "the transaction would have closed on different terms" is sufficient to demonstrate transaction causation.  *In re MarketXT Holdings Corp.*, No. 04-12078 ALG, 2006 WL 2864963, at *3 (Bankr. S.D.N.Y. Sept. 29, 2006) (transaction causation adequately alleged where plaintiff argued that, had it known the truth, "the transaction would have closed on different terms").

As explained in FGIC's pre-trial brief, FGIC's attachment point under the Pyxis Guaranty was 40%.  ECF No. 238 at 12.  Had Putnam provided FGIC with an accurate target portfolio instead of the PCS, FGIC would have insisted on an attachment point of at least 50%.  ECF No. 164-17 (Donnelly Decl.) ¶ 10.  Indeed, even based on the information in the PCS, FGIC was reluctant to insure more than 50% of the deal, ECF No. 238 at 12; had it been aware of the true Pyxis portfolio, it would have required at least that much subordination, assuming it would have done the deal at all.  *See* ECF No.160 at 38 ("A disputed issue of material fact exists over

16

whether the Pyxis Guaranty would have been issued on different, less risky terms if FGIC knew the truth about Pyxis's collateral."). Thus, absent the PCS, FGIC would not have entered the transaction on the terms it did, establishing transaction causation.

### B.    FGIC will prove loss causation

Putnam's argument that FGIC cannot establish loss causation is equally meritless. Putnam tries to escape liability on the basis that FGIC's "loss coincide[d] with a marketwide phenomenon causing comparable losses to other investors." ECF No. 254 at 23. As this Court has twice held, Putnam cannot avoid liability by pointing to the financial crisis, because FGIC's losses were *independent* of the financial crisis. ECF No. 160 at 38-39; ECF No. 281 at 14. FGIC will show that had it issued the Pyxis Guaranty at an attachment point of 50% rather than 40%, it would have been exposed to losses of at least $150 million less when Pyxis failed. This would have eliminated the *first* $150 million of FGIC's liability after the subordinate Pyxis debt was wiped out, because the liability resulting from FGIC's lower attachment point was the first liability FGIC incurred. Had FGIC been exposed to fewer losses under the Pyxis Guaranty, its commutation payment would have been lower. Thus, absent the PCS, FGIC's commutation payment would have been smaller "despite the financial crisis." *See* ECF No. 160 at 38-39 ("FGIC's exposure to increased liability ... was independent of the financial crisis; it existed before it and would have existed without it.").

Moreover, the Second Circuit has held that where a defendant's misconduct increased the chance that a plaintiff suffered losses—no matter how small—loss causation can be proved and the defendant should not be allowed to hide behind the crisis to which it contributed. *See Fin. Guar. Ins. Co.*, 783 F.3d at 404-05; *see Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 587-88

(S.D.N.Y. 2015), *aff'd sub nom. Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85 (2d Cir. 2017).  Based on the Court's February 19, 2020 *Daubert* rulings, FGIC understands that it may not seek to prove that the Constellation CDO scheme, aided and abetted by Putnam, materially exacerbated the scale of the financial crisis.  ECF No. 281 at 13-14.  If FGIC is not permitted to make that case, Putnam should not be permitted to try to hide behind the financial crisis as a purported intervening cause of FGIC's losses.

## II.   Putnam's Arguments about the "Special Relationship" Required for FGIC's Negligence-Based Claims Are Incorrect

### A.   Putnam misconstrues the "special relationship" required for a negligent misrepresentation claim

Putnam concedes that *Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 59–60 (2d Cir. 2012), which the Court applied at summary judgment (ECF No. 160 at 43), governs the "special relationship" showing required in this case. However, Putnam asserts that New York law *also* requires that (1) the special relationship preexisted "the transaction from which the alleged wrong emanated," and (2) there is no special relationship when defendant issues boilerplate disclaimers. ECF No. 254 at 27-29.  These purported requirements are nowhere to be found in *Bayerische* or this Court's summary judgment order, and they are not the law.

The cases Putnam relies on did not dismiss negligent misrepresentation claim on the ground that the parties did not have a pre-existing relationship.  *See Gregor v. Rossi*, 992 N.Y.S.2d 17, 19 (1st Dep't 2014) (dismissing negligent misrepresentation claim because defendant attorneys were retained to represent only the corporation, not the plaintiff shareholders of that corporation, and therefore there was no relationship between the parties); *Elghanian v. Harvey*, 671 N.Y.S.2d 266, 266 (1st Dep't 1998) (affirming dismissal of fraud claims on grounds that statements were inactionable "puffery" and "not[ing]" as *dicta*, without context, elaboration, or citation

18

to authority, "that the requisite relationship between the parties must have existed prior to the transaction from which the alleged wrong emanated").

The special relationship element requires "a closer degree of trust between the parties than that of the ordinary buyer and seller in order to find reliance on such statements justified." *Prime Mover Capital Partners L.P.*, 793 F.Supp.2d at 674 (ruling on negligent misrepresentation claim) (quoting *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 788 (2d Cir. 2003)). Therefore, "a single service call" placed by plaintiff to defendant will not be sufficient to show a relationship beyond that of "an ordinary buyer and seller" in "an ordinary arm's-length commercial transaction" *Alley Sports Bar, LLC v. SimplexGrinnell, LP*, 58 F. Supp. 3d 280, 294 (W.D.N.Y. 2014); *see also RKA Film Fin., LLC v. Kavanaugh*, 100 N.Y.S.3d 611 (Sup. Ct. N.Y. Cty. 2018), *appeal dismissed*, 99 N.Y.S.3d 267 (1st Dep't 2019), (dismissing negligent misrepresentation claim because New York law does not assume special relationship between average borrower and lender and defendant had no specific duty to collect or impart correct information to plaintiff) (cited in ECF No. 254 at 28).

However, in this case, there is no dispute that FGIC and Putnam communicated directly and repeatedly with one another and that Putnam expressly viewed FGIC—like all of Pyxis's investors—as its "client." ECF No. 238 at 12. The Second Circuit in *Bayerische*, and on appeal in this case, imposed no requirement that the plaintiff have a preexisting relationship with the defendant asset manager on other transactions; instead, both courts focused on the close interactions between the parties and FGIC's demonstrated reliance on Putnam: "Just as in *Bayerische*,... [b]efore FGIC agreed to insure credit protection on Pyxis, it met with Putnam representatives at Putnam's offices in Boston,… relied on representations made by Putnam in issuing the Pyxis Guaranty, and …, without the credit protection it provided, Pyxis would not have closed." *Fin. Guar. Ins. Co.*, 783 F.3d at 406.

19

Putnam further argues that New York law shields defendants from tort liability as long as they "disclaim[] any sort of fiduciary or similar relationship." ECF No. 254 at 28. Again, Putnam is wrong. In New York, "where the alleged misrepresentations regard facts peculiarly within defendants' knowledge, 'disclaimers do not, as a matter of law, foreclose a negligent misrepresentation claim.'" *LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*, 10 F. Supp. 3d 504, 526 (S.D.N.Y. 2014) (quoting *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, No. 08 Civ. 7508(SAS), 2013 WL 837536, at *4 (S.D.N.Y. Mar. 6, 2013)). Only Putnam and Calyon (and, unbeknownst to FGIC, Magnetar and Deutsche Bank) had knowledge of the assets to be included in the Pyxis portfolio.

Moreover, Putnam's argument was squarely rejected by the Second Circuit in this case, which held: "*These disclaimers do not preclude the finding of a special relationship* between FGIC and Putnam," because, among other things, they did "not disclose the possibility that Putnam would cede control of the collateral selection process to other market participants with interests adverse to long investors." *Fin. Guar. Ins. Co.*, 783 F.3d at 406 (emphasis added). The Second Circuit expressly distinguished this case from the case on which Putnam relies on the ground that, in that case, the deal documents were "replete with *detailed* disclosures" of defendant's conflicts of interest that actually encompassed the specific misrepresentations alleged by plaintiffs. *Id.* at 407 (citing *HSH Nordbank AG v. UBS AG*, 941 N.Y.S.2d 59, 63 (1st Dep't 2012)); *see* ECF No. 254 at 28 (citing *HSH Nordbank*). Putnam can point to no disclaimer it gave to FGIC that encompasses the particular misrepresentations and omissions it made with respect to the PCS. *Id.* (citing *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 330 (2d Cir. 2002) (holding, in context of securities fraud claim, that general disclaimers did not bar plaintiff from relying on defendant's oral statements)). Putnam's argument should therefore be rejected.

**B.      FGIC does not need to show a "special relationship" to prove its standalone negligence claim**

Putnam mistakenly contends "FGIC must prove a special relationship" to prevail on its negligence claim.  ECF No. 254 at 32.  The *Bayerische* test used for negligent misrepresentation claims does not govern professional negligence claims grounded in misconduct rather than misrepresentations.  Instead, FGIC may establish the professional duties owed by Putnam by demonstrating *either* the functional equivalent of privity, *Perfetto v. CEA Engineers, P.C.*, 980 N.Y.S.2d 788, 789 (2d Dep't 2014), which is similar to the "special relationship test," *or* that "(1) the plaintiff contracted for the service, or the service ordinarily would be performed in the course of the professional performing its obligations under a contract; (2) the defendant's professional services departed from the accepted standards of practice in the relevant field; and (3) the departure proximately caused the plaintiff's injuries." *MF Global Holdings, Ltd. v. PricewaterhouseCoopers LLP*, 199 F.Supp.3d 818, 829-30 (S.D.N.Y. 2016) (internal quotations omitted).  As explained in FGIC's pre-trial brief, New York courts recognize that investment managers owe a duty to their clients, which can support liability for the negligent performance of those duties.  ECF No. 238 at 18.  Thus, the "special relationship" required for negligent misrepresentation is not required.

**III.  Putnam's Legal Arguments Regarding Damages Are Without Merit**

Putnam continues to misrepresent FGIC's damages theory.  As explained repeatedly, FGIC seeks to recover its "actual pecuniary losses"—the amount of its July 2009 commutation payment attributable to Putnam's wrongdoing.  As the Court has held, "[w]hether Putnam's alleged misstatements about Pyxis collateral caused FGIC to (1) pay the $74.5 million commutation payment, or (2) pay a higher

commutation payment than it otherwise would have remains a question for trial."
*See* ECF No. 283 at 4.

At trial, FGIC will prove that Putnam's misconduct caused FGIC to incur liability greater than—and actual pecuniary losses equal to—the amount of its commutation payment. Although the Court has held the collateral source doctrine is not implicated in this case, ECF No. 281 at 16, because Putnam is required to pay FGIC's reasonable mitigation expenses, FGIC may recover the entire commutation payment as damages. *See* ECF No. 216 (Snow *Daubert* Opp.) at 16-18; *Ninth Ave. & Forty-second St. Corp. v. Zimmerman*, 217 A.D. 498, 500 (1st Dep't 1926) (holding that the "natural corollary" to the mitigation requirement is "that one who makes a successful effort to reduce damages will be allowed to recover the expenses necessarily incurred, and he will be allowed also to recover the expenses of a proper effort even though it proves unsuccessful.") (citing *Den Norske Ameriekalinje Actiesselskabet v. Sun Print. & Publ. Assn.*, 226 N.Y. 1, 7 (1919)); *see also Ostano Commerzanstalt v. Telewide Sys., Inc.*, 684 F. Supp. 1172, 1176 (S.D.N.Y. 1988) ("Out-of-pocket expenses embrace . . . costs incurred in reasonable attempts to mitigate damages" and "other consequential damages proximately caused by reliance upon the misrepresentation") (quoting *Lanite Sales Co. v. Klevins Corp.*, 128 N.Y.S.2d 182, 188 (Sup. Ct. 1954); *Clearview Concrete Prods. Corp. v. S. Charles Gherardi, Inc.,* 453 N.Y.S.2d 750, 755 (2d Dep't 1982)).

At a minimum, FGIC will prove that its loss reserves for Pyxis would have been substantially lower had it been exposed to losses of at least $150 million less. Thus, FGIC's commutation payment, which was based on its loss reserves, would have been correspondingly lower. This difference is recoverable as damages. *See* ECF No. 283 at 4 ("Plaintiff takes the position that Defendant's misrepresentations about Pyxis caused it to agree to an attachment point of 40%, instead of 50%, exposing it to more risk, which required higher loss reserves, and a correspondingly higher commutation

payment.  The Court has set this issue … for trial."); ECF No. 238 at 21-22 (detailing calculation of damages based on lower commutation payment).

Putnam claims that FGIC cannot show it was reasonable to allocate $74.5 million of its $100 million commutation payment to Pyxis based on its loss reserves. ECF No. 254 at 35-36.  This allocation was not only reasonable, but was the *only* reasonable method of allocation given that FGIC *arrived at the $100 million commutation amount based on its loss reserves*.  ECF No. 160 at 40.  As the Court has held, the sufficiency of FGIC's evidence as to how it allocated its commutation payment is a question for the jury.  ECF No. 160 at 40-41.

Putnam also argues that "damages cannot be based on a speculative alternative transaction" and FGIC "has never offered any evidence to show that Calyon would have agreed to FGIC providing the Pyxis Guaranty at a 50% attachment point."  ECF No. 254 at 36.  But as the Court held, FGIC presented evidence "that it considered a 50% attachment point," and Putnam's contention that "there is no basis to suggest Calyon would have agreed to a 50% attachment point" is belied by FGIC's evidence "that Calyon was very motivated to do the deal with FGIC." ECF No. 160 at 41 n.26.  Moreover, the evidence will show that if FGIC had known the truth about the Pyxis portfolio and Calyon had not agreed to an attachment point of at least 50%, FGIC would not have participated in Pyxis at all and would have suffered *no* losses.

Under either of FGIC's damages theories, FGIC will meet its burden to show that its damages were directly attributable to Putnam's misrepresentations. ECF No. 254 at 35.  *First*, as just explained, FGIC will show that, regardless of the financial crisis, Putnam's misrepresentations caused it to agree to at least $150 million more liability, resulting in a higher commutation payment.  The difference between the commutation amount FGIC paid, and what it would have paid absent the additional exposure, is thus directly attributable to Putnam.

23

*Second*, as also explained above, FGIC will prove the entire $74.5 million commutation payment was a reasonable cost incurred or settlement payment made to mitigate FGIC's losses under the Pyxis Guaranty caused by Putnam's misrepresentations. *See* ECF No. 216 (Snow *Daubert* Opp.) at 16-18. By mid-2009, FGIC had already accrued losses on Pyxis of $379 million based on the funded balance of the super-senior tranche, and the balance increased steadily through 2012, when it hit its maximum of $782 million. Since the Pyxis Guaranty was irrevocable, FGIC's liability was unavoidable. Faced with this unavoidable liability, FGIC took reasonable steps to mitigate its losses by paying Calyon $74.5 million to extinguish its remaining liability under the Pyxis Guaranty.

If Putnam wishes to argue it should not have to pay the entire amount of the commutation payment as a reasonable mitigation cost, it will be Putnam's burden to show how much, if any, of this mitigation cost was attributable to factors other than its own wrongdoing. As Putnam's own cases show, where a plaintiff meets its burden of proof on the issue of loss causation, the burden shifts to defendant to show that it should not be held accountable for a portion of plaintiff's injuries. *High Point Design, LLC v. LM Ins. Corp.*, No. 14-cv-7878, 2016 WL 426594, at *3 (S.D.N.Y. Feb. 3, 2016) ("[T]he law is clear that the party seeking to allocate expenses bears the burden of proving what amount of allocation is appropriate ….") (citing *Health-Chem Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 559 N.Y.S.2d 435, 438 (Sup. Ct. N.Y. Cty. 1990) ("Once prima facie proof that an expense was incurred in defense of a covered party has been introduced, the burden of showing that all or a specific portion of it was incurred in defense of a non-covered party, is on defendant.")). Thus, it is Putnam's burden to show how much, if any, of the full $74.5 million commutation payment was attributable to factors other than its own wrongdoing.

Finally, Putnam's argument that "FGIC did not mitigate its losses" because it "never approached Putnam about adjusting the portfolio" is demonstrably false. ECF

24

No. 254 at 37.  FGIC did approach Putnam in the fall of 2007, when it was clear that Pyxis was headed toward massive losses, and implored Putnam to wind up the transaction and salvage what value it could.  ECF No. 167-3 (O'Driscoll Opening Report) at 80-81.  Putnam declined to do so.  *Id*.  In any event, Putnam ignores that FGIC's damages derive from the fact that it relied on Putnam's misrepresentations in choosing to attach at 40%, locking it into an irrevocable exposure at a greater level of risk than it otherwise would have assumed.  Putnam's suggestion that FGIC could have mitigated its losses by approaching Putnam after the policy was issued and asking Putnam to adjust the portfolio ignores this.  And whether or not FGIC asked Putnam to select better quality and more diversified collateral after the deal closed, it was Putnam's job to do so; Putnam cannot reduce its liability to FGIC on the basis that it failed to do its job.

Moreover, FGIC was obligated to take "reasonable" steps to mitigate its damages, not Putnam's preferred steps.  *See, e.g., Trust for the Certificate Holders of the Merrill Lynch Mortg. Pass-Through Certificates Series 1999-C1 v. Love Funding Corp.*, 736 F. Supp. 2d 716, 722 (S.D.N.Y. 2010) (requiring that "plaintiff take[] such [mitigating] action within the range of reason," even "if such reasonable attempts at mitigation fail"); *see also Hyosung Am., Inc. v. Sumagh Textile Co., Ltd.*, 25 F. Supp. 2d 376, 387–89 (S.D.N.Y. 1998) (rejecting argument that plaintiff failed its duty to mitigate damages by failing to take action that "would have further limited its damages," because defendant did not show that plaintiff's conduct was "unreasonable").  Given that FGIC's exposure at the time of the commutation payment was $379 million and the super-senior balance only *increased* thereafter, while the Pyxis Guaranty was irrevocable, Putnam cannot credibly argue that FGIC's negotiation of a $74.5 million commutation payment to eliminate this liability was "unreasonable."  Thus, FGIC is entitled to recover the full commutation payment

25

from Putnam as expenses reasonably incurred in mitigating its damages.  *See Ninth Ave.*, 217 A.D. at 500.

## **CONCLUSION**

For the foregoing reasons, Putnam's legal arguments should be rejected.


Dated:  February 27, 2020


Respectfully submitted,

Sean Baldwin
Joy Odom
Amy Nemetz
Margaret Larkin
William Rathgeber
SELENDY & GAY, PLLC
1290 Avenue of the Americas
New York, NY  10104
Tel: 212-390-9000
sbaldwin@selendygay.com

*Attorney for Plaintiff*
*Financial Guaranty Insurance*
*Company*