```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
                                                                 :
FINANCIAL GUARANTY INSURANCE COMPANY,                            :
                                                                 :
                        Plaintiff,                               :
                                                                 :      12-cv-7372 (LJL)
        -v-                                                      :
                                                                 :          ORDER
THE PUTNAM ADVISORY COMPANY, LLC,                                :
                                                                 :
                        Defendant.                               :
                                                                 :
-----------------------------------------------------------------X
```

LEWIS J. LIMAN, United States District Judge:

Trial in this case is set to begin via videoconference on July 6, 2020. For that reason, on June 19, 2020, the parties submitted declarations from the witnesses they intend to present during their cases in chief. Those declarations will serve as the witnesses' direct testimony. As part of its submission, Defendant The Putnam Advisory Company, LLC ("Defendant" or "Putnam") provided a declaration from Carl Bell, who served as the Senior Portfolio Manager and Team Leader for the CDO & Portfolio Credit Team during the time of the Pyxis transaction that produced this lawsuit. *Bell Decl.* ¶ 5.

In broad strokes, Plaintiff Financial Guaranty Insurance Company ("Plaintiff" or "FGIC") claims in this case that it was defrauded into making an investment in a collateralized debt obligation ("CDO") named Pyxis ABS CDO 2006-1 ("Pyxis") by a spreadsheet (the "Peach Colored Spreadsheet" or "PCS") sent to it that listed the specific, yet-to-be-acquired mortgage backed securities ("MBS") that Putnam—as collateral manager—intended to purchase as collateral for the transaction. The PCS was transmitted to FGIC by the structuring bank for the transaction, Calyon Corporate and Investment Bank ("Calyon"), in an email that did not copy

Putnam.  FGIC alleges that the communication originated from Putnam, such that Calyon was merely a conduit for a fraudulent statement made by Putnam or, alternatively, that Putnam was so "involve[d]" or "entangled" with the PCS, *Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 163 (2d Cir. 1980), that it had a duty to correct material errors therein.  Putnam denies authoring the document or, indeed, ever seeing it, and claims that it did not transmit the PCS information to Calyon for Calyon to send to FGIC.

In support of its case, Putnam submitted a declaration from Bell (the "Bell Declaration") that, in relevant part, purports to corroborate Bell's testimony that he would not have communicated information about specific, yet-to-be-acquired securities to Calyon for transmission to FGIC.  The corroboration appears in the form of Bell asserting that Putnam had a general practice of being very cautious about providing such deal-specific information directly to deal participants, based on an understanding of associated risks derived in part from legal counsel.  The statement at issue appears at Paragraph 74 of the Bell Declaration and reads:

> My understanding throughout my career, and as advised by several general counsels, including at Putnam, has been that an asset manager needs to be very cautious regarding providing deal specific information directly to potential participants in a securities offering, such as the Pyxis transaction. The concern, as I understand it, relates to the potential for selective disclosure and the risk of a violation of the limitations associated with the placement. While not necessarily a prohibition in all circumstances, the safe strategy is to let the arranging bank provide deal information to market participants with any requests for information from the asset manager provided through the arranging bank. For that reason, to my knowledge, Putnam never directly distributed targets or other similar information to deal participants as part of the marketing process for Pyxis or any other CDO for which Putnam was a collateral manager. Moreover, to my knowledge, Calyon would not typically copy me or members of my team on any such communications with deal participants.

FGIC argues that the statement above (the "Statement") waived privilege over "all communications between Bell and Putnam's counsel concerning the purported advice that Putnam could not disclose 'deal-specific information' to an investor."  Dkt. No. 332 at 3.  FGIC

2

argues Putnam "must disclose all communications reflecting this purported advice." *Id.* FGIC takes the position that it, in fact, already requested such documents when, over five years ago, it served a Request for Production of "any internal policies, directives, or procedures applicable to or used in connection with Pyxis, including collateral selection, ethics, compliance . . . , [and] marketing policies or procedures," as well as all documents "concerning or relating to communications with any actual or prospective investor in Pyxis." Dkt. No. 325 at 3–4. In other words, FGIC is "moving to compel the production of documents previously requested but withheld," and its "argument now is that they should be turned over because there has been a waiver of privilege." Trans. of 6.23.2020 Conference at 65–66. FGIC also asks for a deposition of Bell or Putnam's general counsel. Dkt. No. 332 at 4.[1]

Putnam counters that the Statement did not amount to a privilege waiver. Dkt. No. 329. Nevertheless, in an effort to resolve this issue, Putnam has offered to "waive any privilege as it relates to the subject matter of the advice Mr. Bell received on the issue referenced in his declaration." *Id.* As directed by the Court during the June 23, 2020 conference, Putnam has conducted a good faith search for documents responsive to FGIC's requests for production. *Id.* at 2. Putnam reviewed 1,434 privileged documents of which Bell was either the author or a recipient. *Id.* Following review, Putnam identified only three documents that were, "in the broadest possible sense, potentially responsive to FGIC's requests for production." *Id.* Putnam has volunteered to make those documents available for *in camera* review and would have no objection to the production of such information conditioned on the understanding that such

---

[1] The parties' papers raise a second issue—whether Putnam's privilege log complied with federal standards. However, any complaint about the adequacy of Putnam's privilege log is long past due. Half a decade has passed since the parties exchanged the discovery at issue. *See* Dkt. No. 325 at 3. Trial is almost a week away. FGIC's argument that Putnam violated Rule 34 is rejected.

3

production would not constitute a privilege waiver beyond the documents turned over. *Id.* FGIC would also be "free to cross examine Mr. Bell on the basis for the statement in his declaration," including on the conversations with counsel that informed Mr. Bell's understanding. *Id.* at 1, 4.

The Statement does not effect an "at-issue" waiver. An "at-issue" waiver is a species of "implied waiver." *In re Cty. of Erie*, 546 F.3d 222, 227 (2d Cir. 2008); *Allen v. W. Point-Pepperell Inc.*, 848 F. Supp. 423, 428 (S.D.N.Y. 1994).[2] "New York courts have defined 'at issue' waiver as occurring 'where a party affirmatively places the subject matter of its own privileged communication at issue in litigation, so that invasion of the privilege is required to determine the validity of a claim or defense of the party asserting the privilege, and application of the privilege would deprive the adversary of vital information.'" *Windsor Sec., LLC v. Arent Fox LLP*, 273 F. Supp. 3d 512, 517–18 (S.D.N.Y. 2017). (quoting *Deutsche Bank Tr. Co. of Americas v. Tri-Links Inv. Tr.*, 43 A.D.3d 56, 63 (2007)). The Second Circuit requires that "a party must *rely* on privileged advice from his counsel to make his claim or defense." *Erie*, 546 F.3d at 229. "[S]imply because privileged information is relevant to a claim or defense in the case does not give rise to an implied waiver." *Leviton Mfg. Co. v. Greenberg Traurig LLP*, 2010 WL 4983183, at *4 (S.D.N.Y. Dec. 6, 2010); *see Erie*, 546 F.3d at 229 ("[P]rivileged information may be in some sense *relevant* in any lawsuit.").

Here, Putnam does not rely on legal advice directly to make its claim or defense. It does not assert an advice-of-counsel defense. *See, e.g.*, *Erie*, 546 F.3d at 228 ("The assertion of an

---

[2] "Because the words *implied* and *waiver* both tend to suggest that the party possessing the privilege *intended* to give it up, the terms *waiver*, and *implied waiver*, are not especially appropriate designations for circumstances in which the party possessing the privilege makes no representation, express or implied, that it intends to surrender its privilege." *John Doe Co. v. United States*, 350 F.3d 299, 302 (2d Cir. 2003), *as amended* (Nov. 25, 2003). "In such circumstances, the rule is perhaps more aptly described as one of forfeiture, rather than waiver." *Id.* For convenience and synchrony with the majority of the caselaw describing this issue, however, the Court will use the term "waiver."

'advice-of-counsel' defense has been properly described as a 'quintessential example' of an implied waiver of the privilege.") (citing *In re Kidder Peabody Secs. Litig.*, 168 F.R.D. 459, 470 (S.D.N.Y. 1996)). Nor has it "place[d] the attorney-client relationship directly at issue." *Id.* (quoting *Sedco Int'l S.A. v. Cory*, 683 F.2d 1201, 1206 (8th Cir. 1982)).

The proffered testimony regarding advice by general counsels is only of the most marginal relevance. The testimony regarding Bell's "understanding" of the care that must be exercised when disclosing information is, at best, relevant to whether Bell acted in conformity therewith—whether the allegedly misleading forward-looking information in the PCS was provided by Bell to Calyon with the intent that it be delivered to FGIC. *Bell Decl.* ¶ 74. The ultimate question, however, is whether that information was relayed to Calyon by Putnam and with that intent.

The reference to "general counsels" is of even less relevance. *Id.* It supposedly bolsters Bell's credibility in asserting that he had the above-stated understanding. But whether the understanding came from general counsels or elsewhere is not particularly relevant. The question, if any, is the understanding. After all, no one in this case is claiming that counsel was involved in the decision of whether or not to provide deal-specific, forward-looking information to Calyon so that Calyon would provide it to FGIC—which is the hotly disputed issue in this case.

The Court concludes, however, that the Statement probably effects a limited waiver, under Federal Rule of Evidence 502(a), of privileged information relating to the advice that Bell received regarding disclosure of deal-specific information directly to deal participants. Rule 502(a) states: "When . . . disclosure is made in a federal proceeding . . ., [] waiver extends to an undisclosed communication or information in a federal or state proceeding only if: (1) the waiver

is intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) they ought in fairness to be considered together." By testifying to an "understanding" that was "advised by several general counsels," regarding the care Putnam must exercise in providing deal-specific information, *Bell Decl.* ¶ 74, Bell impliedly disclosed communications with counsel. *Cf. United Sates v. Bilzerian*, 926 F.2d 1285, 1293 (2d Cir. 1991). The waiver was intentional. It was in a prepared declaration. In fairness, FGIC is entitled to all communications with general counsel or other legal counsel that relate to that understanding, regardless whether those communications might otherwise be privileged, so long as such communications are in the possession of Bell or Putnam.

However, Putnam's offer fully resolves the issue, at least if those documents are provided to FGIC. Dkt. No. 329. In its letters, FGIC proffers extensive evidence that is grist for cross-examination even without the privileged documents—assertions that Bell's "understanding" is an after-the-fact rationalization that Bell did not proffer earlier, that Bell does not recall the events at issue, and that Bell acted inconsistently with the purported understanding. *See* Dkt. Nos. 329, 332. The Court does not pass judgment now on the force of those lines of attack; that will have to await trial. By producing to FGIC the privileged documents that relate to Bell's understanding, however, Putnam will be providing FGIC the material relevant to the already marginal issue of the source of Bell's understanding. Moreover, FGIC will be able to cross-examine Bell on the issue.

The Court reaches a different result with respect to the request for depositions of the general counsel of Putnam and of Bell. In its opposition, Putnam proffers that "Bell will testify that he does not recall any specific conversations with Putnam's general counsel during the timeframe in which he was involved in the creation of Pyxis, and that his use of 'general counsel'

in his declaration was a reference to Putnam's General Counsel's Office." Dkt. No. 329 at 4. He will also testify "that he only has a general recollection of the advice spread over many years, both at Putnam and at other firms." *Id.* Accordingly, FGIC's request is a pure fishing expedition. There is no showing at present that further deposition of Bell or a deposition of the Putnam general counsel (or any attorney in Putnam's General Counsel's Office) would yield any evidence remotely relevant to this case or that would cast doubt on Bell's credibility. Moreover, Bell already testified at his deposition about the "practice and the advice" of "not disclosing" certain "information" to deal participants. Dkt. No. 167-15 at 117–18. Although FGIC terms Bell's statement in its declaration "newly-disclosed evidence," Dkt. Nos. 325, 329, Bell in fact already stated (in a general sense) that such practice was informed by legal considerations. *See* Dkt. No. 167-15 at 118 (discussing how "practice and the advice" was informed by "restrictions" that exist in "agreements with clients"). If FGIC wanted to probe Bell further on this topic, it could have followed up at that deposition. In any event, FGIC will have the opportunity to cross-examine Bell at trial. And if, based on that testimony, there are grounds to question Putnam's representations above and a basis to take the deposition of the Putnam's general counsel, then at that point FGIC can renew its application to take the deposition of the general counsel.

      SO ORDERED.

Dated: June 27, 2020
      New York, New York

                                         LEWIS J. LIMAN
                                         United States District Judge