UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FINANCIAL GUARANTY INSURANCE
COMPANY,

                 Plaintiff,

      v.

THE PUTNAM ADVISORY COMPANY,
LLC,

                 Defendant.

Case No. 12 Civ. 7372 (LJL)

**ECF Case**
**Electronically Filed**

## <u>PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO STRIKE WITNESS TESTIMONY</u>

Date:  June 29, 2020

Sean Baldwin
Jennifer Selendy
Joy Odom
Amy Nemetz
Megan Larkin
Will Rathgeber
Lauren Zimmerman
SELENDY & GAY, PLLC
1290 Avenue of the Americas
New York, NY  10104
Tel: 212-390-9000
sbaldwin@selendygay.com
jselendy@selendygay.com
jodom@selendygay.com
anemetz@selendygay.com
mlarkin@selendygay.com
wrathgeber@selendygay.com
lzimmerman@selendygay.com
*Attorneys for Plaintiff Financial Guaranty*
*Insurance Company*

**TABLE OF CONTENTS**

**Pages**

ARGUMENT ....................................................................................................................1

I.    Dana Skelton's Testimony Should Not Be Stricken..........................................1

    A.    Skelton Offers Proper Fact Testimony, Not Expert Opinion...................1

    B.    Skelton's Declaration is Fully Consistent with Her Deposition Testimony ...........5

    C.    Putnam's Experts, Like Putnam, Mischaracterize FGIC's MBS Analysis..............8

II.    Fiachra O'Driscoll's Testimony Should Not Be Stricken ................................11

    A.    O'Driscoll May Opine On the Spreads at Which Prime and Seasoned RMBS Traded in 2006 ..........................................................................11

    B.    O'Driscoll May Opine on Undisputed Industry Practice Concerning the Provision of Target Portfolios to Investors and Rating Agencies........................12

    C.    O'Driscoll May Offer Summary Evidence of Putnam's RMBS Risk Scoring Model..........................................................................................14

CONCLUSION...............................................................................................................15

## **TABLE OF AUTHORITIES**

**Pages**

**Cases**

*Beastie Boys v. Monster Energy Co.*,
    983 F. Supp. 2d 354 (S.D.N.Y. 2014).............................................................. 14

*Cf. Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
    585 F. Supp. 2d 568 (D. Del. 2008)................................................................. 13

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993).......................................................................................... 1

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
    783 F.3d 395 (2d Cir. 2015)............................................................................ 14

*Henton v. City of New London*,
    No. 3:06 Civ. 2035, 2008 WL 2185933 (D. Conn. May 23, 2008) .................... 7

*Kinematic Techs., Inc. v. Brenton, LLC*,
    2015 WL 6829042 (N.D.N.Y. Nov. 6, 2015) .................................................... 4

*Kruger v. Virgin Atl. Airways, Ltd.*,
    976 F. Supp. 2d 290 (E.D.N.Y. 2013) .............................................................. 7

*Medforms, Inc. v. Healthcare Management Solutions, Inc.*,
    290 F.3d 98 (2d. Cir. 2002).............................................................................. 5

*Palazzo ex rel. Delmage v. Corio*,
    232 F.3d 38 (2d Cir. 2000).............................................................................. 7

*Rule v. Brine, Inc.*,
    85 F.3d 1002 (2d Cir. 1996)............................................................................ 7

*United States v. Cuti*,
    720 F.3d 453 (2d Cir. 2013)............................................................................ 4

*United States v. Rigas*,
    490 F.3d 208 (2d Cir. 2007)............................................................................ 4

**Rules**

Fed. R. Civ. P. 26 ........................................................................................... 13

Fed. R. Evid. 602 ........................................................................................ 1, 3

Fed. R. Evid. 701 ........................................................................................ 1, 4

Fed. R. Evid. 1006 ...................................................................................................................... 15

Plaintiff Financial Guaranty Insurance Company ("FGIC") respectfully submits this memorandum of law in opposition to Defendant The Putnam Advisory Company, LLC's ("Putnam") motion to strike witness testimony (ECF Nos. 334, 335).

## ARGUMENT

## I.      Dana Skelton's Testimony Should Not Be Stricken

Putnam does not move to strike ¶¶1-37 of Dana Skelton's declaration.  It merely moves to strike ¶¶38-41 of her declaration as improper and belated expert testimony because "FGIC did not run this particular LCR analysis prior to this litigation."  ECF No. 335 at 5, 15.  Putnam is wrong on the facts and the law.  Skelton uses *precisely the same LCR results* that FGIC generated in 2006; all she does is *re-size the buckets of assets* to which those LCR results were applied (either directly or through proxy benchmarking and averaging) to reflect the differences between Pyxis's Actual RMBS Portfolio and the PCS RMBS Portfolio.  By doing so, she demonstrates that it is possible to generate today the loss estimates her team would, *in fact*, have generated based on the Actual RMBS Portfolio had it been accurately disclosed in 2006.  Federal Rules of Evidence 602 and 701, as consistently applied in this Circuit, allow a fact witness to testify about what she would *in fact* have done had misrepresented facts been accurately disclosed.  The remainder of Putnam's challenge to Skelton's declaration is a baseless attack on her credibility that (i) has no place in a motion to strike and (ii) is rooted in Putnam's own misunderstanding of FGIC's MBS analysis.

### A.  Skelton Offers Proper Fact Testimony, Not Expert Opinion

Putnam's motion concerning Skelton is premised on a fundamental misunderstanding of FGIC's MBS analysis.  This misunderstanding also underpins Putnam's June 24, 2020 letter ("Letter") offering Dolan's and Longstaff's supplemental declarations, and the testimony in those supplemental declarations.  Once that misunderstanding is corrected, Putnam's motion is clearly baseless.

FGIC's MBS analysis, performed by Skelton's MBS team, generated a loss estimate for Pyxis in three steps.  **First**, the MBS team calculated *loan-pool level* loss estimates for the loan pools underlying the RMBS bonds in the PCS, [1] by inputting the loan pools' detailed credit characteristics into FGIC's LCR model, which generated LCR results (loss estimates) for those loan pools.[2]  **Second**, the MBS team calculated *bond-level* loss estimates for the RMBS bonds backed by those loan pools by comparing the loan-pool loss estimates to the credit enhancement supporting each RMBS (using actual credit enhancement for the 82 ramped RMBS and averages for each bucket of target RMBS, adjusted to account for the bucket's credit rating).[3]  **Third**, the MBS team aggregated its bond-level loss estimates for each RMBS to generate a portfolio-wide loss estimate for the RMBS portfolio as a whole.  ECF No. 308 ¶¶ 187-202.  The "MBS Analysis" section of the Pyxis Credit Memorandum—which Putnam has had *for years*—explained each element of this analysis in detail.  PX325.028-34.  This analysis was implemented through the "MBS Analysis Spreadsheet," as Skelton explains in detail in her Declaration. Skelton Dec. ¶ 9.

---

[1] FGIC did not insure individual loans or loan pools; it insured RMBS *bonds* or the senior tranches of CDOs backed by RMBS *bonds* (or CDOs themselves composed of RMBS bonds), which were themselves collateralized by loan pools.  O'Driscoll Dec. ¶ 33-35; Menhenett Dec. ¶¶ 12, 47-49.

[2] FGIC was only able to run its LCR model on, and generate LCR results for, 25 of the 82 RMBS in the initial ramped Pyxis portfolio, because it did not have access to the loan tapes for the loan pools backing the remainder.  Skelton Dec. ¶ 13; PX325.31.  Where loan tapes for ramped RMBS were not available, the MBS team relied on loss estimates for proxy loan pools with similar credit characteristics.  Skelton Dec. ¶ 13; PX325.31.  For the target, "peach-colored" RMBS in the PCS RMBS Portfolio, Pyxis used loan-pool loss estimate averages for buckets of RMBS rather than generate individual loss estimates for each target RMBS. Skelton Dec. ¶ 20-22; PX1033.

[3] Each tranche of bonds in a CDO portfolio possesses a certain level of credit enhancement in the form of subordination and excess interest.  O'Driscoll Dec. ¶ 40; Menhenett Dec. ¶¶ 38-40; Skelton Dec. ¶ 11.

As explained below, Skelton also explained each element of this MBS analysis at her deposition. *See* Part I.B, *infra*. But Putnam essentially ignored her testimony and chose, for tactical purposes, to mischaracterize the MBS analysis despite contradictory evidence.

Putnam asserts that Skelton's testimony concerning what FGIC's loss estimates would have been based on Pyxis's Actual RMBS Portfolio should be excluded as expert testimony because "FGIC did not run this particular LCR analysis prior to this litigation." ECF No. 335 at 5. Contrary to Putnam's assertion, Skelton did not run any new LCR analyses or generate any new loss estimates in preparing her testimony. Rather, she used *the same* loss estimates that were generated in 2006 for each of the 82 ramped RMBS and for each of the buckets of target RMBS in the PCS RMBS Portfolio. She simply re-sized the buckets of target RMBS from the PCS RMBS Portfolio to reflect the content of the Actual RMBS Portfolio; those changes automatically flowed through the remainder of the MBS Analysis Spreadsheet and generated a loss estimate for the Actual RMBS Portfolio.[4] This testimony is clearly proper.

*First*, Skelton has personal knowledge of these matters under Rule 602. As the MBS team leader, Skelton was directly responsible for preparing loss estimates for RMBS portfolios collateralizing the CDOs that FGIC considered insuring, including Pyxis. Skelton Dec. ¶¶ 6, 7. Skelton describes the exact steps taken in this process in her declaration. Skelton Dec. ¶¶ 11-37. After describing how FGIC developed RMBS portfolio loss estimates for CDOs—including for Pyxis's PCS RMBS Portfolio—she describes how she would have generated loss estimates based on the Actual RMBS Portfolio. This testimony is based on her actual work experience and understanding of FGIC's loss estimate process and her reasoning as to how that process would apply. Skelton

---

[4] She also made two minor adjustments which were necessary to account for two specific changes between the Actual and PCS RMBS Portfolios. Putnam's experts criticize these adjustments, but do not suggest more reasonable alternatives. *See* Part I.C, *infra*.

Dec. ¶¶ 38-41.  Thus, Skelton's testimony as to what FGIC would have done if presented with the Actual RMBS Portfolio is based on a factual foundation rooted in her personal knowledge and perception of FGIC's loss estimate process.

*Second*, Skelton's testimony about what FGIC's loss estimates would have been based on Pyxis's Actual RMBS Portfolio is not based on "scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701.  To begin with, "what-if-you-had-known" testimony is plainly permissible in this Circuit.  In *United States v. Cuti*, for example, testimony was permitted from an auditor and an accountant about how they *would have accounted* for proceeds of transactions that turned out to be fraudulent had they known the truth.  The witnesses understood accounting, but their testimony was based on the factual foundation in the record and a personal familiarity with the accounting of the transactions at issue.  *United States v. Cuti*, 720 F.3d 453, 458 (2d Cir. 2013); *United States v. Rigas,* 490 F.3d 208, 224-25 (2d Cir. 2007) (accountant's lay opinion testimony about correct amount of debt absent fraud was proper); *Kinematic Techs., Inc. v. Brenton, LLC,* 2015 WL 6829042, at *1-2 (N.D.N.Y. Nov. 6, 2015) (admitting "what-if-you-had-known" opinion testimony based on witness's particularized knowledge).  Like the witnesses in *Cuti*, Skelton calculated loss estimates for FGIC's transactions, including Pyxis, based on her experience on the MBS team leading FGIC's bond-level loss estimate analyses.

Neither Skelton's work experience nor her use of a spreadsheet of which she has personal knowledge changes the nature of her testimony or renders that testimony "specialized" or "technical."  In *Medforms, Inc.*, the Second Circuit affirmed the trial court's decision permitting a lay witness to use a programming utility to compare source code files during his testimony and note the files' similarities.  The testimony was "not based on scientific, technical or other specialized knowledge within the scope of 'expert testimony,'" but rather on the witness's "everyday

experience as a computer programmer and specifically on his work on" the software at issue. *Medforms, Inc. v. Healthcare Mgmt. Sols., Inc.*, 290 F.3d 98, 110–11 (2d. Cir. 2002). The case for Skelton's testimony is even stronger, because unlike the programmer in *Medforms* who used a third-party utility to support his testimony, Skelton only seeks to demonstrate how *FGIC's own* document works based on her *own* personal knowledge.

## B. Skelton's Declaration is Fully Consistent with Her Deposition Testimony

Despite only moving to strike ¶¶38-41 of Skelton's declaration, Putnam spends much of its motion attacking the credibility of Skelton's testimony generally, based on its assertion that Skelton did not offer this testimony during her deposition. This is irrelevant to Putnam's motion to strike, which addresses the admissibility of ¶¶38-41. It is also wrong.

At her deposition, Skelton provided an overview of FGIC's MBS analysis process. *See* Exhibit A (Skelton Tr.) at 47:17-48:9; 48:22-49:4. Putnam *never followed up* to ask about the elements of that process—most notably, about the details of FGIC's *bond-level* analysis. Skelton was fully capable in her deposition—as now— of explaining how both the bond-level analysis worked and how the MBS Analysis Spreadsheet was used to perform that analysis, had she been properly refreshed with that spreadsheet. Skelton was also capable of explaining the purpose and function of the loan-level analysis that preceded the bond-level analysis, and specifically how the LCR results were incorporated in that bond-level analysis. The fact that she does not recall the "workings behind" the LCR model, Exhibit A at 15:13-17; 51:15-18, is irrelevant. Her testimony addresses the application of the LCR model's outputs, not the model's detailed internal work-ings—she was responsible for applying the LCR model's outputs to generate bond-level loss anal-yses, and her job responsibilities did not include maintaining or running the LCR model. On the

subject of her testimony—how the LCR model's loan-pool level loss estimates were used to gen-erate bond-level loss estimates, she has extensive personal knowledge and recollection. [5]

It is equally irrelevant that Skelton was unable to recall the specific analysis performed on Pyxis; she worked on dozens—if not hundreds—of transactions on the MBS team and need not remember each one to be found credible as to how the *process*, implemented through the MBS Analysis Spreadsheet, worked. This is particularly true where Putnam did not even present Skelton with the MBS Analysis Spreadsheet at her deposition to refresh her recollection.[6]

Putnam cannot be heard to complain about its own failure to explore the elements of FGIC's MBS analysis during Skelton's deposition (or through interrogatories it never served). Not only did Skelton describe the analysis in her deposition, but the documents on which FGIC relies were fully disclosed in discovery and Putnam could, and should, have used them to obtain from Skelton all the information it now contends it was denied. FGIC's disclosures included:

- The "MBS Analysis" appendix to the Pyxis Credit Memorandum, which ex-plained each element of the MBS analysis in detail. PX325.028, .033-34.

---

[5] Putnam appears to concede Skelton's description of the LCR model has been consistent. *See* ECF No. 335 at 7; Letter at 2.

[6] The record is rife with missed opportunities at Skelton's deposition. *See* Exhibit _ at 47:17-49:25 (Putnam moving on to general inquiries about the MBS underwriting process); *id*. at 51:25-52:17 (Skelton testifying about the credit enhancement analysis, and Putnam moving on to inquire about the LCR model); *id*. at 84:15-85:25 (Skelton testifying about a comparison of the bonds' credit enhancement against FGIC's loss projections, and Putnam continuing to inquire about the bond re-rating process); *id*. at 106:7-107:4 (Skelton testifying that FGIC might be skeptical of subprime loans but it would compare those loans against available credit enhancement, and Putnam moving on to inquire about CDO comparisons); *id*. at 143:19-147:23 (Skelton testifying about the comparison of loss projection against credit enhancement, and Putnam moving on to inquire about the MBS team's assessment of the quality of Putnam's asset selection); *id*. at 265:11-266:5 (Skelton testifying that the "objective" of the MBS team's analysis "was to project losses for each [of] the pools and compare those loss projections against the credit enhancement available to those securities and then determine … how the securities would perform," and Putnam moving on to inquire about a consultant conducting a postmortem of FGIC's MBS and CDO underwriting, and then ending the deposition shortly after 4:00 pm).

- The subject spreadsheet of Skelton's trial declaration, which has the filename "MBS Analysis extra.xls," a file path ending in "Pyxis\Files and Folders\Pyxis 2006-1\Original Analysis," and a last-modified date of August 24, 2006.  PX1033.

- Other iterations of the spreadsheet, which include files titled "MBS Analysis.xls" (D-B96); "Original MBS Analysis.xls" (FGIC-0400555); "28%BBB MBS Analysis.xls" (PX1035, analyzing the 28% BBB and 72% BBB- portfolio assumption discussed in Menhenett Dec. ¶¶ 159-60, 207-09); and "MBS Analysis 0816.xls" (FGIC-0400936, reflecting the analysis the MBS team performed on the PCS RMBS Portfolio on August 16, 2006, the day after it received the additional details on the PCS RMBS Portfolio that it had requested, *see* Menhenett Dec. ¶¶ 174-76).

- An email Skelton sent in April 2008 with the subject "share drive docs," which attached many iterations of this MBS Analysis spreadsheet, including the copy of "MBS Analysis extra.xls" that Mr. Dolan opined on in both his expert report and his original trial declaration (Dolan Report ¶¶ 80, 102, 181; Dolan Dec. ¶¶ 125, 203) and which has been included in every iteration of Putnam's trial exhibit list to date.  D-D88.

*See Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 43 (2d Cir. 2000) (noting that the "sham affidavit" rule Putnam relies on "does not apply if the deposition and the later sworn statement are not actually contradictory" and "where the later sworn assertion addresses an issue that was not, or was not thoroughly or clearly, explored in the deposition"); *see also Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996); *Kruger v. Virgin Atl. Airways, Ltd.*, 976 F. Supp. 2d 290, 309–10 (E.D.N.Y. 2013) (denying motion to strike "sham affidavits" because declarations may address issues outside the scope of deposition testimony); *Henton v. City of New London*, No. 3:06 Civ. 2035, 2008 WL 2185933, at *3-4 (D. Conn. May 23, 2008) (denying a motion to strike where the testimony did "not contradict earlier claims made in Plaintiff's deposition or in his responses to Defendant's interrogatories").

Putnam's misunderstanding of FGIC's MBS analysis leads to multiple errors:

- ***Putnam is wrong*** that Skelton has presented "new, belated LCR calculations."  She has only presented new *bond-level* loss estimates based on re-sized buckets and *preserved LCR calculations*.  ECF No. 335 at 8.

- ***Putnam is wrong*** that Skelton's unfamiliarity with the internal workings of the LCR model casts doubt on the testimony in her declaration—or bears *at all* on her recollection of how the MBS team's credit analysis functioned.  ECF No. 335 at 7.

- ***Putnam is wrong*** that Skelton offers new "disclosure of the methodologies used in the LCR model," that "Ms. Skelton's declaration offers detailed testimony on how FGIC's LCR model worked and a step-by-step explanation of how FGIC used the model for loss estimates," and that "Ms. Skelton … purports to apply the [LCR] model to the actual Pyxis portfolio."  Letter at 2.  Skelton's declaration detailed the methodologies of FGIC's *bond-level* analysis, which used the *LCR model's outputs* as *inputs* that were then compared against the bonds' credit enhancement.  Skelton Dec. ¶ 11.

- ***Putnam is wrong*** that Skelton "opine[s], in detail, on what the LCR model would show on the final Pyxis portfolio" despite not "recall[ing] the 'workings behind' the LCR model."  Skelton's declaration explains—not opines—how FGIC's *bond-level* analysis was performed and what would happen if the amount of assets in the different asset category and ratings buckets were changed, using the same loan-pool loss estimates that FGIC used to evaluate the PCS portfolio, which were preserved in the MBS Analysis Spreadsheet that Skelton discussed in Skelton's declaration.  Skelton Dec. ¶¶ 11-22.

These errors resulted from Putnam's own failures in discovery, not FGIC's.  Putnam's final complaint—that FGIC's trial declarations are more detailed than its motion papers and Proposed Findings of Fact concerning why FGIC's analysis of the Actual RMBS Portfolio would not support a 40% attachment point—is irrelevant.  Motion papers are not disclosure devices; Proposed Findings of Fact do not describe every detail of the case.  FGIC presented its trial evidence when it was required to present it, having made full disclosures in discovery.  Putnam must live with the discovery record it made—a record which is completely consistent with Skelton's testimony.

## C. Putnam's Experts, Like Putnam, Mischaracterize FGIC's MBS Analysis

Putnam also deploys its experts to assail Skelton's declaration as unreliable.  ECF No. 335 at 8.  But Putnam's experts make the same mistakes as Putnam.  Dolan presents a hypothetical to show "how extreme Ms. Skelton's assumption about loss severity is for those assets in the final portfolio that she considers below-investment-grade."  He posits a scenario in which "only one of the 77 Baa3-rated assets" in the ramped RMBS portfolio "was projected to suffer a loss"; "[t]his would cause the 'Baa3 bucket' to suffer losses on average (though they would be very small)."  Dolan Supp. Dec. ¶ 8.  In this scenario, he claims, "[u]nder Ms. Skelton's assumption, all 'buckets

8

subordinate to the Baa3 bucket … would be projected to suffer losses of 100%." Dolan Supp. Dec. ¶ 8.

Dolan misunderstands that, in constructing buckets for the target PCS bonds, the MBS team *did not rely on average bond-level losses from the ramped portfolio*, *i.e.*, on the single-factor averaging Dolan describes. The MBS team compared *the average loan-pool loss estimate* for the ramped bonds against *the average amount of credit enhancement* those bonds enjoyed. In other words, the MBS team calculated two independent averages and compared them. If Dolan's hypothetical did likewise, the loss suffered by his single Baa3 RMBS would be muted in the Subprime Baa3 bucket and there would be no basis for asserting that below-investment-grade buckets should suffer 100% loss severity. But Dolan's hypothetical is not what the PCS RMBS Analysis showed. Even at the 95% confidence interval, it showed the Subprime Baa3 bucket experiencing substantial losses when comparing average loan-pool loss amounts to average bond-level credit enhancement. A 100% loss estimate for subordinate buckets follows necessarily from that fact coupled with the MBS team's use of a bucketing system to analyze the PCS RMBS Portfolio.

Longstaff's analysis is similarly misplaced. He does not criticize Skelton's *description* of the MBS team's bond-level analysis. Instead, he complains that analysis should have been different, and specifically complains that Skelton failed to consider the impact of step downs. Longstaff Supp. Dec. ¶ 20, 28. But the MBS team did not incorporate step downs—idiosyncratic structural components of RMBS—in analyzing CDO RMBS portfolios, for two related reasons. First, accounting for step-downs in analyzing more than a hundred bond in a CDO RMBS portfolio would be very laborious. Second, because step downs only materially impact RMBS cash flow when the RMBS is largely performing, their impact is immaterial when measuring RMBS losses at the 95% confidence interval or above, where the bond is definitionally not performing.

The remainder of Longstaff's critique centers on Skelton's use of asset-sector and rating buckets; he asserts she should have relied on single-factor average bond-level losses calculated for the ramped assets in the MBS Analysis Spreadsheet (the process Dolan mistakenly believed the MBS team in fact applied, as noted above).  Longstaff Supp. Dec. ¶¶ 24-27.  But this is not a criticism of Skelton's explanation of the MBS Analysis Spreadsheet's functioning.  It is wishful thinking.  The MBS team *in fact* analyzed the PCS RMBS Portfolio using asset-category and rating buckets.  Skelton Dec. ¶¶ 20-23.  An assertion that a different methodology would have been preferable is irrelevant, let alone a critique of Skelton's trial declaration.[7]

Longstaff's attack is fundamentally misguided because it assumes the "correctness" of FGIC's models and RMBS analysis is at issue.  It is not.  FGIC insured Pyxis at a 40% attachment point based on loss estimates calculated by the MBS team using the methodology described by Skelton.  Had the MBS team reviewed the Actual RMBS Portfolio, it would have used the same methodology to calculate its loss estimates.  Putnam's post-hoc critique of those models and analyses has no bearing on whether they were in fact used to analyze the PCS RMBS Portfolio and would in fact have been used to analyze the Actual RMBS Portfolio.

---

[7] Putnam's experts' assertions that Skelton should not have corrected the erroneous amount of the ABX asset in the MBS Analysis Spreadsheet, Skelton Dec. ¶ 41 n.7, is likewise meritless.  Neither expert acknowledges it is impossible to compare the PCS RMBS Portfolio against the Actual RMBS Portfolio without some adjustment for this error.  The PCS RMBS Portfolio had a principal balance of $1.376 billion, which included (a) a principal amount for the 82 ramped assets that was $25 million larger than it should have been, and (b) asset buckets constructed to fill the remainder of the portfolio's projected principal amount.  The Actual RMBS Portfolio had a principal balance of $1.376 billion *without* that extra $25 million in the ABX asset line.  Not correcting the ABX volume error would entail *adding* $25 million in ABX assets to the Actual RMBS Portfolio, which was *already sized at $1.376 billion*, resulting in a *$1.401 billion portfolio*.  Skelton offered two methods of addressing this.  Dolan offers no alternative.  Longstaff prefers Skelton's second method, but ignores that (i) employing that method requires "a distortion of the composition of the actual assets purchased for Pyxis," Skelton Dec. ¶ 41 n.7, and (ii) it is not how the MBS team would in fact have accounted for the error based on the Actual RMBS Portfolio in August 2006.

## II.      Fiachra O'Driscoll's Testimony Should Not Be Stricken

### A.   O'Driscoll May Opine On the Spreads at Which Prime and Seasoned RMBS Traded in 2006

Putnam moves to strike Fiachra O'Driscoll's testimony about the spreads at which prime and seasoned RMBS traded in 2006 on the grounds that the Court previously excluded this testimony and, if not, it is unreliable.  ECF No 335 at 9-10 (citing O'Driscoll Dec. ¶¶ 139-141).

*First*, this testimony was not previously excluded.  The Court's *Daubert* Order excluded O'Driscoll's opinion that "adding more prime assets would have caused Pyxis to perform better," because O'Driscoll "did not model such a scenario."  ECF No. 281 at 14-15.  O'Driscoll's testimony concerning *the spreads* at which prime (and seasoned) RMBS traded is based on his industry experience and is obviously different from his excluded opinion concerning the *performance* of such RMBS.  *See* Appendix 1 (comparing testimony Putnam moved to exclude at *Daubert* with testimony Putnam now moves to exclude).  Thus, O'Driscoll's testimony was not barred.[8]

*Second*, the Court should reject Putnam's request to extend the *Daubert* Order to O'Driscoll's opinions about the spreads at which prime and seasoned RMBS traded.  This testimony rebuts the self-serving testimony of Putnam's lay witnesses, Bell and Van Tassel, who claim it was not possible to include more prime and seasoned RMBS in Pyxis because of tight spreads.  *See* Bell Dec. ¶ 88 ("While I do not have access to the exact spreads in the second-half of 2006, I believe" prime RMBS traded at tighter spreads than subprime RMBS); Bell Dec. ¶ 91; Van Tassel Dec. ¶ 44 ("My recollection is that at the time of Pyxis, there was a relatively steep spread curve,

---

[8] Putnam also moves to strike O'Driscoll's separate testimony that more seasoned RMBS suffered less severe losses than less seasoned RMBS on the ground that this opinion was already excluded.  ECF No. 335 at 14 (seeking to strike ¶¶ 139-41 of O'Driscoll's Declaration).  The Order held no such thing.  ECF No. 281 at 14-15 (merely excluding O'Driscoll's opinion "that adding more prime assets would have caused Pyxis to perform better").

meaning that spreads declined significantly the further back in time [vintage] one went."). O'Driscoll's testimony shows that spreads for prime and seasoned RMBS were much less tight than Bell and Van Tassel claim and that substantially more of them could have been included in Pyxis. O'Driscoll Dec. ¶¶ 139-141. Based on O'Driscoll's testimony, Karl Snow opines about different portfolios with more prime and seasoned RMBS that would have met the Pyxis eligibility criteria. Snow Dec. ¶¶ 77-80.

*Third*, Putnam is incorrect that O'Driscoll's testimony about market spreads for seasoned RMBS is unreliable. O'Driscoll discloses the analysis supporting his opinion in the table of spreads in his Declaration. O'Driscoll Dec. ¶¶ 140-141. This table was included in his expert report and was not excluded, despite Putnam's efforts to impugn its reliability through a witness it has since withdrawn. *See* ECF No. 167-3, at 86, Table 1. Putnam offers no reason to exclude it now. It would be especially unfair to exclude such testimony from a highly qualified and independent expert while permitting Bell and Van Tassel to make self-serving, unfounded assertions that tight spreads precluded them from selecting more prime and seasoned RMBS for Pyxis. Indeed, Bell and Van Tassel do not even testify that they actually *tried* to construct a qualifying portfolio more in line with what they promised FGIC.

## B. O'Driscoll May Opine on Undisputed Industry Practice Concerning the Provision of Target Portfolios to Investors and Rating Agencies

Putnam also moves to strike O'Driscoll's opinions about aspects of industry practice on the grounds that they are "new" and "already stricken." ECF No. 335 at 10. The Court should reject both parts of this self-contradictory argument.

*First*, Putnam complains that O'Driscoll's testimony concerning the common use of detailed, line-by-line target portfolios should be stricken because it was not expressed *verbatim* in his expert reports. *Id.* (citing O'Driscoll Dec. ¶ 149). Rule 26 imposes no such requirement. *Cf.*

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 585 F. Supp. 2d 568, 581 (D. Del. 2008) (holding "verbatim consistency" between expert's report and trial testimony is not required). In any event, O'Driscoll's prior reports disclosed the substance of his testimony that target portfolios were routinely provided to investors and the rating agencies. *See, e.g.*, ECF No. 167-3, ¶¶157-161, n.226 (describing Menhenett's request for a detailed target portfolio from Putnam, and opining that "a collateral manager receiving Menhenett's request for a detailed target portfolio would have known that, before assuming very large liabilities, a major institutional investor would have required detailed information about the assets that would be included in the final portfolio, not an additional copy of the pitch book that had already been distributed."); ECF No. 167-58, ¶¶22-29 (describing the process by which detailed target portfolios were provided to the rating agencies). O'Driscoll's declaration merely synthesizes and elaborates on already-disclosed opinions.[9] Moreover, in *his* declaration, Carl Bell asserted, for the first time, that disclosure of "deal specific information" such as a target portfolio to an investor would raise selective disclosure issues for a manager. *See* ECF No. 325. O'Driscoll must be permitted to respond to this assertion made for the first time in Bell's declaration.

*Second*, O'Driscoll's testimony was not excluded by the *Daubert* Order. That Order excluded O'Driscoll's opinions concerning "what attachment point the rating agencies would have calculated if they had received the final Pyxis portfolio." ECF No. 281 at 6. The testimony at issue relates to the information CDO structurers like O'Driscoll were required to provide to the

---

[9] Putnam's complaint is particularly odd as it relates to the rating agencies since O'Driscoll's testimony summarizes *undisputed facts* with which Putnam's own witnesses *agree*. Dolan Dec. ¶¶ 50, 52, 154-55 ("[T]he dealer is generally responsible for communicating with the rating agencies. The main purpose of *sending portfolios* and assumptions packages *to the rating agencies* is to allow them to run their cash flow models and to assign preliminary ratings." (emphases added)).

rating agencies.  O'Driscoll Dec. ¶ 149 ("The rating agencies also required such detailed target portfolios to provide credit ratings for the CDO's debt tranches.").  The *Daubert* Order did not address such testimony.

*Third*, this "opinion" is not speculative.  O'Driscoll describes prevailing industry practices in 2006 regarding the provision of detailed target portfolios by CDO structuring banks to investors, insurers, and the rating agencies.  *Id.*  O'Driscoll is obviously qualified to testify as to these practices: he worked at a structuring bank and responded to requests from rating agencies, investors, and insurers for the detailed target portfolios he describes.  Putnam concedes the structuring bank was primarily responsible for communicating with rating agencies.  Dolan Dec. ¶¶ 50, 52; *see also Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 399 n.1 (2d Cir. 2015).  Industry experience is a proper basis for industry expert testimony.  *E.g.*, *Beastie Boys v. Monster Energy Co.*, 983 F. Supp. 2d 354, 364–65 (S.D.N.Y. 2014) (rejecting challenge to marketing expert's opinions "based principally upon his experience and research in the world of marketing," "even if the field of knowledge … does not readily lend itself to a formal or quantitative methodology.").

## C.  O'Driscoll May Offer Summary Evidence of Putnam's RMBS Risk Scoring Model

Putnam moves to strike O'Driscoll's tabulation of scores contained in Putnam's own risk scoring database on the ground that it constitutes a new expert opinion.  ECF No. 335.  O'Driscoll's declaration summarizes, in chart form, scores that Putnam gave to 1,139 unique bonds issued in five six-month vintage periods listed on the *HEL sorted* tab of its scoring database. O'Driscoll Dec. ¶¶ 126-27; PX411, *HEL sorted*, column CR.  Putnam does not argue that that PX411—produced from its own files—is not admissible.  The O'Driscoll summary is precisely what Rule 1006 expressly allows.

There is no expert opinion or nonreplicable "analysis and calculations" embedded in O'Driscoll's chart, as Putnam claims. ECF No. 335 at 14.[10] O'Driscoll simply took Putnam's own chart, sorted it by date in Column B, and then averaged the rating scores listed in Column CR of PX411 for each of the five vintage groups. O'Driscoll uses the chart to support his long-disclosed opinions that Putnam considered pre-2005H2 RMBS sounder than new-issue assets from a credit perspective, which, coupled with his testimony about the spreads at which such RMBS were trading in 2006, confirms his opinion that Putnam had no basis to omit pre-2005H2 assets from the Pyxis portfolio other than to serve the interests of the equity investors. O'Driscoll Dec. ¶¶125-28. Whether those opinions are persuasive is for the Court to decide at trial.

Rule 1006 permits the use of summaries to save time at trial, as O'Driscoll's summary will do. Moreover, Putnam does not dispute the substance of Mr. O'Driscoll's summary. If this summary is stricken, FGIC will use its examination of Mr. Van Tassel to elicit the same information, which will take significantly longer. This would be especially inefficient and irrational given that Van Tassel essentially agrees with O'Driscoll that he regarded more seasoned RMBS as having a better credit profile at the time he selected RMBS for Pyxis. *See* Van Tassel Dec. ¶ 54.

## CONCLUSION

For the reasons set forth above, the Court should deny Putnam's motion to strike testimony of Dana Skelton and Fiachra O'Driscoll.

---

[10] To the extent the summaries do contain expert analysis, and this is only arguably the case for the beginning of paragraph 129 where O'Driscoll applied a scoring matrix preserved in another Putnam spreadsheet (PAC_FGIC00095043, evaluating the Jackson CDO) to the RMBS in PX411, those opinions are not new. In his opening expert report, O'Driscoll opined at length about the contents of PX411 and additional iterations thereof, noting that each spreadsheet he reviewed categorically excluded 2004 RMBS, and that Putnam winnowed out 2005H1 assets from consideration despite the absence of any apparent credit reason to do so. O'Driscoll Report ¶ 141-43.

Dated:   New York, NY                 Respectfully submitted,
          June 29, 2020

                                   SELENDY & GAY PLLC

                 By:     _____
                             Sean Baldwin
                             Jennifer Selendy
                             Joy Odom
                             Amy Nemetz
                             Megan Larkin
                             Will Rathgeber
                             Lauren Zimmerman
                             SELENDY & GAY, PLLC
                             1290 Avenue of the Americas
                             New York, NY  10104
                             Tel: 212-390-9000
                             sbaldwin@selendygay.com
                             jselendy@selendygay.com
                             jodom@selendygay.com
                             anemetz@selendygay.com
                             mlarkin@selendygay.com
                             wrathgeber@selendygay.com
                             lzimmerman@selendygay.com
                             *Attorneys for Plaintiff Financial Guaranty*
                             *Insurance Company*