Selendy & Gay PLLC
1290 Avenue of the Americas
New York NY 10104
212 390 9000

Sean Baldwin
Partner
212 390 9007
sbaldwin@selendygay.com



July 1, 2020

**Via ECF**

Hon. Lewis J. Liman
United States District Court, Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007

Re:   ***Financial Guaranty Insurance Company v. The Putnam Advisory
      Company, LLC**, No. 12-cv-7372 (S.D.N.Y.)*

Dear Judge Liman,

We write on behalf of Plaintiff Financial Guaranty Insurance Company ("FGIC") in response to your Order dated June 23, 2020. ECF No. 322. As Judge Torres held both at summary judgment and in rejecting a subsequent motion to strike filed by The Putnam Advisory Company, LLC ("Putnam"), FGIC may establish loss causation by proving that it agreed to a lower attachment point, and thus greater exposure to risk, on the basis of the Peach-Colored Spreadsheet ("PCS"). Putnam concedes that if Judge Torres did decide this issue, her ruling should not be disturbed as law of the case. Judge Torres did rule on this point, and her decision is consistent with New York law. Accordingly, there is no basis to take the highly unusual step of revisiting it.

I.    **Judge Torres held twice that FGIC can establish loss causation
      based on its changed attachment point.**

At summary judgment, FGIC argued (and Putnam contested) that it could prove loss causation and damages by showing that, if FGIC had known the true contents of the Pyxis portfolio—specifically, the amount of prime RMBS, pre-2005H2 RMBS, and assets rated above Baa2—FGIC either would not have agreed to participate in Pyxis at all (in which case FGIC would have been induced to pay Putnam $74.5 million less in commutation payments) or it would have agreed to participate in Pyxis only at an attachment point of at least 50% (in which case FGIC

Hon. Lewis J. Liman
July 1, 2020

would have been induced to pay Putnam at least $36 million less in commutation payments). Judge Torres held that this theory of loss causation is legally viable, and Putnam never moved for reconsideration. Five months later, Putnam tried to take a second bite at the apple by seeking leave to move to strike FGIC's 50%-attachment-point damages theory, claiming erroneously (as it does here) that this theory was "new." Judge Torres rejected Putnam's arguments a second time. Now, seeking to exploit the reassignment of this case, Putnam tries again, recycling old arguments that Judge Torres put to rest long ago. ECF No. 333, at 1-3.

FGIC clearly outlined its loss causation theory in its motion for summary judgment. It explained that, as a result of Putnam's fraudulent PCS, "FGIC modeled and ultimately agreed to participate in Pyxis at a 40% attachment point, based on the materially inflated percentages of prime, seasoned, and higher-rated assets disclosed in the PCS." ECF No. 118, at 17. FGIC then explained that had it known the truth, it "would not have agreed to issue the Pyxis Guaranty on the terms it did, and would only have done so (if at all) with at least 50% subordination, meaning it would have been exposed to losses of $150 million less than it was." *Id*. at 35. FGIC then reiterated this point in opposing Putnam's motion for summary judgment. *See* ECF No. 164-5, at 17-18 ("The evidence shows that, absent the PCS, FGIC would have either have declined to issue the Pyxis Guaranty or would only have attached at 50% or more rather than 40%, reducing its exposure by at least $150 million.").

Judge Torres accepted this proximate cause theory and denied Putnam's motion for summary judgment. She explained that "if Putnam's alleged misrepresentations caused FGIC to enter into a different commutation agreement than it would have entered into had it known the truth, loss causation could be established." ECF No. 160, at 35. She then acknowledged that FGIC had already offered evidence to support this theory of loss causation:

> FGIC takes this very position, that Putnam's misrepresentations about Pyxis caused it to agree to an attachment point of 40% instead of 50%, exposing it to more risk, which required higher loss reserves, and a correspondingly higher commutation payment …. There is record evidence [of internal FGIC discussions about potential attachment points] to support this theory…. If FGIC had the benefit of reviewing the actual Pyxis portfolio—or a target portfolio that was actually representative of Pyxis—it is possible, perhaps probable, that FGIC would have demanded an attachment point of 50% or more. The evidence suggests the result would have been a materially less risky Pyxis Guaranty or no Pyxis Guaranty at all. There is support, too, for the position that if Pyxis's attachment point were higher—and its total liability lower—its commutation payment would have also been smaller.

ECF No. 160 at 37.

Hon. Lewis J. Liman
July 1, 2020

Five months later, Putnam tried unsuccessfully to strike the damages theories Judge Torres had already blessed at summary judgment. Judge Torres denied Putnam's renewed efforts, reiterating the conclusion she had reached at summary judgment: that FGIC is entitled to prove proximate cause at trial by showing "that [Putnam's] misrepresentations about Pyxis caused [FGIC] to agree to an attachment point of 40%, instead of 50%, exposing it to more risk, which required higher loss reserves, and a correspondingly higher commutation payment." ECF No. 283, at 4. Judge Torres noted that she had already "set this issue, which [was] not 'new,' for trial" in February 2020. *Id.*

Thus, Putnam's suggestion that Judge Torres did not determine—or even consider—whether FGIC's loss causation theory is valid under New York law does not withstand the slightest scrutiny. Judge Torres *twice* considered, and validated, the legal viability of FGIC's loss causation theory.

Putnam is also wrong that "FGIC has fundamentally changed the theory of loss causation it advanced on summary judgment" because FGIC had purportedly (i) based its attachment-point loss causation theory "on its claimed practice of attaching at two times a CDO's initial AAA attachment point," not on its own review of the target portfolio, and (ii) did not discuss its zero-loss underwriting policy. ECF No. 333, at 3 n.2. Both these statements are false.

As Putnam well knows, FGIC argued at summary judgment that, had Putnam shown "FGIC … the actual Pyxis portfolio" rather than the fraudulent PCS, FGIC would have attached at 50% or higher, if at all, ECF No. 118, at 17, 34-35—a point it had previously made fully two-and-a-half years ago now in Fiachra O'Driscoll's expert report, served on January 15, 2018, *see* ECF No. 167-3 (O'Driscoll Expert Report) ¶¶ 105, 166-70, 183-84, 196. In her summary judgment decision, Judge Torres expressly upheld FGIC's theory that "[i]f *FGIC had the benefit of reviewing the actual Pyxis portfolio*—or a target portfolio that was actually representative of Pyxis—it is possible, perhaps probable, … FGIC would have demanded an attachment point of 50% or more." ECF No. 160, at 37-38 (emphasis added).

In a separate claim, FGIC also argued at summary judgment that the credit rating agencies would have assigned a materially higher AAA attachment point had Putnam shown it the true Pyxis portfolio (rather than the materially misleading rating agency target portfolios). FGIC argued that such action by the rating agencies would have caused FGIC to attach above 50% because of its general preference to attach at two times the AAA attachment point. ECF No. 118, at 19, 34-35. Judge Torres did not rely on this ratings-based claim in upholding FGIC's loss causation theory (because she dismissed FGIC's ratings-based claim and subsequently excluded O'Driscoll's expert testimony about the impact disclosure of the true portfolio would have had on the deal's AAA attachment point), but she concluded that FGIC could prove loss causation on the alternative theory that if it had reviewed the PCS it would have attached, if at all, on different terms.

3

Hon. Lewis J. Liman
July 1, 2020

Nor is FGIC's zero-loss underwriting approach newly disclosed. FGIC's witnesses testified about their zero-loss underwriting policy in their depositions, and Putnam was well aware of it. *See* Menhenett Tr. 73:6-10 ("FGIC was rated AAA, and for its insurance business it relied on its AAA rating. So the AAA dictated a sense of care in the type of credit we put on our book, not only no loss but also stability."); Pfeffer Tr. 161:19-162:7 ("[Y]ou would have to have the structure of the deal create the credit protection that would cover multiples of whatever your loss expectation was, your expected loss. So the deal would need those factors to cover your worst case losses, which were the … 99.7 or 99.5 confidence interval of losses, which is, you know, the thousand year storm stuff."). Fiachra O'Driscoll also addressed this point in his rebuttal report. ECF No. 167-57 ¶ 7 ("FGIC's CDO insurance business focused on highly-rated senior and supersenior tranches of CDOs, on which the returns were low—commensurate with the expected low risk.").

That monolines like FGIC had—and continue to have—a "zero-loss" underwriting standard should not be a surprise to Putnam. Insuring very remote risks is their business model, and it is why monoline insurers receive premiums measured in hundredths of a cent of notional value for insuring structured products. FGIC attached to Pyxis at 40%, almost two times the purported natural AAA rating level. Carl Bell and John Van Tassel acknowledge in their declarations that AAA assets carry a WARF of just 1. Bell Decl. ¶¶ 35-36; Van Tassel Decl. ¶ 37. That means Moody's estimated 10-year probability of default for the asset is 0.36%. FGIC, attaching well north of what it understood to be the AAA attachment point for Pyxis, had a commensurately lower expectation of default and loss.[1]

This was widely known in the industry, as the report of the Financial Crisis Inquiry Commission makes clear: "The notion of 'zero-loss tolerance' was central to the viability of the monoline business model, and they and various stakeholders—the rating agencies, investors, and monoline creditors—had traditionally assumed that the monolines never would have to take a loss."[2]

FGIC has been transparent about its zero-loss underwriting policy since discovery. This policy supports FGIC's argument that its internal credit analysis would have required a 50% attachment point based on the actual Pyxis portfolio. And this, in turn, is indisputably the theory Judge Torres repeatedly upheld as viable in her ruling on summary judgment and in rejecting Putnam's motion for leave to file a motion to strike FGIC's damages theory.

---

[1] David T. Hamilton & Richard Cantor, Moody's Investor Service, *Measuring Corporate Default Rates* (Nov. 2006), https://www.moodys.com/sites/products/defaultresearch/2006200000425249.pdf.

[2] The Financial Crisis Inquiry Report at 276, https://fcic-static.law.stanford.edu/cdn_media/fcic-reports/fcic_final_report_full.pdf.

Hon. Lewis J. Liman
July 1, 2020

## II.   Judge Torres's rulings are law of the case.

Judge Torres's repeated approval of FGIC's attachment-point loss causation theory is law of the case.  Indeed, while claiming that the Court did not rule on the point, Putnam does not dispute a ruling should be treated as law of the case.  ECF No. 333, at 1 ("In the event Your Honor were to conclude that Judge Torres did make such a ruling, Putnam is willing to *treat her decision as law of the case* and to preserve the issue for any possible appeal.") (emphasis added).

Courts may not depart from law of the case absent "compelling reasons" beyond "mere disagreement" with a prior decision.  *MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*, 232 F. Supp. 3d 558, 570-71 (S.D.N.Y. 2017).  Courts "should be loathe to [revisit earlier decisions] in the absence of extraordinary circumstances, such as where the initial decision was clearly erroneous or would work a manifest injustice."  *Clarendon Nat. Ins. Co. v. Lan*, 152 F. Supp. 2d 506, 524 (S.D.N.Y. 2001) (internal quotation marks omitted).

Far from "clearly erroneous," Judge Torres's rulings on loss causation are fully consistent with New York common law.  "Under New York common law, a plaintiff need not demonstrate loss causation as required under the federal securities law."  *Marini v. Adamo*, 995 F. Supp. 2d 155, 200 (E.D.N.Y. 2014) (Bianco, J.) (citing *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 183 (2d Cir. 2007)).  "Instead, 'a fraud plaintiff must show [only] that he acted on the basis of the fraud and suffered pecuniary loss as a result of so acting.'"  *Id.* (quoting *Merrill Lynch*, 500 F.3d at 183); *see also Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 402 (2d Cir. 2015) ("Loss causation … is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." (internal quotation marks omitted)).  To establish loss causation, a plaintiff must demonstrate that "the defendant's alleged fraudulent conduct was a direct and proximate cause of his or her claimed losses."  *Designer Limousine, Inc. v. Authority Transp., Inc.*, 176 A.D.3d 670, 671 (2d Dep't 2019).[3]

In contrast to the more complicated aspects of this case, the chain of loss causation is relatively simple.  FGIC will show at trial that the PCS induced FGIC to incur out-of-pocket losses in the form of a commutation payment pursuant to a guaranty it either would not have issued had it known the truth or, at a minimum,

---

[3] Putnam's contention that FGIC cannot establish loss causation for its common law fraud claim by identifying "a disparity between the transaction price and the true 'investment quality' of the securities at the time of [the] transaction" (ECF No. 333, at 3-4 n.3) ignores the distinction between claims arising under the federal securities laws and common law fraud.  The Supreme Court's holding in *Dura Pharmaceuticals., Inc. v. Broudo*, 544 U.S. 336 (2005), "that overpayment [for an asset caused by fraud] alone cannot prove loss causation … is based on the tailored application of … principles set out by the Supreme Court *in the securities context*."  *Merrill Lynch*, 500 F.3d at 183 (emphasis added).  "Such application does not govern" New York common law fraud claims.  *Id.*

would only have issued at an attachment point of at least 50%.  FGIC will therefore prove that it "acted on the basis" of Putnam's fraud by issuing the Pyxis Guaranty at a 40% attachment point, and that the commutation payment it made to Calyon was "pecuniary loss[] as a result" of issuing that guaranty under fraud.  *See Marini*, 995 F. Supp. 2d at 200.  If the Court finds that, had it known the true portfolio, FGIC would only have issued the Pyxis Guaranty at a 50% attachment point or higher, and therefore would have paid Calyon less than it ultimately did, the amount by which the commutation payment would have been reduced establishes loss causation and damages.  This does not, as Putnam claims, conflate transaction causation and loss causation:  FGIC will prove transaction causation by proving that had it known the true portfolio, it *would not* have agreed to a contract with a 40% attachment point; FGIC will prove loss causation and damages by proving that had it known the true portfolio, it *would only have* agreed to a contract with an attachment point of at least 50%.

There is nothing unusual—and certainly nothing improper—about FGIC's argument that, in the event the factfinder concludes that FGIC would have issued the Pyxis Guaranty at a 50% attachment point if it knew the truth, then the losses FGIC would have incurred as a product of Putnam's fraud should be disaggregated from the total $74.5 million in commutation payments it made to Putnam. Disaggregating losses attributable to fraud from losses attributable to other factors is standard practice in loss causation analyses.  *See Ambac Assur. Corp. v. Countrywide Home Loans Inc.*, 179 A.D.3d 518, 520 (1st Dep't 2020) (plaintiff in RMBS fraud action could only recover for defaulted loans whose characteristics the defendant misrepresented and not for defaulted loans whose characteristics the defendant did not misrepresent); *cf. Liberty Media Corp. v. Vivendi Universal, S.A.*, 923 F. Supp. 2d 511, 518-20 (S.D.N.Y. 2013) (in securities context, expert witness disaggregated loss in value of stock caused by the fraud from loss in value caused by market forces).  Here, FGIC has simply offered the factfinder a way to identify the actual losses it suffered as product of Putnam's fraud if the factfinder believes FGIC would have issued a guaranty with a higher attachment point had it known the truth.

Putnam's argument (ECF No. 333, at 4-5) that the *Dress Shirt* line of cases precludes FGIC from establishing loss causation is a red herring.  The *Dress Shirt* cases are *damages* cases that hold plaintiffs cannot recover speculative and hoped-for lost profits or other benefits they might have *gained* in a hypothetical alternative transaction were it not for the defendant's fraud.  *See, e.g., Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421-22 (1996) (denying recovery "for what [the plaintiffs] might have gained" in an alternative transaction had they not been defrauded); *Dress Shirt Sales v. Hotel Martinique, Assocs.*, 12 N.Y.2d 339, 344 (1962) (denying recovery based on the lost opportunity to sublease rental space was "within the policy of our consistent refusal to allow damages for fraud based on the loss of a contractual bargain, the extent, and, indeed, in this case, the very existence of which is completely undeterminable and speculative"); *Mehra v. Tetrault*, 2008 WL 4276907, at *3-4

6

Hon. Lewis J. Liman
July 1, 2020

(W.D.N.Y. Sept. 12, 2008) (declining to depart from the out-of-pocket rule to award damages that accounted for the possibility that the "[p]laintiffs could have invested their money elsewhere" instead of in the defendants' fraudulent scheme); *Spithogianis v. Haj-Darwish*, 2008 WL 82188, at *7 (S.D.N.Y. Jan. 7, 2008) (denying recovery for pro se plaintiff's claim for "lost profits"). Here, FGIC seeks to defray its actual, out-of-pocket losses caused by Putnam—namely, the commutation payments Putnam induced FGIC to make. FGIC does not seek to recover damages for hypothetical gains it might have earned pursuant to an alternative transaction it might have put its money towards had Putnam's false statements not caused it to make the commutation payments. Putnam cites no case—and FGIC has found none—precluding FGIC from proving loss causation, as it intends to do at trial, by offering specific and concrete evidence that the plaintiff would have avoided pecuniary loss by engaging in a different transaction.[4]

To the extent the *Dress Shirt* line of cases are applicable to the question of loss causation, they help FGIC.[5] Recovery under *Dress Shirt* is appropriate if the alternative bargain that the defendant's fraud caused the plaintiff to forego is not "completely undeterminable and speculative." *Dress Shirt*, 12 N.Y.2d at 344. Putnam concedes that multiple cases since *Dress Shirt* have interpreted it as so holding. *See* ECF No. 299 (Putnam Proposed Findings of Fact and Conclusions of Law) ¶¶85-86. For example, as Putnam acknowledges (ECF No. 333, at 4 n.4), in *In re MarketXT Holdings Corp.*, 2006 WL 2864963, at *7 (S.D.N.Y. Sept. 29, 2006), the court permitted a fraud plaintiff to recover unrealized gains from a foregone alternative opportunity because it had identified specific alternative potential counterparties willing to do a similar deal on better terms. And Putnam is wrong that *MarketXT* is the only case in which a plaintiff recovered fraud damages premised on the loss of an alternative contractual bargain—courts have allowed such recoveries in fraud claims arising in various contexts. *See, e.g., Navaretto v. Group Health Inc.*, 191 A.D.2d 953, 954-55 (3d Dep't 1993) (permitting a fraud claim based on an

---

[4] For this same reason, Putnam's insistence that FGIC cannot prove loss causation because all similarly situated investors suffered large losses in the wake of the financial crisis, *see, e.g.*, ECF No. 299 (Def. Proposed Findings of Fact and Conclusions of Law) ¶¶ 92-93, ignores that FGIC is not like an investor that seeks to make a profit from its investment—instead, FGIC took on a quantifiable sum of exposure to risk based on Putnam's fraud and suffered out-of-pocket losses as a result.

[5] Importantly, the *Dress Shirts* court held that plaintiffs allegations supported a finding that reliance on the lie "caused" plaintiff to buy out the lease because "had it not been for the [defendant's] lie," the plaintiff may have been able to prove that he could have secured the alternative bargain where the sub-tenant assumed responsibility for the remaining six years on the lease. However, what rendered this theory an impossible basis for recovering the plaintiff's out-of-pocket loss of $30,000 was the landlord's existing contractual right to collect a far greater sum of six year's rent payments. In other words, the settlement that plaintiff entered saved him money. That left plaintiff with only a "benefit of the bargain" damages theory where plaintiff would have not only have saved $30,000 but also have been relieved of the duty to pay rent under the lease. It was this speculative transaction that the court rejected only insofar as it was a measure of damages. *Dress Shirt*, 12 N.Y.2d at 343-44.

Hon. Lewis J. Liman
July 1, 2020

alternative transaction when plaintiff was fraudulently induced to leave her former job); *Romano v. Key Bank of Cent. N.Y.*, 90 A.D.2d 679, 679-80 (4th Dep't 1982) (permitting a fraud claim based on an alternative transaction when the plaintiff was induced to enter an agreement under which it got the rights of an unsecured, rather than a secured, creditor).

Finally, that Pyxis would have lost value regardless of Putnam's fraud because of the financial crisis does not preclude a finding that Putnam's fraud caused FGIC to incur losses. *See., e.g., Designer Limousine*, 176 A.D.3d at 671-72 (even "an independent intervening act" would not necessarily relieve defendants of fraud liability). If Putnam had shown FGIC the true Pyxis portfolio, then FGIC either would not have agreed to insure Pyxis at all or would only have agreed to such a guaranty with a materially higher attachment point. How Pyxis ultimately performed during the financial crisis (which post-dated Putnam's fraud) has nothing to do with the fact that Putnam unlawfully denied FGIC the right to make an informed choice about whether, and under what conditions, to issue the Pyxis Guaranty, which ultimately led to FGIC's loss. Indeed, for another cause of loss to be considered a "superseding" one, it must be "of such an extraordinary nature or so attenuated from the defendants' conduct that responsibility for the injury should not reasonably be attributed to them." *Designer Limousine*, 176 A.D.3d at 671-72.[6] There can be no serious argument that FGIC's pecuniary loss in the form of its commutation payment under the Pyxis Guaranty was too attenuated a risk of the fraud—that FGIC would bear the burden of increased exposure to risk in the event of Pyxis's failure is precisely what was contemplated by the Pyxis Guaranty. *See also ACA Fin. Guar. Corp. v. Goldman, Sachs & Co.*, 35 Misc. 3d 1217(A), at *16 (Sup. Ct. N.Y. Cty. Apr. 23, 2012), *rev'd on other grounds*, 106 A.D.3d 494 (1st Dep't 2013) (finding monoline insurer that was fraudulently induced into incurring risk exposure based on misrepresentations about the role of the equity investor had adequately alleged loss causation because its "losses were a foreseeable result" of the misrepresentations, despite defendant's argument that "any portfolio of this type would have been swept up in the meltdown of the subprime market").[7]

Because the PCS induced FGIC to attach at a lower point, and thus incur losses in the form of a commutation payment that it would not have otherwise incurred, the harm it ultimately suffered in the wake of Pyxis's failure was a direct and proximate

---

[6] There can be more than one "proximate cause" of an injury under New York law. *Designer Limousine*, 176 A.D.3d at 671. Even if the financial crisis was a cause of the failure of Pyxis, New York recognizes that a second proximate cause of harm may operate to worsen the injury suffered. *See Alami v. Volkswagen of Am.*, 97 N.Y.2d 281, 287-88 (2002).

[7] The Appellate Division reversed *ACA* solely on the independent ground of justifiable reliance. 106 A.D.3d at 497. That Appellate Division decision was in turn reversed by the New York Court of Appeals. 32 N.E.3d 391 (2015).

result of that fraud. *Designer Limousine*, 176 A.D.3d at 671. That theory is supported by New York law, and it is law of the case.

## III.    If Judge Torres's ruling is not treated as law of the case, this Court must consider FGIC's other loss causation theories, which Judge Torres rejected.

If this Court revisits Judge Torres's repeated approval of FGIC's attachment-point loss causation theory, then it must also revisit earlier decisions in which Judge Torres erroneously rejected FGIC's alternative loss causation theories.

*First*, FGIC has established that had the Pyxis portfolio been as reflected in the PCS, and had FGIC not commuted its liability under the Pyxis Guaranty, it would have suffered roughly $68.5 million less in losses than it did based on the actual portfolio. ECF No. 204-2 (Snow Reply) ¶ 42. Under the collateral source rule, Putnam is not entitled to the benefit of Calyon's forgiveness of much of FGIC's liability under the Pyxis Guaranty. *See* ECF No. 216 (Pl. Opp. to Def. Mot. to Exclude Snow) at 8-14. Had this theory been upheld, FGIC would prove loss causation as to that $68.5 million on the basis that Putnam's wrongdoing exposed FGIC to liability up to that amount and Putnam cannot avoid liability for that harm based on Calyon's own forgiveness of FGIC's liability. *See id*. at 8-15; ECF No. 160, at 40 n.25.

*Second*, because the Pyxis Guaranty was irrevocable, all of FGIC's losses flowing from the transaction were proximately caused by Putnam's misrepresentations. *See* ECF No. 160, at 44. As FGIC argued at summary judgment, "FGIC was not merely induced to *choose to retain* [exposure to loss] by Putnam's misrepresentations; it was induced to assume an *irrevocable obligation to retain* that exposure by Putnam's misrepresentations." ECF No. 172 (Pl. Reply ISO Mot. for Partial SJ) at 18 (emphases in original). As such, all losses it suffered as a result are attributable to Putnam's misrepresentations.

*Third*, the Second Circuit in this case endorsed a theory of loss causation premised on the notion that a defendant may not shirk liability by invoking a marketwide crash to which it contributed. *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 404 n.2 (2d Cir. 2015) ("We observe that there may circumstances under which a marketwide economic collapse is itself caused by the conduct alleged to have caused a plaintiff's loss, although the link between any particular defendant's alleged misconduct and the downturn may be difficult to establish."). Judge Torres's ruling that FGIC's expert Fiachra O'Driscoll may not opine on Putnam's contributions to the housing crisis, and thus the financial crisis, despite his years of experience as a participant in the subprime mortgage financing market, effectively forecloses FGIC from advancing such an argument. *See* ECF No. 213 (Pl. Opp. to Def. Mot. to Excl. O'Driscoll) at 28-29; ECF No. 281 (*Daubert* Order) at 13-14.

Hon. Lewis J. Liman
July 1, 2020

Sincerely,

Sean Baldwin
Partner

Cc:     All Counsel of Record (*via* ECF)